IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MERCK SHARP & DOHME CORP., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 14-199 (RGA) |
| | ) | |
| XELLIA PHARMACEUTICALS APS and | ) | REDACTED - |
| XELLIA PHARMACEUTICALS INC., | ) | PUBLIC VERSION |
| | ) | |
| Defendants. | ) | |

**JOINT CLAIM CONSTRUCTION BRIEF**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Derek J. Fahnestock (#4705)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@mnat.com
dfahnestock@mnat.com

OF COUNSEL:

Brian V. Slater
Gregory B. Sephton
Jason A. Leonard
FITZPATRICK, CELLA, HARPER & SCINTO
1290 Avenue of the Americas
New York, NY  10104-3800
(212) 218-2100

*Attorneys for Plaintiff Merck Sharp & Dohme*

SHAW KELLER LLP
Karen E. Keller (#4489)
Jeffrey T. Castellano (#4837)
Stephanie E. O'Byrne (#4446)
300 Delaware Avenue, Suite 1120
Wilmington, DE  19801
(302) 298-0700
kkeller@shawkeller.com
jcastellano@shawkeller.com
sobyrne@shawkeller.com

OF COUNSEL:

Jeffrey S. Ward
Wendy M. Ward
Stephen R. Howe
MERCHANT & GOULD, P.C.
10 E. Doty Street, Suite 600
Madison, WI  53703
(608) 280-6750

Jeffrey D. Blake
MERCHANT & GOULD, P.C.
191 Peachtree Street NE, Suite 4300
Atlanta, GA  30303
(404) 954-5100

*Attorneys for Defendant Xellia*
*Pharmaceuticals ApS and Xellia*
*Pharmaceuticals, Inc.*

November 25, 2014 - Original Filing Date
December 2, 2014 - Redacted Filing Date

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iv

DISPUTED CONSTRUCTIONS ....................................................................................... vii

I.      Merck's Introduction and Background ..................................................................... 1

        A.      The Stabilizing Role of the Acetate Buffer............................................... 1

        B.      Prior *Sandoz* Litigation on the '300 Patent .............................................. 5

II.     Merck's Opening Position on the Disputed Claim Terms ....................................... 6

        A.      "effective to provide"................................................................................. 6

                1.      Merck's Proposed Construction of "effective to provide" is
                        Supported by the Intrinsic Evidence. ........................................... 6

        B.      Xellia's Proposed Additional Claim Limitations Are Not
                Supported by the Intrinsic Evidence. ......................................................... 7

III.    Xellia's Introduction and Background .................................................................. 10

        A.      The '300 Patent and Its Prosecution History ........................................... 11

        B.      Merck v. Sandoz ....................................................................................... 13

IV.     Xellia's Answering Position on the Disputed Claim Terms:
        LIMITATION (C) REQUIRES AN ACETATE BUFFER THAT IS
        DISTINCT FROM ANY  ACTETATE PRESENT DUE TO
        DISSOCIATED CASPOFUNGIN SALT AND THAT PROVIDES A
        PHARMACEUTICALLY ACCEPTABLE pH................................................ 14

        A.      The claim language demonstrates that "acetate buffer" is distinct
                from any such buffer that may be formed from dissociated
                caspofungin diacetate ............................................................................... 14

        B.      The specification and Merck's previous characterization of it in the
                *Sandoz* case demonstrates that "acetate buffer" is distinct from any
                such buffer that may be formed from dissociated caspofungin
                diacetate. .................................................................................................. 15

        C.      Merck's prior litigation statements show that the acetate buffer is
                distinct from dissociated caspofungin diacetate. ..................................... 19

                1.      Merck stated that there were no acetate-buffered
                        lyophilized formulations in the 1995 PDR. ............................... 22

                2.      Merck argued that claim 1 was non-obvious because
                        Sandoz  tried and failed to "design around" it. ......................... 23

        D.      The acetate buffer must be "effective to provide" a
                pharmaceutically acceptable pH ............................................................. 23

V.    Merck's Reply Position on the Disputed Claim Terms ................................. 24

      A.    "effective to provide"........................................................................... 24

            1.    Xellia Fails to Cite any Intrinsic Evidence to Support its
                  Construction of "effective to provide"........................................ 24

      B.    Xellia's Proposed Additional Claim Limitations Are Not
            Supported by the Intrinsic Evidence and Xellia's Judicial Estoppel
            Arguments are Unfounded..................................................................... 28

            1.    The Structure of Claim 1 Does Not Require that Acetate
                  Buffer be "Added" to the Composition. ...................................... 28

            2.    Xellia's Mischaracterization of the Intrinsic Record and the
                  Prior *Sandoz* Case Fails to Support its Argument that
                  "acetate buffer is distinct from any such buffer that may be
                  formed from dissociated caspofungin diacetate."........................ 29

            3.    Merck Is Not Judicially Estopped From Proposing a Claim
                  Construction in this Case. ........................................................... 34

            4.    Xellia's Argument that Merck "indirectly" Admitted that
                  Acetate Counterions Cannot Form Acetate Buffer is
                  Incorrect. .................................................................................... 36

            5.    Xellia's Argument that it "designed around" the '300
                  Patent Claims is Irrelevant for Claim Construction and is
                  Unfounded in Any Event. ............................................................ 37

VI.   Xellia's Sur-Reply Position on the Disputed Claim Terms ............................ 38

      I.    XELLIA'S CONSTRUCTION IS SUPPORTED BY THE
            INTRINSIC EVIDENCE, WHEREAS MERCK'S CONSTRUCTION
            IS NOT.................................................................................................. 39

            A.    Merck's construction does not give effect to the words of the claim
                  in context.............................................................................................. 39

            B.    The patent specification and file history support Xellia's
                  construction........................................................................................... 41

            C.    Merck's attempt to recast the patent's description of "switching to
                  an acetate buffer" should be rejected. .................................................. 43

      II.   EXTRINSIC EVIDENCE, INCLUDING MERCK'S OWN
            STATEMENTS REGARDING THE SCOPE OF CLAIM 1,
            SUPPORTS XELLIA'S CONSTRUCTION............................................. 44

            A.    Estoppel is the appropriate remedy to prevent Merck from
                  adopting a contrary position in this litigation. ..................................... 45

            B.    Even if estoppel does not apply, Merck's own prior statements are
                  persuasive evidence as to the meaning of limitation c). ....................... 48

VII.    Merck's Conclusion ......................................................................................................... 48

VIII.   Xellia's Conclusion......................................................................................................... 48

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Abbott Labs. v. Baxter Pharm. Prods., Inc.,*
    334 F.3d 1274 (Fed. Cir. 2003) ..................................................................... 40

*Baldwin Graphic Systems, Inc. v. Siebert, Inc.,*
    512 F.3d 1338, 1344 (Fed. Cir. 2008).............................................................. 8

*Becton Dickinson & Co. v. Tyco Healthcare Group,*
    616 F.3d 1249 (Fed. Cir. 2010) ..................................................................... 14

*Capitaliza-T Sociedad De Responsabilidad Limitada De Capital Variable*
    *v. Wachovia Bank of Del. Nat.'l Ass'n,*
    No. 10-520-RGA, 2012 WL 3150386 (D. Del. Aug. 2, 2012) ..........................34

*Chao v. Roy's Constr. Inc.,*
    517 F.3d 180 (3d Cir. 2008) ......................................................................... 34

*Dam Things from Den. v. Russ Berrie & Co.,*
    290 F.3d 548 (3d Cir. 2002) ......................................................................... 20

*Delgrosso v. Spang & Co.,*
    903 F.2d 234 (3d Cir. 1990)........................................................................... 21

*Elkay Mfg. Co. v. Ebco Mfg. Co.,*
    192 F.3d 973 (Fed. Cir. 1999) ....................................................................... 46

*Exxon Chemical Patents, Inc. v. Lubrizol Corp.,*
    64 F.3d 1553 (Fed. Cir. 1995)........................................................................ 29

*Fidelity & Deposit Co. v. Hudson United Bank,*
    653 F.2d 766 (3d Cir. 1981)........................................................................... 16

*Fitness Quest Inc., v. Monti,*
    330 F. App'x 904 (Fed. Cir. 2009) ................................................................ 20

*Genetics Inst., LLC v. Novartis Vaccines & Diagnostics, Inc.,*
    665 F.3d 1291 (Fed. Cir. 2011) ..................................................................... 48

*G-I Holdings, Inc. v. Reliance Ins. Co.,*
    586 F.3d 247 (3d Cir. 2009) ............................................................... 20, 21, 34

*Heartland Payment Sys. Inc. v. Verifone Holdings Inc.,*
    2009 U.S. Dist. LEXIS 119477 (D.N.J. Dec. 29, 2009).................................. 16

*KSR Int'l Co. v. Teleflex Inc.*,
   550 U.S. 398 (2007) ........................................................................... 5

*Markman v. Westview Instruments, Inc.*,
   52 F.3d 967 (Fed. Cir. 1995) ........................................................... 32

*MD Mall Assocs., LLP v. CSX Transp., Inc.*,
   715 F.3d 479 (3d Cir. 2013) ...................................................... 20, 21

*Merck & Co. v. Teva Pharms. USA, Inc.*,
   395 F.3d 1364 (Fed. Cir. 2005)................................................... 24, 27

*Minn. Mining & Mfg. Co. v. Chemque, Inc.*,
   303 F.3d 1294 (Fed. Cir. 2002)......................................................... 20

*Montrose Med. Group Participating Sav. Plan v. Bulger*,
   243 F.3d 773 (3d Cir. 2001) ....................................................... 21, 34

*New Hampshire v. Maine*,
   532 U.S. 742 (U.S. 2001)........................................................... 20, 47

*Novartis Pharmaceuticals Corp. v. Watson Labs., Inc.*,
   Case No. 11:11-cv-01077-RGA,
   Order dated June 21, 2013 (D.I. 250) .............................................. 40

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) (en banc) ....................................... 48

*SanDisk Corp. v. Memorex Products, Inc.*,
   415 F.3d 1278 (Fed. Cir. 2005)................................................... 35, 46

*Sanofi-Aventis U.S. LLC v. Sandoz, Inc.*,
   Nos. 2009-1427, 2009-1444,
   2009 WL 2905997 (Fed. Cir. Sept. 10, 2009) ................................. 29

*Scarano v. Central R. Co.*,
   203 F.2d 510 (3d Cir. 1953.)............................................................ 22

*Shire Development, LLC v. Watson Pharms., Inc.*,
   746 F.3d 1326 (Fed. Cir. 2014) ....................................................... 14

*Shire Labs., Inc. v. Corepharma, LLC*,
   2008 U.S. Dist. LEXIS 88617 (D.N.J. Nov. 3, 2008)...................... 22

*Source Search Techs., LLC v. LendingTree, LLC*,
   588 F.3d 1063 (Fed. Cir. 2009)........................................................ 20

*Vanguard Prods. Corp. v. Parker Hannifin Corp.,*
    234 F.3d 1370 (Fed. Cir. 2001) .......................................................................................... 8

**Other Authorities**

Manual of Patent Examining Procedure ("MPEP") § 2111.03 .................................................... 31

## DISPUTED CONSTRUCTIONS

The only disputed claim term from Claim 1 of U.S. Patent No. 5,952,300 is as follows:

| Claim Term/Phrase for Construction | Merck's Proposed Construction | Xellia's Proposed Construction |
| --- | --- | --- |
| "a pharmaceutically acceptable amount of an acetate buffer effective to provide a pharmaceutically acceptable pH" | A pharmaceutically acceptable amount of an acetate buffer is present such that the resulting composition has a pharmaceutically acceptable pH. | A pharmaceutically acceptable amount of acetate buffer that is added to the composition as a separate component to provide a pharmaceutically acceptable pH, and which is distinct from acetate that may be present due to dissociation of the caspofungin salt of element a). |

I.      **Merck's Introduction and Background**

Plaintiff Merck Sharp & Dohme Corp. ("Merck") sued Defendant Xellia Pharmaceuticals ApS ("Xellia") under the Hatch-Waxman Act for infringement of U.S. Patent No. 5,952,300 ("the '300 patent") covering Merck's Cancidas® medicine, a first-in-class treatment for life-threatening, systemic fungal infections.

In 1992, after several years of research, Merck scientists discovered an important new compound which showed great potential for treating life-threatening fungal infections.  That new compound, called caspofungin, which eventually became the active ingredient of Cancidas®, was a powerful but unfortunately highly unstable molecule.  In 1995, Merck scientists discovered and patented novel formulations that unexpectedly enhance the stability of caspofungin, allowing it to be sold as a commercial, shelf-stable, drug product.  ('300 patent, col. 2, ll. 23-26 & 32-56, Joint Statement Ex. B).[1]  Key to the enhanced stability of these formulations is freeze-drying (*i.e.*, lyophilizing) a solution containing caspofungin (or a pharmaceutically acceptable salt thereof), in the presence of sodium acetate and acetic acid, *i.e.*, an acetate buffer.  ('300 patent, col. 2, ll. 32-56; col. 3, ll. 17-21, Joint Statement Ex. B).  The freeze-dried compositions are later diluted with a suitable diluent (*i.e.*, reconstituted) so they can be intravenously administered to patients.  ('300 patent, col. 2, ll. 12-18; col. 3, ll. 57-61, Joint Statement Ex. B).

A.      **The Stabilizing Role of the Acetate Buffer**

Claim 1 of the '300 patent covers pharmaceutical compositions containing caspofungin, which are stabilized by the presence of an acetate buffer.  ('300 patent, col. 2, ll. 23-26, 28-30, & 32-56; col. 3, ll. 17-23, Joint Statement Ex. B.)  Before discovering that acetate buffer had this

---

[1]      "Joint Statement" refers to the Joint Claim Construction Statement (D.I. 40) filed on August 26, 2014.

unexpected stabilizing effect on caspofungin, the inventors first attempted to formulate the highly unstable caspofungin diacetate salt by formulating it in the presence of tartrate buffer. ('300 patent, col. 2, ll. 26-28 & 63-65, Joint Statement Ex. B.) This mixture of acetate[2] and tartrate improved the stability of caspofungin, providing a formulation that was, according to the inventors, "relatively stable" compared to the highly unstable caspofungin diacetate. ('300 patent, col. 2, ll. 63-67, Joint Statement Ex. B.) But there were still relatively high levels of unwanted impurities in the formulation when tartrate was present with the acetate. ('300 patent, col. 2, ll. 26-28 & 65-67, Joint Statement Ex. B.)

As a result of further experimentation, the inventors unexpectedly discovered that the presence of an acetate buffer provided the improved stability of caspofungin in the lyophilized formulations. ('300 patent, col. 2, ll. 23-26, 28-30, & 32-56, Joint Statement Ex. B.) In particular, they found that compositions containing only acetate buffer were surprisingly more stable than the acetate/tartrate buffered formulations. ('300 patent, col. 3, ll. 1-4; col.8, ll. 45-67, Joint Statement Ex. B.) This demonstrated that acetate was stabilizing caspofungin while tartrate was not. ███████████████████████████

██████████████████████████ (Joint Appendix Ex. 1-C at pp. 213:15-214:22.)

The prosecution history of the '300 patent was dominated by consideration of the role that acetate buffer plays in the claimed caspofungin formulations. Initially, the patent examiner rejected the claims on the ground that stabilizing a peptide like caspofungin by using *any* buffer to control the pH of the formulations —including acetate, citrate, or tartrate buffers—was obvious. (Joint Statement Ex. I, at MRK_CAN_X0000296-98.) But Merck overcame this

---

[2]    There is no dispute among the parties that caspofungin diacetate will dissociate in solution to form caspofungin and acetate ions. (Joint Statement Ex. A; Joint Appendix Ex. 1-A at pp. 6-8; Joint Appendix 1-B at § I.A.)

rejection by explaining the unique role that acetate buffer plays to stabilize caspofungin in the claimed formulations.  Notably, Merck pointed out that the acetate buffer in the claimed invention was "***clearly doing more than merely buffering the formulation*** and would not be obvious to one of ordinary skill in the art."  (Joint Statement Ex. J, at MRK_CAN_X0000309-10) (emphasis added.)  The examiner agreed with Merck's assessment of the results, stating "Applicant has demonstrated that the species of the genus [of buffers] are not equivalent.  The specification shows that tartrate buffer unexpectedly destabilizes [caspofungin] while ***acetate has an unforeseen stabilizing effect on the formulation***."  (Joint Statement Ex. L, at MRK_CAN_X0000315) (emphasis added.)  Thus, the examiner allowed Claim 1, which requires an acetate buffer be present in the formulation.

*   *   *

Xellia seeks FDA approval to market its generic drug products, caspofungin acetate injectable formulations for intravenous infusion, 50 mg and 70mg ("Xellia's ANDA Products") prior to the expiration of the '300 patent.  Xellia has stipulated that the '300 patent is valid and enforceable and that the manufacture, use, offer for sale, or sale within the United States or importation into the United States of Xellia's ANDA Products meets all of the limitations of Claim 1 of the '300 patent with the exception of sub-phrase (c):  "*a pharmaceutically acceptable amount of an acetate buffer effective to provide a pharmaceutically acceptable pH*."  (Stipulated Order, D.I. 26 (May 22, 2014)).  Thus, only claim construction and infringement of sub-phrase (c) of Claim 1 remain at issue in this case.  In an attempt to avoid infringement, Xellia proposes

to ignore some of the language in this sub-phrase of the claim and add limitations that have no basis in the intrinsic record.[3]

Much of the language of sub-phrase (c) is not in dispute.  In particular, Xellia has not disputed, or provided constructions for, the following three portions of sub-phrase (c):  "a pharmaceutically acceptable amount of"; "an acetate buffer"; and "a pharmaceutically acceptable pH".

As shown in the table below, the parties have two disputes:  first, the proper construction of "effective to provide", and second, the propriety of Xellia's request that the Court import two additional claim limitations into sub-phrase (c).

| Sub-phrase (c) | Merck's Proposed Construction | Xellia's Proposed Construction |
|---|---|---|
| effective to provide | such that the resulting composition has | to provide |
|  | [an acetate buffer] is present | [an acetate buffer] that is added to the composition as a separate component . . .<br><br>, and which is distinct from acetate that may be present due to dissociation of the caspofungin salt of element a). |

As explained below, Merck's construction of "effective to provide" is supported by the intrinsic evidence.  Xellia's definition, which deletes the word "effective" from that phrase, is neither supported nor helpful to the Court, and should be rejected.

---

[3]  ████████████████████████████████████████████
████████████████████████████████████████████
████████  (Merck Sharp & Dohme Corp.'s Revised Infringement Contentions, served Sept. 9, 2014, Joint Appendix Ex. 1-E).

Additionally, the Court should reject Xellia's improper attempt to graft additional limitations onto the claim term "an acetate buffer". Both the specification and the prosecution history make clear that the acetate buffer need only be *present* in the composition. And, as Claim 1 is a composition claim, Xellia's proposal to import claim limitations on *how* the acetate buffer is introduced into the composition is unjustified. To do so would improperly convert a composition claim into a process claim when the patent already has separate claims to a process (Claim 7) and a product-by-process (Claim 8).

### B.      Prior *Sandoz* Litigation on the '300 Patent

The validity of Claim 1 was subsequently attacked in a prior patent litigation between Merck and Sandoz. (*Merck & Co., Inc. v. Sandoz Inc.*, 2-10-cv-01625 (D.N.J.).) In that litigation, Sandoz argued that Claim 1 would have been obvious to a person of ordinary skill in the art ("POSA") because, *inter alia*, a POSA would have first selected caspofungin diacetate salt for formulation development, and, having made that selection, would next select an acetate buffer to "match" the acetate counterion of the caspofungin salt already present in the formulation. (Joint Appendix Ex. 1-D at ¶¶ 78, 82, 84, 97.)

But Sandoz was unsuccessful in challenging the validity of Claim 1. Just before trial, Merck submitted a motion for summary judgment on Sandoz's obviousness defense. (Joint Appendix Ex. 2-B.) In ruling in Merck's favor, the Court found that Sandoz was unable to raise a dispute of material fact in support of its defense. (Joint Appendix Ex. 2-C, at pp. 8-17.) In particular, the Court found that Sandoz would be unable to prove at trial that the claimed invention was even "obvious to try" under the Supreme Court's *KSR* standard. *See KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398 (2007). While Xellia cites to various filings in the *Sandoz* case, including statements made by Merck's expert in response to Sandoz's flawed arguments, none of

Merck's statements in this prior case are inconsistent with its positions here, and, as a result, Xellia's attempted mischaracterizations of such statements are incorrect.

*   *   *

The Court therefore should adopt Merck's construction of sub-phrase (c) of Claim 1:  "a pharmaceutically acceptable amount of an acetate buffer [is present] such that the resulting composition has a pharmaceutically acceptable pH."

## II.     Merck's Opening Position on the Disputed Claim Terms

### A.     "effective to provide"

#### 1.     Merck's Proposed Construction of "effective to provide" is Supported by the Intrinsic Evidence.

The intrinsic evidence supports Merck's proposed construction that "effective to provide [a pharmaceutically acceptable pH]" means "such that the resulting composition has [a pharmaceutically acceptable pH]."  First, the patent specification explains that the lyophilized compositions are diluted at the time of administration to a patient, and it is the resulting, reconstituted composition that is administered intravenously to the patient.  ('300 patent, col. 2, ll. 12-18; col. 3, ll. 57-61; col.8, ll. 35-38, Joint Statement Ex. B).  Moreover, in the Summary of the Invention, the patent specification states that "[t]he lyophilized cake is then reconstituted for use by dilution…The patient is then infused with this solution…with the *resultant composition* having a pH of about 5 to 7."  ('300 patent, col. 2, ll. 12-18, emphasis added, Joint Statement Ex. B).  Thus, the intrinsic record supports the construction of "effective to provide [a pharmaceutically acceptable pH]" to mean "such that the resulting composition has [a pharmaceutically acceptable pH]."

As Xellia has failed to provide any proposed construction for "effective to provide" (other than to drop the claim word "effective"), and the intrinsic evidence supports Merck's proposed construction, the Court should adopt Merck's construction.

>    **B.**   **Xellia's Proposed Additional Claim Limitations Are Not Supported by the Intrinsic Evidence.**

In its proposed construction of sub-phrase (c), Xellia asks the Court to import two additional limitations into Claim 1 that would further limit the claim term "an acetate buffer". (Joint Statement Ex. A).  These additional claim limitations appear solely motivated by Xellia's attempt to create a non-infringement position, and they should be rejected by the Court for at least the reasons provided below.

Despite clear intrinsic evidence of, and a lack of ambiguity in, the meaning of "an acetate buffer", Xellia instead insists on importing into Claim 1 additional limitations regarding "an acetate buffer".  First, Xellia contends that sub-phrase (c) of Claim 1 requires an acetate buffer "that is *added* to the composition as a separate component."  (Joint Statement Ex. A, emphasis added).  Second, Xellia argues that sub-phrase (c) requires an acetate buffer "which is distinct from acetate that may be present due to dissociation of the caspofungin salt of element a)."  (*Id*.). Both of these additional limitations focus not on *what* the term "an acetate buffer" means to a person of ordinary skill in the art ("POSA"), but on *how* the acetate buffer is introduced into the claimed compositions.  However, as shown by the claims themselves, as well as the specification and the prosecution history, the key to the claimed compositions, including Claim 1, is the *presence* of an acetate buffer in the composition, which imparts shelf-stability to the claimed caspofungin formulations.

The claims support Merck's claim construction.  Claim 1 requires that an acetate buffer be present in the claimed composition ("A pharmaceutical composition . . .comprising . . .

(c) . . . an acetate buffer"). There is no justification for importing into Claim 1 a restriction on *how* the acetate buffer is introduced into the composition. When the Applicants intended to claim how an acetate buffer is generated in the composition, they expressly included claim language to specify "adding acetic acid," as was done in Claim 7, sub-phrase (b). Claim 1 does not state how an acetate buffer must be formed, and there is no justification for importing such a limitation into Claim 1. Thus, Xellia's proposed construction improperly attempts to convert a composition claim into a process claim when the patent already has separate claims to a process (Claim 7) and a product-by-process (Claim 8). *See*, *e.g.*, *Vanguard Prods. Corp. v. Parker Hannifin Corp.*, 234 F.3d 1370, 1372 (Fed. Cir. 2001) ("A novel product that meets the criteria of patentability is not limited to the process by which it was made."); *Baldwin Graphic Systems, Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1344 (Fed. Cir. 2008) ("Despite [the] similarities [of a term in the product and process claims at issue], these claims are directed toward different classes of patentable subject material under 35 U.S.C. § 101. Courts must generally take care to avoid reading process limitations into an apparatus claim because the process by which a product is made is irrelevant to the question of whether that product infringes a pure apparatus claim.") (citations omitted).

The specification also expressly supports Merck's construction. The Applicants made clear that their composition inventions require the "presence" of an acetate buffer: "[i]t has been found that the compound of the formula [caspofungin structure] and the pharmaceutically acceptable salts thereof are significantly more stable on storage when formulated in the ***presence*** of an acetate buffer." ('300 patent, col. 2, ll. 32-56, emphasis added, Joint Statement Ex. B). The specification further explains that "[t]he [acetate] buffer is typically ***present*** in the range of

about 12.5 mM to about 200 mM with a preferred range of about 25 mM to about 50mM." ('300

patent, col. 3, ll. 21-23, emphasis added, Joint Statement Ex. B).

The prosecution history also supports Merck's proposed construction that Claim 1

concerns the *presence* of an acetate buffer in the composition inventions of the '300 patent.  In

responding to an office action, the Applicants described the invention as directed to "a particular

compound contained *in a* particular pharmaceutical composition."  (Joint Statement Ex. F,

emphasis added, at MRK_CAN_X0000227).  In support of this statement, the Applicants

supplied a manuscript concerning their work to develop a stable formulation of caspofungin for

intravenous administration.  (Joint Statement Ex. F, at MRK_CAN_X0000229-268).  The

Applicants stated: "[i]n conclusion, [caspofungin] has been stabilized by lyophilizing it *in an*

acetate buffer system…"  (Joint Statement Ex. F, emphasis added, MRK_CAN_X0000229).

Thus, the Applicants emphasized the importance to stability of the *presence* of an acetate buffer

in the composition, rather than *how* the acetate buffer was introduced into the composition.

Xellia's proposed additional claim limitations, therefore, contradict the intrinsic evidence.

Merck's "presence only" construction, by contrast, is fully supported by the intrinsic evidence

and should be adopted.

*   *   *

Given the lack of any ambiguity in or dispute as to the meaning of "an acetate buffer"

and the failure of the intrinsic evidence to support Xellia's additional limitations, the Court

should reject Xellia's improper attempt to import these limitations into the claim and maintain

the term's ordinary and customary meaning.  If the Court finds it necessary to affirmatively

address Xellia's proposed additional limitations, then the proper limitation the Court should

include is "is present".

III.   **Xellia's Introduction and Background**

As shown in the parties' Joint Claim Construction Chart (D.I. 40, Ex. A), the only claim

construction dispute is the meaning of limitation c) of claim 1 of the '300 patent, which recites "a

pharmaceutically acceptable amount of an acetate buffer effective to provide a pharmaceutically

acceptable pH." (D.I. 40-1, Ex. B at col. 9, ll. 58-60.) The Court should construe this limitation

as follows:

> **Xellia's proposed construction**: A pharmaceutically acceptable
> amount of acetate buffer that is added to the composition as a
> separate component to provide a pharmaceutically acceptable pH,
> and which is distinct from acetate that may be present due to
> dissociation of the caspofungin salt of element a).

This construction of limitation c) is required by the claims, specification and prosecution history

of the '300 patent, each of which clearly demonstrate that the claimed acetate buffer is a separate

component added to the composition. Further, unequivocal statements made by Merck in prior

litigation over the same claim demonstrate that Merck's true understanding of the meaning of

this limitation is the same as Xellia's.

In contrast, Merck's proposed construction in this litigation is not supported by the

intrinsic evidence and directly contradicts its prior litigation statements. Specifically, Merck now

argues only that acetate buffer must be "present," (*supra* at 5) and that the resulting composition

"has" a pharmaceutically acceptable pH (*Supra* at 6). However, in addition to running afoul of

the instrinsic evidence and its own prior litigation statements, Merck's construction: 1) wrongly

parses the limitation such that "acetate buffer" is removed from its context in the claim, and 2)

eliminates the requirement that there be an amount of acetate buffer in the composition that is

"effective to provide a pharmaceutically acceptable pH."

Merck's proposed construction is a precursor to its infringement argument. ███████

████████████████████████████████████████████████████████████████████

████████ ), Merck must rely on its improper construction and an unsupported theoretical possibility—that acetic acid forms *in situ* from the caspofungin diacetate salt and forms an acetate buffer when Xellia's lyophilized product is reconstituted.[4] When the disputed limitation is properly construed, Merck's infringement argument falls apart at the seams. For the reasons that follow, the court should adopt Xellia's claim construction.

### A.    The '300 Patent and Its Prosecution History

The '300 patent describes and claims a pharmaceutical composition for intravenous administration to a patient containing caspofungin or its salts as the active ingredient. (D.I. 40-1, Ex. B at col. 1, ll. 36-64.) Claim 1 of the '300 patent, the only claim at issue, reads:

> 1.    A pharmaceutical composition for intravenous administration to a patient comprising
>
> a)  a pharmaceutically effective amount of [caspofungin] and the pharmaceutically acceptable salts thereof,
>
> b)   a pharmaceutically acceptable amount of an excipient effective to form a lyophilized cake; and
>
> **c)  a pharmaceutically acceptable amount of acetate buffer effective to provide a pharmaceutically acceptable pH.**

(*Id.* at col. 9, ll. 26-60) (emphasis added).

In addition to the active ingredient, the claimed composition contains an excipient, such as a bulking agent, "to provide an aesthetically suitable lyophilized cake, solid dilution of the active ingredient, and sorption of available moisture." (*Id.* at col. 3, ll. 24-27.) Further, the claimed "pharmaceutically acceptable amount of an acetate buffer effective to provide a

---

[4]    Xellia disputes that this phenomenon occurs in its product.

pharmaceutically acceptable pH" is said to provide enhanced chemical stability to the composition. (*Id.* at col. 2, ll. 22-30.)

The examples provided in the '300 patent describe various lyophilized formulations of a caspofungin salt, caspofungin diacetate, that include either an acetate or tartrate buffer. (*Id.* at col. 8, ll. 11-59.) The formulations having an acetate buffer are said to be "significantly more stable" and are described as showing "significantly less of the unwanted degradates than the other formulations." (*Id.* at col. 8, ll. 65-67.) The specification characterizes these results as surprising. (*Id.*)

During prosecution of the application that led to the '300 patent, the applicant relied on these surprising results to establish patentability of the claimed formulations. In particular, the examiner repeatedly rejected pending claims substantially similar to the issued claims as obvious over various prior art references. The examiner argued that in view of the cited references: 1) caspofungin was known, 2) lyophilization was a well-known technique, and 3) it was known that buffers, such as acetate buffer, could be used to avoid pH changes. (D.I. 40-1, Ex. E at 5-9; D.I. 40-2, Ex. G at 5-7; D.I. 40-2, Ex. I at 3-5.)

Eventually, Merck overcame these rejections. It argued that one of ordinary skill in the art would select a buffer based on the pH that was being controlled, and based on this criteria, one would not have chosen an acetate buffer. Instead, Merck argued, another buffer, such as citrate or phosphate would have been chosen. (D.I. 40-2, Ex. J at 2.) Additionally, in an interview, Merck argued (and the examiner accepted) that the stabilization of caspofungin using an acetate buffer was unexpected, because from a well-known pharmaceutical reference it could not be predicted that acetate would have a stabilizing effect while tartrate would have a destabilizing effect. (D.I. 40-2, Ex. K.)

In the Notice of Allowance, the examiner stated that the obviousness rejection had been overcome by the unexpected stabilizing effect of the acetate buffer in comparison to the tartrate buffer. (D.I. 40-2, Ex. L at 2.)

### B.   Merck v. Sandoz

On March 30, 2010, Merck filed suit in the United States District Court for the District of New Jersey against Sandoz Inc. alleging Sandoz's ANDA directed to a generic caspofungin acetate injection product infringed the '300 patent. Joint Appendix Ex. 2-A at 3-4.) Although Sandoz's proposed ANDA product was an identical copy of Merck's Cancidas product, during development of its generic product Sandoz had attempted to "design-around" the '300 patent claims "by substituting other buffers in the place of acetate buffer." (Joint Appendix Ex. 2-B at 21-22.) As a defense to Merck's infringement claims, Sandoz alleged that the '300 patent was invalid for obviousness. (*Id.* at 1.)

In due course, Merck moved for summary judgment of non-obviousness. (Joint Appendix Ex. 2-B.) Among the arguments Merck advanced in support of its motion was that the inventors unexpectedly discovered that using an acetate buffer in place of a tartrate buffer significantly reduced the amount of degradation of caspofungin. (*Id.* at 20-21.) Merck also argued that Sandoz's failure to design-around "show[s] the superior and unexpected results of using an acetate-buffered lyophilized formulation." (*Id.* at 22.) The court granted Merck's motion in an opinion and order issued on January 30, 2012 (Joint Appendix Exs. 2-C, 2-D.) Ultimately, the case settled and a consent judgment was entered on April 13, 2012. (Joint Appendix Ex. 2-E.)

**IV.**     **Xellia's Answering Position on the Disputed Claim Terms:**

**LIMITATION (C) REQUIRES AN ACETATE BUFFER THAT IS DISTINCT FROM ANY ACTETATE PRESENT DUE TO DISSOCIATED CASPOFUNGIN SALT AND THAT PROVIDES A PHARMACEUTICALLY ACCEPTABLE pH**

**A.     The claim language demonstrates that "acetate buffer" is distinct from any such buffer that may be formed from dissociated caspofungin diacetate**

First, the claim structure requires that the acetate buffer component is separate from the caspofungin (salt) component. Claim 1 requires **both** a) caspofungin or one of its salts **and** c) an acetate buffer. This structure alone suggests that the caspofungin (salt) and acetate buffer each must be separately present in the claimed composition. *Shire Development, LLC v. Watson Pharms., Inc.*, 746 F.3d 1326, 1332 (Fed. Cir. 2014) (holding that where separate claim elements recite "inner lipophilic matrix" and "outer hydrophobic matrix," two separate and distinct matrices are required); *Becton Dickinson & Co. v. Tyco Healthcare Group*, 616 F.3d 1249, 1254 (Fed. Cir. 2010) ("Where a claim lists elements separately, 'the clear implication of the claim language' is that those elements are 'distinct component[s]' of the patented invention.") (citation omitted).

Moreover, even if it were theoretically possible that a single element (here, the caspofungin diacetate salt) could do "double duty" by meeting more than one claim limitation, there is not a shred of evidence in the '300 patent specification that limitations a) and c) can be collapsed into a single element. *See Becton Dickinson*, 616 F.3d at 1254-1255 (holding that separately claimed elements described as separate structures in the specification could not be construed to be met by the same structure). In fact, as explained below, the specification teaches exactly the opposite.

**B.** **The specification and Merck's previous characterization of it in the *Sandoz* case demonstrates that "acetate buffer" is distinct from any such buffer that may be formed from dissociated caspofungin diacetate.**

The specification of the '300 patent indicates that the invention provides "enhanced chemical stability" to caspofungin or caspofungin salt formulations compared to prior formulations employing a tartrate buffer. (D.I. 40-1, Ex. B at col. 2, ll. 22-56.) According to the specification, the tartrate-buffered formulations contained significant amounts of unwanted degradation products. (*Id.*)  The specification further states that "[b]y switching to an acetate buffer, the lyophilized product is more stable, contains less of unwanted degradates while extending the shelf life of the composition." (*Id.* at col. 3, ll. 1-4.) The phrase "switching to an acetate buffer" is instructive. If the acetate buffer came from dissociated caspofungin diacetate, as Merck contends, then the buffer would already be present, and there would be no "switching" from a tartrate buffer to an acetate buffer.

The advantage purportedly observed by "switching to an acetate buffer" is demonstrated in Examples 1-8, where various formulations of caspofungin diacetate were prepared.[5] (*Id.* at col. 8, l. 11-59.) The formulations contained either added acetate buffer or added tartrate buffer. (*Id.*) According to the inventors, "[i]t was surprisingly found that [the acetate-buffered formulations] were significantly more stable and showed significantly less of unwanted degradates than the [tartrate-buffered] formulations." (*Id.* at col. 8, ll. 65-67.)

Importantly for purposes of claim construction, these examples plainly show that any "acetate buffer" that could theoretically form in a composition from dissociated caspofungin diacetate is insufficient to provide the purported benefit of the invention, *i.e.*, unexpected stability.

---

[5]     In support of its claim construction in the *Sandoz* case, Merck submitted the Declaration Stephen R. Byrn, Ph.D., which states that a person of skill in the art would understand that Example 1 describes preparation of compositions using the diacetate salt of caspofungin based on the language "42 mg/ml equivalent of Compound I." (*See* Joint Appendix Ex. 2-F at ¶¶39-40.)

In other words, if acetate buffer that is merely "present" or forms from dissociated caspofungin diacetate is all that is required, the tartrate-buffered compositions would also provide stable compositions. According to the specification, they do not.

In fact, in the prior case with Sandoz, Merck's expert Dr. Byrn succinctly made this very point in his rebuttal expert report. When Sandoz's expert, Dr. Staples, alleged that Merck misled the patent office by failing to account for the buffering capacity of the diacetate salt, Dr. Byrn replied:

> 100.    Third, Dr. Staples states that the inventors misled the Patent Office by failing to account for the contribution of acetate from the caspofungin salt to the buffering capacity of the acetate buffered formulations. (Staples Report ¶ 68.) Dr. Staples neglects that **the same amount of acetate contributed from the caspofungin diacetate salt** would also be present in the tartrate buffered formulations, **formulations that were not stable**.
>
> 101.    The inventors discovered that **adding an acetate buffer** contributed to the stability of the caspofungin formulation, and that this **additional acetate buffer** was doing something more than merely buffering the pH of the formulation (*i.e.,* stabilization of caspofungin is not the result of pH control.) This is unexpected because the diacetate salt of caspofungin is not stable (See ¶ 47 above), **so a POSA would not have expected adding additional acetate would stabilize the formulation**.

(Joint Appendix Ex. 2-F at 29, emphasis added.)

Thus, even according to Merck's own expert, the composition of the invention requires "additional acetate buffer" over and above any which may have been present due to dissociation of the caspofungin diacetate itself, because without it, the formulations are not stable.[6]

---

[6]    As discussed in Section IV. C. below, Merck is judicially estopped from asserting a position that is inconsistent from the arguments made in the *Sandoz* case because those arguments were relied upon by the New Jersey District Court in granting summary judgment in favor of Merck. At a minimum, Merck's statements are considered evidence relevant to claim construction in this proceeding. *See, e.g.*, *Fidelity & Deposit Co. v. Hudson United Bank*, 653 F.2d 766, 777 (3d Cir. 1981); *Heartland Payment Sys. Inc. v. Verifone Holdings Inc.*, 2009 U.S. Dist. LEXIS 119477 at *40 (D.N.J. Dec. 29, 2009).

Requiring that the "acetate buffer" of limitation c) is a separate component from the caspofungin salt of limitation a) is also logical in view of the description in the specification of the method of preparing the acetate-buffered formulations of the invention. That method includes adding a quantity of acetic acid and either sodium hydroxide or sodium acetate (to form an acetate buffer). (*See, e.g.*, D.I. 40-1, Ex. B at col. 2, ll. 4-18; col. 3, ll. 17-24; col. 8, ll. 24-34.) Nowhere does the specification describe preparation of a self-buffering formulation of a caspofungin diacetate salt, i.e., a composition in which additional acetate buffer is *not* added.





(Joint Appendix Ex. 2-G at 48:4 – 49:18, emphasis added.)



Merck's proposed construction here runs afoul of this testimony and should be rejected.

Finally, in an effort to divert attention from the real issue, Merck argues that Xellia's construction introduces process elements into a composition claim. The issue is not ***how*** the acetate buffer gets into the composition, but that the "amount of acetate buffer" in the composition is an amount that is distinct from any amount of acetate buffer that allegedly may form from dissociation of the caspofungin diacetate molecule. According to the '300 patent specification and Merck's own prior litigation statements, dissociated acetate ions, if present, do not meet limitation c).

**C.** **Merck's prior litigation statements show that the acetate buffer is distinct from dissociated caspofungin diacetate.**

In its prior suit with Sandoz, Merck argued that claim 1 is directed to a shelf stable, lyophilized formulation and that *only* the use of acetate buffer in such a formulation resulted in stability for an extended period. In making this argument, Merck stated in its summary judgment pleadings that "additional" acetate buffer was required to provide this unexpectedly superior stability. In particular, Merck repeatedly distinguished the added acetate buffer from the acetate counterion (the "salt" portion of the caspofungin diacetate). As but a few examples of many, Merck stated:

- "... [Sandoz's expert] provides no reason why a POSA would have thought that ***adding in additional*** acetate in the form of a buffer would improve stability when the acetate salt itself was highly unstable." (Joint Appendix Ex. 2-B at 19.)

- "In fact, the only lyophilized product containing acetate in the prior art that [Sandoz's expert] could identify had acetate present as the counterion to the drug (***not as a buffer***), and that acetate was lost as a result of lyophilization." (Joint Appendix Ex. 2-H at 28.)

- "A POSA would not have been motivated to ***choose a buffer to match the counterion*** of a drug compound." (Joint Appendix Ex. 2-I at 19, ¶105.)

Each of these statements demonstrates that limitation c) of claim 1 should be interpreted to exclude any acetate counterion present in solution from dissociation of caspofungin diacetate. Contrary to its arguments in the *Sandoz* case, Merck now argues in essence that the counterion can actually serve as the acetate buffer.

This court should not permit Merck to have its cake and eat it too. Specifically, because Merck's arguments formed the basis for its successful motion for summary judgment, Merck should be judicially estopped from raising contrary arguments in this court. Judicial estoppel is an equitable doctrine that may be invoked in order to protect the integrity of the court by

preventing a party from asserting a claim that is inconsistent with one taken by that party in a previous proceeding. *See, e.g.*, *New Hampshire v. Maine*, 532 U.S. 742, 749-751 (U.S. 2001). This doctrine has been specifically held to be applicable to claim construction arguments. *See, e.g.*, *Minn. Mining & Mfg. Co. v. Chemque, Inc.*, 303 F.3d 1294, 1302-03 (Fed. Cir. 2002); *Fitness Quest Inc., v. Monti*, 330 F. App'x 904, 914 (Fed. Cir. 2009).

The Supreme Court has held that although its application should not involve "inflexible prerequisites or an exhaustive formula" there are several factors that typically inform whether judicial estoppel is an appropriate remedy. *New Hampshire*, 532 U.S. at 749-751. First, the party's position "must be clearly inconsistent with its earlier position." *Id*. at 750. Second, "courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create 'the perception that either the first or the second court was misled.'" *Id*. at 750-751. And third, a court should consider "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *Id*. at 751.

In the Third Circuit,[7] this standard has been interpreted as having three general requirements: "there must be (1) irreconcilably inconsistent positions; (2) adopted in bad faith; and (3) a showing that estoppel addresses the harm and no lesser sanction is sufficient." *MD Mall Assocs., LLP v. CSX Transp., Inc.*, 715 F.3d 479, 486 (3d Cir. 2013) (quoting *G-I Holdings, Inc. v. Reliance Ins. Co.*, 586 F.3d 247, 262 (3d Cir. 2009)); *see also Dam Things from Den. v. Russ Berrie & Co.*, 290 F.3d 548 (3d Cir. 2002). However, the Third Circuit has

---

[7]    Because the issue of judicial estoppel is not one reserved for the Federal Circuit, when the Federal Circuit encounters this issue, it applies the law of the circuit where the case originated. *See, e.g.*, *Source Search Techs., LLC v. LendingTree, LLC*, 588 F.3d 1063, 1071 (Fed. Cir. 2009) ("Whether judicial estoppel applies is a matter of regional circuit law.")

noted that despite the fact that these three general factors should be taken into account, "[t]here is no rigid test for judicial estoppel." *G-I Holdings, Inc. v. Reliance Ins. Co.*, 586 F.3d 247, 262 (3d Cir. 2009).

Each of the three general requirements for the application of judicial estoppel, as outlined by the Supreme Court and interpreted by the Third Circuit, is met here. First, as shown above, Merck took the clear position in the *Sandoz* litigation that the acetate buffer is added as a separate component to the caspofungin formulation to stabilize it. That position is in direct conflict with the claim construction arguments Merck now advances. *See MD Mall*, 715 F.3d at 486.

Second, Merck's statements were advanced in support of its successful motion for summary judgment on Sandoz's obviousness defense. By now arguing the antithesis of its previously successful arguments, Merck has engaged in "playing fast and loose with the court" — the very conduct that the doctrine of judicial estoppel was designed to protect against. *Montrose Med. Group Participating Sav. Plan v. Bulger*, 243 F.3d 773, 779 (3d Cir. 2001).

Third, application of judicial estoppel is especially appropriate in this circumstance, as the benefit conferred on Merck by its bad faith is clear. By arguing two sides of the same coin, Merck has convinced one court to uphold the validity of its patent and extend its monopoly. Merck now attempts to further benefit by seeking a finding of infringement of the same patent, but with the opposite claim construction position. *See Delgrosso v. Spang & Co.*, 903 F.2d 234, 241 (3d Cir. 1990) ("To permit a party to assume a position inconsistent with a position it had successfully relied upon in a past proceeding 'would most flagrantly exemplify . . . playing fast and loose with the courts which has been emphasized as an evil the courts should not tolerate.'") (quoting *Scarano v. Central R. Co.*, 203 F.2d 510, 513 (3d Cir. 1953.)) Had Merck adopted its current

position in the previous case, it is entirely possible that there would no longer be a valid patent for it to claim infringement of by Xellia. This type of conduct should not be allowed by this Court—otherwise Merck will effectively be rewarded for its inconsistent and cynical actions. *See Shire Labs., Inc. v. Corepharma, LLC*, 2008 U.S. Dist. LEXIS 88617, at *25 (D.N.J. Nov. 3, 2008).

### 1.       Merck stated that there were no acetate-buffered lyophilized formulations in the 1995 PDR.

In addition to its direct statements distinguishing the acetate buffer from the acetate counterion, Merck also indirectly made this point in its prior litigation. Specifically, Merck argued that the claimed invention was nonobvious, in part, because none of the lyophilized drug products listed in the 1995 Physician's Desk Reference ("1995 PDR") included an acetate buffer:

> Indeed, Dr. Staples does not dispute that as of 1995 over 80% of the marketed lyophilized drug formulations did <u>not</u> contain a buffer. . . In particluar, only thirty-two out of 181 lyophilized formulations listed in the 1995 PDR contained buffers, and ***none*** of those was an acetate buffer.

(Joint Appendix Ex. 2-B at 14.)

However, at least one of the lyophilized products included in the 1995 PDR, sermorelin acetate (GEREF), contains the active ingredient as the acetate salt. ( Joint Appendix Ex. 2-J.) Because of this product's inclusion in the 1995 PDR, Merck implicitly argued that the acetate counterion of sermorelin acetate was not an "acetate buffer" within the meaning of the '300 patent. This Court should hold Merck to its prior characterization and find that the acetate counterion of caspofungin diacetate is not an "acetate buffer" within the meaning of limitation c).

### 2.     Merck argued that claim 1 was non-obvious because Sandoz tried and failed to "design around" it.

In addition to its argument that the acetate-buffered formulation was unexpectedly stable and therefore non-obvious, Merck also argued that Sandoz tried and failed to develop a formulation of caspofungin diacetate by substituting other buffers for the acetate buffer. (Joint Appendix Ex. 2-B at 21-22.) ███████████████████████████████████████████ ███████████████████████████████████████, Merck must jettison its prior argument in favor of its current position—that a caspofungin diacetate formulation that includes *any* buffer, or even *no* buffer, will infringe claim 1 because limitation c) could be satisfied as long as some acetate ions are present in the reconstituted solution. Again, Merck cannot have it both ways and this Court should accept Xellia's claim construction.

### D.     The acetate buffer must be "effective to provide" a pharmaceutically acceptable pH

First, it is telling that Merck, in its Opening Position on the Disputed Claim Terms above, parses limitation c) into "subphrases," despite Merck's earlier agreement with Xellia that the limitation must be construed in its entirety. (*See* D.I. 40, Ex. A). This deconstruction of limitation c) allows Merck to isolate the "acetate buffer" from both being present in an "effective amount" and from its claimed role: "to provide a pharmaceutically acceptable pH." Yet again, Merck's approach to claim construction here is 180 degrees from its arguments in the *Sandoz* case, where Merck construed subphrase c) in its entirety, as follows:

> 17.     Subphrase "c" of claim 1 of the '300 patent means an amount of acetate buffer effective to provide a pharmaceutically acceptable pH upon reconstitution of the product. The amount of acetate buffer also must be pharmaceutically acceptable.

(Joint Appendix Ex. 2-I at 10, ¶17.) In other words, where Merck previously gave effect to the words "an amount" and "effective to provide," it now does not. "A claim construction that gives

- 23 -

meaning to all the terms of the claim is preferred over one that does not do so." *Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005).

Merck accuses Xellia of attempting to write "effective to provide" out of limitation c). It is *Merck*, not Xellia, who offers a construction that entirely eliminates the claimed role of the acetate buffer (that it be "effective to provide a pharmaceutically acceptable pH") and instead only requires that it be "present" in the composition. According to Merck, there is no requirement that the acetate buffer actually *do* anything.

Merck argues that the intrinsic evidence supports its construction (*supra* at 8-9), but Merck's cited "evidence" does not prove its point. All that can be said of Merck's evidence is that the inventors recognized that when an appropriate amount of acetate buffer is added to the composition, its presence is responsible for the purportedly unexpected stability. (See, e.g., D.I. 40-1, Ex. B at col. 2, ll. 32-56; D.I. 40-2, Ex. F at MRK_CAN_X0000229.) Merck's citations do *not* say that the acetate buffer need not provide the "pharmaceutically acceptable pH" or that the acetate buffer can be formed *in situ*. Thus, the intrinsic evidence does not support Merck.

## V.   Merck's Reply Position on the Disputed Claim Terms

### A.   "effective to provide"

#### 1.   Xellia Fails to Cite any Intrinsic Evidence to Support its Construction of "effective to provide".

Xellia fails to provide a construction for "effective to provide" other than to omit the word "effective" from the claim phrase.  (Joint Statement Ex. A.)  However, it appears now that Xellia will contend later (if its "construction" is accepted) that the acetate buffer must be solely responsible for, *i.e.*, control, the pH of the claimed composition.  Xellia provides no intrinsic support for such a requirement.  Merck's construction, by contrast, is fully supported by the intrinsic record.

Xellia first argues that under Merck's construction, the acetate buffer "need *not* provide a 'pharmaceutically acceptable pH'." (*Supra* at § IV.D) (emphasis added.) Xellia misunderstands Merck's construction. Merck is not suggesting that the acetate buffer is irrelevant to the pH of the claimed composition, but rather that the acetate buffer need not be the ***only*** component of the composition that contributes to the pharmaceutically acceptable pH. As described in Section II.A.1 above, Merck's proposed construction is fully consistent with the specification, which describes the pH of the final, reconstituted composition to be administered intravenously to the patient. ('300 patent, col. 2, ll. 12-18; col. 3, ll. 57-61; col.8, ll. 35-38, Joint Statement Ex. B.) The specification describes that the claimed composition includes other components, all of which together contribute to the final pH, including, *e.g.*, caspofungin or "other pharmaceutically acceptable diluents, excipients or carriers." ('300 patent, col. 2, ll. 4-8; col. 3, ll. 34-36, Joint Statement Ex. B.) Moreover, Example 1 of the '300 patent shows that it is the mixture of ***all*** of the components of the formulation that is adjusted to a pH of "5 to 6.2." ('300 patent, col. 8, ll. 17-34, Joint Statement Ex. B.) ("The solution was mixed and the pH was adjusted to 6 using 1 M NaOH.") Xellia, on the other hand, can point to no intrinsic evidence that states or suggests that acetate buffer ***alone*** produces the final pH and that none of the other components of the composition can contribute to the final pH.

The prosecution history of the '300 patent further contradicts Xellia's argument that acetate buffer must control pH. When the patent examiner rejected the claims on the basis that adding a buffer to control pH was obvious, Merck responded by pointing out that the acetate buffer in the claimed invention was "***clearly doing more than merely buffering the formulation and would not be obvious to one of ordinary skill in the art.***" (Joint Statement Ex. J. at MRK_CAN_X0000309-10) (emphasis added.) With this knowledge that the acetate was not

functioning as a mere buffer (as all buffers, by definition, would do), the examiner allowed the

claims, stating that "[t]he specification shows that tartrate buffer unexpectedly destabilizes

[caspofungin] while *acetate has an unforeseen stabilizing effect on the formulation*."  (Joint

Statement Ex. L at MRK_CAN_X0000315) (emphasis added.)  Thus, the prosecution history

further supports Merck's proposed construction that the acetate buffer need not be solely

responsible for providing the pharmaceutically acceptable pH, because Merck pointed out to the

Examiner that acetate's "buffering" was not the relevant property for its patentability, but rather

that its unique, stabilizing effect was the important discovery.  Indeed, Xellia agrees with

Merck's interpretation of the prosecution history, stating that Merck's evidence supports the

following conclusion:  "[W]hen an appropriate amount of acetate buffer is added to the

composition, its *presence is responsible for the purportedly unexpected stability*."  (*Supra* at §

IV.D) (emphasis added.)  Thus, according to the intrinsic record, the acetate buffer need only be

present in an effective amount and is not required to control the pH of the composition on its

own.

      Xellia's second argument, that Merck has not shown that "the acetate buffer can be

formed *in situ*," is an improper attempt to interject a non-infringement argument during claim

construction.  This is particularly so because Xellia did not even ask the court to construe

"acetate buffer."  (Joint Statement Ex. A; § I above.)  In any event, the '300 patent describes

either using the components of an acetate buffer, namely acetic acid and sodium acetate, or *in*

*situ* formation of an acetate buffer using acetic acid and sodium hydroxide.  ('300 patent, col. 3,

ll. 17-21, Joint Statement Ex. B.)  Moreover, Example 1 shows *in situ* formation of an acetate

buffer by using acetic acid and sodium hydroxide.  ('300 patent, col. 8, ll. 11-34, Joint Statement

Ex. B.) *See also supra* at § II.B; *infra* at § V.B.2.

Xellia attempts to divert the Court's attention away from the intrinsic record by asserting that Merck has improperly "deconstructed" subphrase (c) to change its meaning.[8] Xellia first argues that such alleged deconstruction "allows Merck to isolate the 'acetate buffer' from . . . being present in an 'effective amount'." (*Supra* at § IV.D.) Merck has done no such thing, and agrees that the acetate buffer must be present in an "effective amount", a term neither party suggested needs construction.

Xellia next argues that Merck's alleged deconstruction isolates "the 'acetate buffer' from . . . its claimed role: 'to provide a pharmaceutically acceptable pH.'" (*Id*.) Again, Merck has done no such thing, and agrees that the composition, upon reconstitution, must have a pharmaceutically acceptable pH. But the central issue—and the one Xellia seeks to avoid—is what "effective to provide" means. Merck has provided its construction, in accordance with the intrinsic record; Xellia has failed to do so.

Xellia next relies on *Merck & Co. v. Teva Pharms. USA, Inc*. for the proposition that the preferred claim construction is one that "gives meaning to all the terms of the claim." *Merck & Co. v. Teva Pharms. USA, Inc*., 395 F.3d 1364, 1372 (Fed. Cir. 2005). As shown above, Merck explains the meaning of the term "effective to provide"; by contrast, Xellia provides no meaning for that term and, indeed, drops the word "effective" from its proposed claim construction altogether. (Joint Statement Ex. A.)

Finally, Xellia argues that "Merck's approach to claim construction here is 180 degrees from its arguments in the *Sandoz* case." (*Supra* at § IV.D.) In the *Sandoz* case, however, neither party disputed the construction of subphrase "c)". In any event, as shown below, Merck's prior

---

[8]    Xellia argues that Merck parses subphrase "c)" "despite" some earlier unnamed agreement with Xellia. (*Supra* at § IV.D.) Merck has not parsed the phrase, but instead is focusing on the areas of dispute, specifically because Xellia seeks to add in language that is not part of any legitimate construction.

construction in the *Sandoz* case is completely consistent with Merck's construction here and, indeed, simply repeats verbatim the claim language at issue: "***an amount of acetate buffer effective to provide a pharmaceutically acceptable pH ….***"   (*Compare* Joint Appendix Ex. 2-I at 10, ¶ 17 *with* '300 patent, col. 9, ll. 58-60, Joint Statement Ex. B) (claim language emphasized.) Thus, Xellia's "180 degrees" argument is unfounded:  Merck's current construction cannot be inconsistent with a prior construction that recited the claim language.

*   *   *

In sum, Merck's proposed construction of "effective to provide" is consistent with the intrinsic evidence: "such that the resulting composition has [a pharmaceutically acceptable pH]." Accordingly, the Court should adopt Merck's construction.

### B.    Xellia's Proposed Additional Claim Limitations Are Not Supported by the Intrinsic Evidence and Xellia's Judicial Estoppel Arguments are Unfounded.

#### 1.    The Structure of Claim 1 Does Not Require that Acetate Buffer be "Added" to the Composition.

Xellia now argues for the first time that the structure of Claim 1—which contains subphrases a), b), and c)—requires that each of the three "components" must be "separately present in the claimed composition," meaning "Claim 1 requires ***both*** a) caspofungin or one of its salts ***and*** c) an acetate buffer."  (*Supra* at § IV.A) (emphasis original).  Merck agrees that all three components (caspofungin, an excipient, and an acetate buffer) are required, and it has never contended that caspofungin diacetate itself ***is*** an "acetate buffer."

Xellia's new argument is telling because what Xellia previously argued—and now appears to be distancing itself from—is that Claim 1 requires ***adding*** an acetate buffer as a ***separate*** component from any other components.  (Joint Statement Ex. A; Joint Appendix Ex. 1-B at § I.A; Joint Appendix Ex. 1-A at pp. 6-7) (emphasis added).  But Claim 1 is a composition

- 28 -

claim, not a process claim, and it would be improper to read in a process limitation.  *See, e.g.,*

*Sanofi-Aventis U.S. LLC v. Sandoz, Inc.*, Nos. 2009-1427, 2009-1444, 2009 WL 2905997, at

**2-4 (Fed. Cir. Sept. 10, 2009); *Exxon Chemical Patents, Inc. v. Lubrizol Corp.*, 64 F.3d 1553,

1557-58 (Fed. Cir. 1995). ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████[9]

(Joint Appendix Ex. 1-E Ex. E at pp. 3-6.)

### 2.    **Xellia's Mischaracterization of the Intrinsic Record and the Prior *Sandoz* Case Fails to Support its Argument that "acetate buffer is distinct from any such buffer that may be formed from dissociated caspofungin diacetate."**

Although Xellia now recasts its "adding" argument as one of "estoppel," it does not

dispute that it makes its caspofungin diacetate drug using acetic acid (Joint Appendix Ex. 1-F at

¶ 9), the same acetic acid that the '300 patent teaches can be used to form "an acetate buffer" *in

situ*.  ('300 patent, col. 3, ll. 17-21, Joint Statement Ex. B.)  Xellia apparently disputes whether

this acetic acid will generate an acetate buffer in its proposed ANDA products, something it says

it needs to have considered by its experts to answer.  (Joint Appendix Ex. 1-F at ¶¶ 1-8, 11.)

Because Xellia cannot deny that its ANDA products contain "an acetate buffer," it instead

suggests that Merck somehow disclaimed in the patent or during the prior *Sandoz* case any

construction that covers that scenario.  Xellia's argument has no merit.

Xellia first argues that the specification shows that acetate buffer must be "added" by

stating that the benefit of the invention was "switching to an acetate buffer."  (*Supra* at § IV.B.)

---

[9]       Xellia also argues that "theoretically" the claim elements could be doing "double duty."
But because Merck has never contended as such, the Court need not consider this argument.

But Xellia ignores that this "switching" statement is merely a description of the events that led

up to the discovery of the unique properties of acetate buffer.  First the inventors explained that

the problem in formulating caspofungin, including its diacetate salt, was that it is "highly

unstable."  ('300 patent, col. 2, l. 61, Joint Statement Ex. B.)  Next, the inventors explained that

lyophilized formulations prepared from caspofungin diacetate and tartrate buffer, forming a

mixture of acetate and tartrate, were "relatively stable" as compared to the drug by itself, but still

resulted in "generation of degradates at a relatively high rate."[10]  ('300 patent, col. 2, ll. 63-67,

Joint Statement Ex. B.)  During additional experiments, the Merck scientists ultimately

eliminated tartrate from the formulation, using only acetate buffer, and found that the

compositions were even more stable.[11]  ('300 patent, col. 3, ll. 1-4; col.8, ll. 45-67, Joint

Statement Ex. B.)  It was this unexpected discovery that lead to the conclusion that acetate buffer

provided the unique stabilizing property in caspofungin lyophilized formulations.  ('300 patent,

col. 2, ll. 23-26, 28-30, & 32-56; col. 3, ll. 1-4; col. 8, ll. 65-67, Joint Statement Ex. B.)

Xellia now attempts to discredit this history by arguing that it would be "impossible" to

"switch" between buffers because "the [acetate] buffer would already be present" in the tartrate

examples.[12]  (*Supra* at § IV.B.)  But the inventors' statement that they "switched" to an acetate

buffer is simply a statement of fact concerning the genesis of the invention, not a conclusion as

to what the invention is limited to, far less a clear disavowal of other sources of acetate buffer.

---

[10]    The Examples of the patented invention include some that contain both tartrate and
acetate buffers.  ('300 patent, col. 8, ll. 45-58, Joint Statement Ex. B.)  As conceded in the
*Sandoz* case, these Examples are not disclosed in the prior art.  (Joint Appendix Ex. 2-H at ¶ 60.)

[11]    The reason why acetate improves the stability of caspofungin is still unknown, even to
████████     and experts.  (Joint Appendix Ex. 1-C at pp. 213:15-214:22; Joint Appendix Ex. 1-
G at pp. 223:4-224:4; *see also* Joint Statement, Ex. M at MRK_CAN_X0000238, 268).

[12]    For example, while Xellia argues that "[a]ccording to the specification, [the tartrate
containing examples] do not [provide stable compositions]," the patent specification expressly
states that such formulations are "relatively stable."  (*Compare* § IV.B above *with* '300 patent,
col. 2, ll. 63-67, Joint Statement Ex. B.)

Xellia now attempts to convert how Merck had first prepared its formulations into an alleged admission that any acetate provided by the acetate salt of caspofungin is excluded from the invention.  Xellia's interpretation is inconsistent with the intrinsic record.

The prosecution history further supports the correctness of Merck's interpretation.  The patent examiner allowed the claim because acetate had unique properties over other buffers: "[t]he specification shows that tartrate buffer unexpectedly destabilizes the claimed cyclic peptide while acetate has an unforeseen stabilizing effect on the formulation." (Joint Statement Ex. L at MRK_CAN_X0000315.)  Also, in a presentation describing their caspofungin formulation work provided to the patent examiner, the inventors explained the effect of both acetate and tartrate on caspofungin stability:  "[t]artrate concentration is inversely proportional to [caspofungin] stability while acetate concentration is not." (Joint Statement Ex. M at MRK_CAN_X0000268.)  Thus, the "switching" that allowed the inventors to *discover* the unique stabilizing properties of acetate buffer was to employ *only* acetate buffer, instead of acetate *and* tartrate buffers combined, in the formulation.  Xellia now attempts to twist this discovery into a concession that the claim requires "only acetate", or that "acetate must be added."  But neither of these are limitations of Claim 1.  Rather, the claim requires the *presence* of an effective amount of an acetate buffer.  Although the presence of another buffer in addition to acetate, *e.g.,* tartrate, may not produce as stable a composition as one using only acetate, the claim does not require that acetate be the *only* buffer present.[13]

---

[13]    Claim 1 uses the open transition phrase "comprising," meaning that components other than the claimed components (*e.g.*, tartrate buffer) may be present and are irrelevant to infringement.  ('300 patent, Claim 1, col. 9, ll. 27-60 at ll. 27-28, Joint Statement Ex. B; *see also* Manual of Patent Examining Procedure ("MPEP") § 2111.03 (9th ed. Mar. 2014).)  The specification also notes the presence of other excipients in the compositions.  ('300 patent, col. 3, ll. 34-36, Joint Statement Ex. B.)

Xellia next mischaracterizes the statements of Merck's expert, Prof. Byrn, in the prior

*Sandoz* case.[14]   (*Supra* at § IV.B.)  In that case, Prof. Byrn rebutted Sandoz's obviousness

arguments made by Sandoz's expert, Dr. Staples.  Sandoz argued that it would have been

obvious to select caspofungin diacetate for development and then "match" the buffer to the

acetate counterion by using an acetate buffer.  (Joint Appendix Ex. 2-F at ¶¶ 47, 77.)  Prof. Byrn

was responding to Dr. Staples's erroneous obviousness arguments.

Xellia first relies on Paragraph 100 of one of Prof. Byrn's reports to support its estoppel

argument.  In that paragraph, Prof. Byrn responded to Dr. Staples's argument that the inventors

misled the Patent Office because all of the patent examples contained some acetate.[15]  In

particular, Prof. Byrn pointed out how the '300 patent examples, while both containing acetate,

demonstrated the unexpected properties of the acetate buffer when tartrate was eliminated.

Although Prof. Byrn may have in this instance overstated the instability of the tartrate

examples,[16] calling them "not stable" where the patent itself says they were "relatively stable"

('300 patent, col. 2, l. 66, Joint Statement Ex. B), that misstatement does not change the point he

was making; namely that acetate buffer has a unique stabilizing property that was identified by

the inventors.  (Joint Appendix Ex. 2-F at ¶¶ 90-92, 97-99, 101, 102.)

Xellia next cites Paragraph 101 of Prof. Byrn's report.  There, Prof. Byrn disagreed with

Dr. Staples's argument that it would have been obvious to a person of ordinary skill in the art

---

[14]    Merck addresses Xellia's judicial estoppel arguments below.  (§ V.B.3.)  To the extent
that Prof. Byrn's prior statements are admissible and relevant to claim construction, they are at
best extrinsic evidence taken out of context by Xellia and, as pointed out here, cannot contradict
the intrinsic record.  *See Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 981-983 (Fed.
Cir. 1995) (en banc), *aff'd,* 517 U.S. 370 (1996).
[15]    In his report, Dr. Staples also took the position that acetate present in the formulations
that came from caspofungin diacetate does function as a buffer when mixed in the formulations
with tartrate buffer.  (Joint Appendix Ex. 1-D at ¶¶ 67, 68, 97, 98; *see also* Joint Appendix Ex. 1-
H at ¶13.
[16]    Joint Appendix Ex. 2-F at ¶¶ 90, 92, 99.

("POSA") to add an acetate buffer to caspofungin diacetate.  Dr. Staples's argument is premised

on a fact also rejected by Prof. Byrn, namely that a POSA would have selected caspofungin

diacetate for further development as a lyophilized product.  (Joint Appendix 2-F at ¶¶ 47, 48.)

Thus, when Prof. Byrn opined that "a POSA would not have expected that adding additional

acetate would stabilize the formulation," he accepted, for purposes of argument, Dr. Staples's

erroneous premise that a POSA would have selected as a starting point a highly unstable salt of

caspofungin, *i.e.*, caspofungin diacetate.  Thus, Prof. Byrn merely pointed out the logical

inconsistency in Dr. Staples's argument; he was not arguing that Claim 1 is limited to adding

acetate as a buffer.

Xellia next argues, relying on a quote from Prof. Byrn, that Merck eviscerates subphrase

"c)" by relying on self-buffering of caspofungin diacetate.  This is a straw man.  ███████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████████

(Joint Appendix Ex. 1-E at p. 6) (emphasis added.)  ██████████████████████████████

████████████████████████████████████████████████████  Moreover, in its own

patent application for caspofungin formulations, Xellia admits that lyophilized formulations

containing only caspofungin diacetate are not stable, defeating its own self-buffering argument.

(Joint Appendix Ex. 1-I at [0039], [0060].)  In any event, Merck has not relied on self-buffering

and is not doing so here.  Thus, Xellia's quote from Prof. Byrn on this point is not inconsistent

with Merck's position here.

Xellia next distances itself from its "adding" claim construction by stating that "[t]he issue is not **how** the acetate buffer gets into the composition, but that the 'amount of acetate buffer' in the composition is an amount that is distinct from any amount of acetate buffer that allegedly may form from dissociation of the caspofungin diacetate molecule [sic]." There is no support in the intrinsic record for Xellia's contention. The only way Xellia can make such a distinction is to argue that it matters how the acetate was "added." And, as Merck already addressed, that argument is incorrect.

### 3.  Merck Is Not Judicially Estopped From Proposing a Claim Construction in this Case.

Xellia argues that Merck is judicially estopped from proposing its claim construction due to allegedly inconsistent statements it made in the prior *Sandoz* case. (*Supra* at § IV.C.) Xellia cannot meet any of the requirements for judicial estoppel.

The standard in the Third Circuit for judicial estoppel is strict, requiring "(1) irreconcilably inconsistent positions; (2) adopted in bad faith; and (3) a showing that estoppel addresses the harm and no lesser sanction is sufficient." *G-I Holdings, Inc. v. Reliance Ins. Co.*, 586 F.3d 247, 262 (3d Cir. 2009) (internal quotations and citations omitted); *Chao v. Roy's Constr. Inc.,* 517 F.3d 180, 186 n. 5 (3d Cir. 2008); *Montrose Med. Group Participating Savings Plan v. Bulger,* 243 F.3d 773, 777–78 (3d Cir. 2001); *Capitaliza-T, Sociedad De Responsabilidad Limitada De Capital Variable v. Wachovia Bank of Del. Nat.'l Ass'n*, No. 10-520-RGA, 2012 WL 3150386, at \*2 (D. Del. Aug. 2, 2012). Xellia falls far short of meeting this standard.

First, Xellia fails to show that Merck's statements are "irreconcilably inconsistent." As noted in Section V.A.1 above, Merck's claim construction in the *Sandoz* case is consistent with its current claim construction and the claim language. Moreover, Xellia relies on statements

from Merck's successful summary judgment brief that were made to rebut Sandoz's obviousness

argument. Those statements were not made during claim construction. *See, e.g.*, *SanDisk Corp.*

*v. Memorex Products, Inc.,* 415 F.3d 1278, 1290-91 (Fed. Cir. 2005). And the statements

themselves are not inconsistent. For example, the first and last bulleted statements Xellia cites—

as discussed in detail in § IV.C —were made in response to Sandoz's argument concerning how

a POSA would have allegedly arrived at the invention. Those are not claim construction

statements and, moreover, they assumed for argument's sake Sandoz's premise that a POSA

would have already selected caspofungin diacetate for development. It is important to recognize

that Sandoz's obviousness argument also posited that the POSA would be further motivated to

choose an acetate buffer to match the acetate salt, allegedly making acetate buffer an obvious

choice. But Merck did not advocate that "additional" acetate was required for the claim.[17]

Rather, Merck argued that even if one accepted Sandoz's premise, its logic still failed. These

statements are, therefore, not inconsistent, let alone "irreconcilably inconsistent," with Merck's

position here.

    Xellia's second bulleted statement is one that Merck made to rebut one of Sandoz's

arguments that leuprolide acetate was a prior art example of a lyophilized acetate-buffered

formulation, and, therefore allegedly rendered the claim obvious. As Merck pointed out in its

summary judgment brief, Sandoz was factually incorrect and leuprolide acetate did not contain

*any buffer* and, even though leuprolide was added as an acetate salt, the acetate was admittedly

lost during lyophilization and therefore could not be present in the formulation. (Joint Appendix

Ex. 2-B at § III.B.5.) Again, this statement is not inconsistent with Merck's current position, let

alone "irreconcilably inconsistent." Moreover, although Xellia now takes such statements out of

---

[17]    Joint Appendix Ex. 2-F at ¶¶ 47, 48.

context, it is clear that Merck did not intend to construe any of the claims by those statements, and thus they are not prior positions regarding the scope of Claim 1.

Second, Xellia fails entirely to show that Merck adopted its current position "in bad faith." Xellia makes a superficial attempt to meet this element by arguing that Merck is somehow "playing fast and loose with the court." Xellia fails to mention, however, that there were no claim construction disputes for subphrase "c)" in the *Sandoz* case and, because Sandoz had the burden to prove invalidity, the court did not adopt any of Merck's facts, but rather only required Sandoz to raise factual issues in dispute, something Sandoz failed to do. Thus, although Xellia now argues that Merck's prior position "is in direct conflict with the claim construction arguments Merck now advances," no claim construction arguments concerning subphrase "c)" were at issue in the prior case, but only whether Sandoz's obviousness challenge had merit, something the court found that it did not have.

Finally, Xellia fails to show that "estoppel addresses the harm and no lesser sanction is sufficient." Again, although Xellia speculates that "[h]ad Merck adopted its current position in the previous case, it is entirely possible that there would no longer be a valid patent," that is just speculation. Indeed Xellia could have challenged the validity of the '300 patent here, but it elected not to do so. Thus, Xellia has provided no evidence of a threat to judicial integrity.

### 4.    Xellia's Argument that Merck "indirectly" Admitted that Acetate Counterions Cannot Form Acetate Buffer is Incorrect.

Xellia also argues that Merck "indirectly" conceded in the *Sandoz* case that acetate added into a lyophilized formulation as a drug counterion is not an acetate buffer. (*Supra* at § IV.C.1.) In that case, Merck's expert Prof. Byrn found no lyophilized drug formulations with an acetate buffer in the 1995 *Physician's Desk Reference*. Xellia now asserts that he missed one,

sermorelin acetate,[18] which supposedly supports its claim construction.  But Xellia's alleged example does not undermine his conclusion.  To the contrary, Prof. Byrn's review was undertaken to determine whether acetate buffers in lyophilized formulations were rare or common when the invention was made, and his ultimate conclusion was that they were not common.  (*See* Joint Appendix Ex. 2-F at ¶ 76.)  Moreover, in response to Prof. Byrn's review, Sandoz's expert Dr. Staples claimed that he too found an example that Prof. Byrn missed: leuprolide acetate.  But it turns out that Sandoz's expert was wrong and that the acetate counterion was admittedly lost during lyophilization and was therefore not present at all in the lyophilized formulation.  (Joint Appendix Ex. 2-B at § III.B.5; Joint Appendix Ex. 1-G at pp. 197:3-198:25.)  This failure by Sandoz's expert supported Prof. Byrn's conclusion that acetate buffers in lyophilized formulations were indeed rare when the '300 patent inventions were made.  Thus, Xellia's argument that Merck "implicitly argued" that the acetate counterion of caspofungin diacetate is not an "acetate buffer" within the meaning of limitation c) is unsupported by the extrinsic record relied on by Xellia.

## 5.    Xellia's Argument that it "designed around" the '300 Patent Claims is Irrelevant for Claim Construction and is Unfounded in Any Event.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████ and that, now faced with a "successful" design-around by Xellia, Merck must jettison that argument.  (*Supra* at § IV.C.2.)  Xellia fails to identify the causes for Sandoz's formulation failures.  Moreover, Xellia mistakenly surmises Sandoz's formulation attempts from a non-

---

[18]     Xellia failed to provide any expert testimony on the issue of whether the acetate counterion of sermorelin acetate is or is not an "acetate buffer" within the meaning of the '300 patent.

confidential summary of Sandoz's work described in Merck's Opening Summary Judgment

Brief in the *Sandoz* case.[19]  In the *Sandoz* case, Merck stated that "Sandoz purposefully

endeavored to design-around the '300 patent."  (Joint Appendix Ex. 2-B at § III.C.)  But Xellia

does not know exactly what Sandoz did, and because subphrase "a)" of Claim 1 allows the use of

salts other than "caspofungin diacetate," ███████████████████████████

██████ ██ ████████████████████████████████████

## VI.   Xellia's Sur-Reply Position on the Disputed Claim Terms

Merck's proposed construction erases a limitation of claim 1 so that Merck can expand

the reach of the '300 patent. The patent discloses and claims a formulation that uses an ***added***

***acetate buffer*** to stabilize a naturally unstable caspofungin diacetate salt. Merck's scientists

recognized that the caspofungin diacetate salt was unstable, so they tried adding a number of

buffers to the formulation before settling on an acetate buffer that provides appropriate stability.

The additional acetate buffer is the crux of claim 1 of the '300 patent and the focus of both the

patent's specification and prosecution history.

Merck's construction leads to the absurd result that the mere addition of hydroxide ions to

caspofungin diacetate will result in an acetate buffer sufficient to meet limitation c) of claim 1, as

long as the final product has a pharmaceutically acceptable pH. This is a blatant attempt to

rewrite claim 1 to cover something the inventors never contemplated, and in fact, *distinguished*

in order to obtain the patent. Merck's goal, of course, is to capture Xellia's non-acetate-buffered

---

[19]     The underlying Sandoz documents are still subject to a protective order in that case.

[20]     ███████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████

caspofungin product within the scope of a claim directed to an acetate-buffered product. The intrinsic evidence demonstrates, however, that Merck's proposed construction is incorrect.

Moreover, Merck's statements in the prior litigation with Sandoz show that Merck itself understood limitation c) to mean just what Xellia says it means: "a pharmaceutically acceptable amount of acetate buffer that is added to the composition as a separate component to provide a pharmaceutically acceptable pH, and which is distinct from acetate that may be present due to dissociation of the caspofungin salt of element a)." Accordingly, the Court should adopt Xellia's proposed construction and reject Merck's attempt to change its positions from the previous case.

I.    **XELLIA'S CONSTRUCTION IS SUPPORTED BY THE INTRINSIC EVIDENCE, WHEREAS MERCK'S CONSTRUCTION IS NOT**

A.    **Merck's construction does not give effect to the words of the claim in context.**

A major difference between Xellia's construction and Merck's construction is that Xellia requires that the acetate buffer be present in an amount ***effective to provide*** a pharmaceutically acceptable pH. Xellia's construction is consistent with the plain language of limitation c) of claim 1. (D.I. 40-1, Ex. B at col. 9, ll. 58-60.) Merck's construction, on the other hand, does not require the acetate buffer to be present in an amount that is "effective to provide a pharmaceutically acceptable pH," despite this plain language. (*Supra* at 25-26.) Ironically, Merck accuses Xellia of "writing out" the word "effective" in its construction. However, neither Merck's proposed construction, nor the substance of its arguments, gives any effect to the claim language. (D.I. 40-1, Ex. B at col. 9, ll. 58-60.) Instead, Merck advocates for a construction that rewrites the claim to require only: a) *any* amount of acetate buffer and b) a final pH for the composition that is pharmaceutically acceptable.

As this Court has held, when a claim requires that a component be present in an "effective amount" for something, the customary interpretation requires that the component must be present in an amount that achieves the claimed effect. *Novartis Pharmaceuticals Corp. v. Watson Labs., Inc.*, Case No. 1:11-cv-01077-RGA, Order dated June 21, 2013 (D.I. 250), citing *Abbott Labs. v. Baxter Pharm. Prods., Inc.*, 334 F.3d 1274, 1277-78 (Fed. Cir. 2003). Here, the claims require that the acetate not just be present, as Merck argues, but that it be present *in an amount that is effective to achieve the required pH*.

Merck argues that because the patent describes mixing the components together and then measuring the pH, "the acetate buffer need not be the ***only*** component of the composition that contributes to the pharmaceutically-acceptable pH." (*Supra* at 25.) The point at which pH is measured, however, is entirely beside the point and says nothing about the claimed role of the acetate buffer: "to provide a pharmaceutically acceptable pH." Moreover, the acetate buffer is the only claimed component described in the specification to affect the pH. (D.I. 40-1, Ex. B at col. 3, ll. 14-23.) ***Nothing*** in the specification supports Merck's contention that all of the components together must be responsible for providing the pharmaceutically acceptable pH.

Merck also claims that because the patentee relied on the unexpected stability of acetate-buffered solutions during prosecution, this reliance converts "an amount. .effective to provide a pharmaceutically acceptable pH" into "an amount. .effective to provide superior stability." (*Supra* at 26.) Xellia agrees that Merck argued that the acetate-buffered compositions were unexpectedly superior to tartrate-buffered compositions in terms of stability. However, this argument does not erase the words of the claim that require a specific role for "an acetate buffer" in the composition. It simply means the when the acetate buffer is added in an amount effective

to provide a pharmaceutically acceptable pH, that buffer has an additional effect—it makes the composition more stable than a composition containing only tartrate buffer.

### B.     The patent specification and file history support Xellia's construction.

The specification of the '300 patent is clear that an acetate buffer is added to the formulation in an amount effective to provide a pharmaceutically acceptable pH, which in turn makes the resulting formulation more stable than one containing a tartrate buffer. The specification describes only two ways to include an acetate buffer in the composition in an "amount . . . effective to provide" the claimed pharmaceutically acceptable pH: 1) use of suitable amounts of sodium acetate and acetic acid or 2) use of suitable amounts of acetic acid and sodium hydroxide to form an acetate buffer in the composition. (See, e.g., D.I. 40-1, Ex. B at col. 2, ll. 4-18; col. 3, ll. 17-23; col. 8, ll. 24-34.) In both cases, acetic acid must be *added* to the composition. This is shown by Examples 1-8, where either a) acetic acid and sodium hydroxide or b) tartaric acid and sodium hydroxide were added to solutions containing caspofungin diacetate salt. (*Id.* at col. 8, ll. 11-67.) These solutions necessarily contained an identical amount of acetate ions (if any) that were already present as the acetate counterion of caspofungin diacetate. Yet, only the solutions to which acetic acid were added were described as being "significantly more stable" and showing "significantly less of the unwanted degradates." (*Id.*)

Merck attempts to support its misguided reading of the specification by claiming for the first time that the tartrate buffered compositions described in the specification are "tartrate/acetate" buffered solutions and that the unexpected stability of the invention is a result of *eliminating* the tartrate, leaving dissociated acetate ions that combine with sodium hydroxide

in the formulation to create an acetate buffer. (*Supra* at 30-31.) This argument—and its corresponding new terminology—are not supported by the specification, as shown above.

Nor is there any support for Merck's new argument in the prosecution history. For example, Merck relied on Examples 1-8 during prosecution to convince the patent examiner that the acetate-buffered formulations showed unexpectedly greater stability than the tartrate-buffered solutions and were therefore non-obvious and patentable. (D.I. 40-2, Ex. K, L.) However, under Merck's proposed construction, the same tartrate-buffered solutions that the patentee argued were inferior to the claimed invention would necessarily fall within the scope of the claims.[21] This illogical result is foreclosed by Xellia's construction.

Merck has not provided a single citation from the patent, or the file history, that says that the "amount of an acetate buffer effective to provide a pharmaceutically acceptable pH" can come entirely from dissociated caspofungin diacetate. And while Merck argues that Xellia uses acetic acid in the manufacture of its caspofungin diacetate product, absolutely nothing in the file history or patent specification states that if the acetate salt is used to make the active ingredient, no additional acetate is needed in the composition. In fact, the specification shows exactly the opposite: the caspofungin diacetate active ingredient used in Examples 1-8 was made by adding acetic acid, and additional acetic acid was ***also*** added to the solutions containing the caspofungin diacetate salt to form the acetate buffer. (D.I. 40-1, Ex. B at col. 7, ll. 46-63; col. 8, ll. 11-59.)

---

[21]    Merck explicitly admits that under its proposed construction, the tartrate-buffered solutions fall within the scope of claim 1. (*Supra* at 31, fn 13.)

**C.    Merck's attempt to recast the patent's description of "switching to an acetate buffer" should be rejected.**

As Xellia has pointed out, the specification distinguishes prior formulations employing a tartrate buffer as containing "pharmaceutically significant amounts of unwanted degradation products." (*Id.* at col. 2, ll. 25-28.) The specification further explains that "[b]y *switching* to an acetate buffer, the lyophilized product is more stable, contains less of unwanted degradates while extending the shelf life of the composition." (*Id*. at col. 3, ll. 1-4, emphasis added.) As a matter of logic, there could be no "switching" to an "acetate buffer" if it were already present in the form of dissociated caspofungin diacetate.

Merck tries to blunt this logic by arguing that "switching" is merely a historical description of the events that led to the invention. (*Supra* at 30.) Merck then attempts to rewrite that history using new terminology. Rather than referring to formulations containing caspofungin diacetate and tartrate buffer as "tartrate buffered" as the patent does (see, e.g., D.I. 40-1, Ex. B at col 2, l. 65), Merck now describes such formulations as having "acetate and tartrate buffers combined." (*Supra* at 30-31.) And rather than referring to formulations containing caspofungin diacetate and acetate buffer as "acetate buffered" as the patent does (see, e.g., D.I. 40-1, Ex. B at col. 3, l. 14), Merck now refers to those formulations as containing "only acetate." (*Supra* at 30-31.) A review of Merck's cites to the patent and prosecution history reveals not a single incidence of its revised terminology, which is nothing less than a litigation-inspired attempt to obscure the clear import of the intrinsic evidence. For example, Merck quotes the patent examiner's reasons for allowance (*supra* at 25-26), but the examiner did not refer to a combined tartrate/acetate buffer. Nor does the patent or file history state that the inventors discovered that the unexpected stability of the acetate-buffered solutions was the result of the "removal of tartrate."

In any event, Merck's revised terminology does not support its construction. Even if the benefits of the invention were realized due to "removal of tartrate," as Merck now argues, the patent specification teaches (and the claims require) that any acetate present from caspofungin diacetate alone is not "an amount...effective to provide a pharmaceutically acceptable pH" or an amount that will achieve the unexpected stability described in the patent and file history. In other words, even using Merck's revised terminology, to switch from acetate/tartrate to acetate/acetate, the inventors removed tartrate and ***added*** acetate, confirming that Xellia's construction is correct. (D.I. 40-2, Ex. F at MRK_CAN_X0000229 ("...replacement of tartrate buffer with acetic acid buffer [improved stability].")) [22]

## II.    EXTRINSIC EVIDENCE, INCLUDING MERCK'S OWN STATEMENTS REGARDING THE SCOPE OF CLAIM 1, SUPPORTS XELLIA'S CONSTRUCTION

Like Merck's attempt to revise the specification to fit its infringement theory, Merck also attempts to revise the arguments Merck and its expert made in the *Sandoz* case. This is because Merck's claim construction position here is completely inconsistent with those prior arguments. Merck does not dispute that the prior court relied upon those statements when it ruled in Merck's favor. As discussed at length in Section IV above, Merck should be judicially estopped from making its current, inconsistent claim construction arguments. At a minimum, despite Merck's protestations that it "did not intend to construe any of the claims by [its] statements" in the prior litigation (*supra* at 35-36), the court should consider Merck's prior statements as highly relevant to the present claim construction dispute.

---

[22] ███████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
███████████████████████████ (Joint Appendix Ex. 3-A at MRK_CAN_X0238198; Ex. 3-B at MRK_CAN_X0237700-01.)

**A.**     <u>**Estoppel is the appropriate remedy to prevent Merck from adopting a**</u>
<u>**contrary position in this litigation.**</u>

Merck argues that none of its positions here are inconsistent with arguments it made in

the *Sandoz* litigation. This argument is belied by the statements themselves. ████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████

(Joint Appendix Ex. 2-G at 49:8-18 (emphasis added); *see also supra* at 16-18.) This testimony

is in direct conflict with Merck's current position that the acetate buffer can be derived solely

from the caspofungin diacetate salt.

Likewise, Merck previously argued that "additional" acetate buffer was required to provide

the unexpectedly superior stability of the caspofungin diacetate formulation. (Joint Appendix Ex.

2-B at 19; Ex. 2-H at 28; Ex. 2-I at 19, ¶105; *see also supra* at 19.) These statements about the

necessity of adding acetate and distinguishing the "buffer" from the acetate counterion in the

caspofungin diacetate active ingredient cannot be explained away simply by saying that Merck

was assuming the premise of Sandoz's expert for the sake of argument. Whether Merck was

responding to an obviousness argument, as opposed to making arguments regarding claim

construction, is immaterial—Merck was nevertheless making representations about the scope of its claims. *See Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973, 978-79 (Fed. Cir. 1999) (holding that the scope of a patent's claims were limited by statements made to distinguish those claims from the prior art). *Sandisk*, cited by Merck, does not hold to the contrary. There, the court held that the arguments advanced by the patentee were not inconsistent, but did ***not*** hold that statements about validity could never be inconsistent with claim construction arguments. *Sandisk Corp. v. Memorex Prods.*, 415 F.3d 1278, 1291 (Fed. Cir. 2005).

In the same vein, Merck cannot escape the effect of its arguments regarding the 1995 PDR. Merck tries to run away from its prior arguments by stating that its expert was only seeking to determine whether acetate-buffered lyophilized formulations were "rare" (*supra* at 36-37), but that is not what Merck said before. Merck's expert reviewed all of the lyophilized formulations in the 1995 PDR and concluded that ***none*** of them included an acetate buffer. Given that at least one of the listed products, sermorelin, included the active ingredient as an acetate salt (like the caspofungin diacetate product at issue here), Merck clearly did not view that product as being buffered by dissociated acetate counterion.[23]

Finally, Merck attempts to dismiss its prior arguments about Sandoz's design-around attempts as not relevant because only Merck (and not Xellia) knows the precise strategy Sandoz employed. Merck implies that Sandoz's design-around strategy may have included the use of other counterions (*supra* at 37-38), but whether or not this is the case has no bearing on the

---

[23]     In a footnote, Merck argues that Xellia did not provide any expert testimony regarding whether the acetate counterion of sermorelin acetate is an "acetate buffer" within the meaning of the '300 patent. (*Supra* at 37, fn 18.) Xellia need not provide such testimony, as Dr. Byrn addressed this point when he testified that none of the products, including sermorelin acetate, contained a buffer. (*Supra* at 22.)

meaning of limitation c). In contrast, Merck's prior argument about Sandoz's attempts to use

buffers other than an acetate buffer is directly on point:

> Sandoz, however, states that copying is "irrelevant" to obviousness
> in ANDA cases. This is belied by the fact that ***Sandoz***
> ***purposefully endeavored to design-around the '300 patent (and***
> ***Cancidas® formulation) by substituting other buffers in place of***
> ***the acetate buffer***. Sandoz clearly attempted to design-around the
> '300 patent and Merck's Cancidas® products-but ultimately chose
> to replicate the formulation of Merck's Cancidas® products. These
> undisputed facts show the superior and unexpected results of
> using an acetate-buffered lyophilized formulation.

(Joint Appendix Ex. 2-B at 21-22.) As Xellia previously noted, this argument cannot be

reconciled with Merck's current claim construction position because Merck now asserts that a

caspofungin diacetate formulation inherently contains an acetate buffer in the form of dissociated

acetate ions that combine with sodium hydroxide. If this were true, there would be no way to

"substitut[e]" other buffers in place of the acetate buffer" as Merck described Sandoz's design-

around.

There can be no doubt that Merck's about-face with respect to the meaning of acetate

buffer is in bad faith. Merck's statements in the Sandoz litigation were meant to preserve the

validity of the claims of the '300 patent. In making those statements that the claims were non-

obvious, Merck necessarily was construing the scope of those claims. Having prevailed on

validity previously, but now confronted with a party that ***did*** successfully "design around" the

'300 patent, Merck disavows its previous statements to contort claim 1 beyond recognition.

Merck's sole purpose in doing so is to attempt to show infringement where there is none. This is

*ipso facto* bad faith. In order to protect the integrity of the judicial system, Merck cannot be

permitted to make diametrically opposing arguments in two different courts and succeed on both.

*New Hampshire v. Maine*, 532 U.S. 742, 749 (2001). Thus, estoppel is the *only* appropriate remedy.

> **B.** **Even if estoppel does not apply, Merck's own prior statements are persuasive evidence as to the meaning of limitation c).**

Merck's prior litigation statements are, as Merck points out, extrinsic evidence. But "extrinsic" does not mean "irrelevant." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1319 (Fed. Cir. 2005) (en banc). Merck's prior litigation statements are particularly instructive in this case because Merck took such a clear position on the scope of its patent. Despite Merck's protestations that it "did not intend to construe any of the claims by [its] statements" in the prior litigation (*supra* at 35-36), it is black letter law that arguments made by the patentee to distinguish the prior art from its claimed invention can define the scope of claims. (*See Genetics Inst., LLC v. Novartis Vaccines & Diagnostics, Inc.*, 655 F.3d 1291, 1302 (Fed. Cir. 2011) (stating that "obviousness require[s] the court to compare the properly construed claims to the available prior art"). Thus, even if the court does not preclude Merck from making its inconsistent arguments here, Merck's prior arguments in the *Sandoz* case illustrate that Xellia's claim construction position is correct and should be adopted.

## VII.   Merck's Conclusion

For the foregoing reasons, Merck's proposed claim constructions should be adopted.

## VIII.   Xellia's Conclusion

For the foregoing reasons, Defendant Xellia respectfully requests that the Court adopt its proposed claim construction.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

/s/ Derek J. Fahnestock

_____
Jack B. Blumenfeld (#1014)
Derek J. Fahnestock (#4705)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@mnat.com
dfahnestock@mnat.com


OF COUNSEL:

Brian V. Slater
Gregory B. Sephton
Jason A. Leonard
FITZPATRICK, CELLA, HARPER & SCINTO
1290 Avenue of the Americas
New York, NY  10104-3800
(212) 218-2100

*Attorneys for Plaintiff Merck Sharp & Dohme*

SHAW KELLER LLP

/s/ Karen E. Keller

_____
Karen E. Keller (#4489)
Jeffrey T. Castellano (#4837)
Stephanie E. O'Byrne (#4446)
300 Delaware Avenue, Suite 1120
Wilmington, DE  19801
(302) 298-0700
kkeller@shawkeller.com
jcastellano@shawkeller.com
sobyrne@shawkeller.com


OF COUNSEL:

Jeffrey S. Ward
Wendy M. Ward
Stephen R. Howe
MERCHANT & GOULD, P.C.
10 E. Doty Street, Suite 600
Madison, WI  53703
(608) 280-6750

Jeffrey D. Blake
MERCHANT & GOULD, P.C.
191 Peachtree Street NE, Suite 4300
Atlanta, GA  30303
(404) 954-5100


*Attorneys for Defendant Xellia
Pharmaceuticals ApS and Xellia
Pharmaceuticals, Inc.*

November 25, 2014 - Original Filing Date
8698671
December 2, 2014 - Redacted Filing Date