# Exhibit 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MERCK SHARP & DOHME CORP., )
                                                    )
            Plaintiff,                              )
                                                    )
            v.                                      )    C.A. No. 14-199 (RGA)
                                                    )
XELLIA PHARMACEUTICALS APS and  )        REDACTED -
XELLIA PHARMACEUTICALS, INC.,   )        PUBLIC VERSION
                                                    )
            Defendants.                         )

## DECLARATION OF JASON A. LEONARD
## IN SUPPORT OF MERCK'S REPLY CLAIM CONSTRUCTION BRIEF

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@mnat.com

*Attorneys for Plaintiff*

OF COUNSEL:

Brian V. Slater
Gregory B. Sephton
Jason A. Leonard
FITZPATRICK, CELLA, HARPER & SCINTO
1290 Avenue of the Americas
New York, NY  10104-3800
(212) 218-2100

November 4, 2014

I, Jason A. Leonard, Esq., declare as follows:

1.      I am a member of the bar of the States of New York and New Jersey.

2.      I am also admitted to the bars of the Supreme Court of the United States, United States District Courts for the Southern and Eastern Districts of New York and for the District of New Jersey.

3.      I am an attorney-at-law and an associate at the law firm of Fitzpatrick, Cella, Harper & Scinto, counsel for Plaintiff Merck Sharp & Dohme Corp. in the above-captioned proceedings.

4.      I submit this declaration in support of Merck's Reply Claim Construction Brief.

5.      Attached hereto as **Exhibit A** is a true and correct copy of Xellia's Notice Letter dated January 3, 2014 Regarding Paragraph IV Certifications for U.S. Pat. Nos. 5,952,300 and 6,136,783 with respect to ANDA No. 205923 for Xellia's Caspofungin Acetate Injectable Formulations.

6.      Attached hereto as **Exhibit B** is a true and correct copy of Defendant Xellia ApS's Initial Non-Infringement Contentions, dated June 17, 2014. REDACTED - PUBLIC VERSION
REDACTED - PUBLIC VERSION

7.      Attached hereto as **Exhibit C** is a true and correct copy of excerpts from the Deposition Transcript of Michael Kaufman, Ph.D., dated January 28, 2011 in 2011 in *Merck & Co., Inc. et al. v. Sandoz Inc.*, 2-10-cv-01625 (D.N.J.).  REDACTED - PUBLIC VERSION

8.      Attached hereto as **Exhibit D** is a true and correct copy of the Expert

Report of Mark A. Staples, Ph.D., dated March 29, 2011 in *Merck & Co., Inc. et al. v. Sandoz*

*Inc.*, 2-10-cv-01625 (D.N.J.).

9.      Attached hereto as **Exhibit E** is a true and correct copy of Merck Sharp &

Dohme Corp.'s Revised Infringement Contentions, dated September 9, 2014.
REDACTED - PUBLIC VERSION

10.     Attached hereto as **Exhibit F** is a true and correct copy of Defendant

Xellia Pharmaceuticals ApS's Objections and Responses to Merck's First Set of Requests for

Admission, dated August 21, 2014.

11.     Attached hereto as **Exhibit G** is a true and correct copy of excerpts from

the Deposition Transcript of Mark A. Staples, Ph.D., dated June 10, 2011 in *Merck & Co., Inc. et*

*al. v. Sandoz Inc.*, 2-10-cv-01625 (D.N.J.).

12.     Attached hereto as **Exhibit H** is a true and correct copy of the Reply

Expert Report of Mark A. Staples, Ph.D., dated June 3, 2011 in *Merck & Co., Inc. et al. v.*

*Sandoz Inc.*, 2-10-cv-01625 (D.N.J.).

13.     Attached hereto as **Exhibit I** is a true and correct copy of U.S. Patent

Appln. Pub. No. 2012/0101030 A1, published April 26, 2012.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 4, 2014

Jason A. Leonard, Esq.

## <u>CERTIFICATE OF SERVICE</u>

I certify that I caused copies of the foregoing document to be served on November

4, 2014, upon the following in the manner indicated:

| | |
|---|---|
| Karen E. Keller, Esquire | *VIA ELECTRONIC MAIL* |
| Jeffrey T. Castellano, Esquire | |
| Stephanie E. O'Byrne, Esquire | |
| SHAW KELLER LLP | |
| 300 Delaware Avenue, Suite 1120 | |
| Wilmington, DE  19801 | |
| *Attorneys for Defendants* | |

| | |
|---|---|
| Jeffrey S. Ward, Esquire | *VIA ELECTRONIC MAIL* |
| Wendy M. Ward, Esquire | |
| Stephen R. Howe, Esquire | |
| MERCHANT & GOULD, P.C. | |
| 10 East Doty Street, Suite 600 | |
| Madison, WI  53703 | |
| *Attorneys for Defendants* | |

| | |
|---|---|
| Jeffrey D. Blake, Esquire | *VIA ELECTRONIC MAIL* |
| MERCHANT & GOULD, P.C. | |
| 191 Peachtree Street, N.E., Suite 4300 | |
| Atlanta, GA  30303 | |
| *Attorneys for Defendants* | |

*/s/ Jack B. Blumenfeld*
_____
Jack B. Blumenfeld (#1014)

# Exhibit 1-A

REDACTED
IN ITS
ENTIRETY

# Exhibit 1-B

REDACTED
IN ITS
ENTIRETY

# Exhibit 1-C

REDACTED
IN ITS
ENTIRETY

# Exhibit 1-D

Eric I. Abraham, Esq.
Christina L. Saveriano, Esq.
HILL WALLACK, LLP
202 Carnegie Center
P.O. Box 5226
Princeton, New Jersey  08543
(609) 924-0808
eia@hillwallack.com

*Of Counsel*:

Meredith Martin Addy, Esq.
Mark H. Remus, Esq.
Abby L. Lemek, Esq.
Brinks Hofer Gilson & Lione
NBC Tower – Suite 3600
455 N. Cityfront Plaza Drive
Chicago, Illinois 60611
(312) 321-4200
maddy@brinkshofer.com

**Attorneys for Defendant Sandoz Inc.**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| MERCK & CO., INC., and<br>MERCK SHARP & DOHME CORP., | ) )<br>) )<br>) | **CONFIDENTIAL** |
| Plaintiffs, | ) ) | |
| v. | ) )<br>) | C.A. Nos. 2:10-01625, 2:10-02308-SRC-PS |
| SANDOZ INC., | ) )<br>) | |
| Defendant. | ) )<br>) | |

## EXPERT REPORT OF MARK A. STAPLES, Ph.D.

## TABLE OF CONTENTS

I.   QUALIFICATIONS .................................................................................. 3

    A.   Education ..................................................................................... 3

    B.   Work Experience ........................................................................ 4

    C.   Other Relevant Experience ........................................................ 8

II.  MISCELLANEOUS ................................................................................ 8

III. BACKGROUND ..................................................................................... 8

    A.   Formulation Basics – The Pursuit of the Elegant Dosage Form ............................ 9

    B.   Formulation Stages – The Path of Rational Dosage Form Design ...................... 11

        a)   Preformulation Tests – Stability, Solubility, Drug Substance Design ...... 11

        b)   Formulation ............................................................................. 13

            i.   Form of Administration - Injectable v. Oral ................................ 13

            ii.  Consider Problems Uncovered in Preformulation ........................ 15

                If aggregation, then consider ionic strength and concentration .... 15

                If oxidation, then consider removing air or adding antioxidants .. 17

                If hydrolysis, then consider neutral pH or freeze drying ............. 17

            iii. Formulation Process Development ............................................... 18

        c)   Dosage Form Design – Targeting the End User ...................................... 19

    C.   Buffers Versus pH Adjusting ................................................................. 19

    D.   Salt Versus Buffer .................................................................. 20

    E.   Lyophilization ......................................................................... 21

IV.  PREPARATION OF EXPERT REPORT ............................................... 21

    A.   '300 Patent File History ......................................................... 21

    B.   References Reviewed ............................................................... 26

V.   ASSERTED CLAIM 1 OF THE '300 PATENT IS INVALID ...................... 27

    A.   Legal Standard for Obviousness ............................................. 27

    B.   Person of Ordinary Skill in the Art ......................................... 27

C.      Claim Construction of Claim 1 of the '300 Patent ............................... 27

D.      Claim 1 of the '300 Patent is Obvious in View of the '804 Patent..................... 28

        Claim element (a):  "[caspofungin] and the pharmaceutically acceptable salts
                 thereof" .................................................................................. 30

        Claim element (b):  "a pharmaceutically acceptable amount of an excipients
                 effective to form a lyophilized cake" ....................................... 34

        Claim element (c):  "a pharmaceutically acceptable amount of an acetate buffer
                 effective to provide a pharmaceutically acceptable pH" ........................ 39

VI.     CONCLUSION........................................................................................ 40

1.      I have been asked by counsel for Defendant Sandoz Inc. ("Sandoz") to offer my expert opinion on the validity of Plaintiffs' Merck & Co., Inc. and Merck Sharp & Dohme Corp. (collectively, "Merck") asserted claim 1 of U.S. Patent No. 5,952,300 to Nehrurkar et al. ("the '300 patent").

## I.      QUALIFICATIONS

2.      I am qualified to offer an expert opinion in this case based on my education and experience in the field of pharmaceutical formulations over the last 23 years.  Attached as Exhibit A is a copy of my current CV.

### A.      Education

3.      I received my bachelor of arts degree in 1975 from the University of Kansas with a double major in chemistry and biochemistry.  I received my Ph.D. in 1979 also from Kansas in the field of biological sciences.  My Ph.D. thesis concerned the structure and function of a bifunctional enzyme, and I was awarded the Graduate School award for most outstanding dissertation in Liberal Arts and Sciences from the University of Kansas.  My research was also published in major refereed journals in the field (*e.g.*, J. Biol. Chem.).

4.      I was appointed to initiate research extending studies of cyclic metal-binding peptides to bicyclic structures as models for metalloenzyme function in the Department of Biological Sciences at Harvard Medical School, in the laboratory of Dr. E. R. Blout.  Dr. Blout was a member of the National Academy of Sciences, recognized as directing one of the leading laboratories in the world on peptide structure.  My research from this appointment was published in leading refereed peptide journals.

5.      I earned an MBA in 1985 from Northeastern University.

3

### B.   Work Experience

6.      I began working full-time at New England Nuclear (Boston) in 1980.  From 1982-1986, I also held a part-time appointment in Dr. Blout's laboratory.  At New England Nuclear, I introduced new radiolabeled reagents for protein modification, and produced radiolabeled lipids using enzymic synthesis.  I also supervised the production of about 70 catalog compounds.

7.      The advent of the biotechnology industry in the early 80s in Boston created many start-up opportunities for polypeptide chemists, and I accepted a position leading the analytical, process development, and project management areas at a new company Seragen (Boston-area: Lexington and later Hopkinton) in late 1984.  After working on chimeric proteins that contained tumor targeting and toxic domains at Seragen for several years, I left Seragen to join another start-up specializing in this type of therapeutic agent, Immunogen (Cambridge), in 1987.  While at Immunogen, I performed research and founded the analytical and process development functions at the company.

8.      In 1988, I left Immunogen to take a job at Biogen (Cambridge), a company that was rebuilding its process development department.  In addition to starting as a process development scientist, I founded Biogen's Analytical Development and Formulation Development Groups, and led these groups from 1988 until I left Biogen in 1997.  At Biogen I played an active role in creating protein formulation and dosage form development as a new discipline.  I led the technical development team on the Avonex® (beta-IFN for multiple sclerosis) project for several years.  I also wrote and compiled much of the technical section (Chemistry, Manufacturing and Controls, hereinafter "CMC") of documents for marketing approval (*i.e.*, INDs, BLA) in both the US and Europe.  The Avonex® dosage form involved developing solid state stabilization with human serum albumin (carrier protein) in a vialed

4

lyophilized injectable dosage form. My group became known as one of the most expert in the protein therapeutic field by the early 90s, although most of the work was not published for proprietary reasons.

9.     Following the successful commercialization of Avonex®, my group developed a stable liquid formulation that was dispensed in a pre-filled syringe, and Biogen successfully introduced that dosage form as a second generation product several years after the initial launch of the lyophilized form of Avonex®. Our formulation research that led to the stable liquid IFN was considered novel at the time, and we patented the work. I served as program executive reporting to the Biogen Operating Team on the second generation program. In all, my involvement with the Avonex® program spanned preclinical to post-commercial and second generation development phases over a period of seven years. This product was an unqualified commercial success, and Avonex® has provided revenues in excess of $1 billion annually since 2003.

10.     In parallel with Avonex® development, I directed the analytical and formulation development of a very different product, a synthetic peptide designed as an innovative anti-clotting agent derived from the peptide sequence of natural peptides in the medicinal leech. We successfully stabilized this peptide, subject to a short solution shelf life, as a lyophilized injectable dosage form. This work, although challenging, did not result in a patent due to the obviousness of the formulation recipe and manufacturing process: the trifluroacetate salt was simply neutralized with sodium hydroxide, and mannitol served as a crystalline bulking agent. The formulation and lyophilization process was also straightforward, similar in design to the patent under discussion in this case. I compiled and authored the entire CMC section of the NDA, followed by supervision of the extensive technology transfer from lab to manufacturing

5

scale at facilities in the US and Europe.  When early clinical results did not meet Biogen management benchmarks, Biogen sold the rights to the product (as well as the NDA I helped prepare, which had not yet been submitted) to the Medicines Company.  Marketed as Angiomax®, this product has generated revenues in excess of one hundred million dollars since 2005.  According to the current package insert, the formulation my group developed in the early 90s has remained the same.

11.     I also directed a program during the last several years I was at Biogen surveying advanced delivery technologies for peptide and protein therapeutics, with a focus on in-licensing innovative new technologies.  The company initiated a number of development programs based on this work after I left Biogen in 1997.

12.     In addition to developing the major commercial protein product Avonex® and the major peptide product Angiomax®, my Biogen group performed all the analytical and formulation development on Biogen's entire pipeline of products (clinical phase development) during my tenure.

13.     I left Biogen in 1997 to join a start-up company, Praecis Pharmaceuticals (initially in Cambridge, later Waltham) as Director of Pharmaceutical Sciences.  Praecis focused on depot intramuscular delivery of a highly potent innovative peptide based on leuprolide.  As at Biogen, I directed the groups responsible for analytical, formulation, and dosage form development. Although this work involved peptide, as opposed to protein, chemistry, many of the chemistry-related technical hurdles were similar.  The product manufacturing included an innovative complexation with carboxylmethylcellulose, leading to a slightly soluble solid complex that was subsequently dried and milled to a narrow particle size range, was powder filled in vials, sterilized by gamma irradiation, and reconstituted with saline for injection.  I also led the CMC

Section project team that was responsible for the applications for clinical trial approval, and eventually marketing approval in the US and Europe. In all, I spent five years taking the Abarelix® anti-cancer peptide-based therapy from preclinical to commercial phases at Praecis.

14.     I left my position as Senior Director at Praecis in 2002 to assume the title of Vice President of Development and Manufacturing at another start-up company called GlycoGenesys (Boston). I managed all technical aspects of the company's operations (approximately half the company staff), and performed technology transfer to manufacturing to improve the process. My work enabled GlycoGenesys to restart its clinical trials, which were on hold at the time I joined.

15.     I joined MicroCHIPS in 2003 as Vice President of Pharmaceutical Technology (later Vice President of Research & Development), where I assumed responsibility for all non-electronic-based technical operations (peptide and protein therapeutics in the areas of analytical, formulation, and dosage form development). I also participated in company strategy, Board of Director presentations and fund raising. I managed approximately half the company's staff, and reported directly to the CEO. MicroCHIPS recruited me due in part to my expertise in the development of lyophilized polypeptide products. During my tenure at MicroCHIPS (2003-2007), my group developed innovative methods to create stable, highly concentrated dosage units of amorphous solid formulations, using lyophilization of drug contained in microreservoirs resident on silicon microchips. My group devised methods for sealing the drug reservoirs so that they could be opened selectively and on demand from the implantable chip, using remote control, as the ultimate in drug delivery control. The MicroCHIPS technology was initiated in the lab of Robert Langer, one of the most innovative groups in the drug delivery field; Dr. Langer himself has over 500 patents in this field, and served as scientific advisor to the company. My work was published in highly visible journals (*i.e.*, Nature Biotech.), as well as in other

7

patents, presentations, and review articles.  We developed implanted chips that demonstrated controlled release in animals in two programs:  the leuprolide peptide and the parathyroid hormone ("PTH") protein.  Clinical trials of the PTH application for osteoporosis will begin this year.

16.     I left MicroCHIPS in 2007 to start my own consulting company, Cusp PharmaTech Consulting LLC, in the field of pharmaceutical technology.

### C.     Other Relevant Experience

17.     I have actively participated in professional societies, serving in a wide range of capacities including top leadership positions.  For example, I served as Chair of the Biotechnology Section in 2006 for the American Association of Pharmaceutical Chemists, and Chapter President for the New England Chapter of the Parenteral Drug Association, which was recognized as the top chapter of over 20 worldwide during my term in 2003-2004.

## II.     MISCELLANEOUS

18.     I understand that an expert from Merck may respond to the opinions I offer in this report.   Accordingly, I reserve the right to supplement and/or modify my opinions after reviewing those opinions and any additional evidence.

19.     I have been retained by counsel for Defendant Sandoz Inc. ("Sandoz") and I am being compensated for my time at my normal hourly rate of $250.

20.     I have not testified as an expert witness in the past four years.

## III.     BACKGROUND

21.     I will first describe the process and strategy for development of a drug dosage form in order to outline the commonalities of approach that one skilled in the art of dosage form development will follow, in general terms.  The process and strategy described below has been a

common and widely-accepted approach to dosage form development since at least 1990.  *See, e.g.*, Pharmaceutical Dosage Forms:  Parenteral Medications, Avis et al., 2nd Ed., Marcel Dekker, Inc., New York, Vol. 1 (1992) ("Avis").

### A.    Formulation Basics – The Pursuit of the Elegant Dosage Form

22.    Pharmaceutical formulations for First-in-Man (Phase I) clinical trials are designed according to these generally accepted rules[1]:

- **Rule A**.  Use as few ingredients as possible to achieve minimal target performance characteristics for clinical testing.

- **Rule B**.  Use ingredients that have been previously used, at the likely range of proposed concentrations and total administered dose, in approved pharmaceutical formulations of the same dosage form and route of administration.  Preferably, choose the most common ingredients for the purpose, typically due to advantages in cost, ease of use in manufacturing, safety, etc.  Emphasize selection of standard rather than novel ingredients in order to minimize requests for additional or more extensive studies from regulatory agencies.  Data must support a scientific and clinical defense for the use of each ingredient of the dose as well as the amount per dose.

- **Rule C**.  Use ingredients at the lowest possible concentration in order to achieve target performance characteristics.  The higher the concentration in excess of that required for performance, the more unnecessary risk is assumed (perhaps from long term unintended effects).  Data must support a scientific and clinical defense for the concentration of each ingredient of the dose.

---

[1] These rules are identified as Rules A-D for ease of reference only.

• **Rule D**.  Use screening rather than optimization experiments to provide much of the

rationale for the recipe and process.  The point is to see which ingredients work, and

which processing conditions make a difference.  As long as the formulation and

manufacturing process serve the purpose, extra development effort to optimize is not

necessary.

23.    The initial acceptable clinical formulation serves as an initial prototype

formulation, and probably is not suitable for commercial use.  Rapid development of a dosage

form that is safe and meets minimal stability and manufacturing requirements, but is not ideal, is

the model for early development to minimize time and resources for an unproven drug.

24.    While the first clinical trials are proceeding, the initial prototype formulation is

improved to better match the projected product image of the commercial product.  In some cases

the second prototype formulation may differ from the first in all respects.  The same rules listed

above apply, but with the goal of improved performance and commercialization potential.  If

successful, the second prototype formulation will be introduced in late Phase 1 or in Phase 2

trials, with crossover studies to allow comparison of data obtained with the first and second

prototype formulations.

25.    If the first phases of clinical testing go well and Phase 3 trials are planned, the

second prototype formulation may be optimized for performance that matches commercial needs.

The changes should not be major at this point, and development will emphasize optimization

rather than screening experiments.  The list of ingredients and the type of dosage form will

probably not change.  The result may be a third prototype that may become the marketed

formulation.

**B.**     **Formulation Stages – The Path of Rational Dosage Form Design**

**a)**     **Preformulation Tests – Stability, Solubility, Drug Substance Design**

26.     Formulation development depends on the data available from preformulation studies.  The physicochemical characterization that precedes formulation development is an important step during dosage form development.

27.     In parallel, analytical development must occur so that methods will provide scientifically valid data regarding the limited amount per dose of non-drug and non-formulation ingredients, the target amounts of drug and inactive ingredients in the formulation, and the target potency and purity of the drug.  These methods are qualified for their ability to quantitate non-drug and non-formulation ingredients, including residual substances from processing, contaminants from processing, decomposition products, product variants, products arising from incompatibility between ingredients or contact materials, microbiological and particulate contamination.  Methods that separate and quantitate product-related decomposition products and product variants that increase over time are qualified as stability indicating, and can be used as tests in stability studies.  These methods are generally a subset of tests used to release the product for use on the basis of product purity.

28.     The most basic preformulation studies depend on selection of the best drug substance.  Defining the drug as the active molecule, the drug substance is the form of the drug that is stored and used as a raw material in production of the finished product dosage form.  The ideal drug substance will be stable, provide ease of conversion into drug product, and will have physicochemical characteristics that provide advantages over other preparations.  Factors considered will be the state (usually solid), salt form (if necessary; see Rule B above for guidance on pharmaceutically acceptable salts), most stable crystal type (unless amorphous), and

11

potentially particle size. Often residual moisture must be controlled, as well as residual volatile

organics and acids. Determination of the best properties for crystalline drug substances can be

accomplished with a relatively routine set of studies that explore the different salt and crystal

types that can be prepared, and the physical stability of each salt and crystal type. Note that

formulation groups may have input in selection of the best drug substance, but will usually have

no responsibility for improving the structure of the drug molecule itself.

29.     Once the drug substance has been selected and the physical characteristics have

been determined, the drug substance needs to be studied with regard to solubility and stability.

Solubility should be determined for a range of solvents and aqueous solutions. The selection will

depend on the solvents that may be used in processing the drug substance and product, the

solutions and solvents that may be used to treat and dissolve samples for analytical methods, and

potential formulation conditions.

30.     One of the most important solubility tests run for all drug substances is a pH

solubility profile combined with variation in ionic strength, obtained by adding different NaCl

concentrations at different pH values. Solubility and stability can be tested in parallel. Because

a wide range of pH values will be tested, a number of buffers that are commonly accepted in

pharmaceutical preparations (*see* Rule B above for guidance on pharmaceutically acceptable

buffers) will be selected that have pKa values distributed to support buffer systems for pH 2-10

(approximately). As an example, in the pH range 4.25-5.25, acetate buffer will typically be

chosen. Although other buffers will work in the same pH range, acetate is relatively simple

(monoprotic). It is generally compatible with polypeptide drugs. The concentration achievable

at different pH values is extended with studies at low (no NaCl), medium (physiological: 150

mM) and high (300 mM) ionic strength. The resulting database provides a very useful profile of

the dependence of solubility on pH, and on variation of ionic strength as well as pH.  The same

samples can be tested for stability by incubating a few days or weeks at different temperatures.

These stability profiles provide an initial evaluation of the constraints of storage with respect to

pH and ionic strength, and this data can be used to develop analytical method sample

preparation, samples for in vivo testing, manufacturing process conditions, and (importantly)

options for stable formulation recipes.

31.     Other aspects of preformulation include physical and chemical stress tests

(guidances exist for stress testing conditions).  *See, e.g.,* S. Klick et al., "*Toward a Generic*

*Approach for Stress Testing of Drug Substance and Drug Products,*" Pharm. Tech., 48-66 (Feb.

2005).  This data is useful to understand drug impurity profile and decomposition pathways, that

can then be directly addressed during formulation screening.

32.     A successful preformulation program will allow the formulation group to

communicate to other discipline the chemical and physical constraints of the drug product

formulation and dosage form, and provide options within these constraints that will meet the

requirements of manufacturing, marketing, and clinicians.  The data is also the starting point for

the formulation program.

        b)     **Formulation**

           i.     <u>**Form of Administration - Injectable v. Oral**</u>

33.     The form of administration will be initially dictated by clinical and marketing

needs, which are conveyed to the formulation group as a starting point for the program.  This

initial product image may be achievable, taking various constraints into consideration.  One of

the tasks of the formulation group is to gather data that can be presented to the Project Team, that

clearly supports the feasibility (GO) of the proposed product image, or demonstrates some

absolute physical and/or chemical constraint that greatly lowers the chance of success and creates a need for a modified product image that takes the limitations into consideration, without requiring a compromise in project performance that causes project termination (NO-GO). The formulation group should present a list of options for dosage form design that incorporate as many of the proposed dosage form design specifications as possible, and that are reasonable-risk alternatives. The team is responsible for debating and finalizing modified specifications based on preformulation that enable initiation of formulation. This cycle will repeat throughout the project, when data supports a successful dosage form or indicates that the technical hurdles may justify reconsideration of the proposed specification.

34.     If a drug needs to be administered as an injection for clinical reasons, or because development of a non-injectable form will cause delay or undue expenses for an early phase clinical trial, the Phase I formulation will usually be intravenous ("IV"). The IV dosage form has the fewest constraints in terms of performance requirements: the study can be conducted in a hospital where IV use is routine, and the dose dilution upon administration may lessen the potential for injection site irritation due to the formulation composition. Because IV administration may not be convenient for the patient, later dosage form development will often transition to intramuscular ("IM") or subcutaneous ("SC") administration (which can be done quickly and, potentially by self-injection). Alternatively, additional development time may allow oral dosage form development.

35.     Occasionally IV administration is adequate even as a commercial form. This may be the case for therapeutics that will usually be administered to patients who are in a critical care setting, and already have an IV line set-up.

14

36.     IV products may be large (Large Volume Parenterals, hereinafter "LVPs") or

small volume (Small Volume Parenterals, hereinafter "SVPs"), and due to the great sterility risk

of adding large volumes of product to a patient's blood volume, product manufacturing

requirements are more stringent for LVPs than for SVPs.  LVPs are usually diluents (saline,

dextrose 5%), and SVPs are drugs that are added to LVPs for administration either by direct

dilution or by injection into an IV set.

### ii.     Consider Problems Uncovered in Preformulation

37.     The preformulation program design experiments may vary depending on the

physicochemical characteristics of the drug and drug substance, but the general strategy will be

practiced similarly by all pharmaceutical scientists.  Approaches for polypeptide drugs will, in

particular be similar whether the structure is high- or low-molecular weight, cyclic or linear.

38.     Preformulation data will have revealed constraints for conditions in which the

drug may be maintained without undergoing chemical or physical change.  Considering the

polypeptide case in particular, typical examples of decomposition or change from the native

structure include aggregation, oxidation, hydrolysis, and fragmentation.  Because the bases for

these decomposition pathways are well-known (and have been well-known since the early

1990s), the strategies for minimizing these routes of decomposition are also well-known and may

be fashioned into a general model of formulation design strategy.

### *If aggregation, then consider ionic strength and concentration*

39.     One reason for aggregation is the attraction of different portions of a molecule for

other portions, which may result in self-association.  Changing the ionic strength of a solution

(which may be accomplished by adjusting salt concentration or by adding non-aqueous solvents;

*see* Rule B above for guidance on pharmaceutically acceptable salts and solvents) may change

15

the strength of this effect. Alternatively, because the progress of aggregation is enabled by contact between molecules, decreasing the probability of the molecules contacting each other by lowering the concentration (which may be in a liquid or solid state solution) may also decrease aggregation.

40.     These two strategies, ionic strength modification and dilution, are the typical ways a formulator can decrease the impact of aggregation. Changes in ionic strength will typically be evaluated by comparing the impact on stability in terms of aggregation. For any aqueous solution, the first choice for ionic strength adjustment will typically involve NaCl. Dilution in liquid solution is obvious: the active ingredient concentration is reduced in the recipe without changing the concentration of the other ingredients. A dilution of a solid state preparation involves studies to ensure a solid glass, as opposed to crystalline state, contains the active ingredient. The solid state concentration will typically be manipulated by increasing the weight percentage of the glass-forming excipient (most typically for lyophilized IV preparations, sucrose where a non-reducing sugar is required), potentially in combination with decreasing the weight percentage of the active ingredient. In a model that incorporates a crystalline excipient as a means to achieving a physically stable structure, the majority (or all) of the crystalline excipient (most typically for lyophilized IV preparations, mannitol where a non-reducing sugar is required) will be isolated from the other ingredients after drying and will have a minimal impact on solid state concentration of the active. The important value of the system is the weight of active ingredient within the solids that form the glassy portion of the lyophilized product. Refer to Rule D above for guidance on experimental strategies to efficiently create acceptable formulations that reduce unwanted association.

***If oxidation, then consider removing air or adding antioxidants***

41.     Oxidation may not be a concern for caspofungin, but because the character of the degradants is not fully described, the typical strategy for minimizing oxidation will be briefly described here, as would be practiced by one of ordinary skill in product formulation.  To keep the formulation as simple as possible (*see* Rule A above), it may be possible to reduce oxidation to an acceptable level entirely through adjusting the manufacturing and packaging process to exclude air from the product throughout the shelf life.  This may be done using standard methods and packaging for liquid or lyophilized preparations.

42.     Alternative approaches to alleviate oxidation that are not within the scope of this discussion might include thiol reagents (*i.e.*, glutathione) where disulfide bonds and free thiols are in the active ingredient structure, or chelating agents (*i.e.*, EDTA) where trace metal ions are causing oxidation.  *See* Rule B above for guidance on pharmaceutically acceptable antioxidants.

***If hydrolysis, then consider neutral pH or freeze drying***

43.     Hydrolysis is one of the most common decomposition pathways for peptides, especially at extreme pH values.  To keep the formulation as simple as possible  (*see* Rule A above), it may be possible to reduce hydrolysis to an acceptable level entirely through adjusting the pH.  The exact pH chosen will be product-specific, but the process for determining the optimal pH for stability is standard and based on the preformulation database already discussed.

44.     If the solution pH tends to drift, a pharmaceutically acceptable buffer (*i.e.*, the buffers already examined during preformulation work; *see* Rule B above) will be needed at the minimum concentration (*see* Rule C above) that satisfactorily eliminates pH variability and drift.  Most peptides are optimally stable in the pH 4-8 range.  If the range is 4-6, the preferred buffers in terms of wide use and simplicity will be acetate or citrate.  The preferred way to achieve the

target pH will be to add the target amount of acid in the formulation recipe to the diluent used for

a formulation.  If the active ingredient is not stable to the low pH of a dilute acid solution, the

solution is partially neutralized with a base, preferably NaOH, before adding the active

ingredient.  Once dissolved, the solution of active ingredient is titrated to the target pH with

additional base and the target concentration is typically achieved by adjusting with additional

water.

45.     If the solution pH is sufficiently stable, a buffer may not be required (*see* Rules A

and B above):  adjustment of the pH to the target value with a pharmaceutically acceptable acid

(most preferably HCl) or base (most preferably NaOH) may suffice.  The processing steps are

essentially the same as described for adjustment with buffer.

46.     In the event hydrolysis control in solution is not sufficient, one of the most typical

strategies (especially in early phase formulation development) is to minimize the water

concentration, as accomplished by lyophilization.  Lyophilization has already been described

above as a means of reducing aggregation.  By controlling residual moisture in the lyophilized

product through standard approaches to lyophilization cycle design, hydrolysis will be

significantly retarded due to the lack of water as well as the decreased mobility of the molecules

in the solid state.

### iii.     Formulation Process Development

47.     Process development for finished product manufacture involves unit operations

that are kept as simple as possible, to ensure ease of reproducible and cost-effective

manufacturing.  From a regulatory standpoint, simple processes are generally easier to get

approved as well.  There is little motivation to be innovative in pharmaceutical manufacturing

unless a compelling, product-specific problem must be solved.

48.    Each physical type of dosage form has well understood and commonly practiced guidelines for manufacturing.  At a general level for parenteral preparations, the recipe ingredients must be mixed (normally as a solution), the mixture may need to be adjusted with respect to pH and concentration, the final solution is aseptically filtered, and the solution is filled into vials or other primary packaging container.  Liquid formulations are stoppered and sealed, while lyophilized preparations are transferred to a lyophilizer, lyophilized, then stoppered and sealed.  These unit operations must be optimized for each product, but optimization is relatively routine to one of ordinary skill in product manufacturing process development of parenteral products.

### c)    Dosage Form Design – Targeting the End User

49.    An additional element is design of the dosage form itself.  The dosage form will typically be as simple as possible in early phase clinical studies, but additional considerations for ease of use and competitive marketing aspects of the product may add another layer of development.  These aspects of the dosage form, such as appearance (color of tablets, shape) and accompanying devices (pre-filled syringes, automated injectors), are beyond the scope of this discussion and are simply noted here.

### C.    Buffers Versus pH Adjusting

50.    Preceding sections have mentioned the use of buffers for pH adjustment.  Buffer selection for pharmaceutical preparations is typically restricted to buffers that have been previously used in marketed, approved preparations of the same dosage form as dosage forms under consideration for development (*see* Rule B above).  If a buffer previously unused in a marketed pharmaceutical formulation were to be considered in a drug product formulation design, additional characteristics such as minimal reactivity would need to be considered as well.

51.     Buffers provide a means for minimizing pH change within a preparation.  An additional use of buffers is to achieve a target pH.  These are in fact two functions, which can be separated. The simplest formulation employs a buffer when necessary (*see* Rule A above).  If pH adjustment is required, but pH change after adjustment in minimal with respect to product stability throughput shelf life, then a buffer may not be required.  The most common additives to simply achieve a target pH are HCl and NaOH.

52.     Preformulation and formulation studies should compare the stability of solutions adjusted to the target pH with HCl or NaOH with solutions containing buffer at the same pH. This same study should test different buffer concentrations at the same pH to determine, with actual data, the capacity of the buffer in molar terms to provide minimally acceptable pH control.

**D.     Salt Versus Buffer**

53.     Preceding sections discussed the use of buffers for pH adjustment and salts for ionic strength adjustment.

54.     A buffer, in the dry state, will contain a mix of free acid and the salt of the acid. The ratio of the salt and acid will determine the pH when dissolved.  The buffer will affect the ionic strength of the solution to a different extent depending on the solution pH.

55.     To adjust a solution to a target ionic strength, the simplest and preferred excipient will be NaCl.  In order to determine the correct amount of NaCl for the product formulation, the contribution of buffer salts to ionic strength must be included in the calculation.  If a relatively high buffer concentration is required, addition of NaCl may be unnecessary to achieve the desired ionic strength.

### E.      Lyophilization

56.     Preceding sections discussed how an injectable dosage form preparation may be chosen, which will usually be a SVP.  SVPs must be manufactured as sterile products, and there is flexibility in the form they are provided:  they may be a solid that is reconstituted with diluent prior to IV injection, a liquid, or a suspension.  This flexibility allows the project team to opt for a dosage form that alleviates challenges with dosage form development, such as solubility or stability properties that make it difficult or impossible to meet the project goals.

57.     One of the most typical examples of this situation is inadequate drug product solution stability, which may be solved the most easily with a lyophilized product.  Lyophilized product manufacture is a specialized field, but practitioners use a common development model that increases the potential for success with a reasonable expenditure of development effort and time.

## IV.     PREPARATION OF EXPERT REPORT

### A.      '300 Patent File History

58.     In forming my opinion, I reviewed the file history of the '300 patent.  Merck filed U.S. Patent Application Serial No. 08/827,510 ("the '510 application") on March 28, 1997.  The '510 application claimed priority to U.S. Provisional Application No. 60/015,638 ("the '638 application") filed April 19, 1996.  The '300 patent issued from the '510 application on September 14, 1999.  This patent describes composition and methods for preparing lyophilized product.  The formulation follows standard rules (*see* Rules A and B, above) for a lyophilized product that will be safe, stable, manufacturable, and meets administration requirements.

59.     In an Office Action dated November 8, 1997, the examiner rejected all pending claims as obvious over U.S. Patent No. 5,378,805 [*sic*, 804] to Balkovec et al. (hereinafter "the

21

'804 patent") in view of U.S. Patent Nos. 5,336,756 to Schwartz; 5,466,781 to Dorin et al.;

5,120,859 to Webb et al.; and Remington's Pharmaceutical Sciences (1980). In the Action, the

Examiner confuses a reference to crystalline versus amorphous states in a discussion regarding

the Schwartz patent. Crystalline drug and excipients need to be clearly distinguished in terms of

the desirability and role of crystallinity. Crystalline drug is often a disadvantage in injectable

formulations, when reconstitution is required, because the physically stable crystals will often

take longer to dissolve than amorphous glassy solid. A crystalline excipient like mannitol is

desirable because the crystals dissolve readily, and the tendency to crystallize provides a means

of creating a physical scaffold that also physically protects the lyophilized solid porous product

from collapsing (which can lower stability and product consistency). The Examiner's (probably

inadvertent) switch of the mention of crystalline and amorphous when discussing the Schwartz

patent does not affect the correctness of the Examiner's conclusions, but makes the response to

the Action by the inventors confusing. The main point of the Examiner's argument appears to be

that compounds of similar structure can be reliably predicted to have a tendency to be in the

amorphous or crystalline state. Here, Schwartz taught that a similar compound was crystalline.

The inventors argued that this is not a reasonable expectation in absence of experimental work.

In my experience, I believe the examiner was correct.

60.     In the same Action, the dimer degradant of caspofungin is cited as a reason to

design a formulation that dilutes the drug so as to suppress dimerization. The examiner relied on

U.S. Patent No. 5,466,781 to Dorin, which concerns a naturally dimeric polypeptide larger than

caspofungin; the same physical considerations of aggregation suppression (where aggregation

involves the association of native dimers to form larger molecular weight species) may also

apply to cyclic peptides like caspofungin (where the desired species is the monomer, and

dimeric or larger species form as a consequence of degradation).  As discussed below, the

degradation pathway leading to dimeric caspofungin would lead any skilled formulator to dilute

the drug in the formulation with an excipient.  The practice of dilution may be achieved by

preparing a solid matrix of glass-forming excipient(s), most commonly sucrose if the drug is not

compatible with reducing sugars.

61.     In the same Action, the examiner cites U.S. Patent No. 5,120,859 to Webb as

showing the use of acetate buffer in the pH 5-9 range.  In the absence of any unusual

preformulation data, a skilled formulator would be led to use an acetate or a citrate buffer in a

parenteral preparation of a drug with stability ranging around pH 4.76 (*see* Rule B above; *see*

*also* Ex. B,[2] showing the predominance of acetate and citrate buffers for this pH range in IV

products approved for marketing by the FDA).  Acetate is the most simple weak acid buffer

available for parenteral preparations as discussed below, and would be obviously preferred to

citrate because the drug substance already contains acetate in the form of the diacetate salt of

caspofungin (*see* Rule A above).

62.     In my opinion, the entire claimed formulation is completely typical and is exactly

what a skilled formulator would prepare as a dosage form, referring to the formulation design

Rules A-D presented above.  (*See also* Remington's (1980), also referenced by the Examiner in

the November Action).

63.     The applicants responded in February 1998 essentially asserting their claims were

non-obvious due to their specificity.

64.     The Examiner again rejected the claims in a May 1998 Action, and additionally

introduced a double patenting rejection.  From a practitioner's standpoint, the Examiner's

---

[2] For a general description of Exhibit B, refer to ¶81.

concluding point is very compelling:  that is, the path to screening and optimizing a drug

formulation follows an obvious series of steps that would be pursued using similar excipients and

testing similar variables (*see* formulation design Rules A-D presented above).  Therefore, there is

no element of innovation in the claims.

65.     The applicants responded in August 1998 by primarily reiterating the product-

specific and unpredictable nature of the work.  In October 1998, the Examiner makes a final

decision to deny the claims because the applicants' arguments again are unpersuasive.

66.     After a teleconference in March 1999, the examiner reverses the rejection based

on the fact "it could not have been predicted that tartrate would destabilize the disclosed

cyclopeptide while acetate would stabilize it."  But this reason for reversal is based on a

misleading argument made by the applicants.  First, the selection of an acetate buffer was an

obvious choice and its satisfactory performance is not surprising.  The fact that a different buffer,

tartrate, was not satisfactory is wholly irrelevant and does not make the selection of acetate any

less obvious.  Second, the applicants miscalculated the amount of acetate in the formulation and

additionally presented a series of negative results; together these combined to create a false

impression of non-obviousness.

67.     The statements on the unexpected acetate effect are based on miscalculation of the

actual acetate concentration in the finished product.  The formulation contains 42 mg/mL API

free base, or (1000 mL/L*42 mg/mL/[1093 mg/mmol]) = 38 mM.  Because the API is

caspofungin diacetate salt, the acetate concentration will be 76 mM before adding any buffer to

the formulation.  The addition of 25 mM acetic acid to the formulation makes the final

formulation approximately 0.1 M in acetate buffer, adjusted to pH 6 with sodium hydroxide.

This high concentration of acetate in the formulation means that it will be acting as a buffer at pH 6.

Referring to the Henderson-Hasselbalch equation, $pH = pKa + log([base]/[acid])$

$$6 = 4.76 + log([OAc-]/[HOAc])$$

$$17.38 = [OAc-]/[HOAc]$$

$$and\ [OAc-] + [HOAc] = 0.100\ M$$

$$[HOAc] = 5.44\ mM\ and\ [OAc-] = 94.56\ mM$$

68.    Therefore, a skilled formulator would know that at this concentration, acetate is buffering the drug formulation; there is simply no unexpected "acetate effect." Clearly, if the allowance of the claims was made primarily on this basis, this misrepresentation of the actual composition of the formulation leads to an inaccurate conclusion.

69.    Further, the applicants' presentation relating to tartrate and lactose are not surprising; indeed, a skilled formulator would not have chosen to use either. Tartrate, which was not at issue until introduced by the applicants, not only buffers less effectively than acetate at pH 6, with a pKa of 4.25, but is present at a much lower concentration. There is no reason a skilled artisan would have chosen it rather than acetate. Additionally, because the acetate counterion is already in the formulation recipe as a contribution of the diacetate salt of caspofungin, the tartrate counterion is an additional ingredient in the formulation that is not necessary, violating Rule A: design the simplest formulation possible unless additional complexity is justified by data. Further, tartrate might have worked if it had been used in a proper concentration. That is, rather than producing a "destabilizing effect" as asserted by the applicants, it rather exhibited a lack of buffer capacity at the pKa of the drug.

70.     The most unexpected aspect of the work is the selection of tartrate as the first choice buffer.  There are few precedents for this choice (*e.g.*, Ex. B, showing that even in 2011, tartrate serves as an inactive ingredient in only 10 of 273 IV formulations in drug products approved for marketing, versus 31 instances of acetate; *see also* Rule B above), and the applicants' presentation lacks preformulation data that accounts for this atypical strategy that produced an unacceptable result.  Similarly, the choice of lactose as a bulking agent is even more surprising, and the negative results match what a skilled artisan would have predicted. Specifically, as a reducing sugar, lactose is avoided by formulators of parenteral products (in particular, drugs with an amine functional group like caspofungin) because lactose may form conjugates with active ingredients.  In my opinion, it appears that presentation of the tartrate and lactose results misled the examiner into allowing the claims.

## B.     References Reviewed

71.     In forming my opinion, I relied on the '300 patent and its file history from the United States Patent & Trademark Office, and the following list of references.  I have been told to assume that these references are all prior art to the '300 patent:

- U.S. Patent No. 5,378,804 to Balkovec et al., Jan. 3, 1995;

- U.S. Patent No. 5,037,644 to Shaked et al., August 6, 1991;

- U.S. Patent No. 5,120,859 to Webb, June 9, 1992;

- U.S. Patent No.5,336,756 to Schwartz et al., August 9, 1994;

- U.S. Patent No. 5,552,521 to Belyk et al., September 3, 1996;

- U.S. Patent No. 5,665,760 to Brown et al., September 9, 1997;

- International Patent Application No. 95/31213, published Nov. 23, 1995;

- G.L. Flynn:  "Buffers – pH Control Within Pharmaceutical Systems," Journal of the Parenteral Drug Association March-April, 1980, Vol. 34(2);

26

- A. Albert and E.P. Sargeant, The Determination of Ionization Constants, 3rd Ed., Chapman & Hall, London, England, p. 74 (1984);

- Pharmaceutical Dosage Forms:  Parenteral Medications, Avis et al., 2nd Ed., Marcel Dekker, Inc., New York, Vol. 1 (1992).

- Remington Pharmaceutical Sciences, Mack Publishing Company, Easton, PA, pp. 238, 1463-1469 and 1478-1484 (1980);

- Remington Pharmaceutical Sciences, A. Gennaro, 18th Ed., Mack Publishing Company, Easton, PA, pp. 241-243 (1990); and

- Remington, The Science and Practice of Pharmacy, 19th Ed., Vols. 1 & 2, (1995).

## V.    ASSERTED CLAIM 1 OF THE '300 PATENT IS INVALID

### A.    Legal Standard for Obviousness

72.     I understand that a patent is invalid as obvious under Section 103 of the Patent Code if "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art."  In making the determination of obviousness, I have been asked to consider:  (1) the scope and content of the prior art; (2) the differences between the prior art and the claims at issue; and (3) the level of ordinary skill in the art. Additionally, I have been asked to consider various other considerations such as commercial success, long felt need, and failure of others, and how that impacts my opinion on obviousness.

### B.    Person of Ordinary Skill in the Art

73.     I believe that a person of ordinary skill in the art would have a Ph.D. in pharmaceutical chemistry, an equivalent degree or an equivalent amount of industry experience, and at least 5 to 10 years of experience in pharmaceutical formulations.

### C.    Claim Construction of Claim 1 of the '300 Patent

74.     Claim 1 of the '300 patent recites:

27

1. A pharmaceutical composition for intravenous administration to a patient comprising
   a) a pharmaceutically effective amount of a compound having the formula



(Seq. ID No. 1)

and the pharmaceutically acceptable salts thereof,
   b) a pharmaceutically acceptable amount of an excipient effective to form a lyophilized cake; and
   c) a pharmaceutically acceptable amount of an acetate buffer effective to provide a pharmaceutically acceptable pH.

75. I understand that the Court construed limitation (a) to include caspofungin as a free base [depicted by the chemical structure in the claim] or any pharmaceutically acceptable salt thereof.

**D.    Claim 1 of the '300 Patent is Obvious in View of the '804 Patent**

76. It is my opinion that the subject matter of claim 1 would have been obvious to a person of ordinary skill in the art at the time of the alleged invention in view of the '804 patent and known formulating strategies (*see* Rules A-D, above).  The known formulation strategies are evidenced by Remington, The Science and Practice of Pharmacy, 19th Ed., Vols. 1 & 2, 1995 ("Remington 1995") and G.L. Flynn:  "Buffers – pH Control Within Pharmaceutical Systems," Journal of the Parenteral Drug Association March-April, 1980, Vol. 34(2) ("Flynn"); *see also* Avis, Ch. 5.

28

77.     The '804 patent teaches that caspofungin (identified as compound I-6-1) is particularly outstanding for the control of mycotic infections (col. 2, ll. 33-64).  It teaches isolation of the drug as a lyophilized trifluoroacetate salt (col. 9, ll. 54-56) and a hydrochloride salt (col. 9, ll. 58-61; Example 2 (col. 16, l. 36 – col. 17, l. 67).  It teaches that pharmaceutically acceptable acid addition salts can be used, including those from acids such as hydrochloric, hydrobromic, phosphoric, sulfuric, maleic, citric, acetic, tartaric, succinic, oxalic, malic, glutamic and the like as well as others listed in Journal of Pharmaceutical Science, 66, 2 (1977) (col. 1, l. 67 to col. 2, l. 5 and col. 11, ll. 57-54).

78.     Prior to administration to a patient, a skilled formulator would conduct preformulation studies on caspofungin.  Preferably the pure drug, that is the free base, would be used for these studies.  Because the caspofungin free base is insoluble, the best alternative is to study the drug as an acid addition salt.  The results of studies using a salt are acceptable as a basis for designing the product formulation, as long as the salt of the drug substance is not changed; a change should trigger a repeat of some of the studies with another salt, to determine whether any of the data is affected by salt selection.  There are various acid addition salts discussed in the prior art.  One of skill in the art would focus on those salts which had been used the most frequently in approved drug formulations (*see* Rule B, above), and would be guided by the disclosures in the '804 patent of the tris-trifluoroacetate and tris-hydrochloride salts (*see* col. 17, ll. 40-50 and 61-67) and in U.S. Patent No. 5,552,521 to Belyk et al. ("Belyk"), also commonly assigned to Merck, disclosing the diacetate salt of caspofungin as the preferred embodiment (*see* col. 7, ll. 58-67; col. 8, ll. 1-10).  Further, it is my opinion that a person of ordinary skill in the art at the time of the alleged invention would have pursued a lyophilized formulation of caspofungin.

29

**Claim element (a): "[caspofungin] and the pharmaceutically acceptable salts thereof"**

79.     The '804 patent discloses caspofungin and its salts.  It would have been obvious to use either caspofungin or its salts in a pharmaceutical formulation for the reasons discussed above.

80.     With respect to the selection of a particular salt of caspofungin, Remington 1995 teaches FDA-approved commercially marketed salts as well as the percent of these salts in use through 1974 (p. 1457, Table 2; anion excerpt reproduced below)  This table provides a comprehensive listing of salts that may have been produced for all dosage forms.  A formulator will typically restrict the selection for salt screening to the salts that have been previously used for the dosage form(s) proposed by the project team (refer also to Rule B, above).  In the case of parenteral formulations, this significantly limits the number of preferred choices for initial testing.

### Table 2—FDA-Approved Commercially Marketed Salts

| Anion | Percent[a] | Anion | Percent[a] |
|---|---|---|---|
| Acetate | 1.26 | Iodide | 2.02 |
| Benzenesulfonate | 0.25 | Isethionate[i] | 0.88 |
| Benzoate | 0.51 | Lactate | 0.76 |
| Bicarbonate | 0.13 | Lactobionate | 0.13 |
| Bitartrate | 0.63 | Malate | 0.13 |
| Bromide | 4.68 | Maleate | 3.03 |
| Calcium edetate | 0.25 | Mandelate | 0.38 |
| Camsylate[b] | 0.25 | Mesylate | 2.02 |
| Carbonate | 0.38 | Methylbromide | 0.76 |
| Chloride | 4.17 | Methylnitrate | 0.38 |
| Citrate | 3.03 | Methylsulfate | 0.88 |
| Dihydrochloride | 0.51 | Mucate | 0.13 |
| Edetate | 0.25 | Napsylate | 0.25 |
| Edisylate[c] | 0.38 | Nitrate | 0.64 |
| Estolate[d] | 0.13 | Pamoate (Embonate) | 1.01 |
| Esylate[e] | 0.13 | Pantothenate | 0.25 |
| Fumarate | 0.25 | Phosphate/diphosphate | 3.16 |
| Gluceptate[f] | 0.18 | Polygalacturonate | 0.13 |
| Gluconate | 0.51 | Salicylate | 0.88 |
| Glutamate | 0.25 | Stearate | 0.25 |
| Glycollylarsanilate[g] | 0.13 | Subacetate | 0.38 |
| Hexylresorcinate | 0.13 | Succinate | 0.38 |
| Hydrabamine[h] | 0.25 | Sulfate | 7.46 |
| Hydrobromide | 1.90 | Tannate | 0.88 |
| Hydrochloride | 42.98 | Tartrate | 3.54 |
| Hydroxynaphthoate | 0.25 | Teoclate[j] | 0.13 |
|  |  | Triethiodide | 0.13 |

[a] Percent is based on total number of anionic or cationic salts in use through 1974.  [b] Camphorsulfonate.  [c] 1,2-Ethanedisulfonate.  [d] Lauryl sulfate.  [e] Ethanesulfonate.  [f] Glucoheptonate.  [g] $p$-Glycollamidophenylarsonate.  [h] $N,N'$-Di(dehydroabietyl)ethylenediamine.  [i] 2-Hydroxyethanesulfonate.  [j] 8-Chlorotheophyllinate.  [k] $N,N'$-Dibenzyl-ethylenediamine.  [l] $N$-Methylglucamine.

81.     Further, the FDA has a published database of inactive ingredients approved for use in pharmaceutical drug products, including the route of administration and the dosage form concentration that is commonly used by a person of skill in formulation (*see* Rules B-D, above). Using this database, there are only approximately 13 salts available for use in a parenteral formulation. An excerpt from the most recent version of this FDA database is attached hereto as Exhibit B. This database has been available for public use since at least 1990, and is updated quarterly. Because substances are almost always added to the list, and rarely removed, the

current version of the database provides a superset of salt choices that would have been considered by formulators in previous years.

82.     Using the available resources, a skilled formulator would make one or more of acid addition salts until they located a soluble and stable (in chemical and physical terms) one. The selection of salts and synthesis of salts was routine for a skilled formulator in 1995 (*see also* Rule B above).  Once the salt has been selected, the physiochemical properties of caspofungin drug substance can be studied.  As previously mentioned, a person of ordinary skill would have looked first to the known salts of caspofungin—namely, the tris-trifluoroacetate, tris-hydrochloride and diacetate salts (especially considering Rule A, above).

83.     Preformulation studies would routinely reveal the pKa(s) of the molecule and the stability of the drug as a function of the pH, the stability of the drug as a function of ionic strength, and the impact on solubility of each of these variables (pH and ionic strength).  For preformulation studies, the results are typically conducted with common salts and common buffers (*see also* Rule B above), as exemplified by the Table[3] below.

---

[3] This Table is my own work-product, and I have personally recommended this table for use by my clients for preformulation studies.

32

**Table. Representative formulas for pH and ionic strength solutions**

| pH | Buffer | pKa | [HA] mM | [A-] mM | ionic strength mM | total 50 mM NaCl mM | total 150 mM NaCl mM | total 300 mM NaCl mM |
|---|---|---|---|---|---|---|---|---|
| 2.00 | Cl-CH2COOH | 2.88 | 42.3 | 7.60 | 7 | 43 | 143 | 293 |
| 3.00 | Cl-CH2COOH | 2.88 | 17.7 | 32.20 | 32 | 18 | 118 | 268 |
| 4.00 | CH3COOH | 4.76 | 40.5 | 9.40 | 9 | 41 | 141 | 291 |
| 5.00 | CH3COOH | 4.76 | 15 | 34.90 | 35 | 15 | 115 | 265 |
| 6.00 | bis-Tris | 6.46 | 41.4 | 8.50 | 41 | 9 | 109 | 259 |
| 7.00 | bis-Tris | 6.46 | 16.3 | 33.60 | 16 | 34 | 134 | 284 |
| 7.50 | Tris | 8.06 | 43.5 | 6.40 | 43 | 7 | 107 | 257 |
| 8.00 | Tris | 8.06 | 33.9 | 16.00 | 33 | 17 | 116 | 266 |
| 9.00 | Tris | 8.06 | 8.7 | 41.20 | 8 | 42 | 142 | 292 |

84.     To find a formulation suitable for pharmaceutical use, one would need to consider both patient tolerance and drug shelf-life. The '804 patent teaches several modes of administration and specifically exemplify injectable formulations. (*See* col. 13, ll. 30-68; col. 14, ll. 1-15; example 31, col. 30). Thus based on the instability of caspofungin (making it unsuitable as an oral formulation) and the teaching of the '804 patent that caspofungin can be formulated as an injectable, one of skill in the art would choose an injection as a mode of administration. For intravenous administration, a patient can tolerate formulations with pKa(s) in the approximate range of 4-8. The drug shelf-life would be projected from the preformulation stability data at various pHs. A suitable buffer would be selected based in part on this data. For caspofungin, the solution stability would have revealed the optimal pH was 5, and acetate (with a pKa of 4.76) would have been an obvious choice for a buffer that would also match the counterion of the drug

substance diacetate salt (*see also* Rules A-D, above).[4]  The selection of acetate as a buffer is

discussed in greater detail below.

85.     Caspofungin's inherent physiochemical limitations include decomposition at a

rate that is unacceptable for practical drug use.   It degrades by various pathways, including

hydrolysis, dimerization, and oxidation.     These degradation pathways would have been

discovered during routine preformulation studies.  Thus, a skilled formulator would be motivated

by the routine preformulation studies to formulate the drug into an injectable composition using

routine techniques, including addition of buffers and excipients (subject to Rules A-D, above)

and freeze drying the compositions.  For example, Flynn demonstrates that even as early as 1980,

it was known to use buffers in pharmaceutical systems to establish and sustain a precise chemical

environment so as to promote the physical and chemical integrity of the dosage form of the drug.

*See* p. 144, third sentence, second full paragraph.

**Claim element (b):  "a pharmaceutically acceptable amount of an excipients
effective to form a lyophilized cake"**

86.     It would have been obvious to a person of ordinary skill in the art at the time of

the alleged invention that excipients could be used in a lyophilized formulation containing

caspofungin.  Excipients were a well known ingredient in lyophilized dosage forms at the time of

the alleged invention.  *See, e.g.,* Flynn; Remington 1995; Avis, Ch. 5.  A person would include

excipients in a lyophilized formulation because a lyophilized dosage form generally requires

excipient(s) that produce a lyophilized product with acceptable physicochemical characteristics..

87.     With respect to the selection of particular excipients, the formulation, in addition

to the preformulation, solution study data would reveal whether the acid addition salt of the drug

---

[4] For example, the Merck inventors did solution testing, as would any pharmaceutical chemist,
and determined that the optimal pH for caspofungin was 5.  This was ordinary, routine lab work.

fails to meet the criterion for shelf life stability even when suitably buffered. If the drug is not sufficiently stabilized by the buffer at the target pH, one would add excipients to the composition to help stabilize the drug against aggregation, hydrolysis and oxidation (subject to Rules A-D, above). A skilled formulator would know that one way of dealing with the aggregation issue in a molecule like caspofungin (which will be subject to general formulation considerations expected for proteins, peptides, or small molecules) is to change the ionic strength or change the concentration or, less commonly, change the nature of the solvent (*e.g.*, instead of water, oil based). If the simplest steps of changing ionic strength or concentration were insufficient to solve the aggregation problem, a skilled artisan would be motivated to add an excipient to the formulation to avoid particulate formation during storage (subject to Rule B, above). Indeed, the '804 patent teaches that injectable formulations may contain "formulating agents such as suspending, stabilizing and/or dispersing agents." (Col. 13, ll. 64-68; col. 14, ll. 1-7). For an injectable dosage form, one of skill in the art would not initially choose the latter course of action, but would instead simply rely on an aqueous solution and, in addition, consider freeze drying.

88.     In 1995, a skilled formulator would routinely test excipients in screening experiments to find a formulation that would result in a stable lyophilized cake (*see* Rules A-D, above). To develop freeze dried formulations, one of skill in the art would screen different combinations of excipients using a single conservative freeze drying cycle. These ingredients are typically selected by performing test lyophilization runs on a large number of ingredient combinations and concentrations, and initially selecting the best excipients based on easily determined aspects of product quality (appearance, reconstitution time, etc). The final choice of

excipients would be based on studies of the thermal properties of formulations that passed the preliminary screening experiments.

89.    The common excipients include stabilizing or glass-forming sugars (*e.g.*, sucrose), amorphous polymers (*e.g.*, polyethylene glycol), crystalline excipients (*e.g.*, glycine and mannitol), surfactants (*e.g.*, polysorbate 80) and drug class specific excipients (*e.g.*, arginine for polypeptides).  Excipient screening would routinely test high and low concentrations (*e.g.*, 2 and 10% w/v) of each excipient and would also include complementary excipients (*e.g.*, glass-forming sugars and crystalline sugars) (*see* Rules A-D, above, for considerations involving number and identity of ingredients to screen).

90.    In 1995, a skilled formulator would know that mannitol tends to self-crystallize (*i.e.*, it is a crystalline sugar), which provides physical structure and stability to the cake.  From a product stability standpoint, mannitol may have a negative effect by itself.  This is because the mannitol crystals may exclude the drug, so that the dried drug becomes a highly concentrated residue that may be in contact with concentrated excipients that destabilize the product.  But in 1995, it was also known that sucrose is an excellent amorphous sugar/glass-former that tends to soften as the drying process proceeds (and the matrix warms), so that the matrix physically collapses during lyophilization.  The advantage of the glass forming property of sucrose is that a drug may be stabilized by effectively diluting the drug in the form of a solid solution (of high viscosity-hence a glass).  Therefore, a skilled artisan (applying Rules A-D, above) would know that by combining sucrose and mannitol, one could create a stable physical structure during and after lyophilization due to the crystalline matrix formed by the mannitol, overlaid with a glassy porous matrix of dry sucrose that contains the stabilized drug as well as other excipients as a solid solution.

91.     Mannitol and sucrose would have been obvious choices as excipients to a person of ordinary skill (applying Rules A-D, above).  In fact, using approved IV formulation ingredients as a restriction in combination with the exclusion of reducing sugars for incompatible structures like caspofungin eliminates all other combinations except possibly sorbitol (*see* Ex. B, searching for non-reducing sugars previously used in approved IV products).  However, the -43.5°C glass transition temperature ($t_g$) of sorbitol compares unfavorably with the $t_g$ for sucrose, -32°C).  Routine experimentation would confirm that expectation, as well the optimal amounts of each.

92.     As an example, the following combinations of ingredients might be tested at the screening stage of a lyophilized formulation:

Excipient Recipes

A. pH: [select one based on preformulation data]

A. buffer: [select 1-2 based on preformulation data and pH]

B1. amorphous phase: sugars: trehalose, sucrose [concentrations: 2.0 and 10% w/v]

B2. amorphous phase: polymer: polyvinylpyrrolidone ("PVP" 40k), polyethylene glycol ("PEG") 400 [concentrations:  2.0 and 10% w/v]

C. crystalline phase: glycine, mannitol [concentrations: 2.0 and 10% w/v]

D. amino acid: arginine [concentrations: 2.0 and 10% w/v]

E. surfactant: polysorbate 80 [0.02% only]


All samples contain at least one pH/buffer combination (A)

One set of samples contains one A and one additional ingredient, at 1-2 concentrations. One set of samples contains one A, one B and one C, with C at the high concentration and B at the low concentration.

One set of samples contains one A, one B-D at 2 concentrations, and E at one concentration.

93.     These  screening  experiments  (designed  and  practiced  considering  Rules  A-D, above) would confirm for a person of ordinary skill in the art that mannitol and sucrose would form an acceptable cake during lyophilization.

**Claim element (c): "a pharmaceutically acceptable amount of an acetate buffer effective to provide a pharmaceutically acceptable pH"**

94.     It would have been obvious to a person of ordinary skill in the art at the time of the alleged invention that a buffer could be used in a formulation containing caspofungin. Buffers were a well known method ensuring a stabilizing a dosage form at the time of the alleged invention. *See, e.g.*, Flynn; Remington 1995; Avis, Ch. 5. It would also have been obvious that the buffer should provide a pharmaceutically acceptable pH. (*Id.*). After all, a composition with a pharmaceutically *unacceptable* pH would make no sense at all.

95.     It would have been obvious to a person of ordinary skill in the art at the time of the alleged invention to use acetate as a buffer in a caspofungin formulation. First, the pKa of caspofungin suggests the use of an acetate buffer. The pKa(s) of any drug is(are) an inherent property that may be easily determined during routine preformulation work. Caspofungin has four pKas - 5.1, 8.7, 9.7 and 10.7 (*see* WO/2004/091578). The lowest pKa of 5.1 is relevant for designing a pharmaceutical composition. A suitable buffer should have a pKa around this range. As a rule of thumb, formulators use a buffer at a pH of plus or minus 1 unit from the relevant pKa. There are just a handful of potential buffers that have a relevant pKa around this range (*see* Rule B, above): acetate (4.76), citrate (4.76), tartrate (4.34) and succinate (4.21, 5.64). Ascorbate (5.20) may also serve as a buffer in an IV formulation, but it is usually added to provide an antioxidant.

96.     Second, of the buffers mentioned above, only acetate and citrate are commonly used for parenteral formulations (*see* Ex. B for a tabulation). For example, U.S. Patent No. 4,857,552 to Rosenberg et al. ("Rosenberg") demonstrates that a skilled formulator would select acetate buffer to stabilize a drug at a pKa of 5. Rosenberg taught that the drug esmolol could be formulated at pH near 5.0 using acetate buffer. (Col. 2, ll. 41-48). The fact that acetate is

39

commonly used for parenteral formulations would suggest its use in a caspofungin formulation for two reasons: (1) use of an uncommon buffer may require additional research and investigation and, for that reason, common buffers are much preferred and (2) acetic acid is common ingredient that is readily available and present in nearly every pharmaceutical laboratory.

97.     Third, once the diacetate salt of caspofungin is selected, for the reasons noted above, it would have been obvious to one of skill in the art to use acetate as the addition salt as well as the buffer.  There is no reason to add an additional counterion to the formulation (*see* Rule A, above).  Additionally, acetate is a simple monoprotic acid with properties that are sufficient for the product needs.

98.     In some cases, the amount of acetate present in the acid addition salt of the drug may dictate the pH limits of the target pH within which the acetate will still provide adequate buffering capacity.  In other cases, a skilled artisan would increase the concentration of acetate (*e.g.*, if a wider pH range is desired such as claimed in claim 2 of the '300 patent) (subject to Rule C, above).

99.     For the reasons stated above, it is my opinion that a person of ordinary skill in the art would readily choose an acetate buffer for a caspofungin formulation.  Alternatively, at the very least, acetate would be one of a limited and very small group of possible buffers that would have been obvious to try at the time of the alleged invention.

## VI.    CONCLUSION

100.    It is my opinion that claim 1 of the '300 patent is invalid as obvious over the '804 patent disclosing caspofungin in view of known methods for formulating drug compositions.  A person of ordinary skill in the art as of the date of the alleged invention would have used routine

experimentation and optimization (as summarized in Rules A-D, above) to formulate the diacetate salt of caspofungin into an injectable formulation using an acetate buffer and suitable excipients to form a lyophilized cake.

101.    To the extent that Merck relies on any secondary considerations of non-obviousness to rebut the above contentions, I reserve the right to supplement and/or modify my opinions after reviewing those opinions and evidence.


2 9 MAR 2011
Date

Mark A. Staples, Ph.D.

41

# Exhibit 1-E

REDACTED
IN ITS
ENTIRETY

# Exhibit 1-F

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MERCK SHARP & DOHME CORP., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 14cv199-RGA |
| | ) | |
| XELLIA PHARMACEUTICALS APS, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT XELLIA PHARMACEUTICALS APS'S OBJECTIONS AND
RESPONSES TO MERCK'S FIRST SET OF REQUESTS FOR ADMISSION**

Defendant Xellia Pharmaceuticals ApS ("Xellia") hereby provides these responses and

objections to Merck's First Set of Requests for Admission to Xellia ("Requests").

**GENERAL OBJECTIONS**

Xellia incorporates each of its General Objections from Defendant's Objections and

Responses to Plaintiff's First Set of Requests for the Production of Documents and Things,

served June 12, 2014.

1.      Xellia further objects to these Requests to the extent that they are premature and/or

conflict with any schedule for disclosure set forth under the Local Rules or entered by the

Court.

2.      Xellia further objects to these Requests to the extent they call for a legal conclusion.

3.      Xellia further objects to any Request directed toward applying claim 1 of the '300 Patent

or requiring application of such claim prior to any claim construction ruling by the Court.

In addition, Xellia objects to each Request to the extent it requires a construction of any

element or term contained in claim 1 of the '300 Patent.

1

4.      Xellia further objects to the definition of "Package Insert" to the extent it covers anything other than a package insert approved for distribution with Xellia's ANDA product by the U.S. Food and Drug Administration ("FDA").  Xellia interprets this term to refer solely to an approved package insert.

5.      Xellia has responded to the Requests based on information in its possession, custody, or control that it has been able to ascertain based on reasonable search and inquiry.  Xellia's investigation of the facts relevant to this action is ongoing.  Accordingly, Xellia reserves the right to further amend and/or supplement these responses if additional information becomes available in the course of its ongoing diligent inquiries, through discovery, or otherwise.  These responses should not be construed as, and do not constitute, a waiver of Xellia's right to adduce additional facts at trial.

6.      Xellia's answers to the Requests do not constitute admissions or acknowledgements that the information sought is within the proper scope of discovery or admissible at trial. The General Objections set forth above are made without prejudice to and without waiver of Xellia's right to object on all appropriate grounds to the specific information sought by each Request.

Subject to the General Objections outlined above and the more specific objections set forth below, Xellia responds as follows:


**SPECIFIC OBJECTIONS AND RESPONSES**

1.      Upon reconstitution of Defendant's 50 mg ANDA Product according to section 2.6 B of the Package Insert with 0.9% sodium chloride injection, acetic acid is present.

**Response:**

2

Xellia objects to this Request as prematurely seeking expert opinion.  Subject to its

General Objections and the foregoing, Xellia has insufficient information at this time to either

admit or deny this Request, and therefore denies it.

2.      Upon reconstitution of Defendant's 50 mg ANDA Product according to section 2.6 B of the Package Insert with sterile water for injection, acetic acid is present.

**Response:**

Xellia objects to this Request as prematurely seeking expert opinion.  Subject to its

General Objections and the foregoing, Xellia has insufficient information at this time to either

admit or deny this Request, and therefore denies it.

3.      Upon reconstitution of Defendant's 50 mg ANDA Product according to section 2.6 B of the Package Insert with bacteriostatic water for injection with methylparaben and propylparaben, acetic acid is present.

**Response:**

Xellia objects to this Request as prematurely seeking expert opinion.  Subject to its

General Objections and the foregoing, Xellia has insufficient information at this time to either

admit or deny this Request, and therefore denies it.

4.      Upon reconstitution of Defendant's 50 mg ANDA Product according to section 2.6 B of the Package Insert with bacteriostatic water for injection with 0.9% benzyl alcohol, acetic acid is present.

**Response:**

Xellia objects to this Request as prematurely seeking expert opinion.  Subject to its

General Objections and the foregoing, Xellia has insufficient information at this time to either

admit or deny this Request, and therefore denies it.

5.      Upon reconstitution of Defendant's 70 mg ANDA Product according to section 2.6 B of the Package Insert with 0.9% sodium chloride injection, acetic acid is present.

**Response:**

Xellia objects to this Request as prematurely seeking expert opinion.  Subject to its

General Objections and the foregoing, Xellia has insufficient information at this time to either

admit or deny this Request, and therefore denies it.


6.      Upon reconstitution of Defendant's 70 mg ANDA Product according to section 2.6 B of the Package Insert with sterile water for injection, acetic acid is present.

**Response:**

Xellia objects to this Request as prematurely seeking expert opinion.  Subject to its

General Objections and the foregoing, Xellia has insufficient information at this time to either

admit or deny this Request, and therefore denies it.


**7.**      Upon reconstitution of Defendant's 70 mg ANDA Product according to section 2.6 B of the Package Insert with bacteriostatic water for injection with methylparaben and propylparaben, acetic acid is present.

**Response:**

Xellia objects to this Request as prematurely seeking expert opinion.  Subject to its

General Objections and the foregoing, Xellia has insufficient information at this time to either

admit or deny this Request, and therefore denies it.


8.      Upon reconstitution of Defendant's 70 mg ANDA Product according to section 2.6 B of the Package Insert with bacteriostatic water for injection with 0.9% benzyl alcohol, acetic acid is present.

**Response:**

Xellia objects to this Request as prematurely seeking expert opinion.  Subject to its

General Objections and the foregoing, Xellia has insufficient information at this time to either

admit or deny this Request, and therefore denies it.

9.      Acetic acid is added during the manufacture of the API in Defendant's ANDA Products.

**Response:**

Subject to its General Objections, Xellia admits that acetic acid is added during the

manufacture of the caspofungin acetate API, and that such acid is added as a counter-ion to

obtain the diacetate salt of caspofungin, which is then precipitated out of solution.

10.     Sodium hydroxide is added during the manufacture of Defendant's ANDA Products.

**Response:**

Subject to its General Objections, Xellia admits that sodium hydroxide is added during

the manufacture of its ANDA products to adjust the pH of the bulk solution, not as a buffer.

11.     Upon completion of compounding of bulk solution during manufacturing of Defendant's
ANDA Products (XELLIA 000290-91), acetic acid is present.

**Response:**

Xellia objects to this Request as prematurely seeking expert opinion.  Subject to its

General Objections and the foregoing, Xellia has insufficient information at this time to either

admit or deny this Request, and therefore denies it.

12.     Xellia will provide to each purchaser of Defendant's ANDA Products a copy of the Package Insert.

**Response:**

Xellia objects to this Request as vague and ambiguous insofar as it does not specify the meaning of the term "purchaser."  Subject to its General Objections, Xellia admits that it will distribute a package insert with its ANDA products approved for distribution by the FDA.

13.     Xellia will sell Defendant's ANDA Products in the United States for use as directed by the Package Insert.

**Response:**

Subject to its General Objections, Xellia admits that it will sell its ANDA Products in the United States for use as directed by a package insert approved for distribution by the FDA.

14.     Defendant's ANDA Products are safe for use in patients when administered as directed by the Package Insert.

**Response:**

Subject to its General Objections, Xellia admits this Request For Admission to the extent it refers to a package insert and Products approved for distribution by the FDA.

Respectfully submitted,

Karen E. Keller (No. 4489)
Jeffrey T. Castellano (No. 4837)
Stephanie E. O'Byrne (No. 4446)
SHAW KELLER LLP
300 Delaware Ave., Suite 1120
Wilmington, DE 19801
kkeller@shawkeller.com
jcastellano@shawkeller.com
sobyrne@shawkeller.com

*Attorneys for Defendant Xellia
Pharmaceuticals ApS*

Jeffrey S. Ward
Wendy M. Ward
Stephen R. Howe
MERCHANT & GOULD, P.C.
10 E. Doty St., Suite 600
Madison, WI 53703
(608) 280-6750
jward@merchantgould.com
wward@merchantgould.com
showe@merchantgould.com

Jeffrey D. Blake
MERCHANT & GOULD, P.C.
191 Peachtree St. NE, Suite 4300
Atlanta, GA 30303
(404) 954-5100

Dated: August 21, 2014

*Of Counsel for Defendant Xellia
Pharmaceuticals ApS*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 21, 2014, I caused the foregoing to be served via

electronic mail on the following:

Jack B. Blumenfeld
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@mnat.com

Brian V. Slater
Jason A. Leonard
FITZPATRICK, CELLA, HARPER & SCINTO
1290 Avenue of the Americas
New York, NY 10104-3800
(212) 218-2100
bslater@fchs.com
jleonard@fchs.com

8

# Exhibit 1-G

1

UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY

----------------------------

MERCK & CO., INC, and
MERCK SHARP & DOHME CORP.,

Plaintiffs,

                                        C.A. No.
          vs.                  2:09-cv-06026-SRC-PS

TEVA PARENTERAL MEDICINES, INC.,
and TEVA PHARMACEUTICAL USA, INC.,

Defendants.

----------------------------
MERCK & CO., INC, and
MERCK SHARP & DOHME CORP.,

Plaintiffs,          C.A. Nos.
                                  2:10-cv-01625
          v.                 2:10-02308-SRC-PS

SANDOZ INC.,

Defendant.

----------------------------

The Videotaped Deposition of
 MARK STAPLES, Ph.D., Appearing, was taken pursuant to
 notice on behalf of the Plaintiffs on June 10, 2011, at
 455 Cityfront Plaza, Chicago, Illinois, at 9:12 a.m.,
 before Cynthia J. Conforti, Certified Realtime Reporter
 and Notary Public within Illinois.

Job No: 21868

2

```
 1
 2                    APPEARANCES
 3    For the Plaintiffs:
 4         Fitzpatrick, Cella, Harper & Scinto
 5         1290 Avenue of the Americas
 6         New York, New York  10104
 7         212-218-2100
 8         By:  JASON A. LEONARD, ESQ.
 9              Jleonard@fchs.com
10              BRIAN V. SLATER, ESQ.
11              Bslater@fchs.com
12
13    For the Defendants:
14         Brinks Hofer Gilson & Lione
15         NBC Tower, Suite 3600
16         455 North Cityfront Plaza Drive
17         Chicago, Illinois  60611
18         312-321-4720
19         By:  MARK H. REMUS, ESQ.
20              Mremus@brinkshofer.com
21
22    Also Present: Joseph Pate, Videographer
23              Karen Stoffan, Esq., Merck
24
25
```

4

```
 1
 2    I N D E X (Continued)
 3    EXAMINATION OF MARK STAPLES, Ph.D.        PAGE
 4    Exhibit 63    Letter, Department of Health
                     and Human Services to Adelman
 5                   (3 pages)
                     No Bates Numbers          54
 6
 7    Exhibit 64    Avonex Interferon Beta 1-a
                     Prescribing Information
 8                   (4 pages)
                     No Bates Numbers          57
 9    Exhibit 65    Deposition of Maneesh J.
                     Nerurkar
10                   (49 pages)
                     No Bates Numbers
11    CONFIDENTIAL - ATTORNEYS' EYES ONLY      82
12    Exhibit 66    Deposition Transcript of
                     Michael Kaufman, Ph.D.
13                   (56 pages)
                     No Bates Numbers          92
14
15    Exhibit 67    US Patent 5,552,521
                     (10 pages)
16                   No Bates Numbers          93
17    Exhibit 68    US FDA document
                     Re:  Dosage Form
18                   (8 pages)
                     No Bates Numbers          107
19    Exhibit 69    Merck & Company document
                     Prescribing Information for
20                   Cancidas
                     (48 pages)
21                   No Bates Numbers          141
22
23
24
25
```

3

```
 1
 2              I N D E X
 3    EXAMINATION OF MARK STAPLES, Ph.D.        PAGE
      June 10, 2011
 4
 5    By Mr. Slater            8
 6    By Mr. Remus             236
 7    By Mr. Slater            236
 8    EXHIBITS:
 9    DEFENDANT'S
10    Exhibit 1    US Patent 5,378,804
                    (64 pages)
11                  No Bates Numbers           87
12    Exhibit 67   Overview - Sterile and
                    Liquids Consulting, LLC,
13                  William A. Hunke
                    (9 pages)
14                  No Bates Numbers           80
15    Exhibit 68   US Patent 5,952,300
                    (8 pages)
16                  No Bates Numbers           30
17    PLAINTIFFS'
18    Exhibit 59   Expert Report of Mark
                    A. Staples, Ph.D.
19                  (48 pages)
                    No Bates Numbers           21
20    Exhibit 60   Reply Expert Report of
                    Mark A. Staples, Ph.D.
21                  (17 pages)
                    No Bates Numbers           23
22
23    Exhibit 61   Caspofungin Acetate
                    Prescribing Information
                    SAND-CASP989030 - 58       33
24    HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY
25    Exhibit 62   NO EXHIBIT 62 MARKED
```

5

```
 1
 2              I N D E X (Continued)
 3    EXAMINATION OF MARK STAPLES, Ph.D.        PAGE
 4    Exhibit 70    PDR 1995 Edition - Cosmegen
                     (6 pages)
 5                   No Bates Numbers          142
 6    Exhibit 71    PDR 1995 Edition - FUDR
                     (4 pages)
 7                   No Bates Numbers          144
 8    Exhibit 72    Document titled Pharmaceutical
                     Dosage Forms: Parenteral
 9                   Medications
                     (4 pages)
10                   TCA0002675 - 2690
                     (76 pages)
11                   (34 pages)
                     (36 pages)              148
12
13    Exhibit 73    Journal of the Parenteral
                     Drug Association
14                   (26 pages)
                     No Bates Numbers          169
15    Exhibit 74    Remington: The Science and
                     Practice of Pharmacy
16                   Volume I
                     (62 pages)
17                   No Bates Numbers          186
18    Exhibit 75    PDR 1995 Edition - Lupron
                     (9 pages)
19                   No Bates Numbers          194
20    Exhibit 76    Research Paper - Long-term
                     Stability and in vitro
21                   Release of hPTH(1-34) from
                     a Multi-reservoir Array
22                   (10 pages)
                     No Bates Numbers          203
23
24    Exhibit 77    Rebuttal Expert Report
                     of Stephen R. Byrn
25                   (92 pages)
                     No Bates Numbers          222
```

2  (Pages 2 to 5)

**6**

1
2                    I N D E X (Continued)
3    EXAMINATION OF MARK STAPLES, Ph.D.        PAGE
4    Exhibit 78    US PTO Application Number
          08/827,510
5           MRK_CAN0000042 - 706        227
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**7**

1              DEPOSITION OF MARK STAPLES, Ph.D.
2              THE VIDEOGRAPHER:  This is Tape Number 1 of
3    the videotaped deposition of Dr. Mark Staples, Ph.D.,
4    taken by Brian Slater of Fitzpatrick, Cella, Harper &
5    Scinto, for the Plaintiff, in the matter of Merck &
6    Company, Incorporated, et al., versus Sandoz,
7    Incorporated, in the United States District Court for the
8    District of New Jersey, Case Numbers 2:10-01625 and
9    2:10-02308-SRC-PS.
10             This deposition is being held at 455
11   North Cityfront Plaza Drive, Chicago, Illinois, on
12   June 10, 2011, at approximately 9:12 a.m.
13             My name is Joe Pate from the firm of
14   David Feldman Worldwide, and I am the legal video
15   specialist.  The court reporter is Cynthia Conforti, also
16   in association with David Feldman Worldwide.
17             Will counsel please introduce
18   yourselves.
19             MR. SLATER:  Brian Slater of Fitzpatrick,
20   Cella for Merck, and with me is Jason Leonard also of
21   Fitzpatrick Cella.
22             MR. REMUS:  Mark Remus on behalf of Sandoz,
23   Inc.
24             THE VIDEOGRAPHER:  Would the court reporter
25   please swear in the witness.

**8**

1              DEPOSITION OF MARK STAPLES, Ph.D.
2              (Witness duly sworn.)
3              MARK STAPLES, Ph.D.,
4    called as a witness herein, having been
5    first duly sworn, was examined and testified
6    as follows:
7              EXAMINATION BY MR. SLATER
8       Q.   Good morning, Dr. Staples.
9       A.   Good morning.
10      Q.   Can you state your name for the record.
11      A.   Yes.  It's MARK STAPLES.
12      Q.   What's your home address?
13      A.   It's 10 Rogers Street, Unit 906, Cambridge,
14   Massachusetts, 02142.
15      Q.   Have you ever been deposed before?
16      A.   No, I have not.
17      Q.   Have you ever been deposed in any civil
18   matter, even if it's not as an expert witness?
19      A.   No.
20      Q.   Just to explain generally, the way I'd like
21   to proceed, obviously, I'll be asking you questions.  If
22   there's anything about my questions you don't understand,
23   I'd ask you to point that out.
24      A.   I understand.
25      Q.   If -- if you don't, and you answer the

**9**

1              DEPOSITION OF MARK STAPLES, Ph.D.
2    question, I'm going to assume that you understood the
3    question; is that fair?
4       A.   That's fair.
5       Q.   Okay.  Are you on any medication today that
6    would impair your ability to testify fully or truthfully?
7       A.   No.
8       Q.   Is there any reason why, sitting here today,
9    you can't testify fully and truthfully?
10      A.   No.
11      Q.   You submitted two experts reports in this
12   matter; correct?
13      A.   Yes.
14      Q.   Is there anything about those reports that
15   you would like to change?
16      A.   No.
17      Q.   When was the last time you looked at those
18   reports?
19      A.   Yesterday.
20      Q.   Did you read them?
21      A.   I did.
22      Q.   Did you read the whole reports?
23      A.   I -- I reviewed them.  I didn't read them
24   word for word.
25      Q.   And you didn't notice any mistakes in those

3  (Pages 6 to 9)

194

DEPOSITION OF MARK STAPLES, Ph.D.

1             DEPOSITION OF MARK STAPLES, Ph.D.
2 but it was on the order of once a month or once every
3 3 months.
4         And that was the -- that was the point
5 of making that product.
6    **Q.**  **And you don't recall whether the product had**
7 **an acetate buffer added to it?**
8    A.  Well, I don't know that. It's, you know,
9 it's something from the literature, so I wasn't directly
10 involved, and I don't recall any statements in the
11 literature specifically regarding a buffer, whether it
12 was present or not.
13     MR. SLATER: Let me mark as Plaintiffs'
14 Exhibit 75 an excerpt from the 1995 Physician's Desk
15 Reference, Pages 2502 through 2580.
16     (WHEREUPON, the document was
17     tendered to the witness.)
18     THE WITNESS: Okay. And I'm looking at --
19 I'm looking at page 2502, I see from Tap Pharmaceuticals,
20 the Lupron product.
21    **Q.**  **That's -- that's a leuprolide acetate**
22 **injection product?**
23    A.  That's right.
24    **Q.**  **Is that a solution product?**
25    A.  As I mentioned, it was initially a solution

195

DEPOSITION OF MARK STAPLES, Ph.D.

1             DEPOSITION OF MARK STAPLES, Ph.D.
2 product, and the problem was that it was a significant
3 disadvantage to have to inject it so frequently.
4    **Q.**  **What I mean though is is the product you're**
5 **looking at here on Page 2502 a solution product?**
6    A.  This product is a solution product.
7    **Q.**  **Okay. And it does not contain a buffer,**
8 **correct?**
9    A.  It states it has leuprolide acetate. Yeah,
10 in this case -- in this case, I believe it would have
11 acetate as a buffer, and, specifically, what I think this
12 recipe represents is they began with leuprolide acetate
13 as a -- the direct substance plus its counterion, and
14 then it states that the pH is then adjusted with sodium
15 hydroxide and/or acetic acid.
16     And that suggests to me what they're
17 doing is bringing the pH up within the buffering range
18 of acetate, and the acetate is the buffer in this
19 preparation.
20    **Q.**  **Do you recall that there was a leuprolide**
21 **acetate lyophilized product at the same time in the --**
22 **approved?**
23    A.  I don't recall if it was at the same time,
24 but --
25    **Q.**  **Well, if you go to the next page, see**

196

DEPOSITION OF MARK STAPLES, Ph.D.

1         **DEPOSITION OF MARK STAPLES, Ph.D.**
2 there's a product called Lupron Depot?
3    A.  Okay. Yes. And that was -- that was the
4 one I was referring to in terms of the use of freeze
5 drying with an acetate preparation.
6    **Q.**  **Okay. So let me make sure I understand this**
7 **product.**
8    **It says at the top of the third column**
9 **that the single-dose vial of Lupron Depot 3.75 milligrams**
10 **contains leuprolide acetate, purified gelatin, DL-lactic**
11 **and glycolic acid copolymer and D-Mannitol.  Do you see**
12 **that?**
13    A.  Yes, I do.
14    **Q.**  **So there's no acetate buffer added to that**
15 **vial.**
16    A.  Let me think about that.
17     Yeah, I see no mention of any pH
18 adjuster, so based on this information, I would say the
19 reference to the acetate would primarily involve the
20 counterion, and although it could have a buffering
21 capacity as well, I don't see a reference to pH
22 adjustment that would let me state that.
23    **Q.**  **And then in the last sentence of that first**
24 **paragraph.**
25    A.  Yes.

197

DEPOSITION OF MARK STAPLES, Ph.D.

1         DEPOSITION OF MARK STAPLES, Ph.D.
2    **Q.**  **Do you see it says:**
3    **During the manufacture of Lupron**
4 **Depot, acetic acid is lost leaving the peptide.**
5    A.  Yes, I do see that.
6    **Q.**  **So you start with leuprolide acetate, and**
7 **during manufacture you lose acetic acid from the**
8 **leuprolide acetate?**
9    A.  Well, it's a -- it's a little difficult to
10 interpret.
11     And the reason I say that is it's not
12 clear to me whether -- whether all the acetate counterion
13 is removed.
14     To say that acetic acid is lost
15 leaving the peptide could mean that you're, as I
16 mentioned before, it is -- it is volatile.
17     So if it's not associated with
18 anything, and it's not trapped in a glass, then it will
19 be removed, so that would not be surprising.
20     Whether it would remove all of the
21 counterion though, you could state that all the freed
22 acetic acid was removed, and it's possible you would
23 still have some acetate counterion left, but I can't
24 conclude that one way or the other.
25    **Q.**  **It's also possible that you might not have**

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 2803, New York, NY 10123 (212)705-8585

198

DEPOSITION OF MARK STAPLES, Ph.D.

1  DEPOSITION OF MARK STAPLES, Ph.D.
2  any of the acetate counterion left because maybe all of
3  it is removed as acetic acid.
4      A.    And I'm saying that I don't believe I could
5  determine one way or the other.
6      Q.    Right.
7            Now, in this product, there's a
8  separate ampule that comes with the product of diluent?
9  Do you see that?
10     A.    I do see that.
11     Q.    And it contains carboxymethylcellulose
12  sodium, D-Mannitol, polysorbate 80, water for injection
13  USP and acetic acid and F to control pH.  Do you see
14  that?
15     A.    Yes, I do.
16     Q.    So is it your understanding that the diluent
17  was what's used to reconstitute the solid powder that's
18  in the first vial we discussed?
19     A.    That's correct.  That's what the diluent
20  would be there for.
21     Q.    So in this case, there's no acetic acid
22  added to the formulation prior to lyophilization.  It's
23  added after reconstitution.
24     A.    Yes.  In this case, that seems to be
25  correct.

199

1  DEPOSITION OF MARK STAPLES, Ph.D.
2      Q.    So the precedent that you're relying on,
3  leuprolide acetate, we've got two products.  One is a
4  solution product, and the other is a lyophilized product
5  that doesn't contain in the formulation prior to
6  lyophilization an acetate buffer.  It only contains
7  acetic acid after reconstitution.
8      A.    In the case of -- as far as I can tell from
9  this description, that's the case.
10     Q.    Going to your short list of buffers that you
11  say a person of ordinary skill in the art would limit
12  themselves to in Exhibit B of your report, which of those
13  buffers other than acetate buffer is volatile?
14     A.    Acetate should be the only one that's
15  volatile.
16     Q.    So citrate is not volatile?
17     A.    No.
18     Q.    Ascorbate is not volatile?
19     A.    No.
20     Q.    Tartrate is not volatile?
21     A.    No.
22     Q.    And succinic is not volatile.
23     A.    That's correct.
24     Q.    So whatever happens with the volatility of
25  the acetic acid, that would not be a factor you would

200

1  DEPOSITION OF MARK STAPLES, Ph.D.
2  have to account for if you were using one of the other
3  five buffers that you put on this short list in Exhibit
4  B.
5      A.    That's true.
6      Q.    And just for clarity, is it correct that
7  citrate is not volatile?
8      A.    That's correct.
9      Q.    Is it correct that ascorbate is not
10  volatile?
11     A.    That's correct.
12     Q.    Is it correct that tartrate is not volatile?
13     A.    That's correct.
14     Q.    And is it correct that succinic is not
15  volatile?
16     A.    That's right.
17           MR. SLATER:  Let's take a break.
18           THE VIDEOGRAPHER:  This is the end of Tape
19  Number 4 in the videotaped deposition of Dr. Mark
20  Staples.
21           Going off the record.  The time is now
22  4:13 p.m.
23           (WHEREUPON, a recess was had.)
24           THE VIDEOGRAPHER:  This is the beginning of
25  Tape Number 5 in the videotaped deposition of Dr. Mark

201

1  DEPOSITION OF MARK STAPLES, Ph.D.
2  Staples.  Going on the record.  The time is now 4:30 p.m.
3  Please continue.
4      Q.    If you could return to your opening report,
5  Doctor, Paragraph 22.
6      A.    I'm on Paragraph 22.
7      Q.    Rule B?
8      A.    Okay.  Rule B.
9      Q.    This is your rule that you should use
10  ingredients that have been previously used?
11     A.    That's correct.
12     Q.    In the last sentence of that rule you say:
13           Data must support a scientific and
14  clinical defense for the use of each ingredient of the
15  dose as well as the amount per dose.
16     A.    That's correct.
17     Q.    And Rule C you talk about using ingredients
18  at the lowest possible concentration in order to achieve
19  target performance characteristics, correct?
20     A.    That's correct.
21     Q.    And, again, in the last sentence of that
22  rule, you talk about, again, the need for data to support
23  a scientific and clinical defense for the concentration
24  of each ingredient of the dose.
25     A.    That's correct.

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 2803, New York, NY 10123  (212)705-8585

222

DEPOSITION OF MARK STAPLES, Ph.D.

1    two.
2    A.    I believe so.
3    Q.    It was in the Byrn rebuttal expert report.
4    A.    Yes.
5    Q.    And you reviewed that.
6    A.    I believe I did.  I either -- I either saw
7    it there or I might have seen it in the case file of the
8    original report.
9    Q.    Are you aware that there was a particular
10   degradent, that in these experiments Merck found that it
11   only occurred upon lyophilization, that it was not
12   present during the solution experiments?
13   A.    Yes.
14   Q.    Do you recall that that's the L717
15   degradent?
16   A.    I believe that's -- that's correct.
17   Q.    Why would acetate produce less of the L717
18   degradent than the tartrate-buffered formulations?
19   A.    Let me look at the structural formula for
20   that if you have the 7 -- to put the 717 into context.
21   Did -- I thought that Dr. Byrns --
22   Q.    Let me show you copy of his -- a marked copy
23   of Dr. Byrn's rebuttal expert report as Plaintiffs'
24   Exhibit 77.  You can look at any part of this you want,

223

DEPOSITION OF MARK STAPLES, Ph.D.

1    but I think it's on Page 17.
2    A.    That's exactly what I was thinking.
3    Q.    Could a person of ordinary skill in the art
4    have predicted in advance of lyophilizing that an acetate
5    buffer would produce less of the L717 degrade than a
6    tartrate-buffered Caspofungin formulation?
7    A.    Well, the structures of the degradents and
8    how they're produced goes -- goes outside my -- my
9    background in organic chemistry.
10   So I -- I don't feel like I'm
11   qualified to comment in detail on that point.
12   Q.    But you can comment on the data that's on
13   page 26 of Dr. Byrn's report --
14   A.    Let me turn to that.
15   Q.    -- is that correct?
16   A.    Yes, the -- so I'm looking at a table headed
17   "Lyophilized Caspofungin Formulations."
18   Q.    And the acetate-buffered formulations
19   produced less of the L717 degrade than the
20   tartrate-buffered formulations, correct?
21   A.    Yes, in this -- in this table, that is
22   correct.
23   Q.    And that would not be predictable from a
24   solution experiment in which the L717 degrade did not

224

DEPOSITION OF MARK STAPLES, Ph.D.

1    even appear, correct?
2    A.    I think that's -- I think that's a fair
3    statement.
4    Q.    Can you turn to page or Paragraph 67 of your
5    opening report.
6    Actually, before we go there, back to
7    Tab B of that opening report.
8    A.    Okay.  Exhibit B?
9    Q.    Yeah.  In the second column of the top
10   table.
11   A.    Okay.
12   Q.    You have a heading "PKA Plus or Minus 1."
13   A.    That's correct.
14   Q.    What does that mean?
15   A.    That means the PKA of that buffer plus or
16   minus 1 pH unit.
17   Q.    Okay.  So what is the -- and where does this
18   "plus or minus 1" come from?
19   A.    Well, the plus or minus 1 is what the
20   commonly accepted useful range of a buffer is, assuming
21   standard concentrations.
22   Q.    And for acetate, what is the pH range when
23   you do the plus or minus 1 from its PKA?
24   A.    That's the range 3.76 to 5.76.

225

DEPOSITION OF MARK STAPLES, Ph.D.

1    Q.    What do you mean by "standard
2    concentrations"?
3    A.    Well, when, you know, going -- going from
4    the ordinary rule of minimizing the concentrations as
5    much as possible of any ingredient, if you do need a
6    buffer, you don't want any more than you show that you
7    need.
8    And typically, in a -- in a formulated
9    product, you'll only need -- could be anywhere from I'd
10   expect 20 to 50 millimolar is my own rule of thumb is a
11   typical range.  Now -- well, I'll stop at that.
12   Q.    And in your Table B, you created your subset
13   that's in the bottom table based on that rule of thumb of
14   using the PKA plus or minus 1, right?
15   A.    No.  Well, yes, that's correct, yes.
16   Q.    All right.  You're assuming the person of
17   ordinary skill was targeting a pH of 5, and so you went
18   through the first table and looked for buffers that, when
19   you look at the PKA of that buffer plus or minus 1, did 5
20   fall within that range, yes or no?
21   A.    Yes.
22   Q.    And if it fell within the range, it went
23   into your subset, correct?
24   A.    Let me just check the -- check the top part

# Exhibit 1-H

Eric I. Abraham, Esq.
Christina L. Saveriano, Esq.
HILL WALLACK, LLP
202 Carnegie Center
P.O. Box 5226
Princeton, New Jersey  08543
(609) 924-0808
eia@hillwallack.com

*Of Counsel*:

Meredith Martin Addy, Esq.
Mark H. Remus, Esq.
Brandon C. Helms, Esq.
Abby L. Lemek, Esq.
Brinks Hofer Gilson & Lione
NBC Tower – Suite 3600
455 N. Cityfront Plaza Drive
Chicago, Illinois 60611
(312) 321-4200
maddy@brinkshofer.com

**Attorneys for Defendant Sandoz Inc.**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| MERCK & CO., INC., and MERCK SHARP & DOHME CORP., | **HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY** |
| Plaintiffs, | |
| v. | C.A. Nos. 2:10-cv-01625, 2:10-02308-SRC-PS |
| SANDOZ INC., | |
| Defendant. | |

## REPLY EXPERT REPORT OF MARK A. STAPLES, Ph.D.

## TABLE OF CONTENTS

I.      POSA ........................................................................................................... 1

II.     Background ................................................................................................... 2

      A.     Dr. Byrn's Criticisms of the Prior Art ................................................ 2

      B.     Formulation Strategies ...................................................................... 4

      C.     The Stability of Caspofungin ............................................................ 7

III.    Claim 1 of the '300 Patent Is Obvious ......................................................... 8

      A.     Claim 1 Relates to a Formulation, Not the API .................................. 9

      B.     Possible Complications Arising During Formulation........................... 9

      C.     Excipients....................................................................................... 11

      D.     Selecting the Buffer ........................................................................ 11

IV.    File History of the '300 Patent.................................................................... 14

V.     Conclusion ................................................................................................ 16

# I.     POSA

1.     I disagree with Dr. Byrn's opinion that a POSA would not have any practical experience in pharmaceutical formulations.  It is my opinion that a POSA will have more than just an education.  Instead, based on my experience, a POSA will have "5 to 10 years of experience in pharmaceutical formulations."  I did not say that a POSA will have "5-10 years of industrial experience," so Dr. Byrn's criticism in that regard is not valid.  These 5-10 years of experience that a POSA must have are years of hands-on development work in the field.  These 5-10 years of experience may include experience accumulated during a person's degree program. For example, a Ph.D. who did her entire thesis and perhaps a postdoctoral appointment in applied formulation might qualify within a year after starting employment.  On the other hand, a bachelor-level formulator who went directly into a formulation job might meet this standard within 5-10 years post-degree.

2.     Dr. Byrn points to two of the named inventors (Drs. Nerurkar and Kaufman) as examples of formulators who had "essentially no industrial formulation experience before working on caspofungin."  (¶ 19).  In my experience, it is very unusual for people with such limited experience to be responsible for a formulation project.  In my opinion, the level of skill possessed by each of Drs. Nerurkar and Kaufman is not "ordinary" for a formulator.  For example, Dr. Kaufman testified that he did not have any experience with lyophilization before his work on caspofungin (Kaufman Dep. at 42:9-12).  Similarly, Dr. Nerurkar testified that he did not have any experience with lyophilized compositions prior to his responsibilities in the Merck sterile injectables group, a position he only held from Spring 1994 to 1997 (Nerurkar Dep. at 7:15-8:1).

1

3.      Therefore, with regard to the qualifications of a POSA, Dr. Nerukar did not satisfy the requirements and would not be expected to develop a sterile lyophilized product quickly, even if it would have been obvious to a POSA.  Because Dr. Nerukar was not a POSA, Dr. Byrn's opinions regarding nonobviousness based on the length time required for development are not relevant.  Surprisingly, Merck named Dr. Nerurkar principally responsible for the development of the lyophilization cycle of caspofungin despite his lack of relevant experience (Nerurkar Dep., p. 53, ll. 6-10).  Some of the problems that the inventors had when formulating caspofungin are attributable to their lack of experience rather than caspofungin presenting a particularly challenging formulation project.

## II.     BACKGROUND

### A.      Dr. Byrn's Criticisms of the Prior Art

4.      Dr. Byrn states that the '804 patent does not describe a lyophilized dosage form (¶ 23).  The '804 patent, however, does disclose that caspofungin may be administered as an injectable solution (col. 13, ll. 64-65).  Lyophilized dosage forms were well-known at the time of the alleged invention and a POSA would have understood that lyophilized dosage forms are one means of creating an injectable solution.  Lyopholized dosage forms are reconstituted with diluent prior to administration as injectable solutions.  Thus, the '804 patent's teaching of the injectable solution dosage form necessarily includes the lyophilized drug products as a subset of injectable solution formulations.  The '804 patent further describes isolating caspofungin tris(hydrochloride) through lyophilization (col. 17, ll. 64-66).  Thus, a POSA would understand that the '804 patent contemplates a lyophilized dosage form.

5.      In my opinion, a POSA might develop a lyophilized dosage form as a back-up in the event a solution dosage form does not meet performance criteria within an acceptable

2

development timeframe (Staples Report ¶57).  Dr. Kaufman confirmed my opinion at his

deposition, testifying that he proposed a lyophilized dosage form "during the initial

pharmaceutical assessment…." (Kaufman Dep. at 36:25-37:1).  Therefore, it is not unusual that

a POSA would consider a lyophilized dosage form, even early in formulation development.

    6.    Dr. Byrn criticizes the '804 patent because it does not provide lyophilization-

specific formulation recipes (¶24), a lyophilization process (¶25), or a specification of the

physical characteristics of the target lyophilized solid (¶ 26).  I disagree with Dr. Byrn's

approach.  He suggests that, prior to embarking on formulation development, a POSA will

require detailed directions regarding the excipients and processes required to produce an

acceptable lyophilized product, as well as product physical characteristics that will not be known

until initial development experiments have been completed.  I contend that, once a POSA knows

that an injectable intravenous ("IV") dosage form is the appropriate development target (and that

the drug substance has been successfully isolated and will be made available as starting material

for formulation), a POSA can begin development of a lyophilized formulation according to the

general formulation development principles I described in my Opening Expert Report (Section

III, Background).  Therefore, I disagree with Dr. Byrn's conclusion (¶27) that the '804 patent

"does not teach a POSA how to prepare a stable, lyophilized dosage form of caspofungin with

extended shelf life" because this level of detail is not required in order for a POSA to develop a

lyophilized caspofungin product.

    7.    Dr. Byrn criticizes the '804 patent because it does not discuss the stability of

caspofungin or its salts (¶ 26), but I disagree with his opinion.  Dr. Byrn suggests that a POSA

will assume that a compound is unstable unless proven otherwise.  This is not true.  Where a

reference, such as the '804 patent, does not discuss the stability of a compound, a POSA will

3

have no reason to question its stability. Rather, because stability is an important issue for any active pharmaceutical ingredient ("API"), a POSA would expect that any stability problem of the API would be clearly stated in the reference. Thus, a POSA would assume from the complete silence in the '804 patent regarding the stability of caspofungin (or any other compound disclosed in the '804 patent), that stability is not a problem for these compounds and would not have been discouraged from pursuing a formulation containing caspofungin. Moreover, the '804 patent discloses several formulations that contain salts of caspofungin (see paragraph 22, below), which teaches a person skilled in the art that salts of caspofungin are stable enough to begin formulation efforts.

8.      Dr. Byrn criticizes the '521 patent (referring to Staples Report ¶78) for lack of guidance regarding stability of the diacetate salt and dosage forms for caspofungin (¶¶ 28-29). I disagree with Dr. Byrn's conclusion that the '521 patent "does not teach a POSA how to prepare a stable, lyophilized dosage form of caspofungin with extended shelf life" (¶ 29). A POSA does not need such information to develop a lyophilized caspofungin product because a POSA would know how to prepare a stable, lyophilized dosage from of caspofungin based on his or her skill and experience.

### B.      Formulation Strategies

9.      Dr. Byrn challenges the support for my generally-accepted guidelines (Rules A-D) for formulation development stated in my Opening Expert Report (Staples Report ¶22), but does not dispute the Rules themselves (¶ 31). These Rules outline general practices that, in my opinion, and based on my extensive industrial experience directing formulation projects, represent a simple and general overview that the majority of POSAs would be expected to follow.

4

10.     Dr. Byrn states that there are many aspects in formulating a drug compound that "can make it [a] complicated and time consuming task" (Byrn Report ¶35). While some formulations can be complicated, a lyophilized formulation of caspofungin is not one of them.

11.     Dr. Byrn relies on the statement in Remington's that the development of an "optimum formulation is not an easy task" (¶35). The word "optimum" is an important qualifier for this statement, and caspofungin is a case-in-point. To Merck, the "optimum" formulation for caspofungin was a product that was stable at room temperature. (Hunke Dep. at 42:19-43:11). Merck never achieved that goal. For that particular product (*i.e.*, a room temperature product), formulation was "not an easy task." Merck, however, led by two investigators (Drs. Kaufman and Nerurkar) who began the caspofungin project with essentially no lyophilization development experience (*see* ¶2, above), formulated the lyophilized drug product using standard excipients. It may not have been the "optimum formulation" for Merck, but it met the acceptance criteria for clinical trial evaluation and eventual commercialization.

12.     Dr. Byrn points out that lypophilized formations are not desirable because they are challenging and expensive to prepare (¶¶49-50). But that makes lyophilized formulations undesirable, not non-obvious. While a solution is generally more desirable than a lyophilized product, a lyophilized drug product is the obvious choice where a solution is not possible. This was the case for caspofungin. Lyophilization is a well-known and reliable process for creating a stable dosage form for many compounds. For example, lyophilization is a common formulation strategy for Phase I trials where a company does not yet have a finished dosage form for commercial launch because it is a quick and reliable means of creating a stable dosage form. Dr. Nerurkar admitted that lyophilization is not difficult to do successfully. (Nerurkar Dep. at

101:10-174:3).  As explained above, even without the proper experience, the two principal

investigators on the caspofungin project designed the lyophilized drug product.

13.    Dr. Byrn states that "a POSA, faced with the challenge of formulating

caspofungin, would have examined various types of dosage forms in an effort to find one with

extended shelf life, and would not have begun with buffer-containing lyophilized dosage forms"

(¶37).  I disagree.  In my experience, I would not expect a formulation group to be given a broad-

based charter to expend resources on a wide range of dosage form development in the early stage

of development, before the value of the drug could be more accurately estimated.  These initial

constraints on formulation development significantly reduce the number of options and the level

of complexity of early stage formulation.  For caspofungin, a POSA would have initially tried a

solution then a lyophilized dosage form (if solution formulations fails).  No decision was needed

to initially select acetate buffer, because it would be contributed by the acetate in the diacetate

casopfungin API.

14.    Dr. Byrn discusses proteins and peptides, noting the "unique properties of

caspofungin" to conclude that "[b]ased on the mixture of small molecule and peptide properties

of caspofungin, a POSA looking to formulate caspofungin would lack significant guidance in the

art due to the unique properties and structure of caspofungin" (¶¶ 38-42).  I disagree.  A POSA

would understand that caspofungin would behave like a small molecule rather than a protein or

peptide.  A formulation strategy is more dependent on the molecule's behavior than its size.

Caspofungin behaves more like a small molecule than a large molecule, and therefore small

molecule formulation strategies would apply.  Caspofungin is cyclic.  This cyclic structure limits

its degrees of conformational freedom and the potential for secondary structure through folding,

as is the case with large molecules such as proteins and peptides.  For example, any concerns

6

about a protein or peptide folding to itself typically arise only after the molecule has at least

twenty amino acids. Caspofungin has only six amino acids, so a POSA would not see any need

to employ the formulation strategies that are unique to proteins or peptides.

15.     Regardless, the initial formulation strategies for a small molecule do not differ

from initial formulation strategies for a peptide or protein. A POSA proceeds down the same

formulation path, and if problems arise with a peptide or protein, there are different approaches

available to address those problems. A POSA would not have expected such problems to arise,

nor did any such problems arise at Merck. As such, Dr. Byrn's discussion regarding formulation

strategies unique to proteins or peptides does not apply (¶¶ 38-43).

### C.     The Stability of Caspofungin

16.     Dr. Byrn opines that a POSA would not have a reasonable expectation of success

of creating a caspofungin formulation because there was not a "stable" form of caspofungin

available on which to begin formulation work (¶¶ 44-48). I disagree.

17.     Any discussion regarding the existence of a "stable" API must be put in context

because "stable" is a relative term that depends on specific conditions. It is not an absolute term.

For example, an API may be "stable" at refrigerated conditions but "unstable" at room

temperature. Caspofungin diacetate is stable at low temperatures, but this would not be a

problem, nor would it discourage formulation work because a POSA could effectively work with

an API under these conditions in order to do the necessary formulation work. (Nerurkar Dep. at

32:8).

18.     It is more accurate to say that an API must be "stable enough" to begin

formulation work. A POSA would have understood that caspofungin diacetate was "stable

enough" to do the necessary formulation work  (See paragraph 7, above).

19.     Dr. Byrn's statements about the stability of caspofungin and its salts (¶¶ 34-48, 106) fail to establish that a POSA would not have even attempted a formulation.  A POSA will perform normal "best efforts" development on any project and report results to the project team.  A POSA needs to advise the project team and management when, in her opinion, additional development efforts will yield only incremental improvements.  The team and management typically decides whether the best-achievable (but non-ideal) drug substance and drug product configurations can meet the needs of the project, and justify further development.  This decision must be on a case-by-case basis.  This further highlights the fact that "stable" is in fact a relative term, and acceptable stability will depend on an assessment of the benefits and costs of proceeding with drug development.  For caspofungin, a POSA would have determined that the diacetate salt was "stable enough" to proceed with the project, and formulation would have proceeded, taking into account the limitations of this starting material.

## III.   CLAIM 1 OF THE '300 PATENT IS OBVIOUS

20.     If an IV dosage form was the target product image, a POSA would have initially sought to develop a solution dosage form.  If that was not possible, the POSA would have transitioned to development of a lyophilized product.  Claim 1 of the '300 patent is nothing more than the result of following an obvious and expected development path, resulting in a product composition reflecting the selection of well-known IV dosage form ingredients applicable to a lyophilized product, at concentrations previously used in other lyophilized products for IV administration.

21.     The '804 patent teaches that caspofungin is a useful compound that is effective against a wide range of fungal infections.  In view of these teachings, a POSA would be motivated to find a dosage form for this useful compound.  A POSA would do so using the best

8

available salt, so long as that salt was "stable enough." In this case, the '804 patent disclosed

salts of caspofungin that were stable enough to begin formulation work.

22.     The '804 patent also discloses formulations containing caspofungin (*see*

Examples 28-30). These examples teach a POSA that caspofungin can be formulated into a

finished dosage form and that caspofungin is "stable enough" for formulation work.

### A.     Claim 1 Relates to a Formulation, Not the API

23.     Dr. Byrn puts undue emphasis on the choice of a particular API (*e.g.*, caspofungin

free base or a particular salt of caspofungin) (¶¶ 44-48). Claim 1 does not require a particular

salt of caspofungin. A POSA could begin formulation work with any salt that is "stable

enough," such as caspofungin diacetate. Furthermore, claim 1 relates to a formulation for

caspofungin, not caspofungin itself. Selection of the API is not a formulation task; rather, the

API is the starting point and the formulators begin their work from there.

24.     One of the reasons for creating a dosage form is to create a more stable

environment for the API. Thus, the fact that an API is not as stable as one would like is a reason

to investigate a stable dosage form, rather than a reason not to try to develop an acceptable

dosage form.

25.     Dr. Byrn comments that a POSA would first have focused on simpler, less costly

parenteral formulations (¶¶49-51). I agree with this statement in general, however, this does not

mean that a lyophilized formulation is non-obvious. A POSA would have always been aware of

lyophilization as a formulation option if simpler, less costly formulations do not work.

### B.     Possible Complications Arising During Formulation

26.     I disagree with Dr. Byrn's statement (¶52) that aggregation is an issue that is

unique to proteins, not peptides like caspofungin. Although I agree that some aggregation

mechanisms are unique to proteins, other mechanisms may apply to small molecules and small peptides. In any event, I presented aggregation as a general and potential challenge in drug development, not as a caspofungin-related issue.

27.     I disagree with Dr. Byrn's suggestion that a POSA would need to know "all degradation pathways" in order to begin formulation work (¶54). I expect preformulation studies to provide general guidance on compatible conditions for the drug, and to verify the capability of purity-indicating analytical methods. A POSA will be concerned only with the principal degradation pathways and then address any other degradation pathways if necessary after initial formulation tests. A POSA turns to other degradation pathways only if that testing reveals an unacceptable amount of an unacceptable degradant.

28.     Dr. Byrn admits that the "major degradation product" of caspofungin results from hydrolysis (¶¶ 56-57). Lyophilization is a well known formulation strategy for dealing with hydrolysis because it removes water from the formulation. Thus, lyophilization would have been an obvious formulation strategy for a POSA at the time of the alleged invention for addressing any concerns with the hydrolysis degradant. In my opinion, the fact that lyophilization was a common and well-understood formulation strategy at the time of the alleged invention would have supported the expectation that lyophilization had a reasonable likelihood of creating a stable caspofungin formulation; therefore, I specifically disagree with Dr. Byrn's opinion to the contrary (¶¶61-62).

29.     Although Dr. Byrn contends that a cosolvent formulation approach could be attempted rather than lyophilization (¶63), a POSA would have conducted this work in parallel development to the solution and lyophilized options, with a preference to the solution form, and switching lyophilization development to top priority if the solution development failed to

produce acceptable quality product in the required timeframe.  The difficulty of developing an acceptable solution formulation of caspofungin was clearly identified and acted on early in the development process.  (*See, e.g.*, Kaufman Dep. at 86-100; *see also* MRK_CAN 01156056-255 (ruling out solution due to instability)).  A cosolvent formulation would have met a similar fate.

### C.     Excipients

30.     I disagree with Dr. Byrn's discussion regarding the selection of excipients.  Claim 1 only requires the use of an excipient effective to form a lyophilized cake.  In view of the small amount of API included in each dose, a POSA would know that an excipient is necessary as a bulking agent in order to provide the structure for a lyophilized cake.  Dr. Byrn also suggests that the selection of a particular excipient would be difficult, but claim 1 does not require a particular excipient.  Sugars are standard bulking agents, and it is my opinion that their use in a lyophilized caspofungin formulation would have been obvious to a person skilled in the art at the time of the alleged invention.  Regardless, Merck admitted to the United States Patent and Trademark Office ("USPTO") that "using sugars such as sucrose and mannitol in lyo[philized] formulations is standard." (1/26/99 37 C.F.R. 1.116 Response at 3).  I agree that these sugars are standard and their use in a lyophilized caspofungin formulation would have been obvious to a person skilled in the art at the time of the alleged invention.

### D.     Selecting the Buffer

31.     I disagree with Dr. Byrn's opinion that it would not have been obvious to include a buffer in a lyophilized caspofungin formulation (¶¶69-74).  Buffers are routinely used in lyophilized drug product compositions.  In fact, I am not aware of any lyophilized product that does not include a buffer.  Buffers are utilized in lyophilized compositions in order to prevent and/or ensure against pH drift and product decomposition in the pre-lyophilized solution as well

11

as in the solution that is created when the lyophilized product is reconstituted for administration to a patient.

32.     The buffer may also play a stabilizing role during the lyophilization process as the volume of the formulation that is excluded from ice crystals is freeze-concentrated, or during storage as a solid product that may contain sufficient moisture to make the buffer component important with regard to stabilization of the solid amorphous state.  This is taught, for example, in Avis where it is stated that if "degradation is a risk during freezing due to concentration effects or pH changes, stabilizers or buffers may have to be added."  (Avis at 220).  Avis also cross-references the Flynn reference for a list of acceptable buffers (Avis at 195).

33.     Although Dr. Byrn advances a number of points related to the role of pH and buffer in a drug formulation (in particular, with regard to a lyophilized formulation) (Sections 5-7, ¶¶69-94), these considerations were not required for a POSA to initially assume that an acetate-based formulation would be appropriate for the caspofungin formulation, particularly where the known diacetate salt of caspofungin is one of the possible starting materials.

34.     I disagree with Dr. Byrn's comments in paragraph 93 of his report.  Matching the pKa of the API (in this case, caspofungin) to a buffer is an accepted formulation strategy and was well-known at the time of the alleged invention.  I do not suggest that the first pKa, 5.1 (*see* WO/2004/091578), of the API is useful to "predict" the most stable solution pH for a drug candidate.  However, in this case, the two are very similar.  The most stable solution pH for caspofungin is approximately 5.  A POSA would have determined this during routine preformulation studies.  In fact, Merck confirmed this during such routine preformulation studies.  (See, e.g., MRK_CAN00887550-7554; MRK_CAN00000620-659; Nerurkar Dep. at 151-152; Hunke Dep. at 29:5-6).  There was nothing unique or inventive about performing

solution studies to determine the most stable solution pH, as this has been done in nearly every formulation development effort with which I have been involved. The most stable solution pH (in the case of caspofungin it is 5), would have provided yet another benchmark for selecting an appropriate buffer. Acetate would be an obvious choice as a buffer for a caspofungin formulation because its pKa is within one unit of the most stable solution pH.

35.     A POSA would not avoid screening acetate for suitability during lyophilization because there is sufficient precedent for the use of acetate in lyophilized preparations, particularly in peptide formulations (*e.g.*, leuprolide acetate). In theory, acetic acid will be removed during the lyophilization process, but in practice some may be non-volatile if retained as the counterion of a salt. Additionally, as for residual moisture, some residual acetic acid may remain in the lyophilizate as a component of non-volatile glassy matrix. A POSA would establish the use of acetate in a lyophilized product experimentally; the use of acetate would not be categorically excluded.

36.     If acetate produced an acceptable dosage form, then a POSA need not consider any additional acids discussed by Dr. Byrn (¶¶78-87). Even if a POSA continued to look for other potential buffers, this does not make the choice of acetate non-obvious.

37.     Exhibit B represents the only reasonable starting point for a POSA. (Staples Report ¶80, and the accompanying Exhibit B, referenced by Dr. Byrn, ¶78). Exhibit B depicts only buffers that have been used in FDA-approved commercially marketed parenteral products for IV administration. Dr. Byrn avers my Exhibit B set as too restrictive, based on the Flynn reference (Flynn at 154) and the Sandoz screening experiment (*see, e.g.*, SAND-CASP880388). Applying the general considerations of formulation development by a POSA (Rules B and D from my Opening Expert Report at pp. 9-10), I contend that the more exhaustive lists that Dr.

13

Byrn references are not appropriate for screening experiments (unless there is a demonstrated need to go outside a list restricted to buffers already in use in approved IV products).  In fact, I believe a POSA would use my list in Exhibit B just as a starting point, restricting my Exhibit B list even further to the most commonly used buffers (*e.g.*, such as acetate), and further limiting the list based on the buffer selection criteria that I discuss in this report and my opening report for initial screening.

      38.     As an additional consideration, the POSA would examine the buffer properties and exclude those that are not compatible with the product and route of administration/ dosage form in development.  After determining the most stable pH was approximately 5, a second level experiment might be conducted with only buffers in this list with pKas of about 4-6:  at most, citrate, acetate, tartrate, and succinate, with strong preference for the top two based on frequency of use in approved products:  citrate and acetate.  Acetate will almost certainly have a place in the top tier of any list that requires a buffer at pH 5.

      39.     I do not disagree with Dr. Byrn's comments (Byrn Report ¶¶93-94) regarding the role of drug pKa as a criterion for selecting the target pH.  Given the considerations presented above related to use of acetate already in the drug substance and product stability, the drug pKa is a secondary consideration, however, and does not affect the obviousness of acetate selection.

## IV.    FILE HISTORY OF THE '300 PATENT

      40.     Dr. Byrn defends the reasons why the inventors fairly presented the supporting data for preference of acetic acid (¶¶95-102).  I do not find his arguments sufficiently compelling to alter the position I took in my Opening Expert Report.

      41.     Merck presented acetate to the USPTO as the "nonobvious" buffer choice and hence the basis, in part, for allowing the '300 patent.  If the general rules I presented that a POSA

14

would follow had in fact been followed, acetate would have been on the short list for testing in any event. As I explained above, the preference for acetate within a range of buffers that are effective at pH 5 is obvious because acetate is already present in the API salt, thus minimizing the number of constituents (again, in accordance with the general rules I presented that a POSA would follow). I am aware of the "common ion effect," mentioned by Dr. Byrn that cautions against adding more acetate as a buffer to an acetate salt. This is, however, primarily a consideration when maintenance of solubility is a major concern, and caspofungin diacetate is a relatively soluble molecule, so I reject this as a justification for categorical exclusion. Accordingly, Merck presented the examiner with a formulation that had the incorrect recipe for total acetate content (and which was similarly misrepresented on the package insert) and also reviewed the results of critical experiments that misrepresented the actual composition of the test solutions, because complex mixtures of tartrate and acetate were being compared with acetate-based solutions, not tartrate vs acetate.

42.     A POSA would have selected acetate whether or not they co-screened with tartrate (due to the preference provided by the acetate salt selection for API), and tartrate is not the subject of asserted claim 1, it is acetate. In fact, the comparison of tartrate and acetate should be a moot point because, as I mentioned in an earlier section, two of the alleged inventors were sufficiently inexperienced in developing sterile lyophilized products at the time this work was done as to preclude their qualification as POSAs.

43.     I believe the assessment I have provided in the preceding paragraph strongly supports the basis for my definition of a POSA in this field, because I believe the basis for any misrepresentation of buffer content as well as some of the development choices that were made and that (I believe) contributed to a very long development cycle (also cited as support for

"nonobviousness" in the patent file) simply represent the expected result when inexperienced staff have primary responsibility for a formulation development program. The bottom line of these considerations: an obvious solution was eventually reached by investigators who were still developing basic skills in the field (underlining the very obviousness of the work), but the length and path of development represented as support for non-obviousness was primarily due to the impact of their inexperience.

44.     I acknowledge Dr. Byrn's (¶¶103-105) comments regarding expectations of the crystalline vs amorphous state of caspofungin. I consider these to be moot points with regard to the history of the discussion of obviousness and not pertinent to the current determination of obviousness. The physical state of the API does not have a bearing on any aspect of claim 1, which is silent with respect to whether the API is crystalline or amorphous.

## V.     CONCLUSION

45.     Claim 1 of the '300 patent would have been obvious to a POSA at the time of the alleged invention. Nothing in the opinion of Dr. Byrn changed my opinion.

46.     The '804 patent teaches that caspofungin is a useful compound and that finished dosage forms containing caspofungin are possible and desirable. A lyophilized formulation would have been an obvious formulation path to a POSA. Avis and Remington's (1990 and 1995) teach that lyophilization was a well-known formulation strategy at the time of the alleged invention. A POSA would have a very high expectation that a stable dosage form containing caspofungin could be created because lyophilization was a familiar, well-known process and the removal of water from the formulation during the lyophilization cycle would minimize production of the major caspofungin degradant (the hydrolysis degradant). Avis and the

Remington's references also teach the use of excipients and buffers.  In particular, Avis refers to Flynn which discloses acetate as an acceptable buffer.

47.     A POSA would be motivated to select acetate as a buffer because:  (1) its pKa is appropriate for the first pKa of caspofungin; (2) its pKa is appropriate for the most stable pH that was determined during pre-formulation solution stability testing; (3) acetate was commonly used for parenteral formulations; (4) acetate was present in a typical formulation laboratory; and (5) acetate was already present as a counterion to one of the possible API's (caspofungin diacetate).

48.     For each of these reasons, as well as the reasons stated above and in my opening report, it is my opinion that the formulation of claim 1 of the '300 patent would have been obvious to a POSA at the time of the alleged invention.

_____June 3, 2011_____
Date

_____Mark A. Staples_____
Mark A. Staples, Ph.D.

17

# Exhibit 1-I

(19) **United States**

(12) **Patent Application Publication** (10) Pub. No.: **US 2012/0101030 A1**

Shirode et al.                                                  (43) **Pub. Date:** **Apr. 26, 2012**

(54) **CASPOFUNGIN COMPOSITION**

(75) Inventors: **Swapnil Shirode**, Nasik (IN);
**Piyush Patel**, Mumbai (IN); **Suresh
Gidwani**, Mumbai (IN); **Neil
Parikh**, Irvine, CA (US); **Atul
Patil**, Maharashtra (IN); **Anita
Bevetek Mocnik**, Kraljevec (HR)

(73) Assignee: **XELLIA PHARMACEUTICALS
APS**, Copenhagen S. (DK)

(21) Appl. No.: **13/237,193**

(22) Filed: **Sep. 20, 2011**

**Related U.S. Application Data**

(60) Provisional application No. 61/384,333, filed on Sep. 20, 2010.

**Publication Classification**

(51) **Int. Cl.**
   *A61K 38/12* (2006.01)
   *A61P 3/10* (2006.01)

(52) **U.S. Cl.** .......................................... **514/3.4**; 514/3.6

(57) **ABSTRACT**

The present invention relates to a composition comprising caspofungin or a pharmaceutical acceptable salt thereof and succinate or lactate as a buffering agent.

Figure 1



Figure 2



Figure 3



US 2012/0101030 A1

Apr. 26, 2012

1

## CASPOFUNGIN COMPOSITION

### CROSS-REFERENCE TO RELATED APPLICATIONS

[0001]   This application claims the benefit of U.S. Provisional Patent Application Ser. No. 61/384,333, filed Sep. 20, 2010, which is incorporated by reference herein in its entirety.

### FIELD OF THE INVENTION

[0002]   The present invention relates to a composition comprising caspofungin or a pharmaceutical acceptable salt thereof and succinate or lactate as a buffering agent.

### BACKGROUND

[0003]   Caspofungin (CAS 162808-62-0) is the first of a new class of semi-synthetic antifungal agents belonging to the class of echinocandins. It may be represented by the formula I

(I)



[0004]   Caspofungin is commonly prepared by synthetic derivatisation of pneumocandin $B_0$ which is obtained by fermentation of the fungus *Glarea lozoyensis*. The antifungal activity of caspofungin is due to its inhibition of the biosynthesis of $\beta$-(1,3)-D-glucan, an integral component of the fungal cell wall. It is used for the treatment of invasive aspergillosis in patients who are refractory to or intolerant of other therapies, as well as empirical therapy for presumed fungal infections in febrile, neutropenic patients.

[0005]   Caspofungin as a compound is claimed in the U.S. Pat. No. 5,378,804 issued to Merck & Co.

[0006]   U.S. Pat. No. 5,952,300 discloses a composition for treating and/or preventing fungal infections comprising caspofungin and the pharmaceutically active salt thereof, a pharmaceutically active amount of an acetate buffer and a pharmaceutically acceptable amount of excipients such as a sucrose/mannitol mixture to form a lyophilized cake.

[0007]   A lyophilized caspofungin product is available on the marketed as its diacetate salt by Merck & Co., under the trade name Cancidas® (RLD product). Cancidas® contains in addition to the active ingredient caspofungin diacetate, acetic acid, sodium hydroxide, sucrose and mannitol. Before administration to a patient, the lyophilized product is reconstituted by adding a diluent and the desired amount of the diluted mixture is transferred to infusion bag to be administered to the patient in need thereof.

[0008]   A well known problem with caspofungin compositions prepared for reconstitution prior to administration to the patient, is that the compound is highly unstable resulting in the formation of various degradation products such as e.g. hydrolysis products (impurity B) and dimerization products (impurity C). There will also be impurities present in the composition being formed during the fermentation of the starting material and which have passed along through the synthesis of caspofungin. The main impurity originating from the fermentation is the serine analogue of caspofungin having the formula as shown in WO 2009/158034

[0009]   In addition to the above mentioned degradation impurities and impurities formed during preparation of known caspofungin compositions, further non-characterised impurities are also present. The mechanisms behind the formation of the impurities are not fully understood. However, it is known that the buffer system used when preparing the composition may increase the degradation product formation during preparation and storage. In U.S. Pat. No. 5,952,300 it is, for example, stated that the use of tartrate buffer resulted in undesired degradation products. The solution to the degradation problem according to the teaching of U.S. Pat. No. 5,952,300 is the use of an acetate buffer.

[0010]   Various other strategies are also known to avoid degradation and improve the stability of caspofungin compositions. For example, in WO 2009/002481, a lyophilized caspofungin composition comprising in addition to caspofungin diacetate and an acetate buffer, one or more nonreducing sugars such as trehalose, sucrose, raffinose, or sorbitol or combinations thereof is disclosed.

[0011]   In WO 2008/012310, a caspofungin composition is disclosed comprising, in addition to a pharmaceutically acceptable salt of caspofungin and excipients, only very low levels of a buffering agent, or which is free of a buffering agent.

[0012]   Although various solutions to the impurity problem are suggested in the prior art, there is still a need for a caspofungin composition with improved stability in respect of the formation of impurities during storage.

### SUMMARY OF THE INVENTION

[0013]   The present inventors have surprisingly found that an antifungal composition according to the present invention comprising caspofungin or a pharmaceutically acceptable salt thereof, one or more pharmaceutically acceptable excipients and including succinat or lactate as a buffering agent, is stable resulting in reduced formation of degradation products during storage.

[0014]   The present invention therefore provides a composition comprising a) a pharmaceutically effective amount of caspofungin or a pharmaceutically acceptable salt thereof; b) a pharmaceutically acceptable amount of one or more pharmaceutically acceptable excipients effective to form a lyo-

philized cake; and c) a pharmaceutically effective amount of a buffering agent selected from the group consisting of lactate and succinate.

[0015]   According to one aspect of the invention, the pharmaceutically acceptable salt of caspofungin is an acetate salt. According to another aspect, the composition according to the invention comprises a diacetate salt of caspofungin.

[0016]   According to yet another aspect of the invention, the buffering agent of the composition is succinate. According to yet another aspect of the invention, the buffering agent of the composition is lactate.

[0017]   Furthermore, a composition is provided wherein the excipients is selected from the group consisting of stabilisers, diluents, antioxidants, or preservatives. According to one aspect, the stabilisators are selected from the group consisting of sucrose and mannitol; or a combination thereof.

[0018]   According to a further aspect of the present invention, a compositing is provided comprising a) pharmaceutically acceptable amount of caspofungin or a pharmaceutically acceptable salt thereof; b) about 10-200 mg/ml of one or more pharmaceutically acceptable excipients effective to form a lyophilized cake; and c) a pharmaceutically effective amount of lactate or succinate providing a pharmaceutically acceptable pH.

[0019]   According to one embodiment, the composition of the invention comprises an amount of caspofungin or a salt thereof corresponding to about 42 mg/ml caspofungin. According to yet another embodiment, the composition of the invention comprises about 46 mg/ml diacetate salt of caspofungin; about 30 mg/ml sucrose and about 20 mg/ml mannitol; and about 1.5 mg/ml succinate or about 1.15 mg/ml lactate.

[0020]   The present invention furthermore provides a process for making a caspofungin composition according to the invention comprising the steps of a) mixing an aqueous solution comprising a pharmaceutically acceptable amount of one or more excipients with a pharmaceutically effective amount of a buffering agent selected from the group consisting of lactate and succinate; b) optionally adjusting the pH by adding a base to obtain a pharmaceutically acceptable pH; c) adding to the mixture of a) a pharmaceutically acceptable amount of caspofungin or a pharmaceutically acceptable salt thereof; d) optionally adjusting the pH by adding a base to obtain a pharmaceutically acceptable pH; and e) filtering the solution obtained in d).

[0021]   The mixing of the solutions of step a) of the above process may be performed in any order. Thus, according to one embodiment, a process is provided wherein step a) is performed by firstly preparing an aqueous solution comprising a pharmaceutically effective amount of a buffering agent selected from the group consisting of lactate and succinate; then adding to the said solution of buffering agent a pharmaceutically acceptable amount of one or more excipients dissolved in water. According to another embodiment, a process is provided wherein step a) is performed by firstly dissolving a pharmaceutically acceptable amount of one or more excipients in water; then adding to said solution of excipient(s) a pharmaceutically effective amount of a buffering agent selected from the group consisting of lactate and succinate.

[0022]   According to one embodiment, the pH of step b) of the present invention is adjusted to 5.0-5.7. According to another embodiment, the pH of step d) of the present invention is adjusted to about 6.

[0023]   According to one embodiment, a caspofungin salt, preferably caspofungin diacetate, is added in step c) of the process.

[0024]   The present invention also provides a lyophilized formulation which consists of a composition which prior to lyophilization corresponds to a composition according to present invention.

[0025]   The present invention furthermore provides a formulation for parenteral administration consisting of a lyophilized formulation according to the invention, wherein said lyophilized formulation is dissolved in a pharmaceutically acceptable reconstitution solution suitable for parenteral administration to a patient in need thereof. The pharmaceutically acceptable reconstitution solution may e.g. be selected from the group consisting of distilled or sterile water commonly used for injections, physiologic saline, and bacteriostatic water.

[0026]   According to yet another aspect of the invention, a kit is provided comprising a first container comprising the lyophilized formulation according to the invention and a second container comprising a parenterally acceptable solvent for reconstitution thereof, and optionally a container comprising means for administrating the reconstituted solution to a patient in need thereof.

[0027]   The reconstituted formulation according to the present invention may preferably be used in a method for treating or preventing a fungal infection comprising parenterally administering to a patient in need thereof, e.g. wherein the administration is performed by infusion or injection.

[0028]   The present invention finally provides a use of a composition according to the invention for the preparation of a formulation for parenteral administration for the treatment or prevention of fungal infection, such as infections caused by a fungus belonging to the species *Candida* or *Aspergillus*, such as e.g. infections is caused by a fungus belonging to the species infection is caused by *C. albicans, C. tropicalis, C. krusei, C. glabrata, A. fumigatus, A. flavus* and *A. nigerc*. A method according to any of the claims **15-16**, for the treatment or prevention of fungal infection, wherein the infections is caused by a fungus belonging to the species *Candida* or *Aspergillus*.

BRIEF DESCRIPTION OF THE DRAWINGS

[0029]   FIG. **1** shows the change in the amount of the total impurities in the lyophilized formulations prepared according to example 1 after storage in 1 month (1M) and 2 months (2M), respectively, i.e., caspofungin composition comprising caspofungin diacetate, sucrose, mannitol and as buffering agent either lactate, succinate, tartrate or acetate, and as control, a composition as above not comprising a buffering agent.

[0030]   FIG. **2** shows the changes in impurity B (hydrolysis degradation product), Impurity C (dimerization product) and the total amounts of impurities in the lyophilized formulation prepared according to example 2 after storage in 1 month (1M), 2 months (2M) and 3 months (3M).

[0031]   FIG. **3** shows the changes in impurity B (hydrolysis degradation product), Impurity C (dimerization product) and the total amounts of impurities in the lyophilized formulation prepared according to example 3 after storage in 1 month (1M), 2 months (2M) and 3 months (3M).

DETAILED DESCRIPTION OF THE INVENTION

[0032]   The present invention will now be described in more detail with reference to figures and examples. The following

description and examples intend to illustrate the present invention, and should in no way be considered limiting. Furthermore, the skilled person will acknowledge that various modifications may be introduced without departing from the scope of the invention. Accordingly, other embodiments of the present invention which are within the abilities of the skilled person are to be understood to be within the scope of the claims.

[0033]   The term "caspofungin" as used herein means caspofungin free base known under the CAS number 162808-62-0. The composition of the present invention may comprise caspofungin or a pharmaceutical acceptable salt thereof. The term "pharmaceutically acceptable salts of caspofungin" as used herein means any non-toxic salts of caspofungin. The skilled person is well known with suitable organic or inorganic acids that may be used to form salts of caspofungin, including mono-, di- and tri acid forms. For example, pharmaceutically acceptable acid addition salts may be formed using acids such as hydrochloric, hydrobromic, sulphonic, phosphoric, maleic, malic, lactic, citric, acetic, tartaric, propionic, succinic, oxalic, glutamic, pamoic acid etc. Also other acids well known to the skilled person in respect of forming pharmaceutically active salts may be used. Reference is inter alia made to Berge et al., 1977, "Pharmaceutical salts", J. Pharm. Sci., 66(1), page 1-19. Several pharmaceutical acceptable salts of caspofungin are furthermore known from e.g. U.S. Pat. No. 5,952,300, and WO 2008/12310.

[0034]   According to one aspect of the invention, a lyophilized formulation is provided comprising the acetate salt of caspofungin. According to yet another aspect of the invention, a lyophilized formulation is provided comprising the diacetate salt of caspofungin. An acetate salt of caspofungin, such as a diacetate salt of caspofungin may be prepared as disclosed in U.S. Pat. No. 5,952,300.

[0035]   The term "lyophilized formulation" as used herein means a formulation being prepared by lyophilization/freeze drying of a mixture comprising a pharmaceutically effective amount of caspofungin or a pharmaceutically acceptable salt thereof; a pharmaceutically acceptable amount of one or more pharmaceutically acceptable excipients; and a pharmaceutically acceptable amount of a buffering agent selected from the group consisting of lactate and succinate. The lyophilized formulation may be comprised in lyophilization vials suitable for transport and handling, and for the providing of a reconstituted formulation ready to be administered to a patient in need thereof.

[0036]   The one or more pharmaceutically acceptable excipients of the composition of the invention may be any pharmaceutically acceptable excipients suitable for formation of a lyophilized cake. The one or more pharmaceutically acceptable excipients may further be well known diluent(s) or carrier(s) suitable for parenteral administration and which are well known to the skilled person. Suitable excipients that may be comprised in a composition according to the present invention may be selected from the non-limiting list of the group consisting of stabilizers, diluents, antioxidants, preservatives and the like. For example, a non-limiting list of stabilizers useful in the composition of the present invention comprises sucrose, trehalose, raffinose, sorbitol and/or mannitol.

[0037]   According to one aspect of the invention, the composition of the present invention comprises sucrose or mannitol, or a combination thereof. Based on the teaching of the present invention, the skilled person will be able to select the appropriate excipients and amounts thereof for the manufacturing of a composition according to the present invention.

[0038]   According to the present invention, the composition of the invention comprises as a buffering agent lactate or succinate. The buffering agent can be obtained by either dissolving the salt or the acid form of the buffering agent into water e.g. lactate-salt or lactic acid or succinate-salt or succinic acid. When preparing the composition of the present invention, the buffer agent may also be used in solid form, such as by adding succinic acid or lactic acid into a solution of excipients. Said buffering agent is used in a pharmaceutically effective amount ensuring the providing and maintenance of a pharmaceutically acceptable pH value. More specifically, a pharmaceutically acceptable pH value within the meaning of the present invention is in the range of about 5 to about 8, such as e.g. about 5.5-7.5, such as about 5.5-7.0, such as about 5.5-6.5, such as e.g. about 6.0.

[0039]   The composition of the present invention results in reduced formation of total impurities during storage of a lyophilized formulation prepared therefrom compared with lyophilized formulations based on an acetate buffer system or lyophilized formulations known in the art prepared from a composition not comprising a buffering agent. The term "total impurities" as used herein means the total amount of impurities commonly present in a pharmaceutically acceptable caspofungin product or a pharmaceutically active caspofungin salt prepared according to method for preparing caspofungin or a salt thereof well known to the skilled person in the art. The total amount of impurities present may be measured by HPLC-analysis. The change in the total amount of impurities during storage may be presented as the sum of the area percentage of the total amount of impurities in a formulation to be analysed. The persons skilled in the art are familiar with various applicable HPLC devices and methods for measuring the formation of impurities during storage.

[0040]   The composition according to the present invention is prepared by dissolving and mixing the ingredients, filtering the obtained mixture, and after transferring the solution to suitable vials. The so obtained solution is lyophilized to obtain a lyophilized cake. Lyophilization, or freeze-drying, is a dehydration process typically used to preserve unstable materials or make a material more convenient for transport. It is commonly used within the pharmaceutical industry and involves freezing of the material in question and reduction of the surrounding pressure, adding enough heat to allow the frozen water in the material to sublime and thus be removed from the resulting lyophilized product. The skilled person is well known with the various means and devices available for lyophilization within the pharmaceutical area. The composition according to the present invention is preferably lyophilized in pharmaceutically acceptable vials according to the method of the present invention to obtain a lyophilized cake of the composition of the present invention.

[0041]   The so obtained lyophilized formulation contained in a lyophilization vial may later be reconstituted to its original form prior to administration of the reconstituted solution to a patient in need thereof. The term "formulation for parenteral administration" as used herein means liquid formulation comprising a pharmaceutically effective amount of the caspofungin composition according to the present invention, and wherein said composition have been dissolved in or mixed with one or more pharmaceutically acceptable reconstitution solutions.

US 2012/0101030 A1

Apr. 26, 2012

4

[0042]    The reconstitution may be performed by dissolving the lyophilized product in a pharmaceutically acceptable reconstitution solution. The skilled persons in the art are familar with various solutions useful for the reconstitution of a lyophilized caspofungin formulation. A pharmaceutically acceptable reconstitution solution is e.g. distilled or sterile water commonly used for injections, physiologic saline, or bacteriostatic water for injection. Bacteriostatic water commonly comprises bacteriostatic compounds as preservatives, such as e.g. benzyl alcohol.

[0043]    A pharmaceutically acceptable amount of the reconstituted formulation may then be transferred to means suitable for parenteral administration, such as e.g. intramuscular, subcutaneous, intravenous, intra-peritoneal administration.

[0044]    The reconstituted formulation according to the present invention may be used to treat or prevent infections in a patient. The formulation may inter alia be used to prevent or fight an infections caused by fungus belonging to the *Candida* species and *Aspergillus* species. More specifically, said formulation may be used to treat or prevent infections caused by e.g. *C. albicans, C. tropicalis, C. krusei, C. glabrata, A. fumigatus, A. flavus* and *A. niger*. The present invention therefore also provides a method for the treatment or prevention of fungal infection, such as the infections cause by the above mentioned species.

## EXAMPLES

[0045]    Preparation of Caspofungin Diacetate Formulations

[0046]    A caspofungin composition was prepared by firstly dissolving mannitol in water, then adding sucrose and succinic acid. After the addition of succinic acid, pH was determined and 0.1 M NaOH was then used to adjust the pH to 4.0. To the so-obtained solution, caspofungin diacetate corresponding to 42 mg/ml caspofungin was added. The pH of the so obtained solution was then again adjusted to pH 6.1 with 0.1 M NaOH, and the solution was mixed by stirring.

[0047]    The volume of the solution was adjusted to 400 ml by adding water acceptable for injection, and filtered through a 0.22 µm filter. The solution was thereafter transferred to 10 ml lyophilization vials and stopped with sterile rubber stoppers. The solution was then subjected to lyophilization. The preparation of the composition, except during freeze drying, was performed at a temperature of 2-8° C.

[0048]    The amount of the various ingredients of the composition was as listed in the below table 1.

TABLE 1

| Caspofungin diacetate | 46.58 mg/ml |
| Sucrose | 30.00 mg/ml |
| Mannitol | 20.00 mg/ml |
| Succinic Acid | 1.50 mg/ml |

[0049]    Similar formulations with the difference that lactic acid, tartaric acid, citric acid or acetic acid was used in stead of succinic acid were prepared according to the above method. In addition, a formulation not comprising any buffering agent was prepared as a control.

[0050]    The lyophilized cakes obtained were further subjected to analysing to determine the stability in respect of formation of impurities during storage (example 4). However, due to unexpected and undesirable precipitation of caspofungin when using citric acid as a buffering agent, said composition was abandoned for further analysing

Preparation of Caspofungin Diacetate Formulation with Succinic Acid

[0051]    A caspofungin composition was prepared by firstly dissolving succinic acid in water, then the pH of the solution was adjusted to about 5.5-5.7 by adding NaOH solution. Then secondly sucrose and mannitol were added to the above solution. If needed the pH was again adjusted to about 5.5-5.7 by addition of NaOH. To the so obtained solution, caspofungin diacetate was added. After complete dissolution the pH was again adjusted with NaOH to reach about 5.9-6.1. The solution volume was then adjusted to final value to reach the concentrations given in Table 1.

[0052]    The so obtained composition was filtered through a 0.22 µm filter and thereafter transferred to 10 ml lyophilization vials and stopped with sterile rubber stoppers. The solution was then subjected to lyophilization. The preparation of the composition, except during freeze drying, was performed at a temperature of 2-8° C.

Preparation of Caspofungin Diacetate Formulation with Lactic Acid

[0053]    A caspofungin composition was prepared by firstly dissolving lactic acid in water, then the pH of the solution was adjusted to about 5.0 by adding NaOH solution. Then secondly sucrose and mannitol were added to the above solution. If needed the pH was again adjusted to about 5.0 by addition of NaOH. To the so obtained solution, caspofungin diacetate was added. After complete dissolution the pH was, if needed, adjusted with NaOH to reach about 6.3. The solution volume was then adjusted to final value to reach the concentrations given in Table 2 below.

[0054]    The so obtained composition was filtered through a 0.22 µm filter and thereafter transferred to 10 ml lyophilization vials and stopped with sterile rubber stoppers. The solution was then subjected to lyophilization. The preparation of the composition, except during freeze drying, was performed at a temperature of 2-8° C.

[0055]    The amount of the various ingredients of the final composition was as listed in the below table 2.

TABLE 2

| Caspofungin diacetate | 46.58 mg/ml |
| Sucrose | 30.00 mg/ml |
| Mannitol | 20.00 mg/ml |
| Lactic Acid | 1.14 mg/ml |

Analysis of Stability of Caspofungin Compositions

[0056]    The formulations prepared according to example 1, example 2 and example 3 were stored in the lyophilized state at 2-8° C. for 1, 2 and 3 months, respectively, before stability testing. Prior to testing, the lyophilized material was dissolved in a pharmaceutically acceptable reconstitution solution. The so obtained solutions where then analysed by HPLC according to standard methods well known to the skilled person in the art.

[0057]    The results of the stability testing, including 1 and 2 months data, of the composition prepared according to example 1 are shown in FIG. 1.

[0058]    The results of the stability testing of the composition prepared according to example 2 are shown in FIG. 2.

[0059]    The results of the stability testing of the composition prepared according to example 3 are shown in FIG. 3.

US 2012/0101030 A1

5

[0060]   Surprisingly, the stability testing according to FIG. 1 revealed that a lyophilized formulation based on a composition prepared using succinate or lactate as a buffering agent showed lower formation of total impurities compared with the compositions comprising acetate or tartrate. The fact that acetate seems not to be superior in respect of formation of the impurities determined is surprising taking into account the teaching of the prior art. As mentioned above, U.S. Pat. No. 5,952,300 teach that the use of tartrate buffer results in the formation of undesired degradation product in contrast to acetate buffer. It is furthermore surprisingly observed that the amount of impurities increase during storage when no buffering agent is added, contrary to the teaching of WO2008/12310.

[0061]   When we compare the composition prepared according to example 2 and example 3 above with the product sold in the market by Merck (RLD) we get the following data regarding levels of impurities, see table 3.

TABLE 3

|  | Composition example 2 | Composition example 3 | RLD |
|---|---|---|---|
| Impurity B (%) | 0.39 | 0.44 | 0.38 |
| Impurity C (%) | 0.09 | 0.13 | 0.17 |
| Total impurities | 1.8 | 1.9 | 2.1 |

[0062]   The results in table 3 again shows that the use of acetate buffer in the composition is not superior compared with for instance succinate buffer or lactate buffer which is surprising taking into account the teaching of the prior art.

1. A composition comprising:
a) a pharmaceutically effective amount of caspofungin or a pharmaceutically acceptable salt thereof;
b) a pharmaceutically acceptable amount of one or more pharmaceutically acceptable excipients effective to form a lyophilized cake; and
c) a pharmaceutically effective amount of a buffering agent selected from the group consisting of lactate and succinate.

2. A composition according to claim 1, wherein the pharmaceutically acceptable salt of caspofungin is an acetate salt.

3. A composition according to claim 1, wherein the buffering agent is succinate.

4. A composition according to claim 1, wherein the buffering agent is lactate.

5. A composition according to claim 1, wherein the one or more excipients is selected from the group consisting of diluents, antioxidants, and preservatives.

6. A composition according to claim 1, wherein the excipients is selected from the group consisting of sucrose, mannitol; and a combination thereof.

7. A compositing according to claim 1, wherein the composition comprises:
a) a pharmaceutically acceptable amount of caspofungin or a pharmaceutically acceptable salt thereof;
b) about 10-200 mg/ml of one or more pharmaceutically acceptable excipients effective to form a lyophilized cake;
c) a pharmaceutically effective amount of lactate or succinate effective to provide a pharmaceutically acceptable pH.

8. A composition according to claim 7, wherein the composition comprises an amount of caspofungin or a salt thereof corresponding to about 42 mg/ml caspofungin.

9. A composition according to claims 8, wherein the composition comprises:
a) about 46 mg/ml diacetate salt of caspofungin;
b) about 30 mg/ml sucrose and about 20 mg/ml mannitol; and
c) about 1.5 mg/ml succinate or about 1.15 mg/ml lactate.

10. A process for making a caspofungin composition according to claim 1 comprising the steps of:
a) mixing an aqueous solution comprising a pharmaceutically acceptable amount of one or more excipients with a pharmaceutically effective amount of a buffering agent selected from the group consisting of lactate and succinate;
b) optional adjusting the pH by adding a base to obtain a pharmaceutically acceptable pH;
c) adding to the mixture of a) a pharmaceutically acceptable amount of caspofungin or a pharmaceutically acceptable salt thereof;
d) optional adjusting the pH by adding a base to obtain a pharmaceutically acceptable pH;
e) filtering the solution obtained in d).

11. A process for making a caspofungin composition according to claim 9, wherein step a) is performed by firstly preparing an aqueous solution comprising a pharmaceutically effective amount of a buffering agent selected from the group consisting of lactate and succinate; and then adding to said solution of buffering agent a pharmaceutically acceptable amount of one or more excipients dissolved in water.

12. A process for making a caspofungin composition according to claim 9, wherein step a) is performed by firstly dissolving a pharmaceutically acceptable amount of one or more excipients in water; then adding to said solution of exipient(s) a pharmaceutically effective amount of a buffering agent selected from the group consisting of lactate and succinate.

13. A process according to claim 9, wherein the pH is adjusted to 5.0-5.7 in step b).

14. A process according to claim 9, wherein the pH is adjusted to about 6 in step d).

15. A process according to claim 9, wherein caspofungin diacetate is added in step c).

16. A lyophilized formulation consisting of a composition which prior to lyophilization corresponds to a composition according to claim 9.

17. A formulation for parenteral administration consisting of a lyophilized formulation according to claim 16, wherein said lyophilized formulation is dissolved in a pharmaceutically acceptable reconstitution solution suitable for parenteral administration to a patient in need thereof.

18. A formulation for parenteral administration according to claim 17, wherein the pharmaceutically acceptable reconstitution solution is selected from the group consisting of distilled water, sterile water, physiologic saline, and bacteriostatic water.

19. A kit comprising a first container comprising the lyophilized formulation according to claim 15 and a second container comprising a parenterally acceptable solvent for reconstitution thereof, and optionally a container comprising means for administrating the reconstituted solution to a patient in need thereof.

US 2012/0101030 A1

Apr. 26, 2012

6

**20**. A method of treating or preventing a fungal infection, comprising parenterally administering to an individual in need thereof a composition according to claim **8**.

**21**. The method according to claim **20**, wherein the infections is caused by a fungus belonging to the species *Candida* or *Aspergillus*.

**22**. The method according to claim **21**, wherein the infections is caused by a fungus belonging to the species infection is caused by *C. albicans, C. tropicalis, C. krusei, C. glabrata, A. fumigatus, A. flavus* and *A. nigerc.*

\* \* \* \* \*