# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MERCK SHARP & DOHME CORP., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 14-199-RGA |
| | ) | |
| XELLIA PHARMACEUTICALS APS, | ) | |
| | ) | |
| Defendant. | ) | |

**DECLARATION OF STEPHEN R. HOWE IN SUPPORT OF DEFENDANT XELLIA PHARMACEUTICALS APS'S ANSWERING CLAIM CONSTRUCTION BRIEF**

OF COUNSEL:
Jeffrey S. Ward
Wendy M. Ward
Stephen R. Howe
MERCHANT & GOULD, P.C.
10 E. Doty St., Suite 600
Madison, WI  53703
(608) 280-6750


Jeffrey D. Blake
MERCHANT & GOULD, P.C.
191 Peachtree St. NE, Suite 4300
Atlanta, GA 30303
(404) 954-5100


Dated:  October 7, 2014

Karen E. Keller (No. 4489)
Jeffrey T. Castellano (No. 4837)
Stephanie E. O'Byrne (No. 4446)
SHAW KELLER LLP
300 Delaware Ave., Suite 1120
Wilmington, DE 19801
kkeller@shawkeller.com
jcastellano@shawkeller.com
sobyrne@shawkeller.com
*Attorneys for Defendant Xellia*
*Pharmaceuticals ApS*

I, Stephen R. Howe, Esq., declare as follows:

1. I am an attorney-at-law and associate at the law firm Merchant & Gould, P.C.

2. I am admitted to practice before this Court.  I am also a member of the state bar of Illinois.

3. I am counsel of record for Xellia Pharmaceuticals ApS in the above-captioned matter.

4. I am making this declaration in support of Xellia's Claim Construction Brief.

5. Attached hereto as Exhibit A is a true and correct copy of the Complaint filed on March 30, 2010 in *Merck & Co., Inc. et al. v. Sandoz Inc.*, 2-10-cv-01625 (D.N.J), ECF No. 1.

6. Attached hereto as Exhibit B is a true and correct copy of Merck's Brief in Support of its Motion for Summary Judgment on Sandoz's Obviousness Defense, filed on November 4, 2011 in *Merck & Co., Inc. et al. v. Sandoz Inc.*, 2-10-cv-01625 (D.N.J), ECF No. 123.

7. Attached hereto as Exhibit C is a true and correct copy of the Court's Opinion filed on January 30, 2012 in *Merck & Co., Inc. et al. v. Sandoz Inc.*, 2-10-cv-01625 (D.N.J), ECF No. 143.

8. Attached hereto as Exhibit D is a true and correct copy of the Court's Order filed on January 30, 2012 in *Merck & Co., Inc. et al. v. Sandoz Inc.*, 2-10-cv-01625 (D.N.J), ECF No. 144.

9. Attached hereto as Exhibit E is a true and correct copy of the Court's Order filed on April 16, 2012 in *Merck & Co., Inc. et al. v. Sandoz Inc.*, 2-10-cv-01625 (D.N.J), ECF No. 153.

10. Attached hereto as Exhibit F is a true and correct copy of the Declaration of Professor Stephen R. Byrn in Support of Merck's Motion for Summary Judgment on Sandoz's Obviousness Defense, filed on November 4, 2011 in *Merck & Co., Inc. et al. v. Sandoz Inc.*, 2-10-cv-01625 (D.N.J), ECF No. 123-10.

11. Attached hereto as Exhibit G is a true and correct copy of the Transcript of the

    Deposition of Stephen R. Byrn, dated June 14, 2011 in *Merck & Co., Inc. et al. v. Sandoz*

    *Inc.*, 2-10-cv-01625 (D.N.J) as provided by Merck in the current litigation.

12. Attached hereto as Exhibit H is a true and correct copy of Merck's Response to Sandoz's

    Counterstatement of Facts in Support of its Opposition to Merck's Motion for Summary

    Judgment on Sandoz's Obviousness Defense, filed on November 28, 2011 in *Merck &*

    *Co., Inc. et al. v. Sandoz Inc.*, 2-10-cv-01625 (D.N.J, Nov. 28, 2011), ECF No. 129.

13. Attached hereto as Exhibit I is a true and correct copy of the Final Pretrial Order, filed on

    August 5, 2011 in *Merck & Co., Inc. et al. v. Sandoz Inc.*, 2-10-cv-01625 (D.N.J), ECF

    No. 103.

14. Attached hereto as Exhibit J is a true and correct copy of the entry for GEREF[®]

    (sermorelin acetate for injection) Prescribing Information, (1995) Physicians' Desk

    Reference (49th ed., pp. 2784-2785.)

I declare under penalty of perjury that the foregoing is true and correct.  Executed on October 7, 2014.


_____

Stephen R. Howe, Esq.

# Exhibit 2-A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

David E. De Lorenzi, Esq.
Sheila F. McShane, Esq.
GIBBONS P.C.
One Gateway Center
Newark, New Jersey 07102-5310
(973) 596-4500

Of Counsel:
Dominick A. Conde, Esq.
Brian V. Slater, Esq.
FITZPATRICK, CELLA,
  HARPER & SCINTO
1290 Avenue of the Americas
New York, New York 10104-3800
(212) 218-2100

Edward W. Murray, Esq.
Karen Stoffan, Esq.
MERCK & CO., INC.
RY28-320
P.O. Box 2000
Rahway, New Jersey 07065-0900
(732) 594-0436

Attorneys for Plaintiffs,
MERCK & CO., INC. and
MERCK SHARP & DOHME CORP.

| | |
|---|---|
| MERCK & CO., INC. and<br>MERCK SHARP & DOHME CORP.<br><br>Plaintiffs,<br><br>v.<br><br>SANDOZ INC.<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)     CIVIL ACTION NO.: |

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiffs Merck & Co., Inc. and Merck Sharp & Dohme Corp. (hereinafter "Plaintiffs"), by way of Complaint against Sandoz Inc. allege as follows:

## THE PARTIES

1.       Merck & Co., Inc. is a corporation organized and existing under the laws of the state of New Jersey, having its principal place of business at One Merck Drive, Whitehouse Station, New Jersey 08889.  Merck & Co., Inc. is a global research-driven pharmaceutical company that discovers, develops, manufactures and markets a broad range of innovative products to improve human and animal health.

2.       Merck Sharp & Dohme Corp. is a subsidiary of Merck & Co., Inc., and is a corporation incorporated under the laws of the state of New Jersey, having its principal place of business at One Merck Drive, Whitehouse Station, New Jersey 08889.

3.       On information and belief, Sandoz Inc. ("Sandoz") is incorporated under the laws of the state of Colorado, having a principal place of business at 506 Carnegie Center, Suite 400, Princeton, New Jersey 08540.

4.       On information and belief, Sandoz is in the business of developing and manufacturing generic pharmaceutical products, which are copies of products invented and developed by innovator pharmaceutical companies.

5.       On information and belief, Sandoz assembled and caused to be filed with the United States Food and Drug Administration ("FDA"), pursuant to 21 U.S.C. § 355(j), Abbreviated New Drug Application ("ANDA") No. 200833 concerning a proposed generic drug product, Caspofungin Acetate Injectable, 50 mg/vial and 70 mg/vial.

#1504616 v1
105686-68716

## JURISDICTION AND VENUE

6.      This action arises under the patent laws of the United States of America. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331 and 1338(a).

7.      Sandoz is subject to jurisdiction in New Jersey because it manufactures pharmaceuticals and pharmaceutical products that are sold and used throughout the United States, including within New Jersey.

8.      Sandoz is subject to personal jurisdiction in New Jersey because it regularly and systematically conducts business within New Jersey and has offices within New Jersey.

9.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b), (c) and 28 U.S.C. § 1400(b).

## CANCIDAS®

10.      Merck & Co., Inc. holds approved new drug application ("NDA") 21-227 for CANCIDAS®, the active ingredient of which is caspofungin acetate. CANCIDAS® is approved for the treatment of certain types of fungal infections.

11.      Merck Sharp & Dohme Corp. is the owner of U.S. Patent No. 5,952,300 ("the '300 patent") (Patent attached as Exhibit A).

## SANDOZ ANDA

12.      On or about February 25, 2010, Merck & Co., Inc. received from Sandoz a letter, dated February 24, 2010 (the "February 24 letter"), stating that Sandoz had submitted an ANDA, assigned as No. 200833, to the FDA to seek approval to market Caspofungin Acetate Injectable, in 50 mg/vial and 70 mg/vial forms ("the Sandoz Products").

#1504616 v1
105686-68716

13.     In its February 24 letter, Sandoz stated that, in its ANDA, it had included certifications pursuant to 21 U.S.C. § 355(j)(2)(A)(vii)(IV) that the '300 patent would not be infringed by the manufacture, use, or sale of the Sandoz Products.

14.     The Sandoz ANDA refers to and relies upon the Merck & Co., Inc. NDA and contains data that, according to Sandoz, demonstrates the bioequivalence of the Sandoz Products and CANCIDAS®.

## INFRINGEMENT OF U.S. PATENT NO. 5,952,300

15.     Plaintiffs repeat and reallege paragraphs 1-14 above as if fully set forth herein.

16.     By filing its ANDA No. 200833 under 21 U.S.C. § 355(j) for the purpose of obtaining approval to engage in the commercial manufacture, use or sale of the Sandoz Products before the expiration of the '300 patent, Sandoz committed an act of infringement under 35 U.S.C. § 271(e)(2).

17.     If Sandoz commercially makes, uses, offers to sell, or sells the Sandoz Products within the United States, or imports the Sandoz Products into the United States, or induces or contributes to any such conduct during the term of the '300 patent, it would further infringe the '300 patent under 35 U.S.C. § 271.

18.     Merck will be irreparably harmed if Sandoz is not enjoined from infringing the '300 patent.  Merck does not have an adequate remedy at law.

19.     Sandoz's certification under 21 U.S.C. § 355(j)(2)(A)(vii)(IV) against the '300 patent was wholly unjustified, and thus this case is exceptional under 35 U.S.C. § 285.

#1504616 v1
105686-68716

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request:

A.     Judgment that Sandoz Inc. has infringed one or more claims of the '300 patent by filing ANDA No. 200833 relating to Sandoz's generic caspofungin acetate products;

B.     A permanent injunction restraining and enjoining Sandoz Inc. and their officers, agents, attorneys and employees, and those acting in privity or concert with them, from engaging in the commercial manufacture, use, offer for sale, or sale within the United States, or importation into the United States, of generic caspofungin acetate products as claimed in the '300 patent;

C.     An order that the effective date of any approval of ANDA No. 200833 relating to Sandoz's generic caspofungin acetate products be a date that is not earlier than the expiration date of the '300 patent plus any other regulatory exclusivity to which Plaintiffs are or become entitled;

D.     A declaration that this case is exceptional within the meaning of 35 U.S.C. § 285 and an award of reasonable attorney fees, expenses, and disbursements of this action; and

E.     Such other and further relief as the Court may deem just and proper.

#1504616 v1
105686-68716

Dated: March 30, 2010

Respectfully submitted,

By:_____ s/ Sheila F. McShane_____

David E. De Lorenzi, Esq.
Sheila F. McShane, Esq.
GIBBONS P.C.
One Gateway Center
Newark, New Jersey 07102-5310
(973) 596-4500

Attorneys for Plaintiffs,
MERCK & CO., INC. and
MERCK SHARP & DOHME CORP.

Of Counsel:

Dominick A. Conde, Esq.
Brian V. Slater, Esq.
FITZPATRICK, CELLA,
 HARPER & SCINTO
1290 Avenue of the Americas
New York, New York 10104-3800
(212) 218-2100

Edward W. Murray, Esq.
Karen Stoffan, Esq.
MERCK & CO., INC.
RY28-320
P.O. Box 2000
Rahway, New Jersey 07065-0900
(732) 594-0436

# Exhibit 2-B

David E. De Lorenzi, Esq.
Sheila F. McShane, Esq.
**GIBBONS P.C.**
One Gateway Center
Newark, New Jersey 07102-5310
Tel.: (973) 596-4500
Fax: (973) 596-0545

Dominick A. Conde, Esq.
Brian V. Slater, Esq.
**FITZPATRICK, CELLA, HARPER & SCINTO**
1290 Avenue of the Americas
New York, New York 10104-3800
Tel.: (212) 218-2100
Fax: (212) 218-2200

Edward W. Murray, Esq.
Karen Stoffan, Esq.
**MERCK & CO., INC.**
RY28-320
P.O. Box 2000
Rahway, New Jersey 07065-0900
Tel.: (732) 594-0436

*Attorneys for Plaintiffs*
*Merck & Co., Inc. and*
*Merck Sharp & Dohme Corp.*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| MERCK & CO., INC. and<br>MERCK SHARP & DOHME CORP.,<br><br>        Plaintiffs,<br><br>        v.<br><br>SANDOZ INC.,<br><br>        Defendant. | Civil Action No.: 10-cv-01625-SRC-PS<br><br>Return Date: November 7, 2011<br><br>**ORAL ARGUMENT REQUESTED**<br><br>*Contains Confidential Material -*<br>*Subject to Pending Motion to Seal* |

**MERCK'S BRIEF IN SUPPORT OF ITS MOTION**
**FOR SUMMARY JUDGMENT ON SANDOZ'S OBVIOUSNESS DEFENSE**

## Table of Contents

I.  INTRODUCTION ...................................................................................................................1

II.  BACKGROUND ...................................................................................................................3

    A.  Claim at issue. .............................................................................................................3

    B.  Merck's development of Cancidas®. ...........................................................................4

    C.  After failing to design around the '300 patent, Sandoz copied Merck's
    Cancidas® products. ....................................................................................................5

III.  ARGUMENT .......................................................................................................................5

    A.  The law relating to obviousness. .................................................................................5

    B.  Sandoz cannot meet its burden of proving by clear and convincing
    evidence that Claim 1 of the '300 patent would have been obvious. ..........................8

        1.  A POSA would have had no reasonable expectation of success in
        producing a shelf-stable formulation of caspofungin. ...........................................8

        2.  Sandoz admits that a POSA would have first pursued a solution
        formulation of caspofungin before considering a lyophilized
        formulation. .............................................................................................................9

        3.  Sandoz cannot demonstrate a motivation in the prior art to prepare
        a lyophilized formulation of caspofungin. ...........................................................11

        4.  Sandoz cannot demonstrate a motivation in the prior art to prepare
        a lyophilized formulation of caspofungin with a buffer....................................... 12

        5.  Sandoz cannot demonstrate a motivation in the prior art to prepare
        a lyophilized formulation of caspofungin with an acetate buffer. .......................15

        6.  There was no reasonable expectation of success in using an acetate
        buffer in a lyophilized formulation of caspofungin. ............................................17

        7.  Sandoz does not dispute the unexpected properties of using an
        acetate buffer in a lyophilized formulation of caspofungin. ...............................20

    C.  Multiple objective indicia of nonobviousness preclude Sandoz from
    meeting its burden of proving obviousness.................................................................21

IV.  CONCLUSION...................................................................................................................23

## Table of Authorities

### Cases

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ....................................................................................6

*Burlington Indus., Inc. v. Quigg*,
822 F.2d 1581 (Fed. Cir. 1987) .............................................................21, 22

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ....................................................................................5

*Daiichi Sankyo Co. v. Matrix Labs., Inc.*,
619 F.3d 1346 (Fed. Cir. 2010) ...................................................................17

*Eisai Co. Ltd. v. Dr. Reddy's Labs., Ltd.*,
533 F.3d 1353 (Fed. Cir. 2008) ................................................................6, 7

*Eli Lilly v. Zenith Goldline Pharm.*,
471 F.3d 1369 (Fed. Cir. 2006) ................................................................7, 8

*Graham v. John Deere Co.*,
383 U.S. 1 (1966) .......................................................................................6

*In re Omeprazole Patent Litig.*,
490 F.Supp.2d 381 (S.D.N.Y. 2007) ..................................................7, 12, 14

*In re Omeprazole Patent Litig.*,
536 F.3d 1361 (Fed. Cir. 2008) .............................................................11, 13

*KSR Int'l Co. v. Teleflex Inc.*,
550 U.S. 398 (2007) ..............................................................................7, 19

*Microsoft Corp. v. i4i Ltd. P'ship*,
131 S.Ct. 2238 (2011) .................................................................................6

*Mitsubishi Chem. Corp. v. Barr Labs., Inc.*,
718 F.Supp.2d 382 (S.D.N.Y. 2010) .................................................14, 22, 23

*Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*,
520 F.3d 1358 (Fed. Cir. 2008) ......................................................6, 10, 16, 21

*Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*,
Nos. 04-1689, 06-757, 06-5166, 2007 WL 432792 (D.N.J. Feb. 5,
2007) ........................................................................................................6

*U.S. v. Adams*,
383 U.S. 39 (1966) .............................................................................7, 17, 21, 22

*Unigene Labs., Inc. v. Apotex Inc.*,
  No. 2010-1006, 2011 WL 3715557 (Fed. Cir. Aug. 25, 2011)................................passim

## **Rules & Statutes**

35 U.S.C. § 103(a) ...............................................................................................6, 10

35 U.S.C. § 285.......................................................................................................1

Fed. R. Civ. P. 56(a)..............................................................................................5

## I. INTRODUCTION

This Hatch-Waxman patent infringement case concerns U.S. Patent No. 5,952,300 ("the '300 patent"), which covers Merck's first-in-class, life-saving Cancidas® antifungal drug products. (SOF ¶¶ 1-3.)[1] Cancidas® is indicated to treat life-threatening, systemic fungal infections, and received fast track approval from the Food and Drug Administration ("FDA"), a process reserved for drug products that meet an unmet medical need. (SOF ¶¶ 4, 69-70.)

Defendant Sandoz Inc. ("Sandoz") stipulated to infringement of Claim 1 (Final Pretrial Order ("Pretrial Order"), D.I. 103 at 6, ¶ 21), and the sole-remaining liability issue for this Court to decide is whether Sandoz can meet its burden on its obviousness defense.[2] (Pretrial Order at 50, 73.) Here, admissions by Sandoz and its experts preclude Sandoz from prevailing on its obviousness defense, and Merck, therefore, is entitled to judgment as a matter of law on this issue.

Merck's Cancidas® products are injectable drug formulations that contain the drug compound caspofungin acetate. (SOF ¶ 5.) They are typically administered in a hospital setting to patients with life-threatening, systemic fungal infections. (SOF ¶ 4.) Claim 1 is directed to a shelf-stable, lyophilized formulation containing caspofungin or one of its salts, excipients, and an acetate buffer. '300 patent, col. 9, ll. 26-60. Lyophilization is the process of freeze-drying a liquid solution into a solid. (SOF ¶ 6.)

There are several reasons why Sandoz's defense fails as a matter of law. Any one of those reasons is sufficient to defeat Sandoz's obviousness defense. Sandoz's formulation expert, Dr. Mark Staples, opines that a person of ordinary skill in the art ("POSA") would have begun

---

[1] Citations to SOF refer to the specific paragraphs contained in Merck's Statement of Facts, filed concurrently with this motion.

[2] If this motion is granted, the only remaining issue left for the Court to resolve would be Merck's claim of exceptional case under 35 U.S.C. § 285.

formulation development by selecting a stable salt of caspofungin. (SOF ¶ 32.) However, the salt he alleges a POSA would have selected, caspofungin acetate, is undisputedly highly unstable. (SOF ¶¶ 8-9.) And, Dr. Staples relies on a prior art reference that teaches "[o]ne hardly would expect to prepare stable dosage forms with a chemical substance that was not stable in the pure state." (SOF ¶¶ 37-38, emphasis added.)

Next, Dr. Staples concedes that a POSA would have been focused on solution formulations of caspofungin—not a solid, lyophilized formulation as claimed in the '300 patent. (SOF ¶ 40.) Thus, under his own analysis, a POSA would not have been motivated to pursue a lyophilized formulation of caspofungin. Rather than point to any prior art, Dr. Staples relies on the inventors' internal work on caspofungin formulations in an attempt to provide a motivation to try lyophilization. (SOF ¶ 42.) But, as one would expect based on common sense, the law clearly and explicitly precludes using the inventors' own work to prove obviousness.

Next, to justify adding a buffer to a lyophilized formulation, Dr. Staples again relies on the inventors' own formulation work in solution. However, he fails to support why a POSA would have considered those liquid, solution formulation experiments to be relevant to a solid, lyophilized formulation. (SOF ¶ 73.) Further, even if one assumes that a POSA would have investigated lyophilized formulations of caspofungin with a buffer, the selection of acetate would not have been obvious. As acknowledged by Dr. Staples, acetate is volatile and could be *removed* during lyophilization due to evaporation. (SOF ¶¶ 69, 70.) Thus, there would have been no motivation to use an acetate buffer. Nor would there have been a reasonable expectation that, after lyophilization, acetate would remain in the formulation to act as a buffer, *i.e.*, there is no reasonable expectation that the use of an acetate buffer would successfully result in a stable

formulation. In fact, Sandoz's expert could not point to a single commercial lyophilized formulation containing an acetate buffer as of the time of filing of the '300 patent. (SOF ¶ 71.)

Indeed, Sandoz was so skeptical of the unexpected properties of the claimed invention that it took the unusual step of reproducing the '300 patent's examples. (SOF ¶ 25.) That experiment confirmed what the inventors already discovered—use of an acetate buffer is unexpectedly superior to another buffer that, under Sandoz's theory, should have been equivalent. (SOF ¶ 26.) For these reasons and the reasons described below, Merck's motion for summary judgment on Sandoz's obviousness defense should be granted.

## II. BACKGROUND

### A. Claim at issue.

Claim 1 of the '300 patent reads as follows:

A pharmaceutical composition for intravenous administration to a patient comprising

a) a pharmaceutically effective amount of a compound having the formula



and the pharmaceutically acceptable salts thereof,

b) a pharmaceutically acceptable amount of an excipient effective to form a lyophilized cake; and

c) a pharmaceutically acceptable amount of an acetate buffer effective to provide a pharmaceutically acceptable pH.

'300 patent, col. 9, ll. 26-60. Sandoz only disputed the meaning of "and" in subphrase (a), which this Court construed to mean "either an amount of the diagramed compound [caspofungin] or an amount of a pharmaceutically acceptable salt of the diagramed compound." (D.I. 85 at 10.)

3

**B.** **Merck's development of Cancidas®.**

Prior to the '300 patent, no shelf-stable formulations of caspofungin were disclosed in the art, and the '300 patent inventors faced the daunting task of creating such a formulation. (SOF ¶¶ 7-21.) The inventors discovered that one of the salts of caspofungin, caspofungin acetate, is a highly unstable chemical compound—in fact, it needs to be stored at minus 70 °C to avoid unacceptable degradation. (SOF ¶¶ 8-9.) It took the inventors about two years to develop a stable formulation of caspofungin acetate that could actually be sold and administered to patients. (SOF ¶ 10.) Along the way, the inventors encountered multiple setbacks. Their most desirable formulation would have been a ready-to-use solution formulation that, unlike a solid, lyophilized formulation, does not require reconstitution prior to administration to a patient. (SOF ¶ 11.) However, the inventors discovered that a solution formulation approach was inadequate for long-term storage due to chemical degradation of caspofungin. (SOF ¶ 12.) They also learned that caspofungin degrades by multiple chemical pathways, a fact not disclosed in the prior art. (SOF ¶ 13.)

Eventually, the inventors investigated different lyophilized formulations. However, prior to discovering the claimed invention, several lyophilization formulation attempts failed. For example, they tried lyophilized formulations with and without a citrate buffer, but discovered that both formulations failed to stabilize caspofungin acetate. (SOF ¶ 14.) The inventors also attempted a lyophilized formulation of caspofungin with excipients and a tartrate buffer. (SOF ¶ 15.) That attempt also failed, and in fact led to the discovery of a new problem, namely the observation of a previously unknown degradant in unacceptable amounts. (SOF ¶ 16.) After several such failures to make an acceptable lyophilized formulation, the inventors discovered that a lyophilized formulation of caspofungin with excipients and an acetate buffer was stable for an extended period of time. '300 patent, col. 2, ll. 22-56. The successful use of an acetate buffer

was unexpected and surprising, in part, because acetate is volatile. (SOF ¶¶ 69-70.) Even today, Merck scientists do not know why the acetate-buffered caspofungin formulations are more stable than tartrate-buffered ones—and neither Sandoz nor its formulation expert offered an explanation for acetate's superiority. (SOF ¶¶ 22-24.)

### C. After failing to design around the '300 patent, Sandoz copied Merck's Cancidas® products.

Sandoz did not believe the stability results discussed in the '300 patent. Sandoz was skeptical that, as described in the '300 patent, there were, in fact, any differences between using tartrate or acetate buffers in a caspofungin lyophilized formulation. (SOF ¶ 25.) Accordingly, Sandoz repeated the '300 patent examples using tartrate and acetate buffers. (*Id.*) But Sandoz's results confirmed what the '300 patent inventors discovered: an acetate buffer provides unexpectedly superior stability for caspofungin lyophilized formulations. (SOF ¶ 26.) After failing to show that acetate and tartrate buffers were equivalent, Sandoz investigated multiple other buffers, but ultimately filed its abbreviated new drug application ("ANDA") for products that are exact copies of Merck's commercially-successful Cancidas® products. (SOF ¶¶ 29-30.) Despite confirming that acetate is unexpectedly superior to other buffers,[3] Sandoz now argues that its use would have been obvious.

## III. ARGUMENT

### A. The law relating to obviousness.

Summary judgment should be granted where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The Court should draw all justifiable

---

[3] Neither Sandoz nor its formulation expert refutes these unexpected properties. (SOF ¶¶ 27-28.)

inferences in the nonmovant's favor (*i.e.*, in Sandoz's favor) when deciding whether genuine issues of material fact exist. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, there can be no genuine issues of material fact unless a reasonable factfinder could find for the nonmovant on that issue. *Id.* at 255-56.

A patent challenger asserting an obviousness defense under 35 U.S.C. § 103(a) bears the burden of proof. *Microsoft Corp. v. i4i Ltd. P'ship*, 131 S.Ct. 2238, 2242, 2244, 2252-53 (2011). When deciding if a reasonable factfinder could find in favor of the nonmovant, the Court should take into consideration the burden that the party bears in proving facts—here it is by clear and convincing evidence. *Id.*; *Anderson*, 477 U.S. at 255-56. Obviousness is dependent on a number of factual predicates, but when, as here, those facts are not subject to reasonable dispute, the issue resolves solely into a question of law, and is, therefore, amenable to determination by summary judgment. *See Unigene Labs., Inc. v. Apotex Inc.*, No. 2010-1006, 2011 WL 3715557, at *6 (Fed. Cir. Aug. 25, 2011) (citing *Eisai Co. Ltd. v. Dr. Reddy's Labs., Ltd.*, 533 F.3d 1353, 1356 (Fed. Cir. 2008)); *Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*, Nos. 04-1689, 06-757, 06-5166, 2007 WL 432792, at *1-3, *7-8 (D.N.J. Feb. 5, 2007) (Chesler, J.), *aff'd*, 520 F.3d 1358 (Fed. Cir. 2008).

In assessing an obviousness claim, the Court must consider several underlying factual questions, including "1) the scope and content of the prior art; 2) the level of ordinary skill in the art; 3) the differences between the claimed invention and the prior art; and 4) evidence of secondary factors, also known as objective indicia of nonobviousness." *See Unigene*, 2011 WL 3715557, at *6 (citing *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966)); *see also* 35 U.S.C. § 103(a).

When assessing "the differences between the claimed invention and the prior art" for chemical compositions, several key inquiries are relevant, including (i) whether there was a motivation or suggestion in the prior art to combine references to arrive at the claimed invention, (ii) whether there was a reasonable expectation from the art that such a combination would be successful, and (iii) whether there are unexpected properties of the invention. *See, e.g., U.S. v. Adams*, 383 U.S. 39, 50-51 (1966) (claims held nonobvious where "the operating characteristics of the Adams battery have been shown to have been unexpected"); *Unigene*, 2011 WL 3715557, at *6-8 (applying the obviousness analysis in chemical compound cases to drug formulations); *Eli Lilly v. Zenith Goldline Pharm.*, 471 F.3d 1369, 1377-78 (Fed. Cir. 2006). Further, "[i]f the prior art [references] teach away from combining known elements in the manner claimed by the invention at issue, discovering a successful way to combine them is less likely to be obvious." *In re Omeprazole Patent Litig.*, 490 F.Supp.2d 381, 516 (S.D.N.Y. 2007) (citing *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 416, 425-26 (2007)), *aff'd*, 536 F.3d 1361 (Fed. Cir. 2008); *see also Unigene*, 2011 WL 3715557, at *9-10.

While the motivation to combine need not be explicit in the prior art, the art must provide (i) a starting point "from which a skilled artisan might identify a problem and pursue potential solutions," (ii) "reasons . . . to make particular modifications to achieve the claimed [invention]," and (iii) "reasons for narrowing the prior art universe to a 'finite number of identified, predictable solutions.'" *Eisai*, 533 F.3d at 1359 (quoting *KSR*, 550 U.S. at 421). Particularly for chemical inventions, the "'identified, predictable solutions' may present a difficult hurdle because potential solutions are less likely to be genuinely predictable." *Id.*

**B.** **Sandoz cannot meet its burden of proving by clear and convincing evidence that Claim 1 of the '300 patent would have been obvious.**

For the purpose of this motion, Merck accepts Sandoz's definition of the person of ordinary skill in the art.[4] The focus of this motion, therefore, is on the significant differences between the prior art and the claimed inventions, the lack of motivation in the art to make the claimed invention, the lack of a reasonable expectation of success, unexpected properties of the claimed invention, and prior art teaching away from combining the claimed elements.

**1.** **A POSA would have had no reasonable expectation of success in producing a shelf-stable formulation of caspofungin.**

In his opening expert report, Dr. Staples opines that a POSA would first have required a stable pharmaceutical salt of caspofungin before beginning formulation development. (SOF ¶ 32.) However, Dr. Staples ignores his own requirement when he states that a POSA would have selected an acetate salt of caspofungin for formulation development.

The acetate salt of caspofungin is undisputedly highly chemically unstable, needing to be stored at very low temperatures (*i.e.*, typically minus 70 °C). (SOF ¶ 8.) And, Sandoz admits that caspofungin acetate is hygroscopic, meaning it takes up water, a property that Dr. Staples concedes makes it physically unstable. (SOF ¶ 9.) Thus, according to Dr. Staples's own requirement, a POSA would not have been motivated to select caspofungin acetate for formulation development as a starting point because it is both chemically and physically unstable. *See, e.g.*, *Unigene*, 2011 WL 3715557, at *6-7; *Eli Lilly*, 471 F.3d at 1377.

---

[4]  Sandoz's expert defined the POSA as having "a Ph.D. in pharmaceutical chemistry, an equivalent degree or an equivalent amount of industry experience, and at least 5 to 10 years of experience in pharmaceutical formulations." (Leonard Decl., Ex. A at ¶ 73; *see also* SOF ¶ 31.)

In his reply expert report, Dr. Staples backtracks, stating for the first time that caspofungin acetate was "stable enough" to begin formulation work.  (Leonard Decl.,[5] Ex. B at ¶ 18; *see also* SOF ¶ 33.)  However, the only prior art describing caspofungin on which Dr. Staples relies—all of which was considered by the PTO examiner—does not state that caspofungin acetate was "stable enough."  (SOF ¶¶ 34, 36.)  He cites two prior art references discussing salts of caspofungin, namely U.S. Patent Nos. 5,378,804 and 5,552,521 ("the '804 patent" and "the '521 patent," respectively).  (SOF ¶¶ 34-35.)  It is undisputed that these references are silent as to (i) the degree of instability of caspofungin acetate, (ii) any cause of instability, (iii) the pathways by which caspofungin degrades, and (iv) how potentially to cure the instability.  (SOF ¶ 36.)

Moreover, Dr. Staples fails to provide any objective criteria by which a POSA would have known a salt was "stable enough" to begin formulation.  (SOF ¶ 33.)  In fact, even the prior art on which Dr. Staples relies shows that a POSA would <u>not</u> reasonably have expected an unstable salt form of a drug, such as caspofungin acetate, to produce a stable formulation. (Leonard Decl., Ex. G at 1458 ("One hardly would expect to prepare stable dosage forms with a chemical substance that was not stable in the pure state."); *see also* SOF ¶¶ 37-38.)

Thus, Sandoz has failed to demonstrate that a POSA would have reasonably expected to prepare a stable dosage form from caspofungin acetate, which is a chemically and physically unstable salt form of caspofungin.

### 2. Sandoz admits that a POSA would have first pursued a solution formulation of caspofungin before considering a lyophilized formulation.

According to the 1995 *Physicians' Desk Reference* ("1995 PDR"), over twice as many of the then-marketed injectable drug products were in the form of ready-to-use liquid solutions

---

[5]    Citations to the Leonard Decl. refer to the exhibits contained in the Declaration of Jason A. Leonard, filed concurrently with this motion.

compared to solid, lyophilized formulations.  (SOF ¶ 39.)  Dr. Staples admits that a POSA would first have prepared a solution formulation of caspofungin before even contemplating a lyophilized formulation:  "[i]f an [intravenous] dosage form was the target product image, a POSA would have initially sought to develop a solution dosage form."  (Leonard Decl., Ex. B at ¶ 20; *see also* SOF ¶ 40.)  This admission alone demonstrates a lyophilized formulation would <u>not</u> have been obvious because a POSA would, by Sandoz's own admission, have been focused instead on solution formulations of caspofungin.

In an attempt to conjure a motivation to try a lyophilized formulation, Dr. Staples asserts that a POSA would eventually move on to lyophilization "if the solution development failed to produce acceptable quality product in the required timeframe."  (Leonard Decl., Ex. B at ¶ 29; *see also* SOF ¶ 41.)  Dr. Staples never defines "acceptable quality," nor quantifies the "required timeframe," and rather than pointing to any prior art in support of this statement, he instead improperly relies on the inventors' own work:  "[t]he difficulty of developing an acceptable solution formulation of caspofungin was clearly identified and acted on early in the development process [by the inventors]."  (Leonard Decl., Ex. B at ¶ 29; *see also* SOF ¶¶ 41-42.)  The patent statute, however, prohibits a challenger from relying on the inventor's path to the invention to render it obvious.  *Ortho-McNeil*, 520 F.3d at 1364 (holding that under 35 U.S.C. § 103(a) an expert's analysis was improper because the expert "simply retraced the path of the inventor with hindsight").

Even if the inventors' work could be used to show obviousness, which would be legally improper (as well as circular), the inventors' own work here highlights the inadequacies of Sandoz's arguments.  Even after the inventors identified the instability of caspofungin in solution, they characterized the amount of additional work that would still be required to search

for a stable formulation of caspofungin as a "substantial development effort." (SOF ¶ 43.) And, as explained above (*see* Section II.B., *supra*), it took the inventors two years to arrive at the claimed invention. Thus, far from demonstrating obviousness, the challenges faced by the inventors due to caspofungin's instability highlight Sandoz's failure to demonstrate a reasonable expectation of success in developing a stable formulation of caspofungin.

### 3. Sandoz cannot demonstrate a motivation in the prior art to prepare a lyophilized formulation of caspofungin.

There is no genuine dispute that the prior art on which Sandoz relies does not disclose a lyophilized formulation of caspofungin or any of its salts. (SOF ¶ 44.) In an effort to create a motivation to investigate lyophilization—as opposed to other potential formulation approaches[6]—Dr. Staples focuses in his reply report on a degradant of caspofungin presumed to be formed by hydrolysis, *i.e.*, caused by water. (SOF ¶ 45.) But Sandoz fails to produce any evidence that a hydrolysis degradant of caspofungin was known in the prior art or that a POSA would have expected that caspofungin degrades by hydrolysis. *See Unigene*, 2011 WL 3715557, at *7; *In re Omeprazole*, 536 F.3d at 1380.

Sandoz attempts to rely instead on a statement by Merck's expert, Professor Byrn, that the hydrolysis product is a degradant of caspofungin in solution. (SOF ¶ 48.) However, Professor Bryn's statement is based on Merck's early internal work attempting to understand the degradation of caspofungin, and not the prior art. (SOF ¶ 49.) Moreover, as explained by Professor Byrn, there are other major degradation pathways of caspofungin (also not in the prior

---

[6]     Sandoz's formulation expert omits consideration of other potential formulation approaches, which include powder filling and non-aqueous solutions. (SOF ¶ 46.) This omission is all the more curious given that Sandoz itself investigated powder filling of caspofungin acetate. (SOF ¶ 47.)

art), and a POSA would have had no reasonable expectation that by reducing hydrolysis alone caspofungin would be stabilized.  (*Id.*)

Sandoz has no evidence to contradict Professor Byrn on this point.  Dr. Staples conceded that he was not qualified to opine on the degradation pathways of caspofungin:  "the structures of the degradents [sic] [of caspofungin] and how they're produced goes -- goes outside my -- my background in organic chemistry."  (Leonard Decl., Ex. C at 223:4-12; *see also* SOF ¶ 50.)  As such, Sandoz cannot meet its burden to show that hydrolysis would have motivated a POSA to investigate a lyophilized dosage form for caspofungin.

In an attempt to overcome the absence of any prior art showing the pathways by which caspofungin degrades, Sandoz contends that hydrolysis is a "common" decomposition pathway for peptides.  (SOF ¶ 51.)  However, Sandoz's contention is not specific to caspofungin degradation, and Sandoz has failed to make the link between general teachings about peptides and caspofungin.  On the contrary, Dr. Staples states that "[a] POSA would understand that caspofungin would behave like a small molecule <u>rather than a protein or peptide</u>."  (Leonard Decl., Ex. B at ¶ 14, emphasis added; *see also* SOF ¶ 52.)[7]  By the admission of its own formulation expert, therefore, Sandoz cannot make the link between general teachings regarding peptides and caspofungin, and therefore cannot support hydrolysis as a motivation to try lyophilization.  *See Unigene,* 2011 WL 3715557, at *7; *In re Omeprazole*, 490 F.Supp.2d at 528.

### 4. Sandoz cannot demonstrate a motivation in the prior art to prepare a lyophilized formulation of caspofungin with a buffer.

Even assuming *arguendo* that a POSA would be motivated to try a lyophilized formulation for caspofungin, Sandoz fails to show any motivation to include a buffer in a solid,

---

[7]     Dr. Staples distinguishes small molecules and peptides, in part, based on molecular weight, and asserts that caspofungin behaves as a small molecule. (SOF ¶¶ 52-53.)

lyophilized formulation, much less an acetate buffer. By Sandoz's own logic, if lyophilization was seen by a POSA as the remedy for a hydrolysis problem because it removes the water, a POSA would have had no reason to investigate additionally adding a buffer, which has nothing to do with removing water. Despite this, Sandoz's expert argues that a POSA might, under certain circumstances, consider adding a buffer to a liquid, solution formulation prior to lyophilization. (SOF ¶ 54.) However, Sandoz provides no evidentiary support that any of those circumstances are present here, far less evidence that a POSA would have expected a buffer to help stabilize a solid, lyophilized formulation. (SOF ¶¶ 54, 73.)

Dr. Staples admits that prior to adding any ingredient to a pharmaceutical formulation, a formulator must have a justification for doing so. (SOF ¶ 55.) Dr. Staples further admits that prior to adding a buffer to a formulation "you would first need data showing that there is, in fact, a pH drift [*i.e.*, a showing that the pH of the solution changes over time]." (Leonard Decl., Ex. C at 202:2-13; *see also* SOF ¶ 56.) Absent evidence of pH drift in solution, Dr. Staples admits a POSA would not add a buffer, which could make the formulation less stable than it would be without a buffer. (SOF ¶ 57.) Merck's expert agrees with Dr. Staples that absent pH drift in a solution, a buffer would not be needed. (Byrn Decl., Ex. A at ¶¶ 72-73; *see also* SOF ¶ 58.)[8] Sandoz has never alleged nor provided any evidence that there is pH drift when caspofungin is put in solution. (SOF ¶ 59.) Thus, Sandoz has no support for any alleged motivation to add a buffer to any caspofungin solution formulation, let alone to a solid, lyophilized formulation. *See, e.g.*, *Unigene*, 2011 WL 3715557, at *7; *In re Omeprazole*, 536 F.3d at 1380.

---

[8]     Citations to the Byrn Decl. refer to the Declaration of Professor Stephen R. Byrn, filed concurrently with this motion.

Indeed, Dr. Staples does not dispute that as of 1995 over 80% of the marketed lyophilized drug formulations did <u>not</u> contain a buffer.[9] (SOF ¶ 39.) In particular, only thirty-two out of 181 lyophilized formulations listed in the 1995 PDR contained buffers, and ***none*** of those was an acetate buffer. (Byrn Decl., Ex. A at ¶ 76; Byrn Decl., Ex. A at Exhibit D; *see also* SOF ¶ 39.) As the vast majority of the prior art marketed lyophilized formulations did <u>not</u> contain a buffer, a POSA would not have inferred that a buffer was needed, especially absent any data showing pH drift. *See In re Omeprazole*, 490 F.Supp.2d at 528 ("[A] person of ordinary skill in the art would have to infer from the [prior art patent] that any drug core could react with an enteric coating, so any enteric-coated drug would require a subcoating. This is too broad an inference for obviousness purposes, because the prior art [references] disclose many directly enteric-coated pharmaceutical formulations."); *see also Mitsubishi Chem. Corp. v. Barr Labs., Inc.*, 718 F.Supp.2d 382, 431-32 (S.D.N.Y. 2010) (finding a drug formulation nonobvious where the 1981 PDR disclosed that only a fraction of the marketed formulations contained the claimed formulation excipients), *aff'd*, No. 2010-1432, 2011 WL 3288394 (Fed. Cir. Aug. 2, 2011).

Recognizing that there is no evidence that the pH of a caspofungin solution varies over time (*i.e.*, pH drift), Sandoz now argues—for the first time in its pretrial statement of facts—that a buffer may be added merely if the stability of such a solution varies at all according to pH. (Pretrial Order at 46, ¶ 90.) However, pretrial statements of fact are not evidence and the undisputed evidence shows that the stability of caspofungin in solution does not vary significantly across the pH range to justify inclusion of a buffer. (SOF ¶ 60.) Moreover, Dr.

---

[9]     In his reply expert report, Dr. Staples states that he was not aware of ***any*** lyophilized products without a buffer. (SOF ¶ 62.) At his deposition, he retracted this statement, conceding that even one of the lyophilized products ***he*** developed does not contain a buffer. (SOF ¶ 63.)

Staples testified that only in an <u>extreme</u> situation—one he could not identify during his deposition—would a buffer be needed due to pH stability variability:

> Q. Okay. And if there isn't evidence of a drift, then there's no justification for adding a buffer, and you wouldn't add it.
>
> A. That's correct.
>
> But let me -- let me qualify that, please.
>
> That's assuming that you don't have a situation where you have an extreme sensitivity to the pH. In a typical situation. I think the statement is okay as it stands, but you could have a situation where, even if the pH didn't drift, if there was such a great sensitivity to the exact pH, that you might need an additional protection from a buffer, ***I can't think of a situation that's that extreme***, but I want to just include that as a qualifier.

(Leonard Decl., Ex. C at 202:14-203:5, emphasis added; *see also* SOF ¶ 61.)

Based on the undisputed fact that a POSA would only add a buffer if pH drift was observed in a caspofungin solution, and given that Sandoz has presented no evidence in the prior art or otherwise of any such pH drift, Sandoz cannot establish a motivation to add a buffer to a solid, lyophilized dosage form of caspofungin. Moreover, nowhere does Sandoz explain how even if there was a pH drift in <u>solution</u> that the addition of a buffer to combat this pH drift would translate to improved shelf stability of a <u>solid</u>, lyophilized formulation—a glaring deficiency in proof and logic. (SOF ¶ 73.) Dr. Staples concedes that lyophilization is an extremely complicated and unpredictable process, and thus a POSA would not have reasonably expected to increase stability of a solid, lyophilized caspofungin product based on experiments with caspofungin in solution. (SOF ¶ 72.)

### 5. Sandoz cannot demonstrate a motivation in the prior art to prepare a lyophilized formulation of caspofungin with an acetate buffer.

Even assuming *arguendo* that a POSA would have considered adding a buffer in the absence of any demonstrated need for one (*i.e.*, in the absence of pH drift), Sandoz has failed to

prove that there was a motivation in the prior art to add an <u>acetate</u> buffer to stabilize caspofungin. In fact, the prior art taught away from using an acetate buffer with a lyophilized formulation.

As noted above, none of the marketed lyophilized drug products in the 1995 PDR contained an acetate buffer. (SOF ¶ 39.) Sandoz, however, states that a POSA would have selected an acetate buffer for a lyophilized formulation of caspofungin because <u>solution</u> stability experiments the inventors conducted showed the least amount of degradation at a pH of 5. (SOF ¶ 64.) However, Sandoz does not allege, far less provide evidence, that this stability information was known in the prior art. (*Id.*) Moreover, Sandoz has provided no reason (other than pointing to what the inventors actually did) why a POSA would consider the pH of a liquid <u>solution</u> to be relevant to stabilizing a <u>solid</u> formulation, which is typically not considered to have a pH. (SOF ¶ 73.) *See Unigene,* 2011 WL 3715557, at *7; *Ortho-McNeil*, 520 F.3d at 1364.

Even if a POSA were to focus, in the case of a lyophilized formulation, on buffers capable of achieving a solution pH of 5, there is no reason to select only from among the buffers Dr. Staples has identified. Both experts agree that a buffer will work <u>in solution</u> in a pH range that is plus or minus one pH unit from the buffer's pKa. (SOF ¶ 65.) Thus, assuming a pH of 5 was the correct pH to start from, there were at least twelve buffers to choose from, including acetate. (SOF ¶ 66.) But, as it turned out, pH 5 is ***not*** the correct pH for optimum stability of caspofungin in the lyophilized form. (SOF ¶ 67.) Rather, there is no dispute that the acetate-buffered lyophilized formulations made by Merck scientists turned out to be most stable when the pre-lyophilized solution has a pH of 6, which is undisputedly ***outside*** of acetate's normal buffering range. (SOF ¶¶ 67-68.)

Even more telling, it is undisputed that a POSA would know that acetate is volatile, which means that it could be lost due to evaporation during the lyophilization process. (SOF ¶

69.) Dr. Staples admits that acetate is volatile, and has "a vapor pressure that allows it to be *removed* when freeze drying [*i.e.*, during lyophilization]." (Leonard Decl., Ex. C at 188:11-19; 197:14-16; 199:10-15, emphasis added; *see also* SOF ¶ 70.) And, he concedes that in the case of the only prior art lyophilized product containing acetate that he could point to, Lupron Depot®, the acetate was not even present as a buffer and was "*lost*" as a result of lyophilization. (Leonard Decl., Ex. C at 197:3-198:25, emphasis added; *see also* SOF ¶ 71.) Thus, the prior art taught away from using an acetate buffer with lyophilization. *See Adams*, 383 U.S. at 52; *Unigene*, 2011 WL 3715557, at *9-10.

Dr. Staples provides no explanation as to why a POSA would have sought to add an acetate buffer where some or all of that buffer could be removed from the formulation during lyophilization. Thus, far from providing a motivation or suggestion to use an acetate buffer with a lyophilized product, the art plainly would have discouraged such use as the acetate could be lost during lyophilization.

### 6. There was no reasonable expectation of success in using an acetate buffer in a lyophilized formulation of caspofungin.

Even assuming *arguendo* that a POSA decided to use an acetate buffer in a lyophilized caspofungin formulation, such a person would not have had a reasonable expectation of success that it would produce a shelf-stable formulation. *See, e.g.*, *Unigene*, 2011 WL 3715557, at *6-7; *Daiichi Sankyo Co. v. Matrix Labs., Inc.*, 619 F.3d 1346, 1352 (Fed. Cir. 2010).

First, Dr. Staples admits that adding a buffer may make a formulation <u>less</u> stable than it would be without a buffer. (SOF ¶ 57.) Indeed, he acknowledges that it is not predictable whether a buffer will help or hurt stability. (*Id.*)

Second, as noted *supra* in Section III.B.5, acetate is volatile and could be removed during lyophilization. Logically, there can be no <u>reasonable</u> expectation that adding a buffer that may be lost during lyophilization will improve stability.

Third, Dr. Staples concedes that the lyophilization process makes it difficult to predict the stability of the resulting product: "what happens . . . when you freeze dry a system is that certain portions of that mixture get ***extremely complicated*** during the drying process. Even though they're frozen and cold, things are still going on from a chemical and physical standpoint, and these are ***very hard to predict***." (Leonard Decl., Ex. C at 232:4-233:6, emphasis added; *see also* SOF ¶ 72.) As such, a POSA would not have had a reasonable expectation of success in using <u>any buffer</u> to prepare a shelf-stable dosage form of caspofungin, never mind a volatile buffer such as acetate.

Thus, for at least the above three reasons, Sandoz cannot support its contention that a POSA reasonably would have expected to improve stability by adding an acetate buffer in a lyophilized formulation. In fact, Sandoz's "rationale" as to why a POSA would have tried an acetate buffer has been a moving target. Initially, in its notice letter, Sandoz alleged that a POSA would have been motivated to select buffers with only a single acid group. (SOF ¶ 74.) But Dr. Staples did not adopt this argument, and conceded that a POSA would have considered buffers with multiple acid groups. (SOF ¶¶ 75-76.) Indeed, products formulated by Dr. Staples and Sandoz contain buffers with multiple acid groups. (SOF ¶¶ 77-78.)

Additionally, Sandoz initially alleged that a POSA would select a buffer based on a list of pharmaceutically acceptable salts, and would have been motivated to limit this list to those salts that were found in commercial products greater than 1% of the time. (SOF ¶ 79.) Again, Dr.

18

Staples or any other Sandoz expert in this case never adopted this argument, and characterized this 1% limit as "artificial." (Leonard Decl., Ex. C at 217:25-218:5; *see also* SOF ¶ 80.)

After jettisoning those arguments, Sandoz now asserts through Dr. Staples that a POSA would use an acetate buffer because it matches the counterion of the caspofungin salt used by Merck. (SOF ¶ 81.) But Dr. Staples ignores the fact that caspofungin acetate is highly unstable, and a POSA would have had no reason to select the acetate salt in the first place. (*See* Section III.B.1, *supra*.) Additionally, Dr. Staples provides no reason why a POSA would have thought that adding in additional acetate in the form of a buffer would improve stability when the acetate salt itself was highly unstable. (SOF ¶ 81.) Sandoz, therefore, cannot support its contention that a POSA would have been motivated to select an acetate buffer for caspofungin by matching the buffer to the salt form of caspofungin.

In a final effort to show that an acetate buffer would have been obvious, Sandoz now claims that acetate is merely "obvious to try" along with other possible pH 5 buffers. (*See* Pretrial Order at 47, ¶ 95; *see also* SOF ¶ 82.) In order to be "obvious to try," the prior art must point to "identified, predictable solutions" to the problem with a reasonable expectation of success. *See KSR,* 550 U.S. at 421, 425-26; *Unigene,* 2011 WL 3715557, at *7. As explained above, however, the unrebutted evidence shows that the vast majority of the commercial lyophilized formulations in the prior art do <u>not</u> contain a buffer, and Sandoz's formulation expert conceded that lyophilization is "very hard to predict," fatally undermining any argument that using any pH 5 buffer in a lyophilized formulation would provide an identified, predictable solution to the problem. Moreover, it is undisputed that acetate is volatile and therefore cannot reasonably be considered among any "predictable solutions" for a lyophilized formulation. *See KSR,* 550 U.S. at 421, 425-26; *Unigene,* 2011 WL 3715557, at *7, *9-10. Finally, the most

19

stable pH for the lyophilized caspofungin formulation is 6, which undisputedly is outside the buffering range of acetate, and thus could hardly make acetate a predictable solution to the problem faced by the inventors. (SOF ¶¶ 67-68.)

> **7.     Sandoz does not dispute the unexpected properties of using an acetate buffer in a lyophilized formulation of caspofungin.**

During the development of the lyophilized formulation of caspofungin, the inventors observed a new degradant of caspofungin, L-717, which appeared in unacceptable amounts. (SOF ¶¶ 16-17.) L-717 is not observed when caspofungin is alone as a solid or is in a solution formulation, and is only observed upon lyophilization. (SOF ¶ 17.) Moreover, L-717 was not disclosed or known in the prior art, creating a new, unanticipated obstacle for the inventors. (SOF ¶¶ 17, 19.)

This new degradant presented a significant challenge for Merck to overcome. Merck tried to identify a mechanism for its formation. (SOF ¶¶ 19-20.) The inventors initially thought L-717 was caused by oxidation, which turned out to be incorrect. (SOF ¶ 20.) Surprisingly, using an acetate buffer in place of a tartrate buffer in a caspofungin lyophilized formulation significantly reduces the amount of degradation of caspofungin, including the amount of L-717. (SOF ¶ 21.)

Sandoz does not dispute that acetate-buffered lyophilized caspofungin formulations produce less degradation than the corresponding tartrate-buffered formulations. (SOF ¶¶ 23-24.) Additionally, Sandoz points to no evidence in the prior art that would have enabled a POSA reasonably to predict this was the case. (SOF ¶ 18.) Dr. Staples admitted that there could have been no way to predict acetate's superiority in lyophilized caspofungin formulations because the primary degradation product found in those formulations, L-717, is not even observed in solution. (SOF ¶¶ 17, 23-24.) Thus, any assumptions one could have made regarding the use of

buffers to stabilize solution products of caspofungin do not apply to solid, lyophilized formulations.

Sandoz, even after reading the disclosure of the '300 patent, was skeptical that there would be a stability difference between the acetate and tartrate buffers, and replicated the '300 patent examples hoping to show that tartrate-buffered caspofungin lyophilized formulations are just as stable as acetate-buffered ones.  (SOF ¶ 25.)  To Sandoz's surprise, they reached the same conclusion as the Merck inventors discovered—that acetate-buffered formulations are superior.  (SOF ¶ 26.)  *See Adams*, 383 U.S. at 50-51; *Burlington Indus., Inc. v. Quigg*, 822 F.2d 1581, 1582-83 (Fed. Cir. 1987) (affirming the district court's determination of nonobviousness where the properties were so "unexpected" that an expert "ran three tests over the course of the following three months to confirm the correlation").  Thus, Sandoz can hardly argue now that acetate's superiority was "expected."

### C.  Multiple objective indicia of nonobviousness preclude Sandoz from meeting its burden of proving obviousness.

Objective evidence of nonobviousness "is not just a cumulative or confirmatory part of the obviousness calculus but constitutes independent evidence of nonobviousness."  *Ortho-McNeil*, 520 F.3d at 1365.  Sandoz does not dispute any of the key underlying facts for several objective indicia of nonobviousness, including copying, skepticism of others, and meeting an unmet need.

First, Sandoz admits copying Merck's Cancidas[®] products, which are covered by Claim 1 of the '300 patent.  (SOF ¶¶ 3, 83.)  *See Ortho-McNeil*, 520 F.3d at 1365 (finding copying as objective indicia of nonobviousness in an ANDA case.)  Sandoz, however, states that copying is "irrelevant" to obviousness in ANDA cases.  (Pretrial Order at 49, ¶ 117; *see also* SOF ¶ 84.)  This is belied by the fact that Sandoz purposefully endeavored to design-around the '300 patent

(and Cancidas® formulation) by substituting other buffers in place of the acetate buffer.  (SOF ¶ 85.)  Sandoz clearly attempted to design-around the '300 patent and Merck's Cancidas® products—but ultimately chose to replicate the formulation of Merck's Cancidas® products.  (SOF ¶ 86.)  These undisputed facts show the superior and unexpected results of using an acetate-buffered lyophilized formulation.

Second, as mentioned above (*see* Section III.B.7, *supra*), Sandoz itself was skeptical of the unique properties of the caspofungin formulations claimed in the '300 patent, and tried to show that there were no differences between using an acetate buffer and a tartrate buffer.  (SOF ¶¶ 25-26.)  Sandoz does not deny attempting these experiments, or the results from these experiments.  (*Id.*)  Skepticism of others is powerful evidence of nonobviousness.  *See Adams*, 383 U.S. at 52 ("at the time . . . [of] invention noted experts expressed disbelief in it"); *Burlington*, 822 F.2d at 1582-83; *see also Mitsubishi Chem.*, 718 F.Supp.2d at 444.  Here, Sandoz was so skeptical of the invention even ***after*** reading the '300 patent that it performed experiments to refute its claimed benefits – and to Sandoz's surprise, the patent was correct.

Last, but certainly not least, Cancidas® met a long-felt, but unmet medical need by treating life-threatening fungal infections.  (SOF ¶ 87.)  For example, prior to Cancidas®, patients with invasive aspergillosis fungal infections had a mortality rate over 80%.  (SOF ¶ 88.)  FDA granted fast track review of Cancidas® for the treatment of invasive aspergillosis, a process whereby FDA expedites the review process for drugs used to "treat serious diseases and fill an unmet medical need."  (SOF ¶¶ 89-90.)  Sandoz's own internal documents admit that Merck's Cancidas® products met an unmet medical need.  (SOF ¶ 91.)  Meeting a long-felt, but unmet medical need is objective evidence of the nonobviousness of the '300 patent.  *See Mitsubishi*

*Chem.*, 718 F.Supp.2d at 442-43 (claimed formulation met an unmet medical need that was "not possible" with the prior art formulation).

Sandoz makes the conclusory assertion that there is no nexus between Cancidas® and the '300 patent, but provides no evidence to the contrary. (*See* Pretrial Order at 48, ¶ 99.) Merck has presented ample, unrebutted evidence that Cancidas® is an embodiment of Claim 1 of the '300 patent, and that Sandoz copied it. (SOF ¶¶ 3, 83.) While caspofungin is the effective antifungal agent, without a stable, commercially-viable delivery system it would not have been available to critically ill patients. As Sandoz's marketing expert stated, if you cannot formulate a drug, it does not have any value. (SOF ¶ 92.) For this reason, courts have focused on the drug product as a whole in determining the nexus for secondary considerations. *See, e.g., Mitsubishi Chem.*, 718 F.Supp.2d at 437 ("It is the formulation as a whole that is both the patented invention and the successful commercial product . . . . [I]t is not necessary for the plaintiffs to prove that the success of [the commercial product] is unrelated to its constituent parts, including the [drug] molecule.").

In summary, Sandoz cannot credibly argue that Cancidas® failed to meet an unmet need, or that its failure to design-around the patent or skepticism of the acetate buffer's superiority are irrelevant. These factors weigh heavily in favor of the nonobviousness of Claim 1 of the '300 patent, and provide further support why Sandoz cannot prevail on its obviousness defense by clear and convincing evidence.

## IV.  CONCLUSION

For the reasons discussed above, the Court should grant Merck's motion for summary judgment on Sandoz's obviousness defense for Claim 1 of the '300 patent.

Dated:  September 12, 2011         Respectfully Submitted,

By:  _s/ Sheila F. McShane_____
    David E. De Lorenzi, Esq.
    Sheila F. McShane, Esq.
    GIBBONS PC
    One Gateway Center
    Newark, New Jersey 07102-5310
    Tel.:  (973) 596-4500
    Fax:  (973) 596-0545

    Dominick A. Conde, Esq.
    Brian V. Slater, Esq.
    FITZPATRICK, CELLA, HARPER & SCINTO
    1290 Avenue of the Americas
    New York, New York 10104-3800
    Tel.:  (212) 218-2100
    Fax:  (212) 218-2200

    Edward W. Murray, Esq.
    Karen Stoffan, Esq.
    MERCK & CO., INC.
    RY28-320
    P.O. Box 2000
    Rahway, New Jersey 07065-0900
    Tel.:  (732) 594-0436

    *Attorneys for Plaintiffs*
    *Merck & Co., Inc. and*
    *Merck Sharp & Dohme Corp.*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that true and correct copies of **Plaintiff Merck's Notice of Motion For Summary Judgment on Sandoz's Obviousness Defense, Merck's Brief in Support of Its Motion For Summary Judgment on Sandoz's Obviousness Defense, and Proposed Order Granting Summary Judgment** were caused to be served on September 12, 2011 electronically via ECF and email upon counsel listed below:

| | |
|---|---|
| Eric I. Abraham, Esq.<br>Christina L. Saveriano, Esq.<br>**HILL WALLACK LLP**<br>202 Carnegie Center<br>Princeton, New Jersey 08540<br>Tel.: (609) 924-0808<br>Fax: (609) 452-1888<br>eabraham@hillwallack.com<br>csaveriano@hillwallack.com<br><br>*Attorneys for Sandoz Inc.* | Meredith M. Addy, Esq.<br>Mark H. Remus, Esq.<br>Abby L. Lemek, Esq.<br>Brandon C. Helms, Esq.<br>**STEPTOE & JOHNSON LLP**<br>115 S. LaSalle Street, Suite 3100<br>Chicago, IL 60603<br>Tel.: (312) 577-1300<br>Fax: (312) 577-1370<br>maddy@steptoe.com<br>mremus@steptoe.com<br>alemek@steptoe.com<br>bhelms@steptoe.com<br><br>*Attorneys for Sandoz Inc.* |

Dated: September 12, 2011

Exhibit 2-C

**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

------------------------------------------------ :
MERCK & CO., INC. and MERCK : 
SHARP & DOHME CORP.., :
:
              Plaintiffs, :     Civil Action No. 10-1625 (SRC) (PS)
:      Civil Action No. 10-2308 (SRC) (PS)
v. :
:            **OPINION**
SANDOZ INC., :
:
            Defendant. :
------------------------------------------------ :

**CHESLER, U.S.D.J.**

     This matter comes before the Court upon the motion by Plaintiffs Merck & Co., Inc. and

Merck Sharp & Dohme Corp. (collectively, "Merck") for summary judgment, pursuant to Federal

Rule of Civil Procedure 56, on Defendant's affirmative defense to infringement of patent

invalidity due to obviousness.  For the reasons discussed below, this Court will grant Plaintiffs'

motion.

## BACKGROUND

     This matter involves two Hatch-Waxman actions for patent infringement.  The cases have

been consolidated for pretrial purposes and arise from the following facts.  Briefly, Merck owns

U.S. Patent No. 5,952,300 (the "'300 patent"), which is directed to compositions associated with

Merck's antifungal drug Cancidas®.  Defendant Sandoz, Inc. ("Sandoz") is a generic

pharmaceutical manufacturer who has filed an Abbreviated New Drug Application seeking FDA

approval to engage in the manufacture and sale of generic versions of Cancidas® prior to the

expiration of the Merck patent.

## APPLICABLE LEGAL STANDARDS

### I.     Summary Judgment

Summary judgment is appropriate under FED. R. CIV. P. 56(a) when the moving party demonstrates that there is no genuine issue of material fact and the evidence establishes the moving party's entitlement to judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant, and it is material if, under the substantive law, it would affect the outcome of the suit.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'"  Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004) (quoting Anderson, 477 U.S. at 255).

"When the moving party has the burden of proof at trial, that party must show affirmatively the absence of a genuine issue of material fact: it must show that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party."  In re Bressman, 327 F.3d 229, 238 (3d Cir. 2003) (quoting United States v. Four Parcels of Real Property, 941 F.2d 1428, 1438 (11th Cir. 1991)).  "[W]ith respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case."  Celotex, 477 U.S. at 325.

Once the moving party has satisfied its initial burden, the party opposing the motion must

establish that a genuine issue as to a material fact exists.  Jersey Cent. Power & Light Co. v.

Lacey Township, 772 F.2d 1103, 1109 (3d Cir. 1985).  The party opposing the motion for

summary judgment cannot rest on mere allegations and instead must present actual evidence that

creates a genuine issue as to a material fact for trial.  Anderson, 477 U.S. at 248; Siegel Transfer,

Inc. v. Carrier Express, Inc., 54 F.3d 1125, 1130-31 (3d Cir. 1995).  "[U]nsupported allegations .

. . and pleadings are insufficient to repel summary judgment."  Schoch v. First Fid.

Bancorporation, 912 F.2d 654, 657 (3d Cir. 1990).  "A nonmoving party has created a genuine

issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at

trial."  Gleason v. Norwest Mortg., Inc., 243 F.3d 130, 138 (3d Cir. 2001).

If the nonmoving party has failed "to make a showing sufficient to establish the existence

of an element essential to that party's case, and on which that party will bear the burden of proof

at trial, . . . there can be 'no genuine issue of material fact,' since a complete failure of proof

concerning an essential element of the nonmoving party's case necessarily renders all other facts

immaterial."  Katz v. Aetna Cas. & Sur. Co., 972 F.2d 53, 55 (3d Cir. 1992) (quoting Celotex,

477 U.S. at 322-23).

## II.     Patent invalidity due to obviousness

"A patent is presumed to be valid, 35 U.S.C. § 282, and this presumption can only be

overcome by clear and convincing evidence to the contrary."  Bristol-Myers Squibb Co. v. Ben

Venue Labs., 246 F.3d 1368, 1374 (Fed. Cir. 2001) (citations omitted).  The party asserting

invalidity bears the burden of establishing it.  35 U.S.C. § 282.  "This burden is especially

difficult when . . . the infringer attempts to rely on prior art that was before the patent examiner

during prosecution."  Glaxo Group Ltd. v. Apotex, Inc., 376 F.3d 1339, 1348 (Fed. Cir. 2004)

(quotation omitted).

> To patent an invention, the subject matter must be non-obvious:
>
> A patent may not be obtained . . . if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.  Patentability shall not be negatived by the manner in which the invention was made.

35 U.S.C. § 103(a).

> The Federal Circuit has set forth these basic principles to guide the determination of

obviousness:

> Obviousness is ultimately a question of law, based on underlying factual determinations.  The factual determinations that form the basis of the legal conclusion of obviousness include (1) the scope and content of the prior art; (2) the level of ordinary skill in the art; (3) the differences between the claimed invention and the prior art; and (4) evidence of secondary factors, known as objective indicia of non-obviousness.

Altana Pharma AG v. Teva Pharms. USA, Inc., 566 F.3d 999, 1007 (Fed. Cir. 2009) (citations

omitted).

## ANALYSIS

Plaintiff has moved for summary judgment on Defendant's affirmative defense to infringement of patent invalidity due to obviousness.  The patent claims formulations of a pharmaceutical containing caspofungin.  Because Defendant does not contend that a skilled artisan, prior to invention, faced with the problem of creating a caspofungin formulation for intravenous administration, would have recognized the patented formulation as the obvious solution to the problem, this case does not follow the typical approach to obviousness.  Instead, because there is no dispute that experimentation and a formulation process were needed to arrive

at that solution to the problem, the decision on the instant motion turns on the question of whether the patented formulation was, from the start, obvious to try.[1]  Sandoz contends, in short, that "Merck's claimed formulation is the result of routine pharmaceutical development, not invention."  (Def.'s Opp. Br. 2.)

Discussion of the current law of obviousness begins with the Supreme Court's decision in KSR Int'l Co. v. Teleflex Inc., 550 U.S. 398, 416 (2007), in which it held: "The combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results."[2]  This principle alone could be sufficient to decide this motion, had Sandoz pointed to evidence that the results of the development process would have been predictable to the skilled artisan, but Sandoz has not done so.

In KSR, the Supreme Court discussed the obviousness analysis in three cases and then stated:

> Following these principles may be more difficult in other cases than it is here because the claimed subject matter may involve more than the simple substitution of one known element for another or the mere application of a known technique to a piece of prior art ready for the improvement.  Often, it will be necessary for a court to look to interrelated teachings of multiple patents; the effects of demands known to the design community or present in the marketplace; and the

---

[1] "In a typical 'obvious to try' situation, the inventor selects a particular configuration from a broad range of possibilities suggested by the prior art and discovers that the configuration achieves significant advantages nowhere suggested in the prior art. In such cases, it is clear that the result achieved must be considered as well as the actual physical modification."  Donald S. Chisum, 2-5 Chisum on Patents, § 5.04(1)(f) (2011).  This is a very helpful definition, because it makes clear that it is not only the particular configuration, but the success of that configuration, that must be considered.

[2] Similarly, the Court stated: "If a person of ordinary skill can implement a predictable variation, § 103 likely bars its patentability."  Id. at 417.  Again, had Sandoz offered evidence that the patented formulation was a predictable variation of prior art formulations, that might have been sufficient to defeat this motion – but it has not done so.

> background knowledge possessed by a person having ordinary skill in the art, all in order to determine whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue.

Id. at 417-418.  Thus, the challenge for Sandoz is to show that there was an <u>apparent</u> reason to combine the known elements in the fashion claimed by the patent at issue.  Again, Sandoz has not done so.

> In <u>KSR</u>, the Supreme Court changed the law of "obvious to try:"

> The same constricted analysis led the Court of Appeals to conclude, in error, that a patent claim cannot be proved obvious merely by showing that the combination of elements was '[o]bvious to try.'  When there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, a person of ordinary skill has good reason to pursue the known options within his or her technical grasp. If this leads to the anticipated success, it is likely the product not of innovation but of ordinary skill and common sense. In that instance the fact that a combination was obvious to try might show that it was obvious under § 103.

Id. at 421 (citations omitted).  Following <u>KSR</u>, it is possible to prove obviousness by showing that a combination was obvious to try.

> In <u>Bayer Schering Pharma AG v. Barr Labs., Inc.</u>, 575 F.3d 1341, 1347 (Fed. Cir. 2009), the Federal Circuit clarified the law of "obvious to try:"

> *O'Farrell* observed that most inventions that are obvious were also obvious to try, but found two classes where that rule of thumb did not obtain.

> First, an invention would not have been obvious to try when the inventor would have had to try all possibilities in a field unreduced by direction of the prior art. When what would have been 'obvious to try' would have been to vary all parameters or try each of numerous possible choices until one possibly arrived at a successful result, where the prior art gave either no indication of which parameters were critical or no direction as to which of many possible choices is likely to be successful an invention would not have been obvious.  This is another way to express the *KSR* prong requiring the field of search to be among a "finite number of identified" solutions.  It is also consistent with our interpretation that *KSR* requires the number of options to be "small or easily traversed."

6

> Second, an invention is not obvious to try where vague prior art does not guide an inventor toward a particular solution. A finding of obviousness would not obtain where what was 'obvious to try' was to explore a new technology or general approach that seemed to be a promising field of experimentation, where the prior art gave only general guidance as to the particular form of the claimed invention or how to achieve it.  This expresses the same idea as the *KSR* requirement that the identified solutions be 'predictable.'

Id. (citations omitted).

Sandoz has approached Merck's motion by arguing that the obviousness issue cannot be resolved on summary judgment because the parties' experts disagree, causing genuine material factual disputes to preclude the entry of judgment as a matter of law.  The problem with this approach is that it is ill-suited to deal with situations like this one.  Under Third Circuit law, "[a] nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial."  Gleason, 243 F.3d at 138.  Sandoz appears to have overlooked this principle, because it has not provided sufficient evidence to allow a jury to find in its favor at trial.

What is missing most conspicuously from Sandoz' briefing in opposition to this motion is evidence that the skilled artisan, at the beginning of the development process, would have viewed the final outcome of the process as one of a finite number of identified, predictable solutions. Sandoz offers a conclusory assertion from its expert on this point, but no evidence that provides a supporting foundation for that conclusion.  Furthermore, Sandoz argues as if it is sufficient to show merely that the skilled artisan would have expected to succeed in developing some caspofungin formulation for intravenous administration.  Of course, that is not legally sufficient to prove obviousness, since, under KSR,  the question is whether the solution arrived at was one of a "finite number of identified, predictable solutions."  550 U.S. at 421.  Sandoz tries to get

7

around this by pointing to the evidence that many of the steps in the development process were well-known. Such a strategy misses the point: at issue is whether the solution was identified, predictable, and within a finite number of such solutions.

Sandoz bears the burden of proof at trial of the affirmative defense of invalidity due to obviousness. Thus, the movant meets its initial burden at summary judgment by pointing to the absence of evidence to support Defendant's case. The burden then shifts to Sandoz to point to evidence of record sufficient to establish all the elements of its case.

This Court finds that the evidence of record does not suffice to establish Defendant's case that the patent at issue is invalid for obviousness. Sandoz filed a response to Merck's Statement of Facts which shows the following facts to be undisputed:

> 10. It took the inventors of the '300 patent about two years to develop a stable formulation of caspofungin acetate that could be sold and administered to patients. (Byrn Decl., Ex. A at ¶ 68; see also Leonard Decl., Ex. G at MRK_CANOI156152; Ex. H at MRK_CANOOOI9918.)
> Response: Agreed.
>
> . . .
>
> 12. The inventors discovered that a solution formulation approach was inadequate for long-term storage due to chemical degradation of caspofungin. (Leonard Decl., Ex. G at MRK_CANOI156155.) Sandoz has not provided any evidence that this was known in the prior art. (Leonard Decl., Ex. B at ¶¶ 28-29.)
> Response: Agreed.
>
> 13. The inventors learned during formulation development that caspofungin degrades by multiple chemical pathways, a fact not disclosed in the prior art. (Byrn Decl., Ex. A at ¶ 55.)
> Response: Agreed-in-part. The inventors learned during preformulation that caspofungin degrades by multiple chemical pathways, as would anyone else who was doing routine preformulation studies on caspofungin (Lemek Decl., Ex. 3, pp. 106-107).
>
> 14. During formulation experimentation, the inventors attempted lyophilized

formulations of caspofungin acetate both with and without a citrate buffer and excipients. (Leonard Decl., Ex. W at MRK_CAN00897420, 425.) Both lyophilized formulations failed to stabilize caspofungin acetate. (Id.)
Response: Disagreed. Both formulations provided a stable formulation at 5°C, the same temperature at which Cancidas is stored (Leonard Decl., Ex. W at MRK_CAN00897425).

15. The inventors also attempted a lyophilized formulation of caspofungin with excipients and a tartrate buffer. (Leonard Decl., Ex. I at MRK_CAN00000629.)
Response: Agreed.

16. The tatrate-buffered attempt also failed, and led to the discovery of a new problem, namely the observation of a previously unknown degradant in unacceptable amounts. (Leonard Decl., Ex. J at 22; Ex. Kat 51:14-52:1, 212:14-20; see also Byrn Decl., Ex. A at ¶¶ 60-61.) The inventors referred to this degradant as "Degradate A" or L-717. (Leonard Decl., Ex. K at 51:14-52:1, 212:14-20; Ex. I at MRK_CAN00000621, 632.)
Response: Agreed.

17. Degradant L-717 was not known in the prior art, and created a new and unpredictable obstacle for the inventors. (See Leonard Decl, Ex. L; Ex. M; see also Byrn Decl., Ex. A at ¶¶ 60-61.) L-717 is not observed when caspofungin is alone as a solid or is in a solution formulation, and is only observed in lyophilized formulations. (See Byrn Decl., Ex. A at ¶¶ 60- 61.)
Response: Disagreed. Degradant L-717 was not a problem because it is not toxic (Lemek Decl., Ex. 3 at 109:1-4). Also, this would not have been a problem to a POSA who would have had no reason to use a tartrate buffer in the first place. (Leonard Decl., Ex. A at ¶ 69). Thus, this degradant was a problem of Merck's creation and unique to their poor choice of a buffer, rather than the problem a POSA was attempting to solve.

18. Sandoz has not alleged that a POSA would have predicted the occurrence of L-717 in lyophilized caspofungin formulations. (See, e.g., Leonard Decl., Ex. Cat 232:4-233:6.)
Response: Agreed.

19. Degradant L-717 presented a significant challenge for the Merck inventors, including identifying a mechanism for its formation. (Leonard Decl., Ex. K at 50:13-52:1, 187:11-25; see also Byrn Decl., Ex. A at ¶¶ 60-61.)
Response: Disagreed. Degradant L-717 was not a problem because it was not toxic (Lemek Decl., Ex. 3 at 109:1-4). Also, it would not have been discovered had the Merck inventors tried a logical buffer (e.g., acetate) in the first place. (Leonard Decl., Ex. A at ¶ 69).

9

20. The inventors initially attributed degradant L-717 to oxidation of caspofungin, a finding they later discovered was erroneous. (Leonard Decl., Ex. K at 51:20-52:1, 187:2-16.)
Response: Agreed.

21. The inventors unexpectedly discovered that using an acetate buffer in a caspofungin lyophilized formulation in place of a tartrate buffer significantly reduces the amount of degradation of caspofungin, including the amount of L-717. (Leonard Decl., Ex. K at 211:12-214:22; Ex. H at MRK_CAN00019918; Ex. I at MRK_CAN00000632, 636, 659; see also Byrn Decl., Ex. A at ¶ 90.)
Response: Disagreed. The use of an acetate buffer was not "discovered" by the inventors because acetate was one of the most common buffers and it was an obvious choice. (Lemek Decl., Ex. 11 at 1529; Ex. 2 at p. 194). The use of an acetate buffer was not "unexpected" because of its widespread use and success in other formulations and because there was no reason to believe that it would not work in a caspofungin formulation. (Leonard Decl., Ex. A at ¶¶ 94-99).

22. Merck scientists do not know why the acetate-buffered lyophilized caspofungin formulations are more stable than the corresponding tartrate-buffered ones. (Leonard Decl., Ex. K at 212:22-214:22.)
Response: Agreed.

23. Sandoz's sole formulation expert, Dr. Mark Staples, provides no explanation for acetate's superiority in caspofungin formulations, and admits that there could have been no way to predict acetate's superiority in lyophilized caspofungin formulations. (Leonard Decl., Ex. C at 223:4-224:4.)
Response: Disagreed. Dr. Staples explains that the successful use of acetate to buffer a caspofungin formulation was obvious and expected. Tests were required to confirm that fact, but the test results were not surprising. (Leonard Decl., Ex. A at ¶¶94-99). The only thing that was surprising was that Merck tried tartrate in the first place. (Id. at ¶69).

. . .

40. Dr. Staples admits that a POSA would first have prepared a solution formulation of caspofungin before even contemplating a lyophilized formulation: "[i]f an [intravenous] dosage form was the target product image, a POSA would have initially sought to develop a solution dosage form." (Leonard Decl., Ex. B at ¶ 20.)
Response: Agreed.

41. Dr. Staples asserts that a POSA would eventually move on to lyophilization only "if the solution development failed to produce acceptable quality product in

the required timeframe." (Leonard Decl., Ex. B at ¶ 29.) Dr. Staples never defines "acceptable quality" or quantifies the "required timeframe." (Id.)
Response: Agreed.

. . .

56. Dr. Staples further admits that prior to adding a buffer to a formulation "you would first need data showing that there is, in fact, a pH drift [i.e., a showing that the pH of the solution changes over time]." (Leonard Decl., Ex. C at 202:2-13.)
Response: Agreed.

. . .

64. Dr. Staples states that a POSA would select an acetate buffer for a lyophilized formulation of caspofungin because solution stability experiments conducted by the inventors showed the least amount of degradation was at pH of 5. (Leonard Decl., Ex. A at ¶ 84.) Sandoz does not allege, nor does it provide evidence, that this solution stability information was known in the prior art: (Id.) The drug shelf-life would be projected from the preformulation stability data at various pHs. A suitable buffer would be selected based in part on this data. For caspofungin, the solution stability would have revealed the optimal pH was 5.
Response: Agreed.

. . .

67. The acetate-buffered lyophilized formulations made by Merck scientists turned out to be most stable when the pre-lyophilized solution has a pH of 6. (Leonard Decl., Ex. C at 233:17-234: 18; Ex. I at MRK_CAN00000649; see also '300 patent, col. 3, ll. 14-17.)
Response: Agreed.

68. A pH of 6 is outside of acetate's normal buffering range. (See Leonard Decl., Ex. A at Exhibit B; Byrn Decl., Ex. A at ¶¶ 97-98.)
Response: Agreed.

. . .

72. Dr. Staples concedes that in lyophilized formulations "what happens ... when you freeze dry a system is that certain portions of that mixture get extremely complicated during the drying process. Even though they're frozen and cold, things are still going on from a chemical and physical standpoint, and these are very hard to predict." (Leonard Decl., Ex. C at 232:4-233:6, emphasis added.)
Response: Agreed.

These statements of undisputed fact may be distilled into the following key points.  It took two years of research and experimentation to develop the patented formulation.  In this process, the patentee discovered a number of path-determinative facts: 1) the solution formulation approach was inadequate due to chemical degradation of caspofungin; 2) the approach of lyophilization with a tartrate buffer failed; 3) experimental evidence showing pH drift resulted in the search for a buffer; and 4) solution stability experiments demonstrated the least caspofungin degradation at a pH of 5, but the acetate-buffered formulations turned out to be most stable when the pre-lyophilized solution had a pH of 6, outside of acetate's normal buffering range.

For the sake of discussion, let us assume that Sandoz has presented the evidence necessary to persuade a finder of fact that its responses, cited above, are true.  On this record, no reasonable finder of fact could make factual determinations that would support a conclusion of obviousness.  Rather than showing that the development of the patented formulation was humdrum and routine, and that the formulation arrived at was one of a finite number of identified, predictable solutions, the evidence shows, certainly, that it was not predictable from the start.

The undisputed evidence thus shows that, while initial experiments predicted optimal stability at pH 5, the patented formulation has optimal stability at pH 6 – outside the normal buffering range for acetate.  There is no dispute that the chemical stability of the formulation is a key characteristic of a useful pharmaceutical, nor that the patent claims require use of an acetate buffer.  Sandoz does not explain how these results could possibly have been expected – since the undisputed evidence is that they are not what would have been expected.  This alone precludes

12

proving obviousness.[3]  Sandoz has offered no evidence that a skilled artisan would have had a reasonable expectation of success in using an acetate buffer outside of its normal buffering range.

There are quite a few more problems with Sandoz' case.  Sandoz contends that the fact that the patentee experimented with a formulation using a tartrate buffer was a "poor choice" on the patentee's part.  Sandoz is thus in the peculiar position of arguing that the patented formulation was obvious to one skilled in the art – and yet the patentee failed to see it and chased down a dead end first.  This makes no sense.

Not only has Sandoz failed to offer evidence sufficient to prove its obviousness case, but the evidence that it has offered shows that this case falls within one or both of the categories of cases in which "obvious to try" does not prove obviousness: 1) where there are numerous possible solutions and the prior art gives no indication of which is likely to be successful, Bayer, 575 F.3d at 1347; and 2) "where what was 'obvious to try' was to explore a new technology or general approach that seemed to be a promising field of experimentation, where the prior art gave only general guidance as to the particular form of the claimed invention or how to achieve it." Id.

As the Federal Circuit has stated, the first of these situations is the inverse of the situation

---

[3]  In KSR, the Supreme Court illustrated the application of the doctrine that the "combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results" by discussing three cases.  550 U.S. at 416.  In one of the three cases, Sakraida v. Ag Pro, Inc., 425 U.S. 273, 282 (1976), the Court held: "this patent simply arranges old elements with each performing the same function it had been known to perform . . .Such combinations are not patentable."  In the instant case, in contrast, it cannot be maintained that one old element, the acetate buffer, performed the same function it had been known to perform.  Rather, given that acetate has not been known to buffer optimally at pH 6, in the patent at issue, it performs differently from how it has been known to perform.  This supports a conclusion of nonobviousness.

described by the Supreme Court as follows: "[w]hen there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions," KSR, 550 U.S. at 421.  In such a situation, a finding of "obvious to try" might prove obviousness.  Such is not the case here.  No reasonable finder of fact could hear the evidence offered by Sandoz and conclude that the skilled artisan seeking to create a caspofungin formulation for intravenous use would have recognized the patented formulation as one of a finite number of identified, predictable solutions.[4]  To the contrary, there is no evidence that the patented formulation was among a number of solutions that was finite, nor that it was predictable.  The undisputed evidence is that lyophilization is a process that is, as Sandoz' expert admitted,  "very hard to predict."  (Leonard Decl., Ex. C at 232:18).  Dr. Staples' deposition testimony on lyophilization is devastating to Sandoz' obviousness case:

> Because what happens when -- when you freeze dry a system is that certain portions of that  mixture get extremely complicated during the drying process. Even though they're frozen and cold, things are still going on from a chemical and physical standpoint, and these are very hard to predict. If you're developing a freeze dried formulation, anyone of ordinary skill will understand that they -- they should base their experiment on observations they have made in the solution state as a starting point, but as a starting point only. And then they'll use that as an aid to design the freeze dried study but they -- I would not say they would feel they could predict anything.  They would understand a standard way to design the experiment and to evaluate, but I don't  believe they would claim that they could predict what would happen.

(Id. at 232:12-233:6.)  Dr. Staples thus states unambiguously that the skilled artisan must experiment with freeze-drying and cannot predict the outcome of the experiments.[5]  There is no

---

[4] Nor has Sandoz presented evidence demonstrating that the number of possible solutions was "small or easily traversed."  Bayer, 575 F.3d at 1347.

[5] Similarly, when asked about whether a skilled artisan could predict solution stability at various pH levels, Dr. Staples stated: "At this early stage, usually you don't -- you don't know

evidence of record to the contrary, and this stands as an undisputed fact.  Sandoz cannot prove

that this was a predictable solution, and thus cannot prove obviousness through this approach.

The evidence does show, rather, that this case fits within that class of cases in which it is

error to find that "obvious to try" proves obviousness: where the prior art gives only general

guidance to the form of the invention.  This is a corollary to what has just been shown: the prior

art did not allow the skilled artisan to identify a finite number of specific, predictable solutions.

Instead, it offered only general guidance.  The evidence of record suggests that the idea of

creating a caspofungin formulation for intravenous administration through lyophilization was not

more than a promising field of experimentation, and that the discovery of the patented

formulation was not an obvious, particular solution.

A related inquiry is whether the skilled artisan would have had a reasonable expectation

of success with the patented formulation.  In In re O'Farrell, 853 F.2d 894, 903-904 (Fed. Cir.

1988), the Federal Circuit held: "Obviousness does not require absolute predictability of success.

. . . For obviousness under § 103, all that is required is a reasonable expectation of success."  The

Federal Circuit reaffirmed the vitality of this principle after KSR in In re Kubin, 561 F.3d 1351,

1360 (Fed. Cir. 2009).  Sandoz has failed to offer evidence from which a reasonable trier of fact

could conclude that the skilled artisan, beginning the process of developing an intravenous

formulation of caspofungin, would have had a reasonable expectation of success with the

patented formulation.  To the contrary, the undisputed evidence of record demonstrates that the

---

enough about the system to go to the level of sophistication that you're suggesting in that type of
prediction."  (Leonard Decl., Ex. C at 231:24-232:3).  There is no dispute that achieving
maximum solution stability is a key part of the formulation process, and Dr. Staples is again here
conceding that this cannot be predicted, but must be determined by experimentation.

skilled artisan in those circumstances would have been unable to predict the outcome of the experiments necessary to develop the formulation.

This conclusion is supported by the undisputed evidence that Merck scientists do not know why the acetate-buffered formulations are more stable that corresponding tartrate-buffered ones. This suggests that the success of this combination was not predictable, nor that there was a reasonable expectation of success in combining these elements.

Merck contends correctly that Dr. Staples' assertion in his expert report that the skilled artisan would have had an expectation with success with lyophilization is a purely conclusory assertion which should not be credited. As Merck observes, this conclusion is directly contradicted by Dr. Staples' deposition testimony, quoted above, that the skilled artisan would not be able to predict the results of lyophilization. This Court disregards the conclusory assertion contradicted by the record. See Shaw by Strain v. Strackhouse, 920 F.2d 1135, 1139 (3d Cir. 1990) ("To the extent that the affidavits assumed facts about this case unsupported by the record, however, the expert opinions were properly disregarded.")

Merck also notes that the evidence of record shows that, prior to the development process, the prior art contained no information about the stability of caspofungin or caspofungin formulations. Sandoz has pointed to no contrary evidence. In Defendant's Counter-Statement of Facts, there is a section with the heading, "Knowledge of Caspofungin at the Time of the Invention." (Def.'s 56.1 Counter-Statement 8.) No factual statements in this section assert any knowledge about the stability of caspofungin or caspofungin formulations. Rather, to the extent that the statements address this issue, they assert the absence of knowledge of the instability of caspofungin.

16

Sandoz thus takes the position that, prior to the process of developing the patented

formulation, the skilled artisan had no knowledge about the stability of caspofungin or

caspofungin formulations and that substantial problems with stability had to be dealt with and

overcome during development, but that the solution to these problems that were previously

unknown was an obvious one.  This makes no sense and is entirely unpersuasive.

Plaintiff has moved for summary judgment on Defendant's affirmative defense to

infringement of invalidity based on obviousness.  Defendant bears the burden of proof of

invalidity, by clear and convincing evidence, at trial.  As the movant without the burden of proof

at trial, Plaintiff satisifies its initial summary judgment burden by pointing to the absence of

evidence to support Defendant's case.  The burden then shifts to the nonmovant, who must point

to evidence sufficient to establish all the elements of its defense.  Here, Sandoz has failed to

prove an essential element of its obviousness case – that the skilled artisan at the beginning of the

development process would have recognized a finite number of identified, predictable solutions,

of which the patented formulation was one.  This constitutes a complete failure of proof, and

entitles the movant to judgment as a matter of law.  Plaintiff's motion for summary judgment

will be granted.

**CONCLUSION**

Plaintiff has demonstrated, pursuant to Federal Rule of Civil Procedure 56, an absence of disputes over material facts, and has shown that it is entitled to judgment as a matter of law. Plaintiff's motion for summary judgment is granted, and as to Defendant's affirmative defense to infringement of patent invalidity due to obviousness, Judgment will be entered in favor of Plaintiff.

       ___ s/ Stanley R. Chesler ___
       Stanley R. Chesler, U.S.D.J.

Dated: January 30, 2012

18

# Exhibit 2-D

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

```
-------------------------------------------------  :
MERCK & CO., INC. and MERCK                        :
SHARP & DOHME CORP..,                              :
                                                   :
                  Plaintiffs,                      :
                                                   :
v.                                                 :
                                                   :
SANDOZ INC.,                                       :
                                                   :
                  Defendant.                       :
-------------------------------------------------  :
```

Civil Action No. 10-1625 (SRC) (PS)
Civil Action No. 10-2308 (SRC) (PS)

**ORDER**

**CHESLER**, **U.S.D.J.**

This matter having come before the Court upon the motion by Plaintiffs Merck & Co., Inc. and Merck Sharp & Dohme Corp. (collectively, "Merck") for summary judgment, pursuant to Federal Rule of Civil Procedure 56, on Defendant's affirmative defense to infringement of patent invalidity due to obviousness; and it appearing that this Court reviewed the parties' submissions; and for the reasons set forth in the accompanying Opinion, and good cause appearing,

**IT IS** on this 30th day of January, 2012,

**ORDERED** that Plaintiffs' motion for summary judgment (Docket Entry No. 106) is **GRANTED.**

_____ s/ Stanley R. Chesler _____
Stanley R. Chesler, U.S.D.J.

Exhibit 2-E

CL

**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

---------------------------------------------------------------X

MERCK & CO., INC. and :
MERCK SHARP & DOHME CORP. :
            :
        Plaintiffs, :
            :
      v. :     Civil Action No. 10-01625(SRC)
            :     Civil Action No. 10-02308 (SRC)
SANDOZ INC. :
            :
        Defendant. :

---------------------------------------------------------------X

**CONSENT JUDGMENT**

        Merck & Co., Inc. and Merck Sharp & Dohme Corp. (collectively "Merck"), both

Plaintiffs in Civil Action Nos. 10-01625(SRC) and 10-02308 (SRC), and Sandoz Inc.

("Sandoz"), the Defendant in Civil Action Nos. 10-01625(SRC) and 10-02308 (SRC), have

agreed to terms and conditions representing a negotiated settlement of these actions and have set

forth those terms and conditions in a settlement agreement (the "Settlement Agreement"). Now

the parties, by their respective undersigned attorneys, hereby stipulate and consent to entry of

judgment and an injunction in these actions as follows:

        IT IS this 13 day of April , 2012

        ORDERED, ADJUDGED AND DECREED as follows:

        1.     This Court has jurisdiction over the subject matter of the above actions

and has personal jurisdiction over the parties.

        2.     As used in this Consent Judgment, the term "Sandoz Product" shall mean

a drug product sold, offered for sale or distributed pursuant to Abbreviated New Drug

Application No. 200833.

3.    Sandoz has admitted that Merck's United States Patent Nos. 5,378,804, 5,514,650, and 5,952,300 (the "Merck Patents") are all enforceable and valid for purposes of this action.

4.    In any other or future cause of action or litigation, Sandoz shall not dispute that the Merck Patents are enforceable and valid.

5.    Sandoz has admitted, for itself and its Affiliates, that the manufacture, use, sale, offer to sell or importation of the Sandoz Product in or for the United States would infringe the Merck Patents pursuant to 35 U.S.C. §§ 271(a), (b), (c), and (e)(2).  Nothing in this Consent Judgment shall be construed to abrogate, limit or otherwise affect Sandoz's rights under the so-called safe harbor of 35 U.S.C. § 271(e)(1).

6.    Sandoz, including any of its successors and assigns, is enjoined until August 28, 2017 on its own part or through any Affiliate, from making, having made, using, selling, offering to sell or importing the Sandoz Product unless specifically authorized pursuant to the Settlement Agreement.

7.    Except as the Parties have provided in their Settlement Agreement, by virtue of this Consent Judgment all other claims and demands for relief prayed for by Merck and Sandoz in these actions are deemed to be satisfied.

8.    Except as the Parties have provided in their Settlement Agreement, by virtue of this Consent Judgment all other claims and demands for relief prayed for by Sandoz in these actions are deemed to be satisfied.

9.    Sandoz has agreed that, in the event of breach or violation by Sandoz of the terms of this Consent Judgment, jurisdiction and venue for an action for a preliminary

injunction against the breaching conduct exists in this Court, and Sandoz hereby waives any and all defenses based on personal jurisdiction and venue.

10.     Compliance with this Consent Judgment may be enforced by Merck and its successors in interest, or assigns, as permitted by the terms of the Settlement Agreement.

11.     This Court retains jurisdiction to enforce or supervise performance under this Consent Judgment and the Settlement Agreement.

12.     The above actions, including any counterclaims or affirmative defenses, are dismissed with prejudice and without costs, disbursements or attorneys' fees to any party.

13.     As used in this Consent Judgment, the term "Affiliate" and any other capitalized terms used herein without definition shall have the meanings assigned to them in the Settlement Agreement.

_____
Stanley R. Chesler, U.S.D.J.

We hereby consent to the form and entry of this Order.

s/ Sheila F. McShane
David E. De Lorenzi, Esq.
Sheila F. McShane, Esq.
GIBBONS, P.C.
One Gateway Center
Newark, New Jersey 07102-5310
Tel.: (973) 596-4500
Fax: (973) 596-0545

Dominick A. Conde, Esq.
Brian V. Slater, Esq.
FITZPATRICK, CELLA HARPER &
    SCINTO
1290 Avenue of the Americas
New York, New York 10104-3800
Tel.: (212) 218-2100
Fax: (212) 218-2200

Edward W. Murray, Esq.
Karen Stoffan, Esq.
MERCK & CO., INC.
RY28-320
P.O. Box 2000
Rahway, New Jersey 07065-0900
Tel.: (732) 594-0436

*Attorneys for Plaintiffs*
*Merck & Co., Inc. and*
*Merck Sharp & Dohme Corp.*

s/ Eric I. Abraham
Eric I. Abraham, Esq.
Christina L. Saveriano, Esq.
HILL WALLACK, LLP
202 Carnegie Center
P.O. Box 5526
Princeton, New Jersey 08543
Tel.: (609) 924-5226

Meredith Martin Addy,Esq.
Mark H. Remus, Esq.
Brandon C. Helms, Esq.
Abby L. Lemek, Esq.
STEPTOE & JOHNSON LLP
115 S. LaSalle Street, Suite 3100
Chicago, Illinois 60603
Tel.: (312) 577-1300

*Attorneys for Defendant*
*Sandoz Inc.*

# Exhibit 2-F

David E. De Lorenzi, Esq.
Sheila F. McShane, Esq.
**GIBBONS P.C.**
One Gateway Center
Newark, New Jersey 07102-5310
Tel.: (973) 596-4500
Fax: (973) 596-0545

Dominick A. Conde, Esq.
Brian V. Slater, Esq.
**FITZPATRICK, CELLA, HARPER &
   SCINTO**
1290 Avenue of the Americas
New York, New York 10104-3800
Tel.: (212) 218-2100
Fax: (212) 218-2200

Edward W. Murray, Esq.
Karen Stoffan, Esq.
**MERCK & CO., INC.**
RY28-320
P.O. Box 2000
Rahway, New Jersey 07065-0900
Tel.: (732) 594-0436

*Attorneys for Plaintiffs*
*Merck & Co., Inc. and*
*Merck Sharp & Dohme Corp.*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| MERCK & CO., INC. and<br>MERCK SHARP & DOHME CORP.,<br><br>              Plaintiffs,<br><br>      v.<br><br>SANDOZ INC.,<br><br>              Defendant. | Civil Action No.: 10-cv-01625-SRC-PS<br><br>Return Date: November 7, 2011<br><br>*Contains Confidential Material –*<br>*Subject to Pending Motion to Seal* |

## DECLARATION OF PROFESSOR STEPHEN R. BYRN IN SUPPORT OF MERCK'S MOTION FOR SUMMARY JUDGMENT ON SANDOZ'S OBVIOUSNESS DEFENSE

I, Stephen R. Byrn, Ph.D., declare as follows:

1.    I have been retained as an expert in the above-captioned matter by Merck & Co., Inc. and Merck Sharp & Dohme Corp.

2.    I make this declaration in support of Merck's motion for summary judgment on Sandoz's obviousness defense.

3.    Attached hereto as **Exhibit A** is a true and correct copy of my rebuttal expert report entitled "Rebuttal Expert Report of Professor Stephen R. Byrn," dated May 10, 2011, with all attached exhibits to the report included herein, a document marked as a potential trial exhibit in the above-captioned matter as PTX-138.

4.    Attached hereto as **Exhibit B** is a true and correct copy of my opening expert report entitled "Opening Expert Report of Professor Stephen R. Byrn," dated March 28, 2011, with all attached exhibits to the report included herein, a document marked as a potential trial exhibit in the above-captioned matter as PTX-150.

5.    The facts and opinions set forth in my reports attached as Exhibits A and B are true and of my own personal knowledge, and if called upon as a witness regarding the matters set forth therein, I could and would testify competently to them.


I declare under penalty of perjury that the foregoing is true and correct.  Executed on September 8, 2011.

_____

Prof. Stephen R. Byrn

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that true and correct copies of the **Declaration of Professor Stephen R. Byrn in Support of Merck's Motion for Summary Judgment on Sandoz's Obviousness Defense** were caused to be served on September 12, 2011 via Federal Express and email upon counsel listed below:

| | |
|---|---|
| Eric I. Abraham, Esq. <br> Christina L. Saveriano, Esq. <br> **HILL WALLACK LLP** <br> 202 Carnegie Center <br> Princeton, New Jersey 08540 <br> Tel.: (609) 924-0808 <br> Fax: (609) 452-1888 <br> eabraham@hillwallack.com <br> csaveriano@hillwallack.com <br><br> *Attorneys for Sandoz Inc.* | Meredith M. Addy, Esq. <br> Mark H. Remus, Esq. <br> Abby L. Lemek, Esq. <br> Brandon C. Helms, Esq. <br> **STEPTOE & JOHNSON LLP** <br> 115 S. LaSalle Street, Suite 3100 <br> Chicago, IL 60603 <br> Tel.: (312) 577-1300 <br> Fax: (312) 577-1370 <br> maddy@steptoe.com <br> mremus@steptoe.com <br> alemek@steptoe.com <br> bhelms@steptoe.com <br><br> *Attorneys for Sandoz Inc.* |

Dated: September 12, 2011

**Exhibit A to the Declaration of Prof. Stephen R. Byrn in Support of Merck's Motion for Summary Judgment on Sandoz's Obviousness Defense**

ATTORNEYS' EYES ONLY – Subject to Discovery Confidentiality Order

David E. De Lorenzi, Esq.
Sheila F. McShane, Esq.
**GIBBONS P.C.**
One Gateway Center
Newark, New Jersey 07102-5310
Tel.: (973) 596-4500
Fax: (973) 596-0545

Dominick A. Conde, Esq.
Brian V. Slater, Esq.
**FITZPATRICK, CELLA, HARPER &
SCINTO**
1290 Avenue of the Americas
New York, New York 10104-3800
Tel.: (212) 218-2100
Fax: (212) 218-2200

Edward W. Murray, Esq.
Karen Stoffan, Esq.
**MERCK & CO., INC.**
RY28-320
P.O. Box 2000
Rahway, New Jersey 07065-0900
Tel.: (732) 594-0436

*Attorneys for Plaintiffs
Merck & Co., Inc. and Merck Sharp & Dohme
Corp.*

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| MERCK & CO., INC. and MERCK SHARP & DOHME CORP., | Civil Action Nos.: |
| Plaintiffs, | 10-cv-01625-SRC-PS |
| v. | 10-cv-02308-SRC-PS |
| SANDOZ INC., | |
| Defendant. | |

## REBUTTAL EXPERT REPORT OF PROFESSOR STEPHEN R. BYRN

PTX-138

ATTORNEYS' EYES ONLY – Subject to Discovery Confidentiality Order

<u>Table of Contents</u>

I. EXPERIENCE AND QUALIFICATIONS .......................................................... 1

II. INTRODUCTION AND MATERIALS REVIEWED ........................................... 2

III. SUMMARY OF EXPECTED TESTIMONY ..................................................... 3

IV. ANALYSIS AND OPINIONS ......................................................................... 4

   A. The '300 Patent: Claim 1 ......................................................................... 4

   B. Person of Ordinary Skill in the Art ........................................................... 5

   C. The Scope and Content of the Alleged Prior Art ....................................... 6

      1. Caspofungin References ..................................................................... 6

      2. Dr. Staples' "Known Formulation Strategies" ...................................... 8

   D. Drug Formulation Development ................................................................ 9

      1. General Considerations ....................................................................... 9

      2. Proteins and Peptides ......................................................................... 10

      3. Unique Properties Of Caspofungin ..................................................... 11

   E. Claim 1 of the '300 Patent Is Not Obvious ............................................... 11

      1. There Was No Stable Salt Form Of Caspofungin Known In The Art ......... 12

      2. A POSA Would Have Considered Other Formulation Approaches Before Lyophilization ...................................................................................... 14

      3. Preformulation Studies Would Not Have Led A POSA To The Claimed Invention ... 15

      4. The Unpredictable Effect of Formulation Vehicle and Excipients On Stability .......... 18

      5. It Was Not Obvious To Use A Buffer To Stabilize Caspofungin In A Lyophilized Drug Formulation ....................................................................................... 20

      6. It Was Not Obvious To Use An Acetate Buffer To Stabilize Caspofungin In A Lyophilized Drug Formulation .............................................................. 21

      7. The Use Of An Acetate Buffer To Stabilize Caspofungin In A Lyophilized Drug Formulation Was Unexpectedly Superior ............................................... 25

   F. The '300 Patent Prosecution History ......................................................... 28

   G. Copying .................................................................................................. 31

**ATTORNEYS' EYES ONLY – Subject to Discovery Confidentiality Order**

## I.     EXPERIENCE AND QUALIFICATIONS

1.      I received my Ph.D. in 1970 from the University of Illinois in the area of organic and physical chemistry.  I conducted postdoctoral studies in physical chemistry at the University of California, Los Angeles from 1970 to 1972.  I am currently the Charles B. Jordan Professor of Medicinal Chemistry at Purdue University in West Lafayette, Indiana.  I also served as the head of two academic departments at Purdue, the Department of Medicinal Chemistry and Pharmacognosy from 1988 to 1994 and the Department of Industrial and Physical Pharmacy from 1994 to 2009.

2.      I have extensive experience in pharmaceutical solid-state chemistry, including salt selection and formulation development.  My formulation development experience includes sterile powder filling and parenteral formulations (including lyophilized dosage forms).  I have also taught courses in pharmaceutical dosage form development, including parenteral product development.

3.      I have directed the research of many graduate students and postdoctoral fellows in the study of the properties of drug substances and formulations containing them.  My research includes the stability of drugs and their formulations.  I have contributed to three books and have published in more than 155 scientific journals in the field of drug substances and drug formulations.

4.      I have served on the editorial board of the Journal of Pharmaceutical Sciences since 1994, and I have been a member of the American Association of Pharmaceutical Scientists, Pharmaceutical Sciences Technical Editorial Board since 2007.  In addition, I served on the editorial board of the Journal of Pharmaceutical and Biomedical Analysis from 1998 to 2002, and the editorial board of the Journal of Drug Targeting from 1993 to 1995.  I also currently

1

**ATTORNEYS' EYES ONLY – Subject to Discovery Confidentiality Order**

serve on the Editorial Advisory Board of the journal Pharmaceutics.  I also have served on the

Food and Drug Administration's Pharmaceutical Sciences Advisory Committee from 1997 to

2001, including as chair in 2000 and 2001, and on the Food and Drug Administration's Drug

Substance Technical Committee from 1997 to present, including as chair from 1997 to 2001.

5.      From 1990 to 2005, I was an elected member of the United States Pharmacopeia

Revision Committee, a member of the Council of Experts from 2000 to 2005, and a member of

several subcommittees including chemistry, dissolution, and excipients.  I have lectured

extensively on aspects of medicinal chemistry, including with respect to impurities and the

stability of pharmaceuticals.

6.      I have served as a consultant for many pharmaceutical companies in the United

States and abroad.  In addition, I was the co-founder and study director of SSCI, a contract

research firm that focused on solid-state chemistry screening of drug candidates.  In 2006, SSCI

was sold to Aptuit, where I am currently a consultant.

7.      My *curriculum vitae*, including a list of my publications, is attached as Exhibit A.

8.      A list of cases in which I have provided expert testimony at trial or by deposition

in the last four years is attached as Exhibit B.

9.      I am being compensated at my customary rate of $600 per hour for my time spent

preparing this report.  My compensation is not contingent on the outcome of this case.

## II.      INTRODUCTION AND MATERIALS REVIEWED

10.      I have been informed by Plaintiffs' counsel that the Plaintiffs, Merck & Co., Inc.

and Merck Sharp & Dohme Corp. (collectively "Merck"), have sued Sandoz Inc. ("Sandoz") for

infringement of U.S. Patent Nos. 5,378,804 ("the '804 patent"), 5,514,650 ("the '650 patent"),

**ATTORNEYS' EYES ONLY – Subject to Discovery Confidentiality Order**

and 5,952,300 ("the '300 patent"). I have been informed that Merck has asserted claim 2 of the '804 patent, claims 1 and 2 of the '650 patent, and claim 1 of the '300 patent against Sandoz.

11.     I have been asked to review claim 1 of the '300 patent and provide my opinion as to whether claim 1 as a whole would have been obvious to a person of ordinary skill in the art ("POSA") in light of the prior art. I have also been asked to respond to the opinions set forth in the March 29, 2011 Expert Report of Mark A. Staples, Ph.D. ("Staples Report").

12.     The opinions set forth below are based on the education, knowledge, and experience that I have acquired over the past four decades in practicing, teaching, and consulting in the field of pharmaceutical sciences, as well as the information available to me as of the date of this report. In forming these opinions, I have reviewed the documents listed in Exhibit C of this report.

13.     I reserve the right to supplement this report or to offer rebuttal testimony to respond to any evidence or arguments presented by Sandoz. In addition to the opinions set forth in this report, I may respond to additional testimony and information that becomes available during deposition, at trial, or otherwise. I may also use demonstrative and summary exhibits in the form of illustrations, charts, and the like as part of any potential testimony at trial. Additionally, I may provide a tutorial concerning basic chemistry and formulation development.

**III.     SUMMARY OF EXPECTED TESTIMONY**

14.     I expect to testify as an expert (1) as to the definition of a POSA pertaining to the inventions claimed in the '300 patent; (2) that the invention of claim 1 of the '300 patent would not have been obvious to a POSA in light of the prior art; (3) that the stabilization of caspofungin in the lyophilized dosage form of claim 1 was unexpected, and that using an acetate buffer in such a dosage form was unexpectedly superior to using a tartrate buffer; (4) that Sandoz copied

3

ATTORNEYS' EYES ONLY – Subject to Discovery Confidentiality Order

Merck's commercially successful caspofungin product, Cancidas®, after unsuccessfully attempting to prepare alternative formulations of caspofungin; and (5) that the Patent Examiner who issued the '300 patent was correct in finding the invention of claim 1 was not obvious in light of the prior art.

## IV.    ANALYSIS AND OPINIONS

### A.    The '300 Patent:  Claim 1

15.    The '300 patent, entitled "Antifungal Compositions," describes drug formulations of caspofungin.  ('300 patent, Title and Abstract.)  In particular, the patent describes stable formulations of caspofungin, or a pharmaceutically acceptable salt thereof, that contain an acetate buffer and excipients effective to form a lyophilized cake.  (*See, e.g.*, '300 patent, col. 1, l. 36 – col. 2, l. 18; col. 3, l. 62 – col. 4, l. 6.)  These lyophilized formulations have extended shelf life and are suitable for subsequent reconstitution with a diluent for administration to a patient, *e.g.*, intravenously. (*See, e.g.*, '300 patent, col. 1, ll. 30 –33; col. 2, ll. 22-25; col. 3, ll. 57 – 61; col. 4, l. 34.)

16.    I have been informed that Sandoz alleges that claim 1 of the '300 patent would have been obvious.  Claim 1 of the '300 patent reads as follows:

"A pharmaceutical composition for intravenous administration to a patient comprising

a) a pharmaceutically effective amount of a compound having the formula



(Seq. ID No. 1)

and the pharmaceutically acceptable salts thereof,

b) a pharmaceutically acceptable amount of an excipient effective to form
a lyophilized cake; and

c) a pharmaceutically acceptable amount of an acetate buffer effective to
provide a pharmaceutically acceptable pH."

17.     The meanings of the claim terms above were discussed in my opening expert

report concerning infringement by the Sandoz proposed caspofungin products.  (March 28, 2011

Opening Expert Report of Professor Stephen R. Byrn at ¶¶ 101-104.)

### B. Person of Ordinary Skill in the Art

18.     A POSA with respect to the inventions of the '300 patent would have been a

person with a (a) Ph.D. in pharmaceutics, chemistry, or a closely related discipline, (b) master's

degree in pharmaceutics, chemistry, or a closely related discipline, and at least two years of

practical formulation experience, or (c) bachelor's degree in pharmaceutical sciences, chemistry,

or a closely related discipline, and at least four years of practical formulation experience.

19.     I disagree with Dr. Staples' definition of the POSA to the extent it requires a

Ph.D. with 5-10 years of industrial experience.  (Staples Report ¶ 73.)  Such a length of industrial

experience exceeds that of the typical formulation scientist working in the pharmaceutical

industry.  Indeed, of the three inventors, one (Dr. Nerurkar) had essentially no industrial

formulation experience before working on caspofungin (Nerurkar Tr. 6:16-8:2, Mar. 4, 2011),

and another (Dr. Kaufman) had no prior experience formulating lyophilized dosage forms

(Kaufman Tr. 42:9-12, Jan. 28, 2011).  Additionally, Dr. Staples states as an alternative to "a

Ph.D. in pharmaceutical chemistry," a POSA would have "an equivalent amount of industrial

experience."  (Staples Report ¶ 73.)  Because the length of time required to obtain a Ph.D. varies

ATTORNEYS' EYES ONLY – Subject to Discovery Confidentiality Order

depending on the program and discipline, his definition is vague and should have specified the amount of industrial experience a formulator without a Ph.D. would possess.

### C. The Scope and Content of the Alleged Prior Art

20.     Dr. Staples opines that claim 1 is obvious in light of U.S. Patent No. 5,378,804 ("'804 patent") in combination with "known formulation strategies." (Staples Report ¶ 76.) I will discuss below each of the alleged prior art references on which Dr. Staples relies.

#### 1. Caspofungin References

21.     Dr. Staples cites two prior art references describing caspofungin.

22.     The first caspofungin reference relied on by Dr. Staples in his obviousness analysis is U.S. Patent No. 5,378,804 ("'804 patent"). The '804 patent discloses the chemical compound caspofungin. ('804 patent, col. 16, l. 36 – col. 17, l. 67.) Caspofungin is a cyclohexapeptide, meaning it is a molecule composed of six amino acids in the form of a ring. ('804 patent, col. 16, ll. 36 – 62.) Two of the six amino acids contain chemically modified substituents that differ from the natural cyclohexapeptide Pneumocandin $B_0$. ('804 patent, col. 3, l. 38 – col. 4, l. 67.) Further, the '804 patent discloses pharmaceutically acceptable salts of caspofungin. ('804 patent, col. 1, l. 67 – col. 2, l. 5.)

23.     The '804 patent provides a list of potential dosage forms for the compounds described in the patent ('804 patent, col. 13, l. 40 – col. 14, l. 15), including examples of tablets, capsules, an aerosol, and an injectable solution formulation of certain compounds described in the patent. ('804 patent, col. 28, l. 35 – col. 29, l. 24.) Nowhere does the '804 patent describe a lyophilized dosage form for any of the compounds, let alone a shelf stable one for caspofungin.

24.     While the '804 patent describes adding "[b]uffering agents" to injectable formulations, it directs a POSA to add them to make solutions of the described compounds

"isotonic," as opposed to controlling pH or stabilizing caspofungin. ('804 patent, col. 14, ll. 6 – 8.) Isotonicity is a property of an injectable solution where the osmotic pressure of the solution matches the osmotic pressure of blood. (1 *Pharmaceutical Dosage Forms: Parenteral Medications*, 252-54 (Kenneth E. Avis. ed., 2d ed. 1992) ("Avis").) Additionally, isotonicity typically applies to the final infusion solution, and would not be needed to formulate a stable dosage form that will ultimately be diluted to the proper tonicity before infusion. One may not need to make an intravenous dosage form isotonic if the infusion is slow enough to permit dilution in the blood. (*See, e.g.*, Avis, p. 175.) A POSA, therefore, would not consider this statement in the '804 patent as teaching the use of a buffer to stabilize caspofungin in a lyophilized dosage form.

25.　　The '804 patent also does not disclose how to prepare a lyophilized dosage form of caspofungin. While the '804 patent describes "lyophilization" to obtain the trifluoroacetate and trihydrochloride salts of caspofungin after its synthesis, it does not teach lyophilization as a means of preparing a pharmaceutical dosage form. ('804 patent, col. 17, ll. 40 – 67.)

26.　　The '804 patent states that "the active ingredients may be in powder form for reconstituting with a suitable vehicle prior to administration," ('804 patent, col. 14, ll. 13 – 15), but does not describe what type of powder (crystalline, amorphous, etc.) is required, what excipients if any would be required to stabilize the dosage form, and does not describe a lyophilized cake. Further, the '804 patent does not discuss the stability of caspofungin or what its degradation products are.

27.　　The '804 patent, therefore, does not teach a POSA how to prepare a stable, lyophilized dosage form of caspofungin with extended shelf life.

28.     The second caspofungin reference Dr. Staples refers to is U.S. Patent No. 5,552,521.  (Staples Report ¶ 78.)  The '521 patent discloses a process for synthesizing caspofungin and isolating it as a crystalline diacetate salt.  ('521 patent, col. 10, ll. 54 – 67.)  The '521 does not discuss the stability of the diacetate salt, and does not disclose any dosage forms for caspofungin.

29.     The '521 patent, therefore, also does not teach a POSA how to prepare a stable, lyophilized dosage form of caspofungin with extended shelf life.

### 2.  Dr. Staples' "Known Formulation Strategies"

30.     Because the '804 patent does not render the '300 patent obvious, Dr. Staples combines it with what he describes as "known formulation strategies" as part of his obviousness analysis.  (Staples Report ¶ 76.)

31.     Dr. Staples generally cites to Volumes 1 and 2 of Remington 1995, Flynn, and Chapter 5 of Avis as evidence of his "known formulation strategies."  (Staples Report ¶ 76.)  Dr. Staples does not explain where those references disclose these "known strategies."  For example, the two volumes of Remington on which Dr. Staples generally relies contain a combined 112 chapters.  (*See Remington:  The Science and Practice of Pharmacy* (Alfonso R. Gennaro ed., 19th ed.) ("Remington 1995").)

32.     As described in more detail below, none of these references would have taught a POSA how to prepare a stable lyophilized drug formulation of caspofungin.  Dr. Staples also discusses parenteral products that he was personally involved in developing during his employment in industry, including "unpublished" work by one of his groups.   (Staples Report ¶ 8-15.)  However, he does not allege that any of this work is prior art, and so I have not considered it.  (*See, e.g.*, Staples Report ¶ 71.)

ATTORNEYS' EYES ONLY – Subject to Discovery Confidentiality Order

33.     Before addressing Dr. Staples' specific obviousness arguments, I will first address how a POSA would have approached formulation development in 1996.[1]

### D. Drug Formulation Development

### 1.     General Considerations

34.     Drug formulation is a critical aspect of the drug development process.  (*See, e.g.*, Remington 1995, p. 1447.)  Without a convenient and shelf-stable formulation, a drug cannot be administered to patients in need of treatment.  (*Id.*)

35.     There are many aspects involved in formulating a drug compound (referred to as the active pharmaceutical ingredient or "API"), which can make it a complicated and time consuming task.  (*Id.*) ("The development of an optimum formulation is not an easy task, and many factors readily influence formulation properties.")  Some of those aspects include the route of administration of the drug (*e.g.*, oral, parenteral, inhalation, etc.), the type of dosage form (*e.g.*, tablets, capsules, solutions, suspensions, powders, etc.), the properties of the drug compound, the components used in that dosage form, the process of preparing that dosage form, and the stability of the drug compound in that dosage form.

36.     For each of these aspects, there are many considerations that must be taken into account.  For example, drug stability is critical to the regulatory approval and success of a pharmaceutical product, but a formulator cannot predict what dosage form or combination of excipients will successfully stabilize a drug compound.  Dr. Grieco, Teva's expert in this case, testified that one needs to experimentally test the stability of a compound, and one cannot predict the stability without running the experiments.  (Grieco Tr., 67:20 – 68:24, Nov. 2, 2010.)  Additionally, Sandoz's witness Dr. Nandi agreed that formulation development is trial and error.

---

[1]     The provisional application for the '300 patent was filed on April 19, 1996.  I have used this date as the cut-off for prior art references.

ATTORNEYS' EYES ONLY – Subject to Discovery Confidentiality Order

(Nandi Tr. 85:20-86:4, 114:16-20; 149:10-16, Mar. 11, 2011.)  I agree with Drs. Grieco and

Nandi that trial and error and experimental testing is required to determine stability of

development formulations.

37.     As explained further below, in 1996, a POSA, faced with the challenge of

formulating caspofungin, would have examined various types of dosage forms in an effort to find

one with extended shelf life, and would not have begun with buffer-containing lyophilized

dosage forms, as opined by Dr. Staples.

### 2.     Proteins and Peptides

38.     As described above, caspofungin is a cyclohexapeptide, which is a type of

polypeptide (typically referred to simply as a "peptide").  Proteins and peptides are chemical

molecules composed of amino acids that are linked together through peptide bonds (*i.e.*, amide

bonds) into long polymeric chains.  (Avis, p. 284.)  The order (or sequence) of the amino acids in

these chains makes up the primary structure of the peptide or protein.  Peptides differ from

proteins in the number of amino acids included in the chain, with proteins usually containing

hundreds or thousands of amino acids, whereas peptides typically contain less than fifty.

39.     In the 1980's and 90's, proteins and peptides emerged as a new area of drug

research, due in large part to the improvement in chemical technology necessary to obtain large

quantities of specific proteins and peptides for research.  (Avis, p. 283.)  As new drug therapies

increasingly focused on peptides and proteins, the need arose to develop dosage forms for

pharmaceutically relevant proteins and peptides.  (*See* Avis, p. 7; Remington 1995, p. 1461.)

This task of developing shelf stable and convenient dosage forms for these peptide and proteins

was challenging due to the absence of experience in the art with these types of dosage forms.

(*See* Avis, p. 7; *see also* Remington 1995, p. 1461) ("Proteins and peptides produced by the

ATTORNEYS' EYES ONLY – Subject to Discovery Confidentiality Order

commercialization of biotechnology are presenting preformulation scientists with new challenges.")

### 3. Unique Properties Of Caspofungin

40.     Although caspofungin is a peptide, it also shares some of the properties of a small molecule.  In particular, caspofungin contains two terminal amine functional groups (circled in the structure of caspofungin below):



41.     Those two amine functional groups afford the opportunity for salt synthesis with acid counterions (*see, e.g.*, '804 patent, col. 14, ll. 41 – 47), something common to small drug molecules, but atypical for most peptides and proteins.  Due to the six amino acids comprising caspofungin, caspofungin has a molecular weight in excess of 1000 g/mol, which is more typical of a peptide and not of a small drug molecule.  (Merck Cancidas® Prescribing Information, p. 14.)

42.     Based on the mixture of small molecule and peptide properties of caspofungin, a POSA looking to formulate caspofungin would lack significant guidance in the art due to the unique properties and structure of caspofungin.  A POSA, therefore, would have had no reasonable expectation of successfully formulating caspofungin in a stable dosage form.

### E.  Claim 1 of the '300 Patent Is Not Obvious

43.     Dr. Staples' obviousness analysis assumes that a stable API for caspofungin had been identified in the prior art, and that this stable API could then have been used in his "known

ATTORNEYS' EYES ONLY – Subject to Discovery Confidentiality Order

formulation strategies" to prepare dosage forms of caspofungin. (*See, e.g.*, Staples Report ¶ 87.) His assumption is erroneous because, as will be discussed below, no stable API for caspofungin was known, further complicating the challenge of formulating a unique compound such as caspofungin. Moreover, Dr. Staples' "known formulation strategies," and his selective application of them, are based on a hindsight analysis of the formulations disclosed in the '300 patent, and would not have rendered the subject matter of claim 1 obvious.

### 1. There Was No Stable Salt Form Of Caspofungin Known In The Art

44.     Dr. Staples opines that a POSA would first have investigated soluble and stable acid addition salt forms of caspofungin (*i.e.*, a caspofungin API). (Staples Report at ¶¶ 78-82.) His remaining opinions assume that such a soluble and stable API was known in the prior art. (*See, e.g.*, Staples Report ¶ 97.)

45.     I agree that a POSA would have first attempted to use salt selection to improve the solid-state characteristics of the drug compound itself, including its crystal form. (*See, e.g.*, Remington 1995, p. 1456-57.) Crystal form is important when considering salt forms for an API because it is the crystal form that dictates the solid-state properties of the compound, including solubility and stability. (Avis, pp. 130, 187-88, Remington 1995, p. 1452.)

46.     Dr. Staples states that salt selection of a drug compound was routine in 1995. (Staples Report ¶ 82.) While I agree that salt selection for drug compounds was being performed at that time, a POSA would have had no reasonable expectation of finding a salt that was both soluble and stable, especially for a large molecule such as caspofungin. (Remington 1995, p. 1456) ("Unfortunately, there is no reliable way of predicting the influence of a particular salt species on the behavior of the parent compound in dosage forms.")

**ATTORNEYS' EYES ONLY – Subject to Discovery Confidentiality Order**

47.     Dr. Staples states that a POSA would first look to the then-known salts of caspofungin, namely the tris-triflouroacetate, tris-hydrochloride and diacetate salts.  (Staples Report ¶¶ 78, 82.)  However, the first salt Dr. Staples relies upon, namely the tris-triflouroacetate, is not one of the previously-marketed salt anions that Dr. Staples states a POSA would be restricted to selecting.  (Staples Report ¶¶ 80-81.)  A POSA would have known that the tris-hydrochloride salt may be hygroscopic, which means that it takes up water and as a result may degrade.  (Grieco Tr. 86:21-90:17.)  While U.S. Patent No. 5,552,521 discloses a crystalline diacetate salt of caspofungin, that salt is not stable, and must be stored below -20°C in order to remain stable, and is typically stored at -70°C.  (MRK_CAN00053155; SAND-CASP988303-304.)  By comparison, a typical storage condition for a drug compound before formulation is room temperature (*e.g.*, 25°C).  Storage at -70°C is highly atypical, and is indicative of a very unstable drug compound that may not be stable enough for any drug formulation.  A POSA would not expect to be able to prepare a stable drug formulation from an unstable drug compound.  (Remington 1995,  p. 1458) ("It is extremely important to determine the stability of the bulk chemical as early as possible.  One hardly would expect to prepare stable dosage forms with a chemical substance that was not stable in the pure state.")

48.     Accordingly, a POSA would not have selected the diacetate salt of caspofungin for drug formulation development because a POSA would select a salt that was both soluble and stable.  (*See* Staples Report ¶ 82.)  Following Dr. Staples' approach, a POSA would either have stopped at this stage because a stable salt form was not identified, or would have continued to look for stable salt forms of caspofungin (something not disclosed in the prior art).  Therefore, under Dr. Staples' approach, a POSA would never even have investigated lyophilization because they would not have a stable salt to formulate.  Further, a POSA would have no expectation of

13

**ATTORNEYS' EYES ONLY – Subject to Discovery Confidentiality Order**

formulating a stable drug formulation of caspofungin from the diacetate salt because even in its pure state, the diacetate salt is not stable.

### 2. A POSA Would Have Considered Other Formulation Approaches Before Lyophilization

49.     Dr. Staples opines that a POSA would, from the outset, have pursued a lyophilized formulation of caspofungin. (Staples Report at ¶ 78.) I disagree. A POSA would first have investigated using simpler, less costly parenteral formulations, including ready-to-use solution formulations and powder filled dosage forms. Indeed, Merck considered several approaches in addition to lyophilization, including solution formulations and crystalline solids for powder filling. (MRK_CAN01156153-55.)

50.     Vial lyophilized formulations are more difficult and more costly to prepare than, for example, solution formulations or powder filling. (Remington 1995, p. 1544) Further, lyophilized formulations require the end user to reconstitute the product for use, something that would be avoided with a ready-to-use solution dosage form. Additionally, Avis categorizes lyophilized parenteral dosage forms as "special types" of parenteral dosage forms, warning that lyophilization may chemically and physically alter biological molecules (*e.g.*, peptides and proteins), and that such modifications "might affect their physical properties, therapeutic effectiveness, and even their safety in clinical use." (Avis, pp. 212, 217, 227.) Dr. Staples relies on a chapter of Avis relating to small volume parenterals (Chapter 5), but does not address this chapter of Avis (Chapter 7) relating to parenteral products of peptides and proteins.

51.     With respect to peptides such as caspofungin, references in the art teach that most peptide formulations can successfully be formulated as ready-to-use solution products. (*See, e.g.*, Avis, pp. 289, 312.) A review of the 1995 Physician's Desk Reference ("1995 PDR") shows that over twice as many parenteral products were formulated as ready-to-use solution

ATTORNEYS' EYES ONLY – Subject to Discovery Confidentiality Order

products versus lyophilized dosage forms. (*See* Ex. D.) A POSA, therefore, would first have focused on simpler, less costly parenteral formulations such as ready-to-use solutions before resorting to a complicated, more costly lyophilized dosage form.

52.     Dr. Staples opines that lyophilization may be used to combat aggregation of caspofungin. (Staples Report ¶ 40.) Aggregation is an issue unique to proteins, not peptides like caspofungin. (*See* Avis, p. 308.) Also, there was no teaching in the art that caspofungin is prone to aggregation.

### 3. Preformulation Studies Would Not Have Led A POSA To The Claimed Invention

53.     Although Dr. Staples relies on preformulation experiments as part of his obviousness analysis, data from such experiments are not found in the prior art. (Staples Report ¶¶ 38, 83-85.) While a POSA may have undertaken these experiments, I do not agree that these experiments would have led to the caspofungin formulations claimed in claim 1 of the '300 patent.

54.     Dr. Staples states that a POSA would have discovered the degradation pathways for caspofungin during preformulation studies performed prior to preparing prototype formulations. (Staples Report at ¶ 85.) I disagree that such preformulation studies would have revealed all degradation pathways for a drug compound necessary to formulate a stable dosage form.

55.     During its formulation development work on caspofungin, Merck identified four major degradation products for caspofungin:  L-747969 ("L-969"), the dimers (L-404399 and L-404340), and L-799717 ("L-717"). (MRK_CAN00094059-064) The first three degradants were observed in solution stability experiments, as well as from stability studies of the bulk crystalline

**ATTORNEYS' EYES ONLY – Subject to Discovery Confidentiality Order**

caspofungin diacetate (*i.e.*, the neat solid). However, the last impurity, L-717, did not appear until Merck attempted to lyophilize caspofungin in a dosage form.

56. L-969 is a hydrolysis product of caspofungin. The chemicals structure for L-969 is given below:



Structure for L-747969

57. In aqueous solutions and in the bulk crystalline solid, Merck found that this impurity was the major degradation product. (MRK_CAN00094059.)

58. The dimers (L-404339 and L-404340) result when two caspofungin drug molecules react with each other to larger molecules. The structure of each of the two dimers are as follows:



Structure for Dimer 1 (L-404339)



Structure for Dimer 2 (L-404340)

59. Merck found that the dimers were also formed in solution, but to a lesser extent than the hydrolysis product L-969. (MJK_08.)

ATTORNEYS' EYES ONLY – Subject to Discovery Confidentiality Order

60.     Only when Merck began formulating lyophilized dosage forms of caspofungin, did it identify another impurity, which it called "Degradate A" because its structure was not known.  (MRK_CAN00000621.)  Ultimately, Merck identified Degradate A as the degradation product L-717.  The structure of L-717 is as follows:



61.     L-717 is significantly different than L-969 and the dimers.  It does not form in solution or during storage of the bulk crystalline caspofungin diacetate.  (MJK_022.)  Rather, L-717 is a thermal degradant of caspofungin.  (MRK_CAN00094059.)  Its production, therefore, should not be related to the solution pH prior to lyophilization, making the relevance of a buffer in the solid-state even more surprising.  This is an important distinction because, contrary to Dr. Staples, there is no way to use the preformulation experiments he references to predictably formulate a stable caspofungin lyophilized formulation.  (Staples Report ¶ 85.)

62.     While Dr. Staples states that lyophilization reduces hydrolysis of caspofungin, the goal would be not merely to prevent hydrolysis, but to stabilize caspofungin in a pharmaceutical dosage form.  (Staples Report ¶ 46.)  By lyophilizing caspofungin, a POSA may have expected some reduction in hydrolysis by removing water (the molecule involved in that degradation pathway), but this would have provided no expectation that caspofungin would be stabilized.  Hydrolysis is only one type of degradation, and there would have been no reasonable expectation that by reducing the hydrolysis, caspofungin would be stabilized with respect to other

ATTORNEYS' EYES ONLY – Subject to Discovery Confidentiality Order

degradation pathways. Lyophilizing does not, for example, address the problem of L-717 and, indeed, results in its production. Additionally, even if one could have predicted the production of L-717, then one would have avoided lyophilization because it resulted in the production of an unknown (and potentially uncontrollable) impurity.

63. The hydrolysis product L-969 is a metabolite of caspofungin (MRK_CAN00094059.) Its levels would not need to have been controlled as stringently as a new and unknown impurity such as L-717. To avoid creating this new degradation pathway, a POSA could have attempted to control hydrolysis in solution by, for example, adding a co-solvent to retard hydrolysis. (*See, e.g.*, Avis, p. 192) ("[I]t is important to mention that [water-miscible co-solvents] also serve as stabilizers for those drugs that degrade by hydrolysis.")

### 4. The Unpredictable Effect of Formulation Vehicle and Excipients On Stability

64. In his expert report, Dr. Staples opines that for drug formulations, a POSA would follow his four "rules" to formulate successfully a drug candidate. (*See* Staples Report ¶ 29.) This approach is an oversimplification of the chemistry involved in drug formulation, particularly for complex molecules such as caspofungin.

65. For each type of parenteral dosage form, there are various types of vehicles that need to be considered (*e.g.*, aqueous, water miscible, non-aqueous) as well as many possible added substances (*i.e.*, excipients) each of which would need to be tested to see its effect on stability of the drug compound. (Avis, pp. 175, 192.) The list of excipients is large, and would have provided a formulator in 1996 with many potential options to prepare experimental dosage forms of caspofungin.

66. For proteins and peptides, various special stabilizers have been reported in the literature. (Avis, p. 303.) These stabilizers include serum albumin, amino acids, surfactants,

polyhydric alcohols and carbohydrates, antioxidants, and metal chelants. (Avis, pp. 303-307.) While there is some overlap with between excipients used for small drug molecules and proteins and peptides, the special nature of proteins and peptides results in unique excipients being employed. I note that this list of peptide stabilizers from Avis does not include "buffers," and, in fact, pH is discussed in a separate section from the stabilizers. (Avis, pp. 302-303.)

67.     Dr. Staples states that a formulator would use the minimum number of excipients as possible to prepare a pharmaceutical formulation. (Staples Report ¶ 22.) While in general each excipient's function should be justified, and only excipients with a specific function should be added, formulations for biological compounds have not always followed this rule. (Avis, p. 307.)

68.     Dr. Staples also states that common excipients merely need to be "screened". (*E.g.*, Staples Report ¶¶ 22, 88-89.) Implicit in his screening approach is a lack of predictability in formulating drug compounds because he is suggesting that a formulator should try each excipient or combination of excipients to see the effect, for better or worse. A formulator cannot predict what excipients or combination of excipients will formulate a stable dosage form. As discussed above, for protein and peptide drug compounds, the list of possible stabilizing excipients is expanded (s*ee, e.g.*, Avis, pp. 303-307), and the art describes the stabilization of these types of molecules as "an area in which trial and error plays a major role." (Avis, p. 303.) Accordingly, even if one were to characterize formulation as "screening", I disagree with Dr. Staples that such formulation work can be considered "routine". (Staples Report ¶ 88.) Further, I note that it took the inventors about two years to arrive at the claimed formulations, which is another indication that such formulation is not "routine." (MRK_CAN01156152; MRK_CAN00019918.)

### 5. It Was Not Obvious To Use A Buffer To Stabilize Caspofungin In A Lyophilized Drug Formulation

69.     Dr. Staples opines that it was obvious to use a buffer in a lyophilized caspofungin formulation.  (Staples Report ¶ 94.)  I disagree.

70.     Flynn is a 1980 journal reference that relates to use of buffers in aqueous solutions and does not describe their use to stabilize lyophilized formulations.  (*See* Gordon L. Flynn, *Buffers – pH Control Within Pharmaceutical Systems*, 34 J. Parenteral Drug Ass'n 139, 160 (Mar.-Apr. 1980) ("Flynn").)  A buffer is typically added to ready-to-use solution formulations to resist changes of pH in solution.  (Flynn , p. 139; *see also* Remington 1995, p. 1529 ("Buffers are used primarily to stabilize a solution against the chemical degradation that might occur if the pH changes appreciably.").)  In general, the usable range for a buffer is ±1 pH units from its pKa.  (Flynn, p. 157.)  The pH of a solution is related to the proton concentration in the solution as follows:

$$pH = -\log[H^+]$$

(A. Albert & E.P. Serjeant, *The Determination of Ionization Constants* 203 (3d ed. 1984).)

71.     According to Dr. Staples, a POSA would have determined from the preformulation data that caspofungin solutions have an optimal solution stability pH of 5.  (Staples Report ¶ 84.)  While this data suggests that a pH of 5 provides the optimal solution stability, I do not agree that this preformulation data would have taught a POSA to consider using buffers to stabilize caspofungin in a lyophilized product.

72.     First, as noted above, the purpose of adding a buffer to a solution is to resist change in the pH of the solution.  That caspofungin has an optimal pH for its solution stability does not suggest that the pH in the solution would change significantly, requiring a buffer to resist this change.  Dr. Staples states that "[d]ata must support a scientific and clinical defense for

ATTORNEYS' EYES ONLY – Subject to Discovery Confidentiality Order

the use of each ingredient of the dose." (Staples Report ¶ 22; *see also* Avis, p. 192.) This would require data justifying that caspofungin in solution would also need a buffer to remain stable in the first instance. Dr. Staples fails to provide any such data. Instead of using a buffer to achieve a pH of 5, a POSA would simply use dilute acid or base to adjust the pH to that value. Dr. Staples agrees. (Staples Report ¶¶ 10, 43, 45, 51.)

73.     Second, even if some pH drift in solution were present, it does not appear to have affected caspofungin's stability in solution. I note that the preformulation solution stability work performed by Merck shows that caspofungin is stable at 25°C in the pH range of 4-7 for up to 2 days. (MRK_CAN01156156.) If a POSA chose to lyophilize caspofungin, she would not be motivated to add a buffer to control the solution pH because 2 days is enough stability to manufacture the product. There simply would be no reason to add a buffer even if the decision was made to lyophilize the product.

74.     Third, even if a POSA would have discovered that pH 5 is the ideal solution pH for caspofungin, that finding alone would not have suggested including a buffer in a lyophilized formulation. The solution pH is not necessarily relevant to a lyophilized product because when the water is removed through lyophilization, the formulation no longer is considered to have a "pH" as it did in solution. A POSA, therefore, would not reasonably expect the solution pH to control stability of the lyophilized formulation, and could only know through experiments if the pH of the solution prior to lyophilization was relevant to the stability of the lyophilized drug formulation.

### 6.  It Was Not Obvious To Use An Acetate Buffer To Stabilize Caspofungin In A Lyophilized Drug Formulation

75.     Dr. Staples opines that it was obvious to use an acetate buffer in a lyophilized caspofungin formulation. (Staples Report ¶ 84.) Again, I disagree.

**ATTORNEYS' EYES ONLY – Subject to Discovery Confidentiality Order**

76.     While it is true that acetate is used as a buffer in several solution parenteral products (*see, e.g.*, Remington 1995, p. 1529), that does not suggest its use for lyophilized products.  Indeed, as explained below (*see* paragraph 81), in the 1995 PDR there were no acetate-buffered lyophilized products.  Additionally, acetic acid is a volatile compound as evidenced by its boiling point.  (*The Merck Index*, 11 (12th ed, 1996).)  In solution, acetic acid forms an equilibrium with its acetate anion.  (*See, e.g.*, Avis, p. 183.)  As the lyophilization process occurs under reduced pressure (*i.e.*, under vacuum), a POSA would be concerned that significant amounts of acetic acid may be lost in the process due to its volatility, reducing its buffering capacity as compared to other non-volatile buffers.  Additionally, the formulation composition could change during the process, causing variability that may be difficult to control.  These reasons would lead a POSA away from using acetate as a buffer in a lyophilized product.  Merck was concerned with the loss of acetic acid during lyophilization of caspofungin formulations.  (*See, e.g.*, MRK_CAN00021536.)

77.     Dr. Staples opines that a POSA would have chosen an acetate buffer to match the acetate salt of caspofungin for simplicity.  (Staples Report ¶ 84.)  This is contradicted by Dr. Staples' statement that you would first select a stable salt of the drug.  (Staples Report ¶ 82.)  Given that here, the diacetate salt of caspofungin was highly unstable, there would be no logical reason to match the buffer to the anion used to form the highly unstable salt.

78.     Even if one were to consider using acetate as a buffer, there are many other buffers a POSA would have considered.  Dr. Staples provides a list of buffers that he states are acceptable for parenteral formulations.  (Staples Report, Ex. B.)  However, Dr. Staples' Exhibit

**ATTORNEYS' EYES ONLY – Subject to Discovery Confidentiality Order**

B list omits 13 buffers[2] contained in Flynn. (Flynn, p. 154.) Moreover, it appears that during Sandoz's development work on caspofungin (*see, e.g.*, SAND-CASP880388), 8 of the 15 buffers selected by Sandoz to buffer caspofungin do not appear in Exhibit B of Dr. Staples' report. (Staples Report ¶ 80, Ex. B.) This is further evidence that Dr. Staples' list of buffers is too restrictive and does not accurately reflect all of the options available to a formulator.

79.    Even if there were an expectation that a buffer would function in a lyophilized dosage form, i.e., in the solid state, a POSA would have expected that all buffers capable of maintaining a pH of 5 would be equivalent in this role because the purported function of the buffer would be to control pH and they would be expected to do so. Dr. Staples contends that there are only 5 buffers appropriate for this task. (Staples Report, Ex. B.) However, a POSA would focus on all buffers capable of maintaining a pH of 5, and would expect that any one of them would function equivalently in this role. In Flynn alone, 12 of the 17 buffers listed would provide buffering at pH 5. (Flynn, p. 154.) Dr. Staples' list omits 7 of these buffers.[3]

80.    In its contentions, Sandoz states that a POSA would select acetate over other potential buffers because it is a monocarboxylic acid versus polycarboxylic acids or phosphate. (Sandoz's June 15, 2010 Invalidity Contentions at 59.) Dr. Staples does not address this point in his report.

81.    Polycarboxylic acids and phosphate are commonly used buffers. (*See, e.g.*, Flynn at 154.) The most common buffer used in lyophilized products listed in the 1995 PDR was phosphate, and several polycarboxylic-buffered products also are listed. (Ex. D.) By contrast, the 1995 PDR does not list a single lyophilized product containing an acetate buffer. (Ex. D.)

---

[2]    Benzoic, Gluconic, Glyceric, Aconitic, Adipic, Gluratic, Glutamic, Malic, EDTA, Ammonia, Diethanolamine, Glycine, and Triethanolamine. (*See* Flynn, p. 154.)

[3]    Benzoic, Aconitic, Adipic, Gluratic, Glutamic, Malic, and EDTA. (*Id.*)

**ATTORNEYS' EYES ONLY – Subject to Discovery Confidentiality Order**

This review of the 1995 PDR undermines Sandoz's contention that a buffer would be chosen based upon the number of carboxylic acids.

82.     Additionally, I note that almost half of the buffers listed by Dr. Staples in Exhibit B of his report are polycarboxylic acids (*e.g.*, citrate, maleate, succinate, tartrate), and the most frequently used buffer was phosphate, followed by citrate. (Staples Report, Ex. B.) This again shows a lack of support for an argument regarding choice of buffer based on the number of carboxylic acid groups.

83.     While polycarboxylic acids and phosphate may cause buffer catalysis, the references in the art do not teach to avoid using these buffers. (*See, e.g.*, Flynn, 156-57; Avis 198-199.) For example, Flynn states that "[f]or such reasons [such as buffer catalysis] the interactivity of buffers with the drug should be investigated before the final choice of buffer is made." (Flynn, p. 157) (emphasis added.) Avis only states that buffers "can" cause degradation. (Avis, p. 199.) These references, therefore, merely teach a POSA that buffer catalysis may occur with some buffers, and that experiments should be run to make sure the final buffer does not do so to an appreciable degree.

84.     Sandoz does not cite any references describing buffer catalysis that occurs in lyophilized drug formulations. The only references they cite concern buffer catalysis in aqueous solutions. (*See* Flynn, pp. 139, 156-57, 160; Avis, p. 198-199.) In the case of caspofungin, the number of carboxylic acids did not correlate with degradation. During formulation development at Merck, both mono and polycarboxylic acids were attempted in lyophilized formulations of caspofungin. Lactate, a monocarboxylic acid, worked no better than tartrate, a polycarboxylic acid. (MRK_CAN00017658.) This is further evidence that the use of acetate cannot be justified based on the number of carboxylic acids groups.

24

85. A POSA, therefore, would not be dissuaded from using polycarboxylic acids or phosphate when formulating caspofungin.

86. In its contentions, Sandoz states that a POSA would select salts with a use statistic that was greater than a 1% in the 1995 Remington's table of pharmaceutical salts, when selecting a buffer. (Sandoz's June 15, 2010 Invalidity Contentions at 58.) Again, Dr. Staples does not address this point in his report. I disagree that a POSA would use such a limit, and I do not know where a POSA would derive such a limit. Further, I do not know why a POSA would use a list of drug salt counterions to select a parenteral buffer. In my opinion, Sandoz's percentage use criterion is baseless.

87. A POSA, therefore, would not use a 1% criterion as suggested by Sandoz's contentions.

### 7. The Use Of An Acetate Buffer To Stabilize Caspofungin In A Lyophilized Drug Formulation Was Unexpectedly Superior

88. Based on all the above, the stabilization of caspofungin in the lyophilized dosage form of claim 1 was unexpected because no stable API had been identified. Further, there would have been no expectation of success in using a buffer that matches the counterion of an unstable salt to stabilize a lyophilized formulation.

89. Even if there were an expectation that a buffer would function in a lyophilized dosage form, i.e., in the solid state, a POSA would have expected that all buffers capable of maintaining a pH of 5 would be equivalent in this role because the purported function of the buffer would be to control pH and they would be expected to do so.

90. In the case of caspofungin, however, its stability in a lyophilized dosage form using an acetate buffer was unexpectedly superior to using a tartrate buffer. When compared at pH 5, the amount of each of the four degradates produced during lyophilization and subsequent

**ATTORNEYS' EYES ONLY – Subject to Discovery Confidentiality Order**

storage for 16 weeks at 5 °C were lower with the acetate formulation versus the tartrate

formulation.  (MRK_CAN00019918, 020285.)

| Lyophilized Caspofungin Formulations (50 mM Buffer [pH 5] | Lactose/Mannitol) | | | | |
|---|---|---|---|---|
| Buffer | Caspofungin | L-717 | L-969 | Dimers |
| Tartrate | -1.0% | 0.47% | 0.18% | 0.03% |
| Acetate | -0.2% | 0.13% | 0.05% | -0.08% |
| Difference | 5.0x Less | 3.6x Less | 3.6x Less | Acetate <u>reduced</u> dimers over time. |

This is a surprising result because the overall degradation is five times lower in acetate versus

tartrate.  Further, the L-717 degradate unexpectedly is 3.6 times lower in the acetate

formulations, the degradate that was not seen in the solution experiments with caspofungin.  (*See*

*also*, Kaufman Tr. 211:12-214-22; Ex. E.)

91.     None of the experiments Dr. Staples suggests, however, would have allowed a

POSA to predict the caspofungin degradates formed in a lyophilized dosage form, not to mention

the differences in degradation brought about by two different buffers.

92.      I also note that Sandoz was skeptical of there being a significant difference

between the tartrate and acetate buffers in the lyophilized dosage forms even after reading the

'300 patent.  (SAND_CASP815809.)  In fact, Sandoz attempted to show that both the acetate and

tartrate buffers were equivalent, but ultimately confirmed the superiority of acetate as the

inventors of the '300 patent had surprisingly discovered.  (*See, e.g.*, SAND-CASP543839.)  This

testing is further proof that a POSA would think that both buffers—if needed at all in the

**ATTORNEYS' EYES ONLY – Subject to Discovery Confidentiality Order**

lyophilized state—should function equivalently, but surprisingly the acetate is remarkably better than tartrate.

93.     Dr. Staples also opines that the pKa values of caspofungin would have led a POSA to select acetate as a buffer.  (Staples Report ¶ 95.)  Specifically, he states that because the first pKa for caspofungin is 5.2, it would be close to the pKa for acetic acid (4.76), so acetic acid would be the best choice.  When the pH of a solution matches the pKa, half of the drug molecules will be ionized, and the other half will not.  (Avis, p. 196).  Avis cites an example, chloramphenicol, where the drug compound degraded fastest when the pH matched the pKa.  (*Id.* at 197.)  I do not understand Dr. Staples' argument that the first pKa of a drug would be useful to predict the most stable solution pH for a drug candidate, and the literature example from Avis suggests that matching the pKa to the pH would provide the exact opposite of the intended result.  The only method to determine whether the solution pH has an effect on degradation is by experimentation.

94.     Dr. Staples also cites to U.S. Patent No. 4,857,552 (Rosenberg) to support the use of acetate buffer.  (Staples Report ¶ 96.)  The Rosenberg patent discloses an aqueous formulation of esmolol with an acetate buffer.  Esmolol degrades by hydrolysis due to an ester functional group, and the patent teaches that matching the pKa of the degradation product to the buffer pH to create a second buffering system in solution.  This patent does not teach how to prepare a stable, lyophilized dosage formulation of caspofungin, and focuses on stabilizing a specific compound in aqueous solution.

ATTORNEYS' EYES ONLY – Subject to Discovery Confidentiality Order

### F. The '300 Patent Prosecution History

95.     Dr. Staples opines that the inventors of the '300 patent misled the examiner with the results from the tartrate buffered caspofungin formulations, and that it was not surprising that acetate stabilized caspofungin.  (Staples Report ¶ 70.)  I disagree.

96.     Under his analysis, Dr. Staples focuses on using an acetate buffer at pH 6. (Staples Report ¶¶ 66-67.)   Dr. Staples misunderstands the significance of the pH 6 experiments, and the comparison of tartrate versus acetate overall.

97.     First, the relevance of the pH 6 results shows that acetate functions to stabilize caspofungin outside of its normal buffering range.  In my opinion, the inventors raised the pH 6 results to show that the degradation is not only related to the pH because acetate is stabilizing caspofungin outside of its typical pH buffering range.  While Dr. Staples calculates that there would be some buffering at pH 6 with acetate, a pH of 6 is, nevertheless, outside of acetate's typical buffering range for pH.

98.     A buffer typically buffers within ±1 pH units from its pKa.  (Flynn, p. 157.)  Dr. Staples cites the exact same general rule in his report.  (Staples Report, Ex. B and ¶ 95.)  For acetate, the typical buffering range would be 3.76 - 5.76, and for tartrate, the range would be 1.96 - 5.16 (tartrate has two pKas).  (Staples Report, Ex. B.)  While there will be some buffering capacity for both buffers at pH 6, a POSA would have expected both acetate and tartrate to lack appreciable buffering capacity at pH 6 as stated by the general rule.  Dr. Staples' calculation (Staples Report ¶ 67), therefore, demonstrates that acetate buffers at pH 6, but its ability to buffer would be significantly limited at that pH.

99.     Second, I have reviewed data for the examples in the patent formulated at pH 5. When comparing tartrate versus acetate at pH 5, acetate is clearly stabilizing caspofungin better

28

than tartrate. (*See* paragraph 90 above.) Both acetate and tartrate are effective buffers at pH 5 in solution (something Dr. Staples agrees with in Exhibit B of his report), so Dr. Staples' analysis at pH 6 is undermined because acetate works better than tartrate at pH 5 too. This data, together with the data at pH 6, demonstrates that acetate is superior to tartrate, and that superiority cannot be attributed solely to acetate's pH buffering.

100.    Third, Dr. Staples states that the inventors misled the Patent Office by failing to account for the contribution of acetate from the caspofungin salt to the buffering capacity of the acetate buffered formulations. (Staples Report ¶ 68.) Dr. Staples neglects that the same amount of acetate contributed from the caspofungin diacetate salt would also be present in the tartrate buffered formulations, formulations that were not stable.

101.    The inventors discovered that adding an acetate buffer contributed to the stability of the caspofungin formulation, and that this additional acetate buffer was doing something more than merely buffering the pH of the formulation (*i.e.*, stabilization of caspofungin is not the result of pH control). This is unexpected because the diacetate salt of caspofungin is not stable (See ¶ 47 above), so a POSA would not have expected adding additional acetate would stabilize the formulation.

102.    The inventors, therefore, correctly presented their argument to the Patent Office regarding the comparison between the acetate buffered and tartrate buffered formulations, and the patent examiner correctly understood why a POSA would have mistakenly assumed that all buffers were equivalent, when, in the case of caspofungin in a lyophilized dosage form, the buffers are not equivalent and acetate provides unexpectedly superior stability results.

103.    Dr. Staples also states that a POSA would reasonably expect that caspofungin was crystalline based on the Schwartz reference (U.S. Patent No. 5,336,756), and that the examiner

mistakenly said caspofungin would be amorphous.  (Staples Report ¶ 59.)  I disagree that the examiner made such an error, and in fact meant the opposite—that a POSA would reasonably expect caspofungin to be amorphous.  In turn, the inventors corrected the examiner's misunderstanding of the art.

104.    First, the examiner cites the Schwartz patent as an example of the difficulty of crystallizing a cyclohexapeptide.  (MRK_CAN00000489-90.)  This is made clear when the examiner states that a crystalline lyophilized cake would allow a POSA to "avoid the difficulties associated with crystallization of amorphous substances [*i.e.*, caspofungin]."  (MRK_CAN00000492.)  The examiner, therefore, was attempting to show that caspofungin was amorphous and properly could be combined with another reference discussing amorphous proteins, Dorin.  The inventors were correct in objecting to this factually inaccurate characterization.

105.    I also disagree with Dr. Staples' opinion that you can predict whether a compound would be crystalline or amorphous based on the similarity of structure.  (Staples Report ¶ 59.)  Further, his point is irrelevant because crystalline caspofungin diacetate was already known in the art, so there would be no reason to assume (incorrectly) something already known.  (Staples Report ¶ 59.)  The inventors cited the Belyk patent (U.S. Patent No. 5,552,521) to the patent office, disclosing the crystalline diacetate salt of caspofungin (MRK_CAN00000434).  In response to the Patent Examiner, the inventors provided that same information.  (MRK_CAN00000618.)  The examiner was incorrect to assume that caspofungin was amorphous, when, in fact, the art disclosed the opposite.

106.    Dr. Staples also comments on another reference cited by the Patent Examiner, U.S. Patent No. 5,120,859 (Webb).  Dr. Staples alleges that based upon the teachings of Webb, a

ATTORNEYS' EYES ONLY – Subject to Discovery Confidentiality Order

skilled formulator would be led to use an acetate or citrate buffer "[i]n the absence of any unusual preformulation data." (Staples Report ¶ 60.) As discussed above, no stable API of caspofungin had been identified, and that itself qualifies as "unusual" because the formulation art is based on starting with a stable API. (Remington 1995, p. 1458.) Further, the teachings in Webb are not directed to caspofungin, and the stability of a caspofungin formulation could not have been predicted based on compounds other than caspofungin.

### G. Copying

107.    In my opening expert report, I performed an infringement analysis on the Sandoz proposed caspofungin products. (Opening Byrn Expert Report ¶¶ 105-109.) In that report, I concluded that Sandoz's proposed caspofungin products infringe claim 1 of the '300 patent. (*Id.* at ¶ 109.)

108.    In that same report, I performed an infringement analysis on Merck's Cancidas® products. (Opening Byrn Expert Report ¶¶ 110-114.) In that report, I concluded that Merck's Cancidas® products also meet the limitations of claim 1 of the '300 patent. (*Id.* at 114.)

109.    In comparing the Merck and Sandoz products, I conclude that Sandoz's proposed caspofungin products and Merck's Cancidas® products are identical in composition. (*See, e.g.*, SAND-CASP002624; Domenico Tr. 92:11-93:16, Feb. 24, 2011.) In fact, Sandoz's ANDA admits its products are identical to Cancidas®. (*See, e.g.*, SAND-CASP988309, SAND-CASP002624.)

110.    ████████████████████████████

████████████████████████████████████

████████████████████████████████

████████████████████████████████

**ATTORNEYS' EYES ONLY – Subject to Discovery Confidentiality Order**

██████████████████████████ *See, e.g.*, SAND-CASP758667-672; SAND-CASP790741-42; SAND-CASP653333-3528; SAND-CASP543839-45; Welz Tr., Mar. 2, 2011.)

111.    I have been informed by Merck that there is a Sandoz document that also reflects on my copying analysis, but that Sandoz will not agree to provide the document.  I reserve the right to review and rely on this document if and when it becomes available.

112.    The fact that Sandoz used the '300 patent and Cancidas® as a guide to formulating its proposed caspofungin products, attempted to change the formulation to provide an equivalent product without copying the compositions of claim 1 of the '300 patent or Cancidas®, but ultimately copied Merck's  Cancidas® products further demonstrates the nonobviousness of the compositions of claim 1 of the '300 patent.

Dated: May 10, 2011                                   _____
                                                                      Stephen R. Byrn, Ph.D.

Exhibit A

## CURRICULUM VITAE - DR. STEPHEN R. BYRN

| | |
|---|---|
| **Professional Title:** | Charles B. Jordan Professor of Medicinal Chemistry; School of Pharmacy and Pharmaceutical Sciences, Department of Industrial and Physical Pharmacy, Purdue University, West Lafayette, Indiana 47907 |
| **Home Address:** | 824 Barlow Street, West Lafayette, Indiana 47906 |
| **Marital Status:** | Married, ten children |
| **Education:** | DePauw University, Greencastle, Indiana, B.A., 1962-1966, Chemistry |
| | University of Illinois, Urbana, Illinois, Ph.D., 1966-1970, Organic and Physical Chemistry |
| | University of California, Los Angeles, California, Postdoctoral, 1970-1972, Physical Chemistry |
| **Professional Experience:** | Assistant Professor of Medicinal Chemistry, Department of Medicinal Chemistry and Pharmacognosy, School of Pharmacy and Pharmacal Sciences, Purdue University, West Lafayette, Indiana, July 1, 1972 to June 30, 1976 |
| | Associate Professor of Medicinal Chemistry, Department of Medicinal Chemistry and Pharmacognosy, School of Pharmacy and Pharmacal Sciences, Purdue University, West Lafayette, Indiana, July 1, 1976 to June 30, 1981 |
| | Professor of Medicinal Chemistry, Department of Medicinal Chemistry and Pharmacognosy, School of Pharmacy and Pharmacal Sciences, Purdue University, West Lafayette, Indiana, July 1, 1981 to present |
| | Associate Department Head of Medicinal Chemistry, Department of Medicinal Chemistry and Pharmacognosy, School of Pharmacy and Pharmacal Sciences, Purdue University, West Lafayette, Indiana, 1979 to 1988 |
| | Assistant Dean of the Graduate School, Purdue University, West Lafayette, Indiana, 1984 to 1988 |
| | Head, Department of Medicinal Chemistry and Pharmacognosy, School of Pharmacy and Pharmacal Sciences, Purdue University, West Lafayette, Indiana, l988 to 1994 |
| | Founder and Director, Purdue University Center for AIDS Research, September 30, l988 to March 1, 1998 |
| | Head, Department of Industrial and Physical Pharmacy, School of Pharmacy and Pharmacal Sciences, Purdue |

1

University, West Lafayette, Indiana, September 1, 1994 to June 30, 2009

Charles B. Jordan Professor of Medicinal Chemistry, 1992 to present.

**Memberships:**

Phi Eta Sigma, Rho Chi, Phi Lambda Upsilon, Phi Kappa Phi, Sigma Xi
American Chemical Society
American Crystallographic Association
American Association of Pharmaceutical Scientists

**Awards, Honors:**

Rector Scholar, DePauw University, 1962-1966
Sinclair Oil Company Fellow, University of Illinois, 1967-1968
National Science Foundation Graduate Fellow, University of Illinois, 1968-1971
National Institutes of Health Postdoctoral Fellow, University of California, 1971-1972
Elected Fellow, American Association of Pharmaceutical Scientists, 1989
Elected Member, United States Pharmacopeia Revision Committee, 1990-1995 & 1995-2000 & 2000-2005. Council of Experts 2000-2005, Member of several subcommittees including chemistry, dissolution, excipients and PAT.
Purdue University Representative to the USP, 2000, 2005, 2010.
Alumni Citation, DePauw University, 1991
Thomas W. Binford Memorial Award for Outstanding Contributions to Entrepreneurial Development, World of Difference Award, State of Indiana, 2000
FDA Advisory Committee Service Award, October 31, 2001
AAPS Outstanding Paper Award, 2008, APQ Section (With L. Taylor)
Purdue University, Outstanding Faculty Commercialization Award, 2008-09
AAPS David Grant Research Achievement Award in Physical Pharmacy, 2009
Special Issue (September 2010) of the Journal of Pharmaceutical Sciences was dedicated to Stephen R. Byrn, based on his contributions to the field of solid state pharmaceutics.

**Memberships, Editorial Boards and Major Committees:**

Journal of Pharmaceutical Sciences Editorial Advisory Board - 1994-present.
Pharmaceutics Editorial Advisory Board - 2009 – present
AAPS Pharm. Sci. Tech. Editorial Advisory Board – 2007 – present.
Journal of Validation Technology, Editorial Advisory board – 2010 – present.
Crystal Growth and Design Editorial Advisory Board – 2002 to 2007
Journal of Drug Targeting, 1993-1995.
Journal of Pharmaceutical and Biomedical Analysis, 1998-2002
Pharmaceutical Sciences Advisory Committee, FDA 1997-2001, Chair 2000-2001
Controlled Substances Advisory Committee, State of Indiana 1982-1998 (Chair 1995-8)
Drug Substance Technical Committee, FDA-PQRI, 1997-present (Chair 1997-2001)
.
**Professional Service:**

American Chemical Society, Secretary-Treasurer, Vice-Chairman and Chairman Purdue Section, 1976-1982

Controlled Substances Advisory Committee, l982-present, Secretary, 1987-1994, Chair, 1994-1998

American Society of Pharmacognosy, Program Committee, 1977

Symposium Organizer American Chemical Society, Division of Medicinal Chemistry, 1987

Organizer, First and Third Midwest Organic Solid State Chemistry Symposia, 1988 (University of Illinois), 1990 (Purdue University), 2005 (Purdue University, with Ken Morris)

Organizer of a Short Course, entitled "Polymorphs and Solvates of Drugs," 1988 (Bradford, England), 1990 (Purdue University), 1992 (Bradford, England)

Reviewer numerous journals including JACS, J. Org. Chem., Acc. Chem. Res., J. Pharm. Sci., Pharm. Res.

**University Committees:**

Athletic Affairs Committee, 1979-1984
Computer Center Policy Committee, 1983-1988
Commencement Committee, 1984-l989
Development Committee, 1991-2
Vision (Long Range Planning) Committee, 1993
University Promotions Committee 1995-1998.

**Departmental Committees:**

As Chair of two departments I have served on numerous departmental committees.

**Graduate School Committees:**

M.D.-Ph.D., 1984-1988
Area Committee, 1984-1988
Computer Committee, 1984-1988
Residency Review Committee, 1984-1988
David Ross Fellowship Committee, 1984

**Teaching Effort:**

Courses Taught - Undergraduate Pharmacy Curriculum

   Pharmaceutical Solids, 1998-2001.

   Regulatory Affairs, 1998-present.

   MDCH 310 - Analytical Medicinal Chemistry, l972-1997

   MDCH 418 - Computers in Pharmacy, l978-1988

   IPPH 471 – Sterile Products – Instructor in Charge 2004-05

   IPPH 363 – Industrial Pharmacy  - 2008-2010 (Instructor in charge, 2010)

Courses Taught - Graduate Curriculum

3

MDCH 614 - Advanced Medicinal Analysis, l972-1997

IPPH 590/587 - Pharmaceutical Solids 2004 - present

MDCH 698, 699 - Directed research for M.S. and Ph.D. graduate students and post-doctoral associates. 1972 - present

IPPH 521– Drug Development 2004 - present

IPPH 522 – Good Regulatory Practices 2004 – present

IPPH 562 – Pharmaceutical Manufacturing 2010

## Teaching Programs Founded – Certificate and MS Degree Program in Regulatory and Quality Compliance:

The certificate and Masters Program in Regulatory and Quality Compliance was founded in 2001. Beginning in the fall semester of 2002, Purdue University, School of Pharmacy & Pharmacal Sciences, Department of Industrial and Physical Pharmacy, will begin offering a Certificate Program in Regulatory and Quality Compliance. The purpose of this certificate program is to provide graduate students education in the important aspects of Regulatory and Quality Compliance. In this way, students will have an opportunity to improve their knowledge of regulatory and compliance issues and explore careers in these exciting areas.

This graduate certificate program consists of three courses, each 3 credit hours, that will be conducted on weekends (about one weekend per month) at the Purdue University West Lafayette campus. Participants will attend classes 9:00 am – 5:00 pm Saturday and 8-10 pm Saturday and 9:15 am – 12:15 pm on Sunday. A homework assignment and exam will be given for each major section of the course. The certificate program consists of the following courses: (1) U.S. Food and Drug Law I, (2) Drug Development, and (3) Good Practices (GXP). If taken in successive semesters (Fall, Spring, and Summer), the program can be completed in one calendar year.

The development of this program has been a joint effort between Purdue University and representatives from the pharmaceutical industry (mainly Lilly and Abbott) and the FDA.

Individuals who successfully complete the certificate program will also have the option to apply these 9 credit hours to a Master's Program in Regulatory and Quality Compliance that is still under development at Purdue.

## Graduate Students and Postdoctoral Associates:

M.S. - E. Kreutzer (1976), S. VanEss (1977), B. Stewart (1978), G. Migliaccio (1979), G. Gibson-Clay (1979), J. Gomes (1979), P. Hoyos (1982), L. Morales (1991), H. Tat (1998)

Ph.D. - G. Dolch (1976), M.D. Tsai (1978), R. Clay (1979), J. Gomes (1981), H. Martinez (1983), I. Lassalle (1984), P. Sutton (1984), P. Toren (1985), J. Chaber (l986), D. Kessler (l986), P. Hoyos (l986), E. Kolodziej (1986), D. Carlson (1989), C. Chan (1990), P. Saindon (1991), K. Ray (1992), N. Sipahimalani (1992), Wu-Po Ma (1993), D. Nugyen (1993), P. Toma (1993), G. Stephenson (1994), M. Wahle (1997), W. Xu (1997), T. Borchardt (1997), V. Joshi (1998), X. He (1999), R. Te (2000), X. Chen (2000), Y. Hu (2000), Zhihui Qui

(2001); Hui Li (2002); T. Davis (2003), A Gupta (2005), Chen Mao (2007), Faraj Atassi (2007), EunHee Lee (2007), Yuerong Hu (With L. Taylor) (2008)

Postdoctoral Associates - P.Y. Siew (1976), C.T. Lin (1980), P. Perrier (1981), J. Stowell (1984), B. Tobias (l988), C. Chan (1990), C. Cox (1990), Kin-shan Huang (1995), R. Schlam (1999); N. Poendaev (2001-2003), D. Smith (2003-2006), Eun Hee Lee (2007-2010)

Current Graduate Students - N. Tirasi, Xin Chen, Ziyang Su, Tian Xie, Saisumana Penumetcha

Current Postdoctoral Fellow – EunHee Lee

## Undergraduate Student Activities:

Counselor for Pharmacy Students, 1978-1996.
Faculty Fellow (Shreve Hall & Hillenbrand Hall), 1982-1997.
Senior Faculty Fellow (Shreve Hall), 1986-1990.
Senior Faculty Fellow (Hillenbrand Hall) 1993-1995
Adopt a Student Program, College of Pharmacy, 2009-10

## Research Interests:

### Solid State Chemistry of Drugs/Pharmaceutical Solids

Investigators: S. Byrn, E. Lee, N. Tirasi, Y. Zhang, X. Chen

The overall goal of our research is to develop the field of Solid State Chemistry of Drugs so that all of the principles and factors governing solid state chemistry are understood. This knowledge will then be used to predict and analyze all behaviors of solids observed during the drug development process. Thus, the solid state chemistry of drugs is being studied to improve knowledge of the factors which affect this chemistry and to develop new methods of studying these reactions. At present, our group is focusing stability and stability prediction/anticipation. We are also interested solid state desolvation reactions, solid state decarboxylation reactions, solid-solid reactions, and solid state rearrangements. These studies are important in that they will lead to better understanding of the mechanism of drug degradation and eventually to new approaches to stabilizing drugs. In addition, we are focusing on determining the relationship between thermal motion as measured by solid state NMR spectroscopy and X-ray crystallography, and solid state reactivity. This research has implications for the analysis of drugs, the stability of drugs, the control of drug production, and the development of methods of crystallization. By carrying out research on the solid state chemistry of drugs it is hoped that new approaches and ideas for drug analysis including solid state NMR spectroscopy will be developed. In addition, this research is aimed at providing new insight into drug stability and at developing methods for predicting drug stability. Furthermore, approaches to the production via crystallization of the desired drug form are an important component of these studies.

### Processing and Manufacturing of Pharmaceuticals

Investigators: S. Byrn, N. Tirasi

Approaches to understanding the molecular basis of pharmaceutical manufacturing are being developed. These approaches which include Raman mapping and EDS can in favorable cases provide information on the spatial location of all components in tablets and capsules. The effect of processing on the solid state chemistry of drugs and the stability of formulations is also being

investigated. Particular emphasis is placed on the wet granulation. The regulatory aspects of processing and manufacturing are also being emphasized.

### Discovery, Development, and Formulation of 4-AP Derivatives for Spinal Cord Injury – Joint with Center for Paralysis Research

Investigators: D. Smith, S. Byrn

The most devastating injury to the human body, and the least tractable, is spinal cord injury (SCI). Most SCIs result from a severe compression/contusion of the spinal cord at the time of injury and not due to the severing of the spinal cord, as is commonly assumed. This compression/contusion results in conduction block. By reversing the conduction block, it is possible to resume the passage of motor and sensory information through the area of the lesion, thus resuming some of the behaviors lost due to injury. One way of reversing the conduction block that results from SCI is by using a potassium channel blocker. Blocking the exodus of potassium ions out of the cell at the site of demyelination effectively allows the impulse to transverse the injury. Once past the legion, conduction continues along the nerve pathways as it would normally. The overall effect is: when conduction is restored, behavior is restored. This is seen in the recovery of motor control, sensation and continence along with the loss of spasticity and pain associated with the SCI. Interestingly, the positive effects of potassium channel blockade are independent of the time since injury.

This project involves developing formulations of 4-aminopyridine the best known potassium channel blocker and developing new analogs for 4-aminopyridine and utilizing these analogs in new formulations.

### Structure of Liquid Crystals

Investigators: S. Byrn, D. Smith, Z. Su

The structure of liquid crystals in general and calcium salts in particular is being investigated. The effect of water on liquid crystalline structures is also being studies. PDF X-ray methods as well as conventional techniques are being used to elucidate the mesophases of these materials. These studies will lay the groundwork for using calcium salts to control the release of drug substances.

### Methods of Analysis and Synthesis of Nanocrystalline and Nanoamorphous Drugs.

Investigators: S. Byrn, X. Chen

X-ray PDF methods are being developed to analyze nanocrystalline and nanoamorous drugs in polymers. Methods of synthesis of nanoamorphous particles is also being investigated especially as these methods relate to polymer and drug substance. These methods may ultimately lead to a technology for the controlled synthesis of amorphous nanoparticles. Additional studies are aimed at developing additives that prevent aggregation of the nanoamorphous materials. The use of these materials in taste masked pediatric formulations if of particular interest.

**Engagement Program Founded – Chao Center:**

The Chao Center is a self-supporting manufacturing facility located in the Purdue Research Park. A major donor, Dr. Allan Chao, established the Center with a very substantial gift of $5.0 million. The Chao Center is heavily involved in contract research and manufactures the anti-tuberculosis drug Seromycin for Lilly.

**Educational Program Founded – Graduate Certificate and Masters Program in Regulatory and Quality Compliance:**

The MS and Certificate program in regulatory and quality compliance was founded in 2002 with the help of Todd Chermak of Abbott. The development of this program was greatly assisted by several scientists from both Abbott and Lilly. The program has had 91 Certificate Program graduates, 3 MS graduates and currently enrolls about 30 MS students and 25 Certificate Program candidates. The program has developed 7 courses and is involved in a major distance learning expansion. The program is also intimately involved in educating scientists in several developing countries including China and Kazakhstan. The current program has a budget of about $400,000 per year.

**Publications (Books):**

Byrn, S.R., "Solid State Chemistry of Drugs," Academic Press, New York, New York, l982.

Knevel, A.M., DiGangi, F.E., and Byrn, S.R., "Quantitative Pharmaceutical Chemistry," 7th Edition, Waveland Press, Inc., Prospect Heights, Illinois, l983.

Byrn, S.R., Stowell, J.G., and Pfeiffer, R.R., Solid State Chemistry of Drugs," 2nd Edition, SSCI Press, West Lafayette, IN, 1999

**Publications:**

1. Weingarten, H., Miles, M.G., Byrn, S.R., and Hobbs, C.F., *J. Am. Chem. Soc.*, l967, **89**, 5874, "Amination of $\beta$-Dicarbonyl Compounds with Tetrakis (dimethylamino) Titanium."

2. Curtin, D.Y. and Byrn, S.R., *J. Am. Chem. Soc.*, 1969, **91**, 1865, "Stereoisomrism at the Oxygen:Carbon Single Bond Due to Hydrogen Bonding. Structures of the Yellow and White Crystalline Forms of Dimethyl 3,6- Dichloro-2,5-Dihydroxy-terephthalate."

3. Curtin, D.Y. and Byrn, S.R., *J. Am. Chem. Soc.*, 1969, **91**, 6102, "Structures in Solution of the Yellow and White Forms of Dimethyl 3,6-Dichloro-2,5-Dihydroxyterephthalate."

4. Curtin, D.Y., Byrn, S.R., and Pendergrass, D.B., Jr., *J. Org. Chem.*, 1969, **34**, 3345, "Thermal Rearrangement of Arylazotribenzoyl-methanes in the Solid State. Examination with Differential Thermal Analysis."

5. Byrn, S.R., Maverick, E., Muscio, O.J., Trueblood, K.N., and Jacobs, T.L., *J. Am. Chem. Soc.*, 1971, **93**, 6680, "The Structure of Two Head to Head Allene Dimers."

6. Byrn, S.R., Curtin, D.Y., and Paul, I.C., *J. Am. Chem. Soc.*, 1972, **94**, 890, "The X-Ray Crystal Structure of the Yellow and White Forms of Dimethyl 3,6-Dichloro-2,5-

7

Dihydroxyterephthalate and a Study of the Conversion of the Yellow Form to the White Form in the Solid State."

7.  Wang, A.H.J., Misavage, R.J., Byrn, S.R., and Paul, I.C., *J. Am. Chem. Soc.*, 1972, **94**, 7100, "The Crystal and Molecular Structure of 1-Azabicyclo (3.3.3) Undecane Hydrochloride. Correlation of Molecular Dimensions with Spectroscopic Properties."

8.  Byrn, S.R., *Biochemistry*, 1974, **13**, 5186, "The Cation-Binding Properties of Gramicidin."

9.  Byrn, S.R., *Indiana Pharmacist*, 1974, **79**, "Caution Advised in Handling Neutral Red Dye."

10.  Byrn, Stephen R., *Amer. Jour. Pharm. Ed.*, 1975, **40**, 295, "Combined BS:MS Programs: Alternatives for Pharmacy Students."

11.  Byrn, S.R., *J. Pharm. Sci.*, 1976, **65**, 1-22, "Mechanisms of Solid-State Reactions of Drugs."

12.  Byrn, S.R. and Lin, C.T., *J. Am. Chem. Soc.*, 1976, **98**, 4004, "The Effect of Crystal Packing and Defects on the Desolvation of Hydrate Crystals of Caffeine and L(-)-1,4-cyclohexadiene-1-alanine."

13.  Byrn, S.R., Graber, C.W., and Midland, S.L., *J. Org. Chem.*, 1976, **41**, 2283, "Comparison of the Solid State and Solution Conformation of Methapyriline, Tripelennamine, Diphenhydramine, Histamine and Choline. The IR-X-Ray Method for Determination of Solution Conformation."

14.  Byrn, S.R. and Siew, P.Y., *J. Chem. Soc.*, 1977, Perkin II, 144, "The Structure and Conformation of β-Thiodan in the Solid State and in Solution. Application of the IR-X-Ray Method."

15.  Weintraub, H.J.R., Tsai, M.D., Byrn, S.R., Chang, C.-j., and Floss, H.G., *Int. J. Quantum Chem.*, *Quantum Biology Symp.*, 1976, **3**, 99, "Conformational Analysis of Some Pyridoxal Amino Acid Schiff Bases."

16.  Stamos, I.K., Howie, G.A., Manni, P.E., Haws, W.J., Byrn, S.R., and Cassady, J.M., *J. Org. Chem.*, 1977, **42**, 1703, "Synthesis and Structures of Dilactones Related to Anemonin."

17.  Otten, J.G., Yeh, C.S., Byrn, S.R., and Morrison, H.A., *J. Amer. Chem. Soc.*, 1977, **99**, 6353, "Solution Phase Photodimerization of Tetramethyl Uracil. Further Studies of Ground-State Aggregates."

18.  Byrn, S.R. and Dolch, G.D., *J. Pharm. Sci.*, 1978, **67**, 688, "Analysis of the Binding of Daunomycin and Doxorubicin to DNA Using Computerized Curve Fitting Procedures."

19.  Lin, C.T., Siew, P.Y., and Byrn, S.R., *J. Chem. Soc.*, 1978, Perkin II, 957, "Solid State Dehydrochlorination and Decarboxlation Reactions I. Reactions of *p*-Aminosalicylic Acid Hydrochloride and *p*-Aminosalicylic Acid and the Crystal Structure of *p*-Aminosalicylic Acid."

20.  Lin, C.T., Siew, P.Y., and Byrn, S.R., *J. Chem. Soc.*, 1978, Perkin II, 963, "Solid State Dehydrochlorination and Decarboxylation Reactions II. Reactions of Three Crystal Habits of *p*-Aminosalicylic Acid Hydrochloride and the Crystal Structure of *p*-Aminosalicylic Acid Hydrochloride."

21. Tsai, M.D., Weintraub, H.J.R., Byrn, S.R., Chang, C.-j., Floss, H.G., *Biochemistry*, 1978, **17**, 3183, "Conformational-Reactivity Relationships for Pyridoxal Schiff's Bases of Amino Acids."

22. Tsai, M.D., Byrn, S.R., Chang, C.-j., Floss, H.G., and Weintraub, H.J.R., *Biochemistry*, 1978, **17**, 3177, "Conformational Analysis of Pyridoxal Schiff's Bases. NMR Studies of the Conformation about the $C_4$-$C_{4'}$, C-C, and N-C Bonds of the Pyridoxal Schiff's Bases of Amino Acids."

23. Cassady, J.M., Byrn, S.R., Stamos, I.K., Evans, S.M., and McKenzie, A., *J. Med. Chem.*, 1978, **21**, 815, "Potential Antitumor Agents. Synthesis, Reactivity and Cytotoxicity of Alpha-Methylene Carbonyl Compounds."

24. Lin, C.T. and Byrn, S.R., *Tetrahedron Letters*, 1978, **1975**, "Solvolysis of Hydrazobenzene in Methyl Iodide."

25. Lin, C.T. and Byrn, S.R., *Mol. Cryst. and Liq. Cryst.*, 1979, **50**, 99, "Desolvations of Solvated Organic Crystals."

26. Lin, C.T. and Byrn, S.R., *Tet. Lett.*, 1979, **4623**, "Solid Gas Reaction of Hydrazobenzene with Methyl Iodide."

27. Migliaccio, G.P. and Byrn, S.R., *J. Pharm. Sci.*, 1981, **70**, 284, "Comparisons of the Rotamer Populations of Nialamide, Chloroquine and Azaperone in the Solid State and in Solution."

28. Siew, P.Y. and Byrn, S.R., *J. Pharm. Sci.*, 1981, **70**, 280, "The Crystal Structure and Solid State Behavior of Aspirin Anhydride."

29. Pyne, S.G., Hensel, M.J., Byrn, S.R., McKenzie, A.T., and Fuchs, P.L., *J. Amer. Chem. Soc.*, 1980, **102**, 5960, "Cytochalasin Support Studies, Chiral and Stereochemical Control via an Intramolecular Diels-Alder Reaction of a (Z-)-Diene."

30. Migliaccio, G.P., Shieh, T.L., Byrn, S.R., Hathaway, B.A., and Nichols, D.E., *J. Med. Chem.*, 1981, **70**, 284, "Comparison of Solution Conformational Preferences for the Hallucinogens Bufotenin and Psilocin using 360 MHz Proton NMR Spectroscopy."

31. Chang, C.-j., Gomes, J.D., and Byrn, S.R., *J. Amer. Chem. Soc.*, 1981, **103**, 2892, "Chemical Modification of Deoxyribonucleic Acids: A Direct Study by NMR Spectroscopy."

32. Clay, G.G., Byrn, S.R., and Heinstein, P.H., *J. Pharm. Sci.*, 1982, **71**, 467, "The Interaction of Granacticin with Nucleic Acids and Pyruvate Decarboxylase."

33. Perrier, P. and Byrn, S.R., *J. Org. Chem.*, 1982, **47**, 4671, "The Influence of Crystal Packing on the Desolvation of Purine and Pyrimidine Hydrates."

34. Perrier, P. and Byrn, S.R., *J. Org. Chem.*, 1982, **47**, 4677, "Dehydration of Glucuronamide Hydrate. Confirmation of the Predicted Influence of Crystal Packing on Dehydration Reactions."

35. Lin, C.T., Perrier, P., Clay, G.G., Sutton, P.A., and Byrn, S.R., *J. Org. Chem.*, 1982, **47**, 2978, "Solid State Photooxidation of Coritisol-21-tert-butylacetate to Cortisone-21-tert-butylacetate."

36. Shieh, T.L. and Byrn, S.R., *J. Med. Chem.*, 1982, **25**, 403, "The Solution Conformation of the Thermolysin Inhibitors Carbobenzoxy-*L*-phenylalanine and *β*-Phenylpropionyl-*L*-phenylalanine and Comparison of the Solution Conformation to the Enzyme Bound Conformation."

37. Clay, R.J., Knevel, A.M., and Byrn, S.R., *J. Pharm. Sci.*, 1982, **71**, 1289, "The Desolvation and Oxidation of Crystals of Dialuric Acid Monohydrate."

38. Shieh, T.L., Lin, C.T., McKenzie, A.T., and Byrn, S.R., *J. Org. Chem.*, 1983, **26**, 3103, "Relationship Between the Solid State and Solution Conformations of *β*-benzylaminocrotonate."

39. Donaldson, R.E., Saddler, J.C., Byrn, S.R., McKenzie, A.T., and Fuchs, P.L., *J. Org. Chem.*, 1983, **48**, 2167, "A Triply Convergent Total Synthesis of *L*-(-)-Prostaglandin E$_2$."

40. Chang, C.J., DaSilva Gomes, J., and Byrn, S.R., *J. Org. Chem.*, 1983, **48**, 5151, "Chemical Modification of Deoxyribonucleic Acids: A Direct Study by Carbon-13 Nuclear Magnetic Resonance Spectroscopy."

41. Stewart, B.S., Midland, S.L. and Byrn, S.R., *J. Pharm. Sci.*, 1984, **73**, 1322-1323, "Degradation of Crystalline Ergocalciferol."

42. Ebrahim El-Zayat, A.A., Ferringni, N.R., McCloud, T.G., McKenzie, A.T., Byrn, S.R., Cassady, J.M., Chang, C.-j., and McLaughlin, J.L., *Tetrahedron Letters*, 1985, **26**, 955, "Goniothalenol: A Novel, Bioactive, Tetrahydrofurano-2-pyrone from *Goniothalamus giganteus* (Annonaceae)."

43. Mossa, J.S., Cassady, J.M., Antoun, M.D., Byrn, S.R., McKenzie, A.T., Kozlowski, J.F. and Main, P., *J. Org. Chem.*, 1985, **50**, 916-918, "Saudin, a Hypoglycemic Diterpenoid with a Novel 6,7-Secolabdane Carbon Skeleton, from *Cluytia richardiana*."

44. Byrn, S.R., Gray, G., Frye, J., and Pfeiffer, R.R., *J. Pharm. Sci.*, 1985, **73**, 565-568, "Analysis of Solid-State Carbon-13 NMR Spectra of Polymorphs (Benoxaprofen and Nabilone) and Pseudopolymorphs (Cefaolin)."

45. Byrn, S.R., Chapter 29. Solid State Organic Chemistry and Drug Stability, Annual Reports in Medicinal Chemistry, 1986, 287-294.

46. Byrn, S.R., McKenzie, A.T., Hassan, M.M.A., and Al-Badr, A.A., *J. Pharm. Sci.*, 1986, **75**, 596-600, "Conformation of Glyburide in the Solid State and in Solution."

47. Byrn, S.R. and Kessler, D.W., *Tetrahedron*, 1987, **43**, 1335-1343, "The Solid State Reactivity of the Crystal Forms of Hydrocortisone Esters."

48. Sutton, P.A. and Byrn, S.R., *J. Pharm. Sci.*, 1987, **76**, 253-258, "The Crystal Structure of Two Crystal Forms of 9*α*-Fluorocortisol Acetate. Variation of the Conformation of the A Ring of Steroids due to Crystal Packing."

49. Byrn, S.R., Perrier, P., Lin, C.T., Martinez, H., and Pfeiffer, R.R., *Pharmaceutical Research*, 1987, **4**, 137-141, "The Solid State Decarboxylation of the Diammonium Salt of Moxalactam."

50. Ho, D.K., McKenzie, A.T., Byrn, S.R., and Cassady, J.M, *J. Org. Chem.*, 1987, **52**, 342-347, "O$^5$-Methyl-(q)-2´*R*,3´*S*-Psorospermin."

51. Hedstrand, D.M., Byrn, S.R., McKenzie, A.T. and Fuchs, P.L., *J. Org. Chem.*, l987, **52**, 592-598, "Use of an Axian β-Face Thiomethyl Control Element in Intramolecular Conjugate Additions.  Synthesis of a Tricyclic Bruceantin Precursor."

52. Byrn, S.R., Sutton, P.A., and Tobias, B., *J. Am. Chem. Soc.*, l988, **ll0**, l609-l6l4, "The Crystal Structure, Solid State NMR Spectra, and Oxygen Reactivity of Five Crystal Forms of Prednisolone tert-butylacetate."

53. Riggs, Robert M., McKenzie, Ann T., Byrn, Stephen R., Nichols, David E., Foreman, Mark M., and Truex, Lewis L., *J. Med. Chem.*, l987, **30**, l9l4-l8, "Effect of β-Alkyl Substitution on D-l Dopamine Agonist Activity:  Absolute Configuration of β-Methyldopamine."

54. Habib, A.M., Ho, David K., Masuda, S., McCloud, T., Reddy, K.S., Aboushoer, M., McKenzie, A., Byrn, S. R., Chang, Ching Jer,and Cassady, John M. *J. Org. Chem.*, l987, **52**, 412-l8, "Structure and Stereochemistry of Psorospermin and Related Cytotoxic Dihydrofuranoxanthones from *Psorospermum febrifugum*."

55. Mossa, Jaber S., Cassady, John M., Kozlowski, John F., Zennie, Thomas M., Antoun, Mikhail D., Pellechia, Marianne G., McKenzie, Ann T., and Byrn, Stephen R., *Tetrahedron Lett.*, l988, **29**, 3627-30, "Novel 6,7-seco-6,11-cyclolabdane Diterpenes from *Cluytia richardiana*."

56. Lassalle, I., Hoyos, P.H., Byrn, S.R., Weith, H.L., *Nucleosides and Nucleotides*, 1989, **6**, 1071, "Sequence Preference of Acridine Interaction with Single and Double Stranded Octadeoxyribonucleotides."

57. Cushman, M., Patrick, D., Toma, P., Byrn, S.R., *Tetrahedron Letters*, 1989, **30**, 7161-7164, "A Novel ring System from Intramolecular Oxidative Cyclization of 8-(4-Pentenyl)dihydroberberine."

58. Martinez, H., Byrn, S. R., Pfeiffer, R.R., *Pharm. Res.*, 1990, **7**, 147-153, "Solid State Chemistry and Crystal Structure of Cefaclor Dihydrate."

59. Shieh, T.L., Hoyos, P., Kolodziej, E., Stowell, J.G., Baird, W.M., Byrn, S. R., *J. Med. Chem.*, 1990, **33**, 1225-1230, "Properties of the Nucleic Acid Photoaffinity Labeling Agent, 3-Azido-Amsacrine."

60. Byrn, S.R., Ray, K., Stowell, J.G., Toma, P., *Acta Cryst., Sect. C*, 1990, **C46**, 1573-1576, "Crystal Structure of Acridinyl Ethanol."

61. Alkofahi, A., Ma, W.W., McKenzie, A.T., Byrn, S.R., McLaughlin, J.L., *J. Natural Products*, 1989, **52**, 1371-1373.

62. Ma, W.W., Anderson, J.E., McKenzie, A.T., Byrn, S.R., McLaughlin, J.L., and Hudson, M.S., *J. Nat. Prod.*, 1990, **63**, 1009-1014, "Tubulosine: An Antitumor Constituent of *Pogonopus speciosus*."

63. Pidgeon, C., Weith, H.L., Darbishire-Weith, D., Cushman, M., Byrn, S.R., Chen, J.-K., Stowell, J.G., Ray, K., and Carlson, D., *Anals. New York Acad. Sci.*, 1991, **616**, 593-596, "Synthesis and Liposome Encapsulation of Antisense Oligonucleotides-Intercalator Conjugates."

11

64. Byrn, S.R., Tobias, B., Kessler, D., Frye, J., Sutton, P. Saindon, P., and Kozlowski, J., *Trans. Amer. Cryst. Assoc.,* 1989, **24**, 41-54, "Relationship Between Solid State NMR and Crystal Structures of Polymorphs and Solvates of Drugs."

65. Byrn, S.R., Carlson, D.V., Chen, J.K., Cushman, M.S., Goldman, M.E., Ma, W.P., Pidgeon, C.L., Ray, K.A., Stowell, J.G., and Weith, H.L., *Adv. Drug. Delivery Rev.,* **6**, 1991, 287-308, "Drug-Oligonucleotide Conjugates."

66. Stowell, J.G., Toma, P.H., and Byrn, S.R., *Acta Cryst.,* **C47**, 1991, 1635-1637, "9,10-Dihydro-9-methylacridine."

67. Stowell, J.G., Toma, P.H., and Byrn, S.R., *Acta Cryst.,* **C47**, 1991, 1637-1640, "9-Phenylacridine and 9-Phenylacridine Hydrochloride."

68. Stowell, J.G., Toma, P.H., and Byrn, S.R., *Biorg. and Med. Chem. Letters,* **2**, 1992, 185-190, "The Structure of MK-571 (Form I) at 170K and Conformational Analysis by Molecular Modeling."

69. Saindon, P.J., Cauchon, N.S., Sutton, P.A., Chang, C.J., Peck, G.E., and Byrn, S.R., *Pharm. Res.,* **10**, 1993, 197-203, "Solid-State NMR Spectra of Pharmaceutical Dosage Forms."

70. Dalla Riva Toma, J.M., Toma, P.H., Fanwick, P.E., Bergstrom, D.E., Byrn, S.R., *J. Cryst. and Spect. Res.,* **23**, 1993, 41-47. Photochemical Synthesis and Crystal Structure of two Potentially Useful Metal Carbonyl Complexes: Pentacarbonyl ($\eta^2$-*cis*-cyclooctene)-tungsten(0) and tetracarbonylbis ($\eta^2$-*cis*-cyclooctene)-tungsten(0).

71. Toma, P.H., Nguyen, D.N., Byrn, S.R., *Acta Cryst., C49, 1993, 914-916.* 9-Chloro-2-ethoxy-6-nitroacridine.

72. Stephenson, G.A., Stowell, J.G., Toma, P.A., Dorman, D.E., Greene, J.R., and Byrn, S.R., *J. Am. Chem. Soc.,* **116**, 5766 (1994). Solid-state analysis of Polymorphs, Isomorphic, and Solvated Forms of Dirithromycin.

73. Ma, Wu Po, Hamilton, S.E., Stowell, J.G., Byrn, S.R., and Davisson, V.J., *Biorg. & Med. Chemistry,* **2**, 169-179 (1994). Sequence Specific Cleavage of Messenger RNA by a Modified Ribonuclease H.

74. Byrn, S.R., Pfeiffer, R.R., Stephenson, G., Grant, D.J.W., and Gleason, W.B., *Chemistry of Materials*, **6**, 1148 (1994). Solid-State Pharmaceutical Chemistry.

75. Toma, P.H., Kelley, M.P., Borchardt, T.B., Byrn, S.R., and Kahr, B., *Chemistry of Materials,* 6, 1317 (1994). Chromoisomers and Polymorphs of 9-Phenylacridinium Hydrogen Sulfate.

76. Huang, K.-S., Britton, D., Etter, M.C., and Byrn, S.R., *J. Materials Chemistry,* 1995, **5**, 379-383. Polymorphic Characterization and Structural Comparisons of the NLO Active and Inactive Forms of Two Polymorphs of 1,3-Bis(m-nitrophenyl)urea.

77. Byrn, S.R., Pfeiffer, R.R., Ganey, M., Hoiberg, C., and Poochikian, G., *Pharm Res.* 12, 945-954 (1995). Pharmaceutical Solids: A Strategic approach to Regulatoriy Considerations.

78. Saleki-Gerhardt, A., Stowell, J.G., Byrn, S.R., and Zografi, G., *J. Pharm. Sci.* 84, 318-323 (1995). Hydration and Dehydration of Crystalline and Amorphous Forms of Raffinose.

79. Byrn, S. R. and J. G. Stowell *J. Drug Targeting* 3(4): 239-41 (1995). "Drug targeting using conjugates: the importance of pharmaceutical chemistry.".

80. Akers, M. J., N. Milton, et al. *Pharm. Res* 12(10): 1457-61 (1995). "Glycine crystallization during freezing: the effects of salt form, pH, and ionic strength."

81. Huang, K. S., D. Britton, Etter, M.C., and Byrn, S.R.;*J. Mater. Chem* 5(3): 379-83 (1995). "Polymorphic characterization and structural comparisons of the non-linear optically active and inactive forms of two polymorphs of 1,3-bis(m-nitrophenyl)urea.".

82. Huang, K. S., D. Britton, Etter, M.C., and Byrn, S.R.; *J. Mater. Chem* 6(2): 123-9 (1996). "Synthesis, polymorphic characterization and structural comparisons of the non-linear optically active and inactive forms of polymorphs of 3-(nitroanilino)cycloalk-2-en-1-ones.".

83. Morales, L., Stowell, J.G., and Byrn, S.R.; *Rev. Boliv. Quim* 12(1): 59-67(1995). "Alkyl substituted acridine synthesis. I. Organometallic synthesis.".

84. Stephenson, G. A., Borchardt, T. B., Bunnell, C., Snorek, S., Bowyer, J., Yu, L., and Byrn, S, *J. Pharm. Sci* 84(11): 1385-6. (1995). "Conformational and Color Polymorphism of 5-Methyl-2-[(2- nitrophenyl)amino]-3-thiophenecarbonitrile."

85. Wahle, M.C., Stowell, J.G., and Byrn, S.R., *Acta Crystallogr., Sect. C, Cryst. Struct. Commun.*, c52, 325-8 (1996). "Sodium 3α, 7α, 12α-trihydroxy-5β-cholan-24-oate ethanolate (sodium cholate ethanolate)."

87. Wahle, M.C., and Byrn, S.R., *Acta Crystallogr., Sect. C, Cryst. Struct. Commun.*, C52, 2495-2499 (1996). "Sodium Cholate Methanolate and Sodium Cholate 2-Propanolate."

88. Wahle, M.C. and Byrn, S.R., *Acta Crystallogr., Sect. C, Cryst. Struct. Commun.*, C52, 2500-2502 (1996). "3α, 7α, 12α-Trihydroxy-5β-cholan-24-oic Acid Methyl Ester Ethanolate (Methyl Cholate Ethanolate)."

89. Stephenson, G.A., Wozniak, T.J., Stowell, J.G., and Byrn, S.R., *J. Mol. Struct.*, 380, 93-100 (1996). "Nizatidine, N-[2-[[[2[(dimethylamino)methyl]-4-thiazoyl]methyl]thio]ethyl]-N'-methyl-2-nitro-1,1-ethenediamine."

90. Stephenson, Gregory A.; Pfeiffer, Ralph R.; Byrn, Stephen R., *Int. J. Pharm.*, 146(1), 93-99 (1997). Solid-state investigation of the tautomerism of acetohexamide.

91. Wahle, Mark C. and Byrn, Stephen R., *Acta Crystallogr., Sect. C: Cryst. Struct. Commun.*, C53(3), 334-339 (1997). Hydrated structures of N-methylated cholamide derivatives.

92. Kim, Chinpal; MacKellar, Warren C.; Cho, NaMi; Byrn, Stephen R. ; Morre, D. James, *Biochim. Biophys. Acta*, 1324(2), 171-181 (1997). Impermeant antitumor sulfonylurea conjugates that inhibit plasma membrane NADH oxidase and growth of HeLa cells in culture. Identification of binding proteins from sera of cancer patients.

93. Wahle, Mark C.; Fanwick, Phillip E.; Byrn, Stephen R., *Acta Crystallogr., Sect. C: Cryst. Struct. Commun.*, C53(4), 480-482 (1997). Cholamide dihydrate.

94. Shalaev, Evgenyi Yu.; Byrn, Stephen R.; Zografi, George, *Int. J. Chem. Kinet.*, 29(5), 339-348 (1997). Single-phase and heterophase solid-state chemical kinetics of thermally induced methyl transfer in tetraglycine methyl ester.

95. Huang, Kin-Shan; Britton, Doyle; Etter, Margaret C.; Byrn, Stephen R., *J. Mater. Chem.*, 7(5), 713-720 (1997). A novel class of phenol-pyridine co-crystals for second harmonic generation.

96. Stahly, G. Patrick; McKenzie, Ann T.; Andres, Mark C.; Russell, Catherine A.; Byrn, Stephen R.; Johnson, Pete , *J. Pharm. Sci.*, 86(8), 970-971 (1997). Determination of the Optical Purity of Ibuprofen Using X-ray Powder Diffraction.

97. Shalaev, Evgenyi Yu.; Shalaeva, Marina; Byrn, Stephen R.; Zografi, George, *Int. J. Pharm.*, 152(1), 75-88 (1997). Effects of processing on the solid-state methyl transfer of tetraglycine methyl ester.

98. Stephenson, Gregory A.; Stowell, Joseph G.; Toma, Pascal H.; Pfeiffer, Ralph R.; Byrn, Stephen R., *J. Pharm. Sci.*, 86(11), 1239-1244 (1997). Solid-State Investigations of Erythromycin A Dihydrate Structure, NMR Spectroscopy, and Hygroscopicity.

99. Xu, Wei; Wahle, Mark C.; Stowell, Joseph G.; Byrn, Stephen R., *Acta Crystallogr., Sect. C: Cryst. Struct. Commun.*, C53(12), 1917-1919 (1997). Spirapril hydrochloride hydrate.

100. Joshi, Vidya; Stowell, Joseph G.; Byrn, Stephen R. Mol. Cryst. Liq. Cryst. Sci. Technol., Sect. A, 313, 265-270 1998. Solid-state stability of indomethacin solvates.

101. Borchardt, Thomas B.; Stowell, Joseph G.; Byrn, Stephen R. Mol. Cryst. Liq. Cryst. Sci. Technol., Sect. A, 313, 271-276 (English) 1998. The crystallization of 5-methyl-2-[(2-nitrophenyl)amino]-3-thiophenecarbonitrile in the presence of structurally similar compounds.

102. Morris, K.R., Nail, S.L., Peck, G.E., Byrn, S.R., Griesser, U.J., Stowell, J.G., Hwang, S-J, Park, K, "Advances in pharmaceutical materials and processing", <u>Pharmaceutical Science and Technology Today</u>, Volume 1, No. 6, September 1998.

103. Smith, Jay; MacNamara, Ernesto; Raftery, Daniel; Borchardt, Thomas; Byrn, Stephen J. Am. Chem. Soc., 120(45), 11710-11713 (English) 1998. Application of Two-Dimensional 13C Solid-State NMR to the Study of Conformational Polymorphism.

104. Chongprasert, Suchart; Griesser, Ulrich J.; Bottorff, Arthur T.; Williams, N. Adeyinka; Byrn, Stephen R., Nail, Steven L . J. Pharm. Sci., 87(9), 1155-1160 Effects of Freeze-Dry Processing Conditions on the Crystallization of Pentamidine Isethionate.

105. Yu, Lian; Stephenson, Gregory A.; Mitchell, Christine A.; Bunnell, Charles A.; Snorek, Sharon V.; Bowyer, J. Joe; Borchardt, Thomas B.; Stowell, Joseph G.; Byrn, Stephen R. J. Am. Chem. Soc., 122(4), 585-591, 2000. Thermochemistry and Conformational Polymorphism of a Hexamorphic Crystal System.

106. Guo, Yushen; Byrn, Stephen R., Zografi, George; Pharm. Res., 17(8), 930-935 2000. Effects of lyophilization on the physical characteristics and chemical stability of amorphous quinapril hydrochloride.

107. Guo, Yushen; Byrn, Stephen R., Zografi, George; J. Pharm. Sci., 89, 128-143, 2000. Physical characteristics and chemical degradation of amorphous quinapril hydrochloride.

108. Morris, Kenneth R.; Stowell, Joseph G.; Byrn, Stephen R.; Placette, Allen W.; Davis, Tiffani D.; Peck, Garnet E.; Drug Dev. Ind. Pharm., 26(9), 985-988, 2000. Accelerated fluid bed drying using NIR monitoring and phenomenological modeling.

109. Zografi, Z., Byrn, S.R., Symposium on the Properties of Water in Foods], Helsinki, Finland, May 30-June 4, 1998, Meeting Date 1998, 397-410. Editor(s): Roos, Yrjo H.; Leslie, R. B.; Lillford, Peter J. Technomic Publishing Co., Inc.: Lancaster, Pa. (English) 1999. The effects of residual water on solid-state stability of drugs and drug products.

110. He, Xiaorong; Griesser, Ulrich J.; Stowell, Joseph G.; Borchardt, Thomas B.; Byrn, S.R. ; J. Pharm. Sci., 90, 371, 2001. Conformational color polymorphism and control of crystallization of 5-methyl-2-[(4-methyl-2-nitrophenyl)amino]-3-thiophenecarbonitrile.

111. He, Xiaorong; Stowell, Joseph G.; Morris, Kenneth R.; Pfeiffer, Ralph R.; Li, Hui; Stahly, G. Patrick; Byrn, Stephen R.; Stabilization of a Metastable Polymorph of 4-Methyl-2-nitroacetanilide by Isomorphic Additives. Crystal Growth and Design, 1, 305-312, 2001.

112. Byrn, S. R.; Xu, W.; Newman, A. W.; Chemical reactivity in solid-state pharmaceuticals: formulation implications. Advanced Drug Delivery Reviews, 48(1), 115-136, 2001.

113. Pagola, S.; Stephens, P. W.; He, X.; Byrn, S. R.; Crystal structure solution of the dark red, light red and orange polymorphs of 5-methyl-2-[(2-nitro-4-methylphenyl)amino]-3-thiophenecarbonitrile by high resolution X-ray powder diffraction and simulated annealing techniques. Materials Science Forum, 378-381(Pt. 2, EPDIC 7, Part 2), 789-794 (English) 2001.

114. Reutzel-Edens, Susan M.; Bush, Julie K.; Magee, Paula A.; Stephenson, Greg A.; Byrn, Stephen R.; Anhydrates and Hydrates of Olanzapine: Crystallization, Solid-State Characterization, and Structural Relationships. Growth & Design, 3(6), 897-907, 2003

115. Griesser, Ulrich J.; Morris, Kenneth R.; Byrn, Stephen R.; Stowell, Joseph G. X-ray Diffraction and Solid-State NMR Investigation of the "Single-Crystal to Single-Crystal Dehydration of Thiamine Hydrochloride." Crystal Growth & Design, 3(6), 997-1004, 2003

116. Tishmack, Patrick A.; Bugay, David E., Byrn, Stephen R., "Solid-state nuclear magnetic resonance spectroscopy-pharmaceutical applications." Journal of Pharmaceutical Sciences, 92(3), 441-474 (English) 2003

117. Chen, Xiaoming; Morris, Kenneth R.; Griesser, Ulrich J.; Byrn, Stephen R. ; Stowell, Joseph G. "Reactivity Differences of Indomethacin Solid Forms with Ammonia Gas." Journal of the American Chemical Society, 124(50), 15012-15019, 2002.

118. Newman, Ann W.; Byrn, Stephen R., "Solid-state analysis of the active pharmaceutical ingredient in drug products." Drug Discovery Today, 8(19), 898 -905.

119. Davis, Tiffani D.; Morris, Kenneth R.; Huang, Huapeng; Peck, Garnet E.; Stowell, Joseph G.; Eisenhauer, Bradley J.; Hilden , Jon L.; Gibson, David; Byrn, Stephen R, "In situ Monitoring of Wet Granulation Using Online X-Ray Powder Diffraction," Pharmaceutical Research, 20(11), 1851-1857, 2003.

120. Davis, Tiffani D.; Peck, Garnet E.; Stowell, Joseph G.; Morris, Kenneth R.; Byrn, Stephen R., "Modeling and Monitoring of Polymorphic Transformations During the Drying Phase of Wet Granulation." Pharmaceutical Research, 21 (5), 860-866, 2004.

121. Stephen R. Byrn, Simon Bates, and Igor Ivanisevic. Regulatory Aspects of X-ray Powder Diffraction, Part I. American Pharmaceutical Review, 8(3), 55-59 May/Jun 2005.

122. Stephen R. Byrn, Simon Bates, and Igor Ivanisevic. Regulatory Aspects of X-ray Powder Diffraction, Part II. American Pharmaceutical Review, 8(4), 137-141 Jul/Aug 2005.

123. Stephen Byrn, Kenneth Morris, Shawn Comella, Reducing Time to Market with A Science-Based Product Management Strategy, Pharmaceutical Technology, Aug. 1, 2005.

124. Terakita, Akira; Byrn, Stephen R., Structure and physical stability of hydrates and thermotropic mesophase of calcium benzoate. Journal of Pharmaceutical Sciences, 95(5), 1162-1172, 2006.

125. McBride, Jennifer M.; Smith, Daniel T.; Byrn, Stephen R.; Borgens, Richard B.; Shi, Riyi Dose responses of three 4-aminopyridine derivatives on axonal conduction in spinal cord trauma. European Journal of Pharmaceutical Sciences, 27(2-3), 237-242, 2006.

126. Qiu, Zhihui; Stowell, Joseph G.; Cao, Wenjin; Morris, Kenneth R.; Byrn, Stephen R.; Carvajal, M. Teresa. Effect of milling and compression on the solid-state Maillard reaction. . Journal of Pharmaceutical Sciences, 94(11), 2568-2580, 2005.

127. Qiu, Zhihui; Stowell, Joseph G.; Morris, Kenneth R.; Byrn, Stephen R.; Pinal, Rodolfo Kinetic study of the Maillard reaction between metoclopramide hydrochloride and lactose. International Journal of Pharmaceutics, 303(1-2), 20-30, 2005.

128. Chen, Xiaoming; Griesser, Ulrich J.; Te, Ruth L.; Pfeiffer, Ralph R.; Morris, Kenneth R.; Stowell, Joseph G.; Byrn, Stephen R., Analysis of the acid-base reaction between solid indomethacin and sodium bicarbonate using infrared spectroscopy, X-ray powder diffraction, and solid-state nuclear magnetic resonance spectroscopy. Journal of Pharmaceutical and Biomedical Analysis, 38(4), 670-677, 2005.

129. Smith, Daniel T.; Shi, Riyi; Borgens, Richard B.; McBride, Jennifer M.; Jackson, Kevin; Byrn, Stephen R. Development of novel 4-aminopyridine derivatives as potential treatments for neurological injury and disease. European Journal of Medicinal Chemistry, 40(9), 908-917, 2005.

130. Byrn, Stephen R.; Pfeiffer, Ralph R.; Stowell, Joseph G. Polymorphs, regulations, crystallization, and solid-state chemistry. American Pharmaceutical Review, 5(3), 92, 94, 96-99, 2002.

131. Hu, Yuerong; Wikstrom, Hakan; Byrn, Stephen R.; Taylor, Lynne S. Analysis of the effect of Particle size on Polymorphic Quantitation by Raman spectroscopy. Applied Spectroscopy, 60(9), 977-984, 2006.

132. Atassi, Faraj; and Byrn, Stephen R. General Trends in the Desolvation Behavior of Calcium Salts. Pharmaceutical Research, 23(10), 2405-2412, 2006.

133. Li, Hui; Stowell, Joseph G.; Borchardt, Thomas B.; Byrn, Stephen R. Synthesis, Conformational Polymorphism, and Construction of a G-T Diagram of 2-[(2-Nitrophenyl)amino]-3-thiophenecarbonitrile. Crystal Growth & Design, 6(11), 2469-2474, 2006.

134. Mao, Chen; Chamarthy, Sai Prasanth; Byrn, Stephen R. ; Pinal, Rodolfo A Calorimetric Method to Estimate Molecular Mobility of Amorphous Solids at Relatively Low Temperatures. Pharmaceutical Research, 23(10), 2269-2276, 2006.

135. Crooks, Peter A.; Kottayil, Santosh G.; Al-Ghananeem, Abeer M.; Byrn, Stephen R.; Butterfield, D. Allan Opiate receptor binding properties of morphine-, dihydromorphine-, and codeine 6-O-sulfate ester congeners. Bioorganic & Medicinal Chemistry Letters, 16(16), 4291-4295, 2006.

136. Henck, Jan-Olav; and Byrn, Stephen R., Designing a Molecular Delivery System in a Preclinical Timeframe, Drug Discovery Today, 12, 189-199 (2007)

137. Li, Hui; Stowell, Joseph G.; He, Xiaorong; Morris, Kenneth R.; Byrn, Stephen R., Investigations on solid-solid phase transformation of 5-methyl-2-[(4-methyl-2-nitrophenyl)amino]-3-thiophenecarbonitrile. Journal of Pharmaceutical Sciences 96(5), 1079-1089 (2007).

138. McBride, J. M.; Smith, D. T.; Byrn, S. R.; Borgens, R. B.; Shi, R. 4-Aminopyridine derivatives enhance impulse conduction in guinea-pig spinal cord following traumatic injury. Neuroscience, 148(1), 44-52 (2007).

139. Liang, Jessica K.; Byrn, Stephen. On-line Raman spectroscopy in pharmaceutical process development: application and future prospects. American Pharmaceutical Review 10(4), 45-51 (2007).

140. Hu, Yuerong; Wikstroem, Hakan; Byrn, Stephen R.; Taylor, Lynne S. Estimation of the transition temperature for an enantiotropic polymorphic system from the transformation kinetics monitored using Raman spectroscopy. Journal of Pharmaceutical and Biomedical Analysis, 45(4), 546-551 (2007).

141. Chongcharoen, Wanchai; Byrn, Stephen; Sutanthavibul, Narueporn; Solid state interconversion between anhydrous norfloxacin and its hydrates, Journal of pharmaceutical Sciences, 97 (1), 473-489 (2007).

142. Lee, Eun Hee; Boerrigter, Stephan X.; Rumondor, Alfred C.; Chamarthy, Sai P.; and Byrn, Stephen R., Formation and Solid-State Characterization of a Salt-Induced Metastable Polymorph of Flufenamic Acid, Crystal Growth and Design, 8 (1), 91-97 (2008).

143. Byrn, Stephen; Liang, Jessica; Bates, Simon; Newman, Ann; PAT – Process Understanding and Control of Active Pharmaceutical Ingredients; PAT – The Journal of Process Analytical Technology, 3 (6), 14-19 (2006).

144. Lee, EunHee; Byrn, Stephen; Carvajal, Teresa; Additive Induced Metastable Single Crystal of Mefenamic Acid; Pharmaceutical Research, 23 (10), 2375-2380 (2006).

145. Joshi, Vidya; Morris, Kenneth R.; Byrn, Stephen R.; Carvajal, M. Teresa, Evaluation of the Use of Ea (Activation Energy) as a Quantitative Indicator of Physical Stability of Indomethacin Solvates: Methanolate and Tertiary Butyl Alcohol Solvate, Crystal Growth & Design 9(8), 3359-3366. (2009).

146. Chen, Xiaoming; Stowell, Joseph G.; Morris, Kenneth R.; Byrn, Stephen R., Quantitative study of solid-state acid-base reactions between polymorphs of flufenamic acid and magnesium oxide using X-ray powder diffraction. Journal of Pharmaceutical and Biomedical Analysis (2010), 51(4), 866-874.

147. Lee, Eun Hee; Boerrigter, Stephan X. M.; Byrn, Stephen R., Epitaxy of a Structurally Related Compound on the (100) Faces of Flufenamic Acid Form I and III Single Crystals. Crystal Growth & Design (2010), 10(2), 518-527.

148. Lee, Eun Hee; Smith, Daniel T.; Fanwick, Phillip E.; Byrn, Stephen R., Characterization and Anisotropic Lattice Expansion/Contraction of Polymorphs of Tenofovir Disoproxil Fumarate. Crystal Growth & Design (2010), 10(5), 2314-2322.

149. Trasi, Niraj S.; Boerrigter, Stephan X. M.; Byrn, Stephen Robert, Investigation of the Milling-Induced Thermal Behavior of Crystalline and Amorphous Griseofulvin. Pharmaceutical Research (2010), 27(7), 1377-1389.

150. Atassi, Faraj; Mao, Chen; Masadeh, Ahmad S.; Byrn, Stephen R., Solid-state characterization of amorphous and mesomorphous calcium ketoprofen. Journal of Pharmaceutical Sciences (2010), 99(9), 3684-3697.

151. Byrn, Stephen R.; Zografi, George; Chen, Xiaoming. . Accelerating proof of concept for small molecule drugs using solid-state chemistry. From Journal of Pharmaceutical Sciences (2010), 99(9), 3839-3848.

152. Li, Hui; Wen, Hong; Stowell, Joseph G.; Morris, Kenneth R.; Byrn, Stephen R., Crystal quality and physical reactivity in the case of flufenamic acid (FFA). Journal of Pharmaceutical Sciences (2010), 99(9), 3839-3848.

153. Engers, David; Teng, Jing; Jimenez-Novoa, Jonathan; Gent, Philip; Hossack, Stuart; Campbell, Cheryl; Thomson, John; Ivanisevic, Igor; Templeton, Alison; Byrn, Stephen; et al., A solid-state approach to enable early development compounds: selection and animal bioavailability studies of an itraconazole amorphous solid dispersion. Journal of Pharmaceutical Sciences (2010), 99(9), 3901-3922.

18

154, Lee, Eun Hee; Byrn, Stephen R., Stabilization of metastable flufenamic acid by inclusion of mefenamic acid: solid solution or epilayer., Journal of Pharmaceutical Sciences (2010), 99(9), 4013-4022.

155. Ripin, David H. Brown; Teager, David S.; Fortunak, Joseph; Basha, Shaik Mahaboob; Bivins, Nylea; Boddy, Christopher N.; Byrn, Stephen; Catlin, Kelly K.; Houghton, Stephen R.; Jagadeesh, S. Tirumala; et al., Process Improvements for the Manufacture of Tenofovir Disoproxil Fumarate at Commercial Scale. Organic Process Research & Development (2010), 14(5), 1194-1201.

156. Emeje, Martins; Olaleye, Olajide; Isimi, Christiana; Fortunak, Joseph; Byrn, Stephen; Kunle, Olobayo; Ofoefule, Sabinus, Oral sustained release tablets of zidovudine using binary blends of natural and synthetic polymers. Biological & Pharmaceutical Bulletin (2010), 33(9), 1561-156.

## Book Chapters

Solid State Structure of Chiral Organic Pharmaceuticals, Stahly, G.P.; and Byrn, S. R., in Molecular Modeling Applications in Crystallization, 313-345, Allan Myerson, Ed., Cambridge Univ., Press

Structural aspects of polymorphism. Brittain, Harry G.; Byrn, Stephen R. Drugs Pharm. Sci., 95(Polymorphism in Pharmaceutical Solids), 73-124

The solid-state structure of chiral organic pharmaceuticals. Stahly, G. Patrick; Byrn, Stephen R. Mol. Model. Appl. Cryst., 313-345. Editor(s): Myerson, Allan S. Cambridge University Press: Cambridge, UK.(English) 1999.

## Papers Presented or Co-Authored:

A large number of papers have been presented at various conferences since 1974.

## Invited Lectures, Seminars, and Courses:

"The Mechanisms of Action of Ion Transporting Antibiotics," DePauw Univ., Greencastle, Indiana, October, 1974.

"The Solid State and Solution Conformational Isomerism of Drugs," Commercial Solvents Corporation, Terre Haute, Indiana, May, 1975.

"Solid State Reactions of Drugs," Indiana State University, Terre Haute, Indiana, April, 1975.

"Desolvations of Organic Molecular Crystals and their Pharmaceutical Applications," Chemistry Department, University of Illinois, Urbana Illinois, November, 1977.

"Desolvations of Organic Molecular Crystals and their Pharmaceutical Applications," Department of Medicinal Chemistry, University of Illinois at the Medical Center, Chicago, Illinois, March, 1978.

"Solid State Reactions of Drugs," Eli Lilly and Co., Indianapolis, Indiana, June, 1979.

"Relationship between the Solid State and Solution Conformation of Drugs," Youngstown State University, Youngstown, Ohio, Oct., 1980.

"Solid State Reactions in Medicinal Chemistry," Rose Polytechnical Institute, March, 1980.

"Solid State NMR Spectra of Drugs," Eli Lilly and Co., June, 1982.

"Solid State Chemistry of Drugs," DePauw University, Greencastle, Indiana, October, 1983.

"Polymorphism and the Solid State Chemistry of Drugs," McNeil Laboratories, Fort Washington, Pennsylvania, January, 1984.

"Structure Elucidation of Natural Products Using X-Ray Crystallography," King Saud University, Riyadh, Saudi Arabia, A sereis of 4 lectures presented in February, 1984.

"Mode of Action of AMSA," Drug Dynamics Institute, School of Pharmacy, University of Texas, Austin, Texas, May, 1984.

"Solid State Chemistry of Drugs," Eli Lilly-Tippecanoe Labs, May 10, 1985.

"Methods for the Analysis of Drugs," Hewlett Packard Short Course, Purdue University, West Lafayette, Indiana, June 19, 1985.

"Solid State Chemistry of Drugs," Chemistry Department, University of Kentucky, Lexington, Kentucky, October, 1984.

"Chemistry of Drug-DNA Interactions," Phi Lambda Upsilon Lecture, DePauw-Wabash Chapter, DePauw University, Greencastle, Indiana, March 20, l986.

"Desolvation of Drug Crystal Forms" and "Crystallographic Study and Solid State NMR Spectra of Crystalline Drugs," both Seminars presented at Merck-Frosst  Pharmaceuticals, Montreal, Canada, May 4-6, l986.

"Solid State Chemistry of Drugs, Desolvation, Oxidation, and Solid State NMR Spectra of Steroid Crystal Forms," Merck Sharp and Dohme Research Laboratories, West Point, Pennsylvania, June l0, l986.

"Solid State Stability of Drug Substances," Burroughs Wellcome Company, Research Triangle Park, North Carolina, October l, l986.

"Solid State Oxidation Reactions," Merck Sharpe and Dohme Research  Laboratories, West Point, Pennsylvania, May 8, l987

"Polymorphs and Solvates of Drugs," Ortho Lecture Series, Ortho Pharmaceutical, Raritan, New Jersey, April 22, l987.

"Solid State Chemistry of Drugs," K. N. Trueblood Retirement Symposium, University of California, Los Angeles, California, March 18, 1989.

"Residential School:  Polymorphs and Solvates of Drugs," Short Course, Royal Society of Chemistry, University of Bradford, London, June 24-26, 1989.

"Solid State Oxidation Reactions," University of Wisconsin, Madison, Wisconsin, June 12, 1989.

"Solid State Chemistry of Drugs," Land-of-Lakes Conference, Madison, Wisconsin, June 13, 1989.

"Solid State Chemistry of Steroids," Upjohn Company, Kalamazoo, Michigan, November 6, 1989.

"Solid State Chemistry of Drugs," Wyeth-Ayerst Pharmaceuticals, Rouses Point, New York, February 20, 1990.

"Solid State Chemistry of Drugs," Smith Kline Beecham, King of Prussia, Pennsylvania, April 11, 1990.

X-Ray Crystallographic Analysis of Pharmaceuticals," Land of Lakes Conference, Madison, Wisconsin, August 1, 1990.

"Solid State Oxidation Reactions," Pfizer Central Research, Groton, Connecticut, August 18, 1989.

"Solid State Chemistry of Drugs," Glaxo, Inc., Research Triangle Park, North Carolina, August 22, 1990.

"Polymorphs and Solvates of Drugs," Short Course presented to Hoffmann LaRoche, Nutley, New Jersey, September 11 and 12, 1990.

"Stability of Solvated Crystals," Abbott Laboratories, Abbott Park, Illinois, April 17, 1991.

"Powder Diffraction Analysis of Pharmaceuticals," Parke-Davis/Warner Lambert, Holland, Michigan, May 3, 1991.

"Anticancer Drug Design," American Cancer Society, Indianapolis, Indiana, February 25, 1989.

"Polymorphs and Solvates of Drugs," Short Course, Purdue University, June 5-7, 1990.

"Crystal Hydrates and Water in Crystalline Pharmaceuticals," Eino Nelson Conference, Phoenix, Arizona, November 27, 1990.

"Polymorphs and Solvates of Drugs," Burroughs-Wellcome, Inc., Greenville, North Carolina, April 9, 1991.

"Pharmaceutical Solids Short Course," Rhone-Poulenc Rorer, Collegeville, Pennsylvania, January 22-23, 1992.

"Pharmaceutical Solids Short Course," Eli Lilly and Company, Indianapolis, Indiana, February 13-14, 1992.

"Regulatory Issues for Pharmaceutical Solids," Merck Research Laboratories, West Point, Pennsylvania, February 28, 1992.

"Pharmaceutical Solids Short Course," Sandoz Pharmaceutical, East Hanover, New Jersey, March 2-3, 1992.

"Pharmaceutical Solids Short Course," Meadowlands Hilton, Seacacus, New Jersey, April 21-22, 1992.

"Pharmaceutical Solids Short Course," UNIGOV, University of Puerto Rico, San Juan, Puerto Rico, April 30-May 1, 1992.

"Pharmaceutical Solids Short Course," Abbott Laboratories, Chicago, Illinois, May 15, 1992

"Pharmaceutical Solids Short Course," Sterling, Inc., Renseleaar, NY, June 4-5, 1992

"Residential School: Polymorphs and Solvates of Drugs," Short Course, Royal Society of Chemistry, University of Bradford, London, July, 27-29, 1992.

"Pharmaceutical Solids Short Course," Burroughs Wellcome, Greenville, NC, August 11-12, 1992

"Pharmaceutical Solids Short Course," Washington Marriott, Washington, DC, October 27-28, 1992

"Polymorphs and Solvates Short Course," AAPS Short Course, San Antonio, TX, November 15, 1992

"Drug-Excipient Interactions in the Solid State," UNIGOV Conference on Excipients, San Juan, PR, Jan. 28, 1993

"Pharmaceutical Solids Short Course," Rhône-Poulenc Rorer, Paris, France, Feb. 9-10, 1993

"Pharmaceutical Solids Short Course," Meadowlands Hilton, Secaucus, NJ, April 27-30, 1993

"Pharmaceutical Solids Short Course," Syntex, Inc., Palo Alto, CA, May 6-7, 1993

"Mobility in Pharmaceutical Solids," G.D. Searle, Chicago, Illinois, May 12, 1993

"Solid State Chemistry of Drugs," Parke-Davis Warner/Lambert, Morris Plains, NJ, June 21, 1993

"Pharmaceutical Solids Short Course," Washington Marriott, Washington D.C., September 30, 1993

"Solid-State Pharmaceutical Chemistry," PR&D Building Dedication, Merck Research Laboratories, West Point, PA, October 8, 1993

"AIDS Research at Purdue University," Northeast Missouri State University, Kirksville, MO December 7, 1993.

"Mobility in Pharmaceutical Solids," Hoffmann-LaRoche, Nutley, NJ December 9, 1993.

"Solid State Chemistry of Drugs," Parke-Davis Warner/Lambert, Holland, MI, February 24, 1994.

"Mobility in Pharmaceutical Solids," Pfizer Central Research, Groton, CT, February 9, 1994.

"Solid State Pharmaceutical Chemistry," University of Minnesota, Minneapolis, MN, April 4, 1994.

"Pharmaceutical Solids Short Course," Pfizer, Inc., Groton, CT, April 11-12, 1994.

"Pharmaceutical Solids Short Course," Meadowlands Hilton, Secaucus, NJ, April 27-30, 1994.

"Pharmaceutical Solids Short Course," Geneva, Pharmaceuticals, Broomfield, CO, May 4-5, 1994.

"Pharmaceutical Solids Short Course," Crystal City Marriott, Washington, D.C., October 5-7, 1994.

"Instrumental Methods of Characterizing Bulk Drug Substances" Pharmaceutical Seminars, Wilmington, N.C., June, 1994

"Pharmaceutical Solids, " R.W. Johnson, August 10, 1995.

"Pharmaceutical Solids, " Upjohn Co., December 7, 1995.

"Pharmaceutical Solids Short Course," Crystal City Marriott, Washington, D.C., April, 1995.

"Solid State Chemistry of Drugs, " Syntex Chemicals, Inc., Boulder, CO, February 2, 1996

"Intersection of Laws, Regulations, and Scientific Principles," Burkett Lectures, DePauw University, Greencastle, IN April 2, 1996.

"Organic Solid State Chemistry and Pharmaceutical Materials Science," Burkett Lectures, DePauw University, Greencastle, IN April 2, 1996.

"Pharmaceutical Solids Short Course," Crystal City Marriott, Washington, D.C., April 30-May 2, 1996.

"Practical Consequences of Polymorphism," McNeil Consumer Products, Ft. Washington, PA May 7, 1996.

"Practical Consequences of Polymorphism," Biogen, Cambridge MA, June 12, 1996.

"Practical Consequences of Polymorphism, "Genentech, S. San Francisco, CA, June 19, 1996.

"Pharmaceutical Solids Short Course," Crystal City Marriott, Washington, D.C., April 28 -May 1, 1998.

"Pharmaceutical Solids," Short Course at the DuPont-Merck, June 12-13, 1997.

"Pharmaceutical Solids," Short Course at the FDA, September 29, 1997.

"Pharmaceutical Solids Short Course," Crystal City Marriott, Washington, D.C., April 29-May 1, 1998.

"Pharmaceutical Solids," Proctor and Gamble Pharmaceuticals, Norwich, N.Y., July 27-28, 1998

"Pharmaceutical Solids Short Course," Sanofi Pharma, September 21-23, 1998

"Pharmaceutical Solids Short Course," Novartis, Feb. 4-5, 1999

"CAMP Technologies, J&J, Spring House," PA April 13-15, 1999

"Pharmaceutical Solids, SSCI Course," Washington, DC, April 28-30, 1999

"Solid-state Chemistry of Drugs and Analysis," University of Michigan, College of Pharmacy and Engineering, Ann Arbor, MI 2-10-00.

"Solid-state Chemistry of Drugs," University of Minnesota, College of Pharmacy, 3-30-00.

"Polymorphism and Solid-state Chemistry of Drugs," Ball State University, Chemistry Department, Muncie, IN 11-11-99.

"Particle Formation and Crystallization of Pharmaceuticals," London, England and Crystal City, VA, June and Sept 9-10. 1999

"Pharmaceutical Solids Short Course," Roche, August 12-13, 1999

"Pharmaceutical Solids Short Course," Searle, October 10-13, 1999

"Pharmaceutical Solids Short Course," Warner-Lambert, November 1-3, 1999

"Pharmaceutical Solids Short Course," Warner-Lambert, Feb. 23-25, 2000

"Pharmaceutical Solids Short Course," Pfizer, March 20-22, 2000

"Pharmaceutical Solids," SSCI Course, Washington, DC, May 9-11, 2000

"Pharmaceutical Solids," SSCI Course, Fremont, CA, May 23-25, 2000

"Pharmaceutical Solids," SSCI Course, J&J, July 29-31, 2000.

"Pharmaceutical Materials Science and Research," AAPS Head's Meeting, Indianapolis, IN, October 27, 2000.

"Dimensions of Pharmaceutical Solids," IIT Seminar, November, 2000.

"Pharmaceutical Solids," SSCI Course, Schering, May, 2001.

"Pharmaceutical Solids," SSCI Course, Washington, DC, May 2001.

"Pharmaceutical Solids," SSCI Course, Pfizer, May, 2001.

"Six Dimensions of Pharmaceutical Solids," Wyeth Ayerst, January 2001.

"Polymorphism and Stability of Drugs," Univ. of Kentucky, February 7, 2001.

"Pharmaceutical Solids, SSCI Course," Washington, DC, May 8-10, 2001

"New Technologies for Process Analytical Technologies," FDA, Washington, DC, April 1, 2002.

"PAT," Watson Pharmaceuticals, Corona, CA, March 3-4, 2003

"Pharmaceutical Solids, SSCI Course," Washington, DC, May 9-11, 2002

"Pharmaceutical Solids, SSCI Course," Washington, DC, May 10-12, 2003

"Solid State Chemistry of Biologicals," SSCI Course, South San Francisco, Nov. 16-17, 2003

"Pharmaceutical Solids, SSCI Course," Washington, DC, May 5-7, 2004

"PAT: Achieving Mechanistic Understanding through Solid State Chemistry," SSCI Short Course, Princeton, NJ, September, 2004

"Midwest Organic Solid State Chemistry Symposium" June 2-4, 2005, Purdue University.

"Pharmaceutical Solids, SSCI Course," Washington, DC, May 9-11, 2005

"Biological Solids," South San Francisco, CA, February 15-16, 2005

"Pharmaceutical Solids, SSCI Course," Washington, DC, March 29-31, 2006.

"Pharmaceutical Solids, SSCI Course," Merck and Co., West Point, PA, September 16-17, 2006.

"Biopharmaceutical Solids, Aptuit/SSCI Course," San Francisco, CA, February, 27-28, 2007.

"Pharmaceutical Solids, SSCI Course," Washington, DC, April 10-12, 2007.

"Pharmaceutical Solids, SSCI Course," Washington, DC, April 8-10, 2008.

"Pharmaceutical Solids, SSCI Course," San Francisco, CA, May 14-15, 2008.

"Processing and Formulation Approaches for Improving the Apparent Solubility Controlled Release, Glatt Controlled Release Symposium, Sept. 18-20, 2007, Mahwah, NJ.

"Solid State Properties in Drug Development," Howard University, Washington, DC, Sept. 10, 2007.

"Pharmaceutical Solids, SSCI Course," Washington, DC, April 22-24, 2008.

"Forced Degradation Testing To Improve Stability Prediction and Reduce Time to Market", Forced Degradation of Small Molecules Conference, Philadelphia, PA, February 25-27, 2008

"Solid Phase Characterization Short Course," EAS, Nov. 11, 2008

"Pharmaceutical Solids, SSCI Course," Washington, DC, April 21-23, 2009.

"Pharmaceutical Solids, SSCI Course," San Francisco, CA, May 13-14, 2009.

"Drug Discovery", Kilimanjaro School of Pharmacy/St. Luke Foundation Course, Moshi, Tanzania, March 17 - 28, 2008

"Drug Development", Kilimanjaro School of Pharmacy/St. Luke Foundation Course, Moshi, Tanzania, December 1-12, 2008

"Drug Development", Kilimanjaro School of Pharmacy/St. Luke Foundation Course, Moshi, Tanzania, May 18-29, 2009

"Pharmaceutical Manufacturing," Kilimanjaro School of Pharmacy/St. Luke Foundation Course, Moshi, Tanzania, August 3-14, 2009.

"Drug Discovery", Kilimanjaro School of Pharmacy/St. Luke Foundation Course, Moshi, Tanzania, March 17 - 28, 2010

"Pharmaceutical Solids, SSCI Course," Washington, DC, April 13-15, 2010.

"Drug Development", Kilimanjaro School of Pharmacy/St. Luke Foundation Course, Moshi, Tanzania, 10-19, 2010

"Physical Characterization and Methods of Analysis", Short Course," EAS, Nov. 14, 2010

### **Invited Symposium Talks at National or International Meetings:**

"The Purdue BS-MS Program," AACP Meeting, Boston, Massachusetts, July, 1980.

"Polymorphism and the Solid State Chemistry of Drugs," FACSS Meeting, Philadelphia, Pennsylvania, September, 1983.

"CP/MAS Spectra of Drugs, A New Method for the Investigation of Polymorphs and Solvates," 25th Annual Medicinal Chemistry Symposium, SUNY Buffalo, Buffalo, New York, June 11-14, 1984.

"Polymorphism and the Solid State Chemistry of Drugs," Eastern Analytical Symposium, New York, New York, November 15, 1984.

"Structure-Reactivity Correlations in Crystalline Solids," 132nd Annual A.Ph.A. Meeting, San Antonio, Texas, February 19, 1985.

"Solid State Chemistry of Drugs," A.Ph.A. Acad. Pharm. Sci., Short Course on Materials Characterization, San Francisco, California, March l6, l986.

"Solid State Chemistry of Polymorphs, Solvates, and Metastable Crystal Forms of Drugs," North Eastern Regional Pharmaceutics Association Seventh Annual Meeting, New Haven, Connecticut, June 27, l986.

"Correlation of Crystal Structure and Solid State NMR Spectra of Steroid Polymorphs," 44th Pittsburgh Diffraction Conference, Pittsburgh, Pennsylvania, October 29-3l, l986.

"Polymorphism of Drugs," Annual Meeting of the American Crystallographic Association, University of Texas, Austin, Texas, March 15-20, l987.

"Overview - Current Status of Basic Research in Pharmaceutical Solids," Second Annual Meeting, American Association of Pharmaceutical Sciences, Boston, Massachusetts, June 7-l2, l987.

"X-ray Crystallography and Solid-State NMR," American Crystallographic Association Symposium, Philadelphia, Pennsylvania, June l988.

"Hepa Filtration and Biosafety Training of Pharmacy Students," Biomedical Safety Conference, Indianapolis, Indiana, June l989.

"Design of Anti-AIDS Drugs," 17th International Symposium of the Controlled Release Society, Reno, Nevada, July 22-25, 1990.

"Structure and Stability of Crystal Solvates," American Association of Pharmaceutical Scientists, Las Vegas, Nevada, November 6, 1990.

"Structure and Behavior of Crystal Hydrates," Eino Nelson Conference, Phoenix, Arizona, November 27, 1990.

"Structure and Mobility of Polymorphs and Solvates of Pharmaceuticals," 4th Computational Methods in Chemical Design, Kloster Irsee, Germany, May 15-20, 1994.

"Solid State Chemical Instability: Mechanistic and Kinetic Issues" 36th Annual International Industrial Pharmaceutical Research Conference, " Merrimac, Wisconsin, June 6-10, 1994.

"Solid State Pharmaceutical Chemistry: Applications of Solid State NMR," PharmAnalysis Conference, Atlantic City, NJ, June 21, 1994.

"Solid State Pharmaceutical Chemistry," 25th Meeting, Fine Particle Society and Second International Conference, New Brunswick, NJ, July 26, 1994.

"Solid State Pharmaceutical Chemistry," Am. Cryst. Assoc., July, 27, 1995, Montreal, Canada

"Chemical Reactions in Amorphous or Disordered Pharmaceutical Solids," Fine Particle Society, Chicago, IL, August 23, 1995

"Color Dimorphism from 1905 To 1995," COGM International Meeting, Washington, DC, August 30, 1995

"Practical Consequences of Polymorphism," FDA-AAPS Workshop on Polymorphism, Washington, D.C., February 26-28, 1996

27

"New Developments in Solid State NMR," AAPS-USP Meeting, Washington, D.C., April 25-6, 1996.

"Solid State NMR Spectra of Drugs, Eastern Analytical Symposium, Somerset, N.J., Nov. 8, 1996

"Solid-state Chemical Reactions of Drugs," Higuchi Conference, Lake of the Ozarks, Mo., March 9-11, 1997.

"Assessment: Impact of Bulk Drug Manufacturing Changes on Physical Properties", AAPS-FDA BACPAC Conference, Washington D.C., March 25, 1997

"Practical Consequences of Polymorphism," ACT Meeting, St. Louis, Mo., April 7-9, 1997.

"Characterization of Polymorphic Behavior: Research and Regulatory Perspective," AAPS Eastern Regional Meeting, New Brunswick, N.J., June 9-10,1997.

"Overview - What is Polymorphism and How Important is it?" British Pharmaceutical Conference, Scarborough England, September 18, 1997.

"Chemical Reactivity in the Solid State,"  AAPS National Meeting, Boston, Mass., Nov. 2-6, 1997

"Solid State Chemistry – Regulations and Reactions"  MSI International Symposium, San Diego, CA, February 18-20, 1998

"Physical Transformations of Solvated Pharmaceuticals,"  Royal Society of Chemistry National Meeting, Polymorphism Symposium, Durham, England, April 7, 1998

"Stability of Solid Pharmaceuticals," AAPS Western Regional Meeting, South San Francisco, CA. June 1, 1998

"Crystallization and Polymorphism Issues in Controlled Release Dosage Forms," Organized and presented at a one day short course, Controlled Release Society International Meeting, Las Vegas, NV., June 25, 1998.

"BACPAC," World Pharm Conference, Philadelphia, PA, Sept 22, 1998

"BACPAC and PQRI," DIA Conference, Washington, D.C., Nov. 9, 1998

"PQRI", AAPS National Meeting, San Francisco, CA, Nov. 17, 1999

"Energy-temperature Diagrams," PhaTA4, Karlsruhe, Germany, March 24, 1999

"BACPAC, An Update, SUPAC Conference, Washington, DC, 5-4-99

"BACPAC, Bulk Active Post Approval Changes," World Pharm., Philadelphia, PA, 10-28-00.

"Transformation During Processing," AAPS National Meeting, New Orleans, LA 11-15-99

"PQRI, Drug Substances Technical Committee," AAPS National Meeting, New Orleans, LA 11-15-99

"Impurities and Stability of Pharmaceuticals," GMP-API Course, Univ. of Wisconsin Continuing Ed., Jan 20, 2000 and May 19, 2000.

"Crystallization of Pharmaceuticals," Alun Bowen Lecture, British Crystallographic Association Meeting, April 4, 2000, Edinburgh, Scotland

"Computational Approaches to Solid State Chemistry," Millennium Pharmaceutical Sciences Meeting, San Francisco, CA April 18, 2000

"Chemical Stability of Pharmaceuticals," Land of Lakes Conference, Devils Lake, WI, June, 2000.

"Solid State NMR of Pharmaceuticals," SMASH NMR Conference, Argonne, IL July 16, 2000.

"Polymorphism," Land of Lakes Analytical Conference, Devils Lake, WI, July 31, 2000.

"Fundamentals of Solid State Reactions," AAPS National Meeting, Indianapolis, IN, Oct. 26, 2000.

"NIR and LIF Methods of Monitoring Blend Homogeneity," AAPS National Meeting, Indianapolis, IN 2000.

"Strategies for Metastable Phases," AAPS Congress of Americas Short Course, March 2000.

"Implications of Solid State Chemistry for Process Development," Rhodia International Conference on Process Development, Amelia Island, FL, April 2001

"Raman Mapping and Physical Transformations," EAS, September 2001, Atlantic City, NJ

"Using Crystal Engineering to Predict Stability and Reduce Time to Market," Higuchi Research Seminar, May 2001, Lawrence, KA.

Polymorphism & Crystallization Conference, Chairperson and Presenter on Regulatory Aspects, Philadelphia, PA June 20-21, 2002.

"Crystallization and Solid State Chemistry of Pharmaceuticals", Aminoff Symposium, Royal Academy of Sciences, Stockholm, Sweden, September 12, 2002.

"Validation of Process Analytical Technologies", IVT PAT Conference, Gaithersberg, MD, Oct. 24, 2002

"Engineering Sameness: Polymorphism, Crystallization, and Stability of Solid Pharmaceuticals", AIChE Plenary Lecture, AIChE National Meeting, Indianapolis, IN, November 4, 2002

"Solid State Analysis of API in Drug Product," AAPS National Meeting, November 6, 2002

"Validation of NIR Methods for the Pharmaceutical Industry," AAPS National Meeting, November 6, 2002

"Achieving Sameness, USP, Washington, DC, December 18, 2002.

"Strategies for Incorporating NIR into PAT, " IIR Conference, Washington, DC, Feb 4-6, 2003.

"Overview of Particle Manufacture and Blending," Particle Size analysis Workshop, AAPS, April 30, 2003.

"Reactivity of Polymorphs, Predicting Stability," ACS Prospectives Conference, Tampa, FL Feb 23, 2003

"Regulatory Aspects of Polymorphism," APV Course, Bonn, Germany, May 12, 2003

"Approaches to PAT using In-line Sensors," PAT Summit, Washington, DC, September 29, 2003

"Solid State Characterization Technologies for Online Analysis," AAPS National Meeting, Salt Lake City, UT, October 30, 2003

"National GMP Curriculum, "AAPS National Meeting, Salt Lake City, UT, October 28, 2003

Enz Lectures, University of Kansas, August, 2004

"Solid State Chemistry of Amorphous Materials," ACS Prospectives Symposium, Feb 8-11, 2004

"Polymorphism and Pharmaceuticals," Stephen R. Byrn, IUCR Intl. School of Crystallography, Diversity Amidst Similarity, Erice, Italy

"Strategies to Improve Solubility Using Amorphous Materials and Co-crystals," Barnett Improving Solubility Conference, Philadelphia, PA, June 3, 2005.

"Polymorphs of API and Implications in Drug Development," CVG Conference, Toronto, CA, Sept. 27, 2004

"Implementing Quality by Design," IIR PAT Conference, Princeton, NJ, Dec. 13, 2004.

"Novel Approaches to Characterization," AAPS National Meeting, Baltimore, MD, November 2005.

"Busse Lectures" (1. Solid State Pharmaceutical Chemistry; 2. Regulated Pharmaceutical Industry in 2010), University of Wisconsin, Madison, Wisconsin.

"Achieving Mechanistic Understanding through Solid State Chemistry," PAT Workshop, J. Liang and S. Byrn, PAT Conference, June 14-17, 2005, Philadelphia, PA.

"Regulatory Applications of Patent-Derived Analytical Methods," PITTCON, March 4, 2005, Orlando FL,

"Using PAT to Reduce Time to Market" Academic and Industrial Research in PAT, Wyeth Scientific Symposium, Pearl River, NY, Feb. 27, 2005.

"PAT Process Understanding and Control of APIs" PAT Workshop, J. Liang and S. Byrn, PAT Conference, June 14-17, 2005, Philadelphia, PA.

"Novel Approaches to Characterization. Accelerating the Drug Development Process" AAPS National Meeting, November 11 2004, Baltimore, MD.

"Polymorphs in API, Implications for Drug Development", CVG Meeting, Toronto, CA, Sept. 27-28, 2005.

"Building a Start-up Knowledge Based Company" ACS National Meeting, August 2004, Philadelphia, PA.

"Design and Characterization of Pharmaceutical Solids for Quality Product Development, Strategies for the 21st Century," Keynote Lecture, Stephen R. Byrn, Ph. D., Department of Industrial and Physical Pharmacy, Purdue University and SSCI, Inc. West Lafayette, Indiana, Land of Lakes 48th Conference, Merrrimac Wisconsin, June 2006.

"Physical Characterization of Pharmaceutical Solids,"NIST Meeting on Organic Materials, NIST, Rockville, MD, April 5-7, 2006.

"What does this all mean to a Formulator," AAPS National Meeting, Nashville, TN, Nov. 6-11, 2006.

"New Opportunities in Solid State Characterization", British Pharmaceutical Conference, Manchester, England, September 24-28, 2005.

"Using PAT to Understand Process and Reduce Time to Market and Speed Drug Development while Avoiding Regulatory Problems," Bioanalytical Testing World Congress, Philadelphia, PA, and September 19-21, 2006.

"Science-Based Product Management and PAT", Global Manufacturing Summit, September 7-9, 2005, Atlanta, GA.

"Solid State Strategies for Improving Solubility", Water-Insoluble Drug Delivery Course, Park Hyatt Hotel, Philadelphia, PA, July 18, 2005.

"Implication of Polymorphism for Formulation Design", Formulation Development Meeting, Philadelphia, PA, July 26-27, 2006

 "Improving Drug Development Via Crystallization And Crystal Growth." Edinburg, Scotland, Sept 10-12, 2006.

"Physical Stability in the Solid State", Stephen R. Byrn, AAPS Workshop on Pharmaceutical Stability, September 10-12, Bethesda, MD, 2006.

"Quality by "Design and PAT", AICHE National Meeting, Salt Lake City Utah, November 5, 2007.

Chairman Polymorphism and Crystallization Scientific Forum, IQPC, December 3-5, Philadelphia, PA.  Presented Lead-off Talk entitled: "Designing Optimized Formulations Utilizing Polymorphs/Cocrystals/Amorphous Forms within a Preclinical Timeframe."

"Leverage Forced Degradation Testing To Improve Stability Prediction and Reduce Time to Market", Forced Degradation of Small Molecules,  February 25-27, 2008

"Strategies for Preparation and Manufacture of Polymer-based Nanoparticulate Formulations", Bio-Nano Conference, Hyderbad India, March 13-14, 2008.

"Quality by design and Process Analytical Technology for Pharmaceutical Manufacturing in the 21st Century", Bio-Nano Conference, Hyderbad India, March 13-14, 2008.

"Molecules to Medicines: Bringing Drugs to Market Following GMP. Green Chemistry and Production of Essential Medicines in Developing Countries", March 18-20, 2008, Abuja Nigeria

"A Model for Education and Pharmaceutical Manufacturing in Africa, Green Chemistry and Production of Essential Medicines in Developing Countries", March 18-20, 2008, Abuja Nigeria

"Understanding Additive Effects on Crystallization, Polymorphic Transformation and Solubility" ACS Award in Separations Science and Technology Symposium, ACS National Meeting, New Orleans, LA, April 7, 2008

"Fast to IND with Quality by Design", ISPE International Conference, Boca Raton, FL, Oct. 28, 2008.

"Utilizing Amorphous Dispersions to Reduce Time to IND", AAPS International Meeting, Atlanta, GA, Nov. 23, 2008.

"A QbD Solubility Enhancement Platforms for Fast Drug Development Abstract",  Keynote lecture at the Indo-US Bilateral Workshop on Pharmaceutical Cocrystals and Polymorphs, Mysore, India, February 8 to 11, 2009

"Accelerating Proof of Concept Using Solid State Chemistry", PGSRM Conference, Purdue University, June 25-27,

32

"Sustainable Medicines in Africa", Swintowsky Distinguished Lecture, University of Kentucky, Lectington, KY, Sept. 24, 2009

"Accelerating Proof of Concept", Swintowsky Distinguished Lecture, University of Kentucky, Lectington, KY, Sept. 25, 2009

"Accelerating Proof of Concept Using Solid State Chemistry," David Grant Award Lecture, AAPS, Sept 11, 2009, Los Angeles, CA.

"Accelerating Translational/Clinical Research using Solid State Chemistry", David Grant Symposium, University of Minnesota, June 2, 2010.

"Strategies for Novel Pediatric Formulations," Peck Symposium, Purdue University, October 14, 2010.

**Principal Investigator on Grants:**

"Conformational Isomerism in the Solid State and in Solution," Stephen R. Byrn, Am. Chem. Soc. Starter Grant #2687-G1, $7,500, 7-1-72 to 6-30-76.

"The Structures of Ion Transporting Antibiotics in the Solid State and in Solution," Stephen R. Byrn, Cottrell Research Grant from the Research Corporation, $5,345, 1-1-73 to 12-31-75.

"The Interaction of Intercalating Agents with Dideoxynucleotides-Daunomycin," Stephen R. Byrn, Purdue Cancer Committee Grant, $6,000, 1-1-74 to 12-31-75.

"Structural Studies of Physiologically Active Agents," Stephen R. Byrn, NIH Grant #ES00929, $91,076 Direct Costs, 5-1-74 to 4-30-77.

"Solid State Reactions in Medicinal Chemistry," Stephen R. Byrn, NIH Grant #GM21174, $75,000 Direct Costs, 6-1-74 to 5-31-77.

"Structural Studies of Physiologically Active Agents," Stephen R. Byrn, NIH Grant #ES00929, $127,500 Direct Costs, 5-1-77 to 4-30-80.

"Conformational of Pyridoxal Schiff's Bases in the Presence and Absence of Enzymes," Stephen R. Byrn and M.D. Tsai, David Ross Grant, $8,400, 3-1-76 to 2-28-78.

"Solid State Reactions in Medicinal Chemistry," Stephen R. Byrn, NIH Grant #GM21174, $126,000 Direct Costs, 9-1-78 to 8-31-81.

"Molecular Pharmacology of 9-Aminoacridine Antitumor Agents," Purdue Cancer Committee, $5,000, 7-1-80 to 12-31-82.

"Mechanism of Degradation of Moxalactam and Related Compounds," Eli Lilly and Company, 1-1-81 to 12-31-81, $50,000 Total Costs.

"Acridine-DNA Interactions," Part of a Program Project Grant from the National Cancer Institute, W.M. Baird Project Director, ca. $100,000 Direct Costs for 9-1-81 to 6-30-84.

"Solid State Chemistry of Drugs," Eli Lilly and Company, 1-1-82 to 12-31-82, $46,000 Direct Costs.

"Mode of Action of Mutagenic Drugs," NIH Grant #GM29175, 3-1-83 to 2-28- 86, $181,000 Direct Costs.

"Solid State Chemistry of Insulin, Nabilone and Cefaclor," Eli Lilly and Company, 1-1-83 to 12-31-83, $34,000 Direct Costs.

"Solid State Chemistry of Insulin and Ceftazidine," Eli Lilly and Company, 5-1-85 to 4-30-86, $5,000 Total Costs, (0593-57-13335), D.L. Smith Co-PI.

"Polymorphism and the Bioavailability of Drugs," NIH Grant #GM34520, 12-1-84 to 11-30-85, $180,000 Direct Costs.

"National Cooperative Drug Discovery Group for the Treatment of AIDS - Synthetic Approach," NIH U0l AI257l2, 9-1-87 to 8-31-90, $1,046,000 Direct Costs for three years.

"Anti-HIV (AIDS) Agents Targeted to the RNA Template," NIH Grant #GM24289, 4-1-88 to 3-31-91, $228,000 for three years.

"Solid State Chemistry of Drugs," Grant from Merck and Company, 1988-1990, $50,000.

"Center for AIDS Research," $3,100,000 direct cost, approximately $4,600,000 total costs. September 30, l988 - March 1, 1994.

"Chemical Pharmacology Training Grant," 7-1-90 to 6-30-95, approximately $900,000 Direct Costs for 5 years.

"Chemical Pharmacology Training Grant," 7-1-95 to 6-30-97, approximately $1,200,000 Direct Costs for 5 years.

"Effect of Water on the Molecular Mobility of Pharmaceuticals," Purdue-Wisconsin Joint Project, S. R. Byrn and G. Zografi. Supported by Merck, Pfizer, Sandoz, Glaxo, Upjohn, Boehringer, Bristol-Myers Squibb, and Syntex 1991-1997, approximately $115,000 per year.

"Crystal Growth and Nucleation During Drying," 9-1-95 to 8-31-97, $50,000. NSF Pharmaceutical Processing Center, Purdue University, West Lafayette, IN

"CAMP - Consortium for the Advancement of Manufacturing in Pharmacy" 12-1-96 to 12-31-97, about $380,000, Drying end Point Detection and Blending Detection, CAMP, Narabeth, PA

"CAMP - Consortium for the Advancement of Manufacturing in Pharmacy" 1-1-98 to 12-31-98, about $400,000, Blending Detection, Parametric Release, Crystallization, (PI or Co-PI) CAMP, Narabeth, PA.

"CAMP - Consortium for the Advancement of Manufacturing in Pharmacy" 1-1-99 to 12-31-99, about $467,000, Blending Detection, Parametric Release, Crystallization, Dye Lasers(PI or Co-PI) CAMP, Narabeth, PA.

NSF "Crystallization During Wet Granulation" ca. $30,000 7/1/97 – 12-31-01

NSF "Solid State Acid Base Reactions" ca. $35,000 7/1/97-12/31/00

"CAMP - Consortium for the Advancement of Manufacturing in Pharmacy" Founder of CAMP along with Professor C. Cooney, MIT, G.K. Raju, and W. Leishear. Funding for 1-1-99 to 12-31-07 about $450,000 per year. Projects include: Blending Detection, PAT, Crystallization.

"Effect of Water on the Stability of Solid Pharmaceuticals," Purdue-Wisconsin Joint Project. Founder along with Professor G. Zografi, University of Wisconsin. Program now includes Professors K. Morris, L. Taylor, R. Pinal, and T. Carvajal at Purdue and Professor N. Rodriguez-Hornedo, Univ. of Michigan. Current supporters are Pfizer, Boehringer, Bristol-Myers Squibb, Roche, Inhale, and Abbott. Funding for 1997-present, approximately $100,000 per year.

"Concretion," NSF, 1-1-00 to 12-31-02, $54,000.

"PTCC – Particle Technology and Crystallization Consortium" Founder of PTCC along with Professors A. Myerson, IIT, K. Morris, Purdue and C. Cooney, MIT. Funding for 1-1-03 to 12-31-07 about $400,000 total costs. Projects include: Crystallization monitoring, crystallization inhibition, PAT, and sensors.

"Discovering Once-a-Day Specialty Pharmaceutical Products" A.E. Mann Instutute, Purdue University, 12-1-2008 to 5-31-2009, $98,150 DC.

"Mapping base technologies for detecting counterfeit medications" Lilly Endowment, Purdue University, $100,000, Jan. 1, 2008 through Dec. 31, 2010.

"Indiana Clinical Translational Institute," A. Shekhar, PI, Stephen Byrn, Program Leader Regulatory, 2% Effort, UL1RR025761, KL2RR025760, TL1RR025759, 5/1/08 to 4/30/13. Total Award $24,765,925.

"Drug Reformulation", Mann Institute, Purdue University, $265,000, 11/1/08 to 9/30/10.

"In-vitro, In-vivo Correlations for Dissolution Tests", FDA, $62,000, 9/1/09 to 9/30/10

## Co-Principal Investigator on Grants:

"Chemical-Antitumor Activity of Lactones and Epoxides," J.M. Cassady and S.R. Byrn, NIH Grant, #CA $114,906 Direct Costs, 9-1-75 to 8-31-78.

Member of the Cancer Center of Purdue University. This Cancer Center has received two core grants and a building grant from the National Cancer Institute.

**Consultantships:**

Numerous consultantships with many pharmaceutical companies (including Novartis, Pfizer, BMS, J&J, Wyeth, Lilly, Roche, Abbott, Watson, and Merck) and many others over the years 1975 to present.

Co-Founder and Study Director, SSCI, a research and information GMP contract research firm in West Lafayette, IN employing about 90 people, 1991-2006. SSCI was sold to Aptuit in 2006. Consultant to Aptuit Nov. 2009-present

Consulting for several legal firms on major solid state chemistry, formulation, polymorphism, and salt litigations including the Zantac cases, the Paxil cases, the Norvasc cases, the Plavix cases, the Prevacid cases, the Elan nanoparticle patents 1990-present.

**Last Update:** November 2010

Exhibit B

# Exhibit B

## Stephen R. Byrn

## Testimony in the Last Four Years

## As of March 29, 2011

In the past four years I provided testimony by deposition and/or at trial in the following cases (the party I consulted for is underlined):

a. _Abbott v. Apotex_ (2003-07); _Abbott v. Pharmascience_ (2004-07); _Abbott v. Ratiopharm_ (2005-07) [Clarithromycin – Canada];

b. _AstraZeneca v. IVAX, Teva, and Dr. Reddy's_, No. 05-5553 (D.N.J.) [Nexium®];

c. _Cephalon v. Watson_, No. 09-0724 (D. Del.) [Fentora®];

d. _Elan Pharma Int'l v. Abraxis Bioscience_, No. 06-0438 (D.Del.) [Abraxane®];

e. _Hoffman-La Roche v. Cobalt and Apotex_, No. 07-4539 (D.N.J.) [Ibandronate];

f. _Johnson Mathey v. Noven,_, No. 07-0260 (E.D. Tex. 2009) [Methylphenidate];

g. _King Pharms. v. Purdue Pharm._, No. 08-0050, (W.D. Va.) [Morphine Sulfate];

h. _Lilly v. Teva Pharms._, No. 06-1017 (S.D. Ind.) [Evista®];

i. _Merck & Co., v. Teva Parenteral Medicines, Teva Pharms. and Sandoz Inc._, No. 09-06026, 10-1625, 10-2308 (D.N.J.) [Cancidas®];

j. _Mitsubishi Chemical Corp. and GSK v. Barr Labs. and Pliva_, No. 07-11614 (S.D.N.Y.) [Argatroban];

k. _Novartis v. Teva_, No. 04-4473 (D.N.J.) [Lotrel®];

l. _Pfizer et al. v. Mylan et al._, No. 09-441 (D. Del.) [Lipitor®];

m. _Reckitt Benckiser, and UCB Mfg. v. Tris Pharma_, No. 09-3125 (D.N.J.) [Delsym®];

n. _Sanofi-Aventis and Debiopharm v. Sandoz Inc._, No. 07-02762 (D.N.J.) [Eloxatin®];

o. _Sanofi/BMS v. Apotex and Dr. Reddy's_, No. 02-2255 (S.D.N.Y.); _Sanofi/BMS v. Apotex_, Canada (2010) [Plavix®];

p. _Takeda Pharm. et al. v. Zydus Pharms. and Cadila Healthcare_, No. 10-1723 (D.N.J.) [Prevacid®];

q. _Takeda Pharm. v. Teva Pharms._, No. 06-0033 (D. Del.) [Prevacid®];

r. _UCB and CellTech v. KV Pharm._, No. 08-0223 (D. Del.) [Methylphenidate].

# Exhibit C

Materials Reviewed

| |
|---|
| U.S. Patent No. 5,952,300 |
| U.S. Patent No. 5,378,804 |
| U.S. Patent No. 5,552,521 |
| U.S. Patent No. 4,857,552 |
| U.S. Patent No. 5,336,756 |
| U.S. Patent No. 5,120,859 |
| File History for U.S. Patent No. 5,952,300 (MRK_CAN00000402-833) |
| Nerurkar Deposition Transcript, Mar. 4, 2011 |
| Kaufman Deposition Transcript, Jan. 28, 2011 |
| Grieco Deposition Transcript, Nov. 2, 2010 |
| Nandi Deposition Transcript, Mar. 11, 2011 |
| Domenico Deposition Transcript, Feb. 24, 2011 |
| Welz Deposition Transcript, Mar. 2, 2011 |
| 1 *Pharmaceutical Dosage Forms: Parenteral Medications* (Kenneth E. Avis. ed., 2d ed. 1992) |
| *Remington: The Science and Practice of Pharmacy* (Alfonso R. Gennaro ed., 19th ed.) |
| Gordon L. Flynn, *Buffers – pH Control Within Pharmaceutical Systems*, 34 J. Parenteral Drug Ass'n 139 (Mar.-Apr. 1980) |
| A. Albert & E.P. Serjeant, *The Determination of Ionization Constants* (3d ed. 1984) |
| *The Merck Index* (12th ed, 1996) |
| 1995 Physician's Desk Reference |
| Sandoz's June 15, 2010 Invalidity Contentions |
| Merck Cancidas® Prescribing Information (June 2010) |
| MRK_CAN00053153-56 |
| MRK_CAN01156151-58 |
| MRK_CAN00094040-4163 |
| MRK_CAN00019902-928 |
| MRK_CAN00021535-38 |
| MRK_CAN00020285-290 |
| MRK_CAN00017658-689 |
| MJK_01-034 |
| SAND-CASP880385-427 |
| SAND-CASP988268-304 |
| SAND_CASP815809-810 |
| SAND-CASP988305-346 |
| SAND-CASP002623-24 |
| SAND-CASP758667-672 |
| SAND-CASP790741-42 |
| SAND-CASP653333-3528 |

SAND-CASP543839-45

# Exhibit D

1995 PDR - Ready to Use

| *Physician's Desk Reference* (49th ed. Jan. 1995) **Solution Formulations: Drug Name** |
|---|
| Acel-imune Vaccine |
| Actimmune |
| Adagen |
| Adenocard |
| Adriamycin PFS |
| Akineton |
| Albumarc 5% |
| Albumarc 25% |
| Albuminar-5 |
| Albuminar-25 |
| Albutein 5% |
| Albutein 25% |
| Aldomet |
| Alfenta |
| Alferon N |
| Amicar |
| Amidate |
| Amikacin |
| Amikin |
| Aminocaproic acid |
| Aminohippurate sodium |
| Anectine |
| Antilirium |
| Aquamephyton |
| Aquasol A |
| Aralen |
| Aramine |
| Arduan |
| Arfonad |
| Aristocort |
| Astramorph/PF |
| Atgam |
| Ativan |
| Atropine sulfate |
| Bactrim |
| Benadryl |
| Bentyl |
| Bicillin CR |
| Bicillin CR 900/300 |
| Bicillin LA |
| Brethine |
| Bretylium tosylate |
| Brevibloc |
| Bricanyl |
| Bumex |
| Buminate 5% |
| Buminate 25% |
| Buprenex |
| Calciferol |

1995 PDR - Ready to Use

| *Physician's Desk Reference* (49th ed. Jan. 1995) **Solution Formulations: Drug Name** |
| --- |
| Calcijex |
| Calcimar |
| Calcium Disodium Versenate |
| Calphosan |
| Carbocaine |
| Cardene IV |
| Cardizem |
| Carnitor |
| Cefizox |
| Cefobid |
| Cefotan |
| Celestone Soluspan |
| Ceredase |
| Cholera vaccine |
| Chlorpromazine hydrocholride |
| Cipro IV |
| Cleocin phosphate |
| Clindamycin phosphate |
| Codeine phosphate |
| Cogentin |
| Colchicine |
| Compazine |
| Cortone |
| Cyklokapron |
| Cyanocobalamin |
| Dalalone DP |
| Dalgan |
| DDAVP |
| Decadron |
| Decadron with Xylocaine |
| Decadron LA |
| Deca-Durabolin |
| Delatestryl |
| Demadex |
| Demerol |
| Depo-medrol |
| Depo-provera |
| Depo-testosterone |
| Dexamethasone sodium phosphate |
| DHE 45 |
| Diazepam |
| Didronel |
| Diflucan |
| Digoxin |
| Dilantin |
| Dilaudid |
| Dilaudid-HP |
| Dilaudid hydrochloride |
| Dilor |

1995 PDR - Ready to Use

| *Physician's Desk Reference* (49th ed. Jan. 1995) **Solution Formulations: Drug Name** |
|---|
| Dimenhydrinate |
| Diphenhydramine hydrochloride |
| Diphtheria and Tetanus Toxoids Adsorbed |
| Diphtheria and Tetanus Toxoids and Pertussis Vaccine Adsorbed |
| Diprivan |
| Dobutrex |
| Dolophine |
| Dopamine hydrochloride |
| Dopram |
| Doxorubicin |
| Doxycycline hyclate |
| Droperidol |
| Durabolin |
| Duramorph |
| Duranest |
| Elavil |
| Engerix-B |
| Enlon |
| Enlon-Plus |
| Epinephrine |
| Epi-pen |
| Epogen |
| Erythromycin lactobionate |
| Estradurin |
| Ethamolin |
| Ethiodol |
| Fentanyl citrate |
| Fentanyl citrate and Droperidol |
| Flagyl |
| Fluorouracil |
| Floxin |
| Fluzone |
| Fortaz |
| Foscavir |
| Furosemide |
| Gamimune N 5% |
| Gamimune N 10% |
| Gammar |
| Gamulin Rh |
| Garamycin |
| Garamycin intrathecal |
| Gentamicin sulfate |
| H-Big |
| Haldol |
| Haldol Decanoate |
| Heparin x 5 |
| Hep-B-Gammagee |
| Hespan |

1995 PDR - Ready to Use

| *Physician's Desk Reference* (49th ed. Jan. 1995) **Solution Formulations: Drug Name** |
|---|
| Hexadrol |
| HibTiter |
| Humulin 50/50 |
| Humulin 70/30 |
| Humulin BR |
| Humulin L |
| Humulin N |
| Humulin R |
| Humulin U |
| Hydeltrasol |
| Hydeltra-TBA |
| Hydrocortone Acetate |
| Hydrocortone Phosphate |
| Hydromorphone hydrochloridex2 |
| Hydroxyzine hydrochloride |
| Hyperhep |
| Hyperab |
| Hyperstat |
| Hyper-Tet |
| HypRho-D |
| Iletin I |
| Iletin II |
| Ilotycin |
| Imitrex |
| Imogan |
| Inapsine |
| Inderal |
| INFeD |
| Influenza Vaccine Types A and B |
| Infumorph |
| Innovar |
| Inocor |
| Insulin, regular |
| Insulin, regular purified pork |
| Ipol |
| Isoproterenol hydrochloride |
| Isoptin |
| Isuprel |
| Konakion |
| Kytril |
| Lanoxin |
| Lasix |
| Lente Iletin I |
| Lente purified pork insulin |
| Levophed |
| Levo-Dromoran |
| Levoprome |
| Levsin |
| Lidocaine hydrochloride and Epinephrine |

1995 PDR - Ready to Use

| *Physician's Desk Reference* (49th ed. Jan. 1995) **Solution Formulations: Drug Name** |
| --- |
| Lincocin |
| Lioresal |
| Lopressor |
| Lovenox |
| Loxitane |
| Lufyllin |
| Lupron |
| Marcaine |
| Marcaine with Epinephrine |
| Marcaine Spinal |
| Mefoxin |
| Mepergan |
| Meperidine hydrochloride |
| Mesnex |
| Mestinon |
| Metastron |
| Methergine |
| Methotroxate |
| Methyldopate hydrochloride |
| Metronidazole redi-infusion |
| Metubine |
| Metubine iodide |
| Miacalcin |
| MICRhoGAM |
| Mini-Gamulin Rh |
| Minocin |
| Mio-Rel |
| Mivacron |
| Monistat |
| Morphine sulfate |
| Myochrysine |
| Naloxone |
| Narcan |
| Navane |
| Nebcin |
| Nembutal |
| Neostigmine methylsulfate |
| Neo-Synephrine |
| Nephramine |
| Nesacaine |
| Netromycin |
| Neupogen |
| Neuroforte-R |
| Neuroforte-Six |
| Nitro-BID |
| Norflex |
| Normodyne |
| Novantrone |
| Novocain |

1995 PDR - Ready to Use

| *Physician's Desk Reference* (49th ed. Jan. 1995) **Solution Formulations: Drug Name** |
|---|
| Novolin Lente |
| Novolin N |
| Novolin R |
| Novolin 70/30 Pen fill |
| NPH Iletin I |
| NPH Iletin II |
| Nubain |
| Numorphan |
| Nuromax |
| Nydrazid |
| Omnipaque |
| Omniscan |
| Oncaspar |
| Oncovin |
| Orthoclone OKT |
| Oxytocin |
| Pancuronium bromide |
| Papaverine |
| Pavulon |
| Pentacarinat |
| Pentaspan |
| Pepcid |
| Peptavalon |
| Phenergan |
| Phenobarbital sodium |
| Phenylephrine hydrochloride |
| Phenytoin sodium |
| Plague vaccine |
| Plasma-plex |
| Plasmatein 5% |
| Pneumovax 23 |
| Pnu-Imune 23 |
| Polocaine |
| Premarin |
| Primacor |
| Priscoline |
| Pontocaine |
| Procainamide hydrochloride |
| Prochlorperazine edisylate |
| Procrit |
| Prograf |
| ProHIBiT |
| Prolixin |
| Prolixin decanoate |
| Prolixcin enanthate |
| Promethazine hydrochloride |
| Prostigmin |
| Prostin VR Pediatric |
| Protamine sulfate |

1995 PDR - Ready to Use

| *Physician's Desk Reference* (49th ed. Jan. 1995) **Solution Formulations: Drug Name** |
| --- |
| Protenate 5% |
| Recombinvax HB |
| Reglan |
| Regonol |
| Retrovir |
| Reversol |
| RhoGAM |
| Robaxin |
| Robinul |
| Rocephin |
| Roferon-A |
| Romazicon |
| Sandimmune |
| Sandostatin |
| Scleromate |
| Secobarbital sodium |
| Sensorcaine |
| Sensorcaine-MPF |
| Sensorcaine with Epinephrine |
| Sensorcaine-MPF with Epinephrine |
| Septra |
| Serentil |
| Sodium nitroprusside |
| Solganal |
| Sotradecol |
| Stadol |
| Stelazine |
| Stilphostrol |
| Streptomycin suflate |
| Sublimaze |
| Succinykcholine chloride |
| Sufenta |
| Sulfamethoxazole & Trimethoprim |
| Supprelin |
| Survanta |
| Sus-phrine |
| Synthroid |
| Syntocinon |
| Tac-3 |
| Tagamet |
| Talwin |
| Taxol |
| TE Anatoxal Berna |
| Tenormin |
| Tensilon |
| Terramycin |
| Tetanus and Diphtheria toxoids adsorbed |
| Tetanus and Diptheria toxoids adsorbed - Ultrafined |
| Tetanus and Diphtheria toxoids adsorbed -Purogenated |

1995 PDR - Ready to Use

| Physician's Desk Reference (49th ed. Jan. 1995) Solution Formulations: Drug Name |
|---|
| Tetanus toxoid - Ultrafined |
| Tetanus toxoid adsorbed - Ultrafined |
| Tetanus toxoid adsorbed - Purogenated |
| Tetramune |
| Thiamine hydrochloride |
| Thiocyl |
| Thorazine |
| Thyrel TRH |
| Tigan |
| Timentin |
| Tobramycin |
| Tofranil |
| Toradol |
| Torecan |
| Tracrium |
| Trandate |
| Trilafon |
| Tri-Immunol |
| Triostat |
| Tripedia |
| Tubersol |
| Typhoid vaccine |
| Ultralente insulin |
| Unipen |
| Urecholine |
| Valium |
| Varicella-Zoster Immune Globulin (human) |
| Vasotec |
| Vasoxyl |
| Velosulin |
| Venoglobulin-S |
| Versed |
| Virilon |
| Vistaril |
| Vumon |
| Wycillin |
| Wydase |
| Xylocaine |
| Xylocaine with Epinephrine |
| Xylocaine for Ventricular Arrythmias |
| Xylocaine MPF |
| Yutopar |
| Zantac |
| Zefazone |
| Zemuron |
| Zinacef |
| Zofran |
| Zoladex |

1995 PDR - Lyophilized

| | Drug Name | Buffer | Excipients | pH Adjuster |
|---|---|---|---|---|
| | **Physician's Desk Reference** (49th ed. Jan. 1995) | | | |
| | **Lyophilized Formulations** | | | |
| 1 | Abbokinase | -- | albumin | NaOH or HCl |
| | | | mannitol | |
| | | | sodium chloride | |
| 2 | Acthar | -- | -- | -- |
| 3 | ActHIB | -- | sucrose | -- |
| | | | thimerosal | |
| 4 | Activase | -- | polysorbate 80 | phosphoric acid |
| | | | L-arginine | NaOH |
| | | | altephase | |
| 5 | Adriamycin RDF | -- | methylparaben | -- |
| | | | lactose | |
| 6 | Alkeran | -- | povidone | -- |
| 7 | AlphaNine SD | -- | -- | -- |
| 8 | Ancef | -- | -- | -- |
| 9 | Anectine Flo-Pack | -- | -- | -- |
| 10 | Antihemophilic Factor Bioclate | -- | albumin | -- |
| | | | polyethylene glycol | |
| | | | sodium | |
| | | | histidine | |
| | | | polysorbate 80 | |
| | | | Von Willebrand Factor | |
| | | | calcium | |
| 11 | Antihemophilic Factor, Method M | -- | albumin | -- |
| | | | polyethylene glycol | |
| | | | histidine | |
| | | | glycine | |
| 12 | Antihemophilic Factor Helixate | -- | albumin | -- |
| 13 | Antivenin Crotalidae | -- | phenol | -- |
| | | | thimerosal | |
| 14 | Antivenin (Latrodectus mactans) | | thimerosal | -- |
| 15 | Antivenin (Mycrurus fulvius) | -- | phenol | -- |
| | | | thimerosal | |
| 16 | APL | -- | benzyl alcohol | NaOH |
| | | | lactose | HCl |
| | | | phenol | |
| 17 | Aredia | -- | mannitol | phosphoric acid |
| 18 | Attenuvax | -- | sorbitol | -- |
| | | | gelatin | |
| | | | neomycin | |
| 19 | Autoplex T | -- | -- | -- |
| 20 | Azactam | -- | arginine | -- |
| 21 | Bebulin VH Immuno | -- | -- | -- |
| 22 | Betaseron | -- | dextrose | -- |
| | | | albumin | |

1995 PDR - Lyophilized

| | *Physician's Desk Reference* (49th ed. Jan. 1995) | | | |
|---|---|---|---|---|
| | **Lyophilized Formulations** | | | |
| | Drug Name | Buffer | Excipients | pH Adjuster |
| 23 | Biavax II | -- | sorbitol | -- |
| | | | gelatin | |
| | | | neomycin | |
| 24 | BiCNU | -- | -- | -- |
| 25 | Blenoxane | -- | -- | -- |
| 26 | Botox | -- | albumin | -- |
| | | | sodium chloride | |
| 27 | Capastat | -- | -- | -- |
| 28 | Cefizox | -- | -- | -- |
| 29 | Cefobid | -- | -- | -- |
| 30 | Cefotan | -- | -- | -- |
| 31 | Ceptaz | -- | L-Arginine | -- |
| 32 | Cerubidine | -- | mannitol | -- |
| 33 | Chloromycetin sodium succinate | -- | -- | -- |
| 34 | Coly-Mycin M | -- | -- | -- |
| 35 | Cosmegen | -- | mannitol | -- |
| 36 | CytoGam | -- | sucrose | -- |
| | | | albumin | |
| 37 | Cytosar-U | -- | -- | NaOH |
| | | | | HCl |
| 38 | Cytovene | -- | -- | -- |
| 39 | Cytoxan | -- | mannitol | -- |
| 40 | Dantrium | -- | mannitol | NaOH |
| 41 | Desferal | -- | -- | -- |
| 42 | Diamox | -- | -- | NaOH |
| | | | | HCl |
| 43 | Digibind | -- | sorbitol | -- |
| | | | sodium chloride | |
| 44 | Diuril | -- | mannitol | NaOH |
| | | | thimerosal | |
| 45 | Doxorubicin HCl | -- | lactose | -- |
| 46 | Edecrin | -- | mannitol | -- |
| | | | thimerosal | |
| 47 | Elase | -- | -- | -- |
| 48 | Elspar | -- | mannitol | -- |
| 49 | Emete-Con | -- | -- | -- |
| 50 | Exosurf Neonatal | -- | sodium chloride | HCl |
| | | | | NaOH |
| 51 | Factrel | -- | lactose | -- |
| 52 | Feiba VH Immuno | -- | -- | -- |
| 53 | Flagyl | -- | mannitol | -- |
| 54 | Fludara | -- | mannitol | NaOH |
| 55 | Fudr | -- | -- | -- |
| 56 | Gammagard S/D | -- | albumin | |
| | | | glycine | |
| | | | glucose | |
| | | | polyethylene glycol | |
| | | | tri(n-butyl) phosphate | |
| | | | octoxynol 9 | |
| | | | polysorbate 80 | |

| Physician's Desk Reference (49th ed. Jan. 1995) | | | |
|---|---|---|---|
| Lyophilized Formulations | | | |
| Drug Name | Buffer | Excipients | pH Adjuster |
| 57 Gammar | -- | albumin | -- |
| | | sucrose | |
| 58 Glucagon | -- | lactose | -- |
| 59 Helixate | -- | albumin | -- |
| 60 Hemofil M | -- | -- | -- |
| 61 Hyate:C | -- | -- | -- |
| 62 Idamycin | -- | lactose | -- |
| 63 Ifex | -- | -- | -- |
| 64 Ilotycin Gluceptate | -- | -- | -- |
| 65 Imovax Rabies Vaccine | -- | albumin | -- |
| | | neomycin sulfate | |
| | | phenol red indicator | |
| 66 Imovax Rabies ID | -- | albumin | -- |
| | | neomycin sulfate | |
| | | phenol red indicator | |
| 67 Imuran | -- | -- | NaOH |
| 68 Indocin | -- | -- | |
| 69 Intron A (interferon alfa-2b) | -- | -- | -- |
| 70 Iveegam | -- | glucose | -- |
| | | sodium chloride | |
| 71 Je-Vax | -- | thimerosal | -- |
| | | gelatin | |
| | | formaldehyde | |
| | | mouse serum protein | |
| 72 Kabikinase (streptokinase) | -- | sodium L-glutamate | -- |
| | | albumin | |
| 73 Kefurox | -- | -- | -- |
| 74 Kefzol | -- | polysorbate 80 | -- |
| 75 Koate-HP | -- | tri-n-butyl phosphate | -- |
| | | polysorbate 80 | |
| 76 Kogenate | -- | albumin | -- |
| 77 Konyne 80 (Factor IX Complex) | -- | -- | -- |
| 78 Leucovorin Calcium | -- | sodium chloride | NaOH |
| | | | HCl |
| 79 Librium | -- | -- | -- |
| 80 Lupron Depot | -- | gelatin | -- |
| | | mannitol | |
| | | lactic and glycolic acids copolymer | |
| 81 Lupron Depot-Ped | -- | gelatin | -- |
| | | mannitol | |
| | | lactic and glycolic acids copolymer | |
| 82 Lutrepulse | -- | mannitol | -- |
| 83 Mefoxin | -- | -- | -- |
| 84 Menomune | -- | thimerosal | -- |
| | | lactose | |
| 85 Meruvax II | -- | neomycin | -- |
| | | sorbitol | |
| | | gelatin | |

| | *Physician's Desk Reference* (49th ed. Jan. 1995) | | | |
|---|---|---|---|---|
| | **Lyophilized Formulations** | | | |
| | Drug Name | Buffer | Excipients | pH Adjuster |
| 86 | Methotrexate | -- | -- | NaOH |
| | | | | HCl |
| 87 | Metrodin | -- | lactose | -- |
| 88 | Mezlin | -- | -- | -- |
| 89 | Minocin | -- | -- | -- |
| 90 | Mithracin (plicamycin) | -- | mannitol | disodium phophate |
| 91 | MMR II | -- | sorbitol | -- |
| | | | gelatin | |
| 92 | Monocid | -- | -- | -- |
| 93 | Monoclate-P | -- | albumin | -- |
| 94 | Mononine Coagulation Factor IX (Human) | -- | -- | -- |
| 95 | MR-Vax II | -- | sorbitol | -- |
| | | | neomycin | |
| | | | gelatin | |
| 96 | Mumpsvax | -- | neomycin | -- |
| | | | sorbitol | |
| | | | gelatin | |
| 97 | Mustargen | -- | sodium chloride | -- |
| 98 | Mutamycin | -- | mannitol | -- |
| 99 | Navane | -- | mannitol | -- |
| 100 | Neosar | -- | sodium chloride | -- |
| 101 | Neutrexin | -- | -- | -- |
| 102 | Niphanoid | -- | -- | -- |
| 103 | OmniHIB | -- | sucrose | -- |
| 104 | Omnipen-N | -- | -- | -- |
| 105 | Panhematin | -- | Sorbitol | NaOH or HCl |
| 106 | Paraplatin | -- | mannitol | -- |
| 107 | Parathar | -- | -- | -- |
| 108 | PedvaxHIB | -- | AlOH | -- |
| | | | thimerosal | |
| | | | lactose | |
| | | | sodium chloride | |
| 109 | Pentacarinat | -- | -- | -- |
| 110 | Pentam 300 | -- | -- | -- |
| 111 | Pergonal | -- | lactose | -- |
| 112 | Pipracil | -- | -- | -- |
| 113 | Platinol | -- | -- | -- |
| 114 | Polygam S/D | -- | albumin | -- |
| | | | glycine | |
| | | | glucose | |
| | | | polyethylene glycol | |
| | | | tri(n-butyl) phosphate | |
| | | | octoxynol 9 | |
| | | | polysorbate 80 | |
| 115 | Polymyxin B Sulfate | -- | -- | -- |
| 116 | Pontocaine (Niphanoid) | -- | -- | -- |
| 117 | Primaxim IM | -- | sodium | -- |
| 118 | Prolastin | -- | -- | -- |

1995 PDR - Lyophilized

| | Physician's Desk Reference (49th ed. Jan. 1995) | | | |
|---|---|---|---|---|
| | Lyophilized Formulations | | | |
| | Drug Name | Buffer | Excipients | pH Adjuster |
| 119 | Profilate OSD | -- | -- | -- |
| 120 | Profilnine | -- | -- | -- |
| 121 | Proplex T | -- | -- | -- |
| 122 | Protopam chloride | -- | -- | NaOH |
| 123 | Provocholine | -- | -- | -- |
| 124 | Recombinate | -- | -- | -- |
| 125 | Regitine | -- | mannitol | -- |
| 126 | Rifadin | -- | sodium formaldehyde stearate | NaOH |
| | | | titanium dioxide | |
| 127 | Rocephin | -- | -- | -- |
| 128 | Roferon-A (interferon alfa-2b) | -- | phenol | -- |
| | | | albumin | |
| | | | sodium chloride | |
| 129 | Rubex | -- | lactose | -- |
| 130 | Sandoglobulin | -- | sucrose | -- |
| | | | sodium chloride | |
| 131 | Secretin-Ferring | -- | cysteine hydrochloride | -- |
| | | | mannitol | |
| 132 | Theracys | -- | guerin | -- |
| | | | monosodium glutamate | |
| 133 | Thrombate III (antithrombin III) | -- | -- | -- |
| 134 | Thrombogen | -- | calcium chloride | -- |
| | | | sodium chloride | |
| | | | glycine | |
| | | | benzethonium chloride | |
| 135 | Thytropar | -- | -- | -- |
| 136 | Ticar | -- | -- | -- |
| 137 | Timentin | -- | -- | -- |
| 138 | Trobicin | -- | -- | -- |
| 139 | Unasyn | -- | -- | -- |
| 140 | Vancocin HCl | -- | -- | -- |
| 141 | Velban | -- | -- | -- |
| 142 | Venoglobulin-I | -- | -- | -- |
| 143 | Vibramycin | -- | ascorbic acid | -- |
| 144 | Wydase | -- | lactose | -- |
| | | | thimerosal | |
| 145 | YF-Vax | -- | sorbitol | -- |
| | | | gelatin | |
| 146 | Zefazone | -- | -- | -- |
| 147 | Zinacef | -- | -- | -- |
| 148 | Zosyn | -- | -- | -- |
| 149 | Zovirax | -- | -- | -- |

1995 PDR - Lyophilized

| | Physician's Desk Reference (49th ed. Jan. 1995) | | | |
|---|---|---|---|---|
| | **Lyophilized Formulations** | | | |
| | Drug Name | Buffer | Excipients | pH Adjuster |
| 1 | Abbokinase Open-Cath | monobasic sodium phosphate anhydrous | gelatin | NaOH |
| | | | mannitol | HCl |
| | | | sodium chloride | |
| 2 | Brevital sodium | anhydrous sodium carbonate | -- | -- |
| 3 | Claforan | sodium citrate | dextrose | HCl |
| 4 | | | | NaOH |
| 5 | DTIC-Dome (dacarbazine) | citric acid | mannitol | -- |
| 6 | Eminase | E-aminocaproic acid | p-amidinophenyl-p-anisate | NaOH |
| | | | mannitol | |
| | | | albumin | |
| | | | L-lysine | |
| | | | glycerol | |
| | | | DMSO | |
| 7 | Estradurin | sodium phosphate | phenylmercuric nitrate | NaOH |
| | | | niacinamide | |
| 8 | Fortaz | sodium carbonate | -- | -- |
| 9 | Fungizone | sodium phosphates | sodium desoxycholate | -- |
| 10 | Geref | monobasic sodium phosphate dibasic sodium phosphate | mannitol | -- |
| 11 | Humate-P | sodium citrate | glycine | -- |
| | | | sodium chloride | |
| | | | albumin | |
| | | | other proteins | |
| 12 | Humatrope | dibasic sodium phosphate | mannitol | NaOH |
| | | | glycine | phosphoric acid |
| 13 | Leukine | tromethamine | mannitol | -- |
| | | | sucrose | |
| 14 | Mandol | sodium carbonate | -- | -- |
| 15 | Neosar | sodium bicarbonate | -- | NaOH |
| | | | | carbon dio--ide |
| 16 | Norcuron | citric acid anyhydrous | mannitol | NaOH |
| | | dibasic sodium phosphate anhydrous | | phosphoric acid |
| 17 | Nutropin | monobasic sodium phosphate | mannitol | -- |
| | | dibasic sodium phosphate | glycine | |
| 18 | Pfizerpen | sodium citrate | -- | -- |
| | | citric acid | | |
| 19 | Pregnyl | monobasic sodium phosphate | -- | -- |
| | | dibasic sodium phosphate | | |
| 20 | Profasi | dibasic sodium phosphate | mannitol | -- |
| | | monobasic sodium phosphate | | |
| 21 | Premarin | sodium citrate | lactose | NaOH |
| | | | simethicone | HCl |
| 22 | Primaxin IV | sodium bicarbonate | -- | -- |
| 23 | Proleukin | monobasic sodium phosphate | mannitol | -- |
| | | dibasic sodium phosphate | sodium dodecyl sulfate | |
| 24 | Protropin | monobasic sodium phosphate | mannitol | phosphoric acid |
| | | dibasic sodium phosphate | | |
| 25 | Solu-Cortef | monobasic sodium phosphate | -- | -- |
| | | dibasic sodium phosphate | | |

1995 PDR - Lyophilized

| | Physician's Desk Reference (49th ed. Jan. 1995) | | | |
|---|---|---|---|---|
| | **Lyophilized Formulations** | | | |
| | Drug Name | Buffer | Excipients | pH Adjuster |
| 26 | Solu-Medrol | monobasic sodium phosphate | lactose | -- |
| | | dibasic sodium phosphate | benzyl alcohol | |
| 27 | Synthroid | tribasic sodium phosphate anhydrous | mannitol | NaOH |
| 28 | Tazicef | sodium carbonate | -- | -- |
| 29 | Tazidime | sodium carbonate | -- | -- |
| 30 | Thiotepa | sodium bicarbonate | sodium chloride | -- |
| 31 | TICE BCG | citric acid | glycerin | -- |
| | | | asparagine | |
| | | | potassium phosphate | |
| | | | magnesium sulfate | |
| | | | lactose | |
| | | | iron ammonium citrate | |
| 32 | Wyeth Unipen | sodium citrate | -- | -- |
| 33 | Zanosar | citric acid anhydrous | -- | NaOH |

# Exhibit E

| Tartrate (50 mM) | | | | |
|---|---|---|---|---|
| **F2** | Caspofungin "L-743,872" | L-717 "impurity 10" | L-969 "impurity 9" | Dimers "dimer 1 + 2" |
| Prelyophilized | 97.75 | 0 | 0.23 | 0.23 |
| 16 weeks | 96.75 | 0.47 | 0.41 | 0.26 |
| Δ 16 weeks | -1.00 | 0.47 | 0.18 | 0.03 |

| Acetate (50 mM) | | | | |
|---|---|---|---|---|
| **F19** | Caspofungin "L-743,872" | L-717 "impurity 10" | L-969 "impurity 9" | Dimers "dimer 1 + 2" |
| Prelyophilized | 97.85 | 0 | 0.09 | 0.33 |
| 16 weeks | 97.65 | 0.13 | 0.14 | 0.25 |
| Δ 16 weeks | -0.20 | 0.13 | 0.05 | -0.08 |

| Compare F2:F19 | 5.0 | 3.6 | 3.6 |
|---|---|---|---|

Notes:

1. L-717 is also known as the "oxidative degradate," or "impurity 10."
2. L-969 is the acid/base degradate (hydrolysis product), or "impurity 9."
3. F2 data: MRK_CAN00019918, 924; F19 Data: MRK_CAN00020285; 289.

Exhibit 2-G

REDACTED
IN ITS
ENTIRETY