Exhibit 2-H

David E. De Lorenzi, Esq.
Sheila F. McShane, Esq.
**GIBBONS P.C.**
One Gateway Center
Newark, New Jersey 07102-5310
Tel.: (973) 596-4500
Fax: (973) 596-0545

Dominick A. Conde, Esq.
Brian V. Slater, Esq.
**FITZPATRICK, CELLA, HARPER & SCINTO**
1290 Avenue of the Americas
New York, New York 10104-3800
Tel.: (212) 218-2100
Fax: (212) 218-2200

Edward W. Murray, Esq.
Karen Stoffan, Esq.
**MERCK & CO., INC.**
RY28-320
P.O. Box 2000
Rahway, New Jersey 07065-0900
Tel.: (732) 594-0436

*Attorneys for Plaintiffs*
*Merck & Co., Inc. and*
*Merck Sharp & Dohme Corp.*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| MERCK & CO., INC. and MERCK SHARP & DOHME CORP., Plaintiffs, v. SANDOZ INC., Defendant. | C.A. No. 2:10-01625-SRC-PS *Contains Confidential Material – Subject to Pending Motion to Seal* |

**MERCK'S RESPONSE TO SANDOZ INC.'S COUNTER-STATEMENT OF FACTS IN SUPPORT OF ITS OPPOSITION TO MERCK'S MOTION FOR SUMMARY JUDGMENT ON SANDOZ'S OBVIOUSNESS DEFENSE**

1.      U.S. Patent 5,592,300 ("the '300 patent") to Nerurkar et al. issued on September 14, 1999, and claims priority to a provisional application filed on April 19, 1996. (Lemek Decl., Ex. 4, DTX 1).[1]

**Response:**      Undisputed.

2.      U.S. Patent 5,378,804 ("the '804 patent") to Balkovec et al. issued on January 3, 1995 and was assigned to Merck & Co., Inc. (Leonard Decl., Ex. L, DTX 84).[2]

**Response:**      Undisputed.

3.      The '804 patent was issued, published and publicly available before the alleged invention of the formulation claimed in the '300 patent and more than one year before the earliest priority date of the '300 patent.

**Response:**      Undisputed that the '804 patent is prior art to the '300 patent.

4.      U.S. Patent No. 5,552,521 ("the '521 patent") to Belyk et al. issued on September 3, 1996 and was assigned to Merck & Co., Inc. (Leonard Decl., Ex. M, DTX 91).

**Response:**      Undisputed.

5.      The application for the '521 patent was filed before the alleged invention of the formulation claimed in the '300 patent.

**Response:**      Undisputed that the '521 patent is prior art to the '300 patent.

6.      U.S. Patent No. 4,857,552 ("the '552 patent") to Rosenberg issued on August 15, 1989. (Lemek Decl., Ex. 1, DTX 98).

**Response:**      Undisputed.

7.      The '552 patent was issued, published and publicly available before the alleged invention of the formulation claimed in the '300 patent and more than one year before the earliest priority date of the '300 patent.

**Response:**      Undisputed that the '552 patent is prior art to the '300 patent.

8.      Avis et al., Pharmaceutical Dosage Forms: Parenteral Medications, Marcel Dekker, Inc. ("Avis") (Lemek Decl., Ex. 2, DTX 97), was published and publicly available in

---

[1]      "Lemek Decl." refers to the Declaration of Abby L. Lemek, Esq. filed in support of Sandoz's opposition to Merck's motion for summary judgment.  (D.I. 113.)

[2]      "Leonard Decl." refers to the Declaration of Jason A. Leonard, Esq. filed in support of Merck's motion for summary judgment. (D.I. 107.)

1992 before the alleged invention of the formulation claimed in the '300 patent and more than one year before the earliest priority date of the '300 patent.

**Response:** Undisputed that Avis et al. is prior art to the '300 patent.

9. Remington: The Science and Practice of Pharmacy (19th Ed., 1995) ("Remington 1995") (Lemek Decl., Ex. 11, DTX 85), was published and publicly available in 1995 before the alleged invention of formulation claimed in the '300 patent and more than one year before the earliest priority date of the '300 patent.

**Response:** Undisputed that Remington 1995 is prior art to the '300 patent.

10. G.L. Flynn, "Buffers – pH Control Within Pharmaceutical Systems," Journal of the Parenteral Drug Association March-April, 1980, Vol. 34(2)F (Lemek Decl., Ex. 12, DTX 86), was published and publicly available in 1995 before the alleged invention of formulation claimed in the '300 patent and more than one year before the earliest priority date of the '300 patent.

**Response:** Undisputed that Flynn is prior art to the '300 patent.

11. Development of a formulation for a new drug compound follows a well-known development path. (Leonard Decl., Ex. A, Expert Report of Mark A. Staples, ¶¶ 21-56).

**Response:** Sandoz relies only on the conclusory assertion by Dr. Staples, with no factual basis, that formulation of a drug compound follows a well-known development path. (*See generally* Leonard Decl., Ex. A at ¶¶ 21-56; Byrn Decl.[3], Ex. A at ¶¶ 30-32.)  For example, Dr. Staples cites several large references in their entirety (Leonard Decl., Ex. A at ¶ 21), without pointing to any specific pages that support his formulation strategies (*see generally* Leonard Decl., Ex. A at ¶¶ 22-57).  Merck does not dispute that there are general considerations for developing drug formulations.  (*See* Byrn Decl., Ex. A at ¶¶ 34-42.)  Nor does Merck dispute that there are many aspects and variables to consider when developing a shelf-stable drug formulation, and many different ways to formulate a drug.  (*Id.*; *see also* Lemek Decl., Ex. 11 at

---

[3]      Citations to the "Byrn Decl." refer to the Declaration of Professor Stephen R. Byrn, filed in support of Merck's motion for summary judgment.  (D.I. 107.)

1447 ("the development of an optimum formulation is not an easy task, and many factors readily influence formulation properties".)

12.     Formulation development follows a series of logical, intuitive steps using the information learned during the preformulation studies. (*Id.* at ¶¶ 26-32).

**Response:**     See Merck's response to Sandoz's CSOF ¶ 11.  Sandoz has not provided any specific evidence that drug formulation development is necessarily "logical" or contains "intuitive steps."

13.     Formulators conduct preformulation studies to characterize the drug that is being formulated. (Lemek Decl., Ex. 3, Deposition of Professor Stephen R. Byrn, at 61:4-63:16; Ex. 11 at 1447).

**Response:**     Undisputed that formulators conduct preformulation studies.  Sandoz also does not dispute that preformulation studies will not reveal all characteristics of a drug compound, such as all of its degradation pathways, knowledge of which is required to develop a stable formulation.  (Leonard Decl., Ex. C at 222:10-17, 232:4-233:6; RSOF[4] ¶ 18; *see also* Lemek Decl., Ex. 3 at 108:15-24; Byrn Decl., Ex. A at ¶¶ 53-55; Ex. 11 at 1448 ("This information is critical to the formulation scientist in order to stabilize the drug molecule in the dosage form.").)  Indeed, the L-717 degradant of caspofungin was not identified during preformulation.  (Byrn Decl., Ex. A at ¶¶ 60-61.)  Further, Sandoz does not dispute that the results from preformulation studies on caspofungin are not in the prior art.  (RSOF ¶¶ 13, 48-49, 64.)

14.     "Preformulation may be described as a phase of the research and development process where the preformulation scientist characterized the physical, chemical, and mechanical properties of a new drug substance, in order to develop stable, safe and effective dosage forms." (Lemek Decl., Ex. 11 at 1448).

---

[4]     "RSOF" refers to Merck's statement of facts and Sandoz's responses to them, filed in support of Sandoz's opposition to Merck's motion for summary judgment.  (D.I. 113.)

**Response:**  Undisputed that Remington 1995 states the above, except that the quoted word "characterized" is in fact "characterizes."  (Lemek Decl., Ex. 11 at 1448).  See also Merck's Response to Sandoz's CSOF[5] ¶ 16.

15.  "[T]he formulation scientist uses [information from preformulation studies] to develop dosage forms." (Lemek Decl., Ex. 11 at 1448).

**Response:**  Undisputed that Remington 1995 states that "the formulation scientist uses this information [from preformulation studies] to develop dosage forms."  (Lemek Decl., Ex. 11 at 1448.)

16.  During preformulation, formulators study the stability of the drug molecule as a function of pH. (Lemek Decl., Ex. 3 at 61:4-63:16, 70:22-71:20, 155:23-156:23; *see also* Ex. 11 at 1448 ("Typical studies would include a pH-stability profile . . .").

**Response:**  Sandoz mischaracterizes the cited testimony of Professor Byrn. Formulators study the stability of the drug molecule ***in solution*** as a function of pH, but not in the solid state.  (Lemek Decl., Ex. 3 at 61:4-63:16; 70:22-71:20; 155:23-156:23.)  It is undisputed that compounds in the solid state are not generally considered to have a pH, and so the stability of a compound in the solid state as a function of pH cannot be determined.  (Lemek Decl., Ex. 3 at 63:22-64:16.)

> Q.  Just to clarify, in a solid state, it is not that you don't know it, it is that the concept of pH doesn't really exist, is that correct?
> A.  Correct, you don't know the pH, that's correct; I talked about that in my expert report.  So you don't know whether the pH, the pH of stability in the solution carries over to the solid or not.

(*Id.* at 64:7-16.)

17.  The pH stability profile tells the formulator whether the stability of the molecule depends on the pH and, if so, what the most stable pH is. (*Id.*).

---

[5]  "CSOF" refers to Sandoz's counter-statement of facts, filed in support of its opposition to Merck's motion for summary judgment.  (D.I. 113, Attach. 1.)  "MCSOF" refers to Merck's responses to Sandoz's counter-statement of facts, filed concurrently with Merck's reply brief in support of its motion for summary judgment on October 19, 2011.

**Response:**     See Merck's response to Sandoz's CSOF ¶ 16.

18.     If the stability of the molecule varies according to the pH, then it is desirable to include a buffer to keep the pH steady at the pH of greatest stability.  (Lemek Decl., Ex. 3 at 101:6-15; *see also* Lemek Decl., Ex. 12 at 139, 144, 153; Ex. 2 at 195, 220; Ex. 11 at 1529).

**Response:**     Sandoz mischaracterizes Professor Byrn's testimony, which has nothing to

do with stabilizing a composition but rather merely acknowledges that a buffer can be used to

keep constant a desired pH:

> Q.     Is the predominant reason for including a buffer in any formulation to **stabilize the pH of the composition**?
> A.     Well, that would be one of the reasons, like I was saying, when you reconstitute you want to have a stable pH and you want to have it in a certain range.  So that would be I think the first reason probably.

(Lemek Decl., Ex. 3 at 101:6-15) (emphasis added.)

Contrary to the references cited by Sandoz (Lemek Decl., Ex. 12; Ex. 2; Ex. 11).

Sandoz's formulation expert Dr. Staples has stated that a buffer should only be added to the

formulation if there is evidence of pH drift, *i.e.*, the pH of the solution changes over time, not

just because the stability of the compound varies according to pH (Leonard Decl., Ex. C at

202:2-203:5; RSOF ¶¶ 55-56, 61).  Merck's expert, Professor Byrn, agrees with Dr. Staples that

absent evidence of pH drift, a POSA would not be motivated to add a buffer to the formulation.

(Byrn Decl., Ex. A at ¶¶ 72-73.)  Dr. Staples also contends, and Professor Byrn agrees, that a pH

adjuster, rather than a buffer, may be used to adjust the pH of a solution to a target in the absence

of pH drift.  (*See, e.g.*, Leonard Decl., Ex. A at ¶¶ 43-45, 51; Ex. C at 74:22-75:8; Byrn Decl.,

Ex. A at ¶ 72.)

Sandoz has not provided any evidence that there is <u>pH drift</u> when caspofungin is put in

solution, or that its stability varies <u>significantly</u> according to pH, only that caspofungin's stability

does vary according to pH.  (Byrn Decl., Ex. A at ¶ 73.)  Indeed, Dr. Zimmerman[6] testified that

he was not aware of any data showing that caspofungin showed pH drift in solution.  (Lemek

Decl., Ex. 8 at 116:14-24.)

Further, Sandoz has failed to provide any evidence that the stability of caspofungin in

solution is relevant to the stability of solid, lyophilized formulations of caspofungin.  (*See* RSOF

¶ 73 (discussing only stability of the pre-lyophilization solution and solution after reconstitution

of the lyophilized product, and in solution *during* the freeze-drying process); *see also* RSOF ¶

72; Byrn Decl., Ex. A at ¶ 74.)  See also Merck's response to CSOF ¶ 16.

19.     During preformulation, formulators study degradation pathways (Lemek
Decl., Ex. 3 at 61:4-62:16, 66:7-67:15; 106:11-107:2; Ex. 11 at 1458). It is desirable to prevent
degradation so that as much of the active drug compound remains intact as possible.

**Response:**     See Merck's response to Sandoz's CSOF ¶ 13.

20.     During preformulation, formulators will determine if a molecule is subject
to degradation in the presence of water (*i.e.*, hydrolysis). (Lemek Decl., Ex. 3 at 106:11-107:2;
Ex. 11 at 1458).

**Response:**     See Merck's response to Sandoz's CSOF ¶ 13.

21.     If the molecule is subject to hydrolysis, then the formulator knows that it
is desirable to remove water from the formulation, such as through freeze-drying (*i.e.*,
lyophilization). (Lemek Decl., Ex. 3 at 105:2-21; Ex. 11 at 1544).

**Response:**     Undisputed that one way to minimize degradation of a compound by

hydrolysis is to remove the water in the formulation.  (Lemek Decl., Ex. 3 at 105:2-21; Leonard

Decl., Ex. A at ¶¶ 43, 46 (describing methods to reduce hydrolysis).)  Merck disputes this CSOF

to the extent it suggests that a POSA will only seek to prevent hydrolysis and not seek the

ultimate goal of stabilizing a drug compound in a pharmaceutical dosage form, which Sandoz

itself has stated is desirable.  (CSOF ¶ 19; Byrn Decl., Ex. A at ¶ 62.)  Additionally, Sandoz

---

[6]     Dr. Jeffrey Zimmerman testified on behalf of Merck pursuant to Fed. R. Civ. P. 30(b)(6)
on February 18, 2011.

presents no evidence from the prior art to motivate a POSA to lyophilize caspofungin to prevent hydrolysis.

22.     Formulators will seek to use the fewest number of ingredients. (Leonard Decl., Ex. A at ¶ 9).

**Response:**     Sandoz has not provided any factual basis for this conclusory assertion by Dr. Staples.

23.     If an ingredient already exists in the formulation (*e.g.*, an acetate counter-ion to the drug compound) then it is desirable to use that same ingredient for the other components (*e.g.*, an acetate buffer) rather than a new ingredient (*e.g.*, a phosphate buffer). (Leonard Decl., Ex. A at ¶ 9).

**Response:**     Dr. Staples makes the conclusory assertion, with no factual basis, that an acetate buffer would be selected for a caspofungin acetate formulation over other potential buffers due to the presence of acetate in the formulation as a counterion.  (Leonard Decl., Ex. A at ¶¶ 21-22, 84, 97.)  The citation provided by Sandoz does not support this CSOF.

24.     Formulators will seek to use common, well-known ingredients that have already been approved for use by FDA in pharmaceutical formulations. (*Id.*).

**Response:**     Dr. Staples makes the conclusory assertion, with no factual basis, that formulators will use "the most common [FDA-approved] ingredients" when developing a pharmaceutical formulation.  (Leonard Decl., Ex. A at ¶¶ 22, 96; Ex. B at ¶ 37.)  Dr. Staples also does not provide any factual basis for or objective criteria to define and select a "common ingredient" from any list of FDA-approved ingredients.  (*See* Leonard Decl., Ex. A at ¶¶ 22, 96; Ex. B at ¶ 37.)  References cited by Dr. Staples include a number of potential buffers.  (RSOF ¶¶ 65-66; Leonard Decl., Ex. A at Exhibit B; Ex. X at 154; Byrn Decl., Ex, A at ¶ 78.)  Indeed, Sandoz's own formulators did not restrict themselves ███████████████ Dr. Staples. (RSOF ¶ 29; Leonard Decl., Ex. B at ¶ 37; Byrn Decl., Ex. A at ¶ 78.)

25.     It is important to create a formulation that works and gets FDA approval. The easiest way to do that is to use ingredients that are common and already approved for use in pharmaceutical formulations. (*Id.* at ¶ 22).

**Response:**     Undisputed that it is important to develop a safe and shelf-stable

pharmaceutical formulation.  (Ex. Byrn Decl., Ex. A at ¶ 34; MCSOF ¶ 13.)    Sandoz fails to

provide any factual basis for its contention that the "easiest way" to approval by the FDA is to

use "common ingredients," fails to provide any objective criteria to define and select a "common

ingredient" from any list of FDA-approved ingredients, and fails to define "works."  (*See*

Leonard Decl., Ex. A at ¶¶ 22, 96; Ex. B at ¶ 37; MCSOF ¶ 24.)

26.     Lyophilization was a known formulation technique at the time of the alleged invention for formulating less stable drug compounds in a quick, efficient manner. (Lemek Decl., Ex. 11 at 1544; Ex. 2 at 217).

**Response:**     Lyophilization was a known technique in the prior art, but it is not

reasonably predictable that it will stabilize an unstable drug compound.  Indeed, it is undisputed

that lyophilizing a solution formulation containing caspofungin resulted in over 7 % degradation

by 4 weeks, falling far short of the 10 % over one year criterion a POSA would use to assess

stability.  (Leonard Decl., Ex. W at MRK_CAN00897425; Lemek Decl., Ex. 3 at 34:23-35:15.)

27.     Avis states that freeze-drying can be "a panacea – a way to get into clinical trials quickly...." (Lemek Decl., Ex. 2 at 217).

**Response:**     Sandoz mischaracterizes the Avis reference through selective quotation.

The full sentence from the Avis reference is:  "Although there are those who would consider

freeze-drying ***only as the last resort***, there are others who view it as a panacea – a way to get into

clinical trials quickly or a way to exclude contaminants and inert particles, especially in

comparison with powder filling."  (Lemek Decl., Ex. 2 at 217 (emphasis added); *see also*

MCSOF ¶ 26.)

28.     Dr. Byrn admits that lyophilization is formulation strategy that would "enter the mind" of a POSA for a caspofungin formulation. (Lemek Decl., Ex. 3 at 130:7-16).

**Response:**     Sandoz mischaracterizes Professor Byrn's testimony by selective

quotation.  Professor Byrn actually testified as follows:

Q.     And if you do not obtain the preferred dosage form as a powder or ready-to-use solution, isn't it correct that in 1996 a person of ordinary skill in the art would turn towards a lyophilized dosage form of caspofungin?
A.     I mean, certainly, that would be one of the thoughts that would enter their mind, I think that's what happened with Merck.

(Lemek Decl., Ex. 3 at 130:7-16) (emphasis added.)

29.     By removing all of the water from the formulation at a very low temperature, a stable formulation is created. (Lemek Decl., Ex. 11 at 1544).

**Response:**     See Merck's response to CSOF ¶ 26.

30.     Lyophilized formulations typically include an excipient. (Lemek Decl., Ex. 11 at 1545; Ex. 3 at 117:18-123:1). That is because a lyophilized formulation that consists of just the drug product would be very, very small and "if freeze-dried alone its presence would be hard to detect visually." (Lemek Decl., Ex. 3 at 117:18-123:1).

**Response:**     Undisputed.  However, it should be noted that many lyophilized

formulations are formulated without a buffer.  (*See* RSOF ¶ 39.)

31.     Lyophilized dosage forms implicate two liquid states during which the pH of the solution is important. (Lemek Decl., Ex. 11 at 1545; Ex. 8, Deposition of Dr. Jeffrey Zimmerman, at 116:1:13).

**Response:**     Sandoz mischaracterizes the Remington 1995 reference, which teaches

that "consideration" must be given to not only "the nature and stability characteristics required

during the liquid state, both freshly prepared and when reconstituted before use, but the

characteristics desired in the dried plug," when discussing excipients necessary to increase the

solids content of the lyophilized formulation.  Moreover, the Remington 1995 reference says

nothing about the pH of the solution states.  (Lemek Decl., Ex. 11 at 1545.)  Further, the

evidence show that the stability of caspofungin in the pre-lyophilized solution did not require a

buffer to resist a change in pH. (Byrn Decl., Ex. A at ¶ 73.) The undisputed testimony of both

experts is clear that a solution would only require a buffer if there was evidence of pH drift.

(RSOF ¶¶ 56, 58, 61.) Sandoz has not provided any such evidence.

> 32. First, there is a pre-lyophilization solution that contains all of the ingredients of the formulation. This solution is placed in a vial and then freeze-dried. (Lemek Decl., Ex. 11 at 1544-45).

**Response:** See Merck's response to CSOF ¶ 31. Otherwise, undisputed.

> 33. Second, the lyophilized "cake" is reconstituted prior to use. Water, or another acceptable solution, is added to the vial to create an injectable solution. This liquid solution is added to an IV bag for administration to a patient. (*Id.*).

**Response:** Undisputed that lyophilized products are reconstituted prior to use with an

appropriate diluent.

> 34. Formulation of a lyophilized dosage form requires consideration of the liquid and solid states. (Lemek Decl., Ex. 2 at 220 ("If degradation is a risk during freezing due to concentration effects or pH changes, stabilizers or buffers may have to be added."); *see also* Ex. 11 at 1545).

**Response:** Sandoz mischaracterizes the Avis reference as referring to consideration

of the solid state, rather than the consideration of the stability in solution "***during freezing***" only.

(Lemek Decl., Ex. 2 at 220.) Further, Sandoz mischaracterizes the Remington 1995 reference,

which only teaches consideration of the "appearance characteristics" of the solid state and thus

the "characteristics desired in the dried plug," and nothing else. (Lemek Decl., Ex. 11 at 1545.)

> 35. The advantages of lyophilization would have been obvious to a POSA at the time of the alleged invention. (Leonard Decl., Ex. A at ¶¶ 46, 56, 57, 86; *see also* Leonard Decl., Ex. B at ¶¶ 4, 5, 12, 13, 27).

**Response:** Dr. Staples makes conclusory assertions in his expert reports, with no

factual bases, of the "advantages of lyophilization." (Leonard Decl., Ex. A at ¶¶ 46, 56, 57, 86;

Ex. B at ¶¶ 4, 5, 12, 13, 27.) Dr. Staples himself has admitted that it is impossible to predict

whether lyophilization will stabilize a pharmaceutical formulation. (RSOF ¶ 72.) Dr. Staples

also admitted that a POSA would not have been able to predict the occurrence of L-717, the

caspofungin degradant that was not observed when caspofungin was in solution formulations,

but only upon lyophilization.  (RSOF ¶ 18; Byrn Decl., Ex. A at ¶ 60-61.)  And, Dr. Staples

admits that a POSA would first attempt to develop a solution formulation for caspofungin.

(RSOF ¶¶ 40-41.)  Further, even Sandoz's formulators, when developing their caspofungin

formulation, ███████████████████████████████████ (RSOF ¶ 47.)

       36.     Dr. Staples explains that "lyophilization is a well-known and reliable
process for creating a stable dosage form for many compounds." (Leonard Decl., Ex. B at ¶ 12).

**Response:**     See Merck's response to CSOF ¶ 35.

       37.     Dr. Staples explains that "lyophilization would have been an obvious
formulation strategy for a POSA at the time of the alleged invention for addressing any concerns
with the hydrolysis degradant." (Leonard Decl., Ex. B at ¶ 27).

**Response:**     See Merck's response to CSOF ¶ 35.  As Sandoz admits, the goal is to

create a stable dosage form of caspofungin, *i.e.*, reduce the amount of degradation of

caspofungin, not just address one degradation pathway.  (CSOF ¶ 19; *see also* Byrn Decl., Ex. A

at ¶ 62.)

       38.     Dr. Byrn acknowledges that he does not like lyophilization, so it comes as
no surprise that he personally would not have looked at lyophilization. (Lemek Decl., Ex. 3 at
132:17-133:19). However, Dr. Byrn also acknowledges that others like lyophilization and would
have tried it. (*Id.* at 130:7-132:1).

**Response:**     Sandoz mischaracterizes the testimony of Professor Byrn, who stated only

that he prefers not to use lyophilization for <u>Phase I trials</u>, and said nothing about his preference

for finished dosage forms:

    Q.     Are lyophilized dosage forms a common dosage form for ***Phase I trials*** because
    they are easier to formulate in a short amount of time?
    A.     You know, again, when I do ***Phase I*** I like to use powder, just the powdered drug.
    So I would not spend the time lyophilizing if I didn't have to, I would go straight to the
    powdered drug, the chemical.

Q.      If there were still efforts to create a powder, but it was known that it was going to take a while to create a powdered dosage form, would you expect a person of ordinary skill in the art in 1996 to create a lyophilized dosage form as a short-term solution *for a Phase I trial*?

A.      I'm not a big lyophilized – am not totally in favor of making lyophilized that early, it is time-consuming and expensive.  *So I would rather go with the powder and use that in a Phase I trial*; you can store the powder minus 70 and use that in a Phase I trial.

(Lemek Decl., Ex. 3 at 132:17-133:19) (emphases added.)  Professor Byrn further

explained that lyophilization would be a potential option *if* a POSA was not able to obtain a

powder or solution formulation dosage form for caspofungin, but that even then, it was an

unpredictable method for stabilizing a drug compound.  (Lemek Decl., Ex. 3 at 130:7-132:1.)

Moreover, the prior art supports Professor Byrn's view that lyophilization is not favorably

viewed by everyone in the field.  (MCSOF ¶ 27; Lemek Decl., Ex. 2 at 217 ("there are those who

would consider freeze-drying only as the *last resort*"), emphasis added.)

        39.      Merck has not submitted any evidence a POSA would have had a greater expectation of success for a liquid formulation of caspofungin than for a lyophilized formulation of caspofungin.

**Response:**      Merck has submitted significant, undisputed evidence that a POSA would

have considered a solution product <u>first</u> over a lyophilized formulation, and need not show that a

POSA would have had a "greater expectation of success" for a liquid formulation.  For example,

both experts agree that a POSA would first have attempted a solution formulation for

caspofungin, rather than a lyophilized formulation.  (RSOF ¶¶ 40-41; Byrn Decl., Ex. A at ¶¶ 49-

52.)  Also, it is undisputed that the majority of prior art commercial injectable formulations are

formulated as solution products.  (RSOF ¶ 39.)  Moreover, the prior art references support

formulating a solution product first before other dosage forms.  (*See* Byrn Decl., Ex. A at ¶¶ 50-

51.)

40.     Dr. Byrn testified that a POSA would have tried to create a liquid formulation, failed, and then moved on to the less desirable, but much easier to formulate, lyophilized solution. (Lemek Decl., Ex. 3 at 129:9-132:1).

**Response:**     Sandoz mischaracterizes Professor Byrn's testimony, as he never testified that developing a stable, lyophilized formulation was "much easier to formulate" than a solution formulation.  Professor Byrn stated that whether lyophilization would stabilize a drug compound was unpredictable (as did Sandoz's expert Dr. Staples), and that a POSA would not have had a reasonable expectation of success.  (Lemek Decl., Ex. 3 at 130:17-132:1; RSOF ¶ 72.)

41.     Dr. Byrn agrees that lyophilization is the obvious choice if preferred dosage forms are not possible. (*Id.*).

**Response:**     Sandoz mischaracterizes Professor Byrn's testimony, as he testified that lyophilization was one option, to be considered only after investigating a solution formulation, and he never stated lyophilization was an "obvious choice."  (Lemek Decl., Ex. 3 at 130:7-132:1.)

42.     At the time of the alleged invention, caspofungin was known a promising antifungal agent that was effective against many different fungal infections. (Leonard Decl., Ex. L at col. 2, ll. 33-35).

**Response:**     Undisputed that the '804 patent discloses that caspofungin was "particularly outstanding for the control of mycotic infections."  (Leonard Decl., Ex. L at col. 2, ll. 33-35.)

43.     The '804 patent disclosed caspofungin and the pharmaceutical salts thereof, the usefulness of caspofungin and salts thereof as antifungal agents, and several dosage forms containing caspofungin salts. (Leonard Decl., Ex. L).

**Response:**     Undisputed that the '804 patent discloses caspofungin and pharmaceutically acceptable salts of caspofungin.  See also Merck's response to Sandoz's CSOF ¶ 42.  Undisputed that the '804 patent discloses caspofungin formulated as tablets, gelatin capsules, and an aerosol formulation.  (Leonard Decl., Ex. C at 88:19-89:25; Ex. L at col. 28, l.

14

35 – col. 29, l. 10.)  And it is undisputed that the only injectable example of the '804 patent,

Example 31, is to an injectable *solution* and does not relate to caspofungin.  (Leonard Decl., Ex.

C at 90:2-20; Leonard Decl., Ex. L at col. 29, ll. 13-24.)  It is undisputed that the '804 patent

does not disclose a lyophilized dosage form of caspofungin.  (Leonard Decl., Ex. C at 87:16-

89:25; Ex. L at col. 16, l. 36 – col. 17, l. 67, col. 28, l. 35 – col. 29, l. 10.)

44.     In the '804 patent, Merck touted the many advantages of caspofungin and called it a compound "which is particularly outstanding for the control of mycotic infections." (Leonard Decl., Ex. L at col. 2, ll. 33-35).

**Response:**     See Merck's response to Sandoz's CSOF ¶ 42.

45.     The advantages of caspofungin provided an incentive to develop a formulation for caspofungin. (*Id.*).

**Response:**     See Merck's response to ¶ 42.  It is undisputed that the '804 patent does

not disclose shelf-stable formulations of caspofungin.  (RSOF ¶ 36.)

46.     At no point in the '804 patent did Merck mention, hint or suggest that caspofungin was an unstable molecule or suggest that it was not stable enough for a formulation.

**Response:**     Undisputed that the '804 patent does not disclose (i) the degree of

instability of caspofungin acetate, (ii) any cause of instability, (iii) the pathways by which

caspofungin degrades, and (iv) how to potentially cure the instability.  (*See* RSOF ¶ 36.)

47.     The '804 patent discloses two examples of salts of caspofungin that could be used in a formulation (the hydrochloride and trifluoroacetate salts of caspofungin). (Leonard Decl., Ex. L at col. 9, ll. 54-56, col. 11, ll. 47-50, respectively).

**Response:**     Undisputed that the '804 patent discloses trihydrochloride and

trifluoroacetate salts of caspofungin.  (Leonard Decl., Ex. L at col. 9, ll. 45-61, col. 11, ll. 47-50,

col. 16, l. 36 – col. 17, l. 67.)

48.     The salts of caspofungin that are disclosed in the '804 patent were lyophilized. (*Id.* at col. 9, ll. 54-56).

**Response:** Undisputed that the '804 patent discloses lyophilizing trifluoroacetate and trihydrochloride salts, but those examples would not be considered by a POSA to be pharmaceutical dosage forms because they are not formulated with excipients. (Leonard Decl., Ex. C at 87:16-88:18; Ex. L at col. 9, ll. 45-56, col. 17, ll. 30-67; Byrn Decl., Ex. A at ¶ 25.)

49.     The '521 patent teaches the use and synthesis of caspofungin diacetate, and that caspofungin diacetate is one of the preferred salts of caspofungin. (Leonard Decl., Ex. M at col. 7, ll. 58-67, col. 8, ll. 1-10).

**Response:** Undisputed except that Merck disputes that the '521 patent teaches that caspofungin diacetate is a preferred salt of caspofungin. (Leonard Decl., Ex. M at col. 2, ll. 5-10, col. 9, l. 36 - col. 10, l. 67; *see also* Byrn Decl., Ex. A at ¶ 28; RSOF ¶ 35.)

50.     The '521 patent does not teach a POSA that caspofungin diacetate is unstable.

**Response:** Undisputed that the '521 patent does not disclose (i) the degree of instability of caspofungin acetate, (ii) any cause of instability, (iii) the pathways by which caspofungin degrades, and (iv) how to potentially cure the instability. (*See* RSOF ¶ 36.)

51.     The '521 patent does not teach a POSA that caspofungin diacetate cannot be formulated into a shelf-stable dosage form.

**Response:** Sandoz mischaracterizes the teachings of the '521 patent. While Merck does not dispute that the '521 patent does not teach a POSA that caspofungin diacetate cannot be formulated into a shelf-stable form, it is undisputed that the '521 patent does not teach a POSA how to prepare a stable dosage form of caspofungin diacetate. (Byrn Decl., Ex. A at ¶¶ 28-29; Leonard Decl., Ex. B at ¶ 8.)  See also Merck's Response to Sandoz's CSOF ¶ 50.

52.     Dr. Byrn admits that there is nothing in the '521 patent that suggests that caspofungin diacetate is unstable. (Lemek Decl., Ex. 3 at 128:7-20).

**Response:**    Dr. Byrn testified that the '521 patent does not indicate either way if caspofungin diacetate is stable, and that a POSA would need to do experimentation to determine the stability of caspofungin diacetate.  (Lemek Decl., Ex. 3 at 79:19-81:24, 128:7-20.)

53.    Merck provided several examples in the '804 patent of how caspofungin could be incorporated into a formulation, including as an injectable solution. (Leonard Decl., Ex. L at Examples 28-31).

**Response:**    Examples 28-30 of the '804 patent describe caspofungin formulated into tablets, capsules, and an aerosol formulation.  (MCSOF ¶ 43.).  And it is undisputed that the only injectable example of the '804 patent, Example 31, is to an injectable *solution* and does not relate to caspofungin.  (Leonard Decl., Ex. C at 90:2-20; Ex. L at col. 29, ll. 13-24.)

54.    The '804 patent provides four examples of caspofungin formulations, and there is no suggestion that any of those formulations is unacceptable or unstable. (*Id.*).

**Response:**    Sandoz mischaracterizes the '804 patent, which contains only three examples of caspofungin formulations, and is silent as to their stability.  (RSOF ¶ 36; MCSOF ¶¶ 43, 53; Byrn Decl. Ex. A at ¶ 23.)  And it is undisputed that the only injectable example of the '804 patent, Example 31, is to an injectable *solution* and does not relate to caspofungin. (Leonard Decl., Ex. C at 90:2-20; Ex. L at col. 29, ll. 13-24.)

55.    Merck's expert, Professor Stephen Byrn, agreed that the examples in the '804 patent tell a POSA that it is possible to formulate dosage forms of caspofungin. (Lemek Decl., Ex. 3 at 90:12-19).

**Response:**    Undisputed as to Examples 28-30 of the '804 patent, and undisputed that the only injectable example of the '804 patent, Example 31, is to an injectable *solution* that does not relate to caspofungin.  (Leonard Decl., Ex. C at 90:2-20; Ex. L at col. 29, ll. 13-24.) Example 31 is the only example which Sandoz did not directly question Professor Byrn about during his deposition.  (Lemek Decl., Ex. 3 at 89:12-90:19.)

17

56.     Dr. Byrn concedes that a POSA would attempt a formulation with an unstable molecule if the drug was a "first-in-class" product, like caspofungin. (Lemek Decl., Ex. 3 at 36:9-19).

**Response:**     Sandoz mischaracterizes Professor Byrn's testimony, as he agreed that a POSA "might" attempt a formulation with an unstable compound, "but you would always be searching for that more stable form."  (Lemek Decl., Ex. 3 at 36:9-19.)

57.     Caspofungin is sufficiently stable for a POSA to begin formulation work. (Leonard Decl., Ex. B at ¶¶ 16-19).

**Response:**     Dr. Staples makes the conclusory assertion, with no factual basis, that caspofungin is "'stable enough' to begin formulation work," and Sandoz does not dispute that Dr. Staples fails to provide any objective criteria by which a POSA can determine whether a compound is "stable enough" to begin formulation work.  (Leonard Decl., Ex. B at ¶¶ 17-18.) Nor does Sandoz dispute that a reference relied on by Dr. Staples, Remington 1995, teaches that "[o]ne hardly would expect to prepare stable dosage forms with a chemical substance that was not stable in the pure state."  (RSOF ¶¶ 37-38; Lemek Decl., Ex. 11 at 1458.)  Caspofungin is a highly unstable compound, and both Sandoz's ANDA and Dr. Staples admit that caspofungin must be stored at minus 70 °C.  (Leonard Decl., Ex. C at 94:18-25; Byrn Decl., Ex. B at Exhibit E, SAND-CASP988316.)  Sandoz's ANDA describes this temperature ███████████████ (Supp. Leonard Decl., Ex. GG at SAND-CASP000333.)[7]

58.     While caspofungin must be stored at refrigerated temperatures, "this would not be a problem, nor would it discourage formulation work because a POSA could effectively work with an API under these conditions in order to do with necessary formulation work." (*Id.* at ¶ 17).

**Response:**     Sandoz relies on the conclusory assertion of Dr. Staples, with no factual basis, to support this allegation.  Sandoz mischaracterizes the storage conditions for caspofungin

---

[7]     The "Supp. Leonard Decl." refers to the Supplemental Declaration of Jason A. Leonard, filed concurrently with Merck's reply brief in support of its motion for summary judgment.

diacetate, which ███████████████████████████████████████████████████

████████████████████████████ temperatures. (Leonard Decl., Ex. C at 94:18-25; Byrn

Decl., Ex. B at Exhibit E, SAND-CASP988316; Supp. Leonard Decl., Ex. GG at SAND-

CASP000333.) Sandoz also mischaracterizes Dr. Staples' statements, as he did <u>not</u> characterize

caspofungin diacetate as being stored at "refrigerated temperatures." (Leonard Decl., Ex. B at ¶

17.)

 59. A POSA can effectively work with caspofungin under the storage
conditions for caspofungin to do the necessary formulation work. (*Id.*).

 **Response:** Dr. Staples makes the conclusory assertion, with no factual basis, that a

"POSA could effectively work with an API under these conditions in order to do the necessary

formulation work." Dr. Staples cites to testimony from Dr. Nerurkar, an inventor on the '300

patent, purportedly to support his statement. However, Dr. Nerurkar testified that the instability

of caspofungin was a "unique challenge," not that one could "effectively work" with

caspofungin. (Lemek Decl., Ex. 5 at 31:17-32:5.)

> Q. Did the caspofungin molecule present any **unique challenges** during formulation?
> A. **It's an unstable molecule**.
> Q. Did that affect your formulation efforts?
> A. If the question is do you think about that when you do formulation development,
> the answer is yes. You want to stabilize the molecule.
> Q. And how did that affect your development efforts with respect to caspofungin?
> A. Your efforts should be to stabilize the molecule.

(*Id.*) (emphases added.)

 60. Merck admits in the '300 patent that it was already known that a buffer is
required to stabilize the formulation of caspofungin: "this instability ***was previously combatted***
by ***lyophilizing*** the compound in a tartrate ***buffered*** formulation." (Lemek Decl., Ex. 4, col. 2, ll.
63-67) (emphasis added).

 **Response:** Sandoz mischaracterizes the disclosure of the '300 patent. The quoted

language describes internal development work at Merck done by the inventors that is not prior

art, and thus was not "already known." ('300 patent, col. 2, ll. 63-67; RSOF ¶¶ 15-16.)  The

patent does not describe this prior work as known in the art, but rather as part of the "Detailed

Description of the Invention." ('300 patent, col. 2, ll. 20-67.)  In fact, Sandoz admitted in its

paragraph IV notice letter that this portion of the specification of the patent-in-suit is ***not*** prior

art, and that no tartrate-buffered formulations were known in the art.  (Leonard Decl., Ex. Y at 6,

SAND-CASP604563.)

> 61.     Preformulation studies on caspofungin would provide two pieces of
> information that would guide formulation development: (1) the stability of caspofungin varies
> according to pH and (2) the pH of maximum stability is 5. (Lemek Decl., Ex. 5, Deposition of
> Maneesh Nerurkar, at 149:24-152:15).

**Response:**     Sandoz mischaracterizes the facts of the case.  Preformulation studies of

caspofungin revealed that the stability of caspofungin ***in solution*** varied according to pH and the

pH of maximum stability ***in solution*** is pH 5, as the evidence cited by Sandoz agrees.  (Lemek

Decl., Ex. 5 at 151:23-152:3.)  Preformulation studies did not identify any pH drift, *i.e.*, a change

in the pH over time, when caspofungin was put in solution, and nor did the stability of

caspofungin vary <u>significantly</u> in solution according to pH.  (RSOF ¶¶ 55-56, 58-61; Byrn Decl.,

Ex. A at ¶¶ 70-73.)  Sandoz does not allege that this information was known in the prior art.

(RSOF ¶¶ 48-49, 64.)

> 62.     For caspofungin, the pH of maximum stability is 5. (Lemek Decl., Ex. 6
> (DTX 4) at MRK_00000625; Ex. 5 at 46:17-48:8; Leonard Decl., Ex. G, p. 87).

**Response:**     See Merck's response to CSOF ¶ 61.

> 63.     Following is the pH stability profile for caspofungin that was obtained by
> the Merck inventors, and that would have been obtained by any other POSA seeking to formulate
> caspofungin (*see* Lemek Decl., Ex. 6 at MRK_00000625):



pH-Rate profile at 0.1 mg/mL at 60'C

**Response:** Sandoz mischaracterizes the facts of the case. The pH stability profile cited above shows the stability of caspofungin *in solution*, and the title of the graph, which Sandoz did not include, is: "Solution Stability of [caspofungin]." (Lemek Decl., Ex. 6 at MRK_CAN00000625.) Moreover, Sandoz does not allege that this information was known in the prior art. (RSOF ¶¶ 48-49, 64.)

64. This pH stability chart above shows that the pH of maximum stability is 5 and that if the pH varies from 5, there is a significant increase in the degradation of caspofungin. (*Id.*; Lemek Decl. Ex. 8, pp. 65-66).

**Response:** Sandoz mischaracterizes the facts of the case. The chart above shows the pH of maximum stability *in solution* is pH 5, and that when the pH varies from 5, at 60 °C, the degradation of caspofungin increases, but there is no evidence that the increase would be considered "significant" to a POSA. (Lemek Decl., Ex. 6 at MRK_CAN00000625.) Sandoz does not allege that this information was known in the prior art. (RSOF ¶¶ 48-49, 64.)

65. Dr. Byrn agrees that a POSA would have carried out a routine preformulation solution stability study that would have showed that caspofungin is pH sensitive, and most stable at pH 5. (Lemek Decl., Ex. 3 at 61:15-62:16).

21

**Response:** Undisputed that Professor Byrn testified that a POSA would have conducted preformulation studies on caspofungin, including solution stability studies. (Lemek Decl., Ex. 3 at 61:15-63:1.) Disputed that a POSA would learn from preformulation studies that caspofungin is "pH sensitive," as this term has not been used before in this litigation nor defined by either Dr. Staples or Professor Byrn. See also Merck's response to CSOF ¶ 61.

66. A POSA would have learned that the "major" degradation product of caspofungin in solution was caused by hydrolysis (*Id.* at 106:11-107:2).

**Response:** Undisputed that Professor Byrn reviewed the internal development work of Merck and noted that Merck identified four degradation products of caspofungin, three of which (including hydrolysis) Merck observed in solution. (Byrn Decl., Ex. A at ¶ 55; *see also* RSOF ¶¶ 48-49.) Professor Byrn never testified that a POSA would have identified these impurities, and Sandoz agrees that its expert, Dr. Staples, is not qualified to give an opinion on this issue. (RSOF ¶ 50.) Sandoz does not contend that this information was known in the prior art. (RSOF ¶¶ 12-13, 48-49, 64.)

67. The hydrolysis degradation product would have been discovered during routine preformulation tests. (*Id.* at 106:11-107:2).

**Response:** Sandoz has presented no evidence that a POSA would have discovered the "hydrolysis" degradant of caspofungin. Moreover, Sandoz agrees that its expert Dr. Staples is not qualified to give an opinion on this issue. (RSOF ¶ 50.) Sandoz does not allege that this information was known in the prior art. (RSOF ¶¶ 12-13, 48-49, 64.)

68. "[V]irtually all pharmaceutical systems tend to drift if pH is unbuffered." (Lemek Decl., Ex. 12 at 153).

**Response:** Sandoz mischaracterizes the facts of the case. Sandoz's expert, Dr. Staples, had reviewed the Flynn reference (Lemek Decl., Ex. 12; Leonard Decl. Ex. A at ¶ 71) before preparing his opinions, and nevertheless testified that prior to adding a buffer, a POSA

would first need evidence showing that the unbuffered solution was subject to pH drift. (RSOF ¶¶ 55-56, 61.) Dr. Staples even acknowledged that a lyophilized formulation he developed did not have a buffer (RSOF ¶¶ 62-63), and that the 1995 edition of the *Physician's Desk Reference* showed that two-thirds of the marketed lyophilized formulations did not contain a buffer (RSOF ¶ 39).

69.     Buffers are used to keep the pH of a formulation at the pH of maximum stability. (Lemek Decl., Ex. 12 at 139, 144; Ex. 11 at 1529).

**Response:**     Sandoz mischaracterizes the facts of the case. Both sides' experts agree that buffers are used to prevent ***pH drift*** of a ***solution*** formulation. (*See also* MCSOF ¶¶ 16, 18.)

70.     The ' 804 patent discloses the use of buffers in a caspofungin formulation years before the alleged invention of the '300 patent. (Leonard Decl., Ex. L, col. 14, ll. 6-7).

**Response:**     Sandoz mischaracterizes the facts of the case. The '804 patent discloses the use of buffers in solution compositions for the purpose of making the solutions *isotonic*, not to *stabilize* caspofungin. (Leonard Decl., Ex. L at col. 14, ll. 6-8.) By contrast, the '300 patent discloses the use an acetate buffer in a lyophilized caspofungin formulation to stabilize caspofungin, *i.e.*, minimize degradation of caspofungin. ('300 patent, col. 2, l. 22 – col. 3, l. 4.)

71.     A buffer "can be selected from knowledge of a pH profile of the drug in solution." (Lemek Decl., Ex. 2 at 195). Specifically, "by following the degradation over a given pH range . . . the pH of maximum stability . . . can be determined." (*Id.* at pp. 195-196). Because the stability of caspofungin varies according to pH, a POSA would know to include a buffer. (*Id.*).

**Response:**     Sandoz mischaracterizes the facts of the case. Sandoz fails to provide any evidence that the stability of caspofungin in solution is relevant to the stability of caspofungin in a lyophilized formulation. (RSOF ¶¶ 55-56, 58, 61, 73; MCSOF ¶¶ 16, 18; Byrn Decl., Ex. A at ¶ 74.) The stability of caspofungin varies according to pH in solution, but Sandoz has not provided evidence that this variability is significant, nor that caspofungin in solution is subject to

pH drift, such that a buffer would be necessary to control pH prior to lyophilization. (RSOF ¶¶ 59-60; Byrn Decl., Ex. A at ¶¶ 70-73.)

72.     Dr. Staples has provided his opinion that it would have been obvious to include a buffer in a caspofungin formulation (Leonard Decl. Ex. A, at 76, 84, 94-99; Leonard Dec. Ex. B, at 31-39, 41, 46, 47).

**Response:**     Dr. Staples has provided only conclusory assertions, without any factual bases, that it would have been obvious to include a buffer in a lyophilized caspofungin formulation. First, many of the sections of Dr. Staples' reports relied on by Sandoz for this CSOF deal with the selection of acetate as a buffer, and have nothing to do with the choice of whether to add a buffer to lyophilized formulation in the first instance. (*See* Leonard Decl., Ex. A at ¶¶ 76, 84, 95-99; Ex. B at ¶¶ 33-39, 41, 47.) Only one paragraph from Dr. Staples' opening expert report (Leonard Decl., Ex. A at ¶ 94) and two paragraphs from his reply expert report (Leonard Decl., Ex. B at ¶¶ 31-32) discuss the motivation to include a buffer in a lyophilized formulation.

However, Dr. Staples does not explain, or provide any factual basis for, why a buffer would be expected to stabilize a lyophilized dosage form. (Leonard Decl., Ex. A at ¶ 94.) Dr. Staples initially claimed that he was not aware of any lyophilized formulations without a buffer, but retracted that statement at his deposition. (*Compare* Leonard Decl., Ex. B at ¶ 31, *with* RSOF ¶¶ 39, 62-63.)

One cited basis for Dr. Staples' conclusory assertion that a POSA would be motivated to include a buffer in a lyophilized formulation is a statement in the Avis reference to add a buffer if "degradation is a risk during freezing" due to pH changes. (Leonard Decl., Ex. B at ¶ 32; *see also* RSOF ¶ 73.) Sandoz has provided no evidence that the freeze-drying process causes the degradation seen in lyophilized caspofungin formulations.

Dr. Staples also theorizes that a buffer may play a stabilizing role during storage because it "contains sufficient moisture to make the buffer component important with regard to stabilization of the solid amorphous state." (Leonard Decl., Ex. B at ¶ 32.) Dr. Staples does not explain the factual basis for this statement, or its relevance to lyophilized caspofungin formulations, which were undisputedly more unstable in the presence of pH 5 buffers other than acetate. (RSOF ¶¶ 15-16, 22; Leonard Decl., Ex. W at MRK_CAN00897420, 425.)

73.     Inventor Kaufman agrees that the "pH of optimal stability one discovers in solution is often a good starting point for the solid state stability." (Lemek Decl., Ex. 7, Deposition of Michael Kaufman, at 53:15-54:4).

**Response:**     Sandoz mischaracterizes Dr. Kaufman's testimony by only citing a portion of the relevant testimony and leaving off the last question and answer shown in bold below:

Q.     For your first experiments with a lyophilized caspofungin product, did you include a buffer?
A.     I believe I did, yes.
Q.     Why did you include a buffer?
A.     Because it's been described that the pH of optimal stability one discovers in solution is often a good starting point for the solid state stability.
Q.     Is the same true for your choice of buffers?
A.     Sorry.
Q.     **A good buffer in a solution is also a good starting point for a buffer in the lyophilized product?**
A.     **No. I would say that's not true.**

(Lemek Decl., Ex. 7 at 53:21-54:10) (emphases added.) In the passage cited by Sandoz, Dr. Kaufman was discussing selection of a starting pH and not selection of a particular buffer. For achieving that pH, both experts agree that, absent pH drift, only a pH adjuster (not a buffer) would have been needed. (RSOF ¶¶ 56, 58, 61; Leonard Decl., Ex. A at ¶¶ 45, 51; Byrn Decl., Ex. A at ¶ 72.)

74.     Dr. Byrn agrees that a buffer should have a pKa that is within one unit of the pH of maximum stability. (Lemek Decl., Ex. 3 at 173:18-174:2).

**Response:**     Professor Byrn stated that a buffer's useful range in solution is within one pH unit of the buffer's pKa.  (Byrn Decl., Ex. A at ¶ 70.)  Professor Byrn also opined that a buffer is selected for a particular pH in solution when there is data showing pH drift, and the desired pH is within the buffer's typical range.  (Byrn Decl., Ex. A at ¶¶ 70-73, 78-79.)

75.     Avis lists just four "commonly used" buffers, and only two of the four buffers, acetic acid and citric acid, are appropriate for a pH of 5:

| Buffers | |
|---|---|
| Acetic acid and a salt, pH 3.5-5.7 | 1-2 |
| Citric acid and a salt, pH 2.5-6 | 1-5 |
| Glutamic acid, pH 8.2-10.2 | 1-2 |
| Phosphoric acid salts, pH 6-8.2 | 0.8-2 |

(Lemek Decl., Ex. 2, at 194):

**Response:**     Sandoz mischaracterizes the facts of the case.  While the Avis reference lists the buffers depicted in the figure above, Avis does not give any criteria by which it selected the "commonly used" buffers, nor does Sandoz suggest that Avis teaches a POSA that he should only use one of those four buffers in a parenteral product.  (*See* Lemek Decl., Ex. 2 at 194.)  Avis does not distinguish between solution parenterals and lyophilized parenterals.  As to the latter, it is undisputed that as of 1995, acetate had never been used in a marketed, *lyophilized* parenteral product.  (RSOF ¶ 39.)  Avis also cites to the Flynn reference, a reference considered by Dr. Staples, which lists 12 buffers capable of controlling the solution pH at a pH of 5.  (Byrn Decl., Ex. A at ¶¶ 78-79; Leonard Decl., Ex. B at ¶ 32; *see also* Ex. X at 154.)  Moreover, Sandoz does not dispute that its own formulators did not limit themselves to the pH 5 buffers listed by Avis in the figure above.  (RSOF ¶¶ 29, 85.)  Nor does Sandoz explain the relevance of this fact to caspofungin lyophilized formulations, as Sandoz has not provided a reason why the selection of a buffer based upon the pH of maximum stability in solution is relevant to the stability of a lyophilized formulation.  (*See, e.g.*, MCSOF ¶¶ 16, 18, 72.)

26

76. Remington 1995 teaches that the "acid salts most frequently employed as buffers [in parenteral formulations] are citrates, acetates and phosphates." (Lemek Decl., Ex. 11 at 1529).

**Response:** See Merck's response to CSOF ¶ 75. Merck does not dispute that the Remington 1995 reference states the above quoted language, but Remington 1995 does not distinguish between solution parenterals and lyophilized parenterals. As to the latter, it is undisputed that as of 1995, acetate had never been used in a marketed, *lyophilized* parenteral product. (RSOF ¶ 39.)

77. Dr. Staples states it would have been obvious "to select acetate as a buffer because" of at least five independent reasons: (1) its pKa is appropriate for the first pKa of caspofungin; (2) its pKa is appropriate for the most stable pH that was determined during preformulation solution stability testing; (3) acetate was common used for parenteral formulations; (4) acetate was present in a typical formulation laboratory; and (5) acetate was already present as a counter-ion to caspofungin diacetate. (Leonard Decl., Ex. B, para. 47; see also Ex. A, para. 76, 84, 94-99; Ex. B, 31-39, 41 and 46).

**Response:** Dr. Staples makes the conclusory assertions listed above, with no factual bases, for why a POSA would select acetate to stabilize a lyophilized caspofungin formulation. Dr. Staples does not provide any evidence that "acetate was present in a typical formulation laboratory," or why a POSA would consider this a motivation to include it in a particular formulation. (Leonard Decl., Ex. A at ¶ 96.) Nor does Dr. Staples provide any evidence as to why the presence of acetate as a counterion to caspofungin diacetate would lead to the selection of an acetate buffer or a reasonable expectation that such selection would stabilize caspofungin, particularly since the acetate salt of caspofungin is undisputedly highly unstable. (Leonard Decl., Ex. A at ¶¶ 84, 97; MCSOF ¶ 58; RSOF ¶¶ 8-9; Byrn Decl., Ex. A at ¶ 77.) Dr. Staples does not provide any evidence why a POSA would consider the lowest pKa of caspofungin to be relevant to the selection of a buffer, a statement that Dr. Staples backed off from at his deposition. (*See* Leonard Decl., Ex. A at ¶ 95; Ex. B at ¶ 39; Ex. C at 145:16-163:20.)

Nor does Dr. Staples provide any support for why a POSA would consider the most stable pH for caspofungin in solution to be relevant to the stability of solid, lyophilized caspofungin formulations, or why a POSA would reasonably expect the selection of a buffer based upon the pH of maximum stability in solution would stabilize a lyophilized formulation. (MCSOF ¶¶ 18, 72; Byrn Decl., Ex. A at ¶ 74.)  Even if acetate were commonly used in solution parenteral formulations, Dr. Staples (i) does not provide any objective criteria or motivation to select only "commonly used" buffers (MCSOF ¶¶ 24, 75), and (ii) does not dispute that no marketed lyophilized formulations in the prior art contained an acetate buffer (RSOF ¶ 39).

Sandoz does not dispute that lyophilized formulations of caspofungin are most stable when the pre-lyophilized solution has a pH of 6, which is outside of acetate's buffering range. (RSOF ¶¶ 67-68.)  Moreover, Sandoz does not dispute that acetate is volatile, and thus some or all of the acetate buffer added to the pre-lyophilization solution could be lost during the lyophilization process.  (RSOF ¶¶ 69-71.)  Thus, Dr. Staples has not provided any reason why a POSA would be motivated to add a volatile buffer to a lyophilized formulation, when such a buffer could be lost.  In fact, the only lyophilized product containing acetate in the prior that Dr. Staples could identify had acetate present as the counterion to the drug (not as a buffer), and that acetate was lost as a result of lyophilization.  (RSOF ¶ 71.)

78.    Acetate, citrate and phosphate were the first buffers that Merck tested. (Lemek Decl., Ex. 8 at 63:12-14).

**Response:**    Sandoz mischaracterizes the facts of the case.  Acetate, citrate, and phosphate were the first buffers that Merck tested in *solution* formulations containing caspofungin.  (Supp. Leonard Decl., Ex. KK at MRK_CAN00889666-67.)  Further, Sandoz ignores the fact that Merck used a citrate buffer at pH 5, and <u>not</u> acetate, in these solutions.  (*Id.*)

28

79.     Inventor Kaufman agrees that acetate is a logical choice because of its pKa and because "it's a commonly available buffering agent." (Lemek Decl., Ex. 7 at 26:16-22).

**Response:**     Sandoz mischaracterizes Dr. Kaufman's testimony.  Dr. Kaufman testified

that he selected acetate based upon its pKa for a ***solution*** caspofungin formulation:

> Q.     Why did you select tartrate as a buffer to test for a caspofungin **solution**?
> A.     Because of the PKA, and because it's a commonly available buffering agent.
> Q.     Why did you select acetate as a buffer to test in a caspofungin **solution**?
> A.     The same reasons.

(Lemek Decl., Ex. 7 at 26:16-22) (emphases added.)

80.     When Kaufman first heard of using acetate as a buffer, he did not have any concern that acetate would provide a stable caspofungin formulation. (*Id.* at 63:20-64:11).

**Response:**     Sandoz mischaracterizes Dr. Kaufman's testimony, as he explained that he

had concerns about the use of acetate in a lyophilized formulation due to acetate's volatility.

> Q.     Do you recall your reaction when you first learned of a caspofungin formulation that was lyophilized with an acetate buffer?
> A.     No, not specifically.
> Q.     Did you have any concerns about the ability to create a caspofungin formulation using an acetate buffer?
> Mr. Slater:     Objection to form.
> A.     The concerns I had related to the ability to retain the acetic acid due to the volatility that we discussed.

(Lemek Decl., Ex. 7 at 63:20-64:5.)

81.     Dr. Hunke testified that he did not consider any buffers other than acetate or tartrate. (Lemek Decl., Ex. 9, Deposition of William Hunke, at 47:25-48:5).

**Response:**     Sandoz mischaracterizes Dr. Hunke's testimony, as he merely testified

that he did not recall investigating any buffers other than acetate or tartrate at that particular time.

> Q.     At the time that you and Maneesh were looking at alternative buffers to tartrate, did you consider any buffers other than acetate?
> A.     I don't believe so.

(Lemek Decl., Ex. 9 at 47:25-48:5.)

82.     Citrate is not a preferred buffer for caspofungin diacetate because it would introduce a new ingredient into the formulation. (Leonard Decl., Ex. A at ¶ 97).

**Response:**     Sandoz fails to provide any support for this fact other than the conclusory assertion of its formulation expert Dr. Staples, who fails to provide any factual basis for his opinion that a buffer should match the counterion of the drug compound.  (Leonard Decl., Ex. A at ¶ 97; MCSOF ¶ 77.)

83.     Acetate is already present in a solution of caspofungin diacetate as a counter-ion to the diacetate salt of caspofungin. (*Id.*).

**Response:**     Undisputed that acetate is present as a counterion to caspofungin.

84.     "Routinely in the development of a parenteral product a number of buffer systems are investigated to assess their relative affects (sic) on the stability of the formulation." (Lemek Decl., Ex. 1, col. 5, ll. 7-9).

**Response:**     Sandoz fails to establish why this fact is relevant to caspofungin, as it is undisputed that the '552 patent only discloses solution formulations, and not lyophilized formulations.  (*See, e.g.*, Lemek Decl., Ex. 1 at col. 1, l. 39 – col. 2, l. 3; Byrn Decl., Ex. A at ¶ 94.)

85.     In Rosenberg, acetate provided the best stability for the drug product. (Lemek Decl., Ex. 1 at col. 2, ll. 60-66).

**Response:**     The Rosenberg patent is directed to <u>solution</u> formulations.  (Byrn Decl., Ex. A at ¶ 94; MCSOF ¶ 84.)

86.     At the time of the alleged invention, a POSA would, at the very least, test both acetate and citrate and choose the better of the two, acetate. (Lemek Decl., Ex. 3 at 152:15-154:10; *see also* Leonard Decl., Ex. A at ¶ 99).

**Response:**     Sandoz fails to provide any evidence why a POSA would add a buffer to a solid, lyophilized formulation.  (RSCOF ¶¶ 16, 18, 72.)  Further, Sandoz mischaracterizes Professor Byrn's testimony, and contradicts Sandoz's own admission that no prior art commercial lyophilized formulations contained an acetate buffer.  (RSOF ¶ 39.)

Q.      Do you agree that acetate was one of the most common buffers for parenteral formulations in 1996?
A.      I haven't – like I said, I haven't counted, it is listed in different places.
Q.      Would you agree it is in the top five?
A.      I think that's probably right, but, like I said, **you would almost know immediately not to put it in a lyo product**.
Q.      Because of the volatility issues?
A.      Yes.
Q.      But if you tested acetate, you would know it had superior performance, correct?
A.      Well, you'd still have the – ahead of time, **if you're doing an analysis ahead of time, you wouldn't use it.**
Q.      But if you test it?
A.      Well, later, **if you went against your prediction**, if you will, or your analysis, you would find it, that's what happened.

(Lemek Decl., Ex. 3 at 152:15-153:16) (emphases added.)

87.      Flynn teaches that polycarboxylic acids may facilitate hydrolytic reactions with the active pharmaceutical ingredient. (Lemek Decl., Ex. 12 at 156).

**Response:**      Sandoz is contradicted by its own expert, who conceded in his expert report that a POSA would consider buffers with multiple acid groups (polycarboxylic acids, *e.g.*, citrate, tartrate, succinate, ascorbate) (Leonard Decl., Ex. A at ¶ 95), and who in his own formulation development work used buffers with multiple acid groups (RSOF ¶ 77).  Sandoz's formulators also considered ██████████████████████████████████ for caspofungin.  (RSOF ¶ 78.)  Moreover, Dr. Staples admitted in his deposition that he did not express an opinion in his expert reports that a POSA would select a buffer based upon the number of acid groups of the buffer:

Q.      All right.  Nowhere in your reports do you say that a person would choose a buffer based on the number of carboxylic acids in the reference --
A.      That's true.

(Leonard Decl., Ex. C at 177:6-9.)

88.      Acetate has just one carboxylic acid group (Lemek Decl., Ex. 12 at 154).

**Response:**      Undisputed.

89.     Citrate and other buffers have multiple carboxylic acid groups (*Id.*).

**Response:**     Undisputed that citrate has multiple carboxylic acid groups.  Sandoz has

not defined what "other buffers" means.

90.     Preformualtion studies would confirm that buffers with fewer carboxylic

acid groups are preferred to buffers with more carboxylic acid groups (Lemek Decl., Ex. 6, at

MRK_00000630630; Lemek Decl., Ex 8 at 96:9-99:4; Leonard Decl., Ex. G, p. 87).

**Response:**     See Merck's response to CSOF ¶ 87.  Sandoz provides no evidence that

any of the cited *solution* evidence is relevant to solid, lyophilized caspofungin formulations.

(*See* MCSOF ¶¶ 18, 72; RSOF ¶ 73 (discussing only stability of the pre-lyophilization solution

and solution after reconstitution of the lyophilized product, and *during* the freeze-drying

process); Byrn Decl., Ex. A at ¶ 74.)  Further, the cited testimony of Dr. Zimmerman does not

support this fact.  (Lemek Decl. Ex. 8 at 96:9-99:4.)  Merck's internal work shows that the

number of carboxylic acids groups was not relevant to stability of the lyophilized caspofungin

formulations.  (Supp. Leonard Decl., Ex. HH at MRK_CAN00017658; Byrn Decl., Ex, A at ¶¶

80-85.)

91.     The prior art (*e.g.*, Avis, Remington, Flynn), does not disparage the use of

acetate as a buffer in a formulation. (Lemek Decl., Exs. 2, 11 and 12).

**Response:**     Sandoz mischaracterizes the evidence, and fails to cite to any specific

pages, let alone chapters, in the cited references above, two of which are quite long.  (Lemek

Decl., Exs. 2 and 11.)  Sandoz ignores the undisputed fact that both it and its expert agree acetate

is volatile, and that a POSA would have known acetate could be lost during lyophilization.

(RSOF ¶¶ 69-71.)

92.     Dr. Nerurkar, the lead formulator on this project for Merck, agrees that the

caspofungin formulation was "conventional formulation development." (Lemek Decl., Ex. 5 at

32:6-12).

**Response:**   Sandoz mischaracterizes Dr. Nerurkar's testimony.  Dr. Nerurkar's

definition of "conventional formulation development" is to "stabilize" the drug compound:

> Q.   And what efforts did you undertake in order to stabilize the caspofungin molecule?
> A.   Conventional formulation development.
> Q.   What was the conventional formulation development?
> A.   You try to find a dosage form that will stabilize the molecule.

(Lemek Decl., Ex. 5 at 32:6-12.)

93.   Dr. Nerurkar does not recall any problems that were encountered during the caspofungin formulation development. (*Id.* at 22:19-28:24).

**Response:**   Sandoz mischaracterizes Dr. Nerurkar's testimony.  Dr. Nerurkar did not

state that he did not recall any problems encountered during formulation development for

caspofungin.  For example:

> Q.   Were there any challenges during the development of Cancidas that were unsually difficult to involve [sic]?
> Mr. Slater:   Objection to form.
> A.   That's a relative thing, so what's unusual.
> Q.   Yes, relative to the rest of your experience, was there anything that was unsually challenging?
> A.   Difficult to say.
> Mr. Slater:   Objection to form.  I'm sorry, you also have to give me just a little bit of time to make my objections.  But I'll try to not intrude on the process.
> Q.   I'm sorry, was your answer "difficult to say"?
> A.   Yes.
> Q.   Why is it difficult to say?
> A.   It's an opinion.  Some things are more difficult than others.

(Lemek Decl., Ex. 5 at 24:5-25:1.)

94.   Dr. Nerurkar did not have any concerns about being able to successfully create a lyophilized formulation of caspofungin, nor does he recall any concerns being expressed by others. (*Id.* at 38:12-21).

**Response:**   Sandoz mischaracterizes Dr. Nerurkar's testimony.  Dr. Nerurkar stated he

could not recall any concerns, not that he did not have any concerns.

33

> Q.    When you first started working on a lyophilized formulation of caspofungin, did you have any concerns about being able to successfully create such a lyophilized formulation?
> A.    I don't recall.
> Q.    Do you recall anyone that you worked with expressing any concerns about being able to create a successful lyophilized formulation of caspofungin?
> A.    I don't recall.

(Lemek Decl., Ex. 5 at 38:12-21.)

95.    Dr. Nerurkar does not deny that this was the least challenging formulation project he has ever worked on. (*Id.* at 28:17-24).

**Response:**    Sandoz mischaracterizes Dr. Nerurkar's testimony, as he stated that he did not have an opinion on whether it was the least-challenging product. Dr. Nerurkar neither admitted nor denied this proposition. (Lemek Decl., Ex. 5 at 27:18-28:24.)

96.    Dr. Nerurkar does not recall any challenges when selecting the buffer for the caspofungin formulation. (*Id.* at 29:1-7).

**Response:**    Sandoz mischaracterizes Dr. Nerurkar's testimony, as he stated that he did not have an opinion. (Lemek Decl., Ex. 5 at 22:19-23:2, 23:23-25:1, 29:1-7.)

97.    The formulation claimed in claim 1 of the '300 patent would have been obvious at the time of the alleged invention. (Leonard Decl., Exs. A and B).

**Response:**    This is a legal conclusion and not a fact. Sandoz has failed to point to any specific facts to support this legal conclusion, instead citing two entire expert reports and the conclusory assertions therein. (Leonard Decl., Exs. A and B.) It is Sandoz's burden to prove obviousness by clear and convincing evidence, a burden they have failed to meet.

98.    Dr. Staples expressly disagrees with Merck's argument that there would have been no expectation of success due to stability concerns with caspofungin. (Leonard Decl., Ex. B at ¶¶ 7, 16-19). Dr. Staples states:

> 16.    Dr. Byrn opines that a POSA would not have a reasonable expectation of success of creating a caspofungin formulation because there was not a "stable form of caspofungin available on which to being formulation work (44-48). **I disagree.**

(*Id.* at ¶ 16 (emphasis added)).

34

**Response:**     Sandoz fails to point to any specific facts to support Dr. Staples' opinion. Not a single cited paragraph of Dr. Staples' reply expert report cites to any specific facts that support the conclusion that a POSA would have a reasonable expectation of success in creating a stable caspofungin formulation.  (*See* Leonard Decl., Ex. B at ¶¶ 7, 16-19.)  Further, Dr. Staples only states that a POSA would attempt a caspofungin formulation, not that he would have a reasonable expectation of success in doing so.  (*Id.*; *see also* MCSOF ¶¶ 57-59.)

99.     Based on the '804 patent, a POSA would have had a reasonable expectation that a caspofungin formulation had already been created and could again be created in the future (Leonard Decl., Ex. L, Examples 28-31; A at ¶ 78).

**Response:**     Sandoz fails to point to any evidence that a POSA would have a reasonable expectation of success in creating a shelf stable caspofungin formulation based on the '804 patent.  It is undisputed that the '804 patent does not disclose the degree of instability of caspofungin acetate, any cause of instability, the pathways by which caspofungin degrades, and how to potentially cure the instability.  (RSOF ¶¶ 13, 36.)  The cited portion of Dr. Staples expert report states only that a POSA would be guided by the "disclosures of the '804 patent" and have "pursued a lyophilized formulation of caspofungin," not that the POSA would have a reasonable expectation of success in creating a stable caspofungin formulation.  (Leonard Decl., Ex. A at ¶ 78.)  And it is undisputed that the only injectable example of the '804 patent, Example 31, is to an injectable ***solution*** and does not relate to caspofungin.  (MCSOF ¶¶ 43, 53.)

100.     A POSA would have a reasonable expectation of success that adding one of the most common buffers to a solution that already includes that buffer, would result in an effective solution. (Leonard Decl., Ex. A ¶¶ 75-76).

**Response:**     Sandoz has not defined "effective solution," nor provide evidence that an "effective solution" would be relevant to a solid, lyophilized formulation of caspofungin. Moreover, Sandoz does not dispute that the solution formulations of caspofungin were

inadequate for long-term storage, which Sandoz does not contend was known in the prior art.

(RSOF ¶ 12.)  Further, the cited portions of the Leonard Declaration, Exhibit A, do not support

this CSOF.

      101.    The problem the named inventors were trying to solve was simply "a pharmaceutical composition for administration to a patient." (Lemek Decl., Ex. 4, Abstract). The problem involved formulating a known substance, caspofungin diacetate (Leonard Decl., Ex. M at col. 1, l. 67-col. 2, l. 6), into a known dosage form (*e.g.*, *id.* at col. 13, ll. 44-53; Example 31 ("injectable solution")) according to "conventional pharmaceutical compounding techniques" (*Id.* at col. 13, ll. 34-39).

**Response:**    Sandoz mischaracterizes the facts of the case.  The inventors were trying

to create a shelf-stable dosage form for caspofungin, not just a "pharmaceutical composition for

administration to a patient."  ('300 patent, col. 1, ll. 30-34; col. 2, l. 22 – col. 3, l. 4.)  Sandoz

ignores the detailed disclosure of the problem to be solved in the '300 patent specification.  (*Id.*)

Further, Sandoz again mischaracterizes Example 31 of the '804 patent, which does not disclose

caspofungin in an injectable solution, but rather a different compound, as their expert agrees.

(MCSOF ¶¶ 43, 53.)  And, it is undisputed that the '804 patent does not disclose lyophilized

formulations of caspofungin.  (MCSOF ¶ 48.)

      102.    Claim 1 of the '300 patent does *not* require: (1) a shelf stable formulation; (2) a formulation free of degradants; (3) a solid, lyophilized drug product; or (4) a formulation that contains acetate throughout manufacturing and reconstitution.

**Response:**    These are legal arguments that Sandoz failed to raise during claim

construction as required by the Local Patent Rules.  Sandoz provides no evidence to support

these arguments in the record.

      103.    A POSA would not know about the L-717 degradant from preformulation work. (Lemek Decl., Ex. 3 at 108:15-24).

**Response:**    Undisputed.

      104.    The degradant known as L-717 is not toxic. (*Id.* at 109:1-4).

**Response:** Sandoz has provided no evidence that L-717 is non-toxic. Sandoz

mischaracterizes the testimony of Professor Byrn, on which it relies, who was not aware whether

L-717 was toxic:

> Q. Are you *aware* of any toxicity issues with respect to the L-717 degradate?
> A. No.

(Lemek Decl., Ex. 3 at 109:1-4) (emphasis added.)

105. Merck admits that a POSA would have expected to add a buffer to a caspofungin formulation based on the results of routine pre-formulation stability studies:

> **Q.** From your review of the documents in preparation for your testimony today did you come to an understanding that Cancidas required a buffer for a formulation?
> **A.** Yes.
> **Q.** And what is your understanding of why Cancidas required a buffer?
> **A.** It has a pH stability profile.
> **Q.** What do you mean by pH stability profile?
> **A.** The stability of the drug in solution varies as a function of pH.

(Lemek Decl., Ex. 8, Zimmerman Dep. at 63:25-64:14).

**Response:** Sandoz mischaracterizes the testimony of Dr. Zimmerman. Dr.

Zimmerman did <u>not</u> testify as to what a <u>POSA</u> would expect, only what <u>Merck</u>'s formulators

actually did for its commercial product Cancidas®, which Sandoz does not allege was known in

the prior art. (Lemek Decl., Ex. 8 at 64:2-14; RSOF ¶¶ 48-49, 64.) Sandoz also ignores

contradictory evidence from its formulation expert, Dr. Staples, who stated that a POSA would

only add a buffer if there was evidence of pH drift in solution, and not just because the stability

of a drug varies according to pH. (*See* MCSOF ¶ 18.)

106. Merck admitted that there was a reason for a POSA to add a buffer based on the routine pre-formulation solution stability studies, even where the product was going to be lyophilized:

> **Q.** Did Merck ever seriously consider development of a buffer-free formulation for caspofungin?
> **A.** No.
> **Q.** Why not?

    **A.**       Because caspofungin has a pH rate profile with a pH of maximum solution stability.

    **Q.**       How does that negatively impact it as a drug product?

    **A.**       When formulating one product ***both prior to lyophilization and post*** it is best served when the pH is at the pH of maximum stability rather than allowing it to drift.

(Lemek Decl., Ex. 8, Zimmerman Dep. at 116:1-13 (emphasis added)).

**Response:**     See Merck's response to CSOF ¶¶ 18 and 105. Dr. Zimmerman also testified that Merck had in fact investigated a buffer-free lyophilized product. (Lemek Decl., Ex. 8 at 114:7-9.) Also, Sandoz mischaracterizes Dr. Zimmerman's testimony, as he also testified that he was not aware of any evidence of pH drift when caspofungin is in solution. (Lemek Decl., Ex. 8 at 116:14-24.) Sandoz's expert testified that, absent evidence of a pH drift, a POSA would not be motivated to add a buffer to a formulation. (RSOF ¶¶ 56, 61; MCSOF ¶ 18; Leonard Decl., Ex. A at ¶¶ 45, 51.)

       107.   Dr. Nerurkar agrees that acetate was a logical choice for buffer. (Lemek Decl., Ex. 5 at 71:16-72:18).

**Response:**     Sandoz mischaracterizes Dr. Nerurkar's testimony. Dr. Nerurkar could not remember why acetate was chosen:

Q.     Why was acetate chosen?
A.     I don't recall. I don't recall.
Q.     At the time did acetate seem like an illogical choice?
Mr. Slater:     Objection to form.
A.     No, I don't think I would have used something that would be illogical.
Q.     At the time it made sense to you to use acetate?
A.     I don't recall. I'm just saying that I would not have knowingly chosen something illogical.
Q.     You wouldn't have conducted the experiment if you didn't think it had a reasonable chance of success; is that correct?
Mr. Salter:     Objection to form.
A.     Sometimes you try things; you don't know what's going to happen.
Q.     At the time of this experiment, did you have any reason to believe that acetates [sic] would not work in a caspofungin lyophilized formulation?
A.     I don't recall.
Q.     At the time of this experiment, do you recall anyone expressing any skepticism or concern that acetate would work in a lyophilized caspofungin composition?

A.    I don't recall.

(Lemek Decl., Ex. 5 at 71:16-72:18.)

108.    The purpose of acetate in the claimed invention is "to provide a pharmaceutically acceptable pH." (Lemek Decl., Ex. 3 at claim 1).

**Response:**    This is a legal argument regarding claim construction and was not raised previously by Sandoz, as required by the Local Patent Rules.  Sandoz cites no evidence regarding this argument, including no expert testimony concerning how a POSA would interpret this claim language.  Further, the portion of the claim language cited by Sandoz modifies the "amount" of the acetate buffer required by the claim, not the function of the buffer.  Sandoz has never disputed Merck's definition of acetate buffer as described in the '300 patent specification, and nor has Sandoz provided its own definition.

109.    The purpose of a buffer, and the well-known function of acetate in a pharmaceutical formulation, is to provide a pharmaceutically acceptable pH. (Lemek Decl., Exs. 2, 11).

**Response:**    Sandoz mischaracterizes the evidence.  The purpose a buffer **in solution**, is to "stabilize a solution against the chemical degradation that might occur if the pH changes appreciably."  (Lemek Decl., Ex. 11 at 1529).  Sandoz points to no specific facts in the cited exhibits, both large references.  (Lemek Decl., Exs. 2 and 11.)  Also, Sandoz does not dispute that acetate provides superior stability to lyophilized formulations containing caspofungin when the pre-lyophilized solution has a pH of 6, which is <u>outside</u> of acetate's buffering range.  (RSOF ¶¶ 67-68.)

110.    Merck has not presented any evidence that a POSA would expect acetate to negatively impact a caspofungin formulation.

**Response:**    Sandoz mischaracterizes the evidence.  Merck has provided undisputed evidence that a POSA would expect that acetate could be lost during the lyophilization process

due to acetate's volatility. (RSOF ¶¶ 69-71.) Sandoz has provided no evidence that a POSA would add a buffer to a formulation that is at risk of being partially or completely lost during the lyophilization process. Moreover, Sandoz's expert Dr. Staples agrees that it is not predictable whether a buffer will help or hurt stability. (Leonard Decl., Ex. C at 75:9-11, 149:19-150:3.)

111. Dr. Byrn admits that he is not aware of any reason, other than volatility, why acetate would not be an acceptable buffer in a lyophilized formulation of caspofungin. (Lemek Decl., Ex. 3 at 176:22-177:7).

**Response:** Dr. Byrn testified that volatility was the primary reason a POSA would not reasonably expect an acetate buffer to produce a shelf stable lyophilized composition of caspofungin. (Lemek Decl., Ex. 3 at 176:22-177:7.)

112. Dr. Nerurkar admits that he did not have any expectations for the acetate buffer. (Lemek Decl., Ex. 5 at 73:12-15).

**Response:** Dr. Nerurkar testified that he was surprised by acetate's superiority:

Q. Do you recall the results of these first tests on a caspofungin formulation with acetate?
A. The lyophilized formulation?
Q. Yes.
Mr. Slater: Objection, lack of foundation.
A. I don't remember the exact data. Acetate looked good.
Q. **Were the results surprising to you?**
A. **Yes.**
Q. Why were they surprising to you?
A. Just that it looked good.
Q. **But why were you surprised that it looked good?**
A. **Going in I did not know what would work.**
Q. Did you expect it to look bad, going into it?
A. No, no expectation. It just looked good.

(Lemek Decl., Ex. 5 at 72:19-73:15) (emphases added.) In fact, contemporaneous statements made by the inventors confirm that the "superior" acetate results were "unexpected." (Supp. Leonard Decl., Ex. FF at MRK_CAN00021536-37.)

113. Dr. Nerurkar does not recall any concerns with the volatility of acetate. (*Id.* at 66:7-70:5).

**Response:** Sandoz mischaracterizes Dr. Nerurkar's testimony, as Dr. Nerurkar was

unable to recall problems with the acetate buffer and volatility:

> Q. At the bottom of the page ending in 958, the last two sentences describe a considerable amount of acetate can be lost during the lyophilization process. Do you see that there?
> A. Uh-huh.
> Q. Do you recall what the concerns were there regarding the loss of acetate during lyophilization?
> A. No, except exactly what's written there, that you were losing acetate.
> Q. Was this a problem?
> A. **I don't recall whether that was a problem or not**. It was an observation, I guess.

(Lemek Decl., Ex. 5 at 66:7-20) (emphasis added.) The document in front of Dr. Nerurkar when

he was asked this series of questions demonstrates that at the time of invention, Dr. Nerurkar was

concerned with acetate's volatility: "The results show that . . . a considerable amount (4 to 13%)

of acetate can be is [sic] lost during the lyophilization process. A means of minimizing the

acetate loss will be investigated." (Supp. Leonard Decl., Ex. LL at MRK_CAN00895958;

Lemek Decl., Ex. 5 at 65:18-66:20.)

> 114. Kaufman agrees that he had no expectation for whether the formulation would work. (Lemek Decl., Ex. 7 at 39:3-18, 65:20-23).

**Response:** Sandoz mischaracterizes Dr. Kaufman's testimony, as he testified that he

had no way to predict whether or not acetate would work:

> Q. At the time you first thought of investigating a lyophilized caspofungin product, did you have an expectation that it would work?
> A. No, I didn't – I wouldn't say I had an expectation it would work. I had a hope it would work.
> Q. Did you have any reason to believe it would not work?
> A. **Without ever trying it, I had no real basis to say it would or it wouldn't work**.

(Lemek Decl., Ex. 7 at 39:3-13.)

115.    Dr. Byrn had no opinion of what a POSA would have expected with respect to a buffer in a caspofungin formulation. (Lemek Decl., Ex. 3 at 100:10-17).

**Response:**    Sandoz mischaracterizes Dr. Byrn's testimony, as he testified that a POSA would <u>not be able to predict</u> whether a buffer would affect the stability of a lyophilized formulation:

> Q.    Are you aware of any examples in 1996 or before of formulations that had this same concept of an amorphous phase, where the pH mattered even in the lyophilized cake?
> A.    Well, there is certainly a concept that pH can affect solid state reactivity, but with that concept – maybe I shouldn't say pH – acids and bases – but with that concept, it really isn't a pH concept, it is just ions in the solid can affect reactivity and an amorphous solid can affect reactivity.  So that concept was generally understood.
> Q.    Is that also a concept that would encourage a person of ordinary still [sic] in the art to include a buffer in a lyophilized dosage form?
> A.    Well, you just wouldn't know.
> Q.    Until you do the testing?
> A.    **Exactly, there is no prediction, there is no way to predict it**.

(Lemek Decl., Ex. 3 at 99:19-100:17) (emphasis added.)  Professor Byrn also stated in his expert report that a POSA would not have had a reasonable expectation of success in preparing a stable, lyophilized dosage form containing caspofungin.  (*See, e.g.*, Byrn Decl., Ex. A at ¶ 43, 48, 62, 68, 73-74, 76; *see also* Lemek Decl., Ex. 3 at 131:12-132:1.)

116.    A POSA would not have expected tartrate to effectively buffer a caspofungin formulation. (Leonard Decl., Ex. A, ¶ 69-70).

**Response:**    Sandoz mischaracterizes the evidence and contradicts Dr. Staples' opinions.  Dr. Staples admitted that tartrate was on his list of acceptable buffers.  (Leonard Decl., Ex. A at ¶ 95, and at Exhibit B.)  Moreover, neither expert in this case opined that a POSA would consider the number of carboxylic acid groups when selecting a buffer.  (Leonard Decl., Ex. A at ¶ 95; Ex. C at 177:6-9; Byrn Decl., Ex. A at ¶¶ 80-85.)

117.    Inventors Hunke and Nerurkar testified that they do not recall any skepticism regarding the use of an acetate buffer in a caspofungin formulation. (Lemek Decl., Exs. 9 at 51:8-14; Ex. 5 at 72:10-18, respectively).

**Response:** Sandoz mischaracterizes the testimony of Drs. Hunke and Nerurkar to the extent it suggest that the inability to recall skepticism is the same as the absence of skepticism. It is undisputed that acetate is volatile, and that a POSA would be aware that it could be lost during the lyophilization process. (RSOF ¶¶ 69-71.)

118.    Dr. Hunke was not aware of any concerns that the volatility of acetate would lead away from using it in a caspofungin formulation, nor was Dr. Nerurkar. (Lemek Decl., Exs. 9 at 78:2-20; Ex. 5 at 66:7-68:12, respectively.).

**Response:** Sandoz mischaracterizes the testimony of Drs. Hunke and Nerurkar to the extent it suggest that the lack of knowledge or concerns regarding the volatility of acetate is the same as no concern regarding acetate's volatility. It is undisputed that acetate is volatile, and that a POSA would be aware that it could be lost during the lyophilization process. (RSOF ¶¶ 69-71.) See also Merck's response to Sandoz's CSOF ¶ 113.

119.    There is no evidence that the claimed formulation enabled the therapeutic effectiveness of the product.

**Response:** Merck has provided undisputed evidence that Cancidas®, the marketed formulation containing caspofungin, is an embodiment of Claim 1 of the '300 patent. (RSOF ¶ 3.) Sandoz has provided no evidence that caspofungin could be delivered to patients, and be therapeutically effective, without the shelf-stable formulation claimed in claim 1 of the '300 patent. The Remington 1995 reference, relied on by Dr. Staples (RSOF ¶ 37), states that "[d]rug substances rarely are administered as pure chemical entities, and are almost always given in a formulation containing excipients" (Lemek Decl., Ex. 11 at 1447).

120.    Dr. Perlin did not even mention the '300 patent or the formulation claimed in the '300 patent when providing his opinion that there was a long-felt need for the claimed invention. (Leonard Decl., Ex. AA).

43

**Response:**  Sandoz mischaracterizes Professor Perlin's testimony and his rebuttal expert report.  In his rebuttal expert report, Professor Perlin stated that Cancidas®, the formulated drug product, met a long-felt medical need.  (Perlin Decl., Ex. A at ¶¶ 17-27.)[8]  And, Merck has provided undisputed evidence that Cancidas®, the marketed formulation containing caspofungin, is an embodiment of Claim 1 of the '300 patent.  (RSOF ¶ 3.)  Sandoz repeatedly questioned Professor Perlin at his deposition as to whether Cancidas® or caspofungin met the long-felt need, and Professor Perlin stated affirmatively that the formulated drug product, Cancidas®, met the long-felt need.  (*See, e.g.*, Supp. Leonard Decl., Ex. JJ at 61:10-62:3.)  Sandoz notably does not cite to this testimony (or any specific testimony), nor provide an excerpt of it in the supporting declaration for its Opposition to Merck's Motion for Summary Judgment on Sandoz's Obviousness Defense.  (*See generally* Lemek Decl.)

121.  Merck did not ask Sandoz's lead formulator, or anyone else at Sandoz, whether he was skeptical that the alleged invention of claim 1 would work.

**Response:**  Sandoz mischaracterizes the testimony of Dr. Christian Welz.  Dr. Welz confirmed that he performed "patent invalidation trials" (*see, e.g.*, SOF ¶¶ 25-26), but stated that he was not aware of their purpose or was instructed not to answer by counsel on the basis of privilege (Supp. Leonard Decl., Ex. II at 111:25-116:4).

122.  Merck has no evidence why Sandoz re-created the formulations disclosed in the '300 patent.

**Response:**  To the contrary, the documents speak for themselves.  (*See* SOF ¶¶ 25-26; *see also* MCSOF ¶ 121.)

123.  Cancidas® is not a commercial success. (Lemek Decl., Ex. 10, Boghigian Expert Report).

---

[8]  Citations to the "Perlin Decl" refer to the Declaration of Professor David S. Perlin, filed concurrently with Merck's motion for summary judgment.  (D.I. 107.)

**Response:** While Merck maintains that Cancidas® is a commercial success, for purposes of this motion only, Merck is not relying on the commercial success of Cancidas®.

124. Merck has had to ████████████████████████████████████ ███████████████████████████████████ (*Id.* at ¶¶ 58-59).

**Response:** See Merck's response to Sandoz's CSOF ¶ 123.

125. Any long-felt need or commercial success for Cancidas® is attributable to factors other than the formulation claimed in the '300 patent (*Id.* at ¶¶ 18-23, 74, 90, 93-99)

**Response:** See Merck's response to CSOF ¶¶ 119 and 120. Sandoz has never provided any evidence, other than the conclusory opinions of its *commercial success* expert, that caspofungin, and not Cancidas®, met a long-felt medical need. (*See* Lemek Decl., Ex. 10 at ¶¶ 18-23, 74, 90, 93-99) Yet, Mr. Boghigian, Sandoz's commercial success expert, has stated that if you cannot formulate a drug, it does not have any value. (SOF ¶ 92.)

Dated: October 19, 2011

Respectfully Submitted,

By: _s/ Sheila F. McShane_____
    David E. De Lorenzi, Esq.
    Sheila F. McShane, Esq.
    GIBBONS PC
    One Gateway Center
    Newark, New Jersey 07102-5310
    Tel.: (973) 596-4500
    Fax: (973) 596-0545

    Dominick A. Conde, Esq.
    Brian V. Slater, Esq.
    FITZPATRICK, CELLA, HARPER & SCINTO
    1290 Avenue of the Americas
    New York, New York 10104-3800
    Tel.: (212) 218-2100
    Fax: (212) 218-2200

Edward W. Murray, Esq.
Karen Stoffan, Esq.
MERCK & CO., INC.
RY28-320
P.O. Box 2000
Rahway, New Jersey 07065-0900
Tel.: (732) 594-0436

*Attorneys for Plaintiffs*
*Merck & Co., Inc. and*
*Merck Sharp & Dohme Corp.*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that true and correct copies of **Merck's Response to**

**Sandoz Inc.'s Counter-Statement of Facts in Support of Its Opposition to Merck's Motion**

**for Summary Judgment on Sandoz's Obviousness Defense** were caused to be served on

October 19, 2011 electronically via ECF and email upon counsel listed below:

| | |
|---|---|
| Eric I. Abraham, Esq. | Meredith M. Addy, Esq. |
| Christina L. Saveriano, Esq. | Mark H. Remus, Esq. |
| **HILL WALLACK LLP** | Abby L. Lemek, Esq. |
| 202 Carnegie Center | Brandon C. Helms, Esq. |
| Princeton, New Jersey 08540 | **STEPTOE & JOHNSON LLP** |
| Tel.: (609) 924-0808 | 115 S. LaSalle Street, Suite 3100 |
| Fax: (609) 452-1888 | Chicago, IL 60603 |
| eabraham@hillwallack.com | Tel.: (312) 577-1300 |
| csaveriano@hillwallack.com | Fax: (312) 577-1370 |
| | maddy@steptoe.com |
| *Attorneys for Sandoz Inc.* | mremus@steptoe.com |
| | alemek@steptoe.com |
| | bhelms@steptoe.com |
| | |
| | *Attorneys for Sandoz Inc.* |

Dated: October 19, 2011

# Exhibit 2-I

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

MERCK & CO., INC. and
MERCK SHARP & DOHME CORP.,

     Plaintiffs,

-v-

SANDOZ INC.,

     Defendant.

     Hon. Stanley R. Chesler

     Civil Action No.
     2:10-cv-01625-SRC-PS

     **FINAL PRETRIAL ORDER**

This matter having come before the Court for a pretrial conference pursuant to Fed. R. Civ. P. 16; David E. De Lorenzi and Sheila F. McShane of GIBBONS PC, One Gateway Center, Newark, New Jersey 07102; Dominick A. Conde, Brian V. Slater, and Jason A. Leonard of FITZPATRICK, CELLA, HARPER & SCINTO, 1290 Avenue of the Americas, New York, New York 10104; and Edward W. Murray and Karen Stoffan of MERCK & CO., INC., RY28-320, P.O. Box 2000, Rahway, New Jersey 07065 having appeared for plaintiffs Merck & Co., Inc. and Merck Sharp & Dohme Corp. ("Merck"), and Eric I. Abraham and Christina L. Saveriano of HILL WALLACK LLP, 202 Carnegie Center, Princeton, New Jersey 08540; and Meredith M. Addy, Mark H. Remus, Kelly J. Eberspecher, Abby L. Lemek, and Brandon C. Helms of BRINKS HOFER GILSON & LIONE, NBC Tower, Suite 3600, 455 North Cityfront Plaza Drive, Chicago, Illinois 60611 having appeared for defendant Sandoz Inc. ("Sandoz"); and counsel all having been notified that:

  (1)  a jury/nonjury trial in this matter has been scheduled before Stanley R. Chesler on a date to be set by His Honor's Chambers; and

(2)    the pretrial submissions detailed in ¶ 2 below are to be submitted no later than ~~September 9, 2011~~ *September 9, 2011* ~~thirty days from the date of this order unless otherwise noted herein~~ or they will be deemed waived; and the following Final Pretrial Order is hereby entered:

## 1.    JURISDICTION  (Set forth specifically.)

This is an action for patent infringement arising under the patent laws of the United States of America, involving U.S. Patent No. 5,952,300 ("the '300 patent").  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1338(a). Sandoz admits that personal jurisdiction and venue are proper in this case.

## 2.    PENDING/CONTEMPLATED MOTIONS/TRIAL BRIEFS (Set forth all pending or contemplated motions, whether dispositive or addressed to discovery or the calendar. Also set forth the nature of the motion and the return date. If the court indicated that it would rule on any matter at pretrial, summarize that matter and each party's position. NOTE:  ALL REMAINING PRE-TRIAL MOTIONS INCLUDING DAUBERT AND IN LIMINE MOTIONS SHALL BE FILED NO LATER THAN ~~thirty days after the date of~~ *September 9, 2011* ~~this order~~, and any response shall be submitted no later than ~~ten days of the date such~~ *October 3, 2011* ~~motions(s) are filed.~~ Only those motions listed herein will be entertained prior to trial.)

*The reply to the summary judgment opposition shall be filed no later than October 11, 2011. No replies on in limine motions are permitted*

There are currently no pending motions.  The parties wish to discuss the briefing schedule of the below contemplated motions at the pretrial conference.

Merck's List of Contemplated Motions:

1.    Motion for Summary Judgment of Nonobviousness of Claim 1 of U.S. Patent No. 5,952,300

         Prior to the pretrial conference, Merck will submit a letter motion to Judge Shwartz requesting leave of court to file the motion. *— resolved*

2.    Motion Concerning the Order of Presentation of Evidence at Trial

3.    Merck's Motion *In Limine* to Exclude Testimony from Dr. Mark Staples Regarding Formulation of Small Drug Molecules

4.    Merck reserves the right to seek pretrial rulings and/or a hearing regarding the admissibility or inadmissibility of various exhibits, testimony, or expected testimony.

Sandoz's List of Contemplated Motions:

1. Motion In Limine To Exclude All Evidence Concerning The Sandoz ANDA Product And The Development Thereof;

2. Motion In Limine To Exclude All Evidence Of Secondary Considerations Of Non-Obviousness;

3. Motion In Limine To Exclude All Evidence Regarding Merck's Contention That This Is An Exceptional Case;

4. Motion In Limine To Exclude Testimony From Dr. David S. Perlin;

5. Motion For Sandoz to Proceed First On Its Claim of Invalidity; and

6. Motion To Invoke Fed. R. Evid. 615 For All Non-Expert Witnesses.

**3.    STIPULATION OF FACTS  (Set forth in narrative form a comprehensive listing of all uncontested facts, including all answers to interrogatories and admissions, to which there is agreement among the parties.)**

1.      U.S. Patent No. 5,952,300 ("the '300 patent") expires on March 28, 2017.  The FDA has granted Merck pediatric exclusivity for the '300 patent until September 28, 2017.

2.      Plaintiffs Merck & Co., Inc. and Merck Sharp & Dohme Corp. (collectively "Plaintiffs" or "Merck") assert claim 1 of the '300 patent against Defendant Sandoz Inc. ("Defendant" or "Sandoz").

3.      Merck & Co., Inc. is a corporation organized and existing under the laws of the state of New Jersey, having its principal place of business at One Merck Drive, Whitehouse Station, New Jersey 08889.

4.      Merck Sharp & Dohme Corp. is a subsidiary of Merck & Co., Inc., and is a corporation incorporated under the laws of the state of New Jersey, having its principal place of business at One Merck Drive, Whitehouse Station, New Jersey 08889.

5.      Merck & Co., Inc. holds approved New Drug Application ("NDA") No. 21-227 for Cancidas®, the active ingredient of which is caspofungin acetate.  Cancidas® is approved for

- 3 -

the treatment of certain types of fungal infections. Cancidas® is sold by Merck as 50 mg/vial and 70 mg/vial dosage forms.

6.     Merck Sharp & Dohme Corp. is the owner of U.S. Patent No. 5,952,300.

7.     Sandoz is incorporated under the laws of the state of Colorado, having a principal place of business at 506 Carnegie Center, Suite 400, Princeton, New Jersey 08540.

8.     Sandoz is the holder of Abbreviated New Drug Application ("ANDA") No. 200833, filed with the United States Food and Drug Administration ("FDA"), pursuant to 21 U.S.C. § 355(j), concerning the proposed generic drug products, Caspofungin Acetate Injectable, 50 mg/vial and 70 mg/vial.

9.     On or about February 25, 2010, Merck & Co., Inc. received from Sandoz a letter, dated February 24, 2010 ("Notice Letter"), stating that Sandoz had submitted an ANDA, assigned No. 200833, to the FDA to seek approval to market Caspofungin Acetate Injectable, in 50 mg/vial and 70 mg/vial forms.

10.     In its Notice Letter, Sandoz stated that, in its ANDA, it had included certifications pursuant to 21 U.S.C. § 355(j)(2)(A)(vii)(IV) that the '300 patent is "invalid, unenforceable, and/or not infringed by the manufacture, use, sale or offer for sale of Sandoz's caspofungin acetate injectable, 50 mg/vial and 70 mg/vial."

11.     On March 30, 2010, Plaintiffs filed a civil action in the United States District Court for the District of New Jersey against Sandoz, alleging that the Sandoz proposed caspofungin products referenced in ANDA No. 200833 infringe the '300 patent.

12.     Claim 1 of the '300 patent claims as follows:

"A pharmaceutical composition for intravenous administration to a patient comprising

a) a pharmaceutically effective amount of a compound having the formula

- 4 -

(Seq. ID No. 1)

and the pharmaceutically acceptable salts thereof,

b) a pharmaceutically acceptable amount of an excipient effective to form a lyophilized cake; and

c) a pharmaceutically acceptable amount of an acetate buffer effective to provide a pharmaceutically acceptable pH."

13.    On March 3, 2011, this Court issued an opinion construing the claim term "and the pharmaceutically acceptable salts thereof," found in claim 1, subphrase "a)" of the '300 patent.

14.    This Court held that subphrase "a)" in claim 1 of the '300 patent requires "either an amount of the diagramed compound or an amount of a pharmaceutically acceptable salt of the diagramed compound."

15.    The diagramed compound in claim 1 of the '300 patent is caspofungin.

16.    Merck Sharp & Dohme Corp. is the current assignee of the '300 patent.

17.    Maneesh J. Nerurkar, Michael J. Kaufman, and William A. Hunke are the named inventors on provisional application No. 60/015,638, filed on April 19, 1996.

18.    Patent application No. 08/827,510 claims priority from provisional application No. 60/015,638, filed on March 28, 1997.

19.    U.S. Patent No. 5,952,300 issued from patent application No. 08/827,510 on September 14, 1999.

20.     The references below were cited during prosecution of the '300 patent:

    i.      *Remington's Pharmaceutical Sciences* 238, 1463-69, 1478-84 (16th ed. 1980);

    ii.     *Remington's Pharmaceutical Sciences* 241-43 (18th ed. 1990);

    iii.    A. Albert & E.P. Serjeant, *The Determination of Ionization Constants* 74 (3d ed. 1984);

    iv.     U.S. Patent No. 5,336,756;

    v.      U.S. Patent No. 5,466,781;

    vi.     U.S. Patent No. 5,120,859;

    vii.    U.S. Patent No. 5,378,804;

    viii.   U.S. Patent No. 5,514,650;

    ix.     U.S. Patent No. 5,552,521;

    x.      U.S. Patent No. 5,665,760;

    xi.     U.S. Patent No. 5,037,644; and

    xii.    Int'l App. Pub. No. 95/31213.

21.     Sandoz stipulated that "[u]nder the District Court's claim construction, the manufacture, use, offer for sale or sale of Sandoz's ANDA products within the United States or importation of the Sandoz ANDA products into the United States would infringe claim 1 of the '300 patent."

22.     Merck submitted NDA No. 21-227 for Cancidas® to the FDA on July 28, 2000.

23.     The FDA approved Merck's NDA No. 21-227 for Cancidas® on January 26, 2001 for the treatment of invasive aspergillosis in patients who are refractory to or intolerant of other therapies.

24.     Cancidas® is currently FDA-approved as a treatment for:

    a.   Empirical therapy for presumed fungal infections in febrile, neutropenic patients;

    b.   Candidemia and *Candida* infections, namely abdominal abscesses, peritonitis and pleural space infections;

    c.   Esophageal candidiasis; and

    d.   Invasive aspergillosis in patients who are refractory to or intolerant of other therapies.

## 4.     JUDICIAL NOTICE

**A.     Plaintiffs request that the Court take judicial notice of the following facts:**

Not applicable.

**B.     Defendant objects to the taking of judicial notice for the following reasons:**

Not applicable.

## 5.     JUDICIAL NOTICE

**A.     Defendant requests that the Court take judicial notice of the following facts:**

Not applicable.

**B.     Plaintiffs object to the taking of judicial notice for the following reasons:**

Not applicable.

**6.     PLAINTIFFS' CONTESTED FACTS  (Stated separately for each defendant.  Proof shall be limited at trial to the matters set forth below.  Failure to set forth any matter shall be deemed a waiver thereof.)**

**A.**  **Plaintiffs intend to prove the following contested facts with regard to liability:**

1.    This case involves antifungal drug products sold by Merck under the brand name, Cancidas®. The Cancidas® products are covered by, and are embodiments of, claim 1 of U.S. Patent No. 5,952,300 ("the '300 patent").

2.    Merck & Co., Inc. is a global research-driven pharmaceutical company that discovers, develops, manufactures, and markets a broad range of innovative products to improve human and animal health.

3.    Sandoz is in the business of developing and manufacturing generic pharmaceutical products, which are copies of products invented and developed by innovator pharmaceutical companies.

4.    On November 23, 2009, Sandoz filed an ANDA with the FDA seeking approval to manufacture and sell generic versions of Cancidas® prior to the expiration date of the '300 patent.

5.    The Sandoz ANDA refers to and relies upon the Merck & Co., Inc. Cancidas® NDA and contains data that, according to Sandoz, demonstrates the bioequivalence of the Sandoz proposed caspofungin products and Cancidas®.

The Patent-at-Issue:  U.S. Patent No. 5,952,300

6.    The inventions claimed in U.S. Patent No. 5,952,300 ("the '300 patent"), titled "Antifungal Compositions," were conceived of and reduced to practice at least as early as August 4, 1995.  The priority date for U.S. Patent No. 5,592,300 is at least as early as April 19, 1996.

7.     The following named inventors of the '300 patent conceived of and reduced to practice the inventions of the '300 patent at least as early as August 4, 1995: Maneesh J. Nerurkar, William A. Hunke, and Michael J. Kaufman.

8.     All three inventors of the '300 patent were employed by Merck at the time of their conception and reduction to practice.

9.     All interest in the '300 patent was assigned to Merck & Co., Inc. by inventors Maneesh J. Nerurkar, Michael J. Kaufman, and William A. Hunke on March 26, 1997.  Assignee Merck & Co., Inc. changed its name to Merck Sharp & Dohme Corp. on November 2, 2009. This name change was recorded with the United States Patent and Trademark Office ("PTO") on November 2, 2009.

10.     During prosecution, the applicants overcame multiple obviousness rejections by the Patent Examiner based upon the references considered, including references describing acetate buffers in parenteral dosage forms.  The Patent Examiner ultimately conceded that the use of an acetate buffer in a caspofungin lyophilized dosage form was not obvious in light of the references considered, and that the stabilization of caspofungin with an acetate buffer constituted unexpected results.

POSA Definition

11.     A person of ordinary skill in the art ("POSA") for the '300 patent would possess the following qualifications:  (a) a Ph.D. in pharmaceutics, chemistry, or a closely related discipline, (b) a master's degree in pharmaceutics, chemistry, or a closely related discipline, and at least two years of practical formulation experience, or (c) a bachelor's degree in pharmaceutical sciences, chemistry, or a closely related discipline, and at least four years of practical formulation experience.

- 9 -

12. Dr. Maneesh J. Nerurkar, Dr. William A. Hunke, and Dr. Michael J. Kaufman, the inventors of the '300 patent, meet or exceed the definition of a POSA for the '300 patent.

Claim Construction

13. The claim limitation in subphrase "a" of claim 1 of the '300 patent will be met if caspofungin free base or a pharmaceutically acceptable caspofungin salt is present in the composition in a pharmaceutically effective amount.

14. The '300 patent defines "pharmaceutically acceptable salts" to include acetate salts of caspofungin.

15. The '300 patent also defines a "pharmaceutically effective amount" from subphrase "a" of claim 1 as an amount of active ingredient that will elicit the biological or medical response of a tissue, system, or animal that is being sought by a researcher or clinician.

16. Subphrase "b" of claim 1 of the '300 patent means one or more inactive ingredients (*i.e.*, excipients) that enable the formation of a lyophilized cake. These inactive ingredients also must be pharmaceutically acceptable.

17. Subphrase "c" of claim 1 of the '300 patent means an amount of acetate buffer effective to provide a pharmaceutically acceptable pH upon reconstitution of the product. The amount of acetate buffer also must be pharmaceutically acceptable.

18. The specification of the '300 patent defines acetate buffer to include suitable amounts of acetic acid and sodium hydroxide.

19. The specification of the '300 patent defines a pharmaceutically acceptable pH as a range of 5 to 8, and preferably between 6 and 7.

Nonobviousness of Claim 1 of the '300 Patent

20.    The subject matter of claim 1 of the '300 patent would not have been obvious at the time the invention was made to a person having ordinary skill in the art.

21.    The prior art references cited by Sandoz – either alone or in combination – do not render claim 1 of the '300 patent obvious.

22.    The prior art references cited by Sandoz – either alone or in combination – do not disclose a lyophilized dosage form of caspofungin.

23.    The prior art references cited by Sandoz – either alone or in combination – do not disclose the stability of caspofungin.

24.    The prior art references cited by Sandoz – either alone or in combination – do not disclose a shelf-stable dosage form of caspofungin.

25.    The prior art references cited by Sandoz – either alone or in combination – do not disclose the degradation pathways of caspofungin.

26.    The prior art references cited by Sandoz – either alone or in combination – do not disclose a stable salt form of caspofungin.

27.    The prior art references cited by Sandoz – either alone or in combination – do not disclose stabilization of caspofungin in a dosage form using an acetate buffer.

Scope and Content of the Prior Art

28.    Caspofungin is a cyclohexapeptide.  Two of the six amino acids contain chemically modified substituents that differ from the natural cyclohexapeptide Pneumocandin $B_0$.

29.    Caspofungin contains two terminal amine functional groups.  These two terminal amine functional groups afford the opportunity for salt synthesis of caspofungin with acid counterions.

30.     Caspofungin is an unstable chemical compound.  Crystalline caspofungin diacetate is an unstable salt form of caspofungin.  Caspofungin diacetate must be stored below -20° C (typically -70° C) to remain stable.

31.     Caspofungin has the properties of both a small drug molecule and of a protein or peptide.  A POSA would look to prior art references concerning formulating small drug molecules as well as proteins and peptides when considering dosage forms of caspofungin.

32.     Due to the unique properties and structure of caspofungin, a POSA would lack significant guidance in the art on how to prepare stable dosage forms of caspofungin.

33.     A POSA would first search for both a stable and soluble salt form of caspofungin before contemplating a dosage form of caspofungin.

34.     A POSA would not have had a reasonable expectation of success in preparing a shelf-stable dosage form from an unstable drug compound such as caspofungin.

U.S. Patent No. 5,378,804

35.     U.S. Patent No. 5,378,804 ("the '804 patent") – either alone or in combination – does not render claim 1 of the '300 patent obvious.

36.     The '804 patent discloses the chemical compound caspofungin.  The '804 patent also discloses pharmaceutically acceptable salts of caspofungin.

37.     The '804 patent discloses caspofungin as a drug compound that is synthesized and subsequently isolated by lyophilization.  This lyophilized caspofungin is not a dosage form of caspofungin.

38.     The '804 patent does not describe a lyophilized dosage form of caspofungin.

39.     The '804 patent does not describe a lyophilized dosage form of any compound.

40.     The '804 patent does not describe the stability of caspofungin.  Additionally, the '804 patent does not describe the stability of any of the caspofungin drug product formulations.

41.     The '804 patent does not describe the degradation products of caspofungin or degradation products found in caspofungin drug formulations.

42.     The "[b]uffering agents" described in the '804 patent are used to make the solution drug formulations contemplated by the '804 patent isotonic.  The '804 patent does not describe using buffers or any other pharmaceutical excipients to stabilize caspofungin.

43.     The '804 patent describes a "powder form for reconstitution with a suitable vehicle prior to administration."  A POSA would not have considered this description as describing a lyophilized dosage form.

44.     The '804 patent would not have taught a POSA how to prepare a stable, lyophilized drug formulation of caspofungin with extended shelf life.

U.S. Patent No. 5,552,521

45.     U.S. Patent No. 5,552,521 ("the '521 patent") – either alone or in combination with any other Sandoz reference – does not render claim 1 of the '300 patent obvious.

46.     The '521 patent discloses a chemical process to synthesize caspofungin.

47.     The '521 patent discloses a crystalline diacetate salt form of caspofungin.

48.     The '521 patent does not describe the stability of caspofungin or caspofungin diacetate.

49.     The '521 patent does not describe drug formulations.

50.     The '521 patent would not have taught a POSA how to prepare a stable, lyophilized dosage form of caspofungin.

Known Formulation Strategies

51.     Drug formulation strategies known in the art – either alone or in combination with any other Sandoz reference – do not render claim 1 of the '300 patent obvious.

52.     The 1995 Remington reference ("*Remington: The Science and Practice of Pharmacy* (Alfonso R. Gennaro ed., 19th ed. 1995)") – either alone or in combination with any other Sandoz reference – does not render claim 1 of the '300 patent obvious.

53.     The Avis reference ("1 *Pharmaceutical Dosage Forms: Parenteral Medications* (Kenneth E. Avis ed., 2d ed. 1992)") – either alone or in combination with any other Sandoz reference – does not render claim 1 of the '300 patent obvious.

54.     Drug formulation is a critical aspect of the drug development process.

55.     Without a convenient and shelf-stable formulation, a drug cannot be administered to patients in need of treatment.

56.     Drug formulation is a complicated and time-consuming process.

57.     A POSA would have considered multiple aspects when formulating a drug compound, including route of administration of the drug compound, the type of dosage form, the properties of the drug compound, the components used in the dosage form, the process of preparing the dosage form, and the stability of the drug compound used in the dosage form.

58.     Drug stability is critical to the regulatory approval process and the success of a pharmaceutical product.

59.     A POSA would have targeted a shelf life of two years for a pharmaceutical dosage form.

60.     A POSA would have been unable to predict what dosage form or combination of excipients in a dosage form would stabilize caspofungin.  The experimental process to determine

what dosage form and combination of excipients, if any, that will stabilize a drug compound is trial and error.

61.     In the 1980's and 1990's, drug therapies increasingly focused on peptides and proteins. As the focus increased, the need to develop dosage forms of pharmaceutically relevant proteins and peptides emerged.

62.     A POSA would have found the task of developing a convenient and shelf-stable dosage form of a protein or peptide challenging due to the absence of experience in the art with these types of dosage forms.

63.     In attempting to stabilize caspofungin, a POSA would first have used salt selection in an attempt to improve the solid-state characteristics of caspofungin, including investigating crystal forms of caspofungin.

64.     A POSA would not have had a reasonable expectation of finding a stable and soluble salt of caspofungin.

65.     Merck investigated various salt forms of caspofungin and was unable to obtain a stable salt form of caspofungin.

66.     Sandoz investigated various salt forms of caspofungin and was unable to obtain a stable salt form of caspofungin.

67.     A POSA would have known that hydrochloride salts may be hygroscopic, meaning the salt takes up water from the environment, leading to degradation.

68.     A POSA would not have selected the diacetate salt of caspofungin to develop a dosage form because it is not stable in its pure state.

69.     A POSA would not have selected the diacetate salt of caspofungin to develop a dosage form because it is hygroscopic.

- 15 -

70.     Even if a POSA attempted to develop a dosage form with caspofungin diacetate, he/she would not have had a reasonable expectation of success.

71.     A POSA would have pursued ready-to-use parenteral solutions and powder fill dosage forms before attempting to develop a lyophilized dosage form.

72.     Merck investigated various dosage forms for caspofungin, including ready-to-use solutions, frozen solutions, crystalline solids for powder filling, and lyophilized dosage forms.

73.     Lyophilized dosage forms are more difficult and costly to develop than a ready-to-use solution or powder fill dosage form.

74.     Lyophilized dosage forms have the disadvantage of requiring reconstitution prior to administration to a patient when compared to a ready-to-use solution.

75.     Lyophilization may chemically or physically alter drug compounds, potentially modifying their physical properties, therapeutic effectiveness, and safety.

76.     The 1995 *Physician's Desk Reference* ("PDR") lists over twice as many parenteral products that were formulated as ready-to-use solution dosage forms compared to lyophilized dosage forms.

77.     The 1995 PDR does not list a single lyophilized product containing an acetate buffer.

78.     A POSA would expect the aza linkage in caspofungin to be unstable, making commercialization of caspofungin as a dosage form challenging.

79.     Preformulation studies would not have revealed all of the degradation pathways for caspofungin. Additionally, Merck's preformulation studies did not reveal all of the degradation pathways for caspofungin.

80.     Caspofungin degrades into four major degradation products.  Only three of the caspofungin degradants could have been observed during solution stability experiments.  Only three of the caspofungin degradants could have been observed during stability experiments of the bulk crystalline diacetate salt of caspofungin.

81.     A new degradant of caspofungin, known as Degradate A or L-717, was only observed in lyophilized dosage forms of caspofungin.

82.     Merck initially attributed the formation of L-717 during lyophilization to an incorrect mechanism.

83.     Ultimately, Merck determined the correct mechanism of formation of L-717.

84.     A POSA could not have predicted formation of L-717 from caspofungin solution stability or bulk caspofungin stability experiments.

85.     Many excipients are available for a POSA to select from when preparing a parenteral dosage form.  For peptides and proteins, special stabilizers other than pH buffers have been reported in the literature.

86.     The use of each excipient in a dosage form should be justified.

87.     The effect of each excipient on the stability of a drug compound could not have been predicted in advance, and trial and error plays a major role in the selection of excipients.

88.     It  took over two years for the inventors to arrive at the formulations claimed in the '300 patent.

89.     The Flynn reference ("Gordon L. Flynn, *Buffers – pH Control Within Pharmaceutical Systems*, 34 J. Parenteral Drug Ass'n 139 (Mar.-Apr. 1980)") relates to buffers used in aqueous solutions.

90.     Flynn does not discuss using buffers in lyophilized dosage forms.

- 17 -

91.     The Flynn reference – either alone or in combination with other references cited by Sandoz – does not render claim 1 of the '300 patent obvious.

92.     A POSA would consider the useful pH range for a buffer to be +/- one pH unit from its pKa.

93.     Data for pH solution stability could not have been used to predict stabilization of a drug compound in a lyophilized dosage form.

94.     A POSA would have considered adding a buffer to a solution formulation only if pH drift was observed and the compound stability was affected by pH.

95.     The solution stability data for caspofungin does not exhibit significant pH drift that would have justified adding a buffer.

96.     The solution pH is not necessarily relevant to a lyophilized product because once the water is removed, the lyophilized cake is no longer considered to have "pH" as is it did in solution.

97.     A POSA would not reasonably have expected the pH of a solution of caspofungin to be relevant to the stability of a lyophilized formulation.

98.     The process of lyophilization is complex and unpredictable, and a POSA would not have had a reasonable expectation of preparing a stable dosage form by lyophilization.

99.     None of the references cited by Sandoz – either alone or in combination – discloses an acetate buffer in a lyophilized dosage form.

100.    Acetic acid is chemically volatile as evidenced by its low boiling point.

101.    A POSA would have been concerned that significant amounts of, if not all, acetic acid would be lost during lyophilization, reducing or eliminating its buffering capacity as compared to non-volatile buffers.

102.    A POSA would have been lead away from using acetate as a buffer in a lyophilized dosage form due to its volatility.

103.    A POSA would have been lead away from using acetate as a buffer due to its difficulty in handling because it is a liquid.

104.    Merck was concerned with the loss of acetate during lyophilization of its caspofungin acetate formulations.

105.    A POSA would not have been motivated to choose a buffer to match the counterion of a drug compound.

106.    Assuming a POSA would have investigated using a buffer in a caspofungin product, he/she would have looked to the buffers listed in Flynn, among others, for guidance.

107.    The Flynn reference lists seventeen buffers that are acceptable for parenteral products.  Twelve of the buffers listed in Flynn would provide buffering at a pH of 5.

108.    The list of buffers provided by Sandoz's expert, Dr. Staples, is too restrictive and does not reflect the buffers available to a POSA in the art.

109.    Sandoz, using different criteria, states in its Notice Letter that a POSA would only have considered using buffers that have a single acid group.

110.    A POSA would not have considered the number of acid groups on a buffer when selecting a buffer for a pharmaceutical product.

111.    The 1995 PDR shows that many parenteral products contain buffers with multiple acid groups.  The 1995 PDR undermines Sandoz's contention that a POSA would select a buffer based on the number of acid groups on the buffer.

112.    Sandoz's expert Dr. Staples did not limit his list of potential buffers to those containing a single acid group.

- 19 -

113. The Flynn reference does not teach that multiple acid group buffers should not be used in pharmaceutical products. The Avis reference does not teach that multiple acid group buffers should not be used in pharmaceutical products. The Flynn and Avis references teach a POSA to examine through experiments any potential buffer catalysis to ensure that any catalysis is not appreciable. The teachings in both Flynn and Avis are limited to aqueous solutions.

114. Sandoz cites no reference that teaches the number of acid groups on a buffer causes buffer catalysis in a lyophilized dosage form.

115. During formulation development, Merck used buffers that contained one or more acid groups on the buffer and found no correlation between the number of acid groups and degradation of caspofungin in a lyophilized dosage form of caspofungin.

116. Sandoz's formulation strategies for caspofungin are inconsistent with its obviousness contentions.

117. Sandoz's reliance on the argument that a POSA would only have considered using buffers that have a single acid group in support of its paragraph IV certification to FDA is baseless.

118. Sandoz states in its Notice Letter that a POSA would select a buffer based on pharmaceutical salts that were in marketed use greater than 1% of the time ("1% use statistic") from the 1995 Remington's table of pharmaceutical salts.

119. Sandoz refused to provide a basis for its 1% use statistic during discovery.

120. Sandoz's expert Dr. Staples was unable to provide any basis for Sandoz's 1% use statistic.

121. Sandoz's reliance on a 1% use statistic in support of its paragraph IV certification to FDA is baseless.

122.     A POSA would not use a 1% use statistic when selecting a buffer for a dosage form of caspofungin.

123.     Even if a POSA were to have attempted to use a buffer to stabilize caspofungin in a lyophilized dosage form, a POSA would have expected that all buffers capable of maintaining a pH at the desired value would have been equivalent in this role.

124.     When comparing lyophilized caspofungin dosage forms at a pH of 5, an acetate buffered formulation had five times less degradation overall than a tartrate buffered formulation when stored for sixteen weeks at 5°C.

125.     When comparing lyophilized caspofungin dosage forms at a pH of 5, an acetate buffered formulation had 3.6 times less of degradant L-717 than a tartrate buffered formulation when stored for sixteen weeks at 5°C.

126.     When comparing lyophilized caspofungin dosage forms at a pH of 5, an acetate buffered formulation had less of the degradation products L-717, L-969, and dimers than a tartrate buffered formulation when stored for sixteen weeks at 5°C.

127.     A POSA could not have reasonably predicted the reduction in degradation in going from a tartrate buffer to an acetate buffer.

128.     The acetate buffered formulations of claim 1 of the '300 patent provide a shelf-stable and convenient dosage form of caspofungin when stored at 5°C for up to 2 years.

129.     The acetate buffered formulations of claim 1 of the '300 patent are the only known dosage forms of caspofungin to provide a shelf-stable product.

130.     Data from testing of formulations of caspofungin that Sandoz prepared are relevant to the unexpected properties of and superiority of the caspofungin formulations claimed in the '300 patent.  Sandoz did not account for this data when it submitted its paragraph IV

Notice Letter to Merck concerning the '300 patent. Sandoz's failure to account for this data supporting that the '300 claims are not obvious demonstrates that its paragraph IV certification was wholly unjustified.

131.    The stabilization of caspofungin was unexpected because no stable salt form (*i.e.*, active pharmaceutical ingredient or "API") of caspofungin had been identified in the art.

132.    The experimental results using an acetate buffer as compared to a tartrate buffer in a lyophilized dosage form of claim 1 of the '300 patent were unexpected. Additionally, using an acetate buffer in a lyophilized dosage form of claim 1 of the '300 patent was unexpectedly superior.

133.    Sandoz failed to address unexpected properties for claim 1 of the '300 patent in its Notice Letter to Merck. Additionally, Sandoz failed to address unexpected properties for claim 1 of the '300 patent at any point during discovery. Further, Sandoz's expert Dr. Staples in his two expert reports failed to address unexpected properties for claim 1 of the '300 patent. Sandoz's failure to consider this evidence shows that its paragraph IV certification to FDA was wholly unjustified, and that it failed to address such allegations even during the litigation.

134.    A POSA would not have selected a buffer based on the pKa values of the drug compound.

135.    The Avis reference includes an example where matching the buffer to the pKa of the drug compound provided the least stable conditions for the drug, teaching away from matching the pKa of the drug to that of a potential buffer.

136.    U.S. Patent No. 4,857,552 ("the '552 patent") – either alone or in combination with any other Sandoz reference – does not render claim 1 of the '300 patent obvious.

137.    The '552 patent discloses an aqueous formulation of esmolol with an acetate buffer.

138.    The '552 patent does not disclose a lyophilized dosage form.

139.    The '552 patent does not teach how to prepare a stable, lyophilized dosage formulation of caspofungin.

140.    The inventors of the '300 patent did not mislead the examiner regarding the stability results for the acetate and tartrate buffer experiments of caspofungin.

141.    The stability results for the lyophilized caspofungin formulations with an acetate buffer at pH 6 demonstrate that acetate is doing more than just controlling pH.

142.    A pH of 6 is outside of acetate's typical pH buffering range.

143.    The superiority of the acetate buffer in a dosage form of claim 1 of the '300 patent cannot be attributed solely to its pH buffering.  Merck has been unable to determine the underlying mechanism for the acetate buffer's superiority.

144.    A POSA would not have expected an acetate buffer to stabilize caspofungin because the diacetate salt of caspofungin itself is unstable in its pure state and is hygroscopic.

145.    The Patent Examiner for the '300 patent misunderstood the teachings of U.S. Patent No. 5,336,756 ("the '756 patent") in light of the other art available to the Patent Examiner. The '756 patent teaches that echinocandin type compounds are often amorphous in structure; however the '552 patent discloses caspofungin diacetate as a crystalline compound.  The inventors did not mislead the Patent Examiner by correcting the Patent Examiner's misunderstanding of the teachings in the '756 patent.

146.    U.S. Patent No. 5,120,859 ("the '859 patent") – either alone or in combination with any other Sandoz reference – does not render claim 1 of the '300 patent obvious.  The '859

patent is not directed to caspofungin, and the stability of a caspofungin formulation could not have been predicted based on compounds other than caspofungin.

Copying

147.   Sandoz's proposed caspofungin products are copies of Merck's successful Cancidas® products.

148.   Merck's Cancidas® products contain caspofungin diacetate, which is a pharmaceutically acceptable salt of caspofungin.

149.   Merck's Cancidas® products are FDA-approved for treating mycotic infections, which are infections relating to or caused by a fungus.

150.   The dosing regimens set forth in the Cancidas® prescribing information constitute administering an amount of drug useful to treat mycotic infections.

151.   The prescribing information for Merck's Cancidas® products describes both 50 mg/vial and 70 mg/vial dosage strengths.  These dosage strengths are useful in eliciting the medical response desired by the clinician to treat fungal infections.  Merck's Cancidas® products contain a pharmaceutically effective amount of caspofungin diacetate, meeting the aspect of subphrase "a" of claim 1 of the '300 patent.

152.   Sucrose and mannitol are added to Merck's Cancidas® products to serve as bulking agents that allow formation of a lyophilized cake.  Additionally, the amounts of sucrose and mannitol that are present are at pharmaceutically acceptable levels.  Merck's Cancidas® products have a pharmaceutically acceptable amount of excipients effective to form a lyophilized cake, and therefore meet the aspect of subphrase "b" of claim 1 of the '300 patent.

153.    Glacial acetic acid and sodium hydroxide are added to Merck's Cancidas® products during manufacturing.  Upon reconstitution of the lyophilized cake, the pH of the resulting solution is pharmaceutically acceptable.

154.    Merck's Cancidas® products contain a pharmaceutically acceptable amount of an acetate buffer, and the product will have a pharmaceutically acceptable pH upon reconstitution because the pH specification for its products is between a pH of 5 and 8.  Merck's Cancidas® products thus meet the aspect of subphrase "c" of claim 1 of the '300 patent.

155.    Merck's Cancidas® products meet the limitations of, and are embodiments of, claim 1 of the '300 patent.

156.    The prescribing information for Sandoz's proposed caspofungin products is substantially identical in all relevant aspects to the Cancidas® prescribing information.

157.    Sandoz copied Merck's Cancidas® products after failing to design around the '300 patent.

158.    Sandoz was aware of Merck's Cancidas® products when it developed its proposed caspofungin products.

159.    Sandoz copied the components used in Merck's Cancidas® products when it developed its proposed caspofungin products.

160.    Sandoz's proposed caspofungin products are based on claim 1 of the '300 patent and Merck's Cancidas® products.

161.    Sandoz's expert does not deny Sandoz copied the claims of the '300 patent.

162.    That Sandoz copied the claims of the '300 patent after failing to design around those claims, shows that Sandoz's paragraph IV certification to FDA was wholly unjustified.

Exceptional Case

163. As reflected above in paragraphs 109-22, 130-33, and 157-62, in its Notice Letter Sandoz made assertions that were wholly unjustified. Thus, Sandoz's Notice Letter regarding the '300 patent was baseless.

164. Sandoz repeated its baseless allegations in its invalidity contentions regarding the '300 patent.

165. Sandoz has refused to provide any factual bases for assertions in its Notice Letter sent to Merck.

166. Sandoz has elected not to rely on advice of counsel as a defense to Merck's exceptional case allegations.

167. Sandoz committed litigation misconduct regarding discovery of formulation development documents from its affiliates, Sandoz GmbH and Lek.

168. Sandoz repeatedly asserted in this litigation that it did not have possession, custody, or control of documents in the possession of Sandoz GmbH and Lek.

169. Sandoz GmbH drafted modules 2 through 5 of Sandoz's ANDA No. 200833.

170. Scientists at Sandoz GmbH worked on the formulation of caspofungin on behalf of Sandoz.

171. Lek Pharmaceuticals d.d. ("Lek") is the manufacturing, packaging, and control site for the drug product and drug substance that is the subject of ANDA No. 200833.

172. Sandoz delayed discovery of documents from Sandoz GmbH and Lek that are relevant to patent validity issues in this case.

173. These documents are relevant to caspofungin formulations developed for Sandoz's ANDA No. 200833.

174.     Sandoz was on notice since June 2010 that Merck sought discovery of relevant documents in the possession of Sandoz GmbH and Lek.

175.     Sandoz caused Merck to file multiple motions to compel production of relevant documents in the possession of Sandoz GmbH and Lek, delaying discovery of these documents for over half a year.

176.     On November 23, 2010 Magistrate Judge Shwartz held that Sandoz does have possession, custody, or control of the relevant documents in the possession of Sandoz GmbH and Lek under Federal Rule of Civil Procedure 34.

177.     Despite Sandoz being on notice that Merck was seeking discovery of relevant documents from Sandoz GmbH, Sandoz failed to preserve those relevant documents, including the lead formulator on the caspofungin project, who discarded potentially relevant documents related to his work on caspofungin through mid-November 2010.

Unmet Need

178.     Before January 2001, there was a recognized, increasing incidence of invasive fungal infections, including the identification of new, opportunistic fungal infections, especially in patients whose immune systems were compromised due to acquired immune deficiency syndrome, cancer, or organ transplants, among other conditions.

179.     Prior to the introduction of Cancidas®, the existing treatments for invasive fungal infections – amphotericin B and the azoles – were insufficient due to toxicity and the increasing incidence of drug resistance.

180.     The deficiencies of amphotericin B and the azoles are related to the mechanisms of action of those treatments.

181.    Prior to the introduction of Cancidas®, there was a recognized, long-felt need in the medical community and among patients for a new antifungal agent that was safer, effective, and, ideally, had a different mechanism of action.

182.    Amphotericin B, introduced in 1956, was the first agent approved to treat systemic fungal infections.

183.    Although amphotericin B is effective as a fungicidal agent (*i.e.*, kills fungi), its use is limited by its nephrotoxicity (*i.e.*, kidney toxicity), which adversely affects many patients treated with amphotericin B.

184.    Amphotericin B's mechanism of action is not fungal-specific and accounts for both its efficacy and its toxicity.

185.    Amphotericin B affects the fungal cell's membrane integrity by binding to ergosterol, the main sterol in fungal cell membranes, making the cell's membrane permeable and resulting in cell death.

186.    The significant nephrotoxicity drawback of amphotericin B led to a major research effort in the industry to attempt to develop treatments with reduced toxicity, for example, by acting through a different mechanism of action.

187.    The first member of the azole class of drugs for the treatment of systemic fungal infections, Diflucan® (fluconazole), was approved by the FDA in 1990.

188.    Although the azole class of fungicidal agents are less toxic than amphotericin B, the azoles are mainly fungistatic, meaning that they inhibit the fungi's growth but do not kill fungi as a fungicidal treatment would.

189.    Azole-resistant strains of *Candida albicans* have arisen as the use of azoles has widened.

190.    Resistance to echinocandin drugs, including Cancidas®, is relatively rare and occurs at a low frequency.

191.    Fluconazole displays only limited activity against *Candida krusei* and *Candida glabrata*, the latter being the second most common fungal species in North America.

192.    Fluconazole has a limited spectrum against molds such as *Aspergillus fumigatus*, a leading cause of fungal-associated mortality in severely immune-compromised patients.

193.    Treatments for neutropenic patients with presumed fungal infections prior to the introduction of Cancidas® were inadequate because the unidentified fungus may have been resistant to the treatment (*e.g.*, infection with *C. glabrata* or *C. krusei*, as in the case of fluconazole).

194.    Cancidas® has been shown to be effective against azole-resistant species such as *Candida krusei* and *Candida glabrata*, and azole-resistant strains of *Candida albicans*.

195.    Cancidas® is widely used for patients who fail to respond to (*i.e.*, are refractory to) amphotericin B or fluconazole.

196.    Merck requested fast-track review designation for Cancidas® from the FDA on March 19, 1999.

197.    Fast-track review is an FDA process designed to facilitate development and expedite the review of drugs to treat serious diseases and fill an unmet medical need.

198.    The FDA granted Merck's request for fast-track review designation for Cancidas® on or about May 27, 1999, for treatment of patients with invasive aspergillosis who are refractory to, or intolerant of, other therapies.

199.    Prior to its FDA approval, physicians sought, and Merck provided, access to Cancidas® outside of clinical trials because other available treatments were not adequately safe and effective for treating invasive fungal infections.

200.    The FDA provides access to an unapproved drug for "expanded access" or "compassionate use," for the treatment of patients with serious or life-threatening conditions who have no treatment alternatives.

201.    Cancidas® was the first treatment from a new class of compounds with a new mechanism of action – the echinocandins – approved by the FDA.

202.    Cancidas® is recognized by the Infectious Diseases Society of America as an effective antifungal for the treatment of invasive candidiasis and aspergillosis, with few adverse effects.

203.    The Infectious Diseases Society of America recommends Cancidas® for multiple clinical situations, including primary therapy for candidemia in neutropenic patients, a life-threatening infection.

204.    Cancidas® interferes with the fungal cell wall structure by inhibiting ß (1,3)-D-glucan synthase.  This membrane-bound enzyme, found in a number of pathogenic fungi, is necessary for the biosynthesis of ß (1,3)-D-glucan, an essential component of the fungal cell wall.

205.    Cancidas® is fungicidal against *C. albicans*, the most prevalent cause of invasive fungal infections.

206.    Cancidas® is considered fungistatic against *Aspergillus*.  However, Cancidas® provokes a response from the host's immune system to the fungal infection.  This surprising effect, which is not expected from a fungistatic treatment, is also observed with *C. albicans*.

207.    Cancidas® has a fungal-specific mechanism of action.

Exhibit 2-J



# PDR® 49 EDITION 1995

# PHYSICIANS' DESK REFERENCE®

**Medical Consultant**
**Ronald Arky, MD,** Charles S. Davidson Professor of Medicine and Master, Francis Weld Peabody Society, Harvard Medical School

**President and Chief Operating Officer, Drug Information Services Group:** William J. Gole

**Senior Vice President and General Manager:** Thomas F. Rice

**Product Manager:** Stephen B. Greenberg

**Associate Product Manager:** Cy S. Caine

**Sales Manager:** James R. Pantaleo

**Senior Account Manager:** Michael S. Sarajian

**Account Managers**
Dik N. Barsamian
Donald V. Bruccoleri
Lawrence C. Keary
Jeffrey M. Keller
P. Anthony Pinsonault
Anthony Sorce

**Commercial Sales Manager:** Robin B. Bartlett

**Direct Marketing Manager:** Robert W. Chapman

**Vice President of Production:** Steven R. Andreazza

**Manager, Professional Data:** Mukesh Mehta, RPh

**Manager, Database Administration:** Lynne Handler

**Contracts and Special Services Director:** Marjorie A. Duffy

**Director of Production:** Carrie Williams

**Production Managers:** Kimberly Hiller-Vivas, Tara L. Walsh

**Format Editor:** Gregory J. Westley

**Index Editor:** Jeffrey Schaefer

**Art Associate:** Joan K. Akerlind

**Director of Corporate Communications:** Gregory J. Thomas

**Digital Photography:** Shawn W. Cahill

**Digital Prepress Processing:** Joanne McCloskey, Richard Weinstock

**Editor, Special Projects:** David W. Sifton

 Copyright © 1995 and published by Medical Economics Data Production Company at Montvale, NJ 07645-1742. All rights reserved. None of the content of this publication may be reproduced, stored in a retrieval system, resold, redistributed, or transmitted in any form or by any means (electronic, mechanical, photocopying, recording, or otherwise) without the prior written permission of the publisher. PHYSICIANS' DESK REFERENCE®, PDR®, PDR For Nonprescription Drugs®, PDR For Ophthalmology® and The PDR® Family Guide to Prescription Drugs® are trademarks of Medical Economics Data Production Company, registered in the United States Patent and Trademark Office. PDR Guide to Drug Interactions • Side Effects • Indications™, The PDR® Family Guide to Women's Health and Prescription Drugs™, PDR® Library on CD-ROM™, PDR® Drug Interactions/Side Effects/Indications Diskettes™, and Pocket PDR™ are trademarks of Medical Economics Data Production Company.

**Officers of Medical Economics:** President and Chief Executive Officer: Norman R. Snesil; Executive Vice President and Chief Financial Officer: J. Crispin Ashworth; Senior Vice President of Corporate Operations Group: John R. Ware; Senior Vice President of Corporate Business Development: Raymond M. Zoeller; Vice President of Information Services and Chief Information Officer: Edward J. Zecchini

Printed on recycled paper

ISBN: 1-56363-087-7

## Sanofi Winthrop—Cont.

magnetic field experienced by the protons reorient them with the main magnetic field more quickly than in the absence of a paramagnetic agent.

Therefore, by increasing the relaxation rate, OMNISCAN decreases both the $T_1$ and $T_2$ relaxation times in tissues where it is distributed. At clinical doses, the effect is primarily on the $T_1$ relaxation time, and produces an increase in signal intensity. OMNISCAN does not cross the intact blood-brain barrier and, therefore, does not accumulate in normal brain or in lesions that do not have an abnormal blood-brain barrier e.g., cysts, mature post-operative scars, etc. However, disruption of the blood-brain barrier or abnormal vascularity allows accumulation of OMNISCAN in lesions such as neoplasms, abscesses, subacute infarcts.

The extended time for OMNISCAN to be accumulated in the lesions is unknown.

### INDICATIONS AND USAGE

OMNISCAN is indicated for intravenous administration with magnetic resonance imaging in adult patients to provide contrast enhancement in those central nervous system lesions with abnormal vascularity or those thought to cause abnormalities in the blood-brain barrier. OMNISCAN Injection has been shown to facilitate visualization of central nervous system lesions including but not limited to tumors.

### CONTRAINDICATIONS

None known.

### WARNINGS

Deoxygenated sickle erythrocytes have been shown in *in vitro* studies to align perpendicular to a magnetic field which may result in vaso-occlusive complications *in vivo*. The enhancement of magnetic moment by OMNISCAN may possibly potentiate sickle erythrocyte alignment. OMNISCAN Injection in patients with sickle cell anemia and other hemoglobinopathies has not been studied.

Patients with other hemolytic anemias have not been adequately evaluated following administration of OMNISCAN Injection to exclude the possibility of increased hemolysis. Patients with history of allergy or drug reaction should be observed for several hours after drug administration.

### PRECAUTIONS

**GENERAL**

Diagnostic procedures involving the use of contrast agents should be conducted under supervision of a physician with the prerequisite training and a thorough knowledge of the procedure to be performed.

Since OMNISCAN (gadodiamide) is cleared from the body by glomerular filtration, caution should be exercised in patients with impaired renal function. An alternate route of excretion frequently observed in patients with severe renal impairment receiving iodinated contrast media, is the hepatobiliary enteric pathway, although this has not been demonstrated with OMNISCAN. However, caution should be exercised in patients with renal insufficiency with or without hepatic impairment.

The possibility of a reaction, including serious, life-threatening, fatal, anaphylactoid or cardiovascular reactions or other idiosyncratic reactions should always be considered (see ADVERSE REACTIONS) especially in those patients with a known clinical hypersensitivity.

OMNISCAN should be drawn into the syringe and used immediately. If nondispensable equipment is used, scrupulous care should be taken to prevent residual contamination with traces of cleansing agents.

Repeat procedures: Data for repeated injections are not available. If the physician determines sequential or repeat examinations are required, a suitable interval of time between administrations should be observed to allow for normal clearance of the drug from the body.

**INFORMATION FOR PATIENTS**

Patients receiving OMNISCAN should be instructed to:
1. Inform their physician if they are pregnant or breast feeding.
2. Inform their physician if they have anemia or diseases that affect red blood cells.
3. Inform their physician if they have a history of renal or hepatic disease, seizure, asthma or allergic respiratory disorders.

**LABORATORY TEST FINDINGS**

Asymptomatic transitory changes in serum iron have been observed. The clinical significance is unknown.

**CARCINOGENESIS, MUTAGENESIS, IMPAIRMENT OF FERTILITY**

No long-term animal studies have been performed to evaluate the carcinogenic potential of gadodiamide. The results of three *in vitro* and one *in vivo* short-term genotoxicity assays were negative.

**PREGNANCY CATEGORY C**

OMNISCAN has been shown to increase the incidence of skeletal and visceral abnormalities in the offspring of rabbits administered 0.5 mmol/kg/day (5 times the recommended human dose of 0.1 mmol/kg). This may have been related to

maternal toxicity. There are no adequate and well-controlled studies in pregnant women. OMNISCAN should be used during pregnancy only if the potential benefit justifies the potential risk to the fetus.

**NURSING MOTHERS**

It is not known whether this drug is excreted in human milk. Because many drugs are excreted in human milk, caution should be exercised when OMNISCAN is administered to a nursing woman.

**PEDIATRIC USE**

Safety and effectiveness of OMNISCAN in children have not been established.

### ADVERSE REACTIONS

The most frequent adverse reactions observed in patients during OMNISCAN clinical trials were nausea, headache and dizziness with an incidence of 3% or less. The majority of these adverse reactions were of mild to moderate intensity. The following adverse reactions occurred in less than 1% of the patients:

*Body as a Whole:* Chest pain, fatigue, fever, rigors, asthenia, hot flushes, malaise, pain.
*Cardiovascular:* Warmth.
*Digestive:* Vomiting, abdominal pain, diarrhea, eructation, melena.
*Musculoskeletal:* Arthralgia.
*Nervous System:* Paresthesia, convulsion including generalized seizure, abnormal coordination, anorexia, anxiety, syncope, tremor, ataxia, dry mouth, personality disorder, somnolence.
*Respiratory System:* Rhinitis.
*Skin and Appendages:* Flushing, pruritus, urticaria, rash erythematous, bruise, erythema, myalgia, skin discoloration, sweating (increased), swelling.
*Special Senses:* Taste perversion, tinnitus, vision abnormality, taste loss.
*Urinary:* Renal failure (reversible).

### OVERDOSAGE

The minimum lethal dose of intravenously administered OMNISCAN in rats and mice is greater than 20 mmol/kg (200 times the recommended human dose of 0.1 mmol/kg).

### DOSAGE AND ADMINISTRATION

The recommended dosage of OMNISCAN is 0.2 mL/kg (0.1 mmol/kg), administered as a bolus intravenous injection. The maximum total dose should not exceed 20 mL. Any unused portion must be discarded.

**DOSAGE CHART**

| Body Weight (kg) | (lbs) | Dose (mL) |
|---|---|---|
| 40 | 88 | 8.0 |
| 50 | 110 | 10.0 |
| 60 | 132 | 12.0 |
| 70 | 154 | 14.0 |
| 80 | 176 | 16.0 |
| 90 | 198 | 18.0 |
| 100 | 220 | 20.0 |

To ensure complete injection of the contrast medium, the injection should be followed by a 5 mL flush of 0.9% sodium chloride. The imaging procedure should be completed within 1 hour of administration of OMNISCAN.

Parenteral products should be inspected visually for particulate matter and discoloration prior to administration, whenever solution and container permit. Do not use the solution if it is discolored or particulate matter is present.

### HOW SUPPLIED

OMNISCAN (gadodiamide) Injection is supplied in boxes of 10 single-dose vials.
10 mL vial (NDC 0024-0690-10)
15 mL fill in 20 mL vial (NDC 0024-0690-15)
20 mL vial (NDC 0024-0690-20)
Storage: OMNISCAN should be stored at controlled room temperature 15°C–30°C (59°F–86°F).
**Protect from light.**
Do not freeze. Freezing could cause small cracks in the vials which would compromise the sterility of the product. Do not use if the product is inadvertently frozen.
**Caution:** Federal law prohibits dispensing without prescription.

OSW-2J

Distributed by Sanofi Winthrop Pharmaceuticals
New York, NY 10016
Manufactured by Sterling Pharmaceuticals Inc.
Barceloneta, Puerto Rico 00617

Products are listed alphabetically in the
**PINK SECTION**

Information will be superseded by supplements and subsequent editions

---

## Serono Laboratories, Inc.
**100 LONGWATER CIRCLE**
**NORWELL, MA 02061**

### GEREF®                                            R
**(sermorelin acetate for injection)**
**For intravenous injection only**
**FOR DIAGNOSTIC USE ONLY**

### DESCRIPTION

Geref® (sermorelin acetate for injection) is a sterile, non-pyrogenic, lyophilized preparation containing 50 mcg sermorelin (as the acetate), 5 mg mannitol, 0.66 mg monobasic sodium phosphate, and 0.04 mg dibasic sodium phosphate. Sermorelin acetate is an acetate salt of a synthetic, 29-amino acid polypeptide that is the amino-terminal segment of the naturally occurring human growth hormone-releasing hormone (GHRH or GRH) consisting of 44 amino acid residues. The structural formula for sermorelin acetate is presented below:

Tyr-Ala-Asp-Ala-Ile-Phe-Thr-Asn-Ser-Tyr-
Arg-Lys-Val-Leu-Gly-Gln-Leu-Ser-Ala-Arg-
Lys-Leu-Leu-Gln-Asp-Ile-Met-Ser-Arg-NH₂·(C₂H₄O₂)₃₋₆

The free base of sermorelin has the empirical formula $C_{149}H_{246}N_{44}O_{42}S_1$ and a molecular weight of 3,358 daltons. Sermorelin appears to be equivalent to GRH (1-44) in its ability to stimulate growth hormone secretion in humans. It has also been called GRH (1-29) and GRH (1-29).

### CLINICAL PHARMACOLOGY

Sermorelin increases plasma growth hormone (GH) concentrations by direct stimulation of the pituitary gland to release GH.

Because baseline GH levels are generally very low (< 4 ng/mL), provocative tests may be useful in determining the functional GH-secreting capability of the pituitary somatotroph. Adults and children with normal responses to standard provocative tests of GH secretion were used to define the range of normal plasma GH-level responses to Geref®. It was found that the absolute peak GH level following Geref® infusion and the time elapsed from infusion to that peak are appropriate measures to evaluate the response to GH infusion. Doses of Geref® used in children and adults in these studies ranged from 0.3 to 6.06 mcg/kg with a majority of patients receiving 1 mcg/kg. Based on these studies and published reports, 1 mcg/kg was chosen as the recommended dose for diagnostic purposes.

A total of 71 Geref® injection tests were performed on 47 boys and 24 girls who showed normal responses to standard, indirect provocative tests such as clonidine, L-dopa, and arginine. The GH peak plasma response to Geref® was 28 ± 15 ng/mL (average ± S.D.) and the time to this peak was 30 ± 27 minutes (average ± S.D.).

Of all children who had GH responses of > 7 ng/mL to standard provocative tests, 96% also had responses to Geref® of > 7 ng/mL. In 77 patients who failed to respond to standard provocative tests, mean GH peak responses to Geref® were significantly lower compared to the mean GH peak responses of normal control children. However, 53% of the children who failed to respond to standard tests had a GH response to Geref® of more than 7 ng/mL, suggesting that clinical GH deficiency is frequently not due to somatotroph failure.

The following figure shows the time course of average plasma GH-level responses to Geref® injection in normal children and those with subnormal responses to standard provocative tests, i.e., growth hormone-deficient (GHD) children.

**Mean (& SD) of GH Response to Geref®
in Normal and GHD Children**



In 14 published reports that utilized different forms of GRH including GRH (1-44), GRH (1-40), and formulations of GRH (1-29) other than Geref®, 167 normal young adults of both

sexes, 19 to 40 years old, were tested with approximately 1 mcg/kg GRH peptide. The data derived from pooling these results are similar to the results obtained from 14 normal male adults, 19 to 30 years old tested with Geref®:

**ADULT VOLUNTEERS**

| Source | N | Age Range | Range of Mean Peak GH (ng/mL) | Mean Peak GH (ng/mL) |
|---|---|---|---|---|
| 14 Studies | 167 | 19–40 | 10–41 | 22 |
| Geref® | 14 | 19–30 | — | 24 |

In adults, time to peak GH response to Geref® was 35 ± 29 minutes (average ± S.D.).

Preliminary studies have demonstrated a decline in GH responsiveness to GRH with age in persons over 40 years old, but the normal range of GH response to Geref® in older adults has not been established.

**INDICATIONS AND USAGE**

Geref® as a single intravenous injection is indicated for evaluating the ability of the somatotroph of the pituitary gland to secrete growth hormone (GH). A normal plasma GH response to Geref® demonstrates that the somatotroph is intact. However, a normal response does not exclude GH deficiency because this deficiency is frequently the result of hypothalamic dysfunction in the presence of an intact somatotroph. The Geref® stimulation test is most easily interpreted when there is a subnormal response to conventional provocative testing and a normal response to Geref®. Such findings suggest that hypothalamic dysfunction is the cause for the growth hormone deficiency. When both conventional and Geref® testing result in subnormal GH responses, the site of dysfunction cannot be determined with certainty because some patients with GH deficiency due to hypothalamic dysfunction require repeated Geref® administration before demonstrating a normal response.

The Geref® test has not been found useful in the diagnosis of acromegaly.

**CONTRAINDICATIONS**

Geref® is contraindicated in patients hypersensitive to sermorelin acetate or any of the excipients.

**WARNINGS**

Although hypersensitivity reactions have been observed with other polypeptide hormones, to date no such reactions have been reported following the administration of a single dose of Geref®. Antibody formation has been reported in humans after chronic subcutaneous administration of large doses of sermorelin (see Adverse Reactions section).

**PRECAUTIONS**

Drug Interactions: The Geref® test should not be conducted in the presence of drugs that directly affect the pituitary secretion of somatotropin. These include preparations that contain or release somatostatin, insulin, glucocorticoids, or cyclooxygenase inhibitors such as aspirin or indomethacin. Somatotropin levels may be transiently elevated by clonidine, levodopa, and insulin-induced hypoglycemia. Response to Geref® may be blunted in patients who are receiving muscarinic antagonists (atropine) or who are hypothyroid or being treated with antithyroid medications such as propylthiouracil. Obesity, hyperglycemia, and elevated plasma fatty acids generally are associated with subnormal GH responses to Geref®. Exogenous growth hormone therapy should be discontinued at least one week before administering the Geref® test.

Carcinogenesis, Mutagenesis, Impairment of Fertility: There have been no long-term studies performed in animals to assess the carcinogenic potential of Geref®. Geref® was not mutagenic in in vitro or in vivo genetic toxicology studies.

Pregnancy Category C: Sermorelin acetate has been shown to produce minor variations in fetuses of rats and rabbits when given in subcutaneous doses of 50, 150, and 500 mcg/kg. In the rat teratology study, external malformations (fish tail) were observed in the higher dose groups, and there was an increase in minor skeletal variants at the high dose. Some visceral malformations (hydroureter) were observed in all treatment groups, with the incidence greatest in the high-dose group. In rabbits, minor skeletal anomalies were significantly greater in the treated animals than in the controls. There are no adequate and well-controlled studies in pregnant women. Geref® should be used during pregnancy only if the potential benefit justifies the potential risk to the fetus.

Nursing Mothers: It is not known whether this drug is excreted in human milk. Because many drugs are excreted in human milk, caution should be exercised when Geref® is administered to a nursing woman.

**ADVERSE REACTIONS**

The following adverse reactions, in decreasing order of frequency, have been reported following sermorelin administration:
Transient warmth and/or flushing of the face
Injection site pain
Redness and/or swelling at injection site

Nausea
Headache
Vomiting
Strange taste in the mouth
Paleness
Tightness in the chest

Approximately one in four patients given repeated doses of one or more of the three forms of GRH (1-29, 1-40, and 1-44) has developed antibodies to GRH. The clinical significance of these antibodies is unknown. One patient who developed antibodies to GRH (1-44) also experienced an allergic reaction described as severe redness, swelling, and urticaria at the injection sites. No long-lasting effects from this reaction were reported. No symptomatic allergic reactions to GRH (1-29) have been reported.

**OVERDOSAGE**

Changes of heart rate and blood pressure have been reported with the various GRH peptides in intravenous doses exceeding 10 mcg/kg. Cardiovascular collapse is a conceivable, but as of yet, unreported, complication of overdosage with GRH (1-29).

**DOSAGE AND ADMINISTRATION**

Geref® dosage should be individualized for each patient according to his/her weight. It is recommended that Geref® be administered in a single intravenous dose of 1.0 mcg/kg body weight in the morning following an overnight fast.

DIRECTIONS

Children (or subjects less than 50 kg)
1) Reconstitute the contents of one 50 mcg ampule of Geref® with a minimum of 0.5 mL of the accompanying sterile diluent.
2) Venous blood samples for growth hormone determinations should be drawn 15 minutes before and immediately prior to Geref® administration.
3) Administer a bolus of 1 mcg/kg body weight Geref® intravenously followed by a 3 mL normal saline flush.
4) Draw venous blood samples for growth hormone determinations at 15, 30, 45, and 60 minutes after Geref® administration.

Adults (or subjects over 50 kg)
1) Determine the number of ampules needed, based on a dose of 1 mcg/kg body weight.
2) Reconstitute the contents of each ampule with a minimum of 0.5 mL of the accompanying sterile diluent.
3) Follow steps 2–4 above.

Parenteral drug products should be inspected visually for particulate matter and discoloration prior to administration, whenever solution and container permit. The drug should be discarded if not dissolved or if the reconstituted solution is cloudy or discolored.

HOW SUPPLIED

Geref® is supplied in sterile, nonpyrogenic, lyophilized form in ampules containing 50 mcg sermorelin (as the acetate). The following package combination is available:

NDC 44087-4050-1

1 ampule containing 50 mcg sermorelin (as the acetate) and 1 vial containing 2 mL 0.9% Sodium Chloride Injection, USP The lyophilized product must be stored refrigerated (2° - 8°C/ 36° – 46°F). Use immediately after reconstitution. Discard unused material.

Caution: Federal law prohibits dispensing without prescription.

References available on request.

Manufactured for:
SERONO LABORATORIES, INC.
Randolph, MA 02368 USA
by: Laboratoires Serono, SA
Aubonne, Switzerland
© SERONO LABORATORIES, INC. 1991, 1993

---

**Wyeth-Ayerst Laboratories**
Division of American Home
Products Corporation
P.O. BOX 8299
PHILADELPHIA, PA 19101

**FACTREL®** ℞
[făc´trel]
(gonadorelin hydrochloride)
Synthetic Luteinizing Hormone Releasing
Hormone (LH-RH)
DIAGNOSTIC USE ONLY

Caution: Federal law prohibits dispensing without prescription.

**DESCRIPTION**

An agent for use in evaluating hypothalamic-pituitary gonadotropic function. FACTREL (gonadorelin hydrochloride) injectable is available as a sterile lyophilized powder for reconstitution and administration by subcutaneous or intravenous routes.

Chemical Name: 5-oxo-L-prolyl-L-histidyl-L-tryptophyl-L-seryl -L- tyrosyl-glycyl -L- leucyl-L-arginyl-L-prolyl glycinamide hydrochloride

[See table on top of next page.]

FACTREL is $C_{55}H_{75}N_{17}O_{13}HCl$, as the mono- or dihydrochloride, or their mixture. The gonadorelin base has a molecular weight of 1182.33. It is a white powder, soluble in alcohol and water, hygroscopic and moisture-sensitive, and stable at room temperature. The synthetic decapeptide, FACTREL, has a chemical composition and structure identical to the natural hormone, identified from porcine or ovine hypothalami.

Each SECULE® vial of FACTREL contains 100 or 500 mcg gonadorelin as the hydrochloride, with 100 mg lactose, USP. Each ampul of sterile diluent contains 2% benzyl alcohol in sterile water.

**CLINICAL PHARMACOLOGY**

FACTREL has been shown to have gonadotropin-releasing effects upon the anterior pituitary. The range for normal baseline LH levels, as determined from the literature, is 5–25 mIU/mL in postpubertal males, and postpubertal and premenopausal females. The standard used is the Second International Reference Preparation—HMC. This range may not correspond in each laboratory performing the assay since the concentration of LH in normal individuals varies with different assay methods. The normal responses to FACTREL analyzed from the results of clinical studies included:
(1) LH peak (mIU/mL)
(highest LH value post-FACTREL administration)
(2) Maximum LH increase (mIU/mL)
(peak LH value—LH baseline value)
(3) LH percent response
$\text{peak LH—baseline LH} \times 100\%$ baseline LH
(4) Time to peak (minutes)
(time required to reach LH peak value)
Normal adult subjects were shown to have these LH responses following FACTREL administration by subcutaneous or intravenous routes.
I. MALE ADULTS:
A) Subcutaneous Administration
The results are based on 18 tests in males between the ages of 18-42 years, inclusive:
(1) LH peak: mean 60.3 ± 26.2 mIU/mL
100% ≥ 24.0 mIU/mL
90% ≥ 32.8 mIU/mL
(2) Maximum LH increase: mean 46.7 ± 20.8 mIU/mL
100% ≥ 12.3 mIU/mL
90% ≥ 20.9 mIU/mL
(3) LH percent response: mean 437 ± 243% range: 66–1853%
90% ≥ 188%
(4) Time to peak: mean 34 ± 13 min
B) Intravenous Administration
The results are based on 26 tests in males between the ages of 19-68 years, inclusive:
(1) LH peak: mean 63.8 ± 40.3 mIU/mL
100% ≥ 12.6 mIU/mL
90% ≥ 26.0 mIU/mL
(2) Maximum LH increase: mean 51.3 ± 35.2 mIU/mL
100% ≥ 7.4 mIU/mL
90% ≥ 14.8 mIU/mL
(3) LH percent response: mean 481 ± 184% range: 67–2139%
90% ≥ 142%
(4) Time to peak: mean 27 ± 14 min
In males older than 50 years, the LH baseline and peak levels tend to be higher; however, the maximum LH increases do not differ in regard to age.
II. FEMALE ADULTS:
A) Subcutaneous Administration
The results are based on 38 tests in females between the ages of 19-36 years, inclusive:
(1) LH peak: mean 67.9 ± 27.5 mIU/mL
100% ≥ 12.5 mIU/mL
90% ≥ 39.0 mIU/mL
(2) Maximum LH increase: mean 52.8 ± 26.4 mIU/mL
100% ≥ 7.5 mIU/mL
90% ≥ 23.8 mIU/mL
(3) LH percent response: mean 374 ± 221% range: 108–981%
90% ≥ 185%
(4) Time to peak: mean 71.5 ± 49.6 min

*Continued on next page*

## CERTIFICATE OF SERVICE

I, Karen E. Keller, hereby certify that on October 7, 2014, this document was served on

the persons listed below in the manner indicated:

**BY FTP LINK**

Jack B. Blumenfeld
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@mnat.com

Brian V. Slater
Jason A. Leonard
FITZPATRICK, CELLA, HARPER & SCINTO
1290 Avenue of the Americas
New York, NY 10104
(212) 218-2100
bslater@fchs.com
jleonard@fchs.com

*/s/ Karen E. Keller*
Karen E. Keller (No. 4489)
Jeffrey T. Castellano (No. 4837)
Stephanie E. O'Byrne (No. 4446)
SHAW KELLER LLP
300 Delaware Avenue, Suite 1120
Wilmington, DE 19801
(302) 298-0700
kkeller@shawkeller.com
jcastellano@shawkeller.com
sobyrne@shawkeller.com
*Attorneys for Defendant Xellia*
*Pharmaceuticals ApS*