```
              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF DELAWARE


MERCK SHARP & DOHME CORP.,)
                          )
        Plaintiff,        )   C.A. No. 14-199 (RGA)
                          )
   v.                     )
                          )
XELLIA PHARMACEUTICALS APS)
and XELLIA PHARMACEUTICALS)
INC.,                     )
                          )
        Defendants.       )




                  Friday, December 5, 2014
                  11:02 a.m.
                  Courtroom 6A




                  844 King Street
                  Wilmington, Delaware




BEFORE:  THE HONORABLE RICHARD G. ANDREWS
         United States District Court Judge




APPEARANCES:




         MORRIS, NICHOLS, ARSHT & TUNNEL, LLP
         BY:  JACK B. BLUMENFELD, ESQ.
         BY:  DEREK J. FAHNESTOCK, ESQ.
```

APPEARANCES CONTINUED:

                    -and-

        FITZPATRICK, CELLA, HARPER & SCINTO
        BY:  BRIAN SLATER, ESQ.
        BY:  JASON A. LEONARD, ESQ.

                    Counsel for the Plaintiff



        SHAW KELLER, LLP
        BY:  KAREN KELLER, ESQ.

                    -and-

        MERCHANT & GOULD, P.C.
        BY:  JEFFREY D. BLAKE, ESQ.

                    -and-

        BY:  STEVEN NASH, ESQ.

                    Counsel for the Defendant

```
 1                    THE COURT:  So this is Merck
 2      versus Xellia, civil action number 14-199.  Mr.
 3      Blumenfeld.
 4                    MR. BLUMENFELD:  Yes.  Good
 5      morning, Your Honor.  I'm here with Brian
 6      Slater, who is going to be speaking for Merck
 7      and their concept from Morris Nichols and Jason
 8      Leonard from Fitzpatrick Cella.
 9                    MR. SLATER:  Good morning, Your
10      Honor.
11                    MR. LEONARD:  Good morning, Your
12      Honor.
13                    THE COURT:  Good morning.  Ms.
14      Keller.
15                    MS. KELLER:  Good morning, Your
16      Honor.  Today is Jeff Blake from Merchant &
17      Gould and also Steve Nash from Xellia.
18                    THE COURT:  Good morning to you
19      all.  So I've got the letters divided into the
20      two piles and there seem to be five issues.  Why
21      don't we just start with the -- actually let's
22      start with the first one, which was I guess
23      actually the issues raised by the Plaintiff.  So
24      why don't we talk about the -- wait a second.
```

 1    All right.  Yeah, okay.  So Merck wants to

 2    extend the fact discovery schedule for what

 3    purpose?

 4              MR. SLATER:  We haven't been able

 5    to start depositions, Your Honor, because we

 6    didn't get their documents on time.  They

 7    produced -- 60 percent of the documents were

 8    either produced on the last day they were

 9    supposed to or after; so in other words, we got

10    the bulk of the production late.  And that's --

11    you know, we got 20 percent of the documents on

12    October 6th.

13              THE COURT:  I thought your -- they

14    say they produced 80 percent by the deadline.

15              MR. SLATER:  And what happened is

16    40 percent came in by email.  We were told we'd

17    get them on the deadline, so we actually didn't.

18    I'm not fussing about a day, but that's 40

19    percent on the last day you could do it and then

20    a further 20 percent came in about a month

21    later.

22              THE COURT:  And what are these 20

23    percent about?  Xellia says they're more or less

24    irrelevant.

1    MR. SLATER:  Well, they're are

2    not.  It's all to do with the research

3    developing their product.  Communications

4    between Getz and Xellia.  I mean, they're as

5    relevant as the ones we got before.  There's

6    research reports.  It's the same level of stuff.

7    I have no idea why they're saying that they were

8    unnecessary, but we'll give it to you anyway.

9    That doesn't make sense to me.

10    THE COURT:  All right.

11    MR. SLATER:  We also, because

12    their privilege log was deficient, they've

13    actually agreed to take I think about 70 or 80

14    documents off that log and we got some

15    yesterday, I believe it was, or the day before.

16    I don't think we've gotten all of those, and

17    because we have other issues with their log,

18    which is a very sizeable log, something in the

19    order of 900 documents, which is for me pretty

20    unusual in an ANDA case, I'm anticipating that

21    there's going to be a disputes where even more

22    documents come off the log, so we've been

23    hamstrung in not being able to go forward with

24    depositions until --

```
1                    THE COURT:  Right.  When you say
2       depositions, whose depositions are you talking
3       about?
4                    MR. SLATER:  I mean formulators at
5       Xellia and Getz.
6                    THE COURT:  Give me names.
7                    MR. SLATER:  The key one is Anita
8       Maschnic.
9                    MR. BLAKE:  Maschnic.
10                   MR. SLATER:  Maschnic.
11                   THE COURT:  This is a person in
12      India?
13                   MR. BLAKE:  Ms. Maschnic is in
14      Croatia.  She'll come to New York for a
15      deposition on the date that they -- well, I got
16      to talk about the date, but she will come to New
17      York.
18                   THE COURT:  Okay.  So that's not a
19      problem, right?
20                   MR. SLATER:  Right.
21                   MR. BLAKE:  No.
22                   MR. SLATER:  And we have a 30 B 6.
23                   THE COURT:  Okay.  Wait a second.
24      So there's some formulator.  So I don't mind --
```

1       I don't have a problem extending the discovery

2       because it seems like there's both things that

3       you want to do that -- where you're in

4       agreement, so what are you in disagreement

5       about?

6                   MR. SLATER:  I think the

7       disagreement there is that Xellia had said we

8       should only extend it to January 16th instead of

9       January 30th.  We think we need to January 30th.

10      We're not going to be able to start these until

11      January, because we don't have all the documents

12      yet.

13                  THE COURT:  All right.  So does it

14      make any difference to Xellia really whether

15      it's January 16th or January 30th?

16                  MR. BLAKE:  Yes, Your Honor.  Can

17      I explain briefly why?

18                  THE COURT:  Yeah.

19                  MR. BLAKE:  It has to do with the

20      remaining part of the schedule.  Our concern is

21      that we disagree strongly that Merck hasn't had

22      the chance to start these depositions earlier.

23      As the Court will remember --

24                  THE COURT:  I do remember.  I

1    reread the scheduled conference transcript.

2              MR. BLAKE:  And we produced court

3    technical documents in May.  They didn't do

4    anything with those.  They said they needed them

5    earlier.  They didn't do anything with those for

6    the seven or eight months.  The reason you have

7    a substantial --

8              THE COURT:  So right now we're

9    just talking about the difference between

10   January 16th and January 30th or the 31st,

11   whatever day it was Mr. Slater said.  The two

12   weeks make a difference?

13             MR. BLAKE:  Expert reports are due

14   right now on February 13th.  We said January

15   16th, which is a six-week extension.  They say

16   we were late by a month.  We gave them six

17   weeks, because that's still a month to do expert

18   reports and we don't have to kick into any of

19   the other deadlines.  That's our concern.  We

20   don't want to kick into --

21             THE COURT:  No, No.  I understand.

22   I'm quite confident that we're going to stay on

23   track for the trial date we have, so that's --

24   we're going to do that.

```
 1                    MR. BLAKE:  In that case I don't

 2       care about January 30th.  That's fine.

 3                    THE COURT:  Okay.  All right.  So

 4       the formulator whose name you mentioned, I'm

 5       gathering from some of this that there might be

 6       depositions of Doctor Parikh and Mr. Muka

 7       Pyguay?

 8                    MR. SLATER:  Correct.

 9                    THE COURT:  But I take it that

10       that's pretty much agreed to and you just have

11       to work out dates between yourselves and

12       whatever, but that seems to be under control,

13       right?

14                    MR. BLAKE:  Yes.

15                    THE COURT:  Okay.  So there's

16       three depositions there's no issue there now.

17       What is else is there, Mr. Slater?

18                    MR. SLATER:  There's a 30(b)(6),

19       of which we've gotten the names now of who

20       Xellia is designating.

21                    MR. BLAKE:  We've given them two

22       names, one of which is Ms. Maschnic.  And

23       there's another name, they are going to come to

24       New York and we're going to do the depositions
```

1     in January.

2                    THE COURT:  Okay.  All right.

3     Well, in any event, so that's essentially

4     agreed.  Is there anything else?

5                    MR. SLATER:  We have served

6     notices for two Getz people that we didn't know

7     until we got their letter that they're no longer

8     at Getz.

9                    THE COURT:  Right.  These are

10    people in India?

11                   MR. SLATER:  Yeah.

12                   THE COURT:  So just as a matter of

13    curiosity, how long you think it takes to do the

14    procedures to depose a person in India?

15                   MR. SLATER:  I don't know

16    firsthand.  I know it's slow, because I've heard

17    that.

18                   THE COURT:  Have you done anything

19    to start that process?

20                   MR. SLATER:  We were trying to

21    identify the witnesses that we wanted to take

22    based on review of the documents.  That's how

23    we've ended up with those names, based on that

24    review.

```
1              THE COURT:  And when did you
2     identify those names?
3              MR. SLATER:  After we got their
4     last production, essential between October 20
5     and today.  I can't tell you an exact date, but
6     we had to review all those documents.
7              THE COURT:  And these names were
8     not in any of the 80 percent of the documents
9     you got by September 11th?
10             MR. SLATER:  They could very well
11    have been, but we didn't reach a conclusion as
12    to who we wanted to depose until we had the set
13    and did our review and analysis of the --
14             THE COURT:  What are the names of
15    these two people?
16             MR. SLATER:  I don't have the
17    names.
18             MR. BLAKE:  Can I show them to
19    him?
20             MR. SLATER:  Sure.
21             THE COURT:  Mr. Patil and Mr.
22    Krishnad?
23             MR. BLAKE:  Ms. Tukaye.
24             THE COURT:  Sorry, I should look
```

```
1    at the yellow highlights rather than just read

2    the names.  Ms. Tukaye and Mr. Patil.  All

3    right.  So what do you know about how long it

4    takes to depose somebody who is in India when

5    they haven't started the process?

6                MR. BLAKE:  I am not aware of how

7    long it takes.  I've done it with other

8    countries and the process takes some time.

9                THE COURT:  Yeah, I don't know

10   that India is necessarily -- tht you can say

11   what happens in one country is what happens in

12   another country.

13               MR. BLAKE:  Yes, Your Honor.  I

14   don't know.

15               THE COURT:  Okay.  So who are

16   these two people?

17               MR. BLAKE:  These are -- Ms.

18   Tukaye was, correct me if I'm wrong, Mr. Nash,

19   is a former formulator?

20               MR. NASH:  I believe they are both

21   former formulators.

22               MR. BLAKE:  They are both former

23   formulators who are former employees of Getz.

24   We disagree with Mr. Slater a little bit, as
```

```
 1      you'll see from these product development

 2      reports, they were both produced a long, long

 3      time ago.  There's only two names on there.

 4      They knew who these people were from April and

 5      May of this year, if they wanted to depose them

 6      and start the process and they didn't.  It's

 7      been quite a long period of time.  We have

 8      contacted these people, Your Honor, just so you

 9      know.  We got their deposition notices Tuesday

10      of this week.  We've already contacted both of

11      them.  They don't work for Getz anymore.  And

12      just to be clear, Xellia doesn't have control

13      over Getz?

14                  THE COURT:  No, I got that.

15                  MR. BLAKE:  But we've asked them.

16      They both said the same thing.  We are going to

17      ask our employer -- we're willing to do it, but

18      we have to ask our employers can we stop work

19      and go to the United States to help our former

20      employer in a case that they are not even a

21      party to.  And one's employer has, I believe

22      it's Mr. Patil's employer, has candidly, in the

23      first instance, said we don't think so.  And

24      it's not a closed issue.  We're trying to work
```

```
 1    it out.  Ms. Tukaye's employer hasn't said yet

 2    yes or no.  But we don't have a duty to provide

 3    these people, but we're trying to work it out.

 4                 MR. SLATER:  And not to belabor

 5    the record, because you probably don't want to

 6    hear the who shot John, but we did attempt at

 7    various points to ask -- we asked Xellia, will

 8    you be producing people from Getz and we were

 9    getting the runaround.

10                 THE COURT:  Well, I thought they

11    pretty much said at the Rule 16 conference that

12    they couldn't produce non Getz employees.

13                 MR. SLATER:  Well --

14                 THE COURT:  And maybe even Getz

15    employees.  I forget about that part.  But I

16    mean people who are in India, who are not

17    contractually bound to them in some way, I mean

18    of course they can't produce them.

19                 MR. SLATER:  When we had a meet

20    and confer, they could have just said that and

21    they didn't.  They said we'll get back to you.

22                 THE COURT:  When was this?

23                 MR. SLATER:  July?  July.

24                 THE COURT:  So in July did you
```

1    mention these two people.

2                    MR. SLATER:  We didn't, no,

3    because hadn't ascertained who, but we wanted to

4    get started on are we going to need third party

5    discovery or not.  If they're going to bring

6    people over because they have this relationship

7    with Getz, then at least we know that, but the

8    answer we got was well, I'll look into it and

9    they never got back to us.

10                    MR. BLAKE:  Well, that's not

11   entirely correct.

12                    THE COURT:  Well, I can't really

13   accept that, because it was clear to me at the

14   Rule 16 that they were saying we can't -- we're

15   not responsible and we can't produce these

16   people.

17                    MR. SLATER:  I can only tell you

18   that in the meet and confer we asked and they

19   didn't give me that answer.  They said they

20   would look into it and get back to me, so I

21   mean --

22                    THE COURT:  Okay.  All right.  So

23   we'll come back to these two people.  Is there

24   anything you want to say about the privileged

1    log?

2                    MR. SLATER:  Yeah, I mean the

3    first log we got, Your Honor --

4                    THE COURT:  We're past the first

5    log, aren't we?

6                    MR. SLATER:  We've now gotten a

7    supplemental log this week.

8                    THE COURT:  Right.  Let's talk

9    about the supplemental log.

10                    MR. SLATER:  Yes, there's a host

11   of issues with the log.

12                    THE COURT:  And so are you in

13   process, because one of the things they say is

14   essentially, you know, we need to discuss it?

15                    MR. SLATER:  Well, we asked for a

16   meet and confer on Monday.  They didn't respond

17   to me.  Look, I understand I now know they were

18   working on the supplemental log.  I didn't know

19   that then, so they have now given us the

20   supplemental log.  We're going to have to go

21   through it.  It's extensive.  I think we're

22   going to have to meet and confer and go through

23   it.

24                    THE COURT:  All right.  So you

1    said in your letter what you'd like to do is to

2    have a special master appointed so that if there

3    are issues there's a way to get them resolved,

4    right?

5                    MR. SLATER:  Because I don't want

6    to jeopardize the January 30 date by not getting

7    those issues resolved.

8                    THE COURT:  Mr. -- I'm sorry.

9                    MR. BLAKE:  Blake.

10                   THE COURT:  Blake, sorry.  Can

11   only absorb so many things at once.  Mr. Blake,

12   what do you have to say about that?

13                   MR. BLAKE:  I think we're going to

14   be able to work most of this stuff out.  If we

15   want to have a call, I'm free any day next week,

16   if you want to have a call.  There are certain

17   issues that I mean, I think we can work a lot of

18   this stuff out.  I don't think a special master

19   is needed at this point in time.

20                   THE COURT:  Well, so here's

21   what I'll be --

22                   MR. SLATER:  I'll be in Europe.  I

23   was available this week.  Put that aside, we'll

24   find somebody to have a call.

```
 1                    MR. BLAKE:  Do you want to talk
 2          right after this?
 3                    MR. SLATER:  We could start.
 4                    THE COURT:  Okay.  So, it doesn't
 5          seem to me that it costs a whole lot to appoint
 6          a special master.  You know, starts to cost when
 7          you use the person.  And I, you know -- I am
 8          interested in keeping this case on track.  And
 9          of course, you know, there's a kind of a
10          balancing here, because on the one hand the
11          Plaintiff has no particular motivation to be in
12          a hurry.  On the other hand, if I'm saying yeah,
13          we're going to keep it on track, then the
14          Defendant has no particular motivation to be in
15          a hurry to resolve issues, it will just get
16          dropped if they don't get resolved quickly.  So
17          I'm kind of inclined to get a special master,
18          to get one appointed so if you have problems
19          they can be quickly resolved.  And you know, if
20          you work them out yourself, I don't think the,
21          who's ever is appointed as a special master
22          will, you know, quit in disgust because they got
23          appointed and then they had no work to do.  So
24          I'm going to do that.  Does that take care of
```

1    essentially -- I mean, not take care of in the

2    sense of because I said we'd get back to these

3    two former Getz employees, but in terms of the

4    issues you raised, Mr. Slater, does that pretty

5    much take care of them?

6                    MR. SLATER:  Yes.

7                    THE COURT:  Okay.  So we will get

8    back to those two.  All right.  So then we have

9    the issues that are raised by Xellia, which

10   roughly speaking are you want to depose the

11   inventors of whom there are three?

12                   MR. BLAKE:  Yes, Your Honor.

13                   THE COURT:  And you want to do a

14   30(b)(6).  Let's just talk about the inventors

15   for a second.  Your theory as to how the

16   inventors have some relevant testimony to one

17   limitation in dispute infringement case is what

18   now?

19                   MR. BLAKE:  Well, two things.  We

20   served the notice in October.

21                   THE COURT:  Okay.

22                   MR. BLAKE:  We're still doing

23   claim construction.  And that's because at that

24   point in time we felt it was relevant both to

1    the claim construction issues that were between

2    the parties as we understood them and to even

3    after claim construction, the element of

4    infringement of how you apply the construed

5    claim terms, in a couple ways.  As you'll

6    remember, the claim limitation at dispute is

7    about an acetate buffer that has to be effective

8    to provide a pharmaceutically acceptable pH.

9              THE COURT:  Yeah.  That's about

10   the extent of my understanding.

11             MR. BLAKE:  Okay.  There's going

12   to be -- there is a dispute between the parties

13   as to whether or not the acetate buffer has to

14   be separately added or is a result of the API

15   that's already in the product in its

16   dissociation to form an acetate counter ion.

17   But we believe a buffer has to be separately

18   added.  The inventors are going to have

19   information about whether you have to separately

20   add that buffer, whether the Ap counter ion

21   itself can provide the necessary stabilization

22   or not and what it means.  Even if they're

23             THE COURT:  When you say they are

24   going to have information, what do you mean

```
 1        information?
 2                    MR. BLAKE:  Well, they're going to
 3        know are you able to stabilize the product just
 4        using the counter ion or do you have to add a
 5        separate buffer.  They are going to know, for
 6        instance, the claim says you have to provide a
 7        pharmaceutically acceptable pH.  Can what's just
 8        in the API that may dissociate --
 9                    THE COURT:  So basically you
10        want -- because presumably what they know is the
11        branded product, right?
12                    MR. BLAKE:  Uh-huh.
13                    THE COURT:  So they probably know
14        how the branded product works, but you're
15        supposed to be -- this is supposed to be against
16        the claims, not the branded product, right?
17                    MR. BLAKE:  Yes, Your Honor.  I
18        think it relates in this way.  If you'll give me
19        just a moment.  Both for the claim construction
20        or not.  If their theory is can the dissociation
21        of this ion stabilize the product by itself as
22        opposed to adding in a separate buffer, it's
23        going to be important to understand for the
24        infringement analysis what role does this play
```

```
 1    when they were doing the research and

 2    development of the invention.  Can that

 3    dissociation of the acetate counter ion from the

 4    API, is that sufficient to stabilize the

 5    product?  Is that sufficient to provide a

 6    pharmaceutically acceptable pH?  Do you have to

 7    add something else in?  Did they try adding

 8    other things in?  What did they try to do?  Were

 9    they able to stabilize it with just the counter

10    ion itself?

11              THE COURT:  But you all have done

12    an andis investigation where you have said

13    exactly what it is that you do, whatever that

14    might be.  Presumably you think it's something,

15    I guess, different than what's in the claims,

16    right?

17              MR. BLAKE:  That's correct.

18              THE COURT:  And so if they say

19    that the way we got to where -- to the claims

20    was we did this and this and this, how does that

21    help you?

22              MR. BLAKE:  Well, because we have

23    a separate buffer, a different type of buffer

24    that's added in.  And our non-infringement
```

```
 1        position is that because we use a separate

 2        buffer, we add in a separate buffer, this API

 3        counter ion isn't what's doing the stabilization

 4        and the claim requires the separate buffer.

 5        They're saying the counter ion, perhaps in

 6        combination with other ingredients, is what can

 7        do the stabilization.  And even under their

 8        construction, if they get their construction,

 9        then the Court has to apply their construction

10        to the accused product and there's going to be

11        an argument about whether that counter ion is

12        effective to provide a pharmaceutically

13        acceptable pH, whether it itself is effective to

14        provide it or with other ingredients.  What does

15        it mean when you apply the properly construed

16        claim for it to be effective to provide.  And

17        their research and development work about how do

18        you know what's doing the stabilization, how do

19        you know what's effective to provide the

20        pharmaceutically acceptable pH, is it just the

21        counter ion?  Have they been able to develop a

22        product where they don't need to add a buffer in

23        and it's still effective to make it stable and

24        provide that pH or did they not have to -- did
```

```
1     they have to add a separate buffer and that

2     addition of a separate buffer, which we're using

3     a separate buffer than them, differentiates it.

4     How do know when it's stable?  How do you know

5     when it's effective to provide the appropriate

6     pH?  What did they learn about how these

7     products work and what they've been able to

8     develop and what's effective to provide it?

9                    THE COURT:  All right.  Mr.

10    Slater.

11                   MR. SLATER:  Well, I mean, I don't

12    recognize that as being related to claim

13    construction, what he's saying.  I mean, for

14    claim construction that's whatever is in the

15    record, right, whatever the patent says,

16    whatever the prosecution issue says, and the

17    federal circuit in the Wright Medical case said

18    the inventor's subjective belief of what the

19    claim covers is irrelevant.  As to infringement,

20    which is what I'm hearing now, maybe it's more

21    directed to infringement is what I'm hearing

22    now.  I mean, the inventors don't even know what

23    Xellia is doing, they don't have any access to

24    what they're doing.  So it's irrelevant.
```

1              THE COURT:  Well, no, presumably

2     the theory is essentially there's going to be

3     some kind of factual information that's going to

4     come from this testimony that would be something

5     that your various experts will take into account

6     in making their opinions, I think?

7              MR. BLAKE:  That's correct.

8              MR. SLATER:  As to what they --

9     what Merck did in its own development?

10             MR. BLAKE:  That's correct.  We're

11    not asking Merck's inventors about Xellia's

12    products.  We're going to ask Merck's inventors

13    about what they did to determine -- when you

14    have a buffer that's effective to provide the

15    appropriate pH, what do they know about whether

16    you have to add in a separate buffer to do that

17    and if it has to be a particular type of buffer

18    or can the counter ions -- if their theory is

19    going to be counter ions cause the

20    stabilization, how do they know that?  What

21    proof do they have that causes that.

22             MR. SLATER:  It sounds like they

23    are asking for expert testimony.  That's what we

24    have experts for, right?

1           THE COURT:  Well, that sometimes

2      is the case.  Stop the back and forth.

3      Sometimes it's useful, I think, to have some

4      actual factual testimony that helps serves as

5      underpinning for that expert's opinions.  I

6      mean, obviously I think not only because the

7      inventors don't know what Xellia is doing, but

8      also because their not free experts, even if

9      they knew what Xellia was doing, it wouldn't be

10     proper to be basically asking them to comment on

11     whether Xellia infringes or not.  All right.  I

12     think I've got the general gist of that.  And on

13     the 30(b)(6), what's your point, Mr. Blake?

14           MR. BLAKE:  It's essentially the

15     same, Your Honor, in that we want to -- the

16     company's position about these same topics, on

17     the research and development, it may very well

18     be that the inventors become the 30(b)(6)

19     witnesses, but what is their position about --

20           THE COURT:  What do you mean, what

21     is their position?

22           MR. BLAKE:  Merck's position.

23           THE COURT:  I understand who the

24     they is.  I meant position, not Merck.  What do

```
 1          you mean their position?

 2                    MR. BLAKE:  About whether the

 3          product can be stabilized from this counter ion

 4          or were they required to add a different buffer.

 5                    THE COURT:  So is this the same

 6          thing as essentially contentions?

 7                    MR. BLAKE:  I wouldn't say it's

 8          contentions.  It's the factual information about

 9          what they did in the research and development,

10          what testing they did of different buffers,

11          whether they tested the product with no buffer

12          and just this counter ion.

13                    THE COURT:  Okay.  But that's a

14          lot different than saying -- you know, the word

15          position raises a red flag, because --

16                    MR. BLAKE:  I apologize.

17                    THE COURT:  No, no, no.  No need

18          to apologize.  I'm just saying why I was asking.

19          Seems to me that it's a different kind of thing

20          to say, you know, essentially what did the

21          company do, I mean, what did it learn, you know,

22          questions along that line, but when you start

23          saying position, then I start thinking that

24          you're asking for contentions, which are things
```

1        that basically we don't do by deposition, okay?

2                  MR. BLAKE:  If I may, I agree with

3        you.  What did the company do, what did it learn

4        from it, but I do think it can be a factual

5        question, why did you do it?

6                  THE COURT:  Well, why can be a

7        factual question.  That's different.  I mean,

8        that's a historical question.  There's -- and

9        whether or not why is a relevant question or not

10       is a different issue, but it is that.  All

11       right.  So -- and I take it because there's been

12       reference to this Merck versus Sandoz litigation

13       that whatever was at issue in that case, which I

14       take it was partly invalidity, which is part of

15       why it's not an issue in this case, I take it

16       probably Sandoz had a different formulation of

17       it's generic -- by the way, what happened in

18       that case?

19                  MR. SLATER:  They stipulated to

20       infringement eventually, but it was an issue

21       during the case, and they lost on invalidity and

22       then we settled.

23                  THE COURT:  Okay.  All right.

24       Fair enough.

```
1                    MR. BLAKE:  If I may, Your Honor.

2                    THE COURT:  Yeah.

3                    MR. BLAKE:  The short and sweet on

4         the Sandoz litigation is the infringement issue

5         was different than what it is here.

6                    THE COURT:  Okay.

7                    MR. SLATER:  How do you know that?

8                    MR. BLAKE:  Well, that's a good

9         point.  As far as we know, it was different.

10        And from what we can tell from the depositions,

11        it was different.

12                   MR. SLATER:  But in your brief you

13        suggest that -- and I don't want to do the back

14        and forth, Your Honor, so I'll address --

15                   THE COURT:  So look at me when

16        you're talking.

17                   MR. SLATER:  I will.  I will.  In

18        Xellia's brief they suggested that we had made

19        some kind of an admission in the briefing in

20        that case about a design-around by Sandoz and

21        they speculated what Sandoz's design-around was,

22        in fact, I can't tell you what it was, but they

23        are incorrect.  And so it's rather frustrating

24        for us because we're not permitted to give all
```

1    that information out in this case anyway.  But

2    getting back to the 30(b)(6) topics, Your Honor,

3    we already provided the 30(b)(6) that was taken

4    in that case where a witness went through

5    everything that Merck did.

6              THE COURT:  Wel, so, you know,

7    that's kind of your response on both inventors

8    and the 30(b)(6) and, you know, to me, well,

9    there was a different company with, you know,

10   maybe generically in an analogous kind of

11   position somebody had been motivated to ask a

12   lot of the kinds of questions you'd like to ask,

13   that's a reason to perhaps limit the time, but

14   it's not a reason to say, you know, you can't --

15   you can't explore any of the things you want to

16   explore because a lot of them were already

17   explored before.

18             MR. SLATER:  If they were relevant

19   I would agree with your logic.  Right?  If

20   there's something relevant, they should be

21   entitled to ask about it.  I think that whatever

22   was done, the work that was done, that was

23   explored, I don't think understanding what the

24   inventors tried or didn't try actually relates

```
 1        to either claim construction, right, or
 2        infringement.  Infringement is just going to be
 3        whether what their product is meets the elements
 4        of the claims and our expert presumably is going
 5        to have his basis for saying that, they're going
 6        to have an expert that presumably says not.  I'm
 7        not seeing how what our inventor tried or didn't
 8        try really relates to that, because it's the
 9        claim scope that matters, not what was tried or
10        not tried, right?  I mean, for example --
11                    THE COURT:  No, I agree.
12                    MR. SLATER:  They -- if they tried
13        things that were never in the claim, what
14        relevance is that, right?  And if they tried
15        something different in the patent than what they
16        tried, we're going to be stuck with what we
17        wrote in the patent.  So I'm struggling to see
18        how that could ever actually bear on
19        infringement.  So I do offer the prior
20        transcripts, not because I believe it addresses
21        something relevant, just because whatever they
22        did, they were asked about.  I don't think it's
23        really relevant here at all.
24                    THE COURT:  Okay.
```

1          MR. BLAKE:  May I?

2          THE COURT:  Sure.  Go ahead.

3          MR. BLAKE:  Briefly.  We think

4     it's relevant to claim construction, but even

5     beyond that, let's assume we're past claim

6     construction and we're to the infringement

7     analysis.  And if they were to get their

8     construction, it said their construction would

9     be -- and we disagree with it -- but it would be

10    an amount -- a pharmaceutically acceptable

11    amount of the acetate buffer is present such

12    that the resulting composition has a

13    pharmaceutically acceptable pH.  You have to

14    have an amount of the buffer present in order to

15    have a pharmaceutically acceptable pH.  How do

16    we know what's contributing, in their opinion,

17    to the amount of the acetate buffer that has to

18    be present to get the pH?  Is it the counter

19    ion?  When they were testing, did they think

20    that the stability of the pharmaceutically

21    acceptable pH comes from that counter ion and

22    it's dissociation?  Is it going to be the amount

23    that they say you have to have?  Does their

24    testing show that that by itself provides the

1    right amount?  Did they think you have to add to

2    something separate to get to that amount?  That

3    is an infringement application question under

4    their construction.  How do you get to the

5    proper amount that you would need to get to this

6    pH?  What's contributing to it?  If they have

7    factual information from their testing of

8    buffers about whether you can do it with a

9    counter ion alone or you have to add a buffer,

10   what buffer you have to add, when it becomes

11   stable, how do you know when it's

12   pharmaceutically acceptable pH, what's causing

13   it.

14              MR. SLATER:  But, Your Honor, our

15   case will rise and fall on whether I can show

16   Xellia's product meets the elements of the

17   claim.

18              THE COURT:  Okay.  I think I've

19   got the gist of your disagreement here.  So

20   here's what I'm inclined to do.  I tend to agree

21   with Merck that the chances of any of this being

22   relevant are remote.  Nevertheless, I can't say

23   I don't think it's unreasonable for Xellia to

24   take these kinds of depositions and see what

```
 1        they can get.  I mean, my experience with these
 2        sorts of depositions in similar cases is they're
 3        basically done for that got ya moment where your
 4        inventor, your 30(b)(6) witness says something
 5        inconsistent with your general position and then
 6        they try to make a big deal out of it.  Can't
 7        say -- I have no memory of this ever actually
 8        affecting any decision that I make, but I
 9        understand it's part of the process and so I
10        think that they should have a 30(b)(6)
11        deposition and I think they should have inventor
12        depositions.  But I think that what Merck asked
13        for in terms of, you know, some limits, given
14        the relatively tangential nature of what's
15        sought here, is reasonable.  So basically what
16        I'm going to do is say that Xellia can have
17        seven hours total to depose inventors in a
18        30(b)(1) type capacity.  They can do one
19        inventor for seven hours or they can do two
20        inventors for three and a half hours or they can
21        three inventors for two and whatever hours.  In
22        terms of the 30(b)(6), they can do a 30(b)(6).
23        I think seven hours is enough for that too.  And
24        I do think the one thing about asking for
```

1    contentions which Merck asked that they be

2    prohibited from doing, seems as though they've

3    acknowledged that's not actually part of the

4    reason for doing that.  So I think that that's

5    not likely to come up.  So that's what I would

6    do about the second set of issues.

7                   MR. SLATER:  If I may, Your Honor.

8    There were some other topics in the notice that

9    I don't think we actually fleshed out.

10                   THE COURT:  Well, we're not going

11   to go through all of them.  They've got seven

12   hours, you know, we'll see how -- I mean, use

13   your best judgment, but it's a 30(b)(6) and

14   hopefully the seven hours will cause them to use

15   some judgment as to how to spend the time, okay?

16                   MR. SLATER:  Some of the topics

17   are totally unrelated to like the prosecution of

18   the patents, so it would be potentially a

19   different witness, you know, it would be --

20                   THE COURT:  Well, you know, there

21   were a couple of the topics that I thought were

22   irrelevant, but -- which were topics 2, 3 and

23   11.  And even though I maybe changed my mind on

24   that.  Wait a second -- but you know, that

1    was -- I had no knowledge of the claim

2    construction dispute at the time that I was

3    thinking that.  I actually do think 11 remains

4    irrelevant.

5              MR. BLAKE:  We'll drop it.

6              MR. SLATER:  10 was the --

7              THE COURT:  Right.

8              MR. SLATER:  10 was the

9    prosecution of the patent, Your Honor.

10             THE COURT:  It is whatever it is,

11   but you know they've got seven hours.  If they

12   can use it as they like and you can get, you

13   know, a science witness and a lawyer witness or

14   whomever you need to address their topics, but

15   other than 11, I wasn't convinced that there was

16   anything that I would throw out.

17             MR. BLAKE:  Just to be clear for

18   the record, we'll withdraw 11.

19             MR. SLATER:  Okay.  And just I

20   think they know this already, but all three

21   inventors are former employees, so obviously

22   Merck will attempt to get their cooperation,

23   but --

24             THE COURT:  Well, I mean, it's a

```
1     different -- I'm not saying that you are

2     responsible for getting them if they're just

3     third party citizens out there.  Obviously

4     everybody is expected to cooperate, but if you

5     have no particular hold on them, then I'm not

6     asking you to do anything other than to be

7     reasonable, right?

8               MR. BLAKE:  This is the first I've

9     heard about them not being employed by Merck.

10              MR. SLATER:  That was in their

11    transcripts when they were deposed in the last

12    case, but --

13              MR. BLAKE:  Okay.

14              MR. SLATER:  Putting that aside,

15    one of them is in India, he no longer works for

16    the company.  We can't even locate him.  We'll

17    try to.

18              THE COURT:  Well, you just said

19    one is in India?

20              MR. SLATER:  Yeah.

21              THE COURT:  Okay.  Well, that's

22    the advantage of having three.  Where are the

23    other three located?

24              MR. SLATER:  One is more local and
```

```
 1    we're hopeful we can get his cooperation and the

 2    other fellow is up in Boston working for a major

 3    pharmaceutical company.

 4                THE COURT:  Well, Boston is not

 5    the other side of the world either, so --

 6                MR. BLAKE:  Your Honor, may I just

 7    ask briefly?

 8                THE COURT:  Wait, wait.  Just, you

 9    know, as far as I'm concerned, given what I've

10    said and what I think about the marginal nature

11    of things and since -- when did you turn over

12    these deposition transcripts?

13                MR. SLATER:  It would have been

14    definitely by early August.

15                THE COURT:  Well, in any event,

16    the inventors in India, don't even give that

17    person any thought.  Go for the two inventors

18    who are in the United States.  I mean there's no

19    reason to -- right?

20                MR. BLAKE:  I will probably go

21    that way, Your Honor, yes, I agree with you.

22    I'm not going to come back to you and say I need

23    to take foreign discovery in India.  So, can I

24    just ask briefly, Mr. Slater, do you know, do
```

```
 1        their employment agreements or assignment

 2        agreements for the patents require them to

 3        cooperate?

 4                    MR. SLATER: You have the language.

 5        You can interpret it however you want.  There is

 6        a clause there that you could look at, but I

 7        don't believe it's going to require them to come

 8        from India for deposition.  The last time,

 9        frankly, to get the fellow to come over was not

10        that easy and he eventually decided to do it,

11        but he wasn't obligated to do it -- and --

12                    THE COURT:  That's part of

13        basically what I'm saying is given the

14        relatively marginal nature of what I think it is

15        you're doing here, it's unreasonable to require

16        the guy to come from India, in my opinion, so go

17        for the two that are in the United States.

18                    MR. BLAKE:  Yes, Your Honor.

19                    THE COURT:  Okay.  Any other

20        questions on that?

21                    MR. BLAKE:  No, sir.

22                    MR. SLATER:  No, Your Honor.

23                    THE COURT:  Okay.  So the

24        privilege log I said I'm going to appoint a
```

```
1    special master.  So really the only thing that's

2    left is these two Indian citizens who Xellia is

3    in the process of trying to figure out whether

4    it can coax them to come to the United States

5    for a deposition, right?

6                   MR. BLAKE:  Yes, Your Honor.

7                   THE COURT:  All right.  And you

8    said Mr. Patil right now is not seeming terribly

9    likely and Ms. Tukaye you have not heard or is

10   more up in the air, I guess?

11                  MR. BLAKE:  Yes, she is herself

12   willing to do it.  I think it just depends on

13   whether her employer agrees.  I think a concern

14   is -- I can't identify her employer, but her

15   employer is a competitor in the industry and

16   they may not be so willing to just say we're

17   happy to help out.  But we don't have control

18   over them.  We'll do what we can to help.

19                  THE COURT:  All right.  Is there

20   something else you would like me to do in this

21   regard right now?

22                  MR. SLATER:  I think that's -- no,

23   I think that's fair, Your Honor.

24                  THE COURT:  Okay.  Well, just so
```

1    stay in touch about these two.  I understand Mr.

2    Slater is -- you said you're going to Europe

3    next week?

4                 MR. SLATER:  Yeah.

5                 THE COURT:  Fine time to do that.

6    And let's make sure that one or the other of you

7    is out there, other lawyers in the room,

8    doesn't -- you know, stay in touch, see if you

9    can't be reasonable about this.  I guess the

10   week after we have the claim construction

11   hearing, right?

12                MR. SLATER:  Correct, Your Honor.

13                MR. BLAKE:  Correct.

14                THE COURT:  Which is one term,

15   right?

16                MS. KELLER:  Correct.

17                THE COURT:  How much time have I

18   allotted for that?

19                MR. SLATER:  I think it's a

20   maximum of three hours.

21                THE COURT:  Okay.  Well, can't we

22   make that a maximum of two hours?

23                MR. SLATER:  I should certainly

24   think so, Your Honor.

```
 1              MR. BLAKE:  Yes.

 2              THE COURT:  You can bid lower.  I

 3    mean, I haven't read the briefing, so I saw

 4    there was 40 or 60 pages on it.

 5              MR. SLATER:  It's pretty extensive

 6    for one claim element, although I do think the

 7    parties should be able to reduce their arguments

 8    to 45 minutes per side.

 9              THE COURT:  Why don't you talk

10    about it to each other.  I mean, I'm perfectly

11    happy -- in some ways I'd much rather spend two

12    hours on one term than three hours on 15 terms.

13              MR. SLATER:  You say that now,

14    Your Honor.

15              THE COURT:  No, no, no, no.  I

16    mean, I have spent three hours on one term

17    before.  I mean, you know, you get into whatever

18    the meat of the argument is where sometimes lots

19    of terms in three hours is most of them are

20    superficially done and it would be better just

21    not to do them at all.  But on the other hand --

22    so I'm going to put it on the calendar for two

23    hours.  On the other hand, if you all decide

24    that, in fact, it's reasonable to think you can
```

```
 1    do it in an hour and a half, just tell me when

 2    you show up that morning, okay?  But don't feel

 3    obligated.  If you think, you know, two hours --

 4    I mean, I've got the time to set aside, okay?

 5               MR. BLAKE:  I don't think we're

 6    going to take any more time than is absolutely

 7    necessary.

 8               THE COURT:  The other thing is, I

 9    also was noticing that I have three days set

10    aside for the trial.  I think that essentially

11    there's a stipulation that the generic meets

12    every element of the claim, except for the one

13    limitation that's the subject of the claim

14    construction dispute.

15               MR. SLATER:  That's correct.

16               THE COURT:  Can't I change that to

17    two days for the trial?

18               MR. SLATER:  I mean, we haven't

19    debated how many witnesses.  We're contemplating

20    two experts and no fact witnesses at this point.

21               MR. BLAKE:  I think that's

22    probably where we're going to be.  I'd like just

23    to confer with my colleagues.  I'm inclined to

24    say yes.
```

```
1                    THE COURT:  Okay.  Well, actually,

2        so I'm going to change it to two days

3        regardless, because unlike the Markman where I'm

4        happy to sit there for longer, it will kill me

5        to sit there for a third day of this, so be

6        planning.  If you each have two experts, then

7        two days is reasonable.  But you know, be

8        thinking about that as you move along.

9                    MR. BLUMENFELD:  And Judge, just

10       to be clear, that will be Monday Tuesday?

11                   THE COURT:  Yes.  Thank you.  All

12       right.  So basically the transcript here will

13       serve as to the extent there's any orders in

14       here as the orders in resolving these matters.

15       Is there anything else that we should talk about

16       while we're here?

17                   MR. SLATER:  Just to be absolutely

18       clear, is the fact deadline extended to January

19       30th?

20                   THE COURT:  Yeah, I think it's

21       extended to January 30th.  And part of it was,

22       is particularly extended to do the things that

23       have been identified that need to be done, not

24       to come up with new ideas.  It's the things to
```

1   do in the time allotted.  Actually I think all

2   things considered you got a decent amount of

3   things to do.  And I guess the only other thing

4   I would ask or say is I think you said the

5   opening expert reports are due on February 15th

6   or thereabouts?

7                    MR. BLAKE:  13th, Your Honor.

8                    THE COURT:  13th.  And since this

9   is infringement, that means you, Mr. Slater, the

10  timing of the way that the -- or the sequence of

11  the reports, how soon after yours is the

12  Defendant's reports due?

13                   MR. SLATER:  A month, Your Honor.

14                   MR. BLAKE:  A month, I believe.

15                   THE COURT:  And then your reply is

16  when?

17                   MR. SLATER:  April 10th.

18                   THE COURT:  And the trial is at

19  the end of June, right?

20                   MR. BLUMENFELD:  June 29th.

21                   MR. BLAKE:  Yes.

22                   MR. SLATER:  The pretrial or --

23                   THE COURT:  No, I meant the trial.

24  And so then -- if the reply report is due in

1      April, then there's a period of time to depose

2      experts, which takes you into probably early

3      May?  Okay.  All right.  I guess what I'm

4      wondering is whether it would make sense --

5      well, actually, let me ask.  In terms of the --

6      oh, and I also noticed that I promised you, that

7      I promised you that I'd get you the claim

8      construction by like January 1st.  I should not

9      reread these transcripts or at least I should

10     edit them.  Edit them to say something

11     different.  But in any event it strikes me that,

12     in fact, I should be able to do that.  It may be

13     that to the extent that I have something

14     expressing support for whatever that choice is,

15     that may follow later, but I will let you

16     know -- well, put it like this, at the Markman,

17     remind me again that I said that, and if

18     there's -- I don't think -- I probably won't

19     have an answer for you right at the Markman, but

20     I don't see any reason why I can't -- I mean, I

21     should be able to decide where we're going very

22     shortly thereafter and maybe the explanation

23     will take a while.  All right.  In any event,

24     the only thing I was wondering is does it make

 1      any sense to move -- to adjust the schedule of

 2      the expert reports by a week here or there based

 3      on the timing that we now have in terms of the

 4      discovery, or is it the case, that in fact, as

 5      you've said, your reports, all this stuff he's

 6      doing really has nothing to do with your

 7      reports?

 8                    MR. SLATER:  Won't go in my

 9      report.

10                    THE COURT:  Yeah, yeah.  So

11      basically at least as we sit right now, it seems

12      like the experts' schedule will work.

13                    MR. SLATER:  I mean, the

14      assumptions are, Your Honor -- I don't want to

15      belabor it.  The assumption are, if there are

16      privilege issues to be resolved, they are

17      resolved so that we have the documents in hand

18      to depose the witnesses we've identified.  And

19      then as a second issue that has not been

20      briefed, I'm not saying it's ripe, I'm just

21      going to flag the issue, which is we have spent

22      quite a bit of time trying to get samples of

23      their product.

24                    THE COURT:  I saw that in your

1    letter and I saw also that there was no argument

2    about it.  And I don't, at least when I was -- I

3    can't remember now from reading the transcript,

4    is this because there are samples, but they're

5    in India and it's hard to import them?

6                MR. SLATER:  It's to do with a lot

7    of back and forth.  We wanted to know how we

8    have to handle the samples so that Xellia will

9    not argue that our testing of the samples was in

10   any way impaired by the way we handled the

11   samples.  So you know, we want our chain of

12   custody to be completely clean and no argument

13   that we in any way altered the samples.  And

14   we've had quite a bit of back and forth on that.

15   We are told now, I mean, it's half an inch of

16   paper almost, but we are told now, I believe,

17   that the samples are now leaving Bangalore,

18   India.  We are rather compressed for testing.

19   We're still -- we didn't ask for an extension,

20   because today I don't know that I can't meet

21   that date and we have every intention of trying

22   to meet the date, but I only flag it because

23   Your Honor raised the question of whether we

24   should move those dates.

```
 1                    THE COURT:  All right.  Well, Mr.
 2      Blake?
 3                    MR. BLAKE:  I apologize, I don't
 4      mean to cause an issue here, but there's been a
 5      lot of back and forth.  We offered these samples
 6      in June and they stonewalled taking them a lot
 7      of ways. I don't know if that's ripe.  I mean,
 8      we can discuss it here.
 9                    THE COURT:  Well, I mean, I don't
10      think it's ripe to discuss it now because it
11      really will just be argument untethered to
12      anything.
13                    MR. SLATER:  Obviously we would
14      disagree.
15                    MR. BLAKE:  They are going to get
16      them next week.
17                    THE COURT:  They are going to get
18      them next week.  Well, in any event, let's --
19                    MR. SLATER:  We're content, Your
20      Honor, to try to push forward on the testing and
21      only raise it if we think it's going to be a
22      problem.
23                    THE COURT:  All right.  Well, let
24      me give it back, Mr. Blake, the two things you
```

1    put in my direction and thank you for coming in

2    this morning and I guess I will see you not next

3    week, but the following week.

4              MR. SLATER:  Yes, Your Honor.

5    Thank you.

6              MR. BLAKE:  Thank you.

7              (End at 11:50 a.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

```
 1   State of Delaware )
                      )
 2   New Castle County )

 3

 4

 5              CERTIFICATE OF REPORTER

 6

 7        I, Stacy M. Ingram, Certified Court Reporter

 8   and Notary Public, do hereby certify that the

 9   foregoing record, Pages 1 to 51 inclusive, is a true

10   and accurate transcript of my stenographic notes

11   taken on December 5, 2014, in the above-captioned

12   matter.

13

14        IN WITNESS WHEREOF, I have hereunto set my

15   hand and seal this 5th day of December 2014, at

16   Wilmington.

17

18

19              /s/ Stacy M. Ingram

20              Stacy M. Ingram, CCR

21

22

23

24
```

**/**

/s [1] - 51:19

**1**

1 [1] - 51:9
10 [2] - 36:6, 36:8
10th [1] - 45:17
11 [4] - 35:23, 36:3, 36:15, 36:18
11:02 [1] - 1:11
11:50 - 50:7
11th [1] - 11:9
13th [3] - 8:14, 45:7, 45:8
14-199 [2] - 1:4, 3:2
15 [1] - 42:12
15th [1] - 45:5
16 [2] - 14:11, 15:14
16th [4] - 7:8, 7:15, 8:10, 8:15
1st [1] - 46:8

**2**

2 [1] - 35:22
20 [4] - 4:11, 4:20, 4:22, 11:4
2014 [3] - 1:11, 51:11, 51:15
29th [1] - 45:20

**3**

3 [1] - 35:22
30 [2] - 6:22, 17:6
30(b)(1 [1] - 34:18
30(b)(6 [10] - 9:18, 26:13, 26:18, 30:2, 30:3, 30:8, 34:4, 34:10, 34:22, 35:13
30(b)(6) [2] - 19:14, 34:22
30th [7] - 7:9, 7:15, 8:10, 9:2, 44:19, 44:21
31st [1] - 8:10

**4**

40 [3] - 4:16, 4:18, 42:4
45 [1] - 42:8

**5**

5 [2] - 1:11, 51:11
51 [1] - 51:9
5th [1] - 51:15

**6**

6 [1] - 6:22
60 [2] - 4:7, 42:4
6A [1] - 1:12
6th [1] - 4:12

**7**

70 [1] - 5:13

**8**

80 [3] - 4:14, 5:13, 11:8
844 [1] - 1:14

**9**

900 [1] - 5:19

**A**

a.m [1] - 1:11, 50:7
able [11] - 4:4, 5:23, 7:10, 17:14, 21:3, 22:9, 23:21, 24:7, 42:7, 46:12, 46:21
above-captioned [1] - 51:11
absolutely [2] - 43:6, 47:6
absorb [1] - 17:11
accept [1] - 15:13
acceptable [10] - 20:8, 21:7, 22:6, 23:13, 23:20, 32:10, 32:13, 32:15, 32:21, 33:12
access [1] - 24:23
account [1] - 25:5
accurate [1] - 51:10
accused [1] - 23:10
acetate [6] - 20:7, 20:13, 20:16, 22:3, 32:11, 32:17
acknowledged [1] - 35:3
action [1] - 3:2
actual [1] - 26:4
add [11] - 20:20, 21:4, 22:7, 23:2, 23:22, 24:1, 25:16, 27:4, 33:1, 33:9, 33:10
added [3] - 20:14, 20:18, 22:24
adding [2] - 21:22, 22:7
addition [1] - 24:2
address [2] - 29:14, 36:14
addresses [1] - 31:20

adjust [1] - 47:1
admission [1] - 29:19
advantage [1] - 37:22
affecting [1] - 34:8
ago [1] - 13:3
agree [5] - 28:2, 30:19, 31:11, 33:20, 38:21
agreed [3] - 5:13, 9:10, 10:4
agreement [1] - 7:4
agreements [2] - 39:1, 39:2
agrees [1] - 40:13
ahead [1] - 32:2
air [1] - 40:10
allotted [2] - 41:18, 45:1
almost [1] - 48:16
alone [1] - 33:9
altered [1] - 48:13
amount [9] - 32:10, 32:11, 32:14, 32:17, 32:22, 33:1, 33:2, 33:5, 45:2
analogous [1] - 30:10
analysis [3] - 11:13, 21:24, 32:7
ANDA [1] - 5:20
andis [1] - 22:12
ANDREWS [1] - 1:17
Anita [1] - 6:7
answer [3] - 15:8, 15:19, 46:19
anticipating [1] - 5:20
anyway [2] - 5:8, 30:1
Ap [1] - 20:20
API [4] - 20:14, 21:8, 22:4, 23:2
apologize [3] - 27:16, 27:18, 49:3
APPEARANCES [1] - 1:20
aPPEARANCES [1] - 2:1
application [1] - 33:3
apply [3] - 20:4, 23:9, 23:15
appoint [2] - 18:5, 39:24
appointed [4] - 17:2, 18:18, 18:21, 18:23
appropriate [2] - 24:5, 25:15
April [3] - 13:4, 45:17, 46:1
APS [1] - 1:6
argue [1] - 48:9

argument [5] - 23:11, 42:18, 48:1, 48:12, 49:11
arguments [1] - 42:7
ARSHT [1] - 1:22
ascertained [2] - 15:3
aside [4] - 17:23, 37:14, 43:4, 43:10
assignment [1] - 39:1
assume [1] - 32:5
assumption [1] - 47:15
assumptions [1] - 47:14
attempt [2] - 14:6, 36:22
August [1] - 38:14
available [1] - 17:23
aware [1] - 12:6

**B**

balancing [1] - 18:10
Bangalore [1] - 48:17
based [3] - 10:22, 10:23, 47:2
basis [1] - 31:5
bear [1] - 31:18
become [1] - 26:18
becomes [1] - 33:10
BEFORE [1] - 1:17
belabor [2] - 14:4, 47:15
belief [1] - 24:18
best [1] - 35:13
better [1] - 42:20
between [6] - 5:4, 8:9, 9:11, 11:4, 20:1, 20:12
beyond [1] - 32:5
bid [1] - 42:2
big [1] - 34:6
bit [2] - 12:24, 47:22, 48:14
BLAKE [64] - 2:10, 6:9, 6:13, 6:21, 7:16, 7:19, 8:2, 8:13, 9:1, 9:14, 9:21, 11:18, 11:23, 12:6, 12:13, 12:17, 12:22, 13:15, 15:10, 17:9, 17:13, 18:1, 19:12, 19:19, 19:22, 20:11, 21:2, 21:12, 21:17, 22:17, 22:22, 25:7, 25:10, 26:14, 26:22, 27:2, 27:7, 27:16, 28:2, 29:1, 29:3, 29:8, 32:1,

32:3, 36:5, 36:17, 37:8, 37:13, 38:6, 38:20, 39:18, 39:21, 40:6, 40:11, 41:13, 42:1, 43:5, 43:21, 45:7, 45:14, 45:21, 49:3, 49:15, 50:6
Blake [7] - 3:16, 17:9, 17:10, 17:11, 26:13, 49:2, 49:24
BLUMENFELD [4] - 1:23, 3:4, 44:9, 45:20
Blumenfeld [1] - 3:3
Boston [2] - 38:2, 38:4
bound [1] - 14:17
branded [3] - 21:11, 21:14, 21:16
BRIAN [1] - 2:3
Brian [1] - 3:5
brief [2] - 29:12, 29:18
briefed [1] - 47:20
briefing [2] - 29:19, 42:3
briefly [4] - 7:17, 32:3, 38:7, 38:24
bring [1] - 15:5
buffer [25] - 20:7, 20:13, 20:17, 20:20, 21:5, 21:22, 22:23, 23:2, 23:4, 23:22, 24:1, 24:2, 24:3, 25:14, 25:16, 25:17, 27:4, 27:11, 32:11, 32:14, 32:17, 33:9, 33:10
buffers [2] - 27:10, 33:8
bulk [1] - 4:10
BY [7] - 1:23, 1:23, 2:3, 2:4, 2:7, 2:10, 2:12

**C**

C.A [1] - 1:4
calendar [1] - 42:22
candidly [1] - 13:22
capacity [1] - 34:18
captioned [1] - 51:11
care [4] - 9:2, 18:24, 19:1, 19:5
case [17] - 5:20, 9:1, 13:20, 18:8, 19:17, 24:17, 26:2, 28:13, 28:15, 28:18, 28:21, 29:20, 30:1, 30:4, 33:15, 37:12, 47:4

cases [1] - 34:2
Castle [1] - 51:2
causes [1] - 25:21
causing [1] - 33:12
CCR [1] - 51:20
Cella [1] - 3:8
CELLA [1] - 2:3
certain [1] - 17:16
certainly [1] - 41:23
CERTIFICATE [1] - 51:5
Certified [1] - 51:7
certify [1] - 51:8
chain [1] - 48:11
chance [1] - 7:22
chances [1] - 33:21
change [2] - 43:16, 44:2
changed [1] - 35:23
choice [1] - 46:14
circuit [1] - 24:17
citizens [2] - 37:3, 40:2
civil [1] - 3:2
claim [24] - 19:23, 20:1, 20:3, 20:5, 20:6, 21:6, 21:19, 23:4, 23:16, 24:12, 24:14, 24:19, 31:1, 31:9, 31:13, 32:4, 32:5, 33:17, 36:1, 41:10, 42:6, 43:12, 43:13, 46:7
claims [4] - 21:16, 22:15, 22:19, 31:4
clause [1] - 39:6
clean [1] - 48:12
clear [5] - 13:12, 15:13, 36:17, 44:10, 44:18
closed [1] - 13:24
coax [1] - 40:4
colleagues [1] - 43:23
combination [1] - 23:6
coming [1] - 50:1
comment [1] - 26:10
Communications [1] - 5:3
company [5] - 27:21, 28:3, 30:9, 37:16, 38:3
company's [1] - 26:16
competitor [1] - 40:15
completely [1] - 48:12
composition [1] - 32:12
compressed [1] -

48:18
concept [1] - 3:7
concern [3] - 7:20, 8:19, 40:13
concerned [1] - 38:9
conclusion [1] - 11:11
confer [5] - 14:20, 15:18, 16:16, 16:22, 43:23
conference [2] - 8:1, 14:11
confident [1] - 8:22
considered [1] - 45:2
construction [19] - 19:23, 20:1, 20:3, 21:19, 23:8, 23:9, 24:13, 24:14, 31:1, 32:4, 32:6, 32:8, 33:4, 36:2, 41:10, 43:14, 46:8
construed [2] - 20:4, 23:15
contacted [2] - 13:8, 13:10
contemplating [1] - 43:19
content [1] - 49:19
contentions [4] - 27:6, 27:8, 27:24, 35:1
CONTINUED [1] - 2:1
contractually [1] - 14:17
contributing [2] - 32:16, 33:6
control [3] - 9:12, 13:12, 40:17
convinced [1] - 36:15
cooperate [2] - 37:4, 39:3
cooperation [2] - 36:22, 38:1
CORP [1] - 1:3
correct [10] - 9:8, 12:18, 15:11, 22:17, 25:7, 25:10, 41:12, 41:13, 41:16, 43:15
cost [1] - 18:6
costs [1] - 18:5
Counsel [2] - 2:5, 2:13
counter [16] - 20:16, 20:20, 21:4, 22:3, 22:9, 23:3, 23:5, 23:11, 23:21, 25:18, 25:19, 27:3, 27:12, 32:18, 32:21, 33:9
countries [1] - 12:8

country [2] - 12:11, 12:12
County [1] - 51:2
couple [2] - 20:5, 35:21
course [2] - 14:18, 18:9
court [1] - 8:2
COURT [111] - 1:1, 3:1, 3:13, 3:18, 4:13, 4:22, 5:10, 6:1, 6:6, 6:11, 6:18, 6:23, 7:13, 7:18, 7:24, 8:8, 8:21, 9:3, 9:9, 9:15, 10:2, 10:9, 10:12, 10:18, 11:1, 11:7, 11:14, 11:21, 11:24, 12:9, 12:15, 13:14, 14:10, 14:14, 14:22, 14:24, 15:12, 15:22, 16:4, 16:8, 16:12, 16:24, 17:8, 17:10, 17:20, 18:4, 19:7, 19:13, 19:21, 20:9, 20:23, 21:9, 21:13, 22:11, 22:18, 24:9, 25:1, 26:1, 26:20, 26:23, 27:5, 27:13, 27:17, 28:6, 28:23, 29:2, 29:6, 29:15, 30:6, 31:11, 31:24, 32:2, 33:18, 35:10, 35:20, 36:7, 36:10, 36:24, 37:18, 37:21, 38:4, 38:8, 38:15, 39:12, 39:19, 39:23, 40:7, 40:19, 40:24, 41:5, 41:14, 41:17, 41:21, 42:2, 42:9, 42:15, 43:8, 43:16, 44:1, 44:11, 44:20, 45:8, 45:15, 45:18, 45:23, 47:10, 47:24, 49:1, 49:9, 49:17, 49:23
Court [4] - 1:17, 7:23, 23:9, 51:7
Courtroom [1] - 1:12
covers [1] - 24:19
Croatia [1] - 6:14
curiosity [1] - 10:13
custody [1] - 48:12

**D**

date [7] - 6:15, 6:16, 8:23, 11:5, 17:6, 48:21, 48:22
dates [2] - 9:11, 48:24

days [4] - 43:9, 43:17, 44:2, 44:7
deadline [3] - 4:14, 4:17, 44:18
deadlines [1] - 8:19
deal [1] - 34:6
debated [1] - 43:19
December [3] - 1:11, 51:11, 51:15
decent [1] - 45:2
decide [2] - 42:23, 46:21
decided [1] - 39:10
decision [1] - 34:8
Defendant [2] - 2:13, 18:14
Defendant's [1] - 45:12
Defendants [1] - 1:8
deficient [1] - 5:12
definitely [1] - 38:14
DELAWARE [1] - 1:1
Delaware [2] - 1:14, 51:1
depose [8] - 10:14, 11:12, 12:4, 13:5, 19:10, 34:17, 46:1, 47:18
deposed [1] - 37:11
deposition [7] - 6:15, 13:9, 28:1, 34:11, 38:12, 39:8, 40:5
depositions [12] - 4:5, 5:24, 6:2, 7:22, 9:6, 9:16, 9:24, 29:10, 33:24, 34:2, 34:12
DEREK [1] - 1:23
design [2] - 29:20, 29:21
design-around [2] - 29:20, 29:21
designating [1] - 9:20
determine [1] - 25:13
develop [2] - 23:21, 24:8
developing [1] - 5:3
development [6] - 13:1, 22:2, 23:17, 25:9, 26:17, 27:9
difference [2] - 7:14, 8:9, 8:12
different [17] - 22:15, 22:23, 27:4, 27:10, 27:14, 27:19, 28:7, 28:10, 28:16, 29:5, 29:9, 29:11, 30:9, 31:15, 35:19, 37:1, 46:11

differentiates [1] - 24:3
directed [1] - 24:21
direction [1] - 50:1
disagree [4] - 7:21, 12:24, 32:9, 49:14
disagreement [3] - 7:4, 7:7, 33:19
discovery [5] - 4:2, 7:1, 15:5, 38:23, 47:4
discuss [3] - 16:14, 49:8, 49:10
disgust [1] - 18:22
dispute [3] - 19:17, 20:6, 20:12, 36:2, 43:14
disputes [1] - 5:21
dissociate [1] - 21:8
dissociation [4] - 20:16, 21:20, 22:3, 32:22
DISTRICT [2] - 1:1, 1:1
District [1] - 1:17
divided [1] - 3:19
Doctor [1] - 9:6
documents [12] - 4:6, 4:7, 4:11, 5:14, 5:19, 5:22, 7:11, 8:3, 10:22, 11:6, 11:8, 47:17
DOHME [1] - 1:3
done [8] - 10:18, 12:7, 22:11, 30:22, 34:3, 42:20, 44:23
drop [1] - 36:5
dropped [1] - 18:16
due [4] - 8:13, 45:5, 45:12, 45:24
during [1] - 28:21
duty [1] - 14:2

**E**

early [2] - 38:14, 46:2
easy [1] - 39:10
edit [2] - 46:10
effective [9] - 20:7, 23:12, 23:13, 23:16, 23:19, 23:23, 24:5, 24:8, 25:14
eight [1] - 8:6
either [3] - 4:8, 31:1, 38:5
element [3] - 20:3, 42:6, 43:12
elements [2] - 31:3, 33:16

**email** [1] - 4:16
**employed** [1] - 37:9
**employees** [5] -
12:23, 14:12, 14:15,
19:3, 36:21
**employer** [8] - 13:17,
13:20, 13:21, 13:22,
14:1, 40:13, 40:14,
40:15
**employers** [1] - 13:18
**employment** [1] - 39:1
**End** [1] - 50:7
**end** [1] - 45:19
**ended** [1] - 10:23
**entirely** [1] - 15:11
**entitled** [1] - 30:21
**ESQ** [7] - 1:23, 1:23,
2:3, 2:4, 2:7, 2:10,
2:12
**essential** [1] - 11:4
**essentially** [6] - 10:3,
16:14, 19:1, 25:2,
26:14, 27:6, 27:20,
43:10
**Europe** [2] - 17:22,
41:2
**event** [5] - 10:3,
38:15, 46:11, 46:23,
49:18
**eventually** [1] - 28:20,
39:10
**exact** [1] - 11:5
**exactly** [1] - 22:13
**example** [1] - 31:10
**except** [1] - 43:12
**expected** [1] - 37:4
**experience** [1] - 34:1
**expert** [7] - 8:13, 8:17,
25:23, 31:4, 31:6,
45:5, 47:2
**expert's** [1] - 26:5
**experts** [6] - 25:5,
25:24, 26:8, 43:20,
44:6, 46:2
**experts'** [1] - 47:12
**explain** [1] - 7:17
**explanation** [1] -
46:22
**explore** [2] - 30:15,
30:16
**explored** [2] - 30:17,
30:23
**expressing** [1] - 46:14
**extend** [2] - 4:2, 7:8
**extended** [3] - 44:18,
44:21, 44:22
**extending** [1] - 7:1
**extension** [2] - 8:15,

48:19
**extensive** [2] - 16:21,
42:5
**extent** [3] - 20:10,
44:13, 46:13

## F

**fact** [7] - 4:2, 29:22,
42:24, 43:20, 44:18,
46:12, 47:4
**factual** [6] - 25:3,
26:4, 27:8, 28:4,
28:7, 33:7
**FAHNESTOCK** [1] -
1:23
**fair** [2] - 28:24, 40:23
**fall** [1] - 33:15
**far** [2] - 29:9, 38:9
**February** [2] - 8:14,
45:5
**federal** [1] - 24:17
**fellow** [2] - 38:2, 39:9
**felt** [1] - 19:24
**figure** [1] - 40:3
**fine** [2] - 9:2, 41:5
**first** [5] - 3:22, 13:23,
16:3, 16:4, 37:8
**firsthand** [1] - 10:16
**FITZPATRICK** [1] -
2:3
**Fitzpatrick** [1] - 3:8
**five** [1] - 3:20
**flag** [3] - 27:15, 47:21,
48:22
**fleshed** [1] - 35:9
**follow** [1] - 46:15
**following** [1] - 50:3
**FOR** [1] - 1:1
**foregoing** [1] - 51:9
**foreign** [1] - 38:23
**forget** [1] - 14:15
**form** [1] - 20:16
**former** [7] - 12:19,
12:21, 12:22, 12:23,
13:19, 19:3, 36:21
**formulation** [1] -
28:16
**formulator** [3] - 6:24,
9:4, 12:19
**formulators** [3] - 6:4,
12:21, 12:23
**forth** [5] - 26:2, 29:14,
48:7, 48:14, 49:5
**forward** [2] - 5:23,
49:20
**frankly** [1] - 39:9
**free** [2] - 17:15, 26:8
**Friday** [1] - 1:11

**frustrating** [1] - 29:23
**fussing** [1] - 4:18

## G

**gathering** [1] - 9:5
**general** [2] - 26:12,
34:5
**generic** [2] - 28:17,
43:11
**generically** [1] - 30:10
**Getz** [12] - 5:4, 6:5,
10:6, 10:8, 12:23,
13:11, 13:13, 14:8,
14:12, 14:14, 15:7,
19:3
**gist** [2] - 26:12, 33:19
**given** [5] - 9:21,
16:19, 34:13, 38:9,
39:13
**GOULD** [1] - 2:9
**Gould** [1] - 3:17
**guess** [7] - 3:22,
22:15, 40:10, 41:9,
45:3, 46:3, 50:2
**guy** [1] - 39:16

## H

**half** [3] - 34:20, 43:1,
48:15
**hamstrung** [1] - 5:23
**hand** [6] - 18:10,
18:12, 42:21, 42:23,
47:17, 51:15
**handle** [1] - 48:8
**handled** [1] - 48:10
**happy** [3] - 40:17,
42:11, 44:4
**hard** [1] - 48:5
**HARPER** [1] - 2:3
**hear** [1] - 14:6
**heard** [3] - 10:16,
37:9, 40:9
**hearing** [3] - 24:20,
24:21, 41:11
**help** [4] - 13:19,
22:21, 40:17, 40:18
**helps** [1] - 26:4
**hereby** [1] - 51:8
**hereunto** [1] - 51:14
**herself** [1] - 40:11
**highlights** [1] - 12:1
**historical** [1] - 28:8
**hold** [1] - 37:5
**Honor** [33] - 3:5, 3:10,
3:12, 3:16, 4:5,
7:16, 12:13, 13:8,
16:3, 19:12, 21:17,

26:15, 29:1, 29:14,
30:2, 33:14, 35:7,
36:9, 38:6, 38:21,
39:18, 39:22, 40:6,
40:23, 41:12, 41:24,
42:14, 45:7, 45:13,
47:14, 48:23, 49:20,
50:4
**HONORABLE** [1] -
1:17
**hopeful** [1] - 38:1
**hopefully** [1] - 35:14
**host** [1] - 16:10
**hour** [1] - 43:1
**hours** [16] - 34:17,
34:19, 34:20, 34:21,
34:23, 35:12, 35:14,
36:11, 41:20, 41:22,
42:12, 42:16, 42:19,
42:23, 43:3
**hurry** [2] - 18:12,
18:15

## I

**idea** [1] - 5:7
**ideas** [1] - 44:24
**identified** [2] - 44:23,
47:18
**identify** [3] - 10:21,
11:2, 40:14
**impaired** [1] - 48:10
**import** [1] - 48:5
**important** [1] - 21:23
**IN** [2] - 1:1, 51:14
**INC** [1] - 1:7
**inch** [1] - 48:15
**inclined** [3] - 18:17,
33:20, 43:23
**inclusive** [1] - 51:9
**inconsistent** [1] -
34:5
**incorrect** [1] - 29:23
**India** [14] - 6:12,
10:10, 10:14, 12:4,
12:10, 14:16, 37:15,
37:19, 38:16, 38:23,
39:8, 39:16, 48:5,
48:18
**Indian** [1] - 40:2
**industry** [1] - 40:15
**information** [7] -
20:19, 20:24, 21:1,
25:3, 27:8, 30:1,
33:7
**infringement** [14] -
19:17, 20:4, 21:24,
22:24, 24:19, 24:21,
28:20, 29:4, 31:2,

31:19, 32:6, 33:3,
45:9
**infringes** [1] - 26:11
**Ingram** [3] - 51:7,
51:19, 51:20
**ingredients** [2] - 23:6,
23:14
**instance** [2] - 13:23,
21:6
**instead** [1] - 7:8
**intention** [1] - 48:21
**interested** [1] - 18:8
**interpret** [1] - 39:5
**invalidity** [2] - 28:14,
28:21
**invention** [1] - 22:2
**inventor** [4] - 31:7,
34:4, 34:11, 34:19
**inventor's** [1] - 24:18
**inventors** [17] - 19:11,
19:14, 19:16, 20:18,
24:22, 25:11, 25:12,
26:7, 26:18, 30:7,
30:24, 34:17, 34:20,
34:21, 36:21, 38:16,
38:17
**investigation** [1] -
22:12
**ion** [15] - 20:16, 20:20,
21:4, 21:21, 22:3,
22:10, 23:3, 23:5,
23:11, 23:21, 27:3,
27:12, 32:19, 32:21,
33:9
**ions** [2] - 25:18, 25:19
**irrelevant** [5] - 4:24,
24:19, 24:24, 35:22,
36:4
**issue** [11] - 9:16,
13:24, 24:16, 28:10,
28:13, 28:15, 28:20,
29:4, 47:19, 47:21,
49:4
**issues** [13] - 3:20,
3:23, 5:17, 16:11,
17:3, 17:7, 17:17,
18:15, 19:4, 19:9,
20:1, 35:6, 47:16
**itself** [5] - 20:21,
21:21, 22:10, 23:13,
32:24

## J

**JACK** [1] - 1:23
**January** [15] - 7:8,
7:9, 7:11, 7:15,
8:10, 8:14, 9:2,
10:1, 17:6, 44:18,

44:21, 46:8
**JASON** [1] - 2:4
**Jason** [1] - 3:7
**Jeff** [1] - 3:16
**JEFFREY** [1] - 2:10
**jeopardize** [1] - 17:6
**John** [1] - 14:6
**Judge** [2] - 1:17, 44:9
**judgment** [2] - 35:13,
35:15
**July** [3] - 14:23, 14:24
**June** [3] - 45:19,
45:20, 49:6

## K

**KAREN** [1] - 2:7
**keep** [1] - 18:13
**keeping** [1] - 18:8
**KELLER** [4] - 2:7, 2:7,
3:15, 41:16
**Keller** [1] - 3:14
**key** [1] - 6:7
**kick** [2] - 8:18, 8:20
**kill** [1] - 44:4
**kind** [7] - 18:9, 18:17,
25:3, 27:19, 29:19,
30:7, 30:10
**kinds** [2] - 30:12,
33:24
**King** [1] - 1:14
**knowledge** [1] - 36:1
**Krishnad** [1] - 11:22

## L

**language** [1] - 39:4
**last** [5] - 4:8, 4:19,
11:4, 37:11, 39:8
**late** [2] - 4:10, 8:16
**lawyer** [1] - 36:13
**lawyers** [1] - 41:7
**learn** [3] - 24:6, 27:21,
28:3
**least** [4] - 15:7, 46:9,
47:11, 48:2
**leaving** [1] - 48:17
**left** [1] - 40:2
**LEONARD** [2] - 2:4,
3:11
**Leonard** [1] - 3:8
**less** [1] - 4:23
**letter** [3] - 10:7, 17:1,
48:1
**letters** [1] - 3:19
**level** [1] - 5:6
**likely** [2] - 35:5, 40:9
**limit** [1] - 30:13
**limitation** [3] - 19:17,

20:6, 43:13
**limits** [1] - 34:13
**line** [1] - 27:22
**litigation** [2] - 28:12,
29:4
**LLP** [2] - 1:22, 2:7
**local** [1] - 37:24
**locate** [1] - 37:16
**located** [1] - 37:23
**log** [14] - 5:12, 5:14,
5:17, 5:18, 5:22,
16:1, 16:3, 16:5,
16:7, 16:9, 16:11,
16:18, 16:20, 39:24
**logic** [1] - 30:19
**look** [6] - 11:24, 15:8,
15:20, 16:17, 29:15,
39:6
**lost** [1] - 28:21
**lower** [1] - 42:2

## M

**major** [1] - 38:2
**marginal** [2] - 38:10,
39:14
**Markman** [3] - 44:3,
46:16, 46:19
**Maschnic** [3] - 6:8,
6:13, 9:22
**maschnic** [2] - 6:9,
6:10
**master** [6] - 17:2,
17:18, 18:6, 18:17,
18:21, 40:1
**matter** [2] - 10:12,
51:12
**matters** [2] - 31:9,
44:14
**maximum** [2] - 41:20,
41:22
**mean** [35] - 5:4, 6:4,
14:16, 14:17, 15:21,
16:2, 17:17, 19:1,
20:24, 23:15, 24:11,
24:13, 24:22, 26:6,
26:20, 27:1, 27:21,
28:7, 31:10, 34:1,
35:12, 36:24, 38:18,
42:3, 42:10, 42:16,
42:17, 43:4, 43:18,
46:20, 47:13, 48:15,
49:4, 49:7, 49:9
**means** [2] - 20:22,
45:9
**meant** [2] - 26:24,
45:23
**meat** [1] - 42:18
**Medical** [1] - 24:17

**meet** [6] - 14:19,
15:18, 16:16, 16:22,
48:20, 48:22
**meets** [3] - 31:3,
33:16, 43:11
**memory** [1] - 34:7
**mention** [1] - 15:1
**mentioned** [1] - 9:4
**MERCHANT** [1] - 2:9
**Merchant** [1] - 3:16
**MERCK** [1] - 1:3
**Merck** [13] - 3:1, 3:6,
4:1, 7:21, 25:9,
26:24, 28:12, 30:5,
33:21, 34:12, 35:1,
36:22, 37:9
**Merck's** [2] - 25:11,
25:12
**merck's** [1] - 26:22
**might** [2] - 9:5, 22:14
**mind** [2] - 6:24, 35:23
**minutes** [1] - 42:8
**moment** [2] - 21:19,
34:3
**Monday** [2] - 16:16,
44:10
**month** [5] - 4:20, 8:16,
8:17, 45:13, 45:14
**months** [1] - 8:6
**morning** [8] - 3:5, 3:9,
3:11, 3:13, 3:15,
3:18, 43:2, 50:2
**MORRIS** [1] - 1:22
**Morris** [1] - 3:7
**most** [2] - 17:14,
42:19
**motivated** [1] - 30:11
**motivation** [2] -
18:11, 18:14
**move** [3] - 44:8, 47:1,
48:24
**MR** [144] - 3:4, 3:9,
3:11, 4:4, 4:15, 5:1,
5:11, 6:4, 6:7, 6:9,
6:10, 6:13, 6:20,
6:21, 6:22, 7:6,
7:16, 7:19, 8:2,
8:13, 9:1, 9:8, 9:14,
9:18, 9:21, 10:5,
10:11, 10:15, 10:20,
11:3, 11:10, 11:16,
11:18, 11:20, 11:23,
12:6, 12:13, 12:17,
12:20, 12:22, 13:15,
14:4, 14:13, 14:19,
14:23, 15:2, 15:10,
15:17, 16:2, 16:6,
16:10, 16:15, 17:5,
17:9, 17:13, 17:22,

18:1, 18:3, 19:6,
19:12, 19:19, 19:22,
20:11, 21:2, 21:12,
21:17, 22:17, 22:22,
24:11, 25:7, 25:8,
25:10, 25:22, 26:14,
26:22, 27:2, 27:7,
29:8, 29:12, 29:17,
30:18, 31:12, 32:1,
32:3, 33:14, 35:7,
35:16, 36:5, 36:6,
36:8, 36:17, 36:19,
37:8, 37:10, 37:13,
37:14, 37:20, 37:24,
38:6, 38:13, 38:20,
39:4, 39:18, 39:21,
39:22, 40:6, 40:11,
40:22, 41:4, 41:12,
41:13, 41:19, 41:23,
42:1, 42:5, 42:13,
43:5, 43:15, 43:18,
43:21, 44:9, 44:17,
45:7, 45:13, 45:14,
45:17, 45:20, 45:21,
45:22, 47:8, 47:13,
48:6, 49:3, 49:13,
49:15, 49:19, 50:4,
50:6
**MS** [2] - 3:15, 41:16
**Muka** [1] - 9:6

## N

**name** [2] - 9:4, 9:23
**names** [10] - 6:6, 9:19,
9:22, 10:23, 11:2,
11:7, 11:14, 11:17,
12:2, 13:3
**NASH** [2] - 2:12, 12:20
**Nash** [3] - 3:17, 12:18
**nature** [3] - 34:14,
38:10, 39:14
**necessarily** [1] -
12:10
**necessary** [2] - 20:21,
43:7
**need** [9] - 7:9, 15:4,
16:14, 23:22, 27:17,
33:5, 36:14, 38:22,
44:23
**needed** [2] - 8:4,
17:19
**never** [2] - 15:9, 31:13
**nevertheless** [1] -
33:22
**New** [4] - 6:14, 6:16,
9:24, 51:2

**new** [1] - 44:24
**next** [5] - 17:15, 41:3,
49:16, 49:18, 50:2
**Nichols** [1] - 3:7
**NICHOLS** [1] - 1:22
**non** [2] - 14:12, 22:24
**non-infringement** [1]
- 22:24
**Notary** [1] - 51:8
**notes** [1] - 51:10
**nothing** [1] - 47:6
**notice** [2] - 19:20,
35:8
**noticed** [1] - 46:6
**notices** [2] - 10:6,
13:9
**noticing** [1] - 43:9
**number** [1] - 3:2

## O

**obligated** [2] - 39:11,
43:3
**obviously** [4] - 26:6,
36:21, 37:3, 49:13
**October** [3] - 4:12,
11:4, 19:20
**OF** [2] - 1:1, 51:5
**offer** [1] - 31:19
**offered** [1] - 49:5
**once** [2] - 17:11
**one** [19] - 3:22, 6:7,
9:22, 12:11, 16:13,
18:10, 18:18, 19:16,
34:18, 34:24, 37:15,
37:19, 37:24, 41:6,
41:14, 42:6, 42:12,
42:16, 43:12
**one's** [1] - 13:21
**ones** [1] - 5:5
**opening** [1] - 45:5
**opinion** [2] - 32:16,
39:16
**opinions** [2] - 25:6,
26:5
**opposed** [1] - 21:22
**order** [2] - 5:19, 32:14
**orders** [2] - 44:13,
44:14
**own** [1] - 25:9

## P

**P.C** [1] - 2:9
**pages** [1] - 42:4
**Pages** [1] - 51:9
**paper** [1] - 48:16
**Parikh** [1] - 9:6
**part** [7] - 7:20, 14:15,

28:14, 34:9, 35:3, 39:12, 44:21
**particular** [4] - 18:11, 18:14, 25:17, 37:5
**particularly** [1] - 44:22
**parties** [3] - 20:2, 20:12, 42:7
**partly** [1] - 28:14
**party** [3] - 13:21, 15:4, 37:3
**past** [2] - 16:4, 32:5
**patent** [4] - 24:15, 31:15, 31:17, 36:9
**patents** [2] - 35:18, 39:2
**Patil** [3] - 11:21, 12:2, 40:8
**Patil's** [1] - 13:22
**people** [13] - 10:6, 10:10, 11:15, 12:16, 13:4, 13:8, 14:3, 14:8, 14:16, 15:1, 15:6, 15:16, 15:23
**per** [1] - 42:8
**percent** [8] - 4:7, 4:11, 4:14, 4:16, 4:19, 4:20, 4:23, 11:8
**perfectly** [1] - 42:10
**perhaps** [2] - 23:5, 30:13
**period** [2] - 13:7, 46:1
**permitted** [1] - 29:24
**person** [4] - 6:11, 10:14, 18:7, 38:17
**pH** [14] - 20:8, 21:7, 22:6, 23:13, 23:20, 23:24, 24:6, 25:15, 32:13, 32:15, 32:18, 32:21, 33:6, 33:12
**pharmaceutical** [1] - 38:3
**pharmaceutically** [10] - 20:8, 21:7, 22:6, 23:12, 23:20, 32:10, 32:13, 32:15, 32:20, 33:12
**PHARMACEUTICAL S** [2] - 1:6, 1:7
**piles** [1] - 3:20
**Plaintiff** [4] - 1:4, 2:5, 3:23, 18:11
**planning** [1] - 44:6
**play** [1] - 21:24
**point** [5] - 17:19, 19:24, 26:13, 29:9, 43:20
**points** [1] - 14:7

**position** [11] - 23:1, 26:16, 26:19, 26:21, 26:22, 26:24, 27:1, 27:15, 27:23, 30:11, 34:5
**potentially** [1] - 35:18
**present** [3] - 32:11, 32:14, 32:18
**presumably** [5] - 21:10, 22:14, 25:1, 31:4, 31:6
**pretrial** [1] - 45:22
**pretty** [5] - 5:19, 9:10, 14:11, 19:4, 42:5
**privilege** [3] - 5:12, 39:24, 47:16
**privileged** [1] - 15:24
**problem** [6] - 6:19, 7:1, 49:22
**problems** [1] - 18:18
**procedures** [1] - 10:14
**process** [7] - 10:19, 12:5, 12:8, 13:6, 16:13, 34:9, 40:3
**produce** [3] - 14:12, 14:18, 15:15
**produced** [5] - 4:7, 4:8, 4:14, 8:2, 13:2
**producing** [1] - 14:8
**product** [16] - 5:3, 13:1, 20:15, 21:3, 21:11, 21:14, 21:16, 21:21, 22:5, 23:10, 23:22, 27:3, 27:11, 31:3, 33:16, 47:23
**production** [2] - 4:10, 11:4
**products** [2] - 24:7, 25:12
**prohibited** [1] - 35:2
**promised** [2] - 46:6, 46:7
**proof** [1] - 25:21
**proper** [2] - 26:10, 33:5
**properly** [1] - 23:15
**prosecution** [3] - 24:16, 35:17, 36:9
**provide** [5] - 14:2, 20:8, 20:21, 21:6, 22:5, 23:12, 23:14, 23:16, 23:19, 23:24, 24:5, 24:8, 25:14
**provided** [1] - 30:3
**provides** [1] - 32:24
**Public** [1] - 51:8
**purpose** [1] - 4:3

**push** [1] - 49:20
**Put** [1] - 17:23
**put** [3] - 42:22, 46:16, 50:1
**putting** [1] - 37:14
**Pyguay** [1] - 9:7

---

## Q

**questions** [3] - 27:22, 30:12, 39:20
**quickly** [2] - 18:16, 18:19
**quit** [1] - 18:22
**quite** [4] - 8:22, 13:7, 47:22, 48:14

---

## R

**raise** [1] - 49:21
**raised** [4] - 3:23, 19:4, 19:9, 48:23
**raises** [1] - 27:15
**rather** [1] - 12:1, 29:23, 42:11, 48:18
**reach** [1] - 11:11
**read** [2] - 12:1, 42:3
**reading** [1] - 48:3
**really** [7] - 7:14, 15:12, 31:8, 31:23, 40:1, 47:6, 49:11
**reason** [6] - 8:6, 30:13, 30:14, 35:4, 38:19, 46:20
**reasonable** [5] - 34:15, 37:7, 41:9, 42:24, 44:7
**recognize** [1] - 24:12
**record** [4] - 14:5, 24:15, 36:18, 51:9
**red** [1] - 27:15
**reduce** [1] - 42:7
**reference** [1] - 28:12
**regard** [1] - 40:21
**regardless** [1] - 44:3
**related** [1] - 24:12
**relates** [3] - 21:18, 30:24, 31:8
**relationship** [1] - 15:6
**relatively** [2] - 34:14, 39:14
**relevance** [1] - 31:14
**relevant** [10] - 5:5, 19:16, 19:24, 28:9, 30:18, 30:20, 31:21, 31:23, 32:4, 33:22
**remaining** [1] - 7:20
**remains** [1] - 36:3
**remember** [4] - 7:23,

7:24, 20:6, 48:3
**remind** [1] - 46:17
**remote** [1] - 33:22
**reply** [2] - 45:15, 45:24
**report** [2] - 45:24, 47:9
**REPORTER** [1] - 51:5
**Reporter** [1] - 51:7
**reports** [10] - 5:6, 8:13, 8:18, 13:2, 45:5, 45:11, 45:12, 47:2, 47:5, 47:7
**require** [3] - 39:2, 39:7, 39:15
**required** [1] - 27:4
**requires** [1] - 23:4
**reread** [2] - 8:1, 46:9
**research** [6] - 5:2, 5:6, 22:1, 23:17, 26:17, 27:9
**resolve** [1] - 18:15
**resolved** [6] - 17:3, 17:7, 18:16, 18:19, 47:16, 47:17
**resolving** [1] - 44:14
**respond** [1] - 16:16
**response** [1] - 30:7
**responsible** [2] - 15:15, 37:2
**result** [1] - 20:14
**resulting** [1] - 32:12
**review** [4] - 10:22, 10:24, 11:6, 11:13
**RGA** [1] - 1:4
**RICHARD** [1] - 1:17
**ripe** [3] - 47:20, 49:7, 49:10
**rise** [1] - 33:15
**role** [1] - 21:24
**room** [1] - 41:7
**roughly** [1] - 19:10
**Rule** [2] - 14:11, 15:14
**runaround** [1] - 14:9

---

## S

**samples** [8] - 47:22, 48:4, 48:8, 48:9, 48:11, 48:13, 48:17, 49:5
**Sandoz** [4] - 28:12, 28:16, 29:4, 29:20
**Sandoz's** [1] - 29:21
**saw** [2] - 42:3, 47:24, 48:1
**schedule** [4] - 4:2, 7:20, 47:1, 47:12
**scheduled** [1] - 8:1

**science** [1] - 36:13
**SCINTO** [1] - 2:3
**scope** [1] - 31:9
**seal** [1] - 51:15
**second** [6] - 3:24, 6:23, 19:15, 35:6, 35:24, 47:19
**see** [2] - 13:1, 31:17, 33:24, 35:12, 41:8, 46:20, 50:2
**seeing** [1] - 31:7
**seem** [2] - 3:20, 18:5
**seeming** [1] - 40:8
**sense** [4] - 5:9, 19:2, 46:4, 47:1
**separate** [11] - 21:5, 21:22, 22:23, 23:1, 23:2, 23:4, 24:1, 24:2, 24:3, 25:16, 33:2
**separately** [3] - 20:14, 20:17, 20:19
**September** [1] - 11:9
**sequence** [1] - 45:10
**serve** [1] - 44:13
**served** [2] - 10:5, 19:20
**serves** [1] - 26:4
**set** [5] - 11:12, 35:6, 43:4, 43:9, 51:14
**settled** [1] - 28:22
**seven** [7] - 8:6, 34:17, 34:19, 34:23, 35:11, 35:14, 36:11
**SHARP** [1] - 1:3
**SHAW** [1] - 2:7
**short** [1] - 29:3
**shortly** [1] - 46:22
**shot** [1] - 14:6
**show** [4] - 11:18, 32:24, 33:15, 43:2
**side** [2] - 38:5, 42:8
**similar** [1] - 34:2
**sit** [3] - 44:4, 44:5, 47:11
**six** [2] - 8:15, 8:16
**six-week** [1] - 8:15
**sizeable** [1] - 5:18
**SLATER** [77] - 2:3, 3:9, 4:4, 4:15, 5:1, 5:11, 6:4, 6:7, 6:10, 6:20, 6:22, 7:6, 9:8, 9:18, 10:5, 10:11, 10:15, 10:20, 11:3, 11:10, 11:16, 11:20, 14:4, 14:13, 14:19, 14:23, 15:2, 15:17, 16:2, 16:6, 16:10,

16:15, 17:5, 17:22, 18:3, 19:6, 24:11, 25:8, 25:22, 28:19, 29:7, 29:12, 29:17, 30:18, 31:12, 33:14, 35:7, 35:16, 36:6, 36:8, 36:19, 37:10, 37:14, 37:20, 37:24, 38:13, 39:4, 39:22, 40:22, 41:4, 41:12, 41:19, 41:23, 42:5, 42:13, 43:15, 43:18, 44:17, 45:13, 45:17, 45:22, 47:8, 47:13, 48:6, 49:13, 49:19, 50:4
**Slater** [9] - 3:6, 8:11, 9:17, 12:24, 19:4, 24:10, 38:24, 41:2, 45:9
**slow** [1] - 10:16
**sometimes** [3] - 26:1, 26:3, 42:18
**soon** [1] - 45:11
**sorry** [3] - 11:24, 17:8, 17:10
**sorts** [1] - 34:2
**sought** [1] - 34:15
**sounds** [1] - 25:22
**speaking** [2] - 3:6, 19:10
**special** [6] - 17:2, 17:18, 18:6, 18:17, 18:21, 40:1
**speculated** [1] - 29:21
**spend** [2] - 35:15, 42:11
**spent** [2] - 42:16, 47:21
**stability** [1] - 32:20
**stabilization** [5] - 20:21, 23:3, 23:7, 23:18, 25:20
**stabilize** [4] - 21:3, 21:21, 22:4, 22:9
**stabilized** [1] - 27:3
**stable** [3] - 23:23, 24:4, 33:11
**Stacy** [3] - 51:7, 51:19, 51:20
**start** [10] - 3:21, 3:22, 4:5, 7:10, 7:22, 10:19, 13:6, 18:3, 27:22, 27:23
**started** [2] - 12:5, 15:4
**starts** [1] - 18:6
**State** [1] - 51:1
**STATES** [1] - 1:1
**States** [5] - 1:17,

13:19, 38:18, 39:17, 40:4
**stay** [3] - 8:22, 41:1, 41:8
**stenographic** [1] - 51:10
**Steve** [1] - 3:17
**STEVEN** [1] - 2:12
**still** [4] - 8:17, 19:22, 23:23, 48:19
**stipulated** [1] - 28:19
**stipulation** [1] - 43:11
**stonewalled** [1] - 49:6
**stop** [2] - 13:18, 26:2
**Street** [1] - 1:14
**strikes** [1] - 46:11
**strongly** [1] - 7:21
**struggling** [1] - 31:16
**stuck** [1] - 31:16
**stuff** [4] - 5:6, 17:14, 17:18, 47:5
**subject** [1] - 43:13
**subjective** [1] - 24:18
**substantial** [1] - 8:7
**sufficient** [2] - 22:4, 22:5
**suggest** [1] - 29:13
**suggested** [1] - 29:18
**superficially** [1] - 42:20
**supplemental** [4] - 16:7, 16:9, 16:18, 16:20
**support** [1] - 46:14
**supposed** [3] - 4:9, 21:15
**sweet** [1] - 29:3

**T**

**tangential** [1] - 34:14
**technical** [1] - 8:3
**tend** [1] - 33:20
**term** [3] - 41:14, 42:12, 42:16
**terms** [8] - 19:3, 20:5, 34:13, 34:22, 42:12, 42:19, 46:5, 47:3
**terribly** [1] - 40:8
**tested** [1] - 27:11
**testimony** [4] - 19:16, 25:4, 25:23, 26:4
**testing** [7] - 27:10, 32:19, 32:24, 33:7, 48:9, 48:18, 49:20
**THE** [113] - 1:1, 1:1, 1:17, 3:1, 3:13, 3:18, 4:13, 4:22, 5:10, 6:1, 6:6, 6:11,

6:18, 6:23, 7:13, 7:18, 7:24, 8:8, 8:21, 9:3, 9:9, 9:15, 10:2, 10:9, 10:12, 10:18, 11:1, 11:7, 11:14, 11:21, 11:24, 12:9, 12:15, 13:14, 14:10, 14:14, 14:22, 14:24, 15:12, 15:22, 16:4, 16:8, 16:12, 16:24, 17:8, 17:10, 17:20, 18:4, 19:7, 19:13, 19:21, 20:9, 20:23, 21:9, 21:13, 22:11, 22:18, 24:9, 25:1, 26:1, 26:20, 26:23, 27:5, 27:13, 27:17, 28:6, 28:23, 29:2, 29:6, 29:15, 30:6, 31:11, 31:24, 32:2, 33:18, 35:10, 35:20, 36:7, 36:10, 36:24, 37:18, 37:21, 38:4, 38:8, 38:15, 39:12, 39:19, 39:23, 40:7, 40:19, 40:24, 41:5, 41:14, 41:17, 41:21, 42:2, 42:9, 42:15, 43:8, 43:16, 44:1, 44:11, 44:20, 45:8, 45:15, 45:18, 45:23, 47:10, 47:24, 49:1, 49:9, 49:17, 49:23
**theory** [4] - 19:15, 21:20, 25:2, 25:18
**thereabouts** [1] - 45:6
**thereafter** [1] - 46:22
**they've** [5] - 5:12, 24:7, 35:2, 35:11, 36:11
**thinking** [3] - 27:23, 36:3, 44:8
**third** [3] - 15:4, 37:3, 44:5
**three** [12] - 9:16, 19:11, 34:20, 34:21, 36:20, 37:22, 37:23, 41:20, 42:12, 42:16, 42:19, 43:9
**throw** [1] - 36:16
**tht** [1] - 12:10
**timing** [2] - 45:10, 47:3
**today** [3] - 3:16, 11:5, 48:20
**topics** [7] - 26:16, 30:2, 35:8, 35:16, 35:21, 35:22, 36:14

**total** [1] - 34:17
**totally** [1] - 35:17
**touch** [2] - 41:1, 41:8
**track** [3] - 8:23, 18:8, 18:13
**transcript** [4] - 8:1, 44:12, 48:3, 51:10
**transcripts** [4] - 31:20, 37:11, 38:12, 46:9
**trial** [5] - 8:23, 43:10, 43:17, 45:18, 45:23
**tried** [7] - 30:24, 31:7, 31:9, 31:10, 31:12, 31:14, 31:16
**true** [1] - 51:9
**try** [7] - 22:7, 22:8, 30:24, 31:8, 34:6, 37:17, 49:20
**trying** [6] - 10:20, 13:24, 14:3, 40:3, 47:22, 48:21
**Tuesday** [2] - 13:9, 44:10
**Tukaye** [4] - 11:23, 12:2, 12:18, 40:9
**Tukaye's** [1] - 14:1
**TUNNEL** [1] - 1:22
**turn** [1] - 38:11
**two** [28] - 3:20, 8:11, 9:21, 10:6, 11:15, 12:16, 13:3, 15:1, 15:23, 19:3, 19:8, 19:19, 34:19, 34:21, 38:17, 39:17, 40:2, 41:1, 41:22, 42:11, 42:22, 43:3, 43:17, 43:20, 44:2, 44:6, 44:7, 49:24
**type** [2] - 22:23, 25:17, 34:18

**U**

**under** [3] - 9:12, 23:7, 33:3
**underpinning** [1] - 26:5
**understood** [1] - 20:2
**UNITED** [1] - 1:1
**United** [5] - 1:17, 13:19, 38:18, 39:17, 40:4
**unlike** [1] - 44:3
**unnecessary** [1] - 5:8
**unreasonable** [2] - 33:23, 39:15
**unrelated** [1] - 35:17
**untethered** [1] - 49:11

**unusual** [1] - 5:20
**up** [6] - 10:23, 35:5, 38:2, 40:10, 43:2, 44:24
**useful** [1] - 26:3

**V**

**various** [2] - 14:7, 25:5
**versus** [2] - 3:2, 28:12

**W**

**wait** [5] - 3:24, 6:23, 35:24, 38:8
**wants** [1] - 4:1
**ways** [3] - 20:5, 42:11, 49:7
**week** [12] - 8:15, 13:10, 16:7, 17:15, 17:23, 41:3, 41:10, 47:2, 49:16, 49:18, 50:3
**weeks** [2] - 8:12, 8:17
**wel** [1] - 30:6
**WHEREOF** [1] - 51:14
**whole** [1] - 18:5
**willing** [3] - 13:17, 40:12, 40:16
**Wilmington** [2] - 1:14, 51:16
**withdraw** [1] - 36:18
**witness** [5] - 30:4, 34:4, 35:19, 36:13
**WITNESS** [1] - 51:14
**witnesses** [5] - 10:21, 26:19, 43:19, 43:20, 47:18
**wondering** [2] - 46:4, 46:24
**word** [1] - 27:14
**words** [1] - 4:9
**works** [2] - 21:14, 37:15
**world** [1] - 38:5
**Wright** [1] - 24:17
**wrote** [1] - 31:17

**X**

**Xellia** [19] - 3:2, 3:17, 4:23, 5:4, 6:5, 7:7, 7:14, 9:20, 13:12, 14:7, 19:9, 24:23, 26:7, 26:9, 26:11, 33:23, 34:16, 40:2, 48:8
**XELLIA** [2] - 1:6, 1:7
**Xellia's** [3] - 25:11,

29:18, 33:16

# Y

**year** [1] - 13:5
**yellow** [1] - 12:1
**yesterday** [1] - 5:15
**York** [3] - 6:14, 6:17,
9:24
**yourself** [1] - 18:20
**yourselves** [1] - 9:11