```
 1                UNITED STATES DISTRICT COURT

 2                FOR THE DISTRICT OF DELAWARE

 3

 4    MERCK SHARP & DOHME CORP.,    :   CA NO. 14-199-RGA

 5                                  :

 6              Plaintiff,          :

 7                                  :

 8         v.                       :   December 18, 2014

 9                                  :

10    XELLIA PHARMACEUTICALS APS & :

11    XELLIA PHARMACEUTICALS INC., :

12                                  :

13              Defendants,         :   9:36 o'clock a.m.

14    ...........................

15

16

17            TRANSCRIPT OF MARKMAN HEARING

18      BEFORE THE HONORABLE RICHARD G. ANDREWS

19            UNITED STATES DISTRICT JUDGE

20

21

22    APPEARANCES:

23

24    For Plaintiff:     MORRIS, NICHOLS, ARSHT & TUNNELL

25                       BY:  JACK B. BLUMENFELD, ESQ
```

```
 1                            BY:  DEREK J. FAHNESTOCK, ESQ

 2                                      -and-

 3                            FITZPATRICK, CELLA, HARPER & SCINTO

 4                            BY:  BRIAN V. SLATER, ESQ

 5                            BY:  JASON A. LEONARD, ESQ

 6

 7     Other Appearances:  KAREN STUTTON - Representative for Merck

 8                            LI SU - Representative for Merck

 9                            GERARD DEVLIN - Representative for Merck

10

11

12     For Defendants:     SHAW KELLER LLP

13                            BY:  JEFFREY T. CASTELLANO, ESQ

14                                      -and.

15                            MERCHANT & GOULD

16                            BY:  JEFFREY S. WARD, ESQ

17                            BY:  WENDY M. WARD, ESQ

18                            BY:  JEFFREY D. BLAKE, ESQ

19

20     Other Appearances:  Steven Nash - Representative for Xellia

21

22

23

24     Court Reporter:       LEONARD A. DIBBS

25                            Official Court Reporter
```

P R O C E E D I N G S

THE COURT:  Good morning.  Please be seated.

Generally, when we have these kinds of problems is when Apple or Microsoft has a party.

So, are you all able to proceed or what's the story here?

MR. WARD:  I think the story on our end is, they're going to go first, they'll proceed, and then we could take a quick break to get our system working.

THE COURT:  Okay.

Mr. Blumenfeld, who do you have with you here?

MR. BLUMENFELD:  Good morning, your Honor.

Jack Blumenfeld from Morris Nichols for Merck.

At counsel table is Brian Slater and Jason Leonard from Fitzpatrick Cella.

With the Court's permission, Mr. Slater will be doing Merck's presentation.

Sitting behind them is Derek Fahnestock from Morris Nichols.  And then in the back of the courtroom is Karen Stutton from Merck.  Behind her is Li Su also from Merck and Gerard Devlin also Merck.

THE COURT:  All right.

Thank you, Mr. Blumenfeld.

MR. BLUMENFELD:  I'm not going to hear about transfer

1    again, am I?

2    THE COURT:  No.  That's not usually a problem in these

3    cases.

4    Mr. Castellano?

5    MR CASTELLANO:  Good morning, your Honor.

6    Jeff Castellano from Shaw Keller for Xellia.

7    I have with me Jeff Blake -- I'm sorry -- Jeff Ward and

8    Wendy Ward from Merchant Gould, Jeff Nash from the client, and

9    also Jeff Blake from Merchant Gould.

10    THE COURT:  All right.

11    Thank you, Mr. Castellano.

12    THE COURT:  Why don't you go ahead, Mr. Slater.

13    MR. SLATER:  May it please the Court, as your Honor

14    knows by now reading the briefs, we have one element of Claim 1

15    in dispute, and that's the sub-phrase c), which has to do with

16    the acetate buffer.

17    Just for the Court's convenience, we put a slide

18    together showing the parts of the language of that claim that

19    are in dispute.

20    Your Honor, if we could approach the bench and hand up

21    the slides?

22    THE COURT:  Sure.  Thank you.

23    MR. SLATER:  So, the red parts here, your Honor, are

24    the parts where the parties have a dispute over the claim

25    languages.

1    This is Merck's construction of a pharmaceutically

2    acceptable amount of acetate buffer is present such that the

3    resulting composition has a pharmaceutically acceptable pH.

4    And the focus there, your Honor, is the plaintiff's

5    only construction, as distinct from Xellia's construction, which

6    is that the acetate buffer has to be added.

7    That's the principle dispute.

8    THE COURT:  Well, actually, is there a dispute -- is it

9    your position that if you have the acetate buffer, and you a pH

10   that's in the pharmaceutically acceptable range, that's done, or

11   does there have to be any connection between the acetate buffer

12   and its acceptable pH?

13   MR. SLATER:  There certainly there has to be the

14   acceptable pH.  The reason for our construction is that the

15   buffer -- you can't say it's the only thing that makes the pH.

16   THE COURT:  No, no.  So that's a slightly different

17   thing, saying it's not the only thing, but you have to say it is

18   one of the things?

19   MR. SLATER:  Merck's construction agrees.  It's one of

20   the things that contributes to the pH.

21   So what we're trying to get away from would be a

22   construction that is like a causative thing, where you would

23   have to prove that the acetate buffer alone is the only thing

24   that contribute to the final pH.

25   That's what we sensed Xellia's approach to the term.

1    We're simply trying to say, you need the final pH.  That's

2    important.  The buffer will contribute.  But everything in the

3    composition contributes to pH.

4         So, for example, caspofungin acetate has a native pH of

5    around 6.6.  That's in the package insert.  That's in the

6    record.

7         So, as you add different components into the

8    composition, they're all affecting the pH.  PH is a property of

9    water, so anything that's in there can effect pH.

10        What the buffer does is, you know, in combination with

11   all of the ingredients, you will be able to achieve the final

12   pH.

13        But the notion that you would have to separate out and

14   say, that's the one thing that causes the pH, that doesn't make

15   sense scientifically.

16        THE COURT:  No, it doesn't make -- so let me ask this.

17        If it were the case that without the acetate buffer,

18   the pH would be outside of the acceptable range, clearly then

19   you understand any construction, the acetate buffer is effective

20   to reach the final pH, right?

21        MR. SLATER:  I think the problem is the way it works

22   scientifically.  You mix the ingredients.

23        I'll show you in the patent how --

24        THE COURT:  Well, wait, wait, wait.

25        MR. SLATER:  Sure.

1          THE COURT:  So you disagree.  Let me try to phrase it a

2     different way.

3          If you took out the acetate buffer, and the pH was

4     already in the pharmaceutically acceptable range, would you say

5     that the presence of pH is effective to achieve a

6     pharmaceutically acceptable range?

7          MR. SLATER:  If you had a composition that didn't have

8     an acetate buffer, and it was within the range that the patent

9     prescribes, the acceptable range, then it's in the range.

10          THE COURT:  All right.

11          But, so, then the addition -- or the presence of the

12     acetate buffer has nothing to do with it being in the range, and

13     you would say it's effective to be in the range?

14          MR. SLATER:  Right.  But it wouldn't be this invention,

15     right?  Because this invention does require the presence of a

16     acetate buffer.

17          THE COURT:  Right, right.  So what I'm trying to get at

18     is, it seems to me that -- what I got out of the papers -- was

19     it seemed to me the primary dispute -- and maybe I'm wrong about

20     this -- it seemed to me the primary dispute was that whether or

21     not you did have to prove, in order to meet the elements, that

22     the acetate buffer had some causative effect, not only causative

23     -- you're right, it's a product with lot of things -- has a

24     causative effect on the final product being within the

25     pharmaceutically acceptable range?

1     MR. SLATER:  And that I think that is the dispute.  You
2     stated Merck's position, which is we -- the claims can't mean
3     that we have to show it's the only causative effect.
4          That's the only thing that --
5          THE COURT:  So, but I guess what I'm saying is, it's
6     not the only causative effect.
7          In other words, there's three possibilities.
8          MR. SLATER:  Okay.
9          THE COURT:  It's the only causative effect, it has no
10    effect, it's one of a number of things that has the effect?
11         MR. SLATER:  And I apologize, if I'm slowing you up on
12    that.
13         It's the later of those three is what our position is.
14    It's one thing in the composition that effects pH.  It can't
15    mean to be the only thing that results in the final pH, because
16    there are other ingredients in the composition that would effect
17    the pH.
18         THE COURT:  So, at the end of the day, under your
19    construction, in order to prove that something infringes, you
20    would have to put on some testimony that would convince me that
21    the acetate buffer was having a causative effect.  Not the only
22    cause, but a causative effect achieving this final pH.
23         MR. SLATER:  That will have an effect.  It will effect
24    the pH such that the resulting pH is within the range, but not
25    that -- it's like the sole ingredient that achieves the pH,

1    because that would be scientifically not right.

2           THE COURT:  I tend to agree with you on the science,

3    but I haven't heard what Xellia has to say yet.

4           MR. SLATER:  I'll jump to the last slide.

5           THE COURT:  In any event, that's kind of what was on my

6    mind.

7           Go ahead.

8           MR. SLATER:  This is right on point.

9           So, this is example one of the patents, and I apologize

10   to you, because you can hardly read the image, but it shows you

11   that you add acetic acid.

12          So you have compound one that is already in there.

13   That's the caspofungin.  And you've added in sucrose and some

14   other things.

15          You add acetic acid in.  Now, remember, you started the

16   caspofungin which is at 6.6.  The acetic acid is going to bring

17   the pH down.

18          In the last step you add sodium hydroxide.  And it

19   says, QS to pH 5 to 6.2.  QS is the Latin basically for add as

20   much as you need to get up to the desired pH.

21          So, remember, it is the resulting pH that you are a

22   trying achieve.  And the pH can vary as you add components.

23          One of the things you create in the composition, when

24   you add acetic acid and sodium hydroxide, you create, in the

25   composition, the buffer.  That's not the buffer itself that you

1    are adding.  You're making it as you go along in the

2    composition.  And the resulting pH has to be a certain pH

3    according to the claim.

4         But the notion of saying, well, I'm now going to

5    separate out which ions in this water are actually the ones

6    responsible for the final pH.  That's all we're guarding

7    against.  It's the totality of the composition that achieves the

8    pH.

9         THE COURT:  But I don't think that -- you know, it's a

10   fine line here, because when you say, it's the totality of the

11   composition that attains the final pH.

12        Well, if the final pH is in the acceptable range, then,

13   duh, the totality of the composition has achieved the final pH,

14   right?

15        So, it doesn't matter whether the -- A, under that kind

16   of formulation it doesn't matter whether the acetate buffer is

17   doing anything at all.

18        MR. SLATER:  But scientifically it can't not do

19   anything, because it contributes to the pH.

20        THE COURT:  You know, you could imagine the situation

21   that you have, you know, five tons of caspofungin, and five tons

22   of whatever other excipients are floating around, and you have

23   one molecule of acetate buffer in this great, big mixture that

24   has no effect on anything at all, right?

25        It might as well not be there.  It's scientifically

1  negligible.

2      Would you say, then, that that was effective to achieve

3  the final pH?

4      MR. SLATER:  I think what you pinpointed, your Honor,

5  would be an infringement dispute right?

6      As to whether -- whoever is trying to prove that has

7  proven that the acetate buffer, in fact, contributes in any

8  meaningful way to the pH.

9      THE COURT:  Okay.

10     MR. SLATER:  If it is one molecule, and you get a group

11  of scientists to get together, and they all say, well, that's

12  basically a non-event.  You know, we're not contending that

13  that, you know, contributes.

14     What we're guarding against is the opposite end of the

15  spectrum, which is, you have a lot of acetate in there, right?

16     And you get the resulting pH, and you're able to

17  achieve a stable pharmaceutical product that you're going to

18  launch in competition with Merck, you have a technical legal

19  argument as well.

20     You need to prove to me that that, on its own, is the

21  only thing making it get to that pH.  That's all we're trying to

22  guard against.

23     THE COURT:  Well, that's a different kind of

24  infringement argument, isn't it?

25     MR. SLATER:  I think the problem with what we received

1   from Xellia was, it just wasn't -- it wasn't being crystal clear

2   on what level they're trying to say the acetate buffer does.

3         Are they trying to say, it's the only thing that causes

4   the final pH?

5         Because if they're saying it was, it can contribute to

6   the pH, then we're on the same page.

7         So we're bargaining against what I would consider an

8   extreme construction.  There has to be a direct causation where

9   we prove that the only thing that causes the pH is the buffer.

10        We think that doesn't make sense in the context of the

11  claim.  Or, for example, example one, because you already have

12  pH in the composition is you're adding these various components.

13  Then you would never be able to separate out what causes the pH.

14  Everything contributes to the pH.

15        THE COURT:  Okay.  All right.

16        Well, why don't you go ahead.

17        MR. SLATER:  So I'm going to flip it around a little

18  bit, your Honor, and on the presence versus adding acetate

19  buffer issue.

20        So, just -- just -- I think we touched this.

21        Now, what is an acetate buffer?

22        The specification talks about acetic acid plus sodium

23  acetate.  So acetic acid is the acid.  The sodium acetate is the

24  base.  The two components makeup the buffer.

25        The specification also tells you, well, you can make

1    the buffer in the composition, sort of in situ as it were.

2            And how do you do that?

3            You add acetic acid to --

4            THE COURT:  I'm sorry.  Going back to the basics.  I

5    don't think I actually need to know this to resolve this

6    dispute, but you never know.

7            The buffer is, in this sense, essentially just saying

8    something that makes it stable?

9            MR. SLATER:  A buffer is something that typically

10   resists pH change, right.

11           THE COURT:  But it's kind of like at the end goal for

12   something to make it stable, but scientifically it's more that

13   it causes pH not to vary too much?

14           MR. SLATER:  Right.  In this case -- actually, it's

15   interesting -- because, in this case, the stability, as Merck

16   explained to the Patent Office -- the stability of the buffer is

17   not working just because of a pH effect.

18           In other words, buffers have a range of capacity around

19   what is called a PKA.

20           So, if you a PKA of 4, typically you say the range of

21   buffer is roughly from a pH of 3 to 5.  Plus or minus 1 is the

22   rule of thumb.

23           Here the composition is at a pH that is actually

24   outside of acetate's PKA plus or minus 1 range.

25           So Merck explained to the Patent Office what the effect

1    of the acetate in the composition is, is something more than

2    just a pH effect.

3         So, the stability has to do with something actually

4    about the molecule acetate. It's unique to a molecule acetate

5    and it's not tied to its pH contribution.

6         This is one of the reasons why we don't think it makes

7    sense, your Honor, to tie the meaning of the claim, so literally

8    to what the acetate does in terms of pH, because how it's

9    actually working appears to be -- to do with some other property

10   of acetate, not to do with this pH effect.

11        That was argued extensively to the Patent Office and

12   that was the basis on which the Patent Office granted the

13   patent.

14        You know, the obviousness rejection was, if you want to

15   reach this pH, it's obvious to use any buffer, anything to get

16   you to that pH is obvious, right?

17        The response was, well, no, because this particular

18   buffer, acetate buffer, it doesn't even buffer very well at that

19   pH, so it can't be obvious to use that buffer.

20        By the way, the reason it's working, doesn't appear to

21   be driven by the pH effect. It's something else.

22        And Merck's witnesses had been asked in the prior case,

23   well, why does it work?

24        And Dr. Kaufmann, one of the lead inventors says, I

25   didn't know then, I still don't know now. We don't know why it

1  works.

2        The stability, to answer your point more directly, the

3  stability here is not just a pH effect, right?

4        PH is necessary.  Like there is a desired pH.  But the

5  acetate is contributing something more than just a pH effect.

6        THE COURT:  Okay.

7        MR. SLATER:  So the patent teaches you can make the

8  acetate buffer in situ.  And we've underlined a couple of words

9  here.

10        So, after you've added the acetic acid it says -- and

11  after you've added the base -- the sodium hydroxide -- the

12  specification says, the lyophil acetate thus produced

13  contains...  acetate buffer.

14        In other words, the acetic acid and the sodium

15  hydroxide, themselves, on the shelf, themselves, are not an

16  acetate buffer.  They create the acetate buffer when they're

17  added into the composition.

18        So the specification explains that.

19        The claim in suit is a rather straightforward

20  composition claim, right?

21        A pharmaceutical composition.  Element c), therefore,

22  merely requires the presence of an acetate buffer.

23        And the use of the compromising transitional phrase,

24  that means the claim is open-ended, your Honor, which means you

25  consider other things in there, right?

1        You can have other buffers in there.  There is no

2    exclusive language in the claim.

3        And the specification is consistent.

4        In fact, it says that what you need is the presence of

5    an acetate buffer, right?

6        It could have said, you need to add an acetate buffer,

7    right?

8        The key here is adding.  It says, it's the presence,

9    which is consistent with Merck's presence only construction.

10        The specification also backs up the compromising

11    language of the claim.

12        It says, the compositions are not limited to the active

13    acetate buffer and bulking agents.

14        So, it's clear that can have other components.

15        The prosecution history is consistent with the presence

16    only construction.

17        So the first excerpt, it says, the claims of the

18    present invention are drawn narrowly and specifically to a

19    particular compound contained in a particular pharmaceutical

20    composition.

21        It does not say there that the claims are directed to

22    the addition of acetate buffer.

23        And, similarly, the bottom quote, also from the

24    prosecution history, it says, that the compound -- 872, by the

25    way, your Honor, is caspofungin -- has been stabilized by

lyophilizing in an acetate buffer system.

It doesn't say that the stabilization has to do with how you add the acetate buffer.

That makes me turn to Xellia's arguments, your Honor.

They haven't offered a construction of the term "acetate buffer." They didn't say, here's what it means.

So I don't believe there's any dispute on what I said already on what it is. Rather, they focused on how the acetate buffer ended up in its composition.

So they first say that the acetate buffer has to be added. Then they talk about it like, where does it come from?

It has to be distinct from any acetate that would come from the salt.

So they have two arguments.

Both of those are, essentially, process limitations, which they're trying to read into a product or composition claim.

But patentees are entitled to claim a composition without respect to the way in which it's formed.

That's the Vanguard case, your Honor.

It says, a novel product that meets the criteria of patentability is not limited to the process by which it was made.

Claim 1 on its face, your Honor, says nothing about adding an acetate buffer.

1 　　　　And, in fact, there's a separate process claim in the
2 patent, Claim 7 -- in fact, there's also a product by process
3 claim, Claim 8.  Those are different types of claiming, your
4 Honor, than a composition claim.
5 　　　　And the Sanofi v. Sandoz case says, absence a clear
6 disavowal, you're not supposed to read the process into the
7 composition claim.
8 　　　　In that case, the claim was to an optically pure drug
9 called oxaliplatin.
10 　　　　And the defendant said, well, the only way disclosed in
11 the specification for achieving an optically pure drug is
12 through an HPLC process.
13 　　　　And the Judge read that into the claim and says it's
14 only if you use the HPLC process.
15 　　　　And the Federal Circuit said, no, that's to enable the
16 composition claim.  That tells you one way to do it.
17 　　　　But you don't restrict the composition claim and say,
18 therefore, now that's the only way you can do it.
19 　　　　That's the Sanofi/Sandoz case.
20 　　　　Xellia says that because there's these three
21 sub-phrases of Claim 1, a), b), c), they each have to be
22 separately present.
23 　　　　We agree that you have to meet a), b), and c).  We've
24 never argued, your Honor, that Element a), the salt on its own.
25 If you can't just have caspofungin diacetate in a beaker

1    dissolve.  We've never argued that that alone meets Element c).

2         And, in fact, the quotation makes clear that these are

3    our infringement contentions.

4         I'm not going to read out -- for confidentiality

5    reasons -- I'm not going to read out what they're doing, but

6    I'll read the last sentence, which says, thus, the acetate

7    buffer present in Xellia's product is not the result of

8    disassociation of caspofungin diacetate alone.

9         So we've never contended that this was all about salt

10   buffering or it's just the salt that can meet two elements.

11        That's like a red herring.  We've never argued that and

12   we're not arguing that.

13        If you adopt Xellia's construction, your Honor, that

14   have to add the buffer, you would read out what we discussed

15   earlier, which is adding acetic acid and sodium hydroxide to

16   form the buffer in situ.  You would be reading that out of the

17   claims.  That's the embodiment of how to make the invention.

18        You would have to say, no, that one doesn't count.  You

19   literally have to go to the shelf, to the acetate buffer bowl,

20   and add that.

21        Any other way that the buffer is created in the

22   composition doesn't count, but that would read out the way --

23   one of the ways that the patent talks about making it.

24        Similarly, Example 1 has the same thing where you add

25   the acetic acid followed by the sodium hydroxide.

1        So, again that's not adding a buffer.  That's creating

2   a buffer in the composition.

3        You would have to read that out as well under Xellia's

4   construction.

5        Xellia's points to one word in the specification, where

6   the applicant said they switched from a tartrate buffer to an

7   acetate buffer.

8        They use the word "switch," and they say, aha, that's a

9   concession that, you know, you've disclaimed, or you've given

10  up, or you're limiting yourself to adding an acetate buffer.

11       But, really, what the patentee was trying to explain

12  was, how they arrived at.  How did they deduce that it was the

13  acetate that was providing the beneficial effect?

14       So they had some examples, your Honor, where they have

15  an acetate salt and tartrate added.  And they have another set

16  of examples where they have acetate salt and acetate is added.

17       The tartrate examples, the ones containing some

18  tartrate, those, they said, were relatively stable.  The ones

19  where you remove the tartrate, and you only have acetate, the

20  patent says those were more stable.

21       Ergo, the deduction is, ah, I don't want tartrate,

22  right?

23       It's diminishing the effect.  I'm better off with all

24  acetate it, right?

25       But then Xellia's tries to make too much of that

1     statement.

2          They try to convert the statement into, ah, you're now

3     limited to only having acetate.  You must have only acetate.

4     You must only add acetate.  You can only have take it in your

5     composition.

6          But that doesn't make sense, your Honor, because all

7     the inventors are showing is that acetate s good and beneficial,

8     tartrate detracts.

9          That doesn't mean you can't have a composition that has

10    both, right?

11         You still have an acetate buffer, right?

12         If you have some tartrate, and you still have an

13    acetate buffer, you have an acetate buffer.  You need Element

14    c).  There's nothing in the claim that says that you can only

15    have acetate.

16         So they go too far in reading into that word.  They

17    also assume that the examples that talk about tartrate are not

18    part of the invention.

19         But the numbered examples of the patent, nowhere does

20    it say they're not part of the invention.  They're covered by

21    the claims.

22         So they're still reading in, I believe, too much into

23    one word in the specification.

24         I probably jumped ahead to this slide in what I said.

25         So, this the example.

1    Some of them talk about adding tartrate.  Some of them

2  talk about adding acetate.

3    And the quote on the right says, you know, that the

4  tartrate examples were relatively stable.

5    That doesn't mean they're not covered by the claims.

6  If they have an acetate buffer in there, they're still covered

7  by the claims.  And they do have acetate buffer in there.

8    So what happens is, your Honor, when you add tartrate

9  to caspofungin diacetate in solution, you get a mixture.  You

10  get some caspofungin tartrate.  You get some tartaric acid.  You

11  get some caspofungin acetate and some acetic acid.  And you have

12  sodium acetate and sodium tartrate.  You get all the species.

13    So the tartrate examples -- we seem to be getting

14  caught up.  If you call it a tartrate example, they're saying

15  that's an admission that you -- that the patent is limited to

16  all acetate.

17    That doesn't make sense.  What you're doing is

18  distinguishing what was the difference between the two examples.

19    So the one that is labeled "tartrate," are called

20  "tartrate," because that's the distinction.  But even the

21  tartrate examples have -- they will have in solution,

22  caspofungin acetate, they'll have sodium acetate, they will have

23  acetic acid, so they will have some acetate buffer.

24    They're not as good, because the tartrate detracts.  It

25  causes the buffer catalysis.  So it's not good to have a

1    tartrate in there.

2          But if you have an acetate buffer present, while not as

3    good as the all acetate examples, it is still covered.

4          Xellia's make the argument that --

5          THE COURT:  I'm not too concerned about this argument.

6          MR. SLATER:  Do you want to hear more, your Honor, on

7    the effect to provide --

8          THE COURT:  As far as I'm concerned, I'm ready to hear

9    from Xellia.  If they need to get a computer set up, let's take

10   a break.

11         Thank you Mr. Slater.

12         MR. WARD:  I'm hoping in five minutes or less.

13         THE COURT:  We'll be back in a few minutes.  Take your

14   time.

15         (A recess was taken from 10:04 o'clock a.m. until 10:10

16   o'clock a.m.)

17         THE COURT:  All right.

18         Please be seat.  I know the technical difficulties have

19   been repaired.

20         MR. WARD:  That's correct.

21         THE COURT:  All right.

22         You are Mr. Ward?

23         MR. WARD:  That's correct, your Honor.

24         THE COURT:  Okay.  I was going to say which one, but I

25   think I can actually deduce that one.

1       MR. WARD: That's an easy one.

2       THE COURT: You all are tricky.

3       Go ahead, Mr. Ward.

4       MR. WARD: I'm not trying to be confusing.

5       Thank you, your Honor.

6       I'm Jeff Ward on behalf of Xellia.

7       We can skip the first few slides. I think we know what

8  the issue is here.

9       But I do want to focus -- at least looking at that this

10  is what the claim says. And this is directed to your question,

11  I think, earlier about this effective to provide language.

12       The claim, Element c), specifically has in it a

13  pharmaceutically acceptable amount of an acetate buffer

14  effective to provide a pharmaceutically acceptable pH.

15       That claim could have been written in a different way.

16  It could have said an, acetate buffer, for example.

17       And somewhere else in the claim it says, wherein, the

18  composition has a pharmaceutically acceptable pH.

19       THE COURT: It could have been written that way. I'm

20  pretty sure that I've seen some other claims in some other

21  patents that have actually, in fact, been written that way.

22       MR. WARD: Right. So, there's a difference in the way

23  it's written. Here's it's written to tie together the amount of

24  acetate buffer to achieving its pharmaceutically acceptable pH,

25  which, in turn, as Mr. Slater talks about, gave this unexpected

1    surprising stability over other formulations.

2            So these are the proposed constructions.  You've seen

3    these before.

4            There's really two questions that need to be answered

5    with respect to the claim construction here.

6            The first one is, must the acetate buffer be added as a

7    separate and distinct component from the caspofungin diacetate

8    salt itself?

9            THE COURT:  By the way, I sort of tend to think the

10   answer to that is, no, but I'm going to listen to you.

11           MR. WARD:  Well, I hope I can convince you otherwise by

12   the end of it.

13           The second question is, must the acetate buffer be

14   present in an amount sufficient to provide a pharmaceutically

15   acceptable pH?

16           And it sounds like I may have an uphill battle, but I

17   submit that the answer is, yes, to both of these questions.

18           Now, as we'll see as I go through the presentations, I

19   believe Xellia's construction is confirmed by the claims, the

20   specification, the prosecution history, and also by the

21   positions they took in the Merck v. Sandoz case.

22           I know you're not interested in hearing it, but --

23           THE COURT:  Well, I'll listen to you.

24           At least the impression I got from the briefing was

25   that they didn't actually say anything that was inconsistent

1    with what they're saying now.

2        MR. WARD:  Well, we disagree with that, your Honor, and

3    I'll let you know, as we go through this.

4        THE COURT:  You know, sometimes -- and that's part of

5    the reason why you have these things -- when I do read the

6    briefs in advance, which I try to do, you know, you get

7    opinions, but sometimes they change the results with have

8    hearings like this.

9        MR. WARD:  Sure.  It's our position that their

10   positions taken then were inconsistent with what they are doing

11   now.

12        And the reason is that unlike this case, and the <u>Sandoz</u>

13   case, they were not confronted with a party that was designed

14   around the '300 patent by adding a different buffer to the

15   formulation.

16        So, if you look at the claims.  Start with the claim.

17   The claim has three separate elements.

18        Caspofungin, or its salts, an excipient in its acetate

19   buffer that has to be present in this amount effective to

20   provide a pharmaceutically acceptable pH.

21        This shows, just by the way the claim is written, that

22   the acetate buffer is something different from the caspofungin

23   diacetate, a molecule or active pharmaceutical ingredient.  And

24   it's different and it's separate.

25        And this is confirmed by the case law.  This was cited

1    in our brief where -- and what it was said was, where a claim

2    lists elements separately, the clear importation of that

3    language is that those elements are a distinct component to the

4    claimed invention.

5         THE COURT:  I didn't hear Mr. Slater disagree with you

6    on that.

7         MR. WARD:  Okay.

8         THE COURT:  I mean I don't disagree with you on that.

9         MR. WARD:  Okay.  Well, let me talk about the -- what

10   we think the implication of that is then.

11        What we think that this means, when these have separate

12   components, is that the acetate buffer cannot come from any

13   acetate ions that might disassociate or float away from the

14   caspofungin diacetate in solution.

15        THE COURT:  Well, do you agree with the basic premise

16   that in a composition claim, you know, you look at what you got,

17   and if you've got something where you've got some acetate

18   buffer, it doesn't really matter where it came from?

19        MR. WARD:  No.  Not in the common text of this claim,

20   because this claim talks about caspofungin salt.

21        That's one element.

22        It talks about this excipient that makes this beautiful

23   cake.  And it talks about an acceptable amount of acetate

24   buffer.

25        So, our point is, when you read this claim, that

1    acetate buffer is something different than that first element,

2    which is the caspofungin diacetate.

3              THE COURT:  Right.  But, in other words, if you've got

4    a product, a beautiful cake, and it's got some acetate buffer in

5    it, and it has some caspofungin -- whatever -- salt, you check

6    the box.  It's present.  And it doesn't really matter where it

7    came from.

8              That is, in fact, manufacturing a process type of

9    concern, right?

10             MR. WARD:  No.  We disagree.  We think the way this

11   claim is written, it is something separate.

12             And I think the specification --

13             THE COURT:  Well, let me just ask you to go back.

14             Wouldn't you characterize this is a composition claim?

15             MR. WARD:  Yes.

16             THE COURT:  Okay.

17             MR. WARD:  Yes, it is.

18             Now, the cases we've talked about, the Shire case, for

19   example, in that case, the claim recited, an inner hydrophilic

20   matrix and an outer hydrophilic matrix.

21             And the District Court said, those can be one and the

22   same.

23             The Federal Circuit said, no, those two are separate

24   elements in the claim.  They cannot be the same.

25             That's exactly what Merck is trying to do here.

1    They're trying to say that the acetate buffer is really the same

2    thing as the caspofungin diacetate.

3         THE COURT:  But that's -- and in the end, isn't that an

4    infringement issue?

5         I mean the way -- the thing that you've asked me to

6    construe here, doesn't really address that point, I don't think.

7         MR. WARD:  Well, I think it -- in our mind, this claim

8    construction obviously relates to infringement, because what we

9    are saying is, that to infringe Claim 1, you have to have a

10   certain amount of acetate buffer in there.  And that acetate

11   buffer cannot come from these acetate ions that may float off

12   the caspofungin and react to something else.

13        THE COURT:  You know, I guess when I say this is an

14   infringement issue -- and pardon me if I've got this case mixed

15   up with some other -- actually, I guess you're limited as to

16   what the infringement issues are, because you stipulated that

17   the first two elements are met?

18        MR. WARD:  Correct.

19        THE COURT:  Or maybe your stipulation is the only

20   element that is being challenged is the third one?

21        MR. WARD:  That's correct.

22        THE COURT:  Okay.

23        MR. WARD:  Let me go to the specificatio and I hope

24   this will clear things up here.

25        Now, in the specification, the specification talks

1    about that you can use different salts of caspofungin in the

2    invention just like the claim says.

3           In includes the acetic acid salt.  And that is what is

4    called out here.

5           What we're talking about, if we go to the next slide --

6    and this is, obviously, an illustration -- but the way you make

7    a caspofungin diacetate is you take caspofungin free base, you

8    dissolve it in something, you add acetic acid to it, and what

9    you get is a caspofungin diacetate product.  This drug

10   substantial.

11          And this drug substance, for every molecule of

12   caspofungin, has two molecules of acetate, so that's why it's

13   called caspofungin diacetate.

14          And what we're talking about, and what the

15   specification says, and what it talks about when it talks about

16   making and adding a buffer, or adding an acetic acid buffer, and

17   acetate buffer is, you start then with this caspofungin

18   diacetate API.  You add material to cause the buffer to form,

19   which is the materials that you add in the patent and the

20   examples are acetic acid and sodium hydroxide.

21          When you do that, you get your finished dosage form,

22   which has the caspofungin diacetate and an acetate buffer.

23          Now, notably, the specification does not say, when

24   you're using caspofungin diacetate, you don't need to add any

25   additional acetic acid, or do anything else.

1          You don't need to add an additional buffer.  It never

2     said that.  It never said, caspofungin diacetate alone is good

3     enough, just so you can throw some sodium hydroxide in there.

4          THE COURT:  Don't you agree that -- generally speaking,

5     in a composition claim, you just look at what you have, right?

6          It doesn't ask how you get there.

7          MR. WARD:  The buffer forms, because of what you've

8     done.  What you've done is, you've added things to the

9     composition that form the buffer.

10         And when you look at the examples here, and what they

11    are talking about in this case -- but the way the buffer is

12    formed every single time is they add -- they start with the

13    caspofungin diacetate.  They just don't add sodium hydroxide and

14    say, we have a buffer.  That's all we need to do.

15         What they do is, they take that caspofungin diacetate,

16    they add acetic acid, and they add sodium hydroxide, to make the

17    buffer, like it says in the specifications.  And that's what

18    they call the buffer.

19         They don't call the buffer something that could come

20    off from the caspofungin itself and reacts with the sodium

21    hydroxide.  And that's really shown as we go through this.

22         Now, if you look here, this talks about just a drug

23    substance itself.  And what the specification says is, it's

24    unstable, it's unstable in its free base form.  It's unstable

25    and in its salt form.

1    And, in fact, it's known in its salt form that

2    caspofungin diacetate, you have to store it at minus 70 degrees

3    celsius or it degrades.

4        So what does the specification say?

5        It says, well, when we took that unstable caspofungin

6    diacetate, and we put it in a formulation with a tartrate

7    buffer, it was more stable, relatively more stable than the

8    caspofungin diacetate by itself, but it still had a lot of

9    degradation.

10       So, that's not so good.  We've got to do something

11   better, if we want to have a product to sell.

12       So what did they do?

13       They switched to an acetate buffer.

14       And when you talk about this switching, that means that

15   they took away -- they did not use tartrate buffers.  Instead of

16   forming a tartrate buffer by adding tartaric acid and sodium

17   hydroxide, instead what they did was, they now took the

18   caspofungin diacetate, and they added acetic acid and sodium

19   hydroxide to add in the acetate buffer.

20       And that made the product of the invention.  That's the

21   product that is stable.  That's the product that is more stable

22   and surprisingly so.

23       And the switching term is important, because if you

24   remember -- we'll go through this.

25       When we talked about the tartrate formulations, and the

acetate formulations, both are going to add the same amount of caspofungin diacetate.

So it the ions from the diacetate that was causing the buffering effect. They should have added equal stability, but they didn't.

Now, as Mr. Slater said, there are a couple of ways to make the acetate buffer.

One way is sodium acetate and acetic acid. The other way is a acetic acid plus sodium hydroxide.

And, again, it says -- it doesn't say you don't need to do any of this if you start with caspofungin diacetate.

Now, let's look at the example. This is really where it talks about adding the acetate buffer, and it cannot come from the caspofungin diacetate.

So, you've got Example 1 here. And Example 1 has some ingredients in it.

And the first one is a called Compound 1. And these match up. These colors match up to the claim.

Compound 1 -- and everybody agrees about this -- is caspofungin diacetate.

And then we have these excipients that make the beautiful cake.

Then we have acetic acid and sodium hydroxide.

Those are added to a solution with the caspofungin diacetate in it and they form the acetate buffer.

1          And that's what you see in Examples 1 -- I think it's 3

2    -- or 1, 5, 7, and 8.

3          So you've got Examples 1, 5, 7, and 8 that have acetate

4    buffers in varying amounts.

5          And, again, what you see is -- this is, again, the

6    schematic.  This is what is happening.

7          In Examples 1, 5, 7, and 8, you take the caspofungin

8    diacetate molecule, you add this acetate buffer, again, which is

9    here adding the acetic acid and adding the sodium hydroxide, and

10   you get this final solution that has got the caspofungin

11   diacetate with the buffer around it.

12         Now, the examples also talk about using a different

13   buffer than acetate.  They talk a tartrate buffer.

14         Examples 2, 3, 4, and 6, as we see here, talk about the

15   tartrate buffers.

16         A tartrate buffer is made like an acetic buffer.  In

17   fact, you can make it by adding tartaric acid and sodium

18   hydroxide.

19         Now, what happens there?

20         So if you look at the bottom of our illustrative slide

21   here, what you have for the tartrate system, you have the same

22   amount of caspofungin diacetate that you had in the acetate

23   examples.

24         But this time you're adding a tartrate buffer.

25         And, so, you get the caspofungin diacetate with the

1    tartrate buffer.

2         And what the specification says is -- and what was

3    repeatedly communicated to the Patent Office -- is that this

4    formulation at the top was surprisingly more stable than the

5    formulation at the bottom.

6         And that tells us that the acetate buffer cannot come

7    from the caspofungin diacetate itself, because if it did, you

8    would have the same amount coming in each case.  One works and

9    the other doesn't.

10        And, at this point, I also want to say that Mr. Slater

11   said, our construction reads preferred embodiments out of the

12   claims, or out of the specification and out of the claims.

13        It doesn't do that.  The specification consistently

14   discusses how the acetate buffer is formed.  And every time it

15   says, it's formed by adding acetic acid and sodium hydroxide

16   together to the caspofungin diacetate or the caspofungin salt.

17        So we're not reading anything out.  We're not reading

18   out any presence by the construction that we're advocating.

19        Now, this switching point is -- that we talked about --

20   there was a switch from an acetate buffer to a tartrate buffer.

21        And that's important.

22        Merck now comes up with a new meaning for the word what

23   was switched.

24        They say the switching was really -- switching from a

25   combined acetate tartrate buffer, which would have been that

1   last one, from a mixed buffer system to an acetate only system.

2           The patent never talks about that.

3           The patent talks about tartrate buffer systems and

4   acetate buffer systems.  It doesn't talk about a mixed buffer

5   system.

6           The file history is the same.  It never talks about a

7   mixed system.  It talks about a tartrate system and an acetate

8   system, especially where the molecule that's in the system in

9   the API is the caspofungin diacetate.

10          Now, they also talked about that the invention is just

11  removing the tartrate.

12          There's nothing in the specification that says the

13  invention is removing the tartrate.  It is just not in there.

14          This is also made clear.

15          If you look at what one of their inventors, Dr. Hunke

16  said -- and this is a Declaration he made to the Columbian

17  Patent Office -- talking about his invention.  And he said --

18          THE COURT:  Columbian Patent Office?

19          MR. WARD:  Columbian Patent Office.  For some reason

20  they wanted a patent in Columbia.

21          He talked about the invention.

22          He said, only after a rigorous analyses of pH buffered

23  solutions, acetate, tartrate, et cetera, of caspofungin acetate.

24          So what he's talking about -- and, again, he's starting

25  with this caspofungin acetate, and then putting other buffers

1    into it.

2           Then he said, the acetate buffer compared to the others

3    provide unanticipated improved stability for caspofungin and

4    acetate.

5           This doesn't mention mixed buffers.  And it also means

6    that when you talk about switching, it means switching from one

7    buffer system with caspofungin diacetate to another system.

8           You can't have a switch if the acetate ions from the

9    caspofungin diacetate can solely provide the requisite amount of

10   the acetate buffer.

11          Now, to get to the "effective to provide" issue here,

12   we believe, and we believe the claims -- the clear language of

13   Element c) is, an amount of acetate buffer effective to provide.

14          And, as Merck has said, their construction allows for

15   any amount of acetate buffer, just so there's some in there, as

16   long as, at the end of day, your pharmaceutically acceptable pH

17   shows up somehow.

18          And we believe that is at odds with the customary

19   definition of what "effective to provide" means.

20          And, again, if I go back to the claim, the claim

21   language itself says "effective to provide."

22          They could have written it a different way and just

23   said "acetate buffer."

24          They didn't do that, so that's on them.  That shouldn't

25   be on us.

1          Now, the specification parrots the same language.

2          It says, the acetate buffer formulation includes an

3     amount of acetate effective to provide the pharmaceutically

4     acceptable pH.

5          It just doesn't say any amount.  It talks about adding

6     an amount that's effective to do something.

7          And when it does what it's supposed to do, you get

8     another benefit, which is stability.

9          Now, I'd like to talk about the Merck v. Sandoz case.

10         As we say, that was then and this is now.

11         If you are not inclined to go with this on judicial

12    estoppel, we do believe that the statements that were made in

13    that case are very strong evidence regarding what Merck really

14    thinks this really means.

15         THE COURT:  Well, what does it matter what Merck really

16    thinks?

17         MR. WARD:  It matters what Merck really thinks, because

18    they took the position in that case, that involved a claim

19    construction, that is completely opposite of the position

20    they're taking today.

21         THE COURT:  So, it's not the issue of, estoppel,

22    though.

23         What difference does it make?

24         MR. WARD:  It's almost an admission against interest,

25    or it's very strong extrinsic evidence as to what the claim

1    normally means.

2            THE COURT:  All right.

3            Go ahead.

4            MR. WARD:  I'll give it a shot.

5            In the Merck case, Merck filed for Summary Judgment of

6    nonobviousness.  In support of that, they filed the briefs,

7    papers, a Declaration of their expert, Dr. Byrn.

8            And here's some things that Dr. Byrn said in that

9    case.

10           He said that -- he said in Paragraph 100 -- what he's

11   saying there is, any acetate buffer in the system can't come

12   from the caspofungin diacetate, because that same amount would

13   be present from the tartrate buffer system, so it has to be from

14   somewhere else.

15           And if you go and look at 101, again, he talks directly

16   about what's the discovery, what's the invention here?

17           The invention here is taking a system that has a

18   caspofungin diacetate in it, which is unstable, and adding

19   acetate buffer, adding it by acetic acid and sodium hydroxide.

20           This added buffer is not something that can come from

21   the caspofungin, itself, that makes this product so great at

22   what it is.

23           He said some more things.  This is his deposition.

24           So he said, if your API is caspofungin diacetate, you

25   need to add an additional acetate buffer to meet that claim,

1 yes, you do.

2   This is their expert's interpretation of the claim in

3 the last case.  And this interpretation is relevant, because

4 they had to rely on this interpretation in making nonobviousness

5 arguments, so they could actually prevail.

6   THE COURT:  You know, it's a funny thing.  If they

7 submitted an expert Declaration as to what this meant in this

8 case, I wouldn't pay it any attention.  And you're arguing what

9 they submitted in some other case that I should pay it some

10 attention.

11   You know, and this is something where the Federal

12 Circuit says, in effect, expert Declarations are just about the

13 most worthless kind of evidence you could have on this.

14   And, so, you're saying they choose to use worthless

15 evidence and hold it against them.

16   MR. WARD:  Well, I guess the point would be this.

17   I think the Federal Circuit says expert Declarations

18 can be worthless evidence because people assume the experts are

19 paid, and they're going to be self-serving.

20   So, the interesting theory here is that the expert

21 Declarations in that case says exactly the opposite, so you

22 don't have to worry about the problem of a self-serving

23 Declaration.

24   THE COURT:  Well, no.  Actually self-serving is in the

25 context of they will say whatever it is to win that particular

1    case.

2                 MR. WARD:  Right.

3                 So that's the reason why they're unreliable.

4                 MR. WARD:  I understand, but I guess my point is that

5    they said one thing there to win that case.  Self-serving or

6    not, that's what they said.

7                 And now they're saying something else.  It is not --

8    it's not just Dr. Byrn.  There's another thing he said.  Again,

9    you need all three components.

10                And Merck said the same thing.  And Merck echoed this.

11   This is the thing that Merck said to get Summary Judgment

12   victory in the last case.

13                Now, they said, in that case, that their claims were

14   nonobviousness, because there was no reason why a person of

15   ordinary skill in the art would have thought of adding an

16   acetate buffer, and adding acetate in the form of buffer would

17   improve stability.

18                Now they're walking away from that.  They're just

19   saying, there's no need to add any acetate buffer.  You can just

20   have it the caspofungin diacetate may dissolve, may

21   disassociate, and combine with some sodium hydroxide.

22                That's exactly the opposite of what they said in the

23   last case.

24                THE COURT:  Well, I don't actually see that when you

25   put that up there.

1          On the left-hand side you have something that Merck, or

2   some other representative of Merck is saying, which presumably

3   has to do with an invalidity argument.

4          MR. WARD:  Right.

5          THE COURT:  And what you've got on the right-hand side

6   is them just saying, here's what we need to meet Claim 1.

7          I don't understand how they're talking about the same

8   thing, let alone the conflicted.

9          MR. WARD:  You're talking -- when you're talking about

10  obvious, so they're saying our patent -- our claim is

11  nonobviousness, because nobody would have ever thought to add an

12  additional buffer, an additional acetate buffer to a formulation

13  containing caspofungin diacetate.  So, in making an obviousness

14  determination, you have to have a claim construction.

15         So, instead what they're saying is, our claim is

16  construed to require adding additional acetate buffer, and it's

17  non-nonobviousness, because no one would have thought to do

18  that.

19         That's what they're saying.  That's why it's relevant.

20  When you have obviousness, you have to have claim construction

21  behind it.

22         THE COURT:  So, what you're saying is, on the left-hand

23  side, taking the implied claim construction -- you know, I can't

24  even -- I don't understand your argument.

25         MR. WARD:  What I'm trying to say is that they told

1    that, or they told the Court in the <u>Merck</u> case, the <u>Merck/Sandoz</u>

2    case, that their claim was nonobviousness, because nobody would

3    have thought to add additional acetate buffer to caspofungin

4    diacetate.

5    So, in saying that, what they're saying is, what our

6    claim covers, what our claim is, is adding additional acetate to

7    a system that contains caspofungin diacetate.

8    THE COURT:  Well, isn't that -- you know, as Mr. Slater

9    said, they have a process claim, they have a product by process

10    claim -- isn't that saying, essentially, what is embodied in

11    Claim 7 or 8, of whichever one it is, that's what they're

12    talking about right there?

13    That doesn't mean -- if that's what they're talking

14    about right there -- that doesn't mean that's how you would

15    interpret Claim 1?

16    MR. WARD:  My understanding, your Honor, this is was

17    said with respect to Claim 1.

18    THE COURT:  All right.

19    MR. WARD:  Now, the other thing they said, in support

20    of their case is, they said it's because nobody would have

21    thought to add acetate buffers.

22    They said that, none of the lyophilized products in the

23    Physician's Desk Reference contain an acetate buffer.

24    Now, in our case, we pointed out here that there's a

25    product called Careff (phonetic) that has an acetate

1    counter-ion, just like caspofungin diacetate.

2         So, that means that really when they said none in the

3    last case, they weren't counting products that have acetate

4    counter-ions as having an acetate buffer.

5         So, now, instead, they back away from the non, and just

6    say, well, they're rare.

7         So, again, they're changing the story.

8         Now, the other issue is here.

9         They also said that their patent was nonobviousness

10   because Sandoz tried to design around by substituting other

11   buffers to the acetate buffer.

12        And what they say in their brief is, well, you really

13   don't know what Sandoz tried to do, because you don't have

14   access to their confidential information.

15        That's not relevant, your Honor.

16        What is relevant is what they said.

17        And what they said is, that Sandoz tried to substitute

18   our buffers for the acetate buffer.

19        And since the Sandoz product has a caspofungin

20   diacetate in it, the only way that that could be done is by

21   adding a different buffer in.

22        Again, that shows that their product, or their claim

23   talks about adding a buffer.  The acetate buffer that is in the

24   claim in an effective amount comes from putting those

25   ingredients into the composition and not from this caspofungin

1    diacetate.

2            So, now, what they're trying to say is -- and this is

3    the point they're trying to say now -- that those tartrate --

4    those tartrate formulations are included in the claims.  They're

5    not as good as the acetate buffer.

6            That can't be correct, your Honor, because, if

7    remember, the way they got the patent was by saying that the

8    acetate buffer system was unexpectedly better than the tartrate

9    system.

10           And you can't have an unexpected results case by

11   saying, this thing that's in my claim is unexpectedly better

12   than this thing in my claim.  It's always about this thing that

13   I claim is better than something else that I'm not claiming.

14           So, when they say now that these are covered, it shows

15   that that just can't be corrected, because it's directly

16   rebutted by the arguments they make.  They just can't do that.

17           Now, in the other case, your Honor, they also talk

18   about in the final Pretrial Order what is effective to provide

19   languages, and they put it directly in the claim when they told

20   the Court what they were going to show what Claim 1 would mean.

21           Now they're going to --

22           THE COURT:  That is just the language of the -- oh,

23   wait, it's not reconstitution.

24           So what is your point here?

25           MR. WARD:  My point here is, when they talked about

1    this claim in the last case, what they did is, they had this

2    effective provided language in here, and what they're doing now

3    is, they're trying to read that out.

4          THE COURT:  But, I mean, that is the language of the

5    claim --

6          MR. WARD:  Right.

7          THE COURT:  -- you bolded the actual claim language?

8          MR. WARD:  That's right.

9          THE COURT:  So they were, I guess, going for the plain

10   and ordinary meaning the last time around?

11         MR. WARD:  They're doing something different now, your

12   Honor.

13         THE COURT:  Well, but you don't think that this

14   actually the plain and ordinary meaning?

15         MR. WARD:  No, we do.  We think that --

16         THE COURT:  Let me rephrase that.

17         Subsection c), or limitation c), you think that has the

18   plain and ordinary meaning?

19         MR. WARD:  Effective to provide the part?  Yes.

20         THE COURT:  Okay.

21         MR. WARD:  And the acetate buffer, when you ride this,

22   yes, I think it does.  When you look at the claim, it's talking

23   about something separate from the caspofungin diacetate.

24         THE COURT:  Well, hold on.

25         Mr. Slater, do you also think it has the plain and

1     ordinary meaning?

2        MR. SLATER:  I think to a person of ordinary skill,

3     they would understand when they read that claim, it's talking

4     about the final pH, your Honor, yes.

5        THE COURT:  Okay.  So, basically, both agree that the

6     plain and ordinary meaning of a person of ordinary skill.

7        You just have some different ideas about what that is?

8        MR. WARD:  Well, I'm not -- I guess -- let me step

9     back.

10        I think what we're saying is, the effect it's providing

11     is the customary meaning.  We say that's what it is.

12        When we're talking about this acetate buffer, I don't

13     know whether we're talking about plain or ordinary meaning.

14        What we're saying is, when you look at the claim

15     structure and --

16        THE COURT:  I'm not construing acetate buffer, right?

17     Right?

18        MR. WARD:  We're asking you to.  We're asking you to

19     construe that element in the sense that we're -- we're not --

20     not what an acetate buffer is.  We're asking you to say that it

21     can't come solely from any diacetate that might come from the

22     caspofungin diacetate itself.

23        THE COURT:  You're not asking me to construe what it

24     is, you're just asking me to construe things about it?

25        MR. WARD:  Yes.

1          THE COURT:  Okay.

2          MR. WARD:  Fair enough.

3          THE COURT:  I hadn't actually been thinking about it.

4          MR. WARD:  That's really all I have, your Honor.

5          THE COURT:  Hold on just a minute.

6          Okay.  Just in case.

7          MR. WARD:  No, I never want to miss a good -- a good

8   comment.

9          But thank you.

10          THE COURT:  All right.

11          Thank you, Mr. Ward.

12          Mr. Slater?

13          MR. SLATER:  Just a couple brief points, your Honor,

14   because I think I covered most of my original presentation.

15          On this issue of, you know, when you add the acetic

16   acid and the sodium hydroxide, to I think what I'm hearing now

17   is that Merck, or the claim should be limited to that particular

18   way of forming an acetate buffer in situ.

19          But you have to enable your patent, your Honor.  You

20   have to show how to practice the invention.  You can't convert

21   an enablement into a limitation of the claim.

22          So, because Merck thought of a way to form the buffer

23   in situ, that doesn't mean that Merck's claim needs to be

24   limited to that particular way.

25          You're entitled to claim your invention as broadly as

1  you've written, right?

2          If there's a validity challenge, because it's too

3  broad, you bring a validity challenge.  They never did.

4          But you're entitled to the scope of the claim as

5  written.

6          It's not proper to then say, because one way to form a

7  buffer in situ is to add acetic acid, followed by sodium

8  hydroxide, that that's all the claim means.  That's going to

9  have -- and there was no clear disavowal of other ways to form

10  an acetate buffer in situ.

11          THE COURT:  Yes, I don't have the impression that we're

12  talking about this disavowal here, when both sides are,

13  essentially -- well, I don't have anything else to add to that.

14          MR. SLATER:  Maybe I should say it another way.

15          In order to reach the result that Xellia's is seeking,

16  they would have to be arguing disavowal.  And because they're

17  not, and because they couldn't meet that standard of being a

18  clear disavowal, then I don't think it's proper to read into the

19  claim the process limitation.

20          So I'm not suggesting they've argued disavowal.  In

21  fact, you'll notice they didn't, and they don't cite a disavowal

22  case, and that's because I believe they don't -- they realize

23  they can't reach that threshold.

24          So they're trying to argue it a different way.  But

25  that isn't the standard, if you want to say that we've given up

1    all other ways of forming a buffer.

2         I heard --  I hopefully didn't mishear it -- but I

3    think I heard Mr. Ward say that in the Sandoz case Merck took a

4    claim construction that was completely opposite, but Claim C was

5    never even construed in that case.

6         THE COURT:  I think, actually -- at least as I

7    understand your position -- and, actually, I should say Merck's

8    position -- were you actually counsel in this other case?

9         MR. SLATER:  I was, your.

10        THE COURT:  Your position was, that it was the plain

11   and ordinary meaning.  And I believe your position today is,

12   plain and ordinary meaning.

13        You're trying to give me some help with your

14   construction.  And I have -- I'm less than convinced that your

15   construction actually is a plain and ordinary meaning, but

16   that's -- but I don't actually sense any difference in what

17   you're arguing.

18        I mean I think you are actually arguing the plain and

19   ordinary meaning.  I just think that your construction is,

20   perhaps, broader than what actually goes with the plain and

21   ordinary meaning.

22        But, in any event, I don't see a problem of

23   consistency.

24        MR. SLATER:  Right.  Basically, your Honor, the quote

25   that was up earlier, and I can't find it now, it was basically

1  the quote of the claim language, and that's what we had as part

2  of our construction in the last case.

3       THE COURT:  I saw that.  You said that in the brief.

4       MR. SLATER:  It says "effective to provide."

5       So I don't know how we could be inconsistent in now

6  construing "effective to provide."  I just I don't see that.

7       THE COURT:  Well, even now I'm pretty sure, because of

8  the lack of a better word, the rolling claim construction

9  theory, the parties really are never actually bound to one

10  construction as they learn stuff, and they have a different

11  construction.

12       Maybe it's a bad thing that if you win one case with

13  Construction A and then try to win the next case with

14  construction with not A, but that's not what's happening here.

15       MR. SLATER:  Your Honor, I don't want to belabor the

16  issue of statements in the other case, but I do want to -- I

17  picked this one as an example, your Honor.

18       So this was one of Dr. Bryn's questions put to him.

19       The question was, "You need to additional acetate

20  buffer to meet that claim?

21       And if you look, and actually read the answer with some

22  care, he says -- he says -- "the patent, it talks about adding a

23  buffer."

24       And then he stops himself.

25       "Or that it contains, that the composition contains a

1    buffer."

2         So, is that inconsistent with Merck's position today?

3         No.  We're saying that as long as the composition

4    contains the acetate buffer, the element is met.  So that is

5    actually entirely consistent.

6         And then the bolded part, which I assume is the point

7    of putting this up, "an additional buffer."

8         Well, the question said, "additional acetate buffer."

9         And Mr. Ward said that Bryn testified that it had to be

10   an additional acetate buffer, but, of course, he didn't actually

11   say that.

12        So he said "an additional buffer."

13        He didn't say "an additional acetate buffer."

14        So, if you take the tartrate examples, where you add

15   tartrate, we're contending, and the patent shows that these are

16   examples of the invention, you have also acetate buffer in

17   there.  That would be an example of a additional buffer.

18        So, there's nothing inconsistent even with this quote

19   from what we're saying today.

20        But to the larger point, your Honor, trying to parse

21   what somebody said in another case, when the issues presented

22   were entirely different.  And then looking for these like sound

23   bytes and saying, aha, you used the word "additional,"

24   therefore, the claim really must be limited to additional

25   acetate is beyond the stretch, I would submit.

1          I think I'm probably done, your Honor.

2          THE COURT:  All right.

3          Thank you, Mr. Slater.

4          MR. WARD:  May I add a couple of sur-rebuttal points?

5          THE COURT:  Sure.

6          MR. WARD:  You don't seem very excited about it, but

7     I'm --

8          THE COURT:  No, no, no.  The Delaware lawyers know I

9     say "sure" a lot.

10          MR. WARD:  A lot of people are not excited when I --

11          THE COURT:  No.  It's my way of saying yes.

12          MR. WARD:  We're not saying that the claim is limited

13     to making the acetate buffer using an acetic acid and sodium

14     hydroxide.

15          We're saying that this acetate buffer can't come from

16     the caspofungin diacetate, because there are acetate ions that

17     may float off.

18          And, so, the "effective to provide" language means that

19     it doesn't include any amount of buffer, because it's

20     potentially formed coming from the caspofungin diacetate.

21          You have to have additional components in there that

22     make that buffer, whether it's the acetate -- the acetic acid

23     and the sodium hydroxide, or the sodium hydroxide, or the acetic

24     acid and the sodium acetate.  You have to have something in

25     there.

1          Again, your Honor, with this discussion now that the

2     tartrate examples are within the claim.

3          I would just say, again --

4          THE COURT:  Can you just go back to that slide with the

5     upper and lower mixture making the acetate buffer?

6          MR. WARD:  Sure.  This one?

7          THE COURT:  Right.  So, in the top one, the acetate

8     buffer, with all these little red dots floating around the

9     caspofungin diacetate, right?

10         MR. WARD:  Yes.

11         THE COURT:  And in the bottom one you have a tartrate

12    buffer?

13         MR. WARD:  Yes.  And what the patent says, and what

14    they told the Patent Office was, that this bottom one, the

15    tartrate system was not as stable as the top system, the acetate

16    system.  And, in fact, the acetate system was unexpectedly

17    better than the tartrate system.

18         And that tells you, again, that the tartrate system

19    can't be included in the claims, because you can't say that that

20    is something unexpected.

21         THE COURT:  Well, so, if you have the acetate buffer,

22    is there some chemical reason or something that you can't have

23    some tartrate buffer, too; in other words, a mixed buffer?

24         MR. WARD:  The patent doesn't talk about having a mixed

25    buffer.  It talks about --

1       THE COURT:  No, no.  I'm just thinking.

2       You've got a claim that says "comprises."

3       MR. WARD:  Right.

4       THE COURT:  So, comprises an acetate buffer if it

5  has -- if the part of the acetate buffer that's there, is good

6  enough to do what the patent is trying to accomplish in its

7  comprising claim, and there is no particular chemical reason why

8  you can't have both the acetate buffer and a tartrate buffer --

9  and I mean would be interested in knowing if there was a

10 chemical reason why you couldn't, because otherwise -- I guess

11 what's wrong with the theory, when you say something comprises

12 an acetate buffer, that it's not just a hundred percent an

13 acetate buffer.

14      MR. WARD:  The only thing they've ever had in their

15 examples, when they talk about an acetate buffer, and when they

16 talk about it in the specifications as a 100 percent acetate

17 buffer, they never talked about a mixed.

18      THE COURT:  Since it's a comprising claim, the fact

19 that they have some spare stuff floating around, that's okay,

20 right?

21      MR. WARD:  In a comprising claim, you can have other

22 things, but you still have to have the acetate buffer doing what

23 it's supposed to do in the claim, which is being there in an

24 amount effective to provide the pharmaceutically acceptable pH,

25 which, in turn, gives this unexpected stability.

1          THE COURT:  But there's nothing then that says the

2     acetate buffer has to be a hundred percent of the buffer?

3          MR. WARD:  It's a comprising claim, I agree, so there

4     can be other things in there.  Theoretically, I guess you could

5     try to add a tartrate buffer.

6          But what the patent tells you is, it never talks about

7     a system like that.  You have to have a system to be covered by

8     this claim, where the acetate buffer is there in a sufficient

9     amount, and in an effective amount, that it will provide a

10    pharmaceutically acceptable pH.

11         THE COURT:  But there's nothing about having it there

12    in an efficient or effective amount, means it's the only kind of

13    buffer that's there?

14         MR. WARD:  Right.

15         MR. WARD:  But it still has to be doing -- it has to be

16    there in its amount to do what it needs to do.  It can't come

17    from the caspofungin diacetate salt.

18         The lesson -- the lesson in these examples is that the

19    acetate buffer doesn't come from the caspofungin diacetate.

20         It comes from putting something in the solution.  And

21    the thing you put in is the things that makes the acetate

22    buffer.

23         And what we're trying to say, and what Merck is now

24    trying to say is, this part with the acetate buffer, you don't

25    need to have that.  Instead, all you need to do is, you take

1   take caspofungin diacetate, and then what you do is, you put in

2   some sodium hydroxide, and that's it, voila, you've made this

3   acetate buffer.

4        THE COURT:  Well, so, if you have your little diagram,

5   and you had a third line that says that caspofungin diacetate,

6   and it chose plus sodium hydroxide, I'm wondering what the third

7   product would look like?

8        MR. WARD:  I don't know.  I think that is a matter for

9   expert testimony, but I do think the patent says that that type

10   of product is not covered by this claim.

11        THE COURT:  Well, I guess that sort of depends, because

12   if you -- let's say, for example, you took the caspofungin

13   diacetate, and you threw in mystery ingredients, and you've got

14   something that had caspofungin diacetate surrounded by a few,

15   but not as many red diacetates, wouldn't that be an acetate

16   buffer?

17        MR. WARD:  I think you still have to talk about the

18   amount.  I mean there could be an acetate buffer formed with

19   some mystery ingredients in there, but what the patent talks

20   about always is adding some amount of acetate buffer.  You

21   always have to add an acetate buffer to this caspofungin

22   diacetate, whether or not you have any other mystery ingredients

23   in.

24        What you have to do is, you have to add it, you have to

25   make it, and you have to put it in there.  Otherwise, is it's

1    not covered.

2            That is what they told the Patent Office and that's

3    what they told everybody in their patent.

4            They never talked about, yes, you could mix a tartrate

5    system with an acetate system.

6            They have consistently said that you have to add in the

7    acetate and it has to be there in a sufficient amount.  And if

8    it's not, you don't get a good product.

9            Even if you are inclined to give credit to the story

10   that, well, the invention is really the removal the tartrate.

11   That's what made it a good product.

12           That's not right.  What made a good product was

13   removing the tartrate and putting the acetate in.

14           THE COURT:  Okay.

15           MR. WARD:  Thank you.

16           Well, I'll say one more thing.

17           THE COURT:  Okay.

18           MR. WARD:  Just to bring this back, your Honor.  Our

19   point is that the effective amount in the claim cannot come --

20   the effective amount of acetate buffer cannot come from any of

21   these acetate ions that might float off the caspofungin

22   diacetate.  That's it.

23           THE COURT:  Okay.  Thank you.

24           All right.

25           I told you that I would get you a decision by December

1    31st.

2              Is that what I told you?

3              MR. SLATER:  I believe you said early January, your

4    Honor.

5              THE COURT:  Oh, okay.

6              MR. SLATER:  Then you said, why do I keep ago saying

7    that on the transcript.

8              THE COURT:  You know, I did read the briefing

9    beforehand and thought about it, and I have appreciated the

10   arguments this morning.

11             And, you know, I think in a nutshell it's extremely

12   likely that when I produce a written Order, or a written

13   something or other, that I'm going to say that the claim term

14   that you've asked me to construe, "a pharmaceutically acceptable

15   amount of acetate buffer effective to provide a pharmaceutically

16   acceptable pH" has its plain and ordinary meaning.

17             And I don't think that the wording on Merck's proposed

18   construction captures exactly what I think the plain and

19   ordinary meaning of "effective to provide" is here.

20             I think there's a requirement, which I thought Mr.

21   Slater, more or less, agreed to when he was talking, and

22   certainly something that Xellia's has been seeking is that

23   there's some causative relationship.  I think that's what the

24   "effective to provide" means in this context.

25             And I also take -- it just makes common sense to me,

1    Mr. Slater's statement that the pH of a composition is a product

2    of everything that's in it.

3          I think it does boil down to eventually being an

4    infringement question of whether the -- assuming that there is

5    an acetate buffer in the Xellia product -- whether the amount of

6    that acetate buffer is effective to provide a pharmaceutically

7    acceptable pH.

8          And I think that, as I said, is an infringement

9    question, and I think that's, at least from my point of view, I

10    understand the other parties may have for other reasons.

11          There may be other things that you are concentrating

12    on, in terms of what you're getting out of your experts, in

13    terms of what I see as the decision that I'm going to have to

14    make eventually, based on the presumption which, of course,

15    there is no evidence of.

16          But I'm assuming, from the way you are arguing things,

17    that an analysis of Xellia's product will show an acetate buffer

18    in it.  And that it will show that it how -- maybe the ANDA

19    claims -- you know, it has a pH in the acceptable range in the

20    tablet form, or whatever form we're talking about here, but that

21    checking those two boxes is not going to prove Merck's case.

22          Merck's going to have to prove something else about the

23    contribution of the acetate buffer to that final acceptable --

24    pharmaceutically acceptable pH.

25          I'm not exactly sure what that -- what kind of

1    contribution is going to be enough for me to say that it's

2    effective to provide, but based on the hypothetical that I gave,

3    which Mr. Slater responded to, you know, essentially, one

4    molecule of acetate buffer in a great big thing.

5         He's saying that's an infringement question -- is

6    whether that's effective to provide -- maybe that's an

7    infringement question.  I have no doubt that that is no amount

8    of expert testimony could prove to me that one molecule in the

9    composition is effective to provide the acceptable pH.

10        So, you know, I don't normally -- obviously, when I'm

11   talking about construing a term, talk about the infringement,

12   though, in the ANDA case where I'm the fact finder.

13        I'm not entirely sure that it's as productive in a case

14   where the jury is the fact finder for me to lock myself into a

15   set of words, the consequences of which I don't fully

16   understand, which is the reason why I've been putting on the

17   record, you know, my general thinking about what I see as the

18   dispute here.

19        I would also say -- so I'm not going to adopt Merck's

20   proposed construction, because I think does tend to suggest, or

21   to downplay the "effective to provide" language that's in the

22   limitation.

23        I'm note sure whether I'm actually going to come up

24   with some other language to try to capture what I've just said.

25   I would say, in terms of Xellia's -- is it Xellia or Zellia

1    (phonetic)?

2           MR. WARD:  Xellia.

3           THE COURT:  Xellia.

4           In terms of Xellia's proposed construction, I think

5    that, essentially, their first component, or their first

6    construction -- constructive part, quote, "that is added to a

7    composition in a separate component to provide," unquote.

8           Essentially, is trying to say, adding the process into

9    a composition claim, and I don't think that's appropriate.

10          And the second part, quote, "which is distinct from

11   acetate that may be present due to disassociation of the

12   caspofungin salt of Element a)," unquote, is something where --

13   is essentially a -- is also trying to read -- no, not trying --

14   it is reading part of the process into the composition claim.

15          I don't think it matters how you get what is actually

16   in the composition, in terms of whether or not there's

17   infringement or not.  There are process claims in this patent,

18   so I think the inventors or patentee claimed a composition

19   claim.  And I think you just look at the products you have and

20   it either does or does not meet the limitations.

21          So that's the reason why I think Xellia's proposed

22   construction is not correct.

23          I don't think I have anything more, myself, right now,

24   but because of the holidays, I'm not actually sure when I might

25   get something out in writing.  I wanted to, basically, because I

1    do recognize that time is short, and I hope -- I hope -- hold on

2    a second.

3            Could you excuse me for one moment?

4            (Pause)

5            So, you know, I'm pretty sure that this is going to be

6    my decision, so to the extent you need to get moving based on

7    the construction, you have it, okay?

8            Anything else I can do for you while I'm here, Mr.

9    Slater?

10           MR. SLATER:  Nothing from our perspective, your Honor.

11           THE COURT:  Mr. Ward?

12           MR. WARD:  No, your Honor.

13           THE COURT:  I would just say, as I've kind of

14   indicated, that in terms of the argument that Mr. Merck took

15   inconsistent positions in the prior litigation, I think their

16   claim construction position is the same.

17           The implications of some of their nonobviousness

18   position is a stretch.  And to the extent that Dr. Byrn, in

19   particular, testified to various things, I'm not convinced from

20   -- and I do recognize in the briefing that Merck was backing

21   away from a couple of things that he said.

22           But I don't think that every single thing that your

23   expert says is now a judicial admission, or, you know, something

24   else that binds -- binds the party who called the expert, to it

25   -- to what was said, which is the reason why -- which is part of

1   the reason why I'm not really convinced by Xellia that they've

2   shown, essentially, any inconsistency that matters in the prior

3   litigation, all right?

4           So, if there's nothing further from you, nothing

5   further from me, thank you all for coming.

6                Have a nice holiday.

7                I'll see you -- remind when is this case is scheduled

8   for trial?

9                MR. BLUMENFELD:  June 29th, your Honor.

10               THE COURT:  Okay.  I'll probably see you for a Pretrial

11   Conference before then, but I guess there is no reason why I'm

12   not going to see you before then; is that right?

13               MR. SLATER:  I believe that's correct, your Honor.

14               THE COURT:  Okay.  All right.

15               (All counsel responded "Thank you, your Honor.")

16               (The proceedings adjourned at 11:07 o'clock a.m.)

17                        *  *  *  *

18

19

20

21

22

23

24

25